## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

        Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

        Defendant.

---

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Plaintiff, by and through the undersigned, hereby submits *Plaintiff's Motion for Partial Summary Judgment*. As there are no disputed issues of material fact between the Parties with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; or (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff respectfully requests the Court grant this Motion in its entirety.

### I.      INTRODUCTION

Prior to filing this Motion, Plaintiff carefully examined the factual record developed in discovery and endeavored to request summary judgment on a narrow set of issues where the material facts necessary for the Court to issue a ruling are genuinely undisputed. Plaintiff in this matter, Rebecca Brigham, was a Flight Attendant for Defendant Frontier Airlines, Inc. for just

over eight (8) years, starting in May 2007 and ending with her termination in November 2015. Ms. Brigham thoroughly enjoyed her position with Defendant, incorporated the position of Flight Attendant into her identity, and importantly, was able to support her family on the good and stable income the job provided. In the background, Ms. Brigham struggled with alcoholism from her teenage years into adulthood.

A couple of years into her tenure with Frontier, Ms. Brigham suffered a tragic situation: her daughter passed away just 45 minutes after birth. This event greatly exacerbated Ms. Brigham's alcoholism, and while she never let her drinking affect her job performance, her condition did take a toll on her family, marriage, and general health. As a result, and because she was on the verge of losing all that she cared for, Ms. Brigham checked herself into an in-patient rehab program to treat her alcoholism in late 2014. At the same time, Ms. Brigham self-disclosed her alcoholism to Frontier through its self-disclosure program. While Ms. Brigham's treatment has been a great success, she has not touched alcohol since completing her treatment program, Defendant Frontier never treated her the same again.

Defendant refused to grant Ms. Brigham any reasonable workplace accommodations as dictated by her alcohol treatment plant despite *simultaneously requiring* her compliance with the same treatment plan under threat of termination. Unable to complete her essential job functions without reasonable accommodation and stuck with the unreasonable choice between maintaining a job or foregoing alcohol treatment, Ms. Brigham chose to prioritize her health and well-being while attempting to maintain all scheduled shifts with Defendant. Unfortunately, and predictably given that Ms. Brigham's treatment plan required her to avoid overnight shifts, Ms. Brigham accrued enough absences under Frontier's "dependability program" to suffer termination.

Frontier's failure to accommodate Ms. Brigham's repeated requests for accommodation, its retaliation against her for requesting accommodations, its failure to meaningfully engage in the interactive process, and its discriminatory treatment, were all in violation of the ADA; and therefore, the instant lawsuit was filed (after Ms. Brigham obtained a positive determination from EEOC).

In this Motion, Ms. Brigham seeks partial summary judgment with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation.

## II.      MOVANT'S STATEMENT OF MATERIAL FACTS

1.      Plaintiff Rebecca Brigham started working for Defendant as a flight attendant in May 2007. Dkt. 1, Complaint and Jury Demand, at 1, ¶ 1; Dkt. 12, Answer and Defenses, at 1, ¶ 1.

2.      Throughout her tenure Ms. Brigham was an excellent performer, and up until she disclosed her disability, she incurred no serious performance or disciplinary issues. **Exhibit 1**, Deposition of Gerardo Arellano, at 6:8-11 ("Q. . . . [C]an you state your current position at Frontier, generally what you do? A. So senior manager of talent acquisition, employee relations."); Ex. 1 at 8:21-24 ("And at that time [referring to 2008 through 2010], did you – were – were you ever aware of any performance issues with regard to Ms. Brigham? A. Not that I recall, no."); **Exhibit 2,**[1]

---

[1] Plaintiff notes that this Exhibit 2 contains names of certain Frontier employees with brief discussion of the nature of disabilities. While Defendant failed to mark any part of this deposition transcript as "Confidential" pursuant to the Protective Order [Dkt. 26] entered in this case, Plaintiff has, to the best of her ability, redacted names of certain Frontier employees for privacy. In so

Deposition of Frontier Airlines, Inc. [Gerardo Arellano designated as 30(b)(6) deponent] at 177:17-179:8 (wherein Mr. Arellano admits that managers "have the best information on [] employee's performance" when being questioned on Plaintiff's evaluation in which her manager stated: "Rebecca has two very nice kudos letters in her file and her IOE eval has raving [sic] review. The two missed trips in no way affect her performance or attitude. She obviously loves this job."); and **Exhibit 3**, Deposition of Plaintiff Rebecca Brigham at 40:23-41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick. You're getting a point. I should have never gotten that sick point. I should have not – it should not have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

3.    While Frontier issued written warnings to flight attendants for using sick time, including a few to Ms. Brigham over a period of approximately seven (7) years prior to disclosure of her disability, these warnings were not disciplinary in nature, **Exhibit 4**, Memorandum dated November 17, 2008 Regarding Four Sick Instances Reminder ("The purpose of this letter is for advisement only."), nor did flight attendants generally believe that Defendant's attendance policy was reasonable. Ex. 3 at 36:13-16 ("That's four times being sick in a year, when you're working with the public, who are sick. And I just – I will argue all day that Frontier's attendance policy was ridiculous. We even tried to strike over it.").

4.    Ms. Brigham's performance was measured by her ability to perform the essential functions of her position as a flight attendant, which were explicitly listed in the Flight Attendant

---

doing, Plaintiff assumes no obligations or liability stemming from disclosure of private or confidential information that should have been protected by Frontier.

Position Description. **Exhibit 5**, Frontier Airlines Job Description for Flight Attendant (listing, among other duties: "Follows all Federal Aviation Regulations as required as well as all established Frontier Airlines Policies and procedures" and "Initializes and conducts emergency evacuation of cabin if necessary."); **Exhibit 6**, Deposition of Stefanie Coppedge [Plaintiff's direct supervisor during relevant time period], at 12:2-7 ("Any sort of performance or work issues that – you know, negative things that you can think of related to Ms. Brigham? A. We had to work through the dependability process [referring to absences accrued after Ms. Brigham disclosed her disability]. Q. Okay. Anything outside of the dependability process?  A. No, sir.").

5.      Unfortunately for Ms. Brigham, she has battled issues related to alcoholism for most of her adolescent and adult life. Ex. 3 at 62:24-63:10 ("I mean, that's hard. I have – since I was a teenager, I have always liked alcohol. It was my escape from reality. It was my best friend. And I've always – I was always sort of like a binge drinker, where if I had one, I had to have 20 more. And I was the life of the party. I was just a party girl, and it was all fine and dandy. And then there was a major shift in my drinking after my first daughter passed away. She – she passed away in 2009. And that's when my drinking switched from happy-go-lucky party to sort of drinking more out of sadness and to numb and – yeah.").

6.      The passing of Ms. Brigham's daughter in 2009 had a profound effect on her life and her alcoholism. Ex. 3 at 214:5-20 ("I was five and a half months pregnant, and I got an infection in the lining of my uterus, because I have an incompetent cervix, which we didn't know then. And I got an infection in the lining of my uterus, and my body went into labor to try and get rid of the infection. My daughter, Cindy Lee Brigham, was born, and lived for 45 minutes and died in my arms. Q. How does that still impact you today? A. It's hard. I would have a 12-year old. It's

really hard. I'm not going to lie . . . I did lots of therapy about it, so I'm way better than, of course, I was. Prior to going to treatment, I just hadn't even dealt with it emotionally. I ignored it. I drank it away.").

7.      Alcoholism negatively affected Ms. Brigham's ability to conduct her day-to-day life activities. Ex. 3 at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); **Exhibit 7**, Plaintiff's Responses to Defendant's First Set of Written Discovery Requests Directed to Plaintiff, at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); **Exhibit 15**, Comanche Crossing Counseling, LLC Diagnostic Intake Summary and Treatment Plan, at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her."); and Ex. 15 at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol

dependance.").

8.      Notwithstanding, Ms. Brigham did undertake great efforts to make sure she completed her job duties sober and in compliance with any and all rules surrounding the use of alcohol. Ex. 3 at 68:17-22 ("Q. Was there ever a time that you could not fly because you were drunk or because of the aftereffects of that? A. No, not while I was already on a trip at all. I mean, there were plenty of times that I flew pretty hung over, but never intoxicated."); Ex. 3 at 67:25-68:8 ("Q. Before that, did you ever have a drink while on the job at Frontier? A. No. Luckily, I have never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on duty. However, on overnights, after you're done, it's – it was just kind of a culture where you would take off all the flight attendant gear, put on normal clothes, and go meet at the bar. Nine times out of ten, that's what you did.").

9.      After disclosing her disability to Defendant, Ms. Brigham was capable of performing all essential functions of her job with reasonable accommodation. Ex. 3 at 224:14-22 ("Q. And when – when you – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

10.     Moreover, and with respect to the fundamental question of whether Ms. Brigham was disabled within the meaning of the ADA, Frontier has conceded the same. Ex. 2 at 98:14-99:14 ("Q. Does – does Frontier consider alcoholism to be a disability as defined under the ADA? . . . A. Yes . . . Q. Does Frontier treat a disabled person who has alcoholism any differently than they treat a person with any other disability? A. . . . . [T]he process is designed to see what

accommodation we can provide. But the outcome also depends if the individual is covered under the collective bargaining . . . Do we treat them differently? No, in that form . . . Q. So there's nothing different about the nature of alcoholism that would cause Frontier to approach the interactive process any differently than if, say, for example, somebody broke their leg? A. No.").

11.     After self-disclosing her disability, alcoholism, to Defendant, Ms. Brigham successfully completed an in-patient treatment program, was discharged with a treatment plan, and has not touched alcohol since. Ex. 3 at 65:10-66:8 ("Q. How long were you in rehab in that September 2014 era? A. 60 days . . . I came back, and I tried to return to work, and I had to meet certain criteria in order to come back. I had to meet with a DOT specialist, where – I don't even know why I had to do half the stuff."); Ex. 2 at 70:15-73:12 ("Q. Did – did Frontier have any sort of program related to substance abuse? A. Yes. It was our self-disclosure program . . . Anybody who felt they needed assistance due to some type of . . . dependency . . . had the ability to step forward then essentially say, I'm – I need assistance . . . If an employee did step forward, then that then starts what we call the checklist . . . We would partner with the EAP [employees assistance program] to then identify a substance abuse professional, or SAP. The SAP would then contact the individual . . . And so the SAP would then determine the severity of the situation; they would identify recommendations for the individual; and they would then communicate with our compliance individual."); **Exhibit 8**, Treatment Plan; Ex. 3 at 67:4-10 ("Q. When was the last time you had a drink? A. My sobriety date is September 5th of 2014. I got some treatment September 7th of 2014.").

12.     Ms. Brigham's treatment plan required, among other things, that she avoid "triggers" for drinking identified as "overnight trips or anything longer than a given work day in

her professional arena," with a review of treatment plan requirements to occur every 90 days. Ex. 8 at 2.

13.     Defendant required Ms. Brigham to comply with the terms of her treatment plan as a condition of continued employment through Defendant's self-disclosure program. **Exhibit 9**, Letter to Ms. Brigham Regarding Completion of Substance Abuse Program ("Congratulations on completion of your Substance Abuse Program and beginning the process of returning to work . . . As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or testing may result in your removal from the performance of your job duties and cause you to be subjected to disciplinary action, up to and including termination of employment."); Ex. 2. at 76:25-77:1 (" . . . [W]e're not a second-chance company.").

14.     Unfortunately for Ms. Brigham, it was difficult for her to avoid overnight trips altogether because she did not possess enough seniority to create a schedule that would never include such trips. Ex. 3 at 211:19-212:6 ("Senior flight attendants, and at one point, I was not considered a super senior, but I was senior enough to hold turns. Little turns. I couldn't hold the big high-hour New York/LaGuardia turns, but I was able to hold the super early in the morning Dallas turn that had me home by 11:00 in the afternoon. And then Frontier opened up – Frontier opened the new base in Orlando, and everybody junior to me went over there to get a line. So, therefore, because I obviously couldn't move to Orlando, I – my seniority went down, and that's when we started having problems. And that's when I started asking for reasonable accommodations so that this could work with my recovery.").

15.     Therefore, Ms. Brigham requested three primary accommodations from Defendant

so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the general office (commonly referred to as the "GO") to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior." Ex. 3 at 71:24-72:24; *see also* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time.").

16.     With respect to Ms. Brigham's request to temporarily transfer to the GO, Defendant denied the request because "she wasn't in the work comp program or on OJI [on the job injury], [] she was not eligible to be reassigned." Ex. 2 at 93:19-21; *see also* Ex. 2 at 95:17-23 ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program.").

17.     The collective bargaining agreement applicable to Ms. Brigham during the relevant time period contains no prohibition on temporarily reassigning Plaintiff, or any other individual requesting a reasonable accommodation, to the GO. **Exhibit 10**, Collective Bargaining Agreement, at 43 (internal page 22) ("Flight Attendants are eligible to bid [on a schedule] unless they have been granted Company approved leaves (LOA, MED, FMLA, OJI, etc.) or removed for Company

Business."); 108-09 (internal page 87-88) (outlining the process by which an employee suffering an occupational injury may file a claim, seek leave, and return to duty, but notably, this process contains on restrictions on who may be temporarily reassigned to the GO or for what reasons).

18.     In fact, in the Collective Bargaining Agreement, Defendant made sure to retain all the necessary management rights which allowed it to grant or deny Ms. Brigham's request to temporarily transfer to the GO: "Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate its business and work force . . . ." Ex. 10 at 141 (internal page 120). Moreover, the seniority provisions contained in the Collective Bargaining Agreement do not apply to "assignment to non-flying duty (e.g., light duty)," *i.e.*, the seniority provisions did not apply to Ms. Brigham's request to be transferred to the GO. Ex. 10 at 101 (internal page 80).

19.     In response to companywide requests for reasonable accommodation between 2012 and 2016, Defendant did in fact regularly grant requests to modify schedules and transfer to light duty positions. **Exhibit 11**, Tabs 2012-16[2] (noting various "X" marks under Reasonable Accommodation columns "Modify work schedule" or "Modified Work Schedule," "Explore other positions within Frontier," and other similar granted accommodations described under "Findings/Recommendations" columns for same years); Ex. 3 at 134:7-25 ("Q. Okay. And so this document [referring to Ex. 11 attached hereto] – is this – is this document something you created

---

[2] Plaintiff notes that this document was originally produced by Defendant in native form, Microsoft Excel; however, Plaintiff has converted that document to PDF for the purpose of filing the instant Motion. Should the Court desire to view this Exhibit in native form, Plaintiff will deliver via electronic mail or by whatever method is most convenient. Plaintiff further notes that with respect to this Exhibit, Plaintiff has concurrently filed Plaintiff's Unopposed Motion to File Restricted Exhibit.

in preparation for this deposition, or did this document already exist? A. It was already in existence . . . Okay. And who maintains this document? Do you know? A. It depends on – ERMs, the employee relations managers, predominantly are the ones navigating around this document, and any interactive process will be documented on here."); Ex. 3 at 141:22-142:3 ("Q. Are these – are these employees just in Denver, or are they employees based anywhere in the country? A. Back in 2012, it would have been – we only had our hub in Denver, so it would include – well, outside of our customer service, so it would include everybody. It would be companywide."); Ex. 3 at 147:1-9 ("So in this case [still referring to Ex. 11 attached hereto], we had her [referring to a flight attendant that suffered an on-the-job injury] – see if she wanted the offer of the role of reservations agent. So we extended her the offer, which would then require her to transfer to a role, which means change of job title, not just job functions. She would transfer from the flight attendant role into the department of reservations. So we extended her the offer for a reservations – reservations agent, and she declined.").

20. The only difference was that none of those accommodated, or offered to be accommodated, employees suffered from the disability of alcoholism. Ex. 2 at 159:23-160:10 ("Q. Okay. So is it – for the – for the – for the years that we looked at and that are relevant to this deposition, so definitely the 2012, 2013, 2014, and 2015 tabs . . . you weren't able to identify any – at least not based on the notes, you weren't able to identify any employees that suffered from the disability of alcoholism . . . A. Just based on what was on that document, no."); Ex. 3 at 113:9-14 ("Q. Are those the accommodations that we've been talking about? A. Except not the one where I would go work at the general office. They had told me that that was impossible because that was just for people that got back from OJI.").

21.     Because Ms. Brigham was not accommodated by Defendant but was nevertheless required to comply with her treatment plan, she began to accrue absences that Defendant considered to be violations of its attendance policy, culminating in Plaintiff's termination. Ex. 3 at 41:12-20 ("A. Correct, and I could not do overnights. And I could not do overnights. It's not that I didn't want to do these trips, Danielle. I could not do overnights in order to adhere to my program. Frontier knew this. We had multiple meetings about this. I asked multiple times for reasonable accommodations that they denied, denied, denied. And then give me sick points, and then ultimately fired me for said sick points. It was not fair, and I will argue that till the day I die."); Ex. 2 at 94:3-19 ("Q. Was – was Ms. Brigham ultimately terminated due to attendance issues? A. Yes . . . Q. Was she terminated for any other reason than attendance? A. No, sir.").

22.     Unfortunately, Ms. Brigham is not the only alcoholic at Frontier that suffered unlawful and discriminatory treatment. **Exhibit 12**, Declaration of David St. Hilaire at 1-4 ("On or about May 19, 2015, I entered treatment for alcohol addiction. I was fearful about disclosing my condition to Frontier because I was concerned that given Frontier's reputation for handling these types of issues, I would be retaliated against and treated unfairly . . . These management officials [including Jerry Arellano and Shelley Leyner] told me they knew that I suffered from alcoholism. A former coworker of mine showed these management officials a Facebook post that I had recently posted celebrating the fact that I had been sober for 90 days . . . I was suspended for over a month, without pay, following this meeting."). Notably, Mr. St. Hilaire was never engaged in the interactive process despite management's discovery of his disability; instead, Mr. St. Hilaire was harassed until he quit. Id.

23.     Ms. Brigham is likewise not the only individual at Frontier that has been unlawfully

denied reasonable accommodations. **Exhibit 13**, Affidavit of Christine Kernen in Support of Charges of Jo Roby, Stacy Rewitzer, Renee Schwartzkopf, and Melissa Hodgkins Against Frontier Airlines, at 1-6 ("I gave birth to two children while working for Frontier, the first on March 3, 2014 and the second on November 9, 2015 . . . As was true for the Charging Parties, Frontier did not provide me with appropriate workplace accommodations for pregnancy or breastfeeding . . . I became concerned about incurring additional dependability points if I continued to call in sick, risking disciplinary action or termination, but I could not maintain a schedule which was incompatible with my medical need to express breast milk frequently and regularly.").

24.     Prior to filing this lawsuit, the United States Equal Employment Opportunity Commission issued a Determination in Ms. Brigham's favor. **Exhibit 14**, EEOC Determination, at 2 ("Based upon a review of the evidence gathered from Respondent and Charging Party, I conclude that the Respondent violated the ADA when the Charging Party was denied a reasonable accommodation and discharged.").

### III.    LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Davis v. United States Dept. of Veterans Affairs*, 2017 WL 3608192, at *2 (D. Colo. Aug. 22, 2017) (M.J. Shaffer) (quoting Fed. R. Civ. P. 56(a)).  "A material fact is one which could have an impact on the outcome of the lawsuit." *Id.* (quoting *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000) (internal quotation omitted)). "A dispute over a material fact is genuine if a rational [trier of fact] could find in favor of the nonmoving party on the evidence presented." *Id.* (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th. Cir. 2000) (internal quotation omitted)).  The burden

shifts to the party opposing summary judgment once the movant has made its initial showing. *Id.*

The court must view the factual record and draw all reasonable inferences therefrom in the light most favorable to the party opposing the motion for summary judgment. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). However, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by the party contradict facts specifically averred by the movant, the motion must be denied." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). "Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial . . . it is not enough that the evidence be merely colorable or anything short of significantly probative." *Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

## IV.    ARGUMENT

Because there are no genuinely disputed issues of material fact with regard to: (a) whether Plaintiff was a qualified individual with a disability under the ADA; and (b) whether Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation, Plaintiff seeks summary judgment on the same.

### A.    Plaintiff is a qualified individual with a disability under the ADA.

"The ADA was created to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Mestas v. Town of Evansville*, Case No. 17-8092, at *5 (10th Cir. Sep. 6, 2019) (quoting 42 U.S.C. § 12101(b)(1)). Thus, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a). "The term 'discriminate against a qualified individual with on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). And the term "qualified individual" means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Under the ADA, a person with a disability is defined as an individual who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)). "Whether a person has a substantially limiting impairment, or that they established a record of such, should be 'construed broadly.'" *Id.* (quoting 29 C.F.R. 1630.2(j)(1)(i)). "And even a record of 'previous[]' impairments can still entitle a person to reasonable accommodations in the work place." *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(i) and 1630.2(k)(2). A person is "'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived mental impairment, *whether or not* the impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l)(1) (italics added).

*First*, the undisputed portions of the factual record demonstrate that Ms. Brigham was a "qualified individual" within the meaning of the ADA, *i.e.*, she was able to perform the essential functions of being a flight attendant with a reasonable accommodation. After disclosing her

disability to Defendant, Ms. Brigham was capable of performing all essential functions of her job with reasonable accommodation. Ex. 3 at 224:14-22 ("Q. And when – when you – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

Testimony from Ms. Brigham's direct supervisor, Stefanie Coppedge, during the relevant time period also confirms the same: "Q. Any sort of performance or work issues that – you know, negative things that you can think of related to Ms. Brigham? A. We had to work through the dependability process [referring to absences accrued after Ms. Brigham disclosed her disability]. Q. Okay. Anything outside of the dependability process? A. No, sir." Ex. 6 at 12:2-7; Ex. 6 at 11:3-9 ("Q. Okay. And I think I know that at one point you were her [referring to Ms. Brigham] in-flight supervisor; is that correct? A. Correct . . . That would be in -- I believe it to be August 2014 is when I became an in-flight supervisor, so sometime between August 2014 and, I believe, April or March of 2016.").

And testimony from Mr. Arellano, Frontier's Senior Manager of Employee Relations during most of the relevant time period also confirms that Ms. Brigham was a "qualified individual": "Q. And at that time [referring to 2008 through 2010], did you – were – were you ever aware of any performance issues with regard to Ms. Brigham? A. Not that I recall, no." Ex. 1 at 8:21-24; *see also* Ex. 2 at 177:17-179:8 (wherein Mr. Arellano admits that managers "have the best information on [] employee's performance" when being questioned on Plaintiff's evaluation in which her manager stated: "Rebecca has two very nice kudos letters in her file and her IOE eval

has raving [sic] review. The two missed trips in no way affect her performance or attitude. She obviously loves this job."). The undisputed factual record demonstrates that Ms. Brigham had no difficulty completing the essential functions of her job as a flight until she required a reasonable accommodation. Ex. 3 at 40:23-41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick. You're getting a point. I should have never gotten that sick point. I should have not – it should not have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

And of course, the accommodations requested by Ms. Brigham would have allowed her to comply with her treatment plan as well as the terms of Defendant's self-disclosure program, *i.e.*, Ms. Brigham's requested accommodations would have permitted her to perform the essential functions of her job. *Compare* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time.") *with* Ex. 8 at 2 (Ms. Brigham's treatment plan requiring, among other things, that she avoid "triggers" for drinking identified as "overnight trips or anything longer than a given work day in her professional arena.")

Thus, Ms. Brigham was a "qualified individual" within the meaning of the ADA, *i.e.*, she was able to perform the essential functions of being a flight attendant with a reasonable accommodation, and the Court should find the same.

***Second***, there can be no reasonable dispute that Ms. Brigham was "disabled" within the

meaning of the ADA. Under the ADA, a person with a disability is defined as an individual who: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. *Mestas*, Case No. 17-8092, at *5 (citing 42 U.S.C. § 12102(1)).

Here, Defendant Frontier has conceded that Ms. Brigham was disabled within the meaning of the ADA. Ex. 2 at 98:14-99:14 ("Q. Does – does Frontier consider alcoholism to be a disability as defined under the ADA? . . . A. Yes . . . Q. Does Frontier treat a disabled person who has alcoholism any differently than they treat a person with any other disability? A. . . . [T]he process is designed to see what accommodation we can provide. But the outcome also depends if the individual is covered under the collective bargaining . . . Do we treat them differently? No, in that form . . . Q. So there's nothing different about the nature of alcoholism that would cause Frontier to approach the interactive process any differently than if, say, for example, somebody broke their leg? A. No."). Because there's no genuine dispute that Ms. Brigham was and remains an alcoholic and given that Frontier considers alcoholism to be a disability as defined by the ADA, there is no genuine dispute of material fact as to whether Ms. Brigham was disabled as defined by the ADA.

Even setting aside Defendant's concession, the underlying undisputed facts should lead the Court to the same conclusion. Alcoholism **substantially limited** Ms. Brigham's ability to conduct many major life activities. Ex. 3 at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The

sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Ex. 7 at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); Ex. 15 at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her.") and Ex. 15 at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol dependance.").

Ms. Brigham was substantially limited in a variety of major life activities, and therefore, was disabled within the meaning of the ADA. "Whether a person has a substantially limiting impairment, or that they established a record of such, should be 'construed broadly.'" *Mestas*, Case No. 17-8092, at *5 (quoting 29 C.F.R. 1630.2(j)(1)(i)); 29 C.F.R. § 1630.2(j)(1)(i) ("'Substantially limits' is not meant to be a demanding standard."); Id. at § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.").

Ms. Brigham also had a **record of such impairment**. Apart from the requirement that the Court construe this potential element "broadly," "various requests for accommodations and

treatment" are sufficient to demonstrate a plaintiff had a "record of disability." *Mestas*, Case No. 17-8092, at *6; *see also* 29 C.F.R. § 1630.2(k)(2) ("Whether an individual has a record of impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis.").

Here, there can be reasonable dispute that Ms. Brigham made "various requests for accommodations and treatment." Ex. 3 at 65:10-66:8 ("Q. How long were you in rehab in that September 2014 era? A. 60 days . . . I came back, and I tried to return to work, and I had to meet certain criteria in order to come back. I had to meet with a DOT specialist, where – I don't even know why I had to do half the stuff."); Ex. 2 at 70:15-73:12 ("Q. Did – did Frontier have any sort of program related to substance abuse? A. Yes. It was our self-disclosure program . . . Anybody who felt they needed assistance due to some type of . . . dependency . . . had the ability to step forward then essentially say, I'm – I need assistance . . . If an employee did step forward, then that then starts what we call the checklist . . . We would partner with the EAP [employees assistance program] to then identify a substance abuse professional, or SAP. The SAP would then contact the individual . . . And so the SAP would then determine the severity of the situation; they would identify recommendations for the individual; and they would then communicate with our compliance individual."); Ex. 3 at 67:4-10 ("Q. When was the last time you had a drink? A. My sobriety date is September 5th of 2014. I got some treatment September 7th of 2014."); Ex. 9 ("Congratulations on completion of your Substance Abuse Program beginning the process of returning to work . . . As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or testing may result in your removal from the

performance of your job duties and cause you to be subjected to disciplinary action, up to and including termination of employment."); Ex. 3 at 71:24-72:24 (Ms. Brigham requested three primary accommodations from Defendant so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the general office (commonly referred to as the "GO") to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior."); and Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time."). Therefore, Ms. Brigham was also disabled by way of having a "record of such impairment."

Finally, Ms. Brigham was disabled within the meaning of the ADA because she was **regarded as having such an impairment**. "An individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(l)(1). "Establishing that an individual is 'regarded as having such an impairment' does not, by itself, establish liability. Liability is established under Title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability . . . ." Id. at § 1630.2(l)(3). "For a plaintiff alleging disability discrimination to show that the employer regarded [her] as having an impairment, the

plaintiff must show that (1) she has an actual or perceived impairment, (2) that the impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action." *McHenry v. Lincare Inc.*, Case No. 15-CIV-343-RAW, at *14 (E.D. Okla. Jul. 27, 2016) (citing *Adair v. City of Muskogee*, 2016 WL 3034084, at *6 (10th Cir. 2016)).

As described in detail above, Ms. Brigham has shown she suffers from an actual impairment, Ex. 3 at 62:24-63:10 ("I mean, that's hard. I have – since I was a teenager, I have always liked alcohol. It was my escape from reality. It was my best friend. And I've always – I was always sort of like a binge drinker, where if I had one, I had to have 20 more. And I was the life of the party. I was just a party girl, and it was all fine and dandy. And then there was a major shift in my drinking after my first daughter passed away. She – she passed away in 2009. And that's when my drinking switched from happy-go-lucky party to sort of drinking more out of sadness and to numb and – yeah."). Ms. Brigham has further shown that this impairment was neither transitory nor minor. Id..

And finally, Defendant was aware of and therefore perceived the impairment at the time of the alleged discriminatory action. Ex. 9 ("Congratulations on completion of your Substance Abuse Program and beginning the process of returning to work . . . As a reminder, Frontier Airlines requires compliance with ALL additional treatment, after-care or support group services recommended by your SAP . . . non-compliance with any recommended treatment, aftercare or testing may result in your removal from the performance of your job duties and cause you to be subjected to disciplinary action, up to and including termination of employment."). Ms. Brigham alleges her termination from Frontier was discriminatory in violation of the ADA. Ex. 3 at 40:23-

41:4 ("A. Right. And I would still call in intermittent FMLA [after disclosing disability], but then
later on, they'd be like, Oh, by the way, you ran out of intermittent FMLA. This is coded as sick.
You're getting a point. I should have never gotten that sick point. I should have not – it should not
have even shown up as sick on my schedule, had Frontier reasonably accommodated me.").

As such, Ms. Brigham is also disabled by way of being regarded as having such an
impairment. All of the above analyses taken together, there can be no reasonable dispute that Ms.
Brigham was a qualified individual with a disability within the meaning of the ADA, and the Court
should find the same.

**B.   Defendant violated the law when it failed to reasonably accommodate Ms.
Brigham's request for temporary reassignment.**

There are generally four elements a plaintiff must show to succeed on a failure-to-
accommodate claim: (1) she was disabled; (2) she was otherwise qualified; (3) she requested a
plausibly reasonable accommodation; and (4) the defendant refused to accommodate her disability.
*Aubrey v. Koppes*, Case No. 19-1153, at *12 (10th Cir. Sep. 18, 2020). "Establishing a prima facie
case is not onerous." *Id.* at *13 (citing *Osborne v. Baxter Healthcare Corp.*, 708 F.3d 1260, 1266
(10th Cir. 2015)). A plaintiff satisfies her burden, in a failure to accommodate claim, to show she
was discriminated against because of her disability "*as soon as* the employer, with adequate notice
of the disabled employee's request for some accommodation, fails to provide a reasonable
accommodation." *Exby-Stolley v. Bd. of Cnty. Comm'rs*, Case No. 16-1412, at *19 (10th Cir. Oct.
28, 2020) (italics in original). If plaintiff establishes a prima facie case, the burden shifts to
defendant to present evidence either (1) conclusively rebutting one or more elements of plaintiff's
prima facie case or (2) establishing an affirmative defense, such as undue burden or one of the
other affirmative defenses available to the employer. *Id.* (citing *Lincoln v. BNSF Ry.*, 900 F.3d

1166, 1204 (10th Cir. 2018)).

As discussed above, there can be no reasonable dispute that Ms. Brigham was a qualified individual with a disability within the meaning of the ADA.[3] Therefore, she need only show she requested a plausibly reasonable accommodation and that Defendant Frontier refused to accommodate her disability. Here, Ms. Brigham requested at least three plausibly reasonable accommodations from Defendant so that she could continue to work while also complying with her treatment plan: (1) to be temporarily transferred to the GO to complete administrative or other light duty work; (2) to be allowed to start each month with a "blank schedule" so that she could build a schedule out of "open time" or from the "trade board;" and (3) to simply have overnight trips removed from her schedule as "they [Frontier] had done a few times prior." Ex. 3 at 71:24-72:24; *see also* Ex. 2 at 200:17-25 ("Q. . . . What did Ms. Brigham request of Frontier? A. Oh. She requested adjustments to her schedule. She requested no layovers, no overnights. She requested roles or responsibilities at the GO at the time. She requested that trips be dropped for her. She requested – yeah, pretty much, that was it. Oh, and to be able to pick up trips in open time."). For the purpose of this Motion, Ms. Brigham is only focused on the denial of her request to temporarily transfer to the GO.

A request for a plausibly reasonable accommodation "refers to those accommodations

---

[3] Plaintiff notes that while she is disabled under the "regarded as" prong under the ADA, being "regarded as" having a disability does not necessarily support her failure to accommodate claims even if it is sufficient to support her discrimination and retaliation claims. *See* 29 C.F.R. § 1630.2(o)(4) ("A covered entity is required, absent undue hardship, to provide reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the 'actual disability' prong . . . or 'record of' prong . . . but is not required to provide a reasonable accommodation to an individual who meets the definition solely under the 'regarded as' prong . . . ."). In any event, as Plaintiff is disabled under any of the prongs (actual, record of, or regarded as), she may prevail on her failure to accommodate claim described herein.

which presently, or in the near future, enable the employee to perform the essential functions of [their] job." *Aubrey*, Case No. 19-1153, at *15. "The ADA provides that a 'reasonable accommodation' may include . . . reassignment to a vacant position." *Id.* "Reassignment, too, is a plausibly reasonable accommodation. The ADA expressly recognizes reassignment can be a reasonable accommodation." *Id.* at 27. Here, Ms. Brigham's request to transfer to the GO was a request for reassignment, and therefore, was plausibly reasonable. *See also* Ex. 11 (noting various "X" marks under Reasonable Accommodation columns "Modify work schedule" or "Modified Work Schedule," "Explore other positions within Frontier," and other similar granted accommodations described under "Findings/Recommendations" columns for same years).

Ms. Brigham's request for reassignment was denied. Ex. 2 at 93:19-21; *see also* Ex. 2 at 95:17-23 ("Did Frontier think that transferring Ms. Brigham to the GO, reassigning her would violate the terms of the collective bargaining agreement, or was that due to the . . . OJI work comp issue? A. It was the OJI work comp. She was just not eligible. At the time, she wasn't part of the work comp program.").

"[I]f the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate. The employer must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Aubrey*, Case No. 19-1153, at *23. Here, Defendant has developed no factual record whatsoever demonstrating that reassigning Ms. Brigham would have constituted an "undue hardship." *See* 29 C.F.R. § 1630.2(p)(1) ("Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section."); Id. at §

1630.2(p)(2) (setting forth undue hardship factors such as "nature and net cost," "overall financial resources of the facility," and "[t]he impact of the accommodation upon the operation of the facility . . . .").

Here, Defendant cannot show undue hardship nor can Defendant show it otherwise accommodated Ms. Brigham. *See* 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means . . . modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."); *see also Exby-Stolley*, Case No. 16-1412, at *18 ("[T]he ADA imposes on the employer . . . an *affirmative obligation* to make a reasonable accommodation . . . and we have referred to this duty as an *unvarnished obligation*.") (italics in original, internal quotations and citations omitted). Therefore, Ms. Brigham respectfully requests the Court grant her Motion in this regard in its entirety finding that Defendant violated the ADA when it failed to grant Ms. Brigham's request for reassignment.

## V.    CONCLUSION

For the aforementioned reasons, Plaintiff respectfully requests the Court grant this Motion in its entirety thereby holding: (a) Plaintiff was a qualified individual with a disability under the ADA; and (b) Defendant violated the ADA when it denied Plaintiff's request to be temporarily reassigned as a reasonable accommodation.

Respectfully submitted this 17th day of November, 2020.

THE LAW OFFICE OF JOHN R. CRONE, LLC

/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2020, a true and correct copy of the foregoing *Plaintiff's Motion for Partial Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
        John R. Crone