## GERARDO ARELLANO - July 14, 2020

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  19-cv-03417-WJM-STV

_____

REBECCA BRIGHAM,

Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

Defendant.

_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
GERARDO ARELLANO
July 14, 2020

_____

PURSUANT TO NOTICE and the Federal Rules of Civil Procedure, the videotaped videoconference deposition of GERARDO ARELLANO, whose identity has been verified by the court reporter, was taken on behalf of the Plaintiff on July 14, 2020, commencing at 8:58 a.m., before Jill S. Nielsen, Registered Professional Reporter and Notary Public within the state of Colorado.

(The reporter, Jill S. Nielsen, appearing remotely via videoconference.)

**2**

APPEARANCES

FOR THE PLAINTIFF:
JOHN R. CRONE, ESQ.
EVAN S. GRIMES, ESQ.
The Law Office of John R. Crone, LLC
4550 East Cherry Creek Drive South, Suite 1003
Glendale, Colorado 80246
303.598.3526
john@crone-law.com
(Appearing via videoconference)

FOR THE DEFENDANT:
DANIELLE L. KITSON, ESQ.
CAROLYN THEIS, ESQ.
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, Colorado 80202
303.629.6200
dkitson@littler.com
catheis@littler.com
(Appearing via videoconference)

ALSO PRESENT:

JACALYN PETER, In-House Counsel, VP of Labor
Relations (Appearing via videoconference)
WALT MATHERN, Videographer
(Appearing via videoconference)

**3**

INDEX

EXAMINATION OF GERARDO ARELLANO:                    PAGE
By Mr. Crone                                           5

EXHIBITS

NUMBER                                             INITIAL
                                                  REFERENCE
Exhibit 1    Inflight Performance                     52
             Counseling Record

Exhibit 2    1/29/10 Memo to Kruger from              55
             Arellano re Sick Instances
Exhibit 3    Untitled document requesting             57
             reasonable accomodation

Exhibit 4    10/4/12 Letter To Whom It May            57
             Concern from Dr. Volin;
             5/30/13 Letter To Whom It May
             Concern from Dr. McCrann;
             12/22/13 Note from
             Presbyterian/St. Luke's

(Exhibits provided electronically to the court reporter.)

**4**

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are on the record.  The time now is 8:58 a.m. on July 14, 2020.

We are conducting the virtual deposition of Gerardo Arellano in the matter of Rebecca Brigham v. Frontier Airlines in the United States District Court for the District of Colorado, Case Number 19cv03417.

The video technician is Walt Mathern.  The court reporter is Jill Nielsen.

Will the parties and their counsel please indicate your agreement that this is a virtual deposition and state your name and whom you represent.

MR. CRONE:  Plaintiff agrees this is a virtual deposition.  My name is John Crone, and I represent the plaintiff.

MR. GRIMES:  My name is Evan Grimes, attorney for Plaintiff.

THE WITNESS:  Rebecca Brigham, Plaintiff.

MS. KITSON:  Good morning.  Danielle Kitson with Littler Mendelson.  We agree that this is a virtual deposition, and with me today is my colleague Carolyn Theis from Littler, and also Jacalyn Peter, in-house counsel for Frontier.

## GERARDO ARELLANO - July 14, 2020

Page 5

```
1              GERARDO ARELLANO,
2 having been first duly sworn to tell the truth,
3 testified as follows:
4              EXAMINATION
5 BY MR. CRONE:
6     Q.   Good morning, Mr. Arellano.  How are you?
7     A.   I'm doing good.  Good morning.
8     Q.   Very good.  Well, thanks for coming back
9 and showing up for Part 2.  I want to give you a
10 sense of where we're going today as well.  I think we
11 have two hours, maximum, of your time that we'll
12 need.
13    A.   Okay.
14    Q.   Hopefully less.
15    A.   Okay.
16    Q.   So we'll start.  So -- so some of the
17 questions will be a little bit repetitive to start.
18    A.   Okay.
19    Q.   We covered a lot of ground yesterday, so
20 we'll try to -- I'll -- I'll try to be as efficient
21 as I can.
22         And so the first -- first question for you,
23 we -- we talked a lot about your background
24 yesterday, that is, the positions you've held at
25 Frontier, your educational background and such.  Do
```

Page 6

```
1 you remember those questions?
2     A.   I do.
3     Q.   Is it fair to incorporate all of that
4 information here today rather than going back over
5 it?
6     A.   Yes.
7     Q.   Okay.  However, just for the sake of
8 clarity and -- and the record, can you state your
9 current position at Frontier, generally what you do?
10    A.   So senior manager of talent acquisition,
11 employee relations.  I oversee the talent acquisition
12 team, and in this case, it's made up of three teams.
13 You've got the corporate recruitment team, the
14 inflight recruitment team.  You've got the pilot
15 recruitment team, and then I also support the
16 employer relation side of the house for the pilot
17 group.
18    Q.   Thank you.  And then a couple of questions
19 related to the mechanics of today's deposition.
20         Do you recall receiving a notice of today's
21 deposition that originally asked for the deposition
22 to be in person?
23    A.   Yes.
24    Q.   And then do you recall, after that,
25 subsequent to that deposition notice, Plaintiff
```

Page 7

```
1 amended it so that we -- that way we could do the
2 deposition virtually?
3     A.   Yes.
4     Q.   Okay.  And I -- I notice today that
5 you're -- you're sitting in a room with a few other
6 people.  How -- how many other people are in the
7 room?
8     A.   There's three others.
9     Q.   Okay.  Do you feel safe being in a room
10 with three other people?
11    A.   I do.
12    Q.   Okay.  If you have any concern about your
13 safety, just like yesterday, please let me know and
14 we'll -- and we'll -- we'll -- we'll end this thing
15 and get you out of there, okay?
16    A.   Will do.  Thank you.
17    Q.   Thank you.
18         Okay.  So, Mr. Arellano, when -- when can
19 you first recall meeting Plaintiff?
20    A.   It would have been back early when I was
21 working in group flight, which is by -- I think
22 that's where I initially remember her from, and I was
23 one of the inflight managers.
24    Q.   And what was your -- what was your position
25 in relation to hers?  Did you supervise her, or were
```

Page 8

```
1 you doing something else?
2     A.   I didn't -- no, I didn't supervise her.  I
3 was manager of inflight services.  I had supervised
4 the administrative pieces of the office.
5     Q.   Okay.  And that was, if I remember
6 correctly yesterday -- and please correct me if I'm
7 wrong -- that would have been in the late 2000s, up
8 to 2010 or something?
9     A.   Yeah, because I think we ended up --
10 during the Republic transition -- it would have
11 been in 2006, so 2006 and -- 2004, '5, '6 -- '10.
12 Two thousand, like, eighth.  Yeah, so late 2 --
13 2008, 2009, and 2010.
14    Q.   Okay.  That -- that makes sense.  Thank
15 you.
16         And -- and so -- so when you first met her,
17 she was a flight attendant and you were an inflight
18 manager.  Is -- is that what you stated?
19    A.   No, manager of inflight services.
20    Q.   Got it.  Yeah.  That's right.
21         And at that time, did you -- were -- were
22 you ever aware of any performance issues with regard
23 to Ms. Brigham?
24    A.   Not that I recall, no.
25    Q.   And -- and did your -- did your working
```

## GERARDO ARELLANO - July 14, 2020

9

1 relationship, that is, the structure of where you
2 were in the company, manager of inflight services and
3 then Ms. Brigham was a flight attendant, did that
4 change over time?
5     A.   In what form?
6     Q.   Did you ever -- did you ever come to
7 directly supervise her at any point?
8     A.   No.
9     Q.   Okay.  And so -- so -- so during 2008, '9,
10 '10 through the end of 2015, with relation to
11 Ms. Brigham, you were always dealing with
12 administrative tasks?
13     A.   No.  During that time as well, there was a
14 dependability piece, so I tracked attendance,
15 essentially.
16     Q.   Okay.  Got it.  And -- and that's the
17 dependability policy we -- we spoke about briefly
18 yesterday, right?  Is -- is that what you're
19 referring to?
20     A.   No.  The policy then was different.
21     Q.   Got it.
22     A.   It was -- ultimately, it was designed to
23 just track attendance for the flight attendant group,
24 but not one specific group per se.  And also an
25 extension of that was the leave-of-absence tracking.

10

1 It was more of the data-tracking pieces of -- of the
2 dependability aspects of the flight attendant group.
3     Q.   Okay.  So how long -- so -- so when
4 you're -- when you're describing this for me now, are
5 you talking about from 2008 or so until some date
6 when the dependability program was more formalized?
7     A.   Say that again.
8     Q.   So -- so what you had just described for
9 me, that you are tracking attendance for the flight
10 attendant group, by extension, the leave-of-absence
11 tracking occurred as well, was that prior to the
12 impletation [sic] of -- implementation of the formal
13 dependability policy?
14     A.   As it exists today?
15     Q.   Yes.
16     A.   Yeah.  So it was way before that.
17     Q.   Okay.  Yeah.  And so what -- what dates are
18 you describing here?
19     A.   That would have been prior to 2010.
20     Q.   Got it.  Okay.
21     A.   Yeah.
22     Q.   So -- so prior to 2010, you would track
23 attendance for the flight attendants group and do
24 some leave-of-absence tracking.
25          Was there anything else you were doing as

11

1 part of this dependability?
2     A.   No, just administrating.  We had a team of
3 admins there.  One admin would do the day-to-day,
4 funnel questions, direct traffic for the admin
5 office.  And then I tracked just the -- again, the
6 administrative pieces: resources, files that were --
7 what they call the V files that existed in the crew
8 room.  But, yeah, primarily administrative.
9     Q.   Okay.  If -- if a flight attendant was
10 having an issue with attendance, say too many
11 absences --
12     A.   Uh-huh.
13     Q.   -- would you get involved in any way?  This
14 is prior to 2010.
15     A.   I'm trying to recall.  I was involved in
16 the form of accounting for what they showed based off
17 of their schedule.
18     Q.   But would you ever -- would you ever
19 verbally counsel a flight attendant or issue a
20 letter?
21     A.   I believe I did, yes.
22     Q.   Okay.  And -- and that was prior to 2010?
23     A.   That was 2010 and prior.
24     Q.   Okay.
25     A.   Before -- yeah, when I was involved in that

12

1 role.
2          THE REPORTER:  I'm sorry?
3          THE WITNESS:  When I was in that role.
4     Q.   (BY MR. CRONE)  Do you recall Ms. Brigham
5 having any attendance issues prior to 2010?
6     A.   Not offhand, no.
7     Q.   Okay.  Now, after 2010, is that when the
8 dependability policy was written down and made
9 formal?
10     A.   After 2010?
11     Q.   Yes.
12     A.   I believe so.  I don't know about written
13 down and made formal.  I know it changed, so . . .
14     Q.   Okay.  Well, that's -- that's fair.  So
15 how -- how did it change in 2010?
16     A.   I would have to go and look at the
17 dependability policy then.  I can't recall.
18     Q.   And I've seen a -- I've seen a written --
19 I've seen a written policy.  Did -- can you recall
20 what date it was actually written down?
21     A.   That, I don't.
22     Q.   Okay.
23     A.   I don't know.
24     Q.   And I know you just stated you can't recall
25 how the policy changed after 2010 --

## GERARDO ARELLANO - July 14, 2020

13

1  A.  Uh-huh.
2  Q.  -- but can you recall any of the
3 differences?  Were there different consequences for
4 the flight attendants if they were absent or anything
5 like that?
6  A.  From what time period?
7  Q.  After 2010.
8  A.  Through . . .
9  Q.  Through the end of -- through the end of
10 2015.  I'm sorry.
11  A.  At that time, I believe it was just based
12 on occurrence.  So an occurrence -- they called it --
13 at that time, I think they said an occurrence is an
14 occurrence, but I can't remember the specifics in
15 terms of the -- the meat within those policies.
16  Q.  Okay.  And then between 2010, whenever it
17 is in 2010 -- after 2010 when the policy changed and
18 then through the end of 2015, can you recall
19 Ms. Brigham having any attendance issues?
20  A.  Between 2010 and 2015?
21  Q.  Yeah.
22  A.  In 2010, I believe that's when I left the
23 organization.  I came back in 2012, so in that time
24 period I can't speak to.
25  Q.  All right.

14

1  A.  In 2012, I was the employee relations
2 manager, so possibly between 2012 and 2015, yes.
3  Q.  Okay.  And can you -- can you -- is there a
4 way for you to describe for me what those attendance
5 issues were, the nature of those attendance issues
6 between 2012 and the end of 2015?
7  A.  In general or regarding Rebecca?
8  Q.  Regarding Rebecca.
9  A.  I would have to refer to the documents.
10 Yeah, I -- I can't specifically off recollection.
11  Q.  So -- so you can't, sitting here today,
12 remember the nature of any one of those attendance
13 issues?
14  A.  I would have to refer to the documents.
15 Yeah.
16  Q.  And what about after the end of 2015?  Did
17 the dependability policy change at all between the
18 end of 2015 and -- and now?
19  A.  Yes.
20  Q.  And how so?
21  A.  Between that time period through present,
22 it went from an occurrence over to a point system.
23  Q.  And -- and what does -- what does that
24 mean?  How -- how does the point system work?
25  A.  The point system is designed to then break

15

1 down how the occurrence took place.  For example,
2 a sick call could be worth one point.  If the
3 individual called in late sick, is what they call it,
4 that was an additional half point.
5  So half points were introduced into the
6 dependability, but the total number of occurrences
7 one was allowed did not change.  It was everything in
8 between first occurrence through the end.
9  Q.  Okay.
10  A.  Not end, but the point system changed.
11  Q.  So the occurrences were scored differently;
12 is that -- is that fair?
13  A.  Not that the occurrences were scored
14 differently; they just introduced a different
15 component to it.
16  Q.  Okay.  And -- and -- and maybe that's the
17 point system generally.  Or am I not --
18  A.  That's the -- yeah.
19  Q.  Okay.
20  A.  Yeah.
21  Q.  So going back to the time period between
22 2012 when you came back to Frontier --
23  A.  Uh-huh.
24  Q.  -- and the end of 2015, if a flight
25 attendant took a sick day, for example, how was

16

1 that -- was the flight attendant given some sort
2 of -- I don't want to say point, because you just
3 said the point system is new, but was there some sort
4 of scoring or something because the flight attendant
5 took that day off?
6  A.  If they called in sick and it was qualified
7 and classified or coded as sick, yes, it would be
8 one -- it would be one occurrence.
9  Q.  Okay.  Even if they had -- did flight
10 attendants accrue sick time?
11  A.  Through -- yes.  Through the automated
12 accrual system, yes.
13  Q.  Okay.  So if they had sick time accrued and
14 available to use, would they still be -- be given
15 this occurrence point?
16  A.  Repeat that again.
17  Q.  Yeah.  Sorry.  It was a little -- a little
18 confusing.
19  So -- so you had said that flight
20 attendants accrued sick time, and if they had enough
21 sick time accrued and then used a sick day, would
22 they still be scored this occurrence?
23  A.  Yes.
24  Q.  Okay.  What if they -- did the flight
25 attendants accrue vacation time?

**GERARDO ARELLANO - July 14, 2020**

17

1    A.    Yes.
2    Q.    And if they used vacation time, would they
3 also be scored this occurrence?
4    A.    I guess repeat that again.
5    Q.    Yeah.  And just to be clear, I'm talking
6 about the time period 2012, the -- the end of 2013
7 before the policy changed again.
8          And -- and I was asking, if -- if a flight
9 attendant used their vacation time, would they also
10 be scored some type of occurrence under this policy?
11   A.    I guess that's a -- I'm still not
12 understanding.  Just to clarify, are you asking if a
13 flight attendant -- if a flight attendant took a
14 vacation time, would they accrue an occurrence of
15 attendance, or . . .
16   Q.    Correct.  Yeah, yeah, correct.
17   A.    I don't believe so.  So just -- if they --
18 they took a vacation day, let's say, today, would
19 that count against their dependability?  Is that what
20 you're asking?
21   Q.    That's exactly what I'm asking.
22   A.    No, not to my knowledge.
23   Q.    Okay.  But if they took the sick time, it
24 would?
25   A.    Towards their dependability, yes.

18

1    Q.    Okay.  Okay.  What about --
2    A.    To clarify --
3    Q.    I'm sorry.  Go ahead.
4    A.    To clarify, sick can be a little bit
5 different.  If it's coded under LOA and they're using
6 their sick time, then that's not counted against
7 dependability.
8          If it's only a sick day for what they're
9 calling in -- for example, if an individual had IFM,
10 intermittent FMLA, and they used sick time to get
11 paid for that time, it didn't count against their
12 dependability.
13         So if they call -- called in sick and it
14 is re -- it's not recoded, then in that moment, yes,
15 it would count against their dependability.
16   Q.    Okay.  So in order for it to count, they
17 would have to -- they would have to call in sick, and
18 they could be using their sick time, and -- and then
19 it would count.  But if it -- is that correct?
20   A.    So -- because they could be -- if they
21 called in sick, which essentially -- if they called
22 in intermittent FMLA, the trip is covered under
23 intermittent FMLA, but they're using their sick time.
24 So in that moment, it does not count towards their
25 dependability.  They're not receiving an infraction,

19

1 if you will.
2    Q.    Got it.
3    A.    But if they called -- go ahead.
4    Q.    I'm sorry.  Say that -- go ahead, go ahead.
5    A.    If they call in sick and that occurrence is
6 not recoded to anything else and the sick occurrence
7 stands, then, yes, that counts towards the
8 dependability.
9    Q.    Yeah.  And -- and -- and that makes sense
10 to me.
11         So the -- so if -- if the flight attendant
12 had the IFM already approved and was using one of
13 those days --
14   A.    Uh-huh.
15   Q.    -- whether or not the flight attendant has
16 sick time to be paid for the day, it won't count as
17 an infraction?
18   A.    It won't count as an infraction, correct.
19   Q.    But if they use the sick time to -- to --
20 to make sure they're paid for the day they're out, it
21 still won't count as infraction because they had the
22 IFM accrued?
23   A.    Okay.  Say that again.
24   Q.    If they used the sick time to make sure
25 they're paid for that IFM day that they're out --

20

1    A.    Uh-huh.
2    Q.    -- it wouldn't count as an infraction -- an
3 infraction because the IFM was already approved; is
4 that correct?
5    A.    Yeah, if they requested IFM for that day.
6    Q.    Okay.
7    A.    So it's also -- it's a two-part system.
8 The flight attendant would need to have requested
9 intermittent FMLA on that day, and then that gets
10 recoded.  So if the trip is recoded to IFM, then yes
11 to your question.
12   Q.    So it -- so it can be -- it can be -- the
13 trip could be retroactively recoded?  So in other
14 words, a flight attendant could call out sick.
15 Initially that would be an infraction, but -- but
16 perhaps it could be retroactively recoded as IFM, and
17 then it wouldn't count as an infraction?
18   A.    If the request for intermittent FMLA was
19 done within 24 hours.
20   Q.    Okay.
21   A.    So there's a time period to request the
22 recode, if you will.
23   Q.    Okay.  Okay.
24   A.    And in that example, yes.
25   Q.    Okay.  Okay.  Good.

## GERARDO ARELLANO - July 14, 2020

**21**

1    And what about after the end of 2015 when
2 you said the policies changed?  Has it changed at all
3 in regard to how an infraction might -- might be
4 given or not given when somebody calls in sick?
5    A.    In what -- what form, I guess?  Did what
6 change?  I'm not following you.
7    Q.    Has it -- has it -- has it changed in any
8 way?  So since the end of 2015, the dependability
9 policy --
10    A.    Uh-huh.
11    Q.    -- has it changed in any way with regard to
12 how people are given infractions?
13    A.    When you say "given" -- I guess I'm getting
14 lost in how they're given.  You mean when they accrue
15 an infraction, or . . .
16    Q.    Yeah.  So we had just -- you had just
17 described for me a scenario where a flight attendant
18 might call in sick --
19    A.    Yes.
20    Q.    -- and then they're -- and then that's an
21 infraction.
22    A.    Uh-huh.
23    Q.    So just -- just sticking with that sort of
24 basic scenario, no IFM included or anything --
25    A.    Okay.

**22**

1    Q.    -- since 2015, does it still operate that
2 way?  If a flight attendant just calls in sick, will
3 he or she be given an infraction?
4    A.    Yeah.  Towards the dependability policy,
5 yes.
6    Q.    Okay.  What about if it was -- if they were
7 using IFM time?
8    A.    No.
9    Q.    Okay.  And what about if they were using
10 vacation time?
11    A.    And, again, that's where I'm getting lost.
12 Are -- are you asking vacation with intermittent FMLA
13 or just a strict vacation?
14    Q.    Just -- just I have vacation time accrued;
15 I'm going to the beach.
16    A.    For a flight -- and I guess this is why it
17 gets confusing.  A flight attendant has to bid for
18 their vacation one year in advance.  So if the
19 vacation is scheduled, that does not count against
20 their dependability.
21    Q.    Okay.  Okay.
22    A.    So --
23    Q.    Yeah, yeah.
24    A.    So a flight attendant can't simply say,
25 Hey, I'm going to take tomorrow as a vacation,

**23**

1 because they had not initially bid for it one year in
2 advance.  They have the opportunity to slide it back
3 or forth, but yet that's through a different process.
4 But, yeah, the scheduled vacations don't count
5 against them.
6    Q.    Okay.  So -- and -- and I -- and I think --
7 and I appreciate that clarification.  I think
8 you're -- you're getting at something else, so --
9 so -- and I want to make sure I understand that.
10    When a -- when a flight attendant wants to
11 use vacation time, they have to plan that pretty far
12 in advance?
13    A.    For time off, vacation, yes.
14    Q.    Yeah.  Okay.  And -- and -- and, therefore,
15 it doesn't count against them under the dependability
16 policy?
17    A.    When it's scheduled vacation, correct.
18    Q.    Correct.  Okay.  And -- and that's the same
19 since 2015 and before 2015, right?
20    A.    Correct.  Yes.
21    Q.    Okay.
22    A.    They have to bid for their schedule, yeah.
23 So for December, start bidding their schedule for
24 next year.
25    Q.    Okay.  Are there -- are there any other

**24**

1 types of time off a flight attendant can -- can
2 accrue?  I mean, I -- so I've asked you about sick
3 time and vacation time just because I assume Frontier
4 offers that, but -- but is there any other time of --
5 of accrued -- or any other type of accrued time off?
6    A.    During what time period?  '11 through '15?
7    Q.    Yeah, let's start '11 through '15.
8    A.    There was a provision in the contract that
9 allowed them to accrue one day if they had perfect
10 attendance.
11    Q.    For a calendar year or for six months or --
12 or do you know?
13    A.    Six months.  I believe it was six months.
14 But outside of that, they -- there was no other
15 option to approve time, that I can recall, at this
16 point.
17    Q.    Okay.  What about from '15 onward to the
18 present?
19    A.    Nothing outside of that perfect attendance,
20 that I can think of.
21    Q.    Okay.
22    A.    There may be, but I just -- it's not coming
23 to my memory.
24    Q.    Okay.  A quick follow-up on the -- the --
25 you -- you told me that if somebody called in sick,

## GERARDO ARELLANO - July 14, 2020

25

1 within 24 hours they can make a request to -- to
2 retroactively code that as IFM?
3     **A.     Correct.**
4     Q.     Is there any reason why the policy is 24
5 hours?  Do -- do you know?
6     **A.     Not specifically.**
7     Q.     Okay.
8     **A.     I -- I don't know the background to that.**
9     Q.     Okay.  Is it different -- if somebody -- if
10 somebody requests to have the trip recoded to IFM
11 within the 24-hour period, does it matter -- and I'm
12 asking just about applying the 24-hour period -- does
13 it matter whether that person has made a request for
14 a reasonable accommodation?
15     **A.     You lost me again.**
16     Q.     Yeah.  So -- so after -- so a person calls
17 in sick.  They want to re -- they -- they want to
18 recode the sick day as an IFM day, and they've got 24
19 hours to do it.
20     **A.     Okay.**
21     Q.     Does -- does Frontier -- does it matter at
22 all whether or not the person has made a request for
23 a reasonable accommodation?
24         So what I'm asking is could they have 36
25 hours in that instance, or is it just 24 hours no

26

1 matter what?
2     **A.     In certain cases, we kind of assess the**
3 **situation to determine what -- the nature of the**
4 **request or is there a condition, was there something**
5 **that prohibited them from making that 24-hour**
6 **notification.  We would take that into consideration.**
7     Q.     Okay.  So -- so there's flexibility in the
8 policy?
9     **A.     No.  You had to call within that 24-hour**
10 **time period, but if there's something precluding that**
11 **individual in that moment -- I mean, there's many**
12 **medical conditions that potentially could be.  We**
13 **would have to assess it in that minute.**
14     Q.     Got it.  So --
15     **A.     But -- but we -- everybody had to call**
16 **within 24 hours of that.**
17     Q.     Yeah.  But I guess what I'm asking is so
18 it's not an absolutely rigid policy because you might
19 make an exception if somebody had some condition that
20 prevented them from complying with the 24 hours?
21     **A.     Sure.  Yeah.**
22     Q.     Okay.  All right.  So I want to -- I want
23 to ask you, hopefully in -- in a -- in a -- in an
24 efficient way, about the job duties of flight
25 attendants.

27

1         So -- so do you recall yesterday we
2 spoke -- we spoke at some length about what it is a
3 flight attendant does day to day?
4     **A.     Yeah.**
5     Q.     Okay.  Have those duties changed at all
6 from 2015 onward to the present?
7     **A.     From when again?  The time period?**
8     Q.     From the time period 2011 -- so yesterday
9 we talked about what flight attendants do from the
10 end of 2011 to the end of 2015.
11     **A.     Uh-huh.**
12     Q.     And I'm curious if there's anything --
13 and -- and it doesn't have to be small, minute
14 details, but any -- any -- if there's anything that
15 sticks out in your mind as having changed in what a
16 flight attendant does day to day from the end of 2015
17 to the present.
18     **A.     Yes.  A lot of it is -- now they do sales**
19 **onboard.  A lot of that.  So that's changed since**
20 **then.**
21     Q.     Okay.
22     **A.     Trying to think.  Yeah, other things within**
23 **the day-to-day has possibly changed, but I can't**
24 **account for them all.  But one that comes to mind is**
25 **the sales.  We do more sales onboard.**

28

1     Q.     And what are they selling?
2     **A.     They sell from -- it -- again, from that**
3 **time period, a change -- at one point we were doing**
4 **boxes.  They were doing some form of meals, and then**
5 **it changed to dry snacks.  And then the dry snacks**
6 **then changed to certain potato chips.**
7         **Drinks, obviously.  We served wine at one**
8 **point, different types of wine, and then we also**
9 **do -- the credit card promotion was also included as**
10 **part of that.  And the devices also changed, so . . .**
11     Q.     Okay.  Do you recall yesterday we talked
12 generally about what benefits are afforded to flight
13 attendants, so medical insurance?
14     **A.     Yes.**
15     Q.     Okay.
16     **A.     Yes.**
17     Q.     Has anything changed from the end of 2015
18 to the present in terms of what benefits are offered
19 to flight attendants?
20     **A.     Are you -- has -- different benefits, are**
21 **you asking?  Or changes within the benefits or types**
22 **of benefits?**
23     Q.     So -- so not changes within the plan --
24     **A.     Yeah.**
25     Q.     -- within the insurance plan, but -- but --

**GERARDO ARELLANO - July 14, 2020**

29

1 but types of benefits.

2    A.    We do -- I think we offer company-paid LTD,
3 long-term disability. So at one point, the employee
4 paid for it. Now we -- the company pays for
5 long-term disability.

6    Q.    Okay.

7    A.    And the company also pays for vision as
8 well, and I believe dental. But yeah. But primarily
9 the long-term disability was the biggest change.

10    Q.    And so when you say pay for long-term
11 disability, vision, and dental, you mean the company
12 pays the entirety of the premium?

13    A.    Correct.

14    Q.    Okay. And then medical is still split in
15 some way?

16    A.    Yes. The employee pays a portion.

17    Q.    Yesterday, we also talked a fair amount
18 about the Frontier self-disclosure plan. Do you
19 recall that?

20    A.    I do.

21    Q.    Okay. Has anything changed with regard to
22 the self-disclosure plan from the end of 2015 to now?

23    A.    I believe so. I think it was what was
24 determined self-disclosure.

25    Q.    And -- and what does that mean?

30

1    A.    By simply including it on your FMLA
2 application, that could be interpreted that you're
3 self-disclosing to the company. And I'm not -- I'm
4 trying to figure out when that was rolled out, but
5 that was a change between 2015 and present.

6    Q.    Okay. Anything else that you can recall?

7    A.    You say specific to change within the
8 reporting structure or -- I do -- I know we changed
9 vendors of who we used. But other than that, I can't
10 recall any other specific change.

11    Q.    Okay. What about generally with regard to
12 substance abuse, alcohol or drugs? Does Frontier
13 have any new or different programs from the end of
14 2015 to now?

15    A.    I can't recall. I would have to look at
16 the employee handbook, if it's something referenced
17 in there.

18    Q.    Sure. Do you know if the flight attendants
19 and Frontier had negotiated any new or different
20 collective bargaining agreement since the end of
21 2015?

22    A.    Like renegotiated the agreement? Yes.

23    Q.    Correct. Okay. Do you know how many
24 times?

25    A.    Once.

31

1    Q.    And when did that occur?

2    A.    I think January of 2019. Possibly around
3 there.

4    Q.    Okay. Do you know if Frontier agreed to
5 any new obligations under the -- the new collective
6 bargaining agreement with regard to seniority or how
7 shift bidding works?

8    A.    Can you say that again?

9    Q.    Do you -- do you know if -- if Frontier
10 agreed to any new structure in the collective
11 bargaining agreement that -- that dictates how shift
12 bidding and seniority works?

13    MS. KITSON:  I'm going to object at this
14 point. I mean, I've been letting this go pretty far
15 afield just for general background and general policy
16 information, but we're now into 2019.

17    That's way outside the relevant time
18 period, and I'm going to instruct him not to answer
19 that question. It's going to reveal confidential
20 information about union negotiations. He's not
21 answering that question.

22    MR. CRONE:  Well, he's -- he's -- so
23 your -- your objection on relevance is noted, but you
24 can't instruct to answer based on relevance -- or
25 instruct not to answer based on relevance.

32

1    Moreover, I'm not asking him to -- to
2 reveal the negotiations. Literally, I'm asking
3 whether a new seniority provision now exists or
4 doesn't exist.

5    Any flight attendant at Frontier would
6 probably know this information; any management
7 official would probably know this information. It's
8 not confidential in any way.

9    MS. KITSON:  And I am invoking the
10 protective order provisions of the federal rules to
11 say that this is so far outside the field and impacts
12 current flight attendant negotiations and the
13 collective bargaining agreement. I'm not letting him
14 answer that question.

15    If we need to call the judge, that's
16 perfectly fine, but I don't see -- and relevance does
17 play into that in the sense of whether this is unduly
18 harassing or prying into the business affairs of the
19 company unnecessarily.

20    MR. CRONE:  Well, let's -- let's attack
21 the relevance. First, the -- the relevance is clear.

22    So -- so part of the reason Frontier
23 testified it couldn't accommodate Ms. Brigham was
24 due to the seniority provision in the collective
25 bargaining agreement.

## GERARDO ARELLANO - July 14, 2020

33

1    Whether that's different now is -- is
2 absolutely relevant to her claims. And -- and the
3 case law is clear on that. We've already taken this
4 issue to the judge, and Frontier did not prevail on
5 this issue last time we were before the judge.
6    And, again, there's nothing confidential,
7 work product proprietary about a provision in a
8 collective bargaining agreement that exists out in
9 the world right now. I'm simply --
10    MS. KITSON: We --
11    MR. CRONE: -- asking -- I'm simply
12 asking Mr. Arellano if he knows whether that
13 provision is different than it was under the regime
14 that Mr. [sic] Brigham lived under. That's a
15 perfectly fine, relevant, permissible question.
16    And -- and if -- and if you're going to --
17 if you're going to stand on this hill, then let's
18 call the judge.
19    MS. KITSON: Okay. I think that's fine. I
20 mean, and that is not what the ruling was. We went
21 to the judge. We defined the relevant time period,
22 and the relevant time period, by court order, was
23 defined as November 2011 through November 2015.
24    So, you know, I've allowed you to answer
25 some -- ask some questions about general policies,

34

1 but when you get into union -- union negotiations,
2 what was negotiated and the dynamics of that four
3 years after the fact, we're not going to go there. I
4 mean, I'm happy to call the judge, if you'd like.
5    MR. CRONE: Well, to -- to be -- to be
6 clear, what I meant by we've already addressed this
7 issue is what the scope of relevance is. And -- and
8 we agreed at that point, before we went to the judge
9 last time, that we'd cap it at the end of 2015 just
10 to prevent the argument, but the scope of what's
11 relevant still extends to all of the -- the
12 employer's general practices.
13    And here, we're -- we're not asking for --
14 again, we're not asking for anything that's
15 confidential, proprietary, protected in any way. And
16 so --
17    MS. KITSON: You are asking for
18 confidential, proprietary information that's
19 protected. This is not something the company
20 publishes.
21    MR. CRONE: It's published in the
22 collective bargaining agreement right now because --
23 because he said they -- they -- he just testified
24 that they renegotiated in January 2019. Every flight
25 attendant right now has a copy of it.

35

1    MS. KITSON: Yeah, employees of the
2 company. Current flight attendant employees have a
3 copy of it, internal to the company. It's not posted
4 online.
5    MR. CRONE: Every flight attendant could
6 publish that thing online if they wanted to. There's
7 absolutely nothing stopping them. And so to say it's
8 confidential is -- it's not -- it's not -- it's
9 disingenuous.
10    I just -- I just want to ask if the policy
11 is different now than it was before. The policy
12 lives in the collective bargaining agreement. The
13 collective bargaining agreement is -- is in the hands
14 of hundreds, probably thousands of people out there
15 in the world. That's it.
16    MS. KITSON: I mean, a -- a company has a
17 right to publish and to provide access to information
18 to its employees and to keep that confidential.
19    Nevertheless, I will allow him to answer
20 as to what the current state of the collective
21 bargaining agreement is. I will not allow him to
22 answer as to the negotiations that went into that.
23 Is that --
24    MR. CRONE: I'm not asking about the
25 negotiations. I'm -- I'm asking -- I -- I -- the --

36

1 the question only asks what the policy is.
2    So thank you, Danielle. I appreciate it.
3 Let's -- let's carry on.
4    Q.  (BY MR. CRONE) Mr. Arellano, I'm -- I'm --
5 I'm going to repeat the question for you because it's
6 probably lost in the depths of your mind somewhere
7 after that.
8    So -- so the question I was asking is, with
9 regard to the -- the seniority and the shift-bidding
10 provision that existed in the -- in the collective
11 bargaining agreement between 2011 and 2015 that we
12 discussed with -- with respect to Ms. Brigham
13 yesterday -- so I just want to focus you right in on
14 just the -- that provision.
15    Today, from 2015 to now, is that provision
16 any different in the collective bargaining agreement?
17    MS. KITSON: Object to form. Vague and
18 ambiguous as to "that provision." Are you asking him
19 generally how bidding works? Are you pointing to a
20 specific CBA provision?
21    MR. CRONE: Your objection is noted. I
22 think he can answer if he understands.
23    A.  Yeah, I truly don't know. I was -- since
24 I've handled more on the pilot side since then, I
25 haven't been involved in much of the flight attendant

## GERARDO ARELLANO - July 14, 2020

37

1 contract, so I don't have much of the details from
2 the flight attendant contract anyway.
3     Q.    That's fair.  Thank you.
4     A.    Yeah.
5     Q.    Yesterday, you talked a fair amount about
6 what -- what happens at Frontier if -- if -- if
7 Frontier, you know, know -- knows that somebody has a
8 disability.  And so -- so you called that the
9 interactive process, and you -- you took me through
10 all those steps.  Do -- do you recall that?
11    A.    Yes.
12    Q.    Has anything changed with regard to that
13 interactive process at Frontier between the end of
14 2015 to now?
15    A.    When you say "changed," with regard to how
16 we handle it or steps?  I mean, what specifically?
17    Q.    That -- that's correct, how -- how you
18 handle it.  So the steps you outlined yesterday for
19 me.  And we can go back over them if you don't
20 remember, but -- but if you do remember and you can
21 answer, that's -- that's the question.
22    A.    To my knowledge, I don't think anything's
23 changed.  I think we basically do the intake with the
24 meeting and determine next steps.
25    Q.    Okay.  Have you conducted any of these

38

1 meetings, these interactive process meetings, since
2 the end of 2015?
3     A.    Yes, some.  Not all.
4     Q.    Can you -- can you recall how many?
5     A.    Not offhand, no.
6     Q.    Is it less than five?
7     A.    I would say more than five.
8     Q.    Can you recall, at any of these -- during
9 any of these interactive processes, whether or not
10 you agreed to allow an employee to modify their
11 schedule?
12    A.    I would have to look at my records.  I
13 can't recall.
14    Q.    Can you --
15    MS. KITSON:  I'm going to object on, again,
16 it's outside the scope of what the judge ordered in
17 terms of the relevant time period.
18    Q.    (BY MR. CRONE)  Can you recall, at any of
19 these interactive processes, whether or not you've
20 allowed an employee to -- to be reassigned
21 temporarily to a different position?
22    MS. KITSON:  Objection.  We're so far --
23 what time period are you talking about?
24    MR. CRONE:  We're -- we're -- we're in the
25 period from the end of 2015 onward.

39

1     MS. KITSON:  I'll let him speak generally
2 to that, but I'm not going to -- and as to flight
3 attendants, but beyond that, we're getting a little
4 too far afield.  But can you ask -- can you ask the
5 question again?
6     MR. CRONE:  So -- so -- so, Danielle,
7 let's -- let's try to clear this up now.
8     So I'm entitled -- this isn't the 30(b)(6)
9 deposition, so I -- I'm -- I'm entitled to inquire of
10 anything that's discoverable.
11    And so -- so it's not a -- so -- so -- so
12 here the question is, from the end of 2015 onward,
13 has Mr. Arellano been involved in any -- any
14 interactive processes in which a flight attendant was
15 granted the reasonable accommodations that were
16 denied to Ms. Brigham.  It's clearly relevant.  It's
17 proper.  It's discoverable.
18    And so if we agree on that much, then let's
19 carry on with the deposition.  If we can't agree and
20 we're going to keep getting delayed with these long
21 speaking objections, we should get the judge on the
22 phone.
23    MS. KITSON:  I don't know that we can
24 agree, because we -- not just with respect to the
25 30(b)(6) deposition -- we disagreed on the scope of

40

1 time that would be permissible in this case, not just
2 with respect to the 30(b)(6) deposition.
3     And we argued about that, and we argued
4 about the scope of comparators, and we agreed and the
5 Court ordered that the relevant time period with
6 respect to comparators generally -- and that was one
7 of the 30(b)(6) topics -- that we would not go
8 outside of that time frame.
9     MR. CRONE:  We --
10    MS. KITSON:  Let -- let me take a break,
11 John, and take a look back at the Court's order and
12 take a look back at our correspondence.  Let me take
13 ten minutes and look back --
14    MR. CRONE:  Okay.
15    MS. KITSON:  -- and we can maybe confer
16 offline.
17    MR. CRONE:  Okay.  But -- but before we do,
18 I just want to note that the Court's order applied to
19 the 30(b)(6) deposition.  That's it.
20    And -- and the authority that the Court
21 relied on, that authority clearly laid out that
22 events even four or five years after an employee's
23 termination are relevant to that employee's claims
24 when they have to prove intentional discrimination,
25 which Ms. Brigham needs -- needs to do here.  So --

## GERARDO ARELLANO - July 14, 2020

41

1 so --
2        MS. KITSON:  Right.
3        MR. CRONE:  -- with that said, let's --
4 and -- and with this question still pending, you
5 know, let's -- let's take the break.
6        MS. KITSON:  Okay.
7        THE VIDEOGRAPHER:  The time now is
8 9:40 a.m.  We're off the record.
9        (Recess from 9:40 a.m. to 9:52 a.m.)
10        THE VIDEOGRAPHER:  The time now is 9:52.
11 We're back on the record.
12        MR. CRONE:  So can the court reporter
13 please read back the last pending question.
14        THE REPORTER:  Sure.  Sorry; I have to go
15 back a minute.
16        MR. CRONE:  I -- I know.  That's fine.
17        MS. KITSON:  While the court reporter does
18 that, too, I just want to put on the record what we
19 just discussed, which is that Frontier is allowing
20 these questions to proceed for this specific
21 deposition, but we are reserving our rights, and it
22 is -- and our objections -- and it is our position
23 that this is outside the scope of what should be
24 permissible in questioning.
25        That said, for this deposition to move

42

1 forward and in the interest of efficiency, we'll
2 allow the questions as to flight attendants
3 post-2015.
4        MR. CRONE:  And -- and -- and while
5 Plaintiff -- just for the record, and while
6 Plaintiff disagrees with the substance of Frontier's
7 objections, Plaintiff in no way thinks Frontier has
8 waived its objection.
9        MS. KITSON:  So with that, could we read
10 the question back?
11        MR. CRONE:  Thank you.
12        THE REPORTER:  Yes.  Now I've got to go
13 back again.
14        MS. KITSON:  Sorry.
15        THE REPORTER:  That's okay.
16        (The last question was read by the reporter
17 as follows:  "Can you recall, at any of these
18 interactive processes, whether or not you've allowed
19 an employee to -- to be reassigned temporarily to a
20 different position?")
21        MS. KITSON:  I don't think that was the
22 last question, was it?
23        MR. CRONE:  I -- I think it -- my -- my
24 recollection is that it was.
25        THE REPORTER:  That's what I show as the

43

1 last one.
2        MS. KITSON:  Okay.  Well, can you restate
3 the question, then, I guess, John?  Just restate the
4 question.
5        MR. CRONE:  Yeah, I can --
6   Q.   (BY MR. CRONE)  Well, first let me ask,
7 Mr. Arellano, did -- did you have trouble
8 understanding the question that the court reporter
9 read back?
10   **A.   Yes.**
11   Q.   Okay.  Well, then let's -- let's back up a
12 tad, not to waste time, but just to bring context
13 back into the room.
14        And so I had asked you if -- if you had
15 conducted any interactive process meetings from the
16 end of 2015 onward to the present.  Did you recall
17 that?
18   **A.   Yes.**
19   Q.   Okay.  So let's start there.  Oh, and I'd
20 asked you how many do you recall conducting.  You had
21 stated more than five.
22   **A.   Correct.**
23   Q.   And do you recall that answer?
24   **A.   I do.**
25   Q.   Okay.  Was it more than ten?

44

1   **A.   Between 2015 and present?**
2   Q.   Yes.
3   **A.   Possibly, yeah.  I would have to look in my**
4 **records.**
5   Q.   And I understand you'd have to look in your
6 records to be exact.  Is it -- is it possible that
7 there was more than 15?
8   **A.   Possibly.**
9   Q.   What about more than 20?  Is that possible?
10   **A.   No.**
11   Q.   Okay.  All right.  And in any of these
12 interactive process meetings that you -- that you
13 just identified from the end of 2015 onward to the
14 present, in any of those, did you grant an employee a
15 temporary reassignment to a different position?
16        MS. KITSON:  I'm going to limit that
17 question to flight attendants since that's what we're
18 talking about.
19   Q.   (BY MR. CRONE)  I'm going to -- I'm --
20 I'm -- I'm going to ask -- so -- so -- so the
21 question stands.  It's any employee and any
22 interactive process meeting that you've just
23 identified, any employee.  Did you grant them a
24 temporary reassignment to a different position?
25        MS. KITSON:  We'll have to call the judge

## GERARDO ARELLANO - July 14, 2020

**45**

1 on that.  See, and that's the divisible unit, that's
2 the universe of comparators, is flight attendants.  I
3 mean, are you talking about baggage handlers?  You're
4 talking about the entire company for a five-year
5 period?
6          MR. CRONE:  So -- so, Danielle, I -- I've
7 got to -- I -- so what's the objection?
8          MS. KITSON:  The objection is that it's
9 unduly burdensome and harassing and outside the scope
10 of what the Court ordered, and it's outside the scope
11 of the comparative universe that's at issue.
12          MR. CRONE:  So -- so, one, the Court hasn't
13 ordered anything with regard to this deposition.
14 Second, the scope of the comparators is -- has not
15 been ordered either, so the Court hasn't said only
16 these people are comparators.
17          This is discovery.  We're entitled to
18 discover.  In fact, in the spreadsheet that was
19 produced for yesterday's deposition, Frontier didn't
20 limit it to flight attendants.  There were various
21 other employees on that spreadsheet.
22          And so if -- I didn't hear anything in --
23 in your objection that would allow you to instruct
24 the witness not to answer the question, and so if we
25 have to -- if you want to stop the depo, we can stop

**46**

1 it, and we can go to the judge, but, again, this
2 is -- this is clearly relevant information.  It's
3 discoverable.
4          MS. KITSON:  Let me --
5          MR. CRONE:  It's not --
6          MS. KITSON:  Let's just go off the record
7 really quickly.  Let's go on mute.  I have one
8 question for the witness.  Let's go on mute for a
9 second.
10          MR. CRONE:  Hold on.  There's -- there's
11 a -- there's a question pending, and so I don't -- I
12 don't want to leave a question pending before we go
13 off the record.
14          MS. KITSON:  Right, but I can't determine
15 whether we're going to call the judge or not unless I
16 confer with the witness quickly.
17          MR. CRONE:  Danielle --
18          MS. KITSON:  Let's call the judge.
19          MR. CRONE:  Let's -- why don't you --
20          MS. KITSON:  You're -- you're probing
21 beyond the scope of what is relevant to this case in
22 a post-2015 world which has nothing to do with
23 anything, and it's harassing to the company and
24 prying into the business affairs of the company
25 unnecessarily.

**47**

1          MR. CRONE:  If we -- if we -- if we go off
2 the record, can you review the authority that
3 Plaintiff submitted to the judge in our last dispute
4 where courts have held -- many courts have held that
5 even four or five years after an employee's date of
6 termination, what the company does is relevant
7 because -- and discoverable, properly discoverable,
8 because the -- it's -- it's absolutely relevant to
9 the employer's intent that the -- that the employee
10 has to prove.
11          And so we're not treading new ground here.
12 I mean, this is -- this is -- this is well-worn
13 territory, and if we have to go to the judge about
14 it, then let's do it.
15          But -- but the question that was pending,
16 you were fine with it if it was -- if it was confined
17 to flight attendants but not if we add customer
18 service agents or counter service agents.  I -- I
19 don't understand how that's the dividing line between
20 what's discoverable and what's not.  And -- and I --
21          MS. KITSON:  It's -- under -- under the
22 ADA, the relevant universe is the similarly situated
23 comparable employee universe, and we've talked about
24 that in the context of the organizational structure
25 of the company through the flight attendant reporting

**48**

1 structure and with respect to flight attendants
2 specifically.
3          So to go rooting around in what's happened
4 post-2015 with respect to baggage handlers is too far
5 afield, and, you know, I believe this is probably
6 going to be a bigger discovery fight than this
7 deposition.
8          And I just don't know that it's even an
9 issue in this deposition, and I just need -- let me
10 go off the record and look again at the authority
11 that you've cited.
12          MR. CRONE:  And let's -- and -- and if
13 we -- and -- and this time, let's -- if -- if we --
14 if we can't agree, let's just get the judge on the
15 phone, because now we've -- you know, we're 20
16 minutes into this dispute, and I think the depo would
17 be over by now.  So . . .
18          MS. KITSON:  I 100 percent agree about the
19 judge.  So let me just take a quick look at that, and
20 we'll come back on.
21          MR. CRONE:  Okay.  Let's go off the record.
22          THE VIDEOGRAPHER:  The time now is 10 a.m.
23 We're off the record.
24          (Recess from 10:00 a.m. to 10:15 a.m.)
25          THE VIDEOGRAPHER:  The time now is 10:15.

## GERARDO ARELLANO - July 14, 2020

49

1 We're back on the record.
2        MR. CRONE:  So, Danielle, do you want to
3 put your position on the record, and then we'll do
4 ours, and then we'll read back the last question?
5        MS. KITSON:  Sure.  On the break, I
6 attempted to do some legal research and to look back
7 at the Court's orders and, unfortunately, was not
8 able to do that from a technical standpoint.
9        So we are going to allow Mr. Arellano, for
10 the sake of efficiency, to answer these questions,
11 but Frontier is lodging the objection, preserving its
12 rights, and would like to confer with Mr. Crone after
13 this deposition for purposes of future discovery.
14 But Mr. Arellano, for today, can answer the
15 questions.
16        MR. CRONE:  And Plaintiff is of the opinion
17 that that's a fine solution.  All of Frontier's
18 objections, we agree, are reserved.  We will
19 absolutely confer on them in the future.
20        And now if we could read back the last
21 question, we'll -- we'll get going again.
22        THE REPORTER:  Sure.  Sorry.
23        The last question:  "I'm going to -- I'm
24 going to ask -- so -- so the question stands.  It's
25 any employee and any interactive process meeting that

50

1 you've just identified, any employee.  Did you grant
2 them a temporary reassignment to a different
3 position?")
4        Q.  (BY MR. CRONE)  Do you understand that
5 question, Mr. Arellano?
6        A.  I do.
7        Q.  Okay.
8        A.  I -- I don't recall.
9        Q.  Okay.  And what about any employee in which
10 you've conducted an interactive process meeting from
11 the end of 2015 onward to the present?  Did you grant
12 them a modified schedule?
13        A.  Can you repeat that again?
14        Q.  Yeah.  So in any interactive process
15 meetings from 2015 to the present, for any employee
16 that you've been involved in, have you granted any
17 of those employees a modified schedule as an
18 accommodation?
19        A.  I can't recall at this moment.
20        Q.  Do you recall a Frontier employee named
21 David St. Hilaire?
22        A.  Not offhand, no.
23        Q.  Since the end of 2015 onward to the
24 present, have you been involved in the termination of
25 any employee at Frontier?

51

1        A.  Possibly, yes.  I'd have to look at my
2 notes.
3        Q.  Can you recall how many?
4        A.  Since 2015 to present?
5        Q.  Yes.
6        A.  I can't recall.  It would have to be a
7 handful.  Not many.
8        Q.  So is it possible it was more than five or
9 less than five?
10        A.  Possibly more than five.
11        Q.  Is it possible it's more than ten?
12        A.  No, I don't think more than ten.
13        Q.  And of those terminations that you were
14 involved in, can you recall if any of those
15 terminated employees suffered from alcoholism?
16        A.  I don't recall.
17        Q.  What about any form of substance abuse or
18 addiction?
19        A.  Again, I can't recall.
20        Q.  Mr. Arellano, is -- is there anybody
21 sitting to your right?
22        A.  No.
23        Q.  What about to your left?
24        A.  Danielle.
25        Q.  Okay.  Any -- anybody else?

52

1        MS. KITSON:  (Inaudible.)
2        THE REPORTER:  I'm sorry?  I didn't hear
3 you.
4        Q.  (BY MR. CRONE)  Is -- is there anybody else
5 sitting to your left?
6        A.  No.  Just -- well, Carolyn --
7        MS. KITSON:  Carolyn Theis is down at the
8 very end of the conference table.
9        MR. CRONE:  Okay.
10        Q.  (BY MR. CRONE)  All right.  I'm going to
11 hand you -- just like we did yesterday, I'm going to
12 e-mail it to Danielle and then hand you what's been
13 marked Exhibit 1.
14        Same drill.  Once you've pulled that up and
15 you've reviewed it, let me know.
16        A.  Okay.  I have it up, and I'm reading it
17 now.
18        Q.  Thank you.
19        A.  Okay.
20        Q.  Do you know what this document is?
21        A.  The document is a Performance Counseling
22 Record.
23        Q.  Have you ever -- have you seen these
24 documents before?
25        A.  Yes.

## GERARDO ARELLANO - July 14, 2020

53

1    Q.    Is this a form that Frontier used back in
2 September of 2014 when the document's dated?
3    A.    I believe so.
4    Q.    Okay.  Have you ever filled out one of
5 these forms?
6    A.    Yes.
7    Q.    Who -- who would typically fill out one of
8 these forms?  By that -- by that I mean what would
9 their position be?
10    A.    Could be a supervisor and above.
11    Q.    Okay.  And what's the issue -- and so -- so
12 this -- this is issued to Rebecca Brigham; is that
13 correct?
14    A.    It looks -- yes, her name is on there.
15    Q.    Okay.  And it was -- it's dated
16 September 1, 2014; is that correct?
17    A.    Correct.
18    Q.    And is there any way to tell who -- who --
19 who filled out this form by looking at it?
20    A.    No, not off -- by looking at it, no.
21    Q.    Okay.
22    A.    You can't see who filled it out.
23    Q.    And I see where -- towards the bottom
24 where it says Issued By and there's place for a
25 supervisor's signature, there's no signature there.

54

1 Is that -- is that unusual?
2    A.    No, there should be a signature on there.
3    Q.    And down at the very bottom where it says
4 Employee's Signature, there's not one there either.
5 Is that unusual?
6    A.    No.  We should have the employee's
7 signature, but that is not unusual.
8    Q.    Okay.  So sometimes employees don't sign
9 but the supervisor should sign?
10    A.    Correct.
11    Q.    Okay.  And then what is the -- can you tell
12 by looking at this what the -- what the issue is
13 here, why this was issued to Ms. Brigham?
14    A.    Failure to read a "Must Read," seems like.
15    Q.    And then can you tell by looking at this
16 what -- how Ms. Brigham was expected to resolve this
17 issue?
18        MS. KITSON:  Object to the form.
19    A.    It looks like she was being asked to
20 complete the CBT in accordance to FAM 5 -- 05.25,
21 page 4.
22    Q.    (BY MR. CRONE)  Okay.  Would that be the
23 proper directive to issue Ms. Brigham for this
24 situation?
25        MS. KITSON:  Object to the form.

55

1    A.    In terms of failure to complete or read the
2 CBT?
3    Q.    (BY MR. CRONE)  Correct.
4    A.    Yes.
5    Q.    Okay.  And then right in the middle
6 it says, Effective 9/1/14, you begin a
7 warning/suspension of 365 calendar days, ending
8 9/1/15.
9        Do you see where I just read that?
10    A.    Yes.
11    Q.    Is -- is that -- is that -- is it proper
12 to put someone on a 365-day -- calendar day
13 warning/suspension for this type of issue?
14        MS. KITSON:  Object to the form.
15    A.    That, I -- I wouldn't know.
16    Q.    (BY MR. CRONE)  Okay.  Okay.  We can set
17 that aside.  I'm going to hand you, in the same
18 manner, what has been marked Exhibit 2.  And same --
19 same thing.  Once you've opened it and reviewed it,
20 let me know.
21    A.    Okay.
22    Q.    Okay.  You've seen this document before,
23 haven't you?
24    A.    Yes.
25    Q.    And you -- you wrote this document,

56

1 correct?
2    A.    Correct.
3    Q.    Okay.  And it's dated January 29, 2010?
4    A.    Uh-huh.
5    Q.    Do you think that's the correct date?
6    A.    I believe so, yes.
7    Q.    Okay.  And why did you write this document
8 to Ms. Brigham?
9    A.    To give her an update in terms of where she
10 stood with her occurrences at that time period.
11    Q.    Okay.  So this is not disciplinary in
12 nature?
13    A.    No.
14    Q.    Is this part of -- did you write this
15 letter as part of the dependability policy --
16 policy -- excuse me -- as it existed prior to 2012?
17    A.    I believe so, yeah.
18    Q.    And towards the bottom, you list out sick
19 occurrences.  Do you see where there's four sick
20 occurrences listed?
21    A.    Yes, sir.
22    Q.    Was -- was there anything abnormal about a
23 flight attendant using sick days during this time?
24    A.    No.
25        MS. KITSON:  Object to the form.

**GERARDO ARELLANO - July 14, 2020**

---

57

1    A.    No.

2    Q.    (BY MR. CRONE)  No?  Were these -- so

3 this -- this letter was issued prior to 2012.  Was --

4 was there -- was -- was it considered an infraction

5 at that time for Ms. Brigham -- an infraction under

6 the dependability policy for Ms. Brigham to have used

7 these sick days?

8    A.    No.

9    Q.    Okay.  We can set that aside, and I'll hand

10 you what has been marked Exhibit 3.  And after you've

11 reviewed that document, let me know.

12    A.    Okay.

13    Q.    Have you seen this document before?

14    A.    Yes.

15    Q.    Okay.  Do you know who wrote it?

16    A.    To my understanding, Rebecca did.

17    Q.    Do you -- when did you first see this

18 document?  Can you recall?

19    A.    No.  Not the date specific, no.

20    Q.    Do you know if it was before or after

21 Ms. Brigham was terminated?

22    A.    Might have been before.

23    Q.    Okay.  We can set that aside, and I'll hand

24 you what has been marked Exhibit 4.  And after you've

25 reviewed that document, let me know.

---

58

1    A.    Okay.

2    Q.    Okay.  And have you ever seen any of

3 these -- these documents at -- at Exhibit 4?

4    A.    They look familiar, but I'm -- yeah.

5    Q.    Okay.  So let's -- let's start at page 1.

6 Would you agree with me that that's a letter from

7 Dr. Stephen Volin dated October 4, 2012?

8    A.    Yes.

9    Q.    Okay.  And here that letters says, To Whom

10 It May Concern:  This letter is to certify that

11 Rebecca Kruger is being seen in our office for

12 medical care.

13        First of all, are you aware that

14 Ms. Brigham, the plaintiff in this lawsuit, her --

15 her last name at the time was Kruger, not Brigham?

16    A.    Yes, it says there on the document.

17    Q.    And so here, this note from -- from

18 Ms. Brigham's doctor, would this constitute

19 sufficient evidence for an employee to take a -- a --

20 time off?

21        MS. KITSON:  Object to the form.

22    A.    Can you repeat that again?

23    Q.    (BY MR. CRONE)  Yeah.  So when Ms. --

24 in -- in reviewing this note and thinking about

25 when Ms. Brigham submitted this to Frontier on

---

59

1 October 4 -- or around October 2012, would this have

2 been sufficient evidence to allow her to take the day

3 off?

4        MS. KITSON:  Object to the form.

5    A.    I guess I'm stuck on the "allowed to take a

6 day off."  Yeah, she definitely has the option to

7 call in and have herself removed from her trip, for

8 certain, yeah.

9    Q.    (BY MR. CRONE)  And -- and if she did and

10 she said, "I'm taking a sick day" and submitted this

11 document, you would -- you would have no issue

12 saying, Well, that's a sick day, right?

13        MS. KITSON:  Object to the form.

14    A.    Based on that, yeah, I would think she

15 would -- I mean, that's what the sick policy would be

16 there for.

17    Q.    (BY MR. CRONE)  Okay.  And she wouldn't be

18 disciplined for having taken this day off, would she?

19    A.    It would depend on where she was within

20 total number of infractions or sick instances at that

21 time.

22    Q.    So this could have been coded still as an

23 infraction under the dependability policy?

24        MS. KITSON:  Object to the form.

25    A.    It would have been coded as a sick call and

---

60

1 subject to the dependability policy.

2    Q.    (BY MR. CRONE)  Got it.

3        Let's go to page 2 of this document.  Would

4 you agree that this is a note from Dr. Elizabeth

5 McCrann To Whom It May Concern dated May 30, 2013?

6        MS. KITSON:  Object to the form.

7    A.    Yes.

8    Q.    (BY MR. CRONE)  Okay.  So I have the same

9 question with regard to this document.  Is -- would

10 this document constitute sufficient evidence for

11 Ms. Brigham to have taken time off from Frontier?

12        MS. KITSON:  Object to the form.

13    A.    And can you define when you say "time off"?

14    Q.    (BY MR. CRONE)  Let's say she -- she

15 submitted this in order to take sick time.

16    A.    Yes.

17    Q.    Let's say she submitted this in order -- in

18 order to take FMLA time.

19    A.    When -- well, I guess, take FMLA -- because

20 I'm looking -- just really quickly, I'm looking at

21 the date of May 30.  So by that time, she would have

22 already had -- so it would have been retro to

23 April 1, '13.

24        At that point, she would have needed to

25 have already -- it's a little confusing, though.

---

## GERARDO ARELLANO - July 14, 2020

61

1 ". . . will be completely disabled from April 14
2 until June 14."
3          So she would have already taken sick time
4 at the time that she would have presented that note,
5 and it's looking like she needed additional time into
6 June, and she had questioned if this would have been
7 sufficient for her to take time off.  She would have
8 already been calling out.  And so I guess I'm lost in
9 the question.  Does that make sense?
10     Q.    It does make sense.  So would it have been
11 sufficient to retroactively code her time as FMLA?
12         MS. KITSON:  Object to the form.
13     A.    I would have to check and see if she had
14 FMLA in that -- in that time period.
15     Q.    (BY MR. CRONE)  Okay.  And would she have
16 been disciplined for taking this time off?
17         MS. KITSON:  Object to the form.
18     A.    Again, I would have to look and see where
19 she would have been in terms of dependability, in
20 terms of how many occurrences she would have had on
21 her -- on her record.
22     Q.    (BY MR. CRONE)  Okay.  Let's go to the
23 third page, and here -- this one's a little harder to
24 read.  It's a -- it's a -- it's written in -- in
25 doctor scribble a bit more, but would you agree that

62

1 this appears to be a note from Dr. Pamela Mattson
2 dated December 22, 2013?
3         MS. KITSON:  Object to the form.
4     A.    It looks like 2013, but it's kind of
5 blurry.  Yeah, definitely a doctor's note.
6     Q.    (BY MR. CRONE)  Okay.  And same question.
7 Would this be sufficient for Ms. Brigham to have
8 taken -- first -- we'll start with just sick time --
9 between December 17, 2013, and December 22, 2013?
10     A.    And can you repeat the question again?
11     Q.    Yeah.  Would this have been sufficient
12 evidence for Ms. Brigham to have taken sick time
13 during that time period?
14     A.    It would depend.  And, again, I would have
15 to go back to -- the note is postdated after the
16 22nd.  So if she called off for a trip and she called
17 out sick, this would be her way to substantiate the
18 time off.  But, again, she would have already called
19 out if she had trips scheduled during that time
20 period.
21     Q.    Are -- are there instances in which
22 employees at Frontier call off due to an emergency?
23 In other words, they're -- they're not able to call
24 ahead of time because the emergency, by definition,
25 hasn't happened yet?

63

1     A.    There is what they call emergency drop.
2     Q.    Okay.  And how does that work?
3     A.    I'm trying to recall.  A crew member or
4 flight attendant would have needed to call or make
5 contact with one of their -- if not their supervisor
6 or manager, explain the situation, and request and
7 see if they could take emergency drop for that time
8 period.
9     Q.    Okay.
10     A.    So the manager would evaluate what was
11 provided by the crew member or flight attendant and
12 then make that assessment themselves.
13     Q.    And they probably evaluate a doctor's note
14 just like this, right?
15     A.    If one was presented, yes, that would be
16 part of the decision-making process.
17     Q.    Okay.  And at that point in the
18 decision-making process, would this note have been
19 sufficient to excuse Ms. Brigham for -- under the
20 dependability policy?  Would she still get an
21 infraction there?
22     A.    So say that again.  You're seeing if this
23 would excuse her sick time?
24     Q.    Yeah.  Yeah.  Well, from being -- from
25 earning an infraction under the dependability policy.

64

1     A.    I guess I don't see the relevance of
2 emergency drop to this, and so that's where I'm
3 getting a little lost.
4     Q.    Well -- well, then, let me back up.
5          So -- so in that situation and then this
6 note is provided --
7     A.    Okay.
8     Q.    -- what would -- how would her time be
9 coded, that missed -- the missed time?
10     A.    Okay.  And so in -- in just that example,
11 what would the time be coded, not taking anything
12 else in consideration, she would have already had --
13 if she had a trip during the 17th and the 22nd, she
14 would have needed to remove herself from her trip;
15 typically how we look at the flight attendant's
16 responsibility for their schedule.  So they have to
17 call in and remove.
18          So she would have done that.  If she had a
19 trip, it would have been coded as possibly sick at
20 that time, if that's what she requested.  And then
21 how it would have been handled, it would fall under
22 the dependability policy.
23          And to your point, if she requested
24 emergency drop, then that would be something
25 different.

## GERARDO ARELLANO - July 14, 2020

65

1    Q.   Okay.  So then -- then there wouldn't be --
2    she wouldn't receive an infraction under the
3    dependability policy at that point?
4    A.   Under which point, though?
5    Q.   If she had requested the emergency drop.
6    A.   If it was approved by the inflight manager.
7    Again, she would have to -- she or he would have had
8    to review the circumstances of the situation.
9    Q.   Okay.
10   A.   Yeah.
11   Q.   And then what about if she submitted this
12   in order to retroactively code this as FMLA time?
13   Would this be sufficient evidence to accomplish that?
14        MS. KITSON:  Object to the form.
15   A.   I would have to, again, go back to if she
16   had FMLA in place.
17   Q.   (BY MR. CRONE)  What do you mean by "FMLA
18   in place"?
19   A.   You're saying if this would be sufficient
20   for her to put it as FMLA.  I would have to verify if
21   she had intermittent FMLA in place.  So she would
22   have had options.  If she didn't have FMLA in place,
23   she could have applied.  But, yeah, it depends.
24   Q.   So I just want to make sure I understand
25   that.

66

1        So you would look back to check to see if
2    she had already gotten approved for FMLA?
3    A.   I would have to just do my due diligence
4    and double-check.
5    Q.   Yeah, yeah, but -- but I'm just trying to
6    figure out the -- the steps you're actually taking.
7        So you're saying -- when you say I'd have
8    to go back and check to see if she had FMLA in place,
9    are you saying already certified, approved FMLA time
10   available?  Or are you talking about something else?
11   A.   No.  So, ultimately, you had asked me would
12   this be enough for her -- for the trip to be recorded
13   FMLA.
14   Q.   Correct.
15   A.   Anytime there's a recode, if they're
16   requesting FMLA, we have to see that the employee has
17   FMLA in place, in that example.
18   Q.   Yeah, and that's what I'm trying to really
19   just ask very specifically.  By "in place," do you
20   mean already approved?
21   A.   Already approved, correct.
22   Q.   Okay.  And if that wasn't there, could she
23   then apply for it?
24   A.   Yes.
25   Q.   Okay.

67

1    A.   Definitely.
2    Q.   Okay.  And if she did and presented this
3    note as evidence, would that be sufficient to recode
4    this as FMLA time?
5        MS. KITSON:  Object to the form.
6    A.   If she already did -- had FMLA in place?
7    Q.   (BY MR. CRONE)  Well, yeah.  Let's start
8    there.  Let's say she already had it in place and
9    this was submitted as evidence.
10       Would -- would the -- would the time off be
11   recoded to FMLA time?
12       MS. KITSON:  Object to the form.
13   A.   I guess the question would be when would
14   she have presented this note?  We would have to look
15   at that time frame as well.  So there's other pieces
16   that would be considered, I guess.  And it also
17   depends if it was intermittent FMLA versus continuous
18   FMLA.
19   Q.   (BY MR. CRONE)  So let me -- let me back up
20   and -- and try to make this a bit easier to
21   understand.
22   A.   Okay.
23   Q.   I'm not sure -- I'm not sure where the
24   disconnect is, but I believe if it's on my --
25       MS. KITSON:  It's a hypothetical question

68

1    outside of any specific situation.
2        MR. CRONE:  Okay.
3        MS. KITSON:  Anyway, ask your question.
4    Q.   (BY MR. CRONE)  If it's on my side, I want
5    to clarify for you.  And so -- so let's -- let's look
6    at the note.  The note's dated December 22, 2013,
7    correct?
8    A.   Correct.
9    Q.   And it appears to be excusing an absence
10   between December 17 and December 22.  Do you agree?
11   A.   Agree.
12   Q.   Okay.  So Ms. Brigham -- let's say she
13   submits this note on December 22, the day it's dated.
14   A.   Okay.
15   Q.   And she says, I'd like to recode that --
16   that time as FMLA time that I missed.
17   A.   Uh-huh.
18   Q.   Would -- and then you -- first of all,
19   would this note be sufficient for you, at that time,
20   to say, Okay, I'll do that or I won't do that?
21   A.   Perfect.  So, now, does she have FMLA in
22   place?
23   Q.   First let's say that she does.
24   A.   If she does and she provides this note on
25   December 22, 2013, which is on the day that the --

## GERARDO ARELLANO - July 14, 2020

---

69

1 looks like she was in the hospital, then yes.

2     Q.    Okay.  And now let's say she didn't have

3 the FMLA in place.

4     A.    Okay.  And so -- and the question is would

5 this constitute FMLA?  I mean, that's a conversation

6 that we would have to have and say, Do you want to

7 apply for FMLA?

8     Q.    So in that scenario -- in that scenario,

9 your response would be, Do you want to apply?  And

10 then it would go down that road?

11    A.    Yeah, because if she's requesting FMLA and

12 if it's not in place, then we would definitely send

13 her to the FMLA department to then submit her

14 application for FMLA.

15    Q.    Okay.  And then the final question in this

16 is, if she had the FMLA in place already -- and you

17 had just said this note would be sufficient to code

18 it as FMLA -- would those absences count against her

19 under the dependability policy?

20    A.    So in that example, if she had FMLA, if it

21 was continuous, then she wouldn't be required to put

22 the note.  But if it's intermittent FMLA and if it's

23 already in place, the note, whether she submitted it

24 or not, she could simply have requested it to be

25 recoded.

---

70

1         But either way, the FMLA, continuous

2 or FMLA, does not count against an individual's

3 dependability.

4     Q.    Thank you.  I appreciate you helping me

5 work through those questions.

6         So just a few last questions, and then,

7 like yesterday, we'll take a break real quick.  I'll

8 circle back and see if I missed anything.

9         So have you yourself ever been disciplined

10 by Frontier Airlines?

11    MS. KITSON:  Object to the form.  I'm

12 instructing the witness not to answer that question.

13 Actually --

14    MR. CRONE:  Danielle, do you want to -- do

15 you want to propose the same solution?  We could

16 agree to the same solution with regard to this

17 objection?

18    MS. KITSON:  Sure.  Go ahead.

19    MR. CRONE:  Okay.

20    Q.    (BY MR. CRONE)  Have you ever been

21 disciplined by Frontier Airlines?

22    A.    Yes.

23    Q.    Do you recall when?

24    A.    Last year.

25    Q.    So 2019?

---

71

1     A.    2018, 2019.

2     Q.    2018 or '19.  Any other -- have you ever --

3 ever been disciplined at any other time by Frontier

4 Airlines?

5     A.    Yes.

6     Q.    When?

7     A.    '16, '17.  2016, '17, in that -- possibly

8 around that time frame.

9     Q.    Any other times?

10    A.    Not -- not that I can recall.

11    Q.    Okay.  So thinking about the time in 2018

12 or 2019, what was the discipline for?

13    A.    Dependability.

14    Q.    Did you agree or disagree with the

15 discipline?

16    A.    Whether I agreed or not, it was

17 administered, so . . .

18    Q.    I understand that, but did you think it was

19 administered properly?

20    A.    Sure.

21    Q.    And why were you disciplined under the

22 dependability?

23    A.    Attendance.

24    Q.    How many days did you miss?

25    A.    That, I don't recall.

---

72

1     Q.    Why did you miss the days?

2     A.    They were just sick occurrences.

3     Q.    For what?

4     A.    Just for sick call, that I called in.

5     Q.    Do you recall what you were sick with?

6     A.    Not -- not right at this point, no.

7     Q.    Were you sick at all?

8     A.    Yes.

9     Q.    Okay.  Now, thinking back to the time in

10 2016, 2017, what were you disciplined for then?

11    A.    Dependability.

12    Q.    So that's also related to sick time?

13    A.    Correct.

14    Q.    How many days were you out?

15    A.    That, I don't recall.

16    Q.    Do you recall why you were out?

17    A.    Just for being sick.

18    Q.    Do you recall what you were sick with?

19    A.    No.

20    Q.    Were -- were you, in fact, sick?

21    A.    Yes.

22    Q.    Okay.  Have you ever been subject to any

23 sort of verbal counseling or -- or verbal warning or

24 something like that during your time at Frontier?

25    A.    Not that I can recall off the bat, no.

---

## GERARDO ARELLANO - July 14, 2020

73

1    Q.   Any sort of written counseling or warning
2    that wouldn't rise to the level of discipline?
3         A.   Not that I can recall at this point, no.
4         Q.   When you were disciplined under the
5    dependability policy, that was -- you weren't a
6    flight attendant during any of those times, were you?
7         A.   No.
8         Q.   Were you still subject to the same sort of
9    occurrences, sort of being -- receiving an infraction
10   based on the number of occurrences, or -- or was it
11   something different for you?
12        A.   It was just based on attendance.  I don't
13   know.  I guess I'm not understanding the question.
14        Q.   Yeah.  So you had mentioned that if -- if
15   Ms. Brigham, for example, was -- violated the
16   dependability policy, she'd receive an infraction.
17   And then if enough of these infractions added up,
18   what would happen?
19        A.   Is that --
20        Q.   Yeah, I'm asking you the question.
21             So if -- if -- if, under the dependability
22   policy, Ms. Brigham was -- was given an infraction,
23   how many could she get before something worse would
24   happen, and what would that be?
25        A.   For Brigham or . . .

74

1    Q.   Yeah, yeah, for Brigham.
2         A.   How many -- I guess -- I guess I'm not
3    understanding the question.
4         Q.   So let's go back to the time period 2011 --
5    end of 2011 to 2015.
6         A.   Okay.
7         Q.   Let's say Ms. Brigham violates the
8    dependability policy at that time.  She'd be given an
9    infraction, correct?
10        A.   If she violated the policy or she --
11        Q.   Yeah.
12        A.   She would -- it would just be an occurrence
13   towards the dependability policy.
14        Q.   Got it.  So there's an occurrence.  So how
15   many occurrences is she allowed?
16        A.   Total of eight.
17        Q.   And then after eight, what happens?
18        A.   Then the term processes or the steps kick
19   in, the investigatory meetings, per the contract.
20        Q.   Okay.  So what I'm asking is, with regard
21   to you and these depend -- the dependability issues
22   in 2018, '19, and 2016, '17, did it operate the same
23   way for you, or is it -- '17 -- or did it operate
24   differently?
25             MS. KITSON:   Same policy?

75

1             THE WITNESS:   No, the policy is different.
2         A.   I would fall under the corporate policy.
3         Q.   (BY MR. CRONE)   Okay.  And -- and how
4    does that work?  Does it track occurrences, or is
5    something else happening?
6         A.   It tracks occurrences, I believe.
7         Q.   Okay.  And how many occurrences could
8    you -- could you have before something negative
9    happened?
10        A.   I don't recall.  I'd have to look at the
11   employee handbook.
12        Q.   Okay.  But is it -- was there some limit
13   of -- on occurrences, and then the term steps would
14   also start?
15        A.   I would have to look at the employee
16   handbook.  I can't recall.
17        Q.   Okay.  Are the -- so there's a corporate --
18   a corporate dependability policy that applied to you,
19   and then there was a dependability policy that
20   applied to the flight attendants.
21             Is there a dependability policy at any
22   time, that you're aware of, at Frontier that applies
23   to the baggage handlers?
24        A.   I can't recall, no.
25        Q.   What about the counter service agents?

76

1         A.   I don't recall, no.
2         Q.   What about any of the other employees at
3    Frontier?
4         A.   I -- I don't recall.  Yeah.  Not offhand.
5         Q.   What -- what about the pilots?
6         A.   Not that I remember, no.
7         Q.   If you wanted to find out whether there was
8    a dependability policy that applied to the baggage
9    handlers, where would you look?
10        A.   I would look in first and see if it was
11   included in the contract, CBA.  And if it was not
12   there, then the employee handbook would apply.
13        Q.   Do you know if baggage handlers are
14   represented by a different union than Ms. Brigham's?
15        A.   Baggage handlers, no.
16        Q.   You don't know, or they -- or they are
17   represented by a different union?
18        A.   They're not represented by a union, baggage
19   handlers.
20        Q.   They -- they don't have a union?
21        A.   No.
22        Q.   So with them, you would look, then, just to
23   the employee handbook?
24        A.   Yes.
25        Q.   Okay.  What about the counter service

## GERARDO ARELLANO - July 14, 2020

77

1 agents?

2    A.    If there -- they would be held to the
3 employee handbook.

4    Q.    Okay.  Did they have -- are -- are -- are
5 the counter service agents issued a different
6 handbook than would have been issued to Ms. Brigham?

7    A.    Currently?  Are -- are you looking at now,
8 or during that time period?

9    Q.    Now.

10    A.    We outsource that function.

11    Q.    What about --

12    A.    We --

13    Q.    I'm sorry.  I --

14    A.    Go ahead.

15    Q.    What about during this time that
16 Ms. Brigham was employed?

17    A.    We would have deferred to the employee
18 handbook.

19    Q.    Yeah, and -- and was that the same handbook
20 Ms. Brigham would have been issued?

21    A.    Yeah.  At the time of the employment, she
22 gets the employee handbook.

23    Q.    Okay.  And then same question for the
24 counter service agents.  At the time that Ms. Brigham
25 was employed, would they have been using the same

78

1 handbook that Ms. Brigham was using?

2    A.    Yes.

3    Q.    Okay.  And what about the pilots during the
4 time that Ms. Brigham was employed?  Did -- were --
5 they were represented by a union, weren't they?

6    A.    They were, in-house union.

7    Q.    So it's different than Ms. Brigham's union?

8    A.    Yes.

9    Q.    Do you know the name of their union during
10 that time?

11    A.    It was FAPA.

12    Q.    F-A-P-A?

13    A.    Correct.

14         MR. CRONE:  Okay.  Mr. Arellano, I thank
15 you for your patience, especially during the sort of
16 back-and-forth between lawyers in the room, and so I
17 appreciate that.

18         If you -- if you give me five minutes, I
19 just want to circle through my notes, and then I
20 think we're done.

21         THE WITNESS:  Okay.

22         MR. CRONE:  So we can go off the record
23 now.

24         THE WITNESS:  All right.

25         THE VIDEOGRAPHER:  The time now is 10:54.

79

1 We're off the record.

2         (Recess from 10:54 a.m. until 11:01 a.m.)

3         THE VIDEOGRAPHER:  The time now is 11:01.
4 We're back on the record.

5         MR. CRONE:  Mr. Arellano, just a couple
6 quick follow-up questions.

7    Q.    (BY MR. CRONE)  After you were disciplined
8 in 2018, 2019 for the dependability policy issues,
9 did you suffer any further discipline as a result of
10 that incident?

11    A.    No.

12    Q.    Okay.  And same question for the one in
13 2016, 2017.  Any -- any further discipline after
14 that?

15    A.    No.

16    Q.    Okay.  When you left Frontier in around
17 2010 or so to go to Fresenius, any particular reason
18 you left?

19    A.    The company was purchased by Republic, so
20 my position was moved to Indianapolis.

21    Q.    Got it.

22    A.    Yeah.

23    Q.    And you didn't want to live in
24 Indianapolis?

25    A.    I did not, no.

80

1    Q.    Okay.  That's fair.

2         And then what about when you left in 2014,
3 I think, or so --

4    A.    Okay.

5    Q.    -- to go to JetBlue?  Any -- any particular
6 reason at that time?

7    A.    No.  The opportunity presented itself.

8    Q.    Okay.

9    A.    So they came and searched me.

10    Q.    Excellent.  Thank you.

11         MR. CRONE:  So thank you again.  I don't
12 know if your attorney has any follow-up questions for
13 you, but we are done.

14         MS. KITSON:  I do not.  We're done.  Thank
15 you.

16         MR. CRONE:  Great.  You're welcome.  Thanks
17 again, Mr. Arellano.  Appreciate it.

18         THE WITNESS:  Yeah.  Thank you.

19         MR. CRONE:  We can go off the record.  You
20 too.

21         THE VIDEOGRAPHER:  The time is 11:02.
22 We're off the record.  This concludes today's
23 deposition.

24         (The following proceedings continued on the
25 stenographic record only:)

**ROCKY MOUNTAIN REPORTING**
**(720) 872-9910**

**GERARDO ARELLANO - July 14, 2020**

81

1      THE REPORTER:  Same for order for everybody
2 on this one?
3      MR. CRONE:  Yes, for plaintiff.
4      THE REPORTER:  Ms. Kitson?
5      MS. KITSON:  (No response.)
6      THE REPORTER:  Did she leave?
7      MR. CRONE:  Did we lose her already?  Well,
8 yes for plaintiff, anyway.
9      THE REPORTER:  Okay.
10      MR. CRONE:  Thanks very much.  We
11 appreciate it.
12      THE REPORTER:  Thank you.
13      WHEREUPON, the foregoing deposition was
14 concluded at the hour of 11:03 a.m. on July 14, 2020.
15           *   *   *   *
16
17
18
19
20
21
22
23
24
25

82

1      I, GERARDO ARELLANO, do hereby certify that
2 I have read the foregoing transcript and that the
3 same and accompanying amendment sheets, if any,
4 constitute a true and complete record of my
5 testimony.
6
7
8          _____
               GERARDO ARELLANO
9
10      ( ) No Amendments
11      ( ) Amendments Attached
12
      Subscribed and sworn to before me this
13 _____ day of _____, 2020.
14
15
      Notary Public:_____
16
      Address: _____
17
               _____
18
19
      My Commission Expires: _____
20
      Seal:
21
22
23
24
25

83

1 WITNESS:  GERARDO ARELLANO
2 DATE OF DEPOSITION:  July 14, 2020
3 CASE:  Brigham v. Frontier Airlines, Inc.
4              ERRATA SHEET
5 PAGE    LINE           CHANGE           REASON
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 Signature_____Date_____

84

1              REPORTER'S CERTIFICATE
2 STATE OF COLORADO      )
                           ) ss.
3 COUNTY OF DENVER       )
4      I, JILL S. NIELSEN, do hereby certify that I
  am a Registered Professional Reporter and Notary
5 Public within the State of Colorado; that previous to
  the commencement of the examination, the witness was
6 duly sworn by me to testify to the truth.
7      I further certify this deposition was taken
  remotely in shorthand by me at the time herein set
8 forth, and that it was thereafter reduced to
  typewritten form, and that the foregoing constitutes
9 a true and correct transcript.
10      I further certify that I am not related to,
  employed by, nor of counsel for any of the parties or
11 attorneys herein, nor otherwise interested in the
  result of the within action.
12
      IN WITNESS WHEREOF, I have hereunto affixed
13 my hand and seal this 27th day of July, 2020.
14 My commission expires July 7, 2023.
15
               _____
               JILL S. NIELSEN, RPR
16             Notary Public in and for the
               State of Colorado
17
18
19
20
21
22
23
24
25