**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
   Civil Action No.:  19-cv-03417-WJM-STV
 3
   _____
 4 REBECCA BRIGHAM,

 5 Plaintiff,

 6 v.

 7 FRONTIER AIRLINES, INC.,
   a Colorado corporation,
 8
   Defendant.
 9 _____

10    VIDEOTAPED VIDEOCONFERENCE 30(B)(6) DEPOSITION OF
            FRONTIER AIRLINES, INC.,
11     THROUGH THE TESTIMONY OF GERARDO ARELLANO
                  July 13, 2020
12 _____

13         PURSUANT TO NOTICE and the Federal Rules

14 of Civil Procedure, the videotaped videoconference

15 30()b)(6) deposition of FRONTIER AIRLINES, through

16 the testimony of GERARDO ARELLANO, whose identity has

17 been verified by the court reporter, was taken on

18 behalf of the Plaintiff on July 13, 2020, commencing

19 at 9:01 a.m., before Jill S. Nielsen, Registered

20 Professional Reporter and Notary Public within the

21 state of Colorado.

22

23 (The reporter, Jill S. Nielsen, appearing remotely

24 via videoconference.)

25
```

---

2

```
 1               APPEARANCES
 2 FOR THE PLAINTIFF:
 3      JOHN R. CRONE, ESQ.
        EVAN S. GRIMES, ESQ.
 4      The Law Office of John R. Crone, LLC
        4550 East Cherry Creek Drive South, Suite 1003
 5      Glendale, Colorado 80246
        303.598.3526
 6      john@crone-law.com
        (Appearing via videoconference)
 7
 8 FOR THE DEFENDANT:
 9      DANIELLE L. KITSON, ESQ.
        CAROLYN THEIS, ESQ.
10      Littler Mendelson, P.C.
        1900 Sixteenth Street, Suite 800
11      Denver, Colorado 80202
        303.629.6200
12      dkitson@littler.com
        catheis@littler.com
13      (Appearing via videoconference)
14
   ALSO PRESENT:
15
        JACALYN PETER, In-House Counsel, VP of Labor
16      Relations (Appearing via videoconference)
        WALT MATHERN, Videographer
17      (Appearing via videoconference)
18
19
20
21
22
23
24
25
```

---

3

```
 1                    INDEX
 2 EXAMINATION OF GERARDO ARELLANO:          PAGE
 3 By Mr. Crone                               6
 4                  EXHIBITS
                                           INITIAL
 5 NUMBER                                  REFERENCE
 6 Exhibit 1    Plaintiff's Amended Notice     28
                of Deposition Pursuant to
 7              Federal Rule 30(b)(6) -
                Frontier Airlines, Inc.
 8
   Exhibit 2    Frontier Organizational Chart  34
 9              September 2015
10 Exhibit 2-1  Frontier Airlines Job Description 48
11 Exhibit 2-2  Excel Spreadsheet              134
12 Exhibit 3    Order on Discovery Dispute      46
                30(b)(6)
13
   Exhibit 4    Declaration of Adrienne Prince  86
14
   Exhibit 5    10/5/15 E-mail from Arellano   100
15              to Rush, Leyner, Thompson,
                Coppedge, and Warfield
16
   Exhibit 6    10/15/15 E-mail from Arellano  163
17              to Coppedge, cc Thompson
18 Exhibit 7    12/10/15 Letter to Reef from   108
                Arellano
19
   Exhibit 8    10/30/15 Letter to Brigham     166
20              from Coppedge
21 Exhibit 10   10/27/15 E-mail from Leyner    168
                to Inflight DIA MGR, cc
22              Arellano
23 Exhibit 12   Investigation Notes/Tracking   192
                Form
24
   Exhibit 13   Probationary Flight Attendant  176
25              Evaluation, 2/18/08
```

---

4

```
 1                  EXHIBITS
                                           INITIAL
 2 NUMBER                                  REFERENCE
 3 Exhibit 14   10/6/15 E-mail from Arellano   179
                to Coppedge, cc Rush, Leyner,
 4              Thompson, and Warfield
 5 Exhibit 15   E-mail chain, top e-mail from  172
                Arellano to Leyner, 10/2/15
 6
   Exhibit 16   E-mail chain, top e-mail from  182
 7              Arellano to Micklich, 7/15/15
 8 Exhibit 17   12/21/15 Letter to Board of    110
                Adjustment from Nelson;
 9              Grievance Form 11/23/15;
                12/10/15 Letter to Reef from
10              Arellano
11 Exhibit 20   E-mail chain, top e-mail from  184
                Arellano to Leyner, 9/28/15
12
   Exhibit 21   9/5/14 E-mail from JaJuan      174
13              Williams to Leyner, cc Aragon
14 Exhibit 23   E-mail chain, top e-mail from  188
                Arellano to Leyner, 9/21/14
15
   Exhibit 25   6/4/15 E-mail from Leyner      194
16              to Arellano and Aragon, cc
                Micklich
17
   (Exhibits provided electronically to the court
18 reporter.)
19
20
21
22
23
24
25
```

---

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

**5**

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning.  We are
3 now on the record.  The time now is 9:01 a.m.
4 Mountain Time.  Today is July 13, 2020.  We are
5 conducting the virtual deposition of Frontier
6 Airlines 30(b)(6) witness Gerardo Arellano in the
7 matter of Rebecca Brigham v. The Frontier Airlines in
8 the United States District Court for the District of
9 Colorado, Case Number 19-cv-03417.
10          The video technician is Walt Mathern.  The
11 court reporter is Danielle -- excuse me -- is
12 Jill Nielsen.
13          Will parties please identify themselves,
14 beginning with the plaintiff's client.
15          MR. CRONE:  John Crone for the plaintiff.
16          MR. GRIMES:  Evan Grimes for Plaintiff.
17          THE WITNESS:  Rebecca Brigham, Plaintiff.
18          MS. KITSON:  Daniel Kitson with Littler
19 Mendelson on behalf of the defendant.  With me is
20 Carolyn Theis with my firm and Jackie Peter, who is
21 with Frontier as in-house counsel, and her title is
22 vice president of labor relations.
23               GERARDO ARELLANO,
24 having been first duly sworn to tell the truth,
25 testified as follows:

**6**

1               EXAMINATION
2 BY MR. CRONE:
3      Q.   Good morning, Mr. Arellano, and thanks for
4 appearing by video.  I know it's a bit of a pain.
5 Ms. Brigham appreciates it.
6          So are you aware that when we first noticed
7 the deposition of Frontier Airlines, we had noticed
8 the deposition to be in person?
9          MS. KITSON:  And, Mr. Crone, we had
10 expected the in-person aspect of the deposition would
11 be -- are you asking about in person versus video?
12          MR. CRONE:  I'm just -- I'm just -- I'd
13 appreciate it if the -- if the witness could answer.
14      Q.   (BY MR. CRONE)  I'm simply asking,
15 Mr. Arellano, are you aware that when Ms. Brigham
16 first noticed your deposition, that is, Frontier's
17 deposition, it was meant to be in person?
18          MS. KITSON:  Object to the form.
19      A.   Yes.
20      Q.   (BY MR. CRONE)  And -- and then at
21 Frontier's request, we amended the deposition to do
22 it by video.  Are you aware of that?
23          MS. KITSON:  Object to the form.  There's
24 no abandoning of the deposition.
25          But you can answer the question that he's

**7**

1 asking.
2      A.   Yes.
3      Q.   (BY MR. CRONE)  And was one of the reasons
4 that you didn't want to do the deposition in person
5 that you were worried about sharing a room with other
6 people for an extended period of time?
7          MS. KITSON:  Object to the form, and that
8 calls for attorney-client privileged information.
9 I'm instructing him not to answer.
10      Q.   (BY MR. CRONE)  Mr. Arellano, did you have
11 any safety concerns about doing a deposition in which
12 you would share a room with multiple people for an
13 extended period of time?
14          MS. KITSON:  Object to the form.  This
15 calls for a legal discussion between counsel.  I am
16 the one who expressed the reservations because I have
17 a high-risk mother at home who's 72 years old, and my
18 concern was about too many people being in a room
19 together where they could not socially distance with
20 at least 6 feet between them all wearing masks.  And
21 that is my concern and not Mr. Arellano's.
22          MR. CRONE:  I appreciate you expressing
23 your concerns.
24      Q.   (BY MR. CRONE)  Do you need me to repeat
25 the question, Mr. Arellano?

**8**

1      A.   Yes.
2      Q.   Did you have any safety concerns related to
3 doing an in-person deposition?
4      A.   Yes.
5      Q.   Okay.  But now you find yourself in a room
6 with other people; isn't that correct?
7      A.   Correct.
8      Q.   Okay.  Do you have any safety concerns now?
9      A.   Not at this time, no.
10      Q.   Okay.  If you do, please speak up and let
11 me know, because Plaintiff has no desire to put you
12 at risk.  Is that clear?
13      A.   Yes.
14      Q.   Thank you.
15          Okay.  Mr. Arellano, you understand that
16 you're testifying on behalf of Frontier Airlines,
17 Incorporated, right?
18      A.   Yes.
19      Q.   Okay.  And in order to do that, you, I
20 assume, spent a fair amount of time preparing for
21 today's deposition?
22      A.   Correct.
23      Q.   And without telling me what you spoke about
24 with your attorneys -- I have no interest in that --
25 can you tell me if you reviewed any documents in

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

9

1 order to prepare?
2    **A.   I did.**
3    Q.   And are those documents -- so this morning,
4 I'll tell you that I received a folder with a variety
5 of documents in it, and it was labeled -- excuse
6 me -- it was labeled Virtual Binder.
7         Do you know if -- it's called Virtual
8 Binder, Rule 30(b)(6) Reference Materials.  Is
9 that -- are those the documents you reviewed to
10 prepare for today?
11    **A.   I did, yes.**
12    Q.   Okay.  And then last Friday, so just a few
13 days ago Friday, I had received a folder of materials
14 from your attorneys that I thought was the same
15 binder, that is, a binder of materials you reviewed
16 for today's deposition.
17         Are you familiar with that folder that was
18 produced on Friday?
19    **A.   No.**
20    Q.   Okay.  So you have no idea if those are the
21 same documents or if there are different documents?
22    **A.   No.**
23    Q.   Okay.  So what -- what we'll do is at --
24 at -- at the first break we take, I'll review that so
25 we don't have to stop now.

10

1    **A.   Okay.**
2    Q.   And -- and then we'll -- we'll take it as
3 it goes.
4    **A.   Okay.**
5    Q.   How long did you spend preparing for
6 today's deposition?
7    **A.   Over the weekend.**
8    Q.   Okay.  Can you -- can you guess at how many
9 hours?
10   **A.   Oh, 12 to 15.**
11   Q.   Mr. Arellano, if you need to take a break
12 at any time -- I -- I should have mentioned it.
13 Before we get too much farther into this, if you need
14 to take a break, let me know.
15   **A.   Okay.**
16   Q.   If there -- if there's a question pending,
17 I'll just ask that you finish the question.  But
18 other than that, there aren't -- you're not hostage
19 in the room.  So if you -- if you need a break,
20 please let me know.
21   **A.   Understood.**
22   Q.   Yep.  So let's -- let's start with -- let's
23 start with your current position.  What's your
24 position with Frontier Airlines?
25   **A.   Senior manager of talent acquisition and**

11

1 **employee relations.**
2    Q.   Senior manager of talent acquisition and
3 employee relations?
4    **A.   Uh-huh.**
5    Q.   I should have mentioned, too, so in order
6 to make this work on -- on video, I'm looking at one
7 screen to look at you, and then I've got a screen to
8 the left where I can look at the exhibits.  And so if
9 I'm looking at that while talking to you and that's a
10 bit annoying, I apologize for that.  It's not --
11   **A.   Okay.**
12   Q.   Okay.  And how long have you been the
13 senior manager of talent acquisition and employee
14 relations?
15   **A.   I'm thinking.  Sorry.**
16   Q.   That's fine.
17   **A.   About five years.**
18   Q.   So roughly 2015 to 2020?
19   **A.   Yeah, yeah.**
20   Q.   And were you employed with Frontier
21 Airlines prior to 2015?
22   **A.   Prior to 2013, yes.**
23   Q.   I said 2015.  I'm sorry.
24   **A.   And let me correct that.  Actually, in this**
25 **world now, possibly maybe three years as a senior**

12

1 **manager of talent acquisition.  I came back five**
2 **years ago, though.**
3    Q.   Okay.  So what was your -- what was your
4 position prior to your current position?
5    **A.   It was senior manager of employee**
6 **relations.**
7    Q.   And how long did you hold that position?
8    **A.   In that for about two years.**
9    Q.   Okay.  And then prior to that, what was
10 your position?
11   **A.   I think it was manager of staffing and**
12 **compliance.**
13   Q.   Can you remember how long you were the
14 manager of staffing and compliance?
15   **A.   Not off the bat.  Maybe a few years.**
16   Q.   Okay.
17   **A.   Yeah.**
18   Q.   When you first started with Frontier, what
19 was your position?
20   **A.   I was the inflight administration back in**
21 **2004.**
22   Q.   So --
23   **A.   So admin.**
24   Q.   -- you were -- I'm sorry.  I'm sorry; go
25 ahead.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

13

1    A.    I was an admin, administrative assistant.
2    Q.    And that was in 2004?
3    A.    2004.
4    Q.    Okay.  And then between the time you were
5 an inflight admin in 2004 and then you were a manager
6 of staffing and compliance, did you hold any other
7 positions with Frontier?
8    A.    Yes.
9    Q.    And -- and what were those?
10   A.    After the inflight admin, I was an inflight
11 coordinator.  Then I became an inflight supervisor,
12 then inflight manager, and then employee relations
13 manager, and then the senior manager of employee
14 relations.
15   Q.    And then after you were senior manager of
16 employee relations, you became the manager of
17 staffing and compliance?
18   A.    Manager of staffing and compliance,
19 correct.
20   Q.    And then you were the senior manager of
21 employee relations again in 2015, about?
22   A.    2015, yeah.
23   Q.    And then you are the senior manager, talent
24 acquisition and employee relations currently?
25   A.    Correct.

14

1    Q.    Okay.  During that time period from 2004 to
2 present, did you work for any other companies?
3    A.    I did.
4    Q.    What were those?
5    A.    Fresenius Medical Care.
6          THE REPORTER:  I'm sorry?
7          THE WITNESS:  Fresenius Medical Care.
8    Q.    (BY MR. CRONE)  And what was your position
9 there?
10   A.    Employee relations manager.
11   Q.    And were you the employee relations manager
12 concurrently with -- while at Frontier, or were there
13 gaps in -- in the time you worked at Frontier?
14   A.    Yeah, there's gaps, so between Frontier and
15 Fresenius.
16   Q.    Okay.
17   A.    Yeah.
18   Q.    And so what -- what was the time period
19 that you were at Fresenius?
20   A.    Would have been in 2010 through 2012,
21 possibly.
22   Q.    Any other companies you worked for between
23 2004 and present?
24   A.    Yes.  JetBlue Airways.
25   Q.    And what was your position there?

15

1    A.    There, manager of talent acquisition.
2    Q.    Anywhere else?
3    A.    No.
4    Q.    Okay.  And then what -- what time period
5 were you at JetBlue Airways?
6    A.    It would have been 2014, 2015.
7    Q.    Okay.  So I want to focus in on your
8 current position.  So that's senior manager of talent
9 acquisition and employee relations --
10   A.    Okay.
11   Q.    -- that you've held for about the past
12 three years.  That -- that's correct, the past three
13 years, right?
14   A.    (Nodded head up and down.)
15   Q.    Okay.  In that position, what are your --
16 what are your primary duties?
17   A.    I oversee all of talent acquisition, which
18 would be the corporate recruitment team, pilot
19 recruitment team, and the flight attendant
20 recruitment team.  And then I handle employee
21 relations for our pilot group.
22   Q.    Okay.  So when you say talent acquisition
23 for the corporate group, are you talking about -- so
24 what types of employees fall into the corporate
25 group?

16

1    A.    Oh, so the corporate group will be
2 everybody in this facility, in the corporate office:
3 marketing, accounting, finance.  Anybody who is
4 identified as a corporate employee.
5    Q.    When you say "this facility," are you --
6 are you talking about an office in Denver?
7    A.    Yes.
8    Q.    And is that office in -- at the airport?
9 Is it downtown?  Where is it located?
10   A.    It's close to the airport.
11   Q.    Okay.
12   A.    Right down the road.
13   Q.    Is that -- is that Frontier's headquarters,
14 if that makes sense?
15   A.    It -- it is, yes.
16   Q.    Is that also referred to as the GO, the
17 general office?
18   A.    No.  This place -- the -- the GO was a
19 former building.
20   Q.    And where -- where was that former
21 building?
22   A.    Also right down the road.
23   Q.    Is it -- did -- did you-all just move
24 buildings, or is it -- are there two occupied
25 buildings now?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

17

1    A.    We moved about two years ago.
2    Q.    So everything that was referred to as the
3 "GO" in any of the documents I have referred to has
4 now moved to where you are now?
5    A.    Yes.
6    Q.    Okay.  Does that building have an acronym
7 or a name?
8    A.    Just headquarters, HQ.
9    Q.    Okay.  So you handle talent recruitment for
10 everyone that works in that headquarters?
11    A.    Correct.
12    Q.    And then -- okay.  And then you also
13 mentioned the -- the pilot group.  What -- what's
14 that about?
15    A.    Yeah.  So there's three different teams.
16 There's a corporate recruitment team, the inflight or
17 flight attendant recruitment team, and then the pile
18 recruitment team.
19    Q.    Any -- any other primary duties in your
20 current position?
21    A.    No.
22    Q.    Okay.  When you were the senior manager of
23 employee relations with Frontier for a couple of
24 years around 2015, what were your primary duties
25 then?

18

1    A.    2015, much of the focus was the inflight or
2 flight attendant employee relations business partner.
3 And I also had a few of the corporate departments as
4 well that I was responsible for.
5    Q.    Okay.  So focusing on the flight attendant
6 employee relations, what were the highlights of your
7 job in that regard?
8    A.    Can you explain a little more in terms of
9 highlights?
10    Q.    So -- so -- so what do you do?  I mean, so
11 when you say "flight attendant employee relations,"
12 what does the job entail as related to that, if that
13 makes better sense?
14    A.    If there was a concern dealing with anybody
15 within the inflight group, whether that be management
16 or flight attendant group, and they needed HR
17 consultation, I would be the point of contact.
18    Q.    What are the types of things somebody might
19 have asked for an HR consultation on?
20    A.    Whether it be a complaint that was filed
21 internally or any disagreements between flight
22 attendants, or investigation of sorts, or just
23 guidance in terms of benefits, things like that.
24    Q.    Would the investigations ever relate to
25 allegations of discrimination in the workplace?

19

1    A.    Yes.
2    Q.    How about allegations of retaliation in the
3 workplace?
4    A.    Yes.
5    Q.    How about disability-based discrimination?
6    A.    Yes.
7    Q.    Requests for reasonable accommodation?
8    A.    Yes.
9    Q.    Engaging in the interactive process with
10 somebody who's requested a reasonable accommodation?
11    A.    Yes.
12    Q.    Okay.  And then prior to your time as
13 senior manager of employee relations when you were
14 the manager of staffing and compliance, what were the
15 primary job duties in that position?
16    A.    Under the manager of compliance and
17 staffing?  That one?
18    Q.    Yes.  Yeah.
19    A.    I oversaw all of corporate -- all of talent
20 acquisition as well.  We were a smaller organization
21 at that time, but it was only one recruitment team at
22 the time.  And then compliance is the drug and
23 alcohol program associated with -- whether it be
24 preemployment and everything in between.
25    Q.    And the drug and alcohol program

20

1 preemployment, is that drug-testing somebody prior
2 to -- prior to them taking a job?
3    A.    Yeah.
4    Q.    And then "everything else in between," is
5 there some other component to that?  Does it go on
6 beyond the hiring process?
7    A.    Yes, beyond -- we do the random drug
8 testing for anybody who is DOT; the self-disclosure
9 program as well.
10    Q.    When you say "DOT," what -- what do you
11 mean by that?
12    A.    Department of Transportation.
13    Q.    So is that like if they were caught
14 drinking on the job or something?  Or is that some --
15    A.    Yes.
16    Q.    Okay.
17    A.    Primarily anybody who is safety sensitive
18 is determined as part of the -- the Department of
19 Transportation.  So the corporate group is not
20 considered a DOT role, so people that work in the --
21 at that time it would have been the GO.  They're
22 not subject to some of the requirements that a
23 safety-sensitive role would be.
24    Q.    So if somebody's in the GO and they were
25 caught drinking on the job, is that just a -- a

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

21

1 matter of internal discipline?  The -- the DOT
2 doesn't get involved?
3    **A.   Yes.  That would be handled internally**
4 **based on who supported that core group in terms of**
5 **the employee relation site.**
6    Q.   But somebody in a safety-sensitive position
7 is also subject to these Department of Transportation
8 regulations; is that fair?
9    **A.   Yes.**
10    Q.   If somebody -- what -- what does the DOT do
11 if somebody's caught using drugs or alcohol on the
12 job and they're in a safety-sensitive position?
13       MS. KITSON:  Object to the form.
14    **A.   What would be -- say that again?**
15    Q.   (BY MR. CRONE)  I'm -- so -- so the -- if
16 somebody's in a safety-sensitive position and they're
17 caught using drugs or alcohol on the job, what is --
18 what is DOT's response?
19    **A.   That, I wouldn't know.  We would handle it**
20 **from a corporate side of the house, so I don't know**
21 **what the DOT's response would be.**
22    Q.   Okay.  But what -- what would then
23 Frontier's response need to be?
24    **A.   Well, we would definitely have to**
25 **investigate the situation and -- and determine the**

22

1 next course of action.
2    Q.   Okay.  And -- which might involve random
3 drug and alcohol screenings?
4    **A.   In what form?  I guess I'm confused with**
5 **the question.**
6    Q.   Yeah.  I'm just -- I'm just trying -- when
7 you said you would have to investigate and figure out
8 the proper response, would one proper response be
9 random drug and alcohol screenings?
10       MS. KITSON:  Object to the form.
11    **A.   I'm still not connecting the dots.  Yeah.**
12    Q.   (BY MR. CRONE)  Okay.  Let -- let me back
13 up.
14       So -- so the question I was asking was if
15 somebody's in a safety-sensitive position and they're
16 caught using drugs or alcohol, what would Frontier's
17 response be.  Do you recall that question?
18    **A.   Yes.  No.  But in what form, I guess?**
19 **Because if they could be -- if they're caught by --**
20 **in the act, in the moment, or they're said to**
21 **believe.  It just depends in what moment.**
22       **So everything goes back to the**
23 **documentation and what took place in the situation.**
24 **So that would then yield the response.  So that's**
25 **where I'm kind of lost in --**

23

1    **Q.   Yeah.  I -- yeah.  Okay.  So -- so is there**
2 ever a situation where the response would be the
3 employee must submit to random drug and alcohol
4 screening?
5    **A.   Not if they tested positive for drugs or**
6 **alcohol, no.**
7    Q.   So that's never a response?
8    **A.   No.  There would be -- there again, it goes**
9 **back to if they were identified -- if a drug test**
10 **deemed that the person was under the influence, it**
11 **would go to termination.**
12    Q.   Got it.  Okay.  Got it.
13    **A.   Yeah.**
14    Q.   Okay.
15    **A.   We're not a second-chance company, so if**
16 **anybody did test positive -- and that's what I was**
17 **trying to say.**
18    Q.   I see, I see, I see.  Okay.  I -- I was --
19 I -- I had -- I thought you had mentioned that random
20 drug and alcohol screenings might occur.  I was just
21 trying to figure out when that might occur.
22    **A.   Correct.**
23    Q.   Okay.
24    **A.   So, there's -- yeah, there's different**
25 **categories within the complaints program that yield a**

24

1 certain action.
2    Q.   Okay.  Okay.  All right.  And then before
3 you were the manager of staffing and compliance
4 when you were the inflight supervisor, inflight
5 coordinator, and inflight admin -- I'm hoping we
6 can -- we can tackle these as a group.
7    **A.   Okay.**
8    Q.   Is it possible for you to delineate what
9 the job duties of each of those positions were, or do
10 you want me to go one by one?
11    **A.   One by one.**
12    Q.   Okay.  Let's start with -- let's start with
13 as the inflight admin.  We'll start at the bottom and
14 go up.
15    **A.   Okay.**
16    Q.   So what are the primary duties when you
17 were an inflight admin?
18    **A.   There was truly administrative support for**
19 **the director of inflight services at the time.**
20    Q.   Okay.  And how -- how about when you were
21 the inflight coordinator?
22    **A.   Inflight coordinator, in that role, I also**
23 **maintained a lot of the administrative functions but**
24 **also then assisted the inflight payroll and**
25 **processing, gathering data, things of that nature.**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

25

1  Q.   And how about as the -- as an inflight
2  supervisor?
3  A.   Inflight supervisor, in that moment, I
4  started to handle a lot of the dependability piece
5  and assisted with recoding schedules related to types
6  of absences that were associated with a leave of
7  absence or for a leave of absence.  And then also
8  maintained a lot of the previous role and
9  responsibilities from the admin piece.  So it's kind
10 of a merge.
11 Q.   And who -- and who -- as the inflight
12 supervisor, who are you supervising?
13 A.   I did not have any direct reports.  It was
14 more supervising the process.
15 Q.   And who -- who is in the process?  I guess,
16 what -- what employees are wrapped up in that
17 process?
18 A.   The process would be anybody who filed for
19 a leave of absence deemed by the leave-of-absence
20 department.  I would assist with them in terms of
21 their coding schedules and what helped them return to
22 work by giving them guidance, what they needed to do
23 to be back online, meaning, if there was requirements
24 that they needed to complete, any training that they
25 needed to complete, I would be the -- more of the

26

1  person disseminating that information.
2  Q.   And are these all, you know -- when you're
3  the inflight supervisor, is it -- is it -- is it all
4  flight attendants that are -- that are in this
5  process or anybody else?
6  A.   No, just flight attendants.
7  Q.   Okay.  And when you were at Fresenius and
8  you were the employee relations manager there, what
9  were your -- what were your primary duties at that
10 position?
11 A.   Basically, provided support to everybody,
12 what they deemed in the western division, and HR
13 support in terms of employee relations specific.
14     So I had Colorado, New Mexico, Utah,
15 Wyoming as part of my responsibilities.  So every
16 clinic within those states, basically I was their HR
17 point of contact on all issues.
18 Q.   And how about when you were the manager of
19 talent acquisition at JetBlue?  What were your
20 primary duties there?
21 A.   I ran their pilot recruitment programs
22 there.
23 Q.   Are you a pilot?
24 A.   No.
25 Q.   Have you ever been a flight attendant?

27

1  A.   No.
2  Q.   Is there -- is -- is there a difference at
3  Frontier between human resources and employee
4  relations?
5  MS. KITSON:  In what time frame?
6  MR. CRONE:  Any -- any time frame.
7  Q.   (BY MR. CRONE)  So let -- let's start --
8  let's start right now, currently.
9  MS. KITSON:  I'm going to object that
10 that's outside the scope.  I'm going to limit the
11 witness to what the Court has ordered and what we've
12 agreed to, which is the late 2011 to 2015 time frame.
13 Q.   (BY MR. CRONE)  Then between -- and --
14 and -- and your lawyer -- your lawyer's correct.  So
15 between November 14, 2011, and November 14, 2015, is
16 there any difference between human resources and
17 employee relations at Frontier?
18     In other words, are they different
19 departments?  Are they -- are they in the same
20 department?  Job titles?  What -- what's the
21 difference, if any?
22 A.   Employee relations is -- it's within the HR
23 department.  It's a division of the HR department.
24 Q.   Earlier, before the deposition started, I
25 had distributed Exhibit 1.  Can you -- can you pull

28

1  that up for me?
2  MS. KITSON:  Are you talking to us or the
3  court reporter?
4  MR. CRONE:  I'm asking the witness.
5  THE WITNESS:  Oh, I haven't seen anything.
6  MR. CRONE:  Oh --
7  MS. KITSON:  Yeah, I don't think we got any
8  exhibits.
9  Q.   (BY MR. CRONE)  All right.  Let's try this
10 again.  Give me just one second.  It takes a second
11 to attach the -- the file.
12     How about now?  So if you open your chat,
13 and Exhibit 1 should have -- should have popped up
14 that you can open.
15 A.   Okay.
16 MS. KITSON:  I want to be looking at this
17 together.
18 A.   It has to be downloaded.
19 Q.   (BY MR. CRONE)  I think this will be a good
20 test for whether we want to -- I think this is how we
21 have to do the exhibits, so if it's a little -- it's
22 a little cumbersome, I apologize, but were you able
23 to open it?
24 A.   No, not yet.  It's still --
25 Q.   Okay.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

29

1    A.   Save it.  Okay.

2    Q.   Okay.  Have you -- have you seen this

3 document before?

4    A.   One second.

5    Q.   Yeah, feel -- feel free to scroll through

6 it.

7    A.   I've seen it, yes.

8    Q.   Okay.  And so at page 2 through the end of

9 the document, there's a -- a list of topics that

10 Ms. Brigham had asked you to prepare to testify on

11 today.  Have you reviewed that list of topics?

12    A.   Yes.

13    Q.   And are you prepared to testify on all

14 of those topics with -- with the -- the -- the

15 understanding that any question that calls for a time

16 period is actually only referring to the end of 2011

17 through the end of 2015?

18    A.   Okay.

19    Q.   And so -- and so you are prepared to

20 testify on all of those topics today?

21    A.   Yes.

22    Q.   And what I'd like to do now is -- well,

23 actually, let's go through a few more things, and

24 then -- and then we'll take a short break so I can

25 review the folder that was submitted today.

30

1    A.   Okay.

2    Q.   I think that will be a bit more efficient

3 use of time.  So let's -- let's -- let's wrap up some

4 information on your background.

5        What -- what's your educational background?

6    A.   In what form?

7    Q.   Do you have any college or postgraduate

8 degrees?

9    A.   Yes.  I've got two degrees from New Mexico

10 State University.

11    Q.   And -- and what are those degrees?

12    A.   One is hotel management, bachelor's in

13 hotel management, and bachelor's in Spanish.

14    Q.   Do you have any additional certificates or

15 training or any -- anything like that?

16    A.   Training received at, like, conferences,

17 things of that nature, yeah.  Web training, yeah.

18    Q.   Are any of -- any of those trainings that

19 you've done through conferences, whether in person or

20 online -- are any of them related to the work that

21 you do now with Frontier?

22    A.   Yes, the majority of them are.

23    Q.   Okay.  Can you -- can you recall what types

24 of trainings you've attended?

25    A.   A lot of them were employee law.  A lot of

31

1 them were employee relation conferences.  Some were

2 FMLA-specific.  Yeah.

3    Q.   Any of them discuss the ADA?

4    A.   Yes.

5    Q.   Do you -- do you attend any trainings

6 related to compliance with the ADA that are put on

7 by Frontier, like any internal in-house type of

8 trainings?

9    A.   No.

10    Q.   What about related to anti-discrimination

11 laws more generally, whether it has to do with race

12 or gender or -- or anything like that?

13    A.   And when you say in training, conducted by

14 the company or . . .

15    Q.   Yeah.  So -- so let's -- yeah, let's --

16 let's narrow that down.  Either -- either conducted

17 by the company or perhaps the company hires a third

18 party to do it.

19    A.   No.  I mean, right now I do conduct the

20 discrimination harassment training for all new

21 employee orientation.  I handle that on my site for

22 pilot hiring.  I do that on a regular basis up until

23 recently, every month.  But in terms of participating

24 in the training, not recently.

25    Q.   Okay.  Has -- has -- has Frontier ever put

32

1 on a training or hired a third party to put on a

2 training related to anti-discrimination laws in the

3 workplace ever, in your recollection?

4        MS. KITSON:  And, again, I'll limit that

5 time frame to 2011 to 2015.

6    Q.   (BY MR. CRONE)  So, again, with that time

7 frame in mind, has it ever occurred, to your

8 recollection?

9    A.   I don't recall at this point.  I know there

10 was training; I just don't know if it was in that

11 time period, no.  Very possible, though.

12    Q.   All right.

13        MR. CRONE:  Okay.  Mr. Arellano, I want

14 to -- I want to take a break.  I -- I typically would

15 try to get a little farther down the road, but like I

16 had mentioned, I want to get through that folder of

17 documents just to try to be efficient with -- with

18 our time and make sure I'm not repeating documents

19 and such as -- as we go down the road.

20        MR. CRONE:  So, Danielle and company, if --

21 if you don't mind if we go off the record for -- for

22 about 15 minutes.

23        MS. KITSON:  Sure.  Sounds good.

24        MR. CRONE:  Yeah.  If we reconvened at

25 9:50, I think that would be perfect.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

33

1    MS. KITSON:  Sounds good.  Will do.
2    MR. CRONE:  Thank you.
3    THE WITNESS:  Thank you.
4    THE VIDEOGRAPHER:  The time now is
5  9:34 a.m.  We're off the record.
6    (Recess from 9:34 a.m. to 9:50 a.m.)
7    THE VIDEOGRAPHER:  The time now is
8  9:50 a.m.  We're back on the record.
9    Q.   (BY MR. CRONE)  Mr. Arellano, do you go by
10  Jerry as a first name?
11   **A.   Yes.**
12   Q.   Okay.  But your full name is Gerardo?
13   **A.   Correct.**
14   Q.   Okay.  Thank you.
15       Okay.  So I want to -- I want to talk a bit
16  about -- or I want to ask you to talk a bit about the
17  organizational structure of Frontier Airlines as it
18  relates to Plaintiff Rebecca Brigham.
19   **A.   Okay.**
20   Q.   So I want to put a document in front of
21  you.  This will be Exhibit 2.  Let's see if we can
22  make this work a little easier this time.
23       Okay.  So that -- I assume the noise I
24  heard is Exhibit 2 coming to you.
25   **A.   Yeah.**

---

34

1    Q.   And I know -- yeah, I know you'll take a
2  minute to pull it up.  Once you have it pulled it up,
3  let me know.
4    **A.   Okay.**
5    MS. KITSON:  Looks like Tab 1 from the
6  binder.  Is that --
7    MR. CRONE:  That's correct.  Yep.
8    **A.   Okay.**
9    Q.   (BY MR. CRONE)  Okay.  So Exhibit 2 is
10  labeled Frontier Organizational Chart September 2015.
11  Is this -- have you seen this document before?
12   **A.   Give me a second.  Let me -- let me open it**
13  **up.**
14   Q.   Yeah, please do.  Yeah.
15   **A.   Okay.**
16   MS. KITSON:  And, John, if there's any
17  way -- I don't know if Evan can e-mail those exhibits
18  to me.  I can probably pull those up for Mr. Arellano
19  faster than it's taking to download, if that makes
20  sense.
21   MR. CRONE:  Yeah.  Once -- once we get
22  through the binder ones, I think we can make that
23  work.  But for now --
24   MS. KITSON:  Okay.
25   MR. CRONE:  -- I'm kind of having to just

---

35

1  take them out.  I -- I -- I hoped -- I was just going
2  to mark the entire binder and then go through it that
3  way --
4    MS. KITSON:  Okay.
5    MR. CRONE:  -- but I think, with the two
6  different versions, it's easier to just sort of pull
7  these out.  So I think -- once we get through this
8  stuff, I think it will be --
9    MS. KITSON:  Easier?
10   MR. CRONE:  -- a bit easier, yeah.
11   MS. KITSON:  And, actually, I have the
12  entire binder on my hard drive, too, so if we're
13  referring to tabs, I can pull that up.
14   MR. CRONE:  Yeah, to the -- yeah, to the
15  extent I can refer to tabs and that makes it easier
16  for us, I'll try to.  But if it's in the other
17  folder, it might be just Bates numbers, so . . .
18   **A.   So I have it up.**
19   Q.   (BY MR. CRONE)  Okay.  Thanks.
20       Okay.  So is this -- so have you seen this
21  document before?
22   **A.   Yes.**
23   Q.   And this is a document you relied upon in
24  preparing for today's deposition?
25   **A.   Yes.**

---

36

1    Q.   Okay.  So I was hoping you could walk me
2  through this chart, and first I just want to nail
3  down the time period for the chart.
4        So is this the organization -- organization
5  of the company for -- is it just September 2015, or
6  is it the whole year?  Is that when the document was
7  revised, or sort of how does that work?
8    **A.   I'm just going to look through it real**
9  **quickly.**
10   Q.   Oh, yeah, yeah.  Please do.
11   **A.   I believe that -- to my understanding, that**
12  **was the org chart at September 2015.**
13   Q.   Okay.
14   **A.   For that period, yeah.**
15   Q.   Okay.  And if you look at the first page of
16  it -- or not the first page -- sorry -- the second
17  page where it has Barry Biff [sic] at the top -- I
18  don't know if I'm pronouncing that right, but is --
19   **A.   Yeah.**
20   Q.   -- is -- is Mr. Biff the president of
21  Frontier, or is this, like, some Denver division?
22   **A.   No, he's the president of Frontier.**
23   Q.   Okay.  So then as we work down that chart
24  page by page, where are you in this chart?
25   **A.   On page 1 where it shows Barry Biffle?**

---

**ROCKY MOUNTAIN REPORTING**
**(720) 872-9910**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

37

1    Q.    Yeah.  Oh, "Biffle."  Thank you.  Sorry.
2    A.    In that time frame, September 2015, I would
3 be under Jackie Peter.
4    Q.    Okay.  And then where would I -- where --
5 in 2015 before Ms. Brigham was -- was terminated --
6    A.    Uh-huh.
7    Q.    -- where would I place her in this chart?
8    A.    That would place her under --
9    Q.    Is she on page 4?
10   A.    Let me check.  Should be listed under the
11 one that has Laura Rush, Director of Inflight
12 Services, at the top.
13   Q.    Got it.  So -- so Ms. Brigham would fall on
14 that -- in that square that says "flight attendant"
15 at the bottom?
16   A.    Correct.
17   Q.    Okay.  And 1187, is that how many flight
18 attendants that were employed as of the date of this
19 org chart?
20   A.    That is correct.
21   Q.    Okay.  Is that just -- how do you -- how do
22 you organize the flight attendants?  Are they -- is
23 that 1187 companywide?  Is that just based out of a
24 certain city?  Or how does that work?
25   A.    That -- that is companywide.

38

1    Q.    Okay.  Okay.  And so then -- so then the
2 flight attendants that fall into that box of 1187,
3 Ms. Brigham included --
4    A.    Okay.
5    Q.    -- their -- their direct supervisors -- is
6 that the line above them, Stefanie Coppedge,
7 et cetera?
8    A.    That is correct.
9    Q.    Okay.  And all of those people have titles
10 that say "Supervisor, Inflight."
11        Is that the inflight supervisor
12 position -- is that the same type of position you
13 held that you described earlier?
14   A.    No, it's a little bit different.
15   Q.    Can you tell me how it's different?
16   A.    So the individuals listed here are
17 individuals who manage the day-to-day operation.
18 My -- so specifically when I was supervisor, I didn't
19 oversee any flight attendants.  I oversaw the
20 processes associated with all the administrative
21 pieces of the -- of the role.
22        So I had no direct reports, nor did I have
23 oversight of any of the flight attendants.
24   Q.    Got it.  And -- and so these individuals
25 on the -- on the -- on the org chart,

39

1 Stephanie Coppedge, et cetera, on that line
2 directly above Plaintiff's box --
3    A.    Uh-huh.
4    Q.    -- what are their -- what are their day --
5 day-to-day duties or their primary duties?  Do you
6 know?
7    A.    Their primary duty was to supervise or
8 oversee a group of flight attendants assigned to
9 them.  Typically, that was alphabetical order at the
10 time.  And so they managed all the day-to-day piece
11 specific to that individual or to that work group.
12   Q.    Do they handle the scheduling of flight
13 attendants?  Is that part of the day-to-day?
14   A.    No.
15   Q.    Okay.  Who -- who handles that?
16   A.    That would be our crew-scheduling
17 department.
18   Q.    Is anyone in the -- in the crew-scheduling
19 department -- or excuse me.  Let me start over.
20        Was anybody in the crew-scheduling
21 department a supervisor of Plaintiff Rebecca Brigham?
22   A.    In -- I guess I'm not understanding the --
23   Q.    Yeah.  I'm trying -- I'm trying to figure
24 out -- so I can see that Ms. Brigham's direct
25 supervisor here is Stefanie Coppedge, et cetera, in

40

1 that line above her.
2        Where does the crew schedule -- where does
3 the crew-scheduling department fall in?  Are they
4 even on this chart, or are they somewhere else?
5    A.    They're somewhere else.  They would be
6 under the SOC, systems operation control department.
7    Q.    Okay.  So Ms. Brigham wouldn't have
8 reported to anybody in the crew-scheduling
9 department?
10   A.    That is correct.
11   Q.    Okay.  And then above the line that
12 includes Stefanie Coppedge --
13   A.    Uh-huh.
14   Q.    -- I see Kari Thompson is the manager of
15 inflight services?
16   A.    Correct.
17   Q.    Is that similar to the role you once held,
18 or is that something different too?
19   A.    No, mine was completely different.
20   Q.    Okay.  So what is -- can you describe
21 Kari Thompson's role at the time of this org chart,
22 what her primary duties are?
23   A.    Yeah.  So she oversaw all of the
24 supervisors.  She -- they were the next direct line,
25 so all those people -- people listed there were her

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

41

1 direct reports. So she not only oversaw the
2 day-to-day, but she was also the point of contact
3 from the inflight side of the house with AFA, the
4 union organization.
5     Q.    Okay.
6     A.    So if there were grievances, she would sit
7 in on those behalf, as well as representing the
8 organization.
9     Q.    Representing Frontier?
10    A.    Frontier, correct.
11    Q.    And I want to come back and talk about the
12 grievance process a little bit, but -- but we'll
13 circle back to that in just a few minutes just to get
14 through the chart here.
15          I -- I don't see that there's a line
16 connecting Nicholas Kohlhepp -- if I'm pronouncing
17 that right -- or Lara Jacobsen to Ms. Brigham's
18 square, so she didn't report to either of those two
19 individuals, did she?
20    A.    That is correct.
21    Q.    Okay. But then Laura Rush, who's the
22 director of inflight services, ultimately was then
23 Ms. Thompson's boss?
24    A.    Correct.
25    Q.    And then what were Laura Rush's primary

42

1 duties?
2     A.    Director of inflight services, so she
3 oversaw the entire operation from an inflight
4 perspective; she also was the point of contact
5 between the department and all the executive team;
6 and she also was the -- oversaw a lot of the
7 discussions, decisions associated with flight
8 attendants in general, work -- work procedures,
9 operating procedures, the contract, quote, the
10 bargaining agreement.
11          Also, on the training side of the house, as
12 you can see, Laura Jacobson was the manager of
13 inflight, so she also oversaw all of the training
14 capabilities, whether it be initial, recurrent, or
15 ground school, things of that nature.
16    Q.    Okay. And thinking about this chart as
17 we've just discussed it, was it different in 2014?
18 Were -- were there different -- and so I don't mean
19 the whole chart, but just this page with the director
20 of inflight services on the top down to the flight
21 attendants, do you know if that was different at all
22 for 2014?
23    A.    Not off the hand. I know we were growing
24 the organization, so things often did change in
25 reporting structure departments.

43

1          In 2014, probably Nicholas might have not
2 been in that role, policies and procedures. But I --
3 it might have been different, definitely.
4     Q.    Okay. What about in 2013?
5     A.    2013, it was definitely different. When I
6 became inflight manager, then the supervisors, if I
7 remember correctly, they were managers, not
8 supervisors.
9     Q.    Were they -- and so were they -- so the
10 supervisors and -- that are indicated on 2015 -- in
11 the 2015 chart, in 2013 they were called managers?
12    A.    It's hard for me to say. I'm trying to
13 think, because at one point, the organization was
14 purchased by Republic Airways, which would have been
15 around 2010.
16          A lot of work functions from Denver or
17 Frontier Airlines either transitioned to Indianapolis
18 under the Republic Airways umbrella, so a lot of
19 these rules were not in existence because they were
20 handled by a different organization or part of the, I
21 guess, parent company at that time.
22          So 2013, I -- I don't know. I came back in
23 2012, I believe.
24    Q.    Okay.
25    A.    So, yeah, it's hard to say. It's hard to

44

1 say.
2     Q.    When -- you said Republic Airways bought
3 Frontier in 2010?
4     A.    Yeah.
5     Q.    Does Republic Airways still own Frontier?
6     A.    No.
7     Q.    Okay. How long did Republic Airways own
8 Frontier? Do you know?
9     A.    Not offhand, I don't.
10    Q.    Okay.
11    A.    I would have to refer to documents.
12    Q.    But -- but I guess we could -- we could
13 presume less than ten years?
14    A.    Yes.
15    Q.    Yeah? Okay.
16          Does -- do you know if Republic Airways
17 ever owned any other airlines?
18    A.    I know there was Chautauqua Airlines. They
19 had Shuttle America. Frontier was part of that. I
20 can't think of any others.
21    Q.    When you're -- and when you're talking
22 about Frontier was growing and -- and changes were
23 occurring in, like, 2012, 2013 and after, is that --
24 does that have anything to do with being owned by
25 Republic Airways, or do you know?

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

45

1    A.   I do not know, no.  It was outside of my
2 wheelhouse.
3    Q.   Okay.  Was -- was Frontier -- was Frontier
4 expanding as a company from roughly 2012 forward?
5    A.   Yes.
6    Q.   Okay.  And then this -- back to the
7 question about how this org chart has changed over
8 time.  Can you recall if there were differences in
9 2012 to this chart?
10    A.   You know, I honestly don't know.
11    Q.   Okay.  And then -- and then 2011?
12    A.   No, not -- not offhand, no.
13    Q.   Okay.  I'm going to put -- try this -- try
14 this again here.  I'm going to put Exhibit 3 in front
15 of you, and this ought to be -- it ought to be
16 quicker to discuss this than it is to put in front of
17 you, I hope.
18    MS. KITSON:  Is it a tab number, John?
19    MR. CRONE:  No, it's not.  It's -- it's --
20    MS. KITSON:  Oh, shoot.  Okay.
21    MR. CRONE:  Yeah.  But I -- I just have --
22 I just have one quick question.  I -- I just want to
23 make the record clear.
24    Q.   (BY MR. CRONE)  Just let me know when
25 you -- you have it pulled up.

46

1    A.   I have it open, yeah.
2    Q.   Great.  Thank you.
3         So -- so have you -- have you seen this
4 order before?
5    A.   I don't believe I have.
6    Q.   Okay.  And I'm -- at the -- at the bottom
7 of page 1 where it says Ordered, it says Defendant's
8 witness shall be prepared to testify for the time
9 frame of four years preceding Plaintiff's date of
10 termination.
11         Myself and your lawyers have mentioned a
12 few times here that you are to testify in this rough
13 time period of the end of 2011 to the end of 2015.
14 Does that make sense to you?
15    A.   It does.  I do have some documents here in
16 front of me.
17    Q.   Okay.  Good.  Okay.  So you can set that
18 aside.
19    A.   Okay.
20    Q.   Okay.  So I want to -- what I want to do is
21 I want to ask you some questions that focus you in
22 on -- I'm hoping you can explain to me what exactly a
23 flight attendant does.
24    A.   Okay.
25    Q.   And so -- but I want to ground this in

47

1 time, too, because I assume people's jobs change over
2 time, even if only slightly.
3    A.   Uh-huh.
4    Q.   And so I was hoping you could -- you could
5 explain to me what -- what -- what the primary job
6 duties of a flight attendant were --
7    A.   Okay.
8    Q.   -- in -- in roughly the end of 2011 going
9 into 2012.
10    A.   Perfect.  Are you okay if I refer to the
11 job description?
12    Q.   Please do.  Yeah, that's fine.  If you can
13 just let me know what page number it is, and then
14 please -- yeah, please do.
15    A.   Looks like it says 0001863.
16    Q.   1863?
17    A.   Tab Number 7.
18    Q.   Oh, Tab Number 7?
19    MR. CRONE:  Danielle, do you mind throwing
20 that in here, and we could call that 2-1?
21    MS. KITSON:  So, unfortunately, I have
22 really low bandwidth on my computer --
23    MR. CRONE:  Oh.
24    MS. KITSON:  -- and I've got these on my
25 hard drive.  So -- in fact, I think I've been kicked

48

1 out of the Zoom meeting because of my low bandwidth.
2    MR. CRONE:  No, you're fine.  Hold on.
3 Give me just --
4    MS. KITSON:  The court -- court reporter
5 has the tabs as well.  I believe they were sent.
6    MR. CRONE:  Okay.  So if we could mark
7 Tab 7 as Exhibit 2-1, that would be great.
8    Q.   (BY MR. CRONE)  And then, Mr. Arellano, if
9 you want to refer to that to answer the question,
10 that would be fantastic.
11    A.   Yes.  So you're asking what the primary
12 responsibilities are?
13    Q.   Yeah.  For -- for -- for a flight attendant
14 in 2011.  And just to preview the questions going
15 forward, it will sort of be "and then up through
16 2015."  So if -- if it helps you to just explain
17 that, tell me in one shot, that's fine too.
18    A.   Do you want me to read what it says here
19 or, I guess, overall information about the role?
20    Q.   Yeah, yeah, overall.  You certainly don't
21 need to read the document.  Just what's your
22 understanding of -- of what their primary job duties
23 are is fine.
24    A.   Okay.  (Inaudible.)
25    MS. KITSON:  I'm trying to get back on, and

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

49

1  I'm not able to mute it.  Hold on one second.
2          MR. CRONE:  That's fine.  This is the --
3  this is the fun of the new world.
4          MS. KITSON:  Right.  I've got to get this
5  shut down.
6          MR. CRONE:  No problem.
7          MS. KITSON:  It's not letting me do it.
8  Let's try having you mute.
9          Okay.  Can you hear -- let's see if we can
10 hear you.
11         MR. CRONE:  There's -- there's -- yeah,
12 there's still an echo.
13         THE WITNESS:  Yeah, I'm good to go.
14         MS. KITSON:  Okay.  You unmute.  Are you
15 unmuted?
16         THE WITNESS:  I'm unmuted, yeah.
17         MS. KITSON:  Okay.  Can you guys hear him?
18         MR. CRONE:  Yeah.
19         THE WITNESS:  Can you hear me?
20         MR. CRONE:  Yeah, and -- and -- and with no
21 echo, so . . .
22     Q.  (BY MR. CRONE)  If you can recall what you
23 were about to discuss, feel free.  If you need me to
24 repeat it, that's fine.
25     A.  Ultimately, the role of the flight

50

1  attendant is not only a safety professional, but
2  they're there to make sure the passenger experience
3  is a positive one from every aspect of serving drinks
4  and sharing -- safety is obviously the most
5  important.
6          Ensuring everything goes smooth from
7  beginning to end in the cabin and everything in
8  between.  Serving drinks, being mindful, making aware
9  of any situation that might be ongoing on the
10 aircraft.
11         So there's a lot of components to the role
12 of the flight attendant versus just having a beverage
13 cart pushing up and down the aisle.
14     Q.  As far as the safety component is
15 concerned --
16     A.  Yeah.
17     Q.  -- can you break that down for me?  Can you
18 explain to me exactly what a flight attendant does to
19 ensure the passengers are safe?
20     A.  Perfect.  Upon boarding, to make sure that
21 everybody's assigned to their specific seats.  A lot
22 of that is determined based on the manifest, and it's
23 important that passengers seat -- are seated in their
24 proper seats for that specific reason.
25         Flight attendants do undergo a training.

51

1  As part of their training, they go through
2  self-defense training.  They go through how to
3  restrain a passenger in the event of emergency;
4  what -- all the dos and don'ts should things get
5  escalated.
6          They also need to know how to unarm an
7  individual if they're trying to create harm on any
8  passenger.  They go through proper door drills, how
9  to open up their -- the door, the airplane door, how
10 to not open up the -- the door.
11         Obviously, the beverage cart, what is
12 stowed where.  At that time, we did have coffee pots
13 on the aircraft.  They knew how to make the coffee.
14 Outside of that, how to defend themselves with the
15 proper equipment, coffee, hot liquids, things of that
16 nature.
17         They were also informed of how to maintain
18 and unlatch the bathroom doors, what happens, how to
19 unlock.  Emergency procedures as well.
20         Also informed in the event of evacuation --
21 evacuation; how to evacuate the aircraft, how to
22 deploy the slide from the aircraft.  Let's see.  How
23 to stow luggage up to how to stow the beverage cart.
24         So that's kind of a summary piece of that
25 from a safety perspective.

52

1      Q.  Are there no more -- is there -- are there
2  no more coffee pots due to COVID?
3      A.  It's a different type of -- I haven't been
4  on an aircraft recently, but I know they removed
5  the -- in terms of weight, the coffee pots actually
6  are extremely heavy.  But it -- it's a little bit
7  different now.  But yeah.
8      Q.  So it's not a pandemic-related thing; it's
9  a --
10     A.  No.
11     Q.  Okay.  And so what about intoxicated
12 passengers?  Are they trained to deal with those?
13     A.  Yes.
14     Q.  Is there any component to that training
15 that trains them on how to identify whether
16 somebody's under the influence of alcohol or drugs?
17     A.  Definitely.
18     Q.  Okay.  And then the other sort of broad
19 component that you mentioned which is related to the
20 passenger experience, which, you mentioned, is -- is
21 serving drinks and being mindful of the passengers --
22 are there -- is there anything else going on there?
23 Can you -- can you flush that out for me?
24     A.  Say that again?  I'm sorry.
25     Q.  That's fine.  The -- the passenger

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

53

1 experience, so -- so not thinking about the safety
2 component, which you just outlined really well for
3 me --
4     A.   Uh-huh.
5     Q.   -- on the passenger experience side, is
6 there more to it there?  Can you -- can you outline
7 that a bit or break it down a bit for me?
8     A.   Yeah, just making sure their experience is
9 a positive one, from either -- A, if they have
10 questions, if they're wanting additional food items
11 or -- or snacks, things of that nature.
12          A lot of times -- there may be a baby
13 crying onboard.  There -- sometimes they go and try
14 and assist with that to make the experience for
15 everybody a very positive one.
16          So in terms of the passenger experience,
17 it's upmost because, at the end of the day, we want
18 that returning customer to come back.
19          So if they have a positive experience,
20 which is -- dealt with the flight attendants, which
21 is the first line of -- the passenger sees, it's
22 important that that experience be a -- positive from
23 beginning to end.
24     Q.   What about fearful flyers?  Are they
25 trained to -- to -- to -- to calm or comfort fearful

54

1 flyers?
2     A.   Definitely.  And I guess fearful can be
3 in -- in all forms.  For example, I'm not -- I don't
4 like flying, but I do it for the role.  And so at
5 times, they either engage in conversation, trying to
6 just calm the anxiety down.  So it depends on fearful
7 in what form.  It could be a variety of forms.
8          So, yeah, I think they are trained in that
9 customer service to make sure to ease the anxiety,
10 which I think then leads to any type of fear.
11     Q.   I also dislike flying.  Talking about it
12 right now kind of makes me nervous, to be honest.
13          I -- it -- it just -- it strikes me that
14 the position is stressful.  Is it -- is it fair to
15 call it a stressful position?
16     A.   The flight attendant role?
17     Q.   Yes.
18     A.   It -- it depends on who you ask.  I think a
19 lot of people see it a little bit differently.  So I
20 don't know if it would be -- I -- I don't -- I don't
21 think it's a stressful role, but it depends, again, I
22 would say, on who you ask.
23     Q.   Is it fair to say whether it's stressful or
24 not is subjective?
25     A.   Yeah.

55

1     Q.   What about -- what about the -- the actual
2 day-to-day schedule?  So setting aside what flight
3 attendants do, what their duties actually are,
4 what -- what's a day look like?  When do they start?
5 Where do they go?  How does the day end?  Can you
6 walk me through that, if that makes sense.
7     A.   That's a big question.  I guess there's so
8 many components to that.  So are you looking at what
9 is the day in the life of a flight attendant, or what
10 is their schedule specifically?
11     Q.   Yeah, I'm looking for a day in the life as
12 related to their schedule.  I think -- I think the
13 way to make this easier to look at is let's think
14 about, were you familiar, between 2011 and 2015, with
15 Rebecca Brigham personally?
16     A.   Yes.  Between 2011 and '15, yes.  I am --
17 the company came back -- when I say "came back," came
18 back from Indianapolis in 2012, which is when I
19 returned, so from 2012 forward.
20     Q.   Okay.  And -- and so she was a flight
21 attendant that you knew from the job; is that -- is
22 that correct?
23     A.   Right.  Yeah.
24     Q.   And so thinking about the types of flights
25 that she worked on and the routes that she was

56

1 scheduled on and that sort of thing, what are -- what
2 does a day look like for that flight attendant?  What
3 time does it start?  Where do they go?  How does it
4 end?  That -- that sort thing.
5     A.   And it's hard to answer that question
6 because everybody had a different -- a flight
7 attendant had a different way to bid a schedule based
8 on their preference.
9     Q.   Okay.
10     A.   So every day would be different for each
11 flight attendant based on the type of routes they bid
12 for, the type of flying they bid for.  So it's hard
13 to say what that would be, ideally, for every -- in a
14 general purpose.
15          It just depends on preferential treatment
16 on the individuals who bid and the type of schedule
17 and the type of flying they wanted to do: locations,
18 if they wanted day trips, if they wanted redeyes, if
19 they wanted layovers.  It just depended on the
20 individual.  It's all completely different.  It's
21 hard to answer that question.
22     Q.   Yeah, and that's actually very helpful.
23 And so -- so the -- so the flight attendants are able
24 to bid on certain types of trips that they want to
25 work on?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

57

1  A.  Yes.
2  Q.  Okay.  How does that -- how does that
3 bidding process work?
4  A.  They go through -- which I believe the
5 scene is they submit their bid through -- I believe
6 at that time it would have been -- Sabre is the
7 overall software.
8      They submit their bid there.  It goes
9 through -- and, again, there's so many preferences as
10 to how they're able to bid their schedule.  "If this,
11 then that" is kind of the process, and the networking
12 part of that.
13      And so when they submit the bid, they --
14 essentially they're submitting their preferences.
15 And it can come down to I don't want to work this
16 type of trip; I don't want to work into these cities;
17 I do want to work these cities; I'd rather not do day
18 trips, layovers, redeyes; I'd rather only do two
19 days, not three days.
20      So there's so many preferences that they're
21 able to do that, and those preferences are large.
22      Once they submit their bid, as we call it,
23 then it goes through -- and, again, it's all a
24 seniority-based system.  The system is then kind of
25 calculated based on seniority based on that bid to

58

1 see who can hold that particular trip.
2  Q.  Okay.
3  A.  And then at the end of the day, it spits
4 out everybody's -- sorry -- it kind of displays
5 everybody's schedule, keeping in mind all those rules
6 and regulations associated with the collective
7 bargaining agreement.
8  Q.  So through that process, are there any
9 flight attendants -- and, again, limited by the time
10 period end of 2011 to end of 2015 -- were there any
11 flight attendants that were able to obtain a
12 relatively set schedule, you know, every -- every --
13 roughly every week they'd get the same trips, or was
14 it just always different all the time?
15  A.  It would depend -- that's also a difficult
16 question to answer because it depends on that type of
17 month.  If -- it depends on our seasons, if it's a
18 busy season, if it's summer, if it's a holiday
19 season.
20      But if you were a very, very senior flight
21 attendant, obviously they get the first pick of
22 everything that's out there.  So if that individual
23 always bid a certain trip, it would be very likely
24 that they would have a set schedule.
25      But, again, it's all based on preference

59

1 and what they can hold, and in that moment.  Some
2 people wanted holidays off, so they would bid their
3 schedules accordingly.  If there was some time that
4 they were going on vacation, they would bid their
5 schedule accordingly.  So it would always constantly
6 change.
7  Q.  So is one of the -- the perks of becoming a
8 more senior flight attendant having more control over
9 your schedule?
10  A.  Definitely leads to quality of life.
11  Q.  Yeah.  Do flight attendants ever perform
12 duties at the headquarters or what was called the GO?
13 Or are all of their duties performed inflight?
14  A.  In what -- what form?  I guess if you can
15 elaborate.
16  Q.  Yeah, sure.  So -- so the -- the primary
17 job duties that you've described for me of a flight
18 attendant during the time period, I imagine all of
19 that happening on the plane or at the gate, you know,
20 sort of inflight or -- or on the way to go fly.  Is
21 that -- is that fair, my assumption?
22  A.  No, because there's also the training
23 component.
24  Q.  Oh, okay.
25  A.  So they would have to go do training,

60

1 recurrent training, ground school, train -- if there
2 was a new policy being rolled out or something that
3 the flight attendants -- say, for example, that
4 they're changing the beverage service or a new
5 product being rolled out.  They would have to go
6 through that training, which would be off the
7 aircraft.
8  Q.  And what's the -- would -- would that occur
9 at the -- at what was the GO or headquarters now?
10  A.  At that time, yes, that's where we actually
11 had all of the training.  Recurrent training was also
12 there.
13  Q.  And what is flight school?
14  A.  Flight school is anybody -- any flight
15 attendant coming on board, they go through -- at that
16 time -- the training has since revolved.  I think it
17 was six weeks that they would have to go through
18 training.  And in that, they covered everything that
19 they needed to know.
20      They reviewed the collective bargaining
21 agreement with them as well.  The training manual,
22 basically, is everything that the flight attendant
23 needs to know before they're actually released to
24 line.
25      They would go through self-defense

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

61

1 training.  They would go through beverage cart
2 training service.  Rules and regulations.  FARs
3 associated with the FAA.
4        They would go through -- they were taken
5 out by the airport to do -- how to distinguish flames
6 if the plane got caught on -- got on -- on fire.
7 They would do how to open up the doors, slide
8 deployment.  They would actually have to jump down
9 the slide to make sure there's no issues or concerns
10 with that.  So, yeah, quite a bit.
11        Q.   When you mentioned that they would review
12 the collective bargaining agreement as part of this
13 training, who, during the -- the time period that we
14 defined, would have been that individual in charge of
15 reviewing the collective bargaining agreement with
16 the new flight attendants?
17        A.   And let me -- I guess I should repeat that.
18 They would discuss the -- that the flight attendants
19 were covered by the collective bargaining agreement.
20 I'm not sure they went through it by detail.
21        Q.   Okay.
22        A.   But the FAA or the AFA or -- I'm not sure
23 who the union representation was at that time.  I
24 believe they just came in and would say, Hi, we're
25 representing this.

62

1        Q.   Okay.  Got it.
2        A.   If you have any questions here forth, you
3 can reach out to us.  But, yeah, I think that was
4 maybe one day that they would came in.
5        Q.   And who was the person again -- I think you
6 mentioned it already, so I apologize.  Who was the
7 person on the org chart we looked at that -- that
8 was -- I think you mentioned one individual was in
9 charge of overseeing the -- the CBA or being the
10 liaison to the union or something like that,
11 seeing --
12        A.   It -- it would depend.  You know, there's
13 Laura Rush.  Under her would be Kari Thompson.  And
14 then you had Nicholas Kohlhepp on the side that
15 handled all policies and procedures; basically, the
16 operating procedures for the flight attendants.
17        So in terms of the collective bargaining
18 agreement, a lot of the language in there would be --
19 roll under the labor department, the language
20 specifically.
21        The management of the collective
22 bargaining agreement was a shared responsibility with
23 Kari Thompson, Laura Rush, and employee relations at
24 that time, and our labor department.
25        Q.   Did we -- did we -- I don't think we saw

63

1 anybody in the labor department on the -- on the org
2 chart that I can recall; is that correct?
3        A.   It was -- at that time, labor was part of
4 HR.
5        Q.   Oh, it was?  Okay.
6        A.   Yeah, yeah.
7        Q.   All right.  Okay.  So outside of the --
8 outside of the -- the training that at that time
9 would occur at the GO or headquarters, was there
10 anything else a flight attendant might do at the GO
11 or at headquarters?
12        A.   And, again, that's also a tough question.
13 So, for example, a lot of our instructors were
14 certified flight attendants.  Some of them would fly;
15 some of them would instruct.  And so they would work
16 at the GO under the training department.
17        So everybody -- let's see.  Our inflight
18 instructors as well assisted out at the airport.  It
19 would just depend.  I think at times they would use
20 flight attendants in other capacities, but I don't
21 know all the details around that.
22        Q.   Okay.  What if a -- what if a flight
23 attendant became injured or something like that and
24 they couldn't -- couldn't stand for long periods, or
25 whatever the case may be, they couldn't work in -- in

64

1 the plane and do the inflight service?  Would they
2 ever be temporarily reassigned to the GO or
3 headquarters?
4        A.   At times, yeah.
5        Q.   Can you recall any of those times?  Can --
6 can you recall specifically that ever occurring with
7 respect to any flight attendant?
8        A.   Yeah.  I don't know the specific names, but
9 yes.
10        Q.   Can you -- whatever is coming to mind,
11 can you describe for me what the injury was that led
12 to being reassigned temporarily to the GO or
13 headquarters?
14        A.   Yeah, what the injury was specifically
15 or . . .
16        Q.   Yeah, or just -- or just -- well, whatever
17 the cause was.  Whatever --
18        A.   It would be attributed to work comp or
19 on-the-job injury, the work comp program.
20        Q.   So if somebody was injured on the -- if
21 somebody was a flight attendant, they were injured on
22 the job, they might be temporarily reassigned to the
23 GO or headquarters?  Am I -- am I describing that
24 right?
25        A.   Yeah.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

**65**

1  Q.  Okay.  And then what types of work might
2 they be assigned there?
3  A.  It would just depend on what was available,
4 what was needed.  It was pretty much administrative.
5  Q.  Okay.  When this has occurred in the --
6 the past, can you recall how long the employee was --
7 was reassigned to the GO or headquarters?
8  MS. KITSON:  Object to the form.
9  A.  I don't know the specific time frame.  If
10 anything, it was always different.  It would be based
11 upon restrictions, the improvement of the individual.
12 Yeah, so it would -- it would vary.
13  Q.  (BY MR. CRONE)  Okay.  What -- what's --
14 what's the shortest time you can recall somebody was
15 reassigned to the GO?
16  A.  I can't -- I can't think offhand.  I mean,
17 it could have been a month, could have been two.
18 Yeah.
19  Q.  Can you recall the longest time you -- that
20 a flight attendant was reassigned to the GO?
21  A.  Not specifically, no.
22  Q.  Can you recall roughly how many flight
23 attendants you recall -- now I'm not making sense.
24 Let me start over.
25  Can you recall roughly how many flight

**66**

1 attendants were reassigned to the GO due to a work
2 comp injury or something like that during the
3 relevant time period?
4  MS. KITSON:  I'm just going to interpose an
5 objection that this is outside the scope, because the
6 objection that we lodged and that was accepted is
7 that we would only be testifying about disability
8 accommodations, not temporary conditions.
9  That said, if you want to ask him in his
10 individual capacity if he has any memory of that, I
11 just want to make it clear that he's testifying on
12 his own behalf and not the company's.
13  MR. CRONE:  Yeah.  So the objection's
14 noted.
15  Q.  (BY MR. CRONE)  So, Mr. Arellano, do -- do
16 you need me to repeat that question?
17  A.  Yes.
18  Q.  Okay.  Can you recall roughly how many
19 flight attendants were temporarily reassigned to the
20 GO during the relevant time period?
21  A.  It would be a handful.  Again, this is just
22 a guesstimate.  Eight to ten.  Maybe a little bit
23 more.
24  Q.  What -- so you had mentioned that a flight
25 attendant might be reassigned to the GO temporarily

**67**

1 due to a work comp issue or something like that.
2 Were there any other reasons?
3  A.  From an HR perspective, I can't think of
4 one.  I -- I can't speak to what the inflight
5 department did, but on the HR side, OJI work comp
6 would be the only reason.
7  Q.  Sure.  And what does OJI mean?
8  A.  On-the-job injury.  So -- yeah.
9  Q.  Okay.  So thinking -- thinking again about
10 how a flight attendant's day is actually structured,
11 do flight attendants ever start in one city and end
12 their day in another?
13  A.  Yes.
14  Q.  And if they do, I assume they don't -- they
15 don't fly home.  I mean, do they -- do they stay at
16 this other city where they ended?
17  A.  Yes.
18  Q.  Okay.  And where -- where do they stay?
19  A.  At hotels.
20  Q.  Are they on the clock the whole time?  off
21 the clock?  Do you know?
22  A.  In -- in what form off the clock?  I
23 guess . . .
24  Q.  So -- so let's say the flight attendant
25 starts in Denver and ends in Cleveland --

**68**

1  A.  Uh-huh.
2  Q.  -- and they're going to stay in a hotel
3 overnight in Cleveland.  Are they being paid
4 overnight, or are they off on their own time?
5  A.  They do receive per diem.
6  Q.  Per diem?
7  A.  Uh-huh.
8  Q.  Is it possible for a flight attendant to --
9 to stay multiple nights before returning home while
10 working?
11  A.  It is possible, yes.
12  Q.  How many -- how many nights might a flight
13 attendant stay away from home while working?
14  A.  It would be, again, depending on
15 preference.  Our line of flight has changed
16 dramatically from that time period.  Then, everything
17 predominantly did come through Denver since our --
18 Denver was our hub.
19  If there was a layover, again, it just
20 depends on the type of flying and how the lines were
21 built in terms of the pairings.  So yeah.
22  Q.  Okay.  Now --
23  A.  At max, possibly -- maybe a little more,
24 yeah.
25  Q.  Okay.  I want to -- I want to switch gears

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

**69**

1 a little bit and chat about benefits that were
2 provided to flight attendants during this time.  And
3 were flight attendants provided medical insurance?
4    **A.**    They were.
5    Q.    Was it fully paid by Frontier, or did they
6 have to chip in?
7    **A.**    They had to pay a portion.
8    Q.    Okay.  What about dental?
9    **A.**    Yes.
10    Q.    Same?  Did they -- was -- did -- did the
11 employee pay a portion?
12    **A.**    I would have to refer to the benefit
13 package to determine that.
14    Q.    Okay.
15    **A.**    Yeah.
16    Q.    Were they provided, do you know, any other
17 types of insurance --
18    **A.**    Yes.
19    Q.    -- or benefits --
20    **A.**    Yes.
21    Q.    -- beyond specifically insurance?  I'm
22 sorry.
23    **A.**    Yeah.  Yes, we offered a medical package.
24 We offered dental, vision, obviously.  We offered
25 life insurance policies, short-term disability,

---

**70**

1 long-term disability.
2    Q.    Okay.  Did -- did Frontier offer any
3 wellness programs?  So not an insurance benefit, but
4 any sort of wellness program that encouraged
5 employees to live healthy lifestyles and that sort of
6 thing?
7    **A.**    We utilized quite heavily the EAP program.
8    Q.    Is -- is "EAP" employee assistance?
9    **A.**    That's correct, the employee assistance
10 program.
11    Q.    Okay.
12    **A.**    At that time, I would have to double-check
13 the benefit package, if we did have one of those
14 programs.
15    Q.    Did -- did Frontier have any sort of
16 program related to substance abuse?
17    **A.**    Yes.  It was our self-disclosure program.
18    Q.    Okay.  So that's what it was called, the
19 self-disclosure program?
20    **A.**    Correct.
21    Q.    And what was the purpose of that program?
22    **A.**    Anybody who felt they needed assistance due
23 to some type of dependability -- or a dependency, I
24 should say, they had the ability to step forward and
25 then essentially say, I'm -- I need assistance.  So

---

**71**

1 they would do that through our compliance program.
2    Q.    And was this -- was this part of some
3 benefit provided through insurance, or was this just
4 something Frontier did on its own?
5    **A.**    I guess, in the form of "insurance," can
6 you explain or elaborate?
7    Q.    So like the medical insurance was provided
8 through Blue Cross or United or something like that;
9 is that right?
10    **A.**    At that time, I would have to check to see
11 who the provider was.
12    Q.    I just mean some private insurance provider
13 actually --
14    **A.**    Okay.
15    Q.    -- was -- was retained?
16    **A.**    For, yeah, medical packages.  Yes.
17    Q.    But for the self-disclosure program, is
18 this something that Frontier is just paying for, it's
19 just doing -- it's created this program of its own
20 volition?  There's not a third party involved?
21    **A.**    That is correct.
22    Q.    And so anybody who needs assistance could
23 self-disclose through this program?
24    **A.**    Yes.
25    Q.    And then what would happen if they did?

---

**72**

1    **A.**    If an employee did step forward, then that
2 then starts what we call the checklist.  There was a
3 checklist of events that the compliance coordinator,
4 specialist, whoever the -- received the disclosure.
5 That individual would meet with the employee, review
6 guidelines then set forth, and expectations.
7        In that point, that's where we would then
8 partner with the EAP, the employee assistance
9 program, with regard to the substance abuse piece
10 where we -- they would -- we would reach out to them,
11 said an employee has now self-disclosed.
12        We would partner with the EAP to then
13 identify a substance abuse professional, an SAP.  The
14 SAP would then contact the individual and then would
15 review the -- initial-contact counseling and then
16 determine next steps from that point forward.
17        And so the SAP would then determine the
18 severity of the situation; they would identify
19 recommendations for the individual; and they would
20 then communicate with our compliance individual.
21        And then they would partner in terms of
22 what the next steps were that they recommended,
23 that they be enrolled in a program.  The SAP
24 would determine the length of the program based on
25 their conversation, which was private, with the

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

73

1 individual.

2      Q.   And -- and that's what I was going to ask

3 is is the whole process confidential once an employee

4 self-discloses?

5      A.   Confidential, yes.  So people who are

6 attached to -- and HR in this case would have access

7 to the information, if needed.

8      Q.   So it's confidential within the group --

9 within the people that are a part of the

10 self-disclosure program?

11      A.   Yeah, compliance and HR, but nobody outside

12 of that.

13      Q.   Okay.  Was the employee -- was the employee

14 promised that if they self-disclosed, they wouldn't

15 lose their job because they self-disclosed?

16      A.   That, I -- I do not know, no.  I don't know

17 if anybody was promised that.  Self-disclosure,

18 ultimately what it is is, Hey, I need assistance with

19 an issue and then guided through the process.  Yeah.

20      Q.   Did Frontier have any concern that -- that

21 people would be worried about losing their job if

22 they -- if they came out and said, I need assistance?

23      A.   No.

24      MS. KITSON:  Object to the form.

25      A.   And when you're in the program, it all

74

1 depends, because they're -- once you go through the

2 required steps identified by the substance abuse

3 provider, there is what we call the aftercare

4 program.

5      The aftercare program is a collaboration

6 between the substance abuse provider and the facility

7 where the individual went and did their treatment.

8 Combine these two, then determine what that aftercare

9 program is.

10      The aftercare program identifies that the

11 individual will now go through random drug testing,

12 which is designed and identified by the substance

13 abuse provider based on their dialogue with the

14 treatment center.

15      And so an individual, for year one, can

16 say, I want them to go through 24 random drug tests.

17 That's where the compliance department then schedules

18 a drug test, or randoms.

19      If the individual is -- tests positive in

20 that, then, yes, in that moment, they've now failed

21 the program because they tested positive, and that

22 could potentially lead to separation.

23      Q.   Okay.  Got it.  Got it.

24      A.   Only then.  But being in the program, no.

25      Q.   Okay.  Do you know if Ms. Brigham was

75

1 subject to random drug or alcohol tests at any point

2 during her employment with Frontier?

3      A.   She would have been subject to that as part

4 of the role of a flight attendant because all -- and

5 this goes back to the DOT, safety sensitive.  They

6 are subject to the random drug testing.

7      Q.   What about through the self-disclosure

8 program?

9      A.   Yes, that would be in addition to the

10 regular random drug.  Then they go through the

11 program as well.  So that's in addition to what she

12 would be subject to.

13      Q.   Do you know if she ever failed to pass one

14 that she took?

15      A.   Excuse me?

16      Q.   Do you know if she ever failed to pass a

17 drug or alcohol screening?

18      A.   To my understanding, no.

19      Q.   When you were at JetBlue in roughly 2014 to

20 2015, did JetBlue have a similar self-disclosure

21 program?

22      A.   That, I don't know.

23      Q.   Is it -- is -- are you aware of whether

24 other airlines have self-disclosure programs, or is

25 this unique to Frontier, or do you know?

76

1      A.   No, other airlines have them.  But all --

2 it comes down to if they're a second-chance company.

3 That also defines a different type of regulation or

4 process.  Frontier is not a second-chance company.

5      Q.   Okay.  So what -- when -- when you say

6 Frontier is not a second-chance company, what exactly

7 does that mean?

8      A.   If you're, for example, under FAA

9 regulations, if you test positive for drugs or

10 alcohol either through a test, random, reasonable, or

11 suspicion, if your results come back positive,

12 ultimately, our compliance department is required to

13 report that to the FAA.

14      In that -- and so the -- typically, the

15 employee would be released.  If that employee is

16 released, that positive test does follow them

17 throughout their career should they want to apply for

18 a DOT position.

19      So it could prevent them from applying

20 with another carrier, unless the carrier was a

21 second-chance company.  If they're a second-chance

22 company, they could apply with that airline.

23      In that same scenario, if the employee had

24 previously tested positive, they would not be

25 eligible for hire at Frontier, because we're not a

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

77

1 second-chance company.
2     Q.   Got it.  Okay.  So -- so at Frontier, if
3 I fail one of these tests, you'll be fired.  And
4 that -- and -- and you couldn't reapply at Frontier.
5 But if you went to a second-chance airline, you
6 could -- you could at least try?
7     A.   If you -- and, again, in terms of
8 failure -- you would have to then define "failure."
9 If you tested -- if, for whatever reason, during a
10 reasonable random, if you tested a -- it depends on
11 the level.
12          And so if it's alcohol, if it was above .02
13 or .04, there was a condition.  If you were above
14 .04, then, yes, you would be separated because that
15 was above the legal limit.
16     Q.   Okay.
17     A.   If you were below that -- I would have to
18 look at the contract at the time.  I believe there
19 was some language that existed on there.
20     Q.   Yeah.  So -- so an employee could
21 self-disclose through the self-disclosure program
22 that they had a problem with alcohol?
23     A.   Uh-huh.
24     Q.   And that wouldn't trigger this
25 second-chance program at that point?

78

1     A.   Correct, because it was brought in forward
2 through the self-disclosure program, so they have
3 protection under that.
4     Q.   Okay.  Okay.  Got it.
5          During -- during the relevant time period,
6 so end of 2011 through end of 2015, who was in charge
7 of the self-disclosure program?
8     A.   2011 -- say that again.
9     Q.   So end of 2011 through the end of 2015,
10 the -- the relevant time period that we're in, who
11 was in charge of the self-disclosure program?
12     A.   I believe there was some changes at one
13 point.  2011 to -- we -- we had Chris Benedict, who
14 was manager of staffing and compliance, so the role
15 that I had previously had, he oversaw --
16     Q.   Uh-huh.
17     A.   -- the substance abuse program or the
18 self-disclosure.  Prior to -- at one portion, I would
19 have been in that position.
20     Q.   Okay.
21     A.   Yeah.
22     Q.   So it would have been either Chris Benedict
23 or yourself during that time period?
24     A.   I'm just trying to think in my career here.
25 I think it would have been just Chris Benedict.  I

79

1 would have to look at it, because I think I had a
2 portion there.  I came back from JetBlue -- no, we
3 came back in 2012.  2013.  I think a portion I did,
4 yes.
5     Q.   Okay.
6     A.   Yeah.
7     Q.   Was there any other sort of drug- or
8 alcohol-related programs at Frontier outside of the
9 self-disclosure program?
10     A.   In what -- just programs in general
11 or . . .
12     Q.   Yeah.  Just any -- any -- any program to
13 deal with employees that might have drug or alcohol
14 issues generally, outside of this self-disclosure
15 program?
16     A.   And you're talking about the company,
17 correct?
18     Q.   Correct.
19     A.   The pilots have their own program, which is
20 called the HIMS program, to be equivalent to our
21 self-disclosure program.  And that would be -- to my
22 knowledge, that would be the only other program.
23     Q.   Okay.  Do you know, does Frontier still
24 have this self-disclosure program in place currently?
25          MS. KITSON:  Object to the form.  I'm going

80

1 to instruct the witness not to answer.  It's outside
2 the relevant time frame.
3     Q.   (BY MR. CRONE)  So -- so at -- at -- at the
4 present date, is -- does the self-disclosure program
5 exist in any form at Frontier?
6          MS. KITSON:  Same instruction.
7          MR. CRONE:  So, Danielle, it's -- it's
8 tough without seeing you, but is this really a point
9 we're going to take to the judge?
10          MS. KITSON:  And I would -- again, to make
11 a distinction, we're talking about the scope of the
12 30(b)(6) topic.  So if you want to ask him in his
13 personal capacity, that's fine.
14          MR. CRONE:  I -- I -- yeah, I'm aware that
15 I can do that, but it's -- it's -- it's a
16 straightforward yes, no, and it will be in the record
17 in a tidy spot right here.  I mean, do we really want
18 to -- I mean, how -- is the question really --
19          MS. KITSON:  Is this your only question, as
20 to whether it exists today?
21          MR. CRONE:  Yeah.  I just want to know if
22 it exists today or if it's -- or if it's no longer
23 there.  That's all.
24          MS. KITSON:  You can answer that.
25          MR. CRONE:  Thank you.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

81

1    A.   Yes.

2         THE WITNESS:  And do you guys mind if I

3    take a break?  I've been drinking a lot of water.

4         MR. CRONE:  I think -- I think now is a

5    great time for a break, but why don't we -- is ten

6    minutes good?

7         THE WITNESS:  Yes, yes, definitely.

8         MR. CRONE:  Okay.  We'll see you in -- in

9    ten minutes.  Thanks.

10        THE WITNESS:  Thank you.

11        MR. CRONE:  We'll go off record.

12        THE VIDEOGRAPHER:  The time now is 10:46.

13   We're off the record.

14        (Recess from 10:46 a.m. to 10:57 a.m.)

15        THE VIDEOGRAPHER:  The time now is 10:57.

16   We're back on the record.

17        Q.   (BY MR. CRONE)  Mr. Arellano, I want to --

18   I want to give you a little hope here about how the

19   rest of the day is going so you're not -- I think --

20   I think we can easily get to lunch in the next hour

21   and take a better break for everybody.

22        A.   Uh-huh.

23        Q.   And then I think, after that, we're looking

24   at maybe a couple of hours, and we'll have it wrapped

25   up.  I -- I don't think we'll have to sit here the

82

1    entire day.

2         So I don't want to make any promises, but I

3    want to give you some sense of where we're -- where

4    we're going, so . . .

5         A.   Thank you.

6         Q.   Yeah, no problem.

7         And so the self-disclosure program, do you

8    have any idea how -- how much it costs Frontier to

9    run that program?

10        A.   I do not.

11        Q.   Okay.  I want to -- I want to switch gears

12   a little bit and talk a bit more about the collective

13   bargaining agreement.  I promised you earlier in the

14   morning that we would.

15        A.   Yeah.

16        Q.   I don't want to -- I don't want to let you

17   down.

18        So the -- the -- the union that exists that

19   represents -- or represented Ms. Brigham during --

20        A.   Uh-huh.

21        Q.   -- during the relative time period, do you

22   know if that union always represented Frontier flight

23   attendants, or did they come in at some time, that

24   you can recall?

25        A.   We did have an in-house -- I don't want to

83

1    say in-house union, but prior to AFA -- it's always

2    been AFA.

3         Q.   Okay.

4         A.   Before that, it was just handled

5    internally --

6         Q.   Okay.

7         A.   -- through --

8         Q.   Okay.

9         A.   It was a committee.  Yeah.

10        Q.   Okay.  Okay.

11        Okay.  So what's your understanding of the

12   purpose of the collective bargaining agreement

13   between the AFA and Frontier?

14        A.   Pretty much it defines a lot of the

15   expectations for -- and coverages awarded to the

16   flight attendants.  It addresses consistency.  It

17   addresses bidding process, training requirements

18   outlined.  A lot of rules and regulations,

19   essentially.  It's kind of their version of the

20   employee handbook, if you will.

21        Q.   Okay.  Is -- does -- does Frontier and the

22   AFA renegotiate that collective bargaining agreement

23   from time to time?

24        A.   When it comes up for negotiations, yes.

25   When it comes up for re-up.

84

1         Q.   Is -- is Frontier obligated to comply with

2    whatever agreements are made inside of the collective

3    bargaining agreement?

4         A.   Yes.

5         Q.   And then I think -- I think you had

6    mentioned that it was, I want to say, Laura Rush

7    that was sort of overseeing -- one of the people

8    overseeing Frontier's compliance with the collective

9    bargaining agreement.  Is that -- is that correct, or

10   am I getting that wrong?

11        A.   I'm -- I'm not sure she ensured compliance.

12   I think, overall, she was there to run the operation

13   as it stood but yet being compliant with the rules

14   and regulations outlined in the collective bargaining

15   agreement.

16        Q.   All right.

17        A.   Yeah.

18        Q.   I'm sorry.  Was there anybody else doing

19   that with her?

20        A.   On the inflight side, you would have --

21   Kari Thompson, at times, would assist with that.  And

22   a lot of that would be -- be dependent upon, let's

23   say, the scheduling.  If a flight attendant wanted a

24   certain -- when they arrived late, they would adhere

25   to the collective bargaining agreement.  They were

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

85

1 there to enforce it, essentially.
2    Q.   Okay.
3    A.   Yeah.
4    Q.   Do you know Adrienne Prince?
5    A.   I do.
6    Q.   Who was Adrienne Prince during the relevant
7 time period?
8    A.   She, at that time -- I know she was a
9 steward at one point and then became the vice
10 president, so I would have to see where she was in
11 terms of that time period.
12    Q.   Whether she was steward or vice president,
13 those are roles with the AFA?
14    A.   With the AFA, correct.
15    Q.   Was she, I assume, also then employed by
16 Frontier? Or maybe not. I'm not sure.
17    A.   She was. She was a flight attendant -- or
18 is a flight attendant. I believe she still works.
19    Q.   Okay. I want to put in front of you
20 Exhibit 4. And so this is -- give me just one second
21 here.
22         MS. KITSON: John, can I ask you a favor?
23         MR. CRONE: Yeah.
24         MS. KITSON: Can you e-mail that document,
25 like shoot it to me via e-mail as you're pulling

86

1 these things up one by one just like you would hand
2 it to me?
3         MR. CRONE: Yeah.
4         MS. KITSON: That would be great.
5         MR. CRONE: Yeah. No problem. I'll send
6 it over right now.
7         There you are, Danielle. That should be
8 off to you.
9    Q.   (BY MR. CRONE) And hopefully that should
10 be in front of you, Mr. Arellano.
11    A.   Yep. I've got it in front of me.
12    Q.   Great. Can you give it a review for me?
13    A.   Yeah.
14    Q.   Thanks.
15    A.   Yeah. Okay.
16    Q.   Have you ever -- prior to reviewing that
17 today, have you ever seen that document?
18    A.   No.
19    Q.   But you -- you've reviewed it now?
20    A.   Yeah.
21    Q.   And is there anything in that -- is there
22 any factual statement in that document that you think
23 is inaccurate?
24    A.   Let me look at it again.
25    Q.   Sure.

87

1         MS. KITSON: I would take it sentence by
2 sentence.
3         THE WITNESS: Yeah.
4    A.   If I look at Number 5, I don't ever recall
5 the union seeking accommodations. And, again, the
6 reason -- if -- if I was in that conversation, due to
7 confidentiality, we do feel that that meeting, with
8 the interactive process, was outside of the realm of
9 the CBA, so that conversation primarily was with
10 Rebecca.
11         So I don't recall any conversations with
12 the union where they proposed accommodations, at
13 least to my knowledge.
14    Q.   (BY MR. CRONE) Okay. So -- so the
15 allegations on paragraph 5, you don't recall that
16 happening, but you don't know if that's inaccurate;
17 is that fair?
18    A.   I simply don't recall, correct.
19    Q.   Okay. And -- and take your time and let me
20 know if there's anything else.
21    A.   And I -- I don't agree with where it says
22 Ms. Brigham was denied this requested accommodation.
23 I do feel we requested her accommodation in the form
24 of time off through the intermittent FMLA, which
25 allowed her to manipulate her schedule.

88

1         And Number 6, we did again grant her
2 accommodation just in the form of IFM, so it -- it
3 allowed her to adjust her schedule as she saw fit
4 and, of course, based within her seniority.
5    Q.   Okay. So I want to -- I want to take both
6 of those since you just mentioned -- so it's
7 Frontier's position that Ms. Brigham was granted an
8 a -- an accommodation in the form of IFM? Am I -- am
9 I hearing you correctly?
10    A.   No, in the form of time off.
11    Q.   Time off.
12    A.   Yeah.
13    Q.   Okay. And -- I'm sorry. Go ahead.
14    A.   And Number 7, I do feel we provided Rebecca
15 with solutions. And so, again, we did accommodate
16 her requests in many forms, not only in the form of
17 time off, but the ability to use intermittent FMLA as
18 she sees fit.
19         We also allowed her other opportunities to
20 look within the job or to see if there was another
21 opportunity that would better assist her with what
22 she was requesting.
23    Q.   Okay. So I want to make sure that we have
24 this properly summarized. It's -- it's Frontier's
25 position that Ms. Brigham was offered, one, the time

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

89

1 off you mentioned as an accommodation; is that
2 correct?
3     A.    Correct.
4     Q.    And then, two, intermittent FMLA leave?
5     A.    Correct.
6     Q.    And, three, the ability to look for
7 different jobs --
8     A.    Yes.
9     Q.    -- within the -- within the organization?
10     A.    Yeah.  She was also offered personal leaves
11 of absence, vis-a-vis -- oh, and also non-FMLA
12 medical leave as well, which is an additional to the
13 FMLA.  So she was, I believe -- and to my
14 recollection, she had non-FMLA medical leave, and I
15 believe that might have been it.
16     Q.    Okay.  So I want to make sure we've got it.
17 So you added non-FMLA medical leave, and was there
18 something else, or was it just that?
19     A.    Non-FMLA medical leave, FMLA personal
20 leave.
21     Q.    Okay.
22     A.    Yeah.
23     Q.    Okay.  And then is the time off, the first
24 thing we listed, is that different from the non-FMLA
25 medical leave and the FMLA personal leave?  Is

90

1 there -- is there also just a category of time off,
2 or is that the same?
3     A.    It would have been under her personal
4 leave, definitely.
5     Q.    Okay.  So that would just be regular
6 personal leave?
7     A.    Time off would also -- well, she had the
8 ability to use intermittent FMLA in the form that she
9 felt needed to assist with her request to adjust her
10 schedules.
11     Q.    Okay.
12     A.    So we did allow her the ability to use it
13 outside of parameters for what she was approved for.
14     Q.    Okay.  So the intermittent FMLA, thinking
15 about that specifically, how does that work?  How
16 does one go about obtaining approval to use
17 intermittent FMLA?
18     A.    Typically, the first step is they have a
19 dialogue with their leave-of-absence department.  In
20 that dialogue, the person doing the intake meeting
21 will then determine if the need is either continuous
22 or intermittent FMLA.
23     Based upon assessment, the individual or
24 the employee is then provided with the application,
25 whether it be intermittent or FMLA.

91

1     If it is intermittent FMLA, they're
2 instructed that there's a certain time period.
3 Typically, it's 15 days from the date of that
4 conversation.  They're provided with the application
5 and the 15 days marked and provided with a deadline,
6 Please return the completed paperwork by this time
7 frame.
8     And then once that application is received,
9 they then look at it and see if the nature of the
10 request qualifies the individual for FMLA or
11 intermittent FMLA.
12     They also look at the individual's schedule
13 to see if they worked a set number of hours.  They
14 looked at year of service; if the employee has been
15 here more than a year, things of that nature, to then
16 determine if they qualify or are approved for the
17 leave of absence.
18     Q.    All right.  With regard to the ability to
19 look for different jobs within the organization, did
20 Frontier ever offer to reassign Ms. Brigham, or -- or
21 did they offer the opportunity to -- to allow her to
22 apply for other jobs?
23     A.    The opportunity to apply.  Typically, what
24 we did with the interactive process, if there was a
25 role that the individual was interested, outside of

92

1 Rebecca Brigham, but if an individual said, I'd like
2 this role, we would look and see if they met the
3 essential functions of the role, were able to
4 complete the essential functions of the role, and if
5 they were minimally qualified.
6     We, as employee relations, would then have
7 that conversation with the hiring manager and see if
8 there was an opportunity to at least award the
9 individual the opportunity to interview for the
10 role --
11     Q.    Okay.
12     A.    -- outside of just the standard application
13 process.
14     Q.    Okay.  Did -- did Frontier -- excuse me.
15 Did Frontier ever offer to reassign Ms. Brigham to
16 the GO or headquarters?
17     A.    Not to my knowledge.
18     Q.    Did Ms. Brigham ever request that as a
19 reasonable accommodation?
20     A.    Yes, she did.
21     Q.    Why did Frontier deny that request?
22     A.    I'm not -- again, this is my opinion.  I'm
23 not sure we denied the request.  We were trying to
24 operate within the rules and regulations outlined in
25 the collective bargaining agreement.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

93

1 And in that opportunity -- and, again, it's
2 a complicated process in the form of there's so many
3 avenues that we need to look at. So when she
4 requested that, we then determined she was an active
5 employee. And as an active employee, she was
6 required to go ahead and bid for a schedule.
7 So being an active employee, we were unable
8 to assign her to a temporary ground assignment or
9 another opportunity, because she was technically an
10 active employee, and it was only allowed for OGI or
11 work comp, that opportunity to be reassigned. That
12 option was only afforded to individuals who sustained
13 an injury.
14 Q. Okay. So because she didn't sustain an
15 injury, she wasn't eligible to be reassigned to the
16 GO as --
17 A. No.
18 Q. -- as an accommodation?
19 A. Since she wasn't in the work comp program
20 or on OJI, then she was not eligible to be
21 reassigned.
22 Q. Okay.
23 A. Yeah.
24 Q. Any other reason why Frontier felt like it
25 couldn't reassign her to the GEO -- or the -- excuse

94

1 me -- the GO as she requested?
2 A. No, not to my knowledge.
3 Q. Was -- was Ms. Brigham ultimately
4 terminated due to attendance issues?
5 A. Yes.
6 Q. And was she taking time off work through
7 any of these various processes that you had just
8 testified that Frontier offered, so the time off,
9 like personal leave, intermittent FMLA, non-FMLA
10 medical leave, FMLA personal leave? Was she using
11 all of that time off?
12 A. She -- yes, she was utilizing those
13 resources, true. Yeah.
14 Q. But she was still, then, terminated for
15 attendance issues?
16 A. Correct.
17 Q. Was she terminated for any other reason
18 than attendance?
19 A. No, sir.
20 Q. Did -- did Ms. Brigham request to
21 modify her schedule? Whether or not you recall
22 Adrienne Prince helping her with it, did Ms. Brigham
23 request to modify her schedule as a reasonable
24 accommodation for her alcoholism?
25 A. She did request it, yes.

95

1 Q. And do you recall whether Frontier granted
2 that request?
3 A. We did not.
4 Q. And why was that?
5 A. Due to the collective bargaining agreement.
6 Q. So Frontier thought if -- if Ms. Brigham
7 was allowed to modify her schedule, that would
8 violate the terms of the collective bargaining
9 agreement?
10 A. I agree, yes.
11 Q. Okay. Do you recall Adrienne Prince
12 communicating to Frontier that it would not violate
13 the terms of the collective bargaining agreement?
14 A. I do not.
15 Q. And sorry. I'm going to go back just a
16 little bit.
17 Did Frontier think that transferring
18 Ms. Brigham to the GO, reassigning her would violate
19 the terms of the collective bargaining agreement, or
20 was that due to the OGI -- or OJI work comp issue?
21 A. It was the OJI work comp. She was just not
22 eligible. At the time, she wasn't part of the work
23 comp program.
24 Q. Okay. Does Frontier's opinion change at
25 all today about whether a modified schedule would

96

1 violate the terms of the collective bargaining
2 agreement based on your review of Adrienne Prince's
3 declaration?
4 A. Can you rephrase that again?
5 Q. Yeah. Does -- does -- does Frontier's
6 opinion change today as to whether or not allowing
7 Ms. Brigham to modify her schedule would violate
8 the terms of the CBA based on your reading of
9 Adrienne Prince's declaration in Exhibit 4?
10 A. No.
11 Q. Okay. So the -- the time off for personal
12 leave or through intermittent FMLA or -- or non-FMLA
13 medical leave or FMLA personal leave -- those
14 things -- were they offered by Frontier to
15 Ms. Brigham, or does she request those things?
16 A. They were available to her, so she had to
17 request them. In certain cases --
18 Q. And so --
19 A. -- she was offered personal leave.
20 Q. So --
21 A. If she is not eligible for an FMLA or
22 intermittent FMLA or a non-FMLA medical leave, the
23 department would offer her personal leave.
24 Q. So the -- so setting the personal leave
25 aside and -- and thinking about the FMLA, whether

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

97

1  it's intermittent or for personal leave or -- or the
2  medical leave, those things were available to
3  Ms. Brigham as they are to any other employee; is
4  that correct?
5      A.   That is correct.
6      Q.   Okay.  But the personal leave was something
7  different that -- that -- I mean, can -- could any
8  other employee get additional personal leave if they
9  were, say, out of FMLA time, or did they have to ask?
10     A.   Yeah.
11     Q.   Oh, they can?
12     A.   They had to request it.
13     Q.   Oh, they have to request it.  Okay.  Okay.
14     A.   And these were approved by the department.
15     Q.   Okay.  And -- and so setting all of the --
16 the -- the leave, the FMLA leave, intermittent or
17 personal FMLA leave, or whatever it is that Frontier
18 offered -- or, I mean -- sorry -- was available to
19 Ms. Brigham to request --
20     A.   Okay.
21     Q.   -- did Frontier offer any other reasonable
22 accommodation to Ms. Brigham in response to her
23 requests?
24         MS. KITSON:  Objection.  Asked and
25 answered.

98

1      Q.   (BY MR. CRONE)  I can rephrase that -- it
2  got a little wordy -- if -- if you need it.  Do you
3  want me to rephrase?
4      A.   Yes, please.
5      Q.   Yeah.  Okay.  Yeah.  So -- so did Frontier
6  offer any other proposed reasonable accommodations to
7  Ms. Brigham other than, You can request leave time of
8  some sort or you can apply for different jobs?
9      A.   Okay.  That would be it, yeah.
10     Q.   All right.  And just to make this clear,
11 too, so any -- any employee can apply for any listed
12 jobs, can't they?
13     A.   Correct.
14     Q.   Does -- does Frontier consider alcoholism
15 to be a disability as defined under the ADA?
16         MS. KITSON:  Object to the form.
17         THE WITNESS:  Do I answer?
18     A.   Yes.
19     Q.   (BY MR. CRONE)  Does Frontier treat a
20 disabled person who has alcoholism any differently
21 than they treat a person with any other disability?
22         MS. KITSON:  Object to the form.
23     A.   I would have to say, as part of the
24 interactive process, we also have to keep in mind,
25 if they're covered by the collective bargaining

99

1  agreement, certain terms of what we are allowed to
2  offer, in that case, yes.
3         But, overall, the process is designed to
4  see what accommodation we can provide.  But the
5  outcome also depends if the individual is covered
6  under the collective bargaining.
7      Q.   (BY MR. CRONE)  Okay.
8      A.   Do we treat them differently?  No, in that
9  form.
10     Q.   So there's nothing about the nature of
11 alcoholism that would cause Frontier to approach the
12 interactive process any differently than if, say, for
13 example, somebody broke their leg?
14     A.   No.
15     Q.   I'm pulling up an exhibit.  Sorry.  I'm
16 not -- I'm not -- I'm not ignoring you.  I also want
17 to get it e-mailed to Danielle.
18         MS. KITSON:  Thank you.
19         MR. CRONE:  Yeah.
20     Q.   (BY MR. CRONE)  Okay.  Mr. Arellano, so I
21 sent you, when it gets there, what has been marked
22 Exhibit 5.  If you can just review it and let me know
23 once you've reviewed it.
24     A.   Okay.
25         MS. KITSON:  I'm going to object,

100

1  Mr. Crone.  And you are not permitted to use this
2  document.  We have claimed privilege over this
3  document, and under Rule 26(b)(5), you are not
4  permitted to use it until we resolve that claim with
5  the judge.
6         So I'm happy to call the Court, if you
7  would like -- we can take a break for that later --
8  but you are not permitted to ask questions about this
9  document, and I'm instructing the witness not to
10 answer.
11         MR. CRONE:  We -- what if we agree that --
12 that he'll only refer to the part of the document
13 that's clearly not privileged?  And so I'm talking
14 about the last couple of sentences.  Would that
15 resolve the issue that way?
16         MS. KITSON:  No.  I mean, the entire e-mail
17 is a re -- relaying of what has been told to
18 Mr. Arellano by outside counsel, Holland & Hart.
19         MR. CRONE:  Well, I don't -- I don't -- I
20 mean, that's not apparent on the face of the e-mail,
21 that's for sure.
22         MS. KITSON:  And I'm happy to confer with
23 you about the context of the e-mail.  And if you want
24 to ask Mr. Arellano the context in which he wrote
25 this e-mail, that's fine, but he's not going to

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

101

1 answer any substantive questions about it.
2        MR. CRONE:  Okay.  Well, then how do you
3 propose we go about resolving the privilege issue
4 today?
5        MS. KITSON:  As I just said, you could ask
6 him if he were at a meeting, if there were attorneys
7 there.  You could ask him if all of the information
8 in this e-mail is information that was relayed to him
9 by Holland & Hart.
10        You can ask him those types of questions.
11 He's not going to answer substantive questions about
12 the content of the e-mail.
13        MR. CRONE:  Yeah, and -- and so I -- I
14 think that will get us there.
15        What if I direct him to the exact two
16 sentences I want him to -- that I want to ask a
17 question about and ask whether that was relayed by an
18 attorney at Holland & Hart -- at Holland & Hart or
19 not?  Can I do that?
20        MS. KITSON:  Let me confer with him
21 quickly.  If we can go on mute, and we'll confer
22 off-screen and come right back.
23        MR. CRONE:  That will work.
24        (Short interruption.)
25        MS. KITSON:  Okay.  So I understand that

102

1 the very last sentence that begins with "Next
2 steps" --
3        MR. CRONE:  Yep.
4        MS. KITSON:  Are you with me?  That
5 sentence is not privileged.  So you can ask about
6 that sentence.
7        MR. CRONE:  Okay.  Give me just one second
8 here.  So -- and then, Danielle, I just wanted --
9 just to just make sure the record is clear, you're
10 definitely asserting that this is confidential under
11 the proposed protective order that I don't remember
12 if we have in place yet?
13        MS. KITSON:  I don't believe so.  Did we
14 mark it confidential?
15        MR. CRONE:  I -- I don't think you did, and
16 I don't care if we do right now even though -- I
17 don't think the protective order is on file yet, or
18 maybe it is.  But, I mean, I don't care.  We can act
19 as if it is, is what I'm saying.
20        MS. KITSON:  Yeah, and that's fine.  I -- I
21 don't think there's anything confidential in it other
22 than if Ms. Brigham wanted to assert that it's
23 confidential.
24        MR. CRONE:  Well, I thought, you know, just
25 in terms of while we resolved the privilege issue, I

103

1 mean, maybe it doesn't hurt.  I mean, I'm not telling
2 you what to do.  I just want to -- I just want to --
3 you know, just want to know if -- if -- if it's going
4 to fall under the protective order or not, at least
5 until we're --
6        MS. KITSON:  Let me look at it again.  Hold
7 on.
8        MR. CRONE:  Okay.  And I'm sorry, Danielle.
9 I just -- I just want to prevent the problem down the
10 road.
11        MS. KITSON:  No, that's fine.
12        Hey, John, so, you know, I would say all of
13 the documents that are produced are subject to the
14 protective order in that it governs all document
15 productions, but we would not mark this document as
16 confidential per the protective order.
17        MR. CRONE:  Okay.  Okay.  Got it.  Yep,
18 yep.  That's helpful.
19        (BY MR. CRONE)  Okay.  So -- hold on one
20 second.  Okay.  So, Mr. Arellano, the sentence that
21 starts with "Next steps" -- are you with me there?
22    **A.**   Yes.
23    Q.   Did you write that sentence?
24    **A.**   **Did I write that sentence?**
25    Q.   Yeah.

104

1    **A.**   Yes.
2    Q.   Yep.  And -- and then everything above that
3 in the e-mail, is it your contention that you're just
4 relaying what the attorney told you or what -- I
5 should say what an attorney told you?
6    **A.**   Yes.
7    Q.   Okay.  So then let's just look at the next
8 steps, if we could -- we could do that.
9        You wrote, If the last occurrence is not
10 covered by FMLA, then we would proceed with the term
11 steps.
12        Is that termination, what you're referring
13 to by "term steps"?
14    **A.**   **Yeah, term steps typically starts, under**
15 **the contract at that point -- it starts the**
16 **investigatory meeting that they outlined in the**
17 **contract.  So that's the meeting with the union**
18 **representation, and it's kind of dialogue with the**
19 **flight attendants to get their feedback of what took**
20 **place.**
21    Q.   Okay.
22    **A.**   **So that's kind of the steps, correct.**
23    Q.   Okay.  And by "the last occurrence," do you
24 recall what you're -- you're referring to?  What's
25 the occurrence?

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

105

1    A.    The infraction, the date that she had
2  missed.
3    Q.    So -- so an absence from work?
4    A.    An absence from work, correct.
5    Q.    Okay.  And then the -- that last sentence
6  there, is that -- where it says, On this one -- so
7  it's in that same little paragraph.  That's not
8  something the attorney told you, or is that?  I just
9  want to be really clear.
10        MS. KITSON:  Where are you?  I'm sorry.
11        MR. CRONE:  So right on -- in the same
12  little "next steps" paragraph.
13    A.    Yeah.
14    Q.    (BY MR. CRONE)  I didn't realize those are
15  two separate sentences.  It says, On this one, comma.
16    A.    Yes.
17    Q.    Is that -- that's your own writing?  The
18  attorney didn't tell you that?
19    A.    Correct.
20    Q.    Okay.  And so on that one where it says,
21  "On this one, let's definitely ensure she has union
22  representation available," why did you definitely
23  want to ensure she had union representation
24  available?
25    A.    It's per the contract.  And so at that

106

1  point, because we were beginning the steps as
2  outlined in the contract, we wanted to make sure that
3  she had union representation.
4    Q.    Okay.  So you're just following the terms
5  of the collective bargaining agreement there?
6    A.    Correct.
7    Q.    Okay.  And the date on the e-mail is
8  October 2, 2015; is that correct --
9    A.    Yes.
10    Q.    -- to your recollection?
11    A.    That is correct, yes.
12    Q.    Mr. Arellano, do you have any -- do you
13  have any medical training?
14    A.    In what form?
15    Q.    Any -- any form at all.
16    A.    No.
17    Q.    No?  What about any training in therapy of
18  any type?
19    A.    Like formal training, no.
20    Q.    Okay.  Any expertise developed along the
21  way on substance abuse or addiction?
22    A.    Just through the training we received
23  either through employment conferences or Web -- Web
24  conferences or Web training.
25    Q.    Okay.  And was any of that -- was any of

107

1  that directly -- any of that training directly
2  related to the mechanism of how addiction works or
3  how it should be treated?
4    A.    Not to my knowledge.
5    Q.    Okay.  I want to hand you a document that's
6  marked Exhibit 7.  I understand that that's out of
7  order, but I've kind of rearranged things.  And so if
8  we just go out of order a tad, it will -- it will
9  allow me to follow this outline, and it will then, I
10  think, get us out the door quicker today.
11    A.    Okay.
12    Q.    So if you don't mind being out of order,
13  let me send this to Danielle.
14        I put Exhibit 7 up here.  There you are.
15  And let me know once you've reviewed that.
16    A.    Okay.
17    Q.    Okay.  Did you draft Exhibit 7?
18    A.    Excuse me?
19    Q.    Did you -- did you draft Exhibit 7?
20    A.    I did, yes.
21    Q.    And what -- what is that?  What is
22  Exhibit 7?
23    A.    It's a response to a grievance that was
24  filed through the union, and this is basically the
25  results of that meeting.

108

1    Q.    Okay.  And so -- so Ms. Brigham followed --
2  or first filed a grievance with the union; is that
3  correct?
4    A.    When you say "first filed," what does that
5  mean?
6    Q.    So this is -- I'm trying to figure out
7  if this is -- this is Frontier's response to
8  Ms. Brigham's grievance.  Is that what's happening
9  here?
10    A.    Yes.
11    Q.    Okay.  And then -- and then -- so what
12  you're asking for here is Frontier was asking that
13  the grievance be denied?  Is that what -- is that
14  what the purpose of that letter is?
15    A.    No.  It's more the purpose of the results
16  of that request.  So if we go to Number 1 --
17    Q.    Uh-huh.
18    A.    -- it was a request communicated on the
19  grievance filed.  I'm not sure if Rebecca filed it or
20  not, but it was definitely on behalf of her by the
21  union.
22    Q.    Okay.
23    A.    And so the response to that.
24    Q.    So who is -- who -- who denies or grants
25  the grievance?  Was it you or somebody else?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

109

1    A.   It's filed through the union.  So anytime
2 there is a result that the flight attendant does not
3 agree with, they have the ability to file the
4 grievance through the union.  And then that then
5 comes to the company.
6    Q.   And then -- and then does the company
7 ultimately decide to grant or deny the grievance, or
8 is there some other party in there?
9    A.   No.  Yeah.  After the -- so we -- a meeting
10 is conducted to then discuss the grievance, and we
11 meet at the table with the union.  They present their
12 case.  We review the facts, all facts related.
13         And then after that -- a decision isn't
14 made on the spot, but then after the grievance, we
15 all collaborate, review the facts again of the -- the
16 case and what was presented at that grievance
17 meeting, and then a decision is rendered.
18    Q.   So here, that occurred with Ms. Brigham,
19 and her grievance was denied?
20    A.   Yes.
21    Q.   Okay.  And did you make the decision to
22 deny her grievance, or was it somebody else, or was
23 it a team -- excuse me -- a collaborative effort?
24    A.   It was a collaborative effort.
25    Q.   Do you recall who was in the group?

110

1    A.   Not -- not off the bat right now.
2    Q.   But you certainly were?
3    A.   Yes.
4    Q.   Just to make sure I'm absolutely positive
5 on how this works, I'm going to hand you -- an even
6 more out-of-order exhibit.  This one is going to be
7 called 17.  Sorry about that.  And let me send it to
8 Danielle first.
9         Okay.  And then once you get that, if you
10 could take a look at that for me.  I don't know if
11 you need to review it in detail.  I just want to ask
12 you if this is Ms. Brigham's grievance.
13         So review it as much as you need to, but
14 that -- but that's the question, whether or not this
15 is Ms. Brigham's grievance, or if you should.
16         I should -- I should direct you to --
17 Mr. Arellano, I'm sorry.  I should direct you to page
18 3 of the document.  That -- my question is if page 3
19 is her grievance, and then I'll have some other
20 questions about the --
21    A.   Page 3?  Okay.
22    Q.   Sorry about that.
23    A.   That is the grievance, yes.
24    Q.   Okay.  Okay.  And then -- so you've seen
25 that document before, then, page 3?

111

1    A.   Yes.
2    Q.   Okay.  And then page 1 to 2 of the
3 document, have you seen that?  Do you know what that
4 is?
5    A.   Page 2?
6    Q.   Page 1 and 2.
7    A.   Oh, yes.  That's the request that then is
8 elevated to the Assistant Board of Adjustment.
9    Q.   Okay.  So if the -- if the employee in this
10 case, Ms. Brigham, doesn't agree with Frontier's
11 position, they can then appeal to this Board of
12 Adjustment?
13    A.   That is correct.
14    Q.   Do you know what happened at the Board of
15 Adjustment in this case?
16    A.   That, I don't know.
17    Q.   Okay.
18    A.   Even though it's forwarded to the SBAs,
19 what we call it, they determine if the union wants to
20 proceed on their side.  I don't know if the union
21 proceeded with it on their end.
22    Q.   Okay.  Okay.
23    A.   Yeah.
24    Q.   So it becomes -- it's your understanding
25 that it becomes up to the union at some point to

112

1 decide how far to push it?
2    A.   That is correct.
3    Q.   Okay.  Do you think you've got 20 more
4 minutes in you?  We can get to noon and take a lunch
5 at noon?
6    A.   I'm okay with that.
7    Q.   Okay.  Great.
8         So let's switch gears here a little bit and
9 talk about Frontier's policies and procedures related
10 to the ADA, so the Americans With Disabilities Act.
11    A.   Okay.
12    Q.   And I just want to ask generally -- and
13 this is, of course, during the relevant time period,
14 so the end of 2011 to the end of 2015.  Generally, if
15 Frontier learns that an employee has a disability,
16 what's the first thing that Frontier does?
17    A.   We begin the interactive process, and that
18 means scheduling a -- typically at that time it was a
19 face-to-face meeting with the individual to get more
20 facts.
21    Q.   So you -- so you start what's called the
22 interactive process.  That starts with typically a
23 face-to-face meeting?
24    A.   Yeah.
25    Q.   And there you want to gather facts about

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

113

1 what exactly?

2     A.    Yeah.  Oh, exactly what the situation is?

3     Q.    Yeah, yeah.  So, what -- yeah, what facts

4 are you after?  What are the important facts?

5     A.    Ultimately, when they have a disability,

6 we're trying to see what it is that they're seeking,

7 what is their request if they have a request, and

8 basically just truly gather information.

9     Q.    Okay.

10     A.    Yeah.

11     Q.    Okay.  Then what happens next?

12     A.    At that point, we then determine, based on

13 their request -- again, we have to evaluate what

14 specifically that they're seeking, and then offer

15 recommendations.

16         But before we do that, we always reveal --

17 or review what we obtained from that meeting with the

18 folks on the HR side --

19     Q.    Uh-huh.

20     A.    -- and determine what can be done, if

21 anything.

22     Q.    Okay.  And then at that point, did --

23 does -- can it go different ways?  So is that -- or I

24 should just ask you what -- what -- what happens

25 after that?

114

1     A.    After the review?

2     Q.    Yeah, yeah.

3     A.    We then go back to the employee, have,

4 again, another conversation, see if anything's

5 changed from the time of the intake meeting, see if

6 there's any new information that we need to take into

7 consideration, and then hopefully address any

8 concerns or questions they may have.

9     Q.    Does -- and then after that, what happens?

10     A.    After that, if we are making an

11 accommodation, we'll work with the hiring manager

12 or we'll work with their manager, we'll work with

13 their department and make sure that what we agree to

14 in terms of an accommodation -- that they're able to

15 roll that out and make sure that it's implemented and

16 followed.

17         If there is no accommodation or if there is

18 no agreement, then we close out the case.

19     Q.    And then is that the end of the process, or

20 is there any more to it?

21     A.    In what form, I guess?

22     Q.    Just after -- so if you make the

23 accommodation, you said you'll work with a -- a

24 manager to implement it and make sure it's followed.

25 If there isn't, you close out the case, and then is

115

1 that the end of the -- the process, or is there

2 anything else?

3     A.    Oh, no, no.  If -- if we do make an

4 accommodation, it's constant follow-up with the

5 individual, with the department, to make sure that

6 nothing has changed --

7     Q.    Okay.

8     A.    -- and making sure the manager is being

9 compliant with what is recommended.  So there's

10 constant follow-up with the employee.

11     Q.    Okay.

12     A.    Yeah.

13     Q.    Is this the process that was followed with

14 Ms. Brigham?

15     A.    I do believe so.

16     Q.    Do you know, did -- did Frontier become

17 aware of Ms. Brigham's disability, or did Ms. Brigham

18 make Frontier aware of her disability?

19     A.    And when you say "Frontier," you're

20 referring to my knowledge?  Their -- her supervisors?

21 Managers?  Or in general?

22     Q.    Good question.  Any -- any of her -- anyone

23 supervisory to her -- to Ms. Brigham at Frontier.

24     A.    I believe, if -- if I recall conversations

25 with Rebecca, Ms. Brigham, she did disclose that she

116

1 had shared her disability with her supervisors.  Some

2 of her supervisors, not all.  I think three specific.

3     Q.    Do you recall who?

4     A.    It would have been -- we called her JJ, but

5 JaJuan is her name, Williams, Stefanie Coppedge, and

6 Jeff, and I'm blanking on his name.

7     Q.    But Jeff is the first name?

8     A.    Jeff is the first name, yeah.

9     Q.    Yeah.  Okay.

10     MS. BRIGHAM:  Last name Farney.

11     MR. CRONE:  Ah, thank you.

12     THE WITNESS:  Yeah, Farney.

13     MR. CRONE:  Okay.

14     MS. BRIGHAM:  And I also had talked to

15 Fadia.

16     MR. CRONE:  Hey -- hey, Rebecca --

17     THE WITNESS:  What?

18     MR. CRONE:  -- it's -- it's not your turn

19 to testify today.

20     MS. BRIGHAM:  Oh.

21     MR. CRONE:  Thanks for --

22     MS. BRIGHAM:  Sorry.

23     MR. CRONE:  No, you're okay.  Thanks for

24 getting the last name in there.  That's appreciated.

25 But you'll get -- you'll get your turn.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

117

1    Q.    (BY MR. CRONE)  Okay.  So the last name was
2  correct that -- that -- that Rebecca --
3    A.    Yeah.  Farney, yeah.
4    Q.    Okay.
5    A.    And I guess Fadia Daphis, too, then.
6    Q.    Okay.  Yeah.  Well, then -- perfect.
7          And then so after Ms. Brigham shared this
8  with her supervisors, then the process that you just
9  described to me is -- is -- is what happened?
10    A.    No.  That -- at that point, I'm not sure
11  exactly how long the supervisors were aware or when
12  they were notified.  It was just when it was brought
13  to my attention by Rebecca.
14    Q.    Okay.
15    A.    Yes.
16    Q.    So you -- so you think there might have
17  been some gap between them being notified and this
18  interactive process beginning?
19    A.    That, I don't know.  I really don't know
20  the time frame associated with --
21    Q.    Okay.
22    A.    Or the time then, yeah.
23    Q.    But at some point it did occur, the
24  interactive process?
25    A.    Oh, yes, 100 percent.

118

1    Q.    Okay.  Are there -- are there any -- so the
2  interactive process, as -- as you've described it to
3  me, are there any reasons for Frontier to deviate
4  from following that process?
5    A.    In -- in what form?
6    Q.    Are -- are there any employees with
7  certain, you know, issues or disabilities or
8  requested accommodations?  Just any reason at all why
9  Frontier might deviate from following the interactive
10  process as -- as you've outlined it?
11    A.    Not to my knowledge, no.  I mean, one
12  thing that we -- we're just having to take into
13  consideration the collective bargaining agreement.
14  But outside of that, all cases are typically handled
15  the same.
16    Q.    Okay.  Taking into consideration the
17  collective bargaining agreement, is -- when you say
18  that, are you -- do you mean whether or not Frontier
19  can comply with the request the employee may have
20  made or whether or not Frontier can come up with a --
21  with a possible solution for the employee, or both?
22    A.    It's more with -- complying with the
23  request.
24    Q.    And so in this case, with respect to Ms. --
25  Ms. Brigham's request, did you understand her to have

119

1  made a request to Frontier to be transferred to the
2  GO or headquarters as a reasonable accommodation?
3          MS. KITSON:  Asked and answered.
4          You can answer.
5          THE WITNESS:  Oh.
6    A.    A request to transfer to the GO?  That, I
7  don't know.  I know she requested to see if there's
8  other responsibilities that she could do instead of
9  flying.  I don't know if it was specific to the GO.
10    Q.    (BY MR. CRONE)  But a different --
11  different position, in any event, than a flight
12  attendant?
13    A.    I don't know if different position; just
14  different duties.
15    Q.    Okay.  And was it Frontier's position,
16  then -- I think you testified before last break that
17  it's Frontier's position that that would violate the
18  collective bargaining agreement?
19          MS. KITSON:  Objection.
20    Q.    (BY MR. CRONE)  Is that correct?
21          MS. KITSON:  Misstates prior testimony.
22          THE REPORTER:  I'm sorry; I didn't hear the
23  objection.
24          MS. KITSON:  Misstates prior testimony.
25          THE REPORTER:  Thank you.

120

1    Q.    (BY MR. CRONE)  And -- and I don't want to
2  misstate your testimony, so that's why I'm just
3  asking the question.
4          Is -- did -- did Frontier believe that a
5  transfer of duties, maybe -- I mean, you're just
6  saying it -- maybe it wasn't necessarily to the GO,
7  but a -- but a -- a reassignment of duties would
8  violate the collective bargaining agreement?
9    A.    Give me a second.  I'm trying to . . .
10    Q.    That's fine.
11    A.    It's -- it's hard to answer this question
12  because -- not "reassignment of duties."  It's what
13  she was requesting is more specific.  That was only
14  specific to the work comp department and OGI.
15          So to say "reassignment of duties," it's --
16  it's just -- it's hard to answer that.  That's the
17  position.  It's more so -- she wasn't on work comp,
18  so when the request came through, it was hard to
19  honor that request when she, technically, wasn't in
20  the work comp program.
21    Q.    Okay.  But by "hard to honor," do you mean
22  it would violate the collective bargaining agreement
23  to honor the request, or it was just hard to do it?
24    A.    Again, it's a complicated question.  How we
25  define eligible and not eligible is based on their

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

121

1 active status as deemed by the HR department.
2          Active status is anybody not on a
3 continuous leave of absence.  And so in Rebecca's
4 case, she was considered to be active, and so -- and,
5 therefore, then that triggers rules and regulations
6 associated with bidding in the contract.
7          And so in that moment was she eligible to
8 bid for a regular site?  No, because she had a bid
9 for a line of flying.  And so how -- we have to carve
10 out that question to -- to then take a position.
11     Q.  Yeah, but was she -- but was she requesting
12 to bid differently?  I -- I -- I was asking about the
13 request to -- to work at the GO instead of her normal
14 duties, so to be reassigned.
15     A.  Yeah, but you were asking if it was a
16 violation of the contract.
17     Q.  Correct.
18     A.  And so in order for me to respond, at that
19 moment, she was considered an active employee.
20     Q.  Okay.
21     A.  So as an active employee, she had to then
22 follow the requirements of eligible to bid in order
23 to bid for a line.  So in that point, it made her not
24 eligible for a temporary ground assignment.  And so
25 it's not -- it's hard for me to answer yes or no to

122

1 that question.
2     Q.  Yeah, and -- and I appreciate you taking
3 the time to explain it.  And -- and so that -- I
4 guess I still want to -- I want to zero in on this,
5 though.
6          So is that -- would that have violated --
7 so not being eligible to bid on a temporary ground
8 assignment, would that violate the CBA, or is -- or
9 is it a policy or something?  I'm trying to figure
10 out why she couldn't do it.
11     A.  Yeah.  So it would, in that case -- since
12 she's eligible to bid and she didn't submit the bid,
13 then that then triggers other pieces of the contract.
14 So with every piece of the contract, there's a
15 tentacle attached to it.  One leads to another.
16     Q.  Uh-huh.
17     A.  And so the request isn't as simple as, Is
18 she eligible for this?  We then have to kind of
19 dissect.  We have to look at the contract and what --
20 what her status was at that time.
21          She was an active employee, thus, not
22 making her eligible for a -- any type of -- of
23 temporary ground assignment because she was
24 considered active, if that makes sense.
25          So she was ineligible for the work comp

123

1 program, two cases, because she wasn't -- she hadn't
2 sustained an injury that removed her from service,
3 and the other piece is it was only awarded to
4 those -- that -- reassignment was only offered to
5 individuals on a work comp status.
6     Q.  Okay.  Okay.
7     A.  It all determines on that status of the
8 individual.  It's hard to --
9     Q.  Okay.
10    A.  So yeah.
11    Q.  Yeah, and I think -- I think we're covering
12 some ground we already covered, so I think we --
13 we've closed that loop.
14    A.  Okay.
15    Q.  I -- I appreciate the explanation.
16    A.  Yeah.
17    Q.  I -- the last question on -- on this topic:
18 When -- in the interactive process that you outlined
19 for me --
20    A.  Yeah.
21    Q.  -- and you had said, you know, we have to
22 take into consideration the CBA, is that what you're
23 talking about, what you just described here?  So
24 you -- you looked at Ms. Brigham's request, and then
25 the issue with the work comp and OJI is taking into

124

1 consideration the collective bargaining agreement; is
2 that fair?
3     A.  In -- in one moment -- in one factor, I
4 should say, but it's also looking at her status.
5 We have to look at her status to make that
6 determination.  And her status goes, then, back to
7 the contract.  If she's an active employee per the
8 collective bargaining agreement, she's required to
9 submit a bid.
10    Q.  Okay.
11    A.  And if she then doesn't submit a bid, then
12 other pieces then kick in.  And so it's kind of a --
13 that's how we need to determine -- it all goes back
14 to what was her status at the time?
15    Q.  Yeah.
16    A.  So if she was on intermittent FMLA leave,
17 she was not considered to be on a leave of absence;
18 therefore, making her an active individual, an active
19 bidder.
20    Q.  Okay.  Do you happen to know -- can you
21 recall what other provisions of the collective
22 bargaining agreement are then triggered by this
23 request?
24    A.  Yes.  The -- basically, it comes out to
25 eligible to bid.  If she's eligible to bid, then at

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

125

1 that point she's required to then follow the rules
2 and regulations associated with bidding.
3        Now, if she elected not to bid, then
4 there's what they call the default bid.  If she had a
5 default bid, that would then kick in.  If she did not
6 have a default bid, then she was assigned a
7 schedule --
8    Q.   Okay.
9    A.   -- whether she bid for one or not.  And
10 that was then determined by what was left, what was
11 not bid for anybody.  Then the scheduling department
12 then puts together a schedule for her.
13   Q.   Okay.
14   A.   Yes.
15   Q.   So could she bid, then -- so when she's
16 active, could she -- could she -- just setting aside
17 the disability and all of that, just in a normal day,
18 could she bid for a temporary ground assignment
19 whenever she wanted?
20   A.   No.  That was not part of the process.
21 It's not a -- it's not a bid for it.
22   Q.   So when she asks to be reassigned to the
23 GO, this isn't something she could have just done
24 through this bidding process anyway; is that correct?
25   A.   Correct.  It's not outlined in the

126

1 collective bargaining agreement.
2    Q.   So the -- so the process that you're --
3 that you just described didn't really prevent her
4 from asking to be reassigned to the GO, at least
5 through the process that was available under the
6 collective bargaining agreement, that is, the bidding
7 process?
8    A.   I'm not understanding the question.
9    Q.   So her -- so her -- she couldn't have
10 requested to be reassigned to the GO through the
11 bidding process?  That wasn't possible, correct?
12   A.   No, but she did request it via in person
13 when she and I spoke.  So she did request it, but not
14 through the bidding process, correct.
15   Q.   Okay.  Okay.  And then -- and so she made
16 that request face to face with you?
17   A.   Yes, I do recall that.
18   Q.   What about her request for a modified
19 schedule?  Did she make that face to face with you,
20 or was that made some other way?
21   A.   I believe she did, had -- in that same
22 conversation had asked that she could only bid a
23 certain type of trip.  So yes.
24   Q.   Okay.  I've got a couple of quick questions
25 in a different ballpark --

127

1    A.   Okay.
2    Q.   -- and I think that will -- that will get
3 us to lunch and put us in good shape to -- to still
4 get done in the midafternoon instead of evening --
5    A.   Okay.
6    Q.   -- hopefully.
7        So for flight attendants such as
8 Rebecca Brigham during the relevant time period,
9 does Frontier maintain a -- a personnel file on those
10 employees?
11   A.   Yes.
12   Q.   Do you know what's in a -- in one of those
13 personnel files?
14   A.   Are you just referring to a personnel file
15 in general, the HR personnel file?
16   Q.   Yeah, yeah.  Just that.  Do you know -- do
17 you know what documents are stored in there?
18   A.   Yeah.  We would include anything collected
19 during the employment process: driver's license, any
20 certification provided, résumé.
21        It would include any disciplinary
22 notifications, if anything were registered throughout
23 their tenure with the company.  Any performance
24 appraisals, if anything was administered, would be in
25 that file.

128

1        Social security card, I think, would be in
2 there if we were presented one during the employment
3 process.  And I believe that would be it in terms of
4 personnel file.
5    Q.   Okay.  What about in Ms. Brigham's case
6 where she made a self-disclosure and then the
7 subsequent reasonable accommodation process occurred
8 that we discussed?  Would that be in the file, or
9 would that be somewhere else?
10   A.   That would be somewhere else.
11   Q.   Where would that -- where would those types
12 of documents be stored?
13   A.   I believe that might be -- so the
14 compliance department at that time had their own
15 tracking method because they were considered DOT, and
16 so during an audit, they had to account for any
17 records, things of that nature, so they would be
18 filed within the compliance files, which were under
19 secured lock and key, per DOT regulations.
20   Q.   Okay.
21   A.   So those were kept separate from the
22 personnel file.
23   Q.   Okay.  Do you know how long the -- those
24 secured lock-and-key DOT files -- do you know how
25 long they're maintained?

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

129

1    A.    They're kept in place during the tenure of
2  the individual.  That's -- that's all I know right
3  now, yeah.
4    Q.    Do you know if -- if all of that
5  information that would have been in the lock-and-key
6  file with regard to Ms. Brigham -- do you know if
7  it's been disclosed in this lawsuit?
8    A.    I believe so, yes.
9    Q.    So nothing -- nothing was lost or destroyed
10 after she -- after Ms. Brigham was terminated?
11   A.    Not to my knowledge, no.
12        MR. CRONE:  Okay.  I think, unless anybody
13 disagrees, we made it to lunch.
14        Danielle, do you want to take a full hour,
15 or do you want -- I could -- I could probably do 45
16 minutes, if you really want to.
17        MS. KITSON:  I'm going to defer to Jerry.
18 How long do you want to take?
19        THE WITNESS:  I'm good whichever.
20        MS. KITSON:  Okay.  Let's just take an
21 hour.
22        MR. CRONE:  Okay.  Okay.  So we -- we can
23 go off the record.  Sorry; I should have mentioned
24 that.  And I'll see you at 1:00.
25        THE VIDEOGRAPHER:  The time now is 11:58.

130

1  We're off the record.
2        (Recess from 11:58 a.m. to 12:56 p.m.)
3        THE VIDEOGRAPHER:  The time now is 12:56.
4  We're back on the record.
5        MR. CRONE:  Thank you.
6    Q.    (BY MR. CRONE)  So, Mr. Arellano, I think
7  we all got back from lunch.  Were you able to get
8  a -- a break and chance to eat something?
9    A.    Definitely.
10   Q.    Good.  And I just want to reiterate again,
11 if there are any issues, in your mind, related to
12 sitting in a room with other people, please let me
13 know.  I don't want you to be there if you don't want
14 to be.
15   A.    Okay.  Thank you.
16   Q.    Okay.  And when we left off, I was asking
17 you some questions about documents, the personnel
18 file and such.  Do -- do you remember those
19 questions?
20   A.    Yes, I do.
21   Q.    So I have a few more similar questions
22 related to how members of management at Frontier
23 communicated during the relevant time period.
24   A.    Okay.
25   Q.    I'm also only asking questions about

131

1  Ms. Brigham's supervisors, so the org chart we looked
2  at, and, you know, we sort of went through that
3  structure.  I'm just talking about those people,
4  okay?
5    A.    Okay.
6    Q.    How, generally, do members of that
7  management team, if it's fair to call them that,
8  communicate?  Is it by e-mail? verbally?  Something
9  else?
10   A.    Both.  Both e-mail or verbally, by phone.
11   Q.    Okay.  And for everything that -- for all
12 communications that are done by e-mail, are those
13 e-mails saved by Frontier?
14   A.    They're saved as part of the -- yeah, when
15 you send an e-mail, it goes into your "sent," things
16 of that nature.
17   Q.    Okay.  And what about, are verbal
18 communications ever documented after the fact in
19 a memorandum or something like that?
20   A.    By supervisors?
21   Q.    Yes.
22   A.    That, I don't know.  I don't know if
23 they . . .
24   Q.    Okay.  And are there any -- you know, apart
25 from e-mail communications and verbal communications,

132

1  is there any other way that the management team would
2  typically communicate?  So I'm not asking for some
3  weird, random, one day somebody used a messenger or a
4  pigeon for fun.  I just mean the -- the regular
5  course of business.
6    A.    Can you explain?  I'm lost.
7    Q.    Yeah.  Might -- might somebody use, say, a
8  text message or something like that?
9    A.    That, I don't know.  I mean, back then, I
10 don't know if our phones had text capabilities,
11 but -- yeah.
12   Q.    Okay.  Do -- does Frontier issue company
13 phones to management personnel?
14   A.    No.
15   Q.    No.  Okay.  So now we're going to -- now
16 we're going to switch gears a bit, and I want to ask
17 you some questions that hopefully will allow you to
18 explain to me sort of the circumstances surrounding
19 other employees, employees not necessarily being
20 Rebecca Brigham --
21   A.    Okay.
22   Q.    -- and reasonable accommodations they
23 sought and those types of things.
24   A.    Okay.
25   Q.    So I'm going to hand you, via -- you know,

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

133

1 via Zoom here, a document that was disclosed in the
2 virtual binder.
3     **A.   Okay.**
4         MR. CRONE:  And so I think, unless the
5 court reporter corrects me, I think we could mark
6 this one 2-1, unless -- do we already have a 2-1?
7         THE REPORTER:  I'll have to look.  Sorry.
8 I don't --
9         MR. CRONE:  That's okay.  I just -- for
10 some reason, I don't remember if we did.
11        THE VIDEOGRAPHER:  I have a 2-1 marked.
12        THE REPORTER:  Yeah, I was going to say, I
13 thought so too.  Yes.
14        MR. CRONE:  This will be 2-2.  Sorry about
15 that.
16        And, Danielle, this is Tab 71 in the
17 virtual binder.
18        MS. KITSON:  Okay.
19        MR. CRONE:  Okay.  And I will send this
20 over.
21     Q.   (BY MR. CRONE)  So that's on its way to
22 you, Mr. Arellano.  It's an Excel spreadsheet.  Let
23 me know when you have it opened.
24     **A.   Okay.  It's open.**
25     Q.   Okay.  And is this one of the documents you

134

1 reviewed in preparation for today's deposition?
2     **A.   Yes.**
3     Q.   Okay.  And when I open this document, it --
4 it opens to Tab 2020.  Are -- is your spreadsheet
5 also on Tab 2020?
6     **A.   It is.**
7     Q.   Okay.  And so this document -- is this --
8 is this document something you created in preparation
9 for this deposition, or did this document already
10 exist?
11    **A.   It was already in existence.**
12    Q.   Okay.  Is this document something that
13 Frontier has maintained over the years, or was it
14 created more recently?
15    **A.   No, it's been maintained over the years.**
16    Q.   Okay.  And who maintains this document?  Do
17 you know?
18    **A.   It depends on -- ERMs, the employee**
19 **relations managers, predominantly are the ones**
20 **navigating around this document, and any interactive**
21 **process will be documented on here.**
22    Q.   Okay.  And so they're all able to access,
23 like, a shared spreadsheet document of some sort and
24 type the information in?
25    **A.   Correct.**

135

1     Q.   Okay.  Okay.  So if you look at the 2020
2 tab, and there's -- there's an employee name at
3 the -- in the Last and First Name.  It says
4 Minnie Mouse.  Is this a real employee, or is this an
5 example?
6     **A.   Example.**
7     Q.   Okay.  Got it.  Okay.  Good.
8         And so I want to look at the 2012 tab, if
9 you can navigate to the 2012 tab.
10    **A.   Okay.**
11    Q.   Okay.  And my question here, first, is is
12 there a -- is there a document like this that covers
13 the latter part of 2011?
14    **A.   I would have to check.  That, I don't know**
15 **offhand.**
16    Q.   Okay.
17    **A.   Yeah.**
18    Q.   And looking at the 2012 tab, at Line 5 --
19 or excuse me -- Line 5, there's an employee named
20 ██████ ██████.  Are -- do you see where I'm looking
21 at there?
22    **A.   Yes.**
23    Q.   Okay.  So I want to make sure I understand
24 how this works.  So if I look at her row, which is
25 Line 5, and then I start to scroll over to the

136

1 right --
2     **A.   Uh-huh.**
3     Q.   -- I see that -- it looks like under --
4 under the -- the column Reasonable Accommodation,
5 there's a -- there's an X mark under Modified Work
6 Schedule.  Do you see that?
7     **A.   Standby.  Modified -- okay.  Yeah.**
8     Q.   Does that mean -- does that mean that
9 ██████ ██████ was granted a modified work schedule as
10 a reasonable accommodation?
11    **A.   Based on this, I would have to assume so,**
12 **yes.**
13    Q.   Okay.  And then when you -- when you go a
14 little bit farther to the right, it says, Slide -- I
15 assume that means sliding, but correct me if I'm
16 wrong -- ten-hour schedule, two hours in the morning
17 to accommodate her not driving in the dark.
18    **A.   Uh-huh.**
19    Q.   Is that -- is that additional comment
20 there -- that's one of those ERMs putting that
21 information in?
22    **A.   Correct.**
23    Q.   Okay.  Is there any way to figure out who
24 drafted that particular comment?
25    **A.   Yes.  If you scroll to the left --**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

---

**137**

1    Q.   Uh-huh.
2    A.   -- under Client Manager --
3    Q.   Yep.
4         -- it would have been that individual,
5    Peggy Decker.
6    Q.   Oh, got it.  Okay.  So then -- so the
7    client manager is the specific manager working with
8    this particular employee, ███████?
9    A.   Correct.
10   Q.   Okay.  And then -- and then the manager, is
11   that the -- is that just the employee's immediate
12   supervisor, or is that somebody else?
13   A.   That's the immediate supervisor, correct.
14   Q.   Okay.  Okay.  And then staying -- staying
15   on Line 5 with ███████ there --
16   A.   Yes.
17   Q.   -- on the Type where it says Non-OJI, does
18   that mean it's not an on-the-job injury?
19   A.   That is correct.  It's not OJI-specific to
20   the accommodation.
21   Q.   Okay.  Got it.  And then the next column,
22   Medical Issue, there's a column for vision
23   impairment?
24   A.   Uh-huh.
25   Q.   And so -- and then as -- and then the next

---

**138**

1    set of columns are all the various accommodations
2    that Ms. Worthey received.
3         So here is it -- in reading this, is it --
4    is it fair that she was granted a modified work
5    schedule, intermittent FMLA, and that's it?
6    A.   No.  Typically the way we use this
7    document is anything that was captured during that
8    conversation, then we would mark with the X.  And
9    then the result would be noted in the column
10   Comments.
11   Q.   Oh, got it.  Okay.
12   A.   Yes.
13   Q.   So these were -- so those things were
14   brought up --
15   A.   Yes.
16   Q.   -- and then you -- and then you can read
17   the comments to see that she got a modified work
18   schedule?
19   A.   Yes.
20   Q.   Okay.
21   A.   Yes.
22   Q.   Okay.  Got it.  Okay.
23        And then to the right of those comments, it
24   says EEOC Charge Filed, question mark.  There's
25   nothing for this one.  Notification Letter, there's

---

**139**

1    nothing.  But then it says, Interactive Checklist
2    Used, and it says no?
3    A.   Where do you see that?
4    Q.   So I'm still on Row 5, which is
5    ███████.
6    A.   Okay.
7    Q.   All the way to the right, then, of the
8    Findings and Recommendations.  There's three more
9    columns.  They're AE, AI --
10   A.   Oh, yeah.
11   Q.   Okay.  So the -- so the EEOC Charge Filed
12   column, I assume that's a yes or no whether or not
13   the employee filed a complaint of discrimination with
14   the EEOC?
15   A.   That is correct.
16   Q.   Okay.  And then the next one, Notification
17   Letter, what's that about?
18   A.   Notification Letter, that I would -- yeah,
19   I'm unsure on that specific column.
20   Q.   Okay.
21   A.   The only thing that I can think of is if
22   there was a follow-up letter that went out to the
23   individual.
24   Q.   Okay.
25   A.   But, again, I'm not sure specifically, back

---

**140**

1    in 2012, how it was used.
2    Q.   Okay.
3    A.   Yeah.
4    Q.   And then the column for Interactive
5    Checklist Used, here it says no.
6    A.   Yes.
7    Q.   Do you know what that interactive checklist
8    is?
9    A.   No.
10   Q.   Okay.  Is it safe to assume there's some
11   document that the ERM can use to check off something
12   task-related to the interactive process?
13   A.   It's hard to say.  That can mean a lot of
14   things, but, yet again, yeah, I wouldn't -- I don't
15   want to just assume, so --
16   Q.   Okay.
17   A.   -- yeah.
18   Q.   Okay.  Okay.  And then -- so here, is it --
19   so this -- this spreadsheet that existed at least as
20   far back as 2012 and then up to 2016 -- we have that
21   data --
22   A.   Uh-huh.
23   Q.   -- it's tracking -- and I don't want to --
24   I mean, my math is just -- is not that good, but
25   it -- it tracks Columns A through AG, so that's

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

141

1 roughly 30 or more data points, is that fair, for
2 each employee?
3     A.    I -- say that again, now.  You lost me.
4     Q.    Yeah.  So I'm trying to -- I'm trying to --
5 so it looks like, for each employee, there's roughly
6 30 or more potential --
7     A.    Oh.
8     Q.    -- data points that are being tracked.
9     A.    Got it.  Oh, I see what you're saying.
10    Q.    Yeah.  Okay.
11    A.    Perfect.  Yes.
12    Q.    Okay.  Thanks.
13          And so do you know if -- if any employee
14 on this 2012 tab suffered from the disability of
15 alcoholism?
16    A.    No, but I can check for you, if you'd like.
17 I would have to look at the notes.
18    Q.    Got it.  Okay.  Well, before we -- before
19 we do that -- and it -- and it might be worth it to
20 do that.  A quick question, sort of, while we're --
21 while we're kind of on these general questions.
22          Are these -- are these employees on Tab
23 2012, are these employees just in Denver, or are they
24 employees based anywhere in the company?
25    A.    Back in 2012, it would have been -- we only

142

1 had our hub in Denver, so it would include -- well,
2 outside of our customer service, so it would include
3 everybody.  It would be companywide.
4     Q.    Okay.  So -- so when I look at this tab for
5 2012, that means that, starting with ████████ on
6 Row 5 and ending with ████████ on Row 24 -- so
7 that would mean 19 employees companywide requested
8 accommodations that were captured on this spreadsheet
9 for 2012?
10    A.    My understanding, yes.
11    Q.    Okay.  Okay.  Now, back to the question
12 about whether any of these employees in 2012 on
13 this spreadsheet suffered from the disability of
14 alcoholism.  If there's any way for you to answer
15 that, that would be great.
16    A.    Can you give me a chance just to go through
17 the notes really quick?
18    Q.    Yeah, please do.  Yes.
19    A.    Okay.  I don't see anything on here that
20 would identify that.
21    Q.    Okay.  Thanks.  And we can -- before we
22 turn the tab, at -- at ████████, it -- it shows
23 here that non-OJI is checked for her?
24    A.    Uh-huh.
25    Q.    That means she didn't suffer an on-the-job

143

1 injury, right?
2     A.    Right.  She was a --
3     Q.    Okay.  And then --
4     A.    She was a reservations agent.
5     Q.    Got it.
6     A.    Yeah.
7     Q.    And then for -- like, for example, on Line
8 9, that's ████████.  That has "OJI" checked, so
9 ████████, then, did suffer an on-the-job injury?
10    A.    That is correct.
11    Q.    Okay.  Okay.
12          Okay.  So we can turn to Tab 2013.
13    A.    Okay.
14    Q.    And in looking at the spreadsheet for 2013,
15 is it fair to say all the same data points are being
16 tracked that were tracked in 2012?
17    A.    Let me just double-check.
18    Q.    Sure.
19    A.    I believe so.
20    Q.    Okay.  And then, just as another example
21 to make sure I'm looking at this right, Line 6 is
22 ████████.  Do you see that employee?
23    A.    I do.
24    Q.    And it says that she suffered a non-OJI,
25 and it sounds like she was also granted a modified

144

1 schedule.
2          Is that -- is that -- am I reading that
3 right?
4     A.    Let me double-check.  So what was your
5 question again?  That she was offered a modified?
6     Q.    That she was granted a modified schedule,
7 and she also was non-OJI.
8     A.    Was non-OJI.  It looks like they did have a
9 discussion, but the notes just indicate there was a
10 scheduled adjustment.  So I'm not sure -- I can't
11 speak to what the actual adjustment was, though.
12    Q.    Sure.
13    A.    Yeah.
14    Q.    But the schedule must have changed in some
15 way?  That's what adjusted would mean?
16    A.    Correct.
17    Q.    Okay.  And then same for ████████,
18 who's on Line 7 right below ████████?
19    A.    Yes.
20    Q.    Looks like she was also non-OJI and also
21 received a modified schedule?
22    A.    Yes.
23    Q.    Okay.  And then -- and then
24 ████████, Line 11, she's an inflight employee;
25 is that correct?  Does that mean flight attendant?

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

145

```
1     A.    That is correct.
2     Q.    Okay.  And she -- she was OJI, so she had
3 an on-the-job injury, and she received a modified
4 schedule; is that correct?
5     A.    Let me double-check.
6     Q.    Okay.
7     A.    So yes to your question.
8     Q.    Okay.  Thank you.
9           Okay.  So let's --
10          MS. KITSON:  I'm sorry; can you read back
11 the question?
12          THE REPORTER:  Sure.
13          (The following question was read by the
14 reporter:  "And she -- she was OJI, so she had an
15 on-the-job injury, and she received a modified
16 schedule; is that correct?")
17    A.    No.
18    (BY MR. CRONE)  I'm sorry.  She was -- she
19 was offered a modified schedule; is that -- is that
20 correct?
21    A.    Not a modified schedule.  If I look at
22 this -- and I'm looking at the notes --
23    Q.    Uh-huh.
24    A.    -- we would try to facilitate an
25 opportunity for her to move into a role.  I know we
```

146

```
1 possibly discussed modified schedule, but it's hard
2 to determine if one was offered or provided.
3     Q.    Sounds like -- I'm sorry.  Go ahead.
4     A.    No, go ahead.
5     Q.    I'm looking at -- so for ████████ --
6 I'm looking -- I just want to make sure we're on the
7 same thing.  I'm at Row 11, and then I'm over in
8 Column AD, which is the Findings, Recommendations.
9           And right at the bottom of that paragraph,
10 in red it says, 3/29/13, ████████ was offered to -- to
11 position of reservations agent -- I think that's a
12 typo --
13    A.    Yeah.
14    Q.    -- offered the position of reservations
15 agent to begin on 4/8/13.  After much discussion,
16 ████████ has elected to decline the offer.
17    A.    Yeah.  So --
18    Q.    Yes.  I'm sorry.  No, I was just going to
19 ask if that's what you're trying to clarify, what
20 that is.
21    A.    Yeah.  Ultimately, during the interactive
22 process, if it's deemed that the individual cannot
23 meet the essential functions of the role, in that
24 case, we try to see if there's another role that they
25 can potentially perform.
```

147

```
1          So in this case, we had her -- see if she
2 wanted the offer of the role of reservations agent.
3 So we extended her the offer, which would then
4 require her to transfer to a role, which means change
5 of job title, not just job functions.
6          She would transfer from the flight
7 attendant role into the department of reservations.
8 So we extended her the offer for a reservations --
9 reservations agent, and she declined.
10    Q.    Okay.  And what was -- what was
11 ████████ disability?  Can you tell from this?
12    A.    No, I cannot tell from this.
13    Q.    All -- but we can -- we can tell that it
14 was -- it was an on-the-job injury of some sort; we
15 just don't know that exactly?
16    A.    Correct.
17    Q.    Okay.  Okay.
18          Okay.  If we could, for 2013, same tab, is
19 there a way for you to tell if any of these people
20 had alcoholism as a disability?
21    A.    Can you allow me -- can you give me an
22 opportunity to read through the notes?
23    Q.    Yep, yep.  No problem.
24    A.    Okay.  Not that I see.
25    Q.    Okay.  Could you turn to Tab 2014?
```

148

```
1     A.    Okay.
2     Q.    And Tab 2014 looks like a slower year in
3 the reasonable accommodation business, and so it
4 seems like there's fewer employees here, but it looks
5 to be like roughly all the same data points are being
6 tracked for each one; is that fair?
7     A.    I believe so.
8     Q.    Okay.  And can you tell me, in 2014,
9 whether any of these employees had alcoholism as --
10 as a disability?
11    A.    Let me read through those real quick.
12    Q.    Sure.  Thank you.
13    A.    Okay.  I don't see any on there.
14    Q.    Okay.  Now can we turn to Tab 2015?
15    A.    Yes.
16    Q.    Okay.  So Tab 2015 is where Rebecca Brigham
17 appears at Row 10.  Do you see that?
18    A.    I do.
19    Q.    Okay.  And the column for Date Notified By
20 EE, which is Column I, does that mean date notified
21 by employee?
22    A.    Yes.
23    Q.    Okay.  And then for Rebecca Brigham, which
24 is Row 10 at -- at the date filed, it says June 4,
25 2015.
```

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

149

1    Does that mean the date Frontier was first
2 notified about the existence of her disability or the
3 request for a reasonable accommodation or something
4 else?
5    A.    Let me -- let me read the notes.
6    Q.    Sure.  Thank you.
7    A.    Typically, it's down in the notes.
8    Q.    Yeah.  No problem.
9    A.    I would have to look at the date when HR
10 was aware; not when the company was notified.
11    Q.    Okay.
12    A.    Because I think she had notified the
13 supervisors prior to that.
14    Q.    Okay.  All right.  So this is -- so that
15 Date Filed column means date HR is aware?
16    A.    Yes.
17    Q.    Okay.  All right.  And then at -- for
18 Rebecca Brigham again, so staying on Line -- or Row
19 12 --
20    A.    Okay.
21    Q.    -- at Column Q, it says -- that's the
22 Modify Work Schedule column under the reasonable
23 accommodation umbrella.  Do you see where I'm at
24 there?
25    A.    Yes.

150

1    Q.    And in Rebecca's column there, it says N/A.
2 Do you see that?
3    A.    I do.
4    Q.    Do you know why it says N/A there?
5    A.    Typically, N/A, not applicable, since it
6 wasn't necessarily associated with a work comp claim
7 or OJI, on-the-job injury.
8    Q.    Okay.  I don't see N/A in that column for
9 any other employee on any other tab for any year in
10 this spreadsheet.
11    Can you explain why it's only in
12 Rebecca Brigham's row?
13    A.    If you give me a second, let me just kind
14 of review that.
15    Q.    Yeah.
16    A.    Honestly, I don't know.
17    Q.    Okay.  But you -- you -- you did fill in
18 this information because you're noted as the client
19 manager.  Jerry, in -- in Column G, that's you,
20 right?
21    A.    Yes.
22    Q.    Okay.
23    A.    The only piece with this, because of the
24 case that had been -- it was a long case for Rebecca.
25 There were different responsibilities, so at one

151

1 point I was handling the case.  Another point, when I
2 left and came back, somebody else was handling the
3 case.
4    But it's always the same person, or
5 different people -- whoever was handling that case
6 was able to make comments.
7    Q.    Okay.  Okay.
8    A.    If that makes sense.
9    Q.    It does.  Thank you.
10    A.    Yeah.
11    Q.    And then on these other rows where the
12 client manager is noted as you, Jerry, you input the
13 information there as well, but you never used the
14 phrase "N/A," did you?
15    A.    So what is the question?  I'm sorry.
16    Q.    So the -- the question is anywhere on this
17 spreadsheet where the client manager is noted as
18 Jerry, that's you inputting this information,
19 correct?
20    A.    It -- yes.  But, again, it depends on who
21 was handling the case at the time.  So if my name was
22 listed, not every time did the client manager go in
23 there and change the name if they had overseen or
24 were jumping in.  So -- but it was just more updating
25 the common field.

152

1    Q.    Okay.  But you'd agree that whoever put the
2 information in, nobody had used the term "N/A"
3 anywhere else on this document, did they?
4    A.    Let me just verify.  One second.
5    Yes, I would agree.
6    Q.    Okay.  In the Findings and Recommendation
7 for Rebecca Brigham -- so we're at Row 10 and Column
8 AF.  Sort of in the middle of that -- that paragraph
9 it says -- it's the third line down.  It says,
10 Ms. Brigham failed to provide medical documentation
11 supporting her position.
12    Do you see where I'm at?
13    A.    Yes.
14    Q.    What medical document -- what medical
15 documentation did Ms. Brigham fail to provide?
16    A.    Let me just read the comments real quickly.
17    Q.    Sure.
18    A.    Got it.  So, ultimately, when I say on
19 there, Ms. Brigham failed to provide medical
20 documentation supporting her position, she was
21 requesting herself to -- looks like here --
22 overnights -- flying overnights, staying overnights
23 in hotels, things of that nature.
24    So when we look at her accommodation, we
25 look at what is provided on the certification form.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

153

1    Q.    Okay.
2    A.    On the certification form, it does not
3  mention no flying overnights.  And so as part of the
4  interactive process, we would have looked at that as
5  well.
6          And so, ultimately, that's stating that
7  there was no medical documentation to support her
8  position that she was not allowed to fly overnights.
9    Q.    Okay.  So --
10   A.    Or layovers, I should say.
11   Q.    Oh, yeah.  Sorry.
12         So specifically what you were referring to
13 here is that you didn't have -- Frontier didn't have
14 documentation that Ms. Brigham couldn't do overnight
15 flights, overnight trips?
16   A.    Medical documentation.
17   Q.    Medical documentation.  Okay.
18   A.    Yeah.
19   Q.    Okay.  So -- so for these on Ms. -- on --
20 on Ms. Brigham's row here, Row 10 --
21   A.    Yeah.
22   Q.    -- under the Reasonable Accommodation
23 umbrella, so that's Columns -- looks like Columns Q
24 through AC?
25   A.    Yeah.

154

1    Q.    So there's -- we had already discussed
2  there's "N/A" under Modified Work Schedule.
3    A.    Uh-huh.
4    Q.    There's an X under FMLA Intermittent.
5    A.    Uh-huh.
6    Q.    And I think you had mentioned -- was she
7  granted that?
8    A.    She was granted intermittent FMLA, correct.
9    Q.    Okay.  And -- and was she granted it, or
10 was she just allowed to apply to use it?
11   A.    Can you explain?
12   Q.    So could she have applied to use
13 intermittent FMLA whether or not the interactive
14 process ever occurred?
15   A.    Yes.
16   Q.    Okay.  And then there's an X under Explore
17 Other Positions With Frontier?
18   A.    Uh-huh.
19   Q.    So is this what you mentioned earlier, she
20 could have applied for other positions?
21   A.    Not only could she have applied, but we did
22 mention other opportunities that she should consider.
23   Q.    And she could have applied for these other
24 opportunities whether or not the interactive process
25 ever occurred, right?

155

1    A.    Correct.
2    Q.    And then a couple columns down, AD, where
3  it says Termed, again, that means terminated?
4    A.    And where was that again?  I'm sorry.
5    Q.    Column AD.  It's just a few to the right
6  from the Reasonable Accommodation -- or just one to
7  the right from the Reasonable Accommodations.
8    A.    Yeah.  Typically, we use that term in terms
9  of what the status would be, so it goes back to their
10 status at that time.  Or if there was an update
11 regarding the outcome, then yes.
12   Q.    Okay.  And -- and here that means
13 terminated?
14   A.    Yes.
15   Q.    Yeah.  Okay.
16         For 2015, can you tell me if anybody else
17 had alcoholism as a disability?
18   A.    One moment, please.  Let me read through
19 the comments.
20   Q.    Sure.
21   A.    So what was your question again?  Can you
22 ask that last one?
23   Q.    Yeah.  Was there anybody else in 2015, at
24 least on this spreadsheet, that had alcoholism as
25 their stated disability?

156

1    A.    So let me rephrase that.  According to the
2  notes, it doesn't reference if anybody was on there.
3  Just based on the notes, I don't see that on the
4  notes.
5    Q.    Got it.  Yeah, I mean, except for
6  Ms. Brigham, we know --
7    A.    Yes.
8    Q.    Yeah, yeah, yeah.
9          Okay.  And then last question with respect
10 to Row 10, Ms. Brigham and this -- and Tab 2015.
11   A.    Yes.
12   Q.    On the right of the Findings and
13 Recommendations where the EEOC Charge Filed column is
14 at, there's no check mark.
15         Does that mean, at the time of this
16 document's creation, Ms. Brigham hadn't yet filed
17 her charge, or -- or -- or whoever was filling this
18 out didn't know about it?
19   A.    Could be that they did know, did not know.
20 It just wasn't checked.
21   Q.    Got it.
22   A.    So don't know.  Yeah.
23   Q.    Okay.  And then under Notification Letter,
24 that's not checked either.  So whatever that
25 notification letter is, safe to assume it didn't

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

157

1 happen yet or whoever was filling this out didn't
2 know about it?
3     A.   It -- yeah.  It's hard to say.
4     Q.   And what about the Interactive Checklist
5 Used?  That's not checked either here.  Does that
6 mean no interactive checklist was used --
7     A.   Not --
8     Q.   -- with --
9     A.   Not necessarily.  Just depends on the
10 individual, whoever's working the case, if they
11 checked that box or not.
12     Q.   And one of those individuals here would
13 have been yourself, right?
14     A.   Correct.
15     Q.   Yeah.  Do you recall using an interactive
16 checklist with Ms. Brigham?
17     A.   I'm trying to recall.  Not a checklist
18 per se, but just more, during the process, we would
19 document her file.
20     Q.   Okay.
21     A.   And I also refer to that in terms of what
22 steps we were with her, so -- yeah.
23     Q.   Okay.  Okay.  Let's flip to Tab 2016.  And
24 Rebecca Brigham remains on -- on -- on this for the
25 year 2016, so my only questions are related to her.

158

1 And she's at Row 10 still.
2     A.   Okay.
3     Q.   And if we -- if we move over to the right
4 to those same columns we were just discussing --
5     A.   Uh-huh.
6     Q.   -- right next to the Findings and
7 Recommendations, so Columns AG and AH --
8     A.   Uh-huh.
9     Q.   -- there now it says the EEOC charge is
10 filed.
11     A.   Uh-huh.
12     Q.   Now, is -- whoever's filling this out would
13 check that because now they've seen an EEOC charge;
14 is that fair?
15     A.   Yes.
16     Q.   And the Notification Letter is checked, so
17 whatever that is, that must have occurred by now,
18 too, right?
19     A.   Right.
20     Q.   But the Interactive Checklist is still not
21 used -- or Interactive Checklist Used, question mark,
22 is still not checked.
23          Fair to say, by this point, whoever's
24 filling this out has decided the interactive
25 checklist was not used?

159

1          MS. KITSON:  Object to the form.
2     A.   Yeah, I'm not sure.  Again, it just depends
3 on the individual filling this out, and when they did
4 such, say that a list was or was not used.  It's just
5 the box was not checked.
6     Q.   (BY MR. CRONE)  Okay.
7     A.   Yeah.
8     Q.   Well, for 2016, it -- it still notes Jerry
9 as the client manager.  Did -- did you fill this out?
10     A.   Some pieces I would have; some pieces not.
11 If you recall, I was not here during a certain time
12 period as well --
13     Q.   Uh-huh.
14     A.   -- that Rebecca's case was still being
15 handled.  So, again, I -- yeah, it's hard to say.
16 But, for the most part, a lot of that is my comments
17 as well.
18     Q.   Okay.  And there's a -- there's a tab --
19 sorry.  Hold on.  Let me find this.
20          Never mind.  You've already answered that
21 question, so we're going to -- we're going to skip
22 that one.
23          Okay.  So is it -- for the -- for the --
24 for the years that we looked at and that are relevant
25 to this deposition, so definitely the 2012, 2013,

160

1 2014, and 2015 tabs --
2     A.   Uh-huh.
3     Q.   -- you weren't able to identify any -- at
4 least based on the notes, you weren't able to
5 identify any employees that suffered from the
6 disability of alcoholism?
7     A.   Based on -- go ahead.
8     Q.   I'm sorry.  Go ahead.  I'm sorry.
9     A.   Just based on what was on that document,
10 no.
11     Q.   Got it.  Does that seem -- does that seem
12 atypical for you, or -- or is that expected, in your
13 review of those years?
14          MS. KITSON:  Object to the form.
15     A.   Yeah, because I think at -- when -- when
16 you read the document, it identifies that that's part
17 of the self-disclosure program.
18     Q.   (BY MR. CRONE)  Uh-huh.
19     A.   I don't know if any of the other
20 individuals were part of the self-disclosure
21 program.
22     Q.   Got it.  So it may just be that the notes
23 aren't thorough enough to reflect others?
24     A.   I'm not sure, yeah.  Ultimately, we
25 identify the situation.  In that case, Rebecca was in

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

161

1 the self-disclosure program, which would then
2 highlight that.
3         If it's not noted on any of the other
4 individuals, I would have to assume that they were
5 not part of that program.
6    Q.   Okay.  Okay.
7    A.   Yeah.
8    Q.   That's fair enough.  Thank you.
9         We can set that exhibit aside, whatever
10 that means, closing the window or -- or -- or
11 whatever.  So . . .
12        Okay.  So I want to -- I want to turn --
13 turn your attention to -- to a different topic now,
14 which is more specifically Frontier's decision to
15 terminate Ms. Brigham in the -- towards the end of
16 2015.
17   A.   Okay.
18   Q.   And so you had noted earlier that the
19 documents in a -- in a -- in a flight attendant's
20 personnel file were stored in -- in one of two
21 places.  Would that include any documents related to
22 the basis for her termination, for Ms. Brigham's
23 termination?
24   A.   Can you explain a little more?
25   Q.   Yeah.  So I -- I -- we were talking

162

1 generally about what's in an -- in an employee's
2 personnel file.  Do -- do you recall that?
3    A.   Yes.
4    Q.   And then there was -- there was the -- the
5 second sort of part of the file that was under lock
6 and key that has to do with the -- with the --
7    A.   Compliance?
8    Q.   -- the drug -- yeah.  And -- and so in --
9 in either of those places, is that where -- all the
10 documents related -- that would go into an employee's
11 personnel file related to why they were terminated,
12 would they live in one of those two places?
13   A.   No.
14   Q.   No?  So -- so there's more -- there's
15 somewhere elsewhere they might exist?
16   A.   It's called a P-tracker.
17   Q.   Okay.  Can you explain what that is?
18   A.   P-tracker is the -- basically, the
19 department file.
20   Q.   Uh-huh.
21   A.   Anything that we felt that would not go
22 into the personnel file: comments, notes.  But it
23 also tracks any accolades, performance issues,
24 discussions, letters, things of that nature.
25        Or any discussions that the supervisors may

163

1 have had with any employee under the inflight or
2 flight employment group would be documented in
3 P-tracker.
4    Q.   Okay.  Okay.  Do you know if all that
5 information has been turned over in this lawsuit?
6    A.   To my understanding, yes.
7    Q.   Okay.  Okay.  I'm going to -- I'm going to
8 send over Exhibit 6.
9        MR. CRONE:  And, Danielle, I'll e-mail it
10 to you.
11        MS. KITSON:  Can we take a break at the
12 next convenient time, too, John?
13        MR. CRONE:  Yeah, absolutely.  If you want,
14 I only have a couple on this one, and we -- and then
15 we can definitely do a break easily there.
16        MS. KITSON:  Thanks.
17   A.   Okay.  I have it up.
18   Q.   (BY MR. CRONE)  Excellent.  So can you give
19 it a quick review for me?
20   A.   You bet.
21   Q.   Yeah.
22   A.   Okay.
23   Q.   Okay.  And so you wrote this e-mail, right?
24   A.   Right.
25   Q.   Okay.  So in the middle at the -- at the

164

1 first bullet point, you had wrote -- at the end of
2 that sentence it says, The company has continued to
3 make exceptions for her.
4        Do you see that?
5    A.   Yes.
6    Q.   And what exceptions are you referring to
7 there?
8    A.   Well -- well, it depends on this time.  So
9 when Rebecca would be approved, let's just say, 8
10 days per month, a lot of the times she would have
11 exceeded that; she would call in 10, 11, sometimes up
12 to 12.  And so in those cases, we would make
13 exceptions for her to go above what the medical
14 documentation supported.
15   Q.   Okay.  And so that's -- that's what you're
16 talking about when you -- when you -- in -- in the
17 second bullet point where it says, We're also willing
18 to provide her new FML -- FMLA paperwork to allow for
19 the ability to increase the number of days she's
20 allowed to use, that's what you're talking about
21 there?
22   A.   Yes.  And it's more to drive consistency.
23 Typically, just generally, we try and hold
24 individuals, Hey, if you're approved for five days,
25 make sure you remain within that.

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

165

1    But if we see a pattern of individuals
2 utilizing more than they're approved for, we ask them
3 to recertify or just provide us updated medical
4 information to support their need.
5    Q.   Okay.  So -- so here, Ms. Brigham was --
6 she wasn't approved prior to -- to take off the
7 amount of days that she was taking?  Is that what
8 you're saying here?
9    A.   Based on the medical documentation, the
10 doctor would have indicated.  If she was approved or
11 can take a maximum of eight, we typically just
12 approved what the medical professional was providing
13 us.
14    Q.   Okay.
15    A.   Whatever's on there is what -- what --
16 what -- we would try and document that.
17    Q.   Okay.  So somewhere out there, there's a --
18 a medical certification that says Ms. Brigham should
19 have X number of days off per month?
20    A.   Yes.  And the employee certification form,
21 whether that be intermittent or FMLA, there is a
22 section of that notification that includes frequency,
23 frequency of use I believe it specifically says.  And
24 under the frequency, the provider would indicate how
25 many times per month, per week, and things of that

166

1 nature.
2    Q.   Okay.
3    A.   So we basically -- we don't make
4 adjustments in -- on that.  We just basically -- if
5 you request or the nature of the request qualifies
6 the individual for intermittent FMLA, we'll then
7 approve for the frequency documented by the medical
8 professional.
9    Q.   Got it.  Okay.
10    MR. CRONE:   Now is a great time to go off
11 the record and take that break.
12    THE WITNESS:  All right.  Thank you.
13    THE VIDEOGRAPHER:  The time now is 1:48.
14 We're off the record.
15    (Recess from 1:48 p.m. to 1:59 p.m.)
16    THE VIDEOGRAPHER:  The time now is 1:59.
17 We're back on the record.
18    Q.   (BY MR. CRONE)  While we were off the
19 record, I went ahead and sent you Exhibit 8.
20    A.   Oh.
21    Q.   So hopefully you can pull that up.
22    MR. CRONE:  And, Danielle, I e-mailed
23 Exhibit 8 to you as well.
24    MS. KITSON:  Great.
25    Q.   (BY MR. CRONE)  So once you have it pulled

167

1 up, let me know.
2    A.   It is open.
3    Q.   Okay.  Great.  Okay.  So have you seen this
4 document before?
5    A.   I can't say I have.
6    Q.   Okay.  Do you mind reading it --
7    A.   Yeah.
8    Q.   -- quickly?  Thanks.
9    A.   Will do.  Okay.
10    Q.   So here, Ms. Coppedge appears to be telling
11 Ms. Brigham that there's going to be an investigatory
12 meeting pursuant to the CBA on a certain date; is
13 that fair?
14    A.   Yes.
15    Q.   Okay.  And what's an investigatory meeting?
16    A.   That is a meeting -- it's called a
17 fact-finding.  Ultimately, it's an opportunity to
18 discuss concerns from management and allow
19 the individual, in this case Rebecca, or flight
20 attendant, to then either answer questions, voice
21 concerns, or just basically dialogue with the
22 individual.
23    Q.   Okay.  So prior to this investigatory
24 meeting with Ms. Brigham, management would not have
25 yet made up its mind to terminate Ms. Brigham; is

168

1 that fair?
2    A.   Yeah.
3    Q.   Okay.
4    A.   That -- that's the purpose of the
5 investigatory meeting.
6    Q.   Got it.  Okay.
7    And that, here, was set to occur on
8 November 3, 2015.  Do you know if it did occur on
9 that date?
10    A.   That, I don't.
11    Q.   Okay.  And the letter here is dated
12 October 30, 2015.  So by October 30, 2015, management
13 hadn't yet made up its mind to terminate Ms. Brigham?
14    A.   That's my understanding.
15    Q.   Okay.  Let's set -- let's set that aside,
16 and I want to -- sorry.  I want to -- I want to pull
17 up -- this is going to be a little out of order
18 again.  Sorry about that.  I'm going to send you
19 what's -- what's going to be labeled Exhibit 10.  I'm
20 sending it to Danielle, and now I will send it to
21 you.
22    Okay.  Once you have Exhibit 10, if you
23 could -- it's a short e-mail letter.  If you could
24 review it.  Let me know when you've done that.
25    A.   Okay.  I just opened it up, so I'm going to

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

169

1 read it now.
2    Q.    Thanks.
3    A.    Okay.
4    Q.    So Exhibit 10 is an e-mail from Shelly --
5 how do you pronounce her last name?  Is it "Leyner"?
6 "Leyner"?
7    A.    "Leyner."
8    Q.    "Leyner" -- to yourself; is that correct?
9    A.    It's to the inflight department.
10    Q.    Oh, and -- and you're cc'd.  Yeah.
11    A.    Yeah.
12    Q.    Okay.  Do you recall receiving this e-mail?
13    A.    Yes.
14    Q.    Okay.  And the date is October 27, 2015; is
15 that correct?
16    A.    Looks like it, yes.
17    Q.    And what is Ms. Leyner telling not just
18 you, but -- but you by way of copy on this e-mail?
19    A.    Basically, that the infraction that
20 occurred 23-25 did not meet their criteria for -- to
21 be recorded to intermittent FMLA.
22    Q.    And what did that mean for Ms. Brigham on
23 October 27?
24    A.    Can you repeat that?
25    Q.    What did that mean for Ms. Brigham as of

170

1 October 27, 2015?
2    A.    That meant that the nature -- so,
3 essentially, she would have requested intermittent
4 FMLA, and the request was not necessarily accepted;
5 therefore, they were notifying the department that it
6 would remain as a sick call.
7    Q.    Does that mean that she would be
8 terminated?
9    A.    No.  That means that the instance would
10 be -- fall under the dependability policy.
11    Q.    Okay.  Can you pull up Exhibit 5 again?  Do
12 you have that still at your fingertips?
13    A.    Do you know which one it was?
14    Q.    It was -- it was Number 5, and it was the
15 e-mail that we were arguing about whether a portion
16 was privileged.  And I don't want to look at that
17 part at all.  I want to look at that last sentence
18 that we agreed was okay to look at.
19    A.    Okay.  One second.
20    Q.    I can resend it, if need be.
21    A.    I'm just going through all the attachments
22 real quick.  I think I might have closed it.
23    Q.    Okay.  I'm going to -- I'll get you another
24 copy.
25    A.    Okay.  Thank you.

171

1    Q.    Yeah, no problem.  There you -- I have it
2 there.
3    A.    Okay.  The one that has the next steps?
4    Q.    Yeah.  Just that line because, again, I --
5 I don't want to wade into that privileged area.  Just
6 the next steps.
7    A.    Uh-huh.
8    Q.    Do you see where you had wrote on -- so,
9 first of all, this is on October 2, 2015; is that
10 correct?
11    A.    Yes.
12    Q.    And here you wrote, Next steps.  If the
13 last occurrence is not covered by FMLA, then we
14 proceed with the term steps.
15    A.    Uh-huh.
16    Q.    So here, are you saying that if the last
17 occurrence isn't covered by FMLA, then you're going
18 to fire Ms. Brigham?
19    A.    No.  Term steps will always refer to the
20 section of the contract -- the investigatory meeting.
21 It was just a side term that -- we referred to that
22 investigatory meeting as term steps.  So it was the
23 beginning process of that.
24    Q.    Okay.
25    A.    But no, not -- not that she was going to be

172

1 terminated.
2    Q.    Okay.
3    A.    That decision is never rendered until all
4 the facts are determined and the employee is allowed
5 to weigh in in case there's something that we have
6 missed.
7    Q.    So if there was something you had missed,
8 for example, that would recode the absence described
9 in -- in Exhibit 10 by Ms. Leyner, that could change
10 the outcome?  Is that what you're saying?
11    A.    Yeah, depending on what the employee
12 presented.  Correct.
13    Q.    Okay.  Okay.  I'm going to -- I'm going to
14 go out of order a little bit again, so sorry about
15 that.  This one is going to be called Exhibit 15.
16 And let me send it to Danielle first.  Then I will
17 send it to you.  I'm getting a little more efficient
18 at this, I think, and that ought to show up to you in
19 a second.
20    A.    Okay.
21    Q.    And then the same thing.  Once you get it,
22 if you could review it real quick and let me know
23 once you've done that.
24    A.    Okay.  I have it.
25    Q.    Thank you.  Oh, you know what?  I -- I just

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

173

1 noticed something, Mr. Arellano. I'm sorry. The
2 very bottom of this exhibit has that same e-mail
3 where a good portion of it is privileged.
4    **A.  Okay.**
5    Q.  So the same -- same sort of caution. I
6 don't want to look at any of that stuff. Just --
7 just anything else.
8    **A.  Okay. Go ahead.**
9    Q.  So at the top of that Exhibit 15, there
10 you're writing an e-mail to Shelly Leyner on
11 October 2, 2015; is that correct?
12    **A.  That is correct.**
13    Q.  And you wrote, Hi Shelly, Let's ensure we
14 have our i's dotted and t's crossed before moving
15 forth with term.
16    **A.  Correct.**
17    Q.  Again, here are you referring to
18 terminating Ms. Brigham, or are you referring to the
19 steps taken towards?
20    **A.  Referring to the steps. Typically, what we**
21 **would do, anytime anybody reached that termination**
22 **level or step or initiating that fact-finding, we**
23 **wanted to make sure we had our facts so that we**
24 **wouldn't waste everybody's time if they came in and**
25 **we missed something.**

174

1    **So in reference to this "ensure we have our**
2 **i's dotted and t's crossed," I wanted to ensure that**
3 **any infraction was properly coded that she had**
4 **requested and that everything had been taken care of,**
5 **so that way we didn't waste her time or our time to**
6 **go to that meeting and then determine, Oh, we forgot**
7 **to recode this occurrence over to intermittent FMLA.**
8    Q.  Okay.
9    **A.  Yeah.**
10    Q.  I am -- if you give me just a second here,
11 I'm actually getting rid of stuff here. So -- so
12 this will save us some time if you just bear with me
13 for a minute here.
14    Okay. I'm going to apologize again for the
15 order. I'm going to send you a document that is
16 labeled Exhibit 21.
17    **A.  Okay.**
18    Q.  Okay. And same -- same thing as always.
19 Once you get it and review it, let me know.
20    **A.  Let me see -- oh, there it is. Okay. I'm**
21 **in there now.**
22    Q.  Okay. And is that -- is this e-mail from
23 JJ Williams -- is this the other supervisor that you
24 had mentioned was one of Ms. Brigham's supervisors?
25    **A.  She -- I don't know if she was Brigham's**

175

1 **supervisor, but she was an inflight supervisor.**
2    Q.  Got it. Okay. And it was way earlier in
3 the day when you mentioned her name, so it's a while
4 back I asked you that.
5    **A.  Yeah.**
6    Q.  And here, where -- where Ms. Williams is
7 writing to Shelly Leyner, I understand you're not
8 copied on this, but I'm -- I'm interested in your
9 opinion.
10    **A.  Okay.**
11    Q.  It says -- is -- here is -- do you
12 know what Ms. Williams is referring to, this
13 leave-of-absence paperwork for a medical condition?
14    **A.  Can I read it real quickly?**
15    Q.  Oh, yeah, please do. Yeah.
16    **A.  Okay. And so what was your question again?**
17 **I'm sorry.**
18    Q.  Yeah. This -- so here it looks like
19 Ms. Williams is referring to leave-of-absence
20 paperwork for a medical condition that will require
21 her schedule to be cleared for the month. "She
22 expressed to me that it is urgent."
23    Do you know what -- what Ms. Williams is
24 referring to?
25    **A.  Yeah. I believe either on that same day or**

176

1 the day prior, we had met with -- or even after --
2 with Ms. Rebecca Brigham in terms of what was going
3 on with her situation.
4    Q.  Got it. So --
5    **A.  So I believe she was approved for FMLA,**
6 **continuous leave.**
7    Q.  Okay. Got it. So is this when -- is
8 this -- is this right around the time, then, that
9 Ms. Brigham went to a monthlong treatment out of
10 state?
11    **A.  To my understanding, yes.**
12    Q.  Okay.
13    **A.  So that would have entered her into the**
14 **self-disclosure program.**
15    Q.  Got it. Okay.
16    Okay. We're going to back up to a document
17 that's now titled Exhibit 13. Give me just one
18 second here.
19    Okay. When that shows up for you,
20 Mr. Arellano, if you could review that and let me
21 know once you have.
22    **A.  Okay. I have it. I'm going to read it**
23 **now.**
24    Q.  Thank you.
25    **A.  Okay.**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

177

1    Q.    Okay.  Have you ever seen this document
2  before?
3       A.    Not -- not this specific document, no.
4       Q.    But do -- do you know what it -- what this
5  document is?
6       A.    It looks -- possibly a document that was
7  used right after her hire.  She was a probationary
8  flight attendant at the time.  So other than that,
9  I -- yeah, I'm not sure what method it would have
10  been used.
11      Q.    On -- at -- at the bottom of the second
12  page where there's bolded Personnel File -- do you
13  see where I'm at there?  Then under it it says,
14  Number of Complimentary Letters --
15      A.    Uh-huh.
16      Q.    -- 2, and a bunch of exclamation points;
17  Number of Complaint Letters, zero.  And then there's
18  some comments, and whoever filled this out said,
19  Rebecca has two very nice kudos letters in her file
20  and her IOE eval has raving review.  The two missed
21  trips in no way affect her performance or attitude.
22  She obviously loves this job.
23      A.    Okay.
24      Q.    Was -- you know, based on your experience
25  and your time at Frontier, was Ms. Brigham off to a

178

1  great start?  Was she off to a good -- good start
2  when she started the position?
3       A.    It's hard for me to say because I didn't
4  manage Ms. Brigham, so I really can't speak to that
5  at all.  Yeah.
6       Q.    This is -- this isn't enough for you?
7            MS. KITSON:  Object to the form.
8       Q.    (BY MR. CRONE)  Well, not -- well -- well,
9  I was going to follow it up with what other pieces of
10  information would you need to know?
11            MS. KITSON:  Object to the form.
12      A.    Yeah, I -- I just -- I just can't make that
13  assessment.  It's hard for me to answer if she was or
14  was not.
15      Q.    (BY MR. CRONE)  Yeah, and then -- so -- so
16  then I'll -- I'll follow it up with a question.
17  What -- what additional information would allow you
18  to you make that assessment?
19      A.    I don't -- that, I don't know.  I think,
20  overall, the inflight managers/supervisors had access
21  to information that I wouldn't have.  That's through
22  everyday engagement, interaction, compliance with the
23  contract.
24            This doesn't address a lot of these issues
25  or concerns or -- or anything like that.  Yet again,

179

1  it's just -- it's hard for me to answer that question
2  honestly.  I wouldn't know.
3       Q.    Do you -- do you ever trust managers who --
4  who work below you -- do you ever trust their opinion
5  on -- on -- on -- on an employee's performance that
6  you have not directly observed?
7       A.    Yeah.  They would have the best information
8  on that employee's performance, true.
9       Q.    Okay.  And so here, whichever manager
10  filled this out, I mean, do you -- do you trust this
11  evaluation was filled out accurately?
12      A.    Sure.
13      Q.    Okay.  I'm going to hand you -- I think we
14  might actually be in order for at least one.  The
15  next one is Exhibit 14.  And same as always, if you
16  can give that a review when you receive it and let me
17  know once you have.
18      A.    Give me --
19      Q.    And I'm sorry.  And, Mr. Arellano, I'm
20  sorry.  This one also has that other e-mail.  I just
21  scrolled through it.  I see it now.
22      A.    Okay.
23      Q.    The one we've argued about.  So same kind
24  of deal, if you could just not pay attention to most
25  of that e-mail.

180

1       A.    Okay.
2            MS. KITSON:  And I think, John, what
3  happened, just for your -- I -- I think -- we have a
4  redaction tool in our document review system, and I
5  think what happened is maybe the redactions didn't
6  get applied before final production.  So we will swap
7  those out with redacted versions.
8            MR. CRONE:  Yeah, and that's okay.  I just
9  want to -- I just want you to know I'm not trying
10  to -- I'm not trying to throw this thing all over
11  there.  I just didn't -- didn't know it was there.
12  I'm actually just interested in the top.
13      Q.    (BY MR. CRONE)  But, of course, take a look
14  it all, Mr. Arellano.
15      A.    Okay.
16      Q.    So this is an e-mail from you to
17  Stefanie Coppedge; is that correct?
18      A.    Yes.
19      Q.    The -- the -- the top portion?
20      A.    Yeah.
21      Q.    And that's dated October 6, 2015?
22      A.    Correct.
23      Q.    Okay.  So at the second paragraph, you
24  wrote, The other piece I'm noticing is that all her
25  overnights (August and September) seem to only occur

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

181

1 over the weekends. This seems to be a change in
2 pattern from her previous months.
3          I want to just take that -- those two
4 sentences. What do you -- what do you mean there?
5 What -- what -- what are you getting at?
6     A.   Just, simply, part of the -- what we do on
7 our side is kind of assess patterns, look at
8 situations, look at schedules.
9          In an effort to better help Rebecca and
10 give her some better guidance, I would have reviewed
11 her schedule to assess and kind of see if there's any
12 change in pattern, change in bidding, and any
13 specific trips that should have occurred to help us
14 have a better understanding. And in that case, I was
15 simply highlighting that.
16    Q.   Okay. And then you go on to write, I was
17 auditing her Crew Trac schedule and find that she
18 dropped a four-day (9/18/15 through 9/21/15) and then
19 adds a three-day (9/18/15 to 9/20/15). I also
20 noticed this a few times for the August bid month.
21 The question that arises, is she truly doing
22 everything (bidding accordingly) to help herself?
23 I'm not so sure anymore.
24          What did you mean by that?
25    A.   Well, I was just answering -- or asking the

182

1 question, and I was trying to seek clarification.
2 If -- she had a -- looked like a four-day and then
3 she dropped that same trip but right over that trip
4 that she dropped, she picked up a three-day on the
5 same time period.
6          And so recapping conversations that she and
7 I had, she didn't want to do layovers. And so my
8 question was why would one pick up a three-day?
9     Q.   Did you not trust that she was doing
10 everything to help herself at this point?
11    A.   Oh, definitely. I was just kind of
12 verifying.
13    Q.   Okay. Next one is -- let me make sure.
14 Next one is Exhibit 16. Okay. Same -- same drill,
15 Mr. Arellano.
16    A.   Okay. Give me one second. Okay. I'm in
17 there now.
18    Q.   Great. Thanks. Yes. If you could take a
19 look and let me know once you've reviewed.
20    A.   Okay.
21    Q.   So at the bottom where Cassandra Micklich
22 is writing you an e-mail, that's July 10, 2015,
23 right?
24    A.   July 10, 2015, correct.
25    Q.   Yeah. Is Cassandra Micklich still employed

183

1 at Frontier?
2     A.   No.
3     Q.   But at this time, she was a drug and
4 alcohol specialist; is that correct?
5     A.   Yeah. Based on the signature line, yes.
6     Q.   Okay. And do you know where
7 Cassandra Micklich is employed now?
8     A.   I do not.
9     Q.   Okay. What is Cassandra asking you? I --
10 I read this, and I couldn't quite make sense of it.
11 I was hoping you could help.
12    A.   Looks like she had a conversation with
13 Rebecca, asking about calling in well if she called
14 off for a trip.
15          And so in the contract, there's two
16 conditions. If you are calling in sick for a trip,
17 basically, it prevents you from calling in well and
18 picking up the remainder of the trip. However, if
19 you're approved for intermittent FMLA, intermittent
20 FMLA would allow you to pick up the trip, depending
21 on the type of trip and how long -- the longevity of
22 the trip.
23          And I think Rebecca -- I mean Cassie or
24 Cassandra is trying to clarify, if she did this,
25 could she call in well. But it would depend. If

184

1 she's calling in sick, then the option would be no.
2 If she's requesting intermittent FMLA, the answer
3 would be yes.
4     Q.   Okay.
5     A.   And so in this case, anything related to
6 schedules, operational procedures, we always refer
7 them to the inflight supervisor or manager or
8 department to answer those questions.
9     Q.   Okay. And so that's why your response
10 to -- to Cassie, Cassandra, was, Good question. I
11 would recommend she reach out to her inflight
12 supervisor?
13    A.   Correct.
14    Q.   Okay. Thank you. We can set that aside.
15          I'm trying to get rid of a couple more
16 here. Just got rid of two more, if that makes you
17 feel good.
18    A.   Okay.
19          MS. KITSON: I like it.
20    Q.   (BY MR. CRONE) Okay. Where -- okay.
21 This -- so the next one out of order, of course,
22 still, because I've -- I've taken stuff out and
23 whatever, but this one's going to be Exhibit 20.
24          And when you receive it, Mr. Arellano, same
25 drill. If you can review and let me know once you've

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

185

1 reviewed.

2    A.    Okay.  I'm in there now.

3    Q.    Thank you.

4    A.    Okay.

5    Q.    Okay.  So at the -- at the bottom of
6 this e-mail string, you see the e-mail from
7 Rebecca Brigham to Laura Rush?

8    A.    Yes.

9    Q.    And that's dated September 28, 2015?

10   A.    Right.

11   Q.    And Rebecca says, Hi -- Hey there, Laura.
12 I was wondering if you were available anytime
13 this week to meet me -- with me regarding my
14 self-disclosure and if we can find a solution for
15 my calling in for overnights.  Thanks, Rebecca
16 Brigham #413206.

17        Laura Rush then responds:  Hey Rebecca, Any
18 accommodation requests must go through Shelly Leyner
19 in HR.  Unfortunately, inflight is unable to do
20 anything else at this time.

21        So I want to stop there and ask you, is
22 Laura Rush's response correct?

23   A.    Well, not necessarily.  And the reason why
24 I say that, she doesn't -- she's not requesting -- in
25 the e-mail, just based on the language, she's not

186

1 requesting an accommodation.  It's just simply she
2 wanted to discuss with Laura.

3        And so it's hard for me to identify if
4 Laura, in that respect, is incorrect, because Rebecca
5 does not identify she's wanting to discuss an
6 accommodation.

7    Q.    Okay.  So --

8    A.    Is that what you were referring to?

9    Q.    I'm sorry; I didn't mean to cut you off.
10 Please --

11   A.    Is that what you were referring to, or
12 something else?

13   Q.    It is, yes.  So -- thank you.

14        And then -- and then as we scroll up, it
15 looks like Shelly then e-mails you on September 28,
16 2015.  Do you see where I'm at?

17   A.    Yes.

18   Q.    And Shelly says, Hi Jerry.  Shall we --
19 Shall we call a meeting?

20   A.    Okay.

21   Q.    And she's forwarded you Ms. Brigham's
22 e-mail; is that correct?

23   A.    Yes.

24   Q.    Okay.  And at this time, Ms. Leyner is the
25 super -- supervisor of disability program management.

187

1 Is that your -- I mean, is that correct, in your
2 recollection?

3    A.    That is correct.

4    Q.    Okay.  And then if we scroll up a little
5 bit higher, it looks like we're at -- still at
6 September 28, 2015.

7        You wrote back and said, Yes.  Not sure
8 what more we can do for her.  Can you see how many
9 FMLA days she has accrued?

10        And you wrote that back to Ms. Leyner; is
11 that correct?

12   A.    Correct.

13   Q.    Okay.  And here, can you recall, as of
14 September 28, 2015, whether or not there was more
15 that you could have done for -- in response to
16 Ms. Brigham's request in this e-mail?

17   A.    I believe so, and that's the reason I was
18 asking, Can you see how many FMLA days she has
19 accrued?

20   Q.    Okay.

21   A.    Fortunately, with that, FMLA days roll off
22 regarding intermittent, and then that way, when they
23 roll off, she's accruing more.  Ultimately, that was
24 the direction, Hey, can you do another audit and see
25 if she has accrued any additional time?

188

1        So, in essence, to answer your question,
2 yes, we could have done more in that case had she had
3 more days on top.  Other option:  She could have
4 exercised personal leave as an option as well.

5    Q.    Okay.  Any -- any other options?

6    A.    Definitely she could have gone on
7 continuous leave if she was looking to be out for
8 additional time.  So, yeah, other options for sure.

9    Q.    Okay.  So the next one is -- is Exhibit 23.
10 I'll send it to Danielle.  Okay.  And then same
11 thing.  Once you get it, if you could review it and
12 then let me know.

13   A.    Okay.  I'm in there now.

14   Q.    Okay.  Thank you.

15   A.    Okay.

16   Q.    Okay.  So here it looks like, if you
17 scroll down to the bottom of the e-mail chain, on
18 September 5, 2014, you asked Shelly Leyner to get a
19 list of all active employees who have been on
20 approved LOA -- that means leave of absence, right?

21   A.    Correct.

22   Q.    -- greater than 180 days.  So is that -- is
23 that what you were asking Ms. Leyner?

24   A.    Yes, for basically 180 days, anybody who
25 was out on continuous LOA.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

189

1    Q.   Got it.  Okay.  And then she responded with
2 this chart.  And -- and that's on September 19, 2014.
3 Do you see that response?
4    A.   September 19, the little chart, yes.
5    Q.   Yeah.  So my question is it looks like -- I
6 just want to know if I'm reading this right.  So it
7 looks like that she's got this list of what would be
8 names, but it looks like, where it's highlighted in
9 black, are -- is that all Rebecca Brigham, and then
10 the ones that aren't highlighted in black are other
11 people?  Or am I looking at this wrong?
12    A.   I would have to -- yeah.  I'm just going to
13 kind of go through this now because this document
14 typically would highlight -- it just has her name.
15        No.  The way this looks, it would be a
16 spreadsheet that would document and reflect flight
17 attendants, not just Rebecca, but anybody who had
18 continuous leave for a period of time.
19        And if you look at that, you look at the
20 base-type -- base-type changes for individuals there
21 as well, so I think it was others.  Not only Rebecca,
22 but others.
23    Q.   Okay.  Got it.  Okay.  Thank you.
24        And then are you aware of whether
25 Ms. Brigham had any performance-related issues prior

190

1 to her self-disclosure?
2    A.   Can you define "performance"?
3    Q.   So anything that would have caused her to
4 be disciplined formally or informally, counseled
5 verbally, anything -- anything that would have --
6 would have -- well, let's start there.  So -- so
7 anything that would have resulted in discipline.
8    A.   I believe so.  That would have been -- that
9 I know of, dependability.
10    Q.   Okay.  And so can you -- can you explain
11 what you mean by that?
12    A.   Dependability is any -- is our attendance
13 policy.  If there was any infraction that violated
14 anything identified in the dependability policy, it
15 would have yielded a performance counseling either
16 via documentation of a verbal warning, written
17 warning, final termination warning.
18    Q.   Okay.  And do you know if -- if, prior to
19 her self-disclosure, she received any verbal
20 counseling related to the dependability?
21    A.   I believe so.
22    Q.   And then what about a -- a -- a written
23 warning?
24    A.   That, I don't know.
25    Q.   Okay.  What about a -- what about the

191

1 termination steps?
2    A.   Termination steps or a final termination
3 warning?
4    Q.   I'm sorry.  Final termination warning.
5    A.   I do believe she had a few final
6 termination warnings.
7    Q.   Okay.  And -- and it -- to your
8 recollection, this all has to do with the
9 dependability policy?
10    A.   It related to dependability, yes.
11    Q.   Okay.
12    A.   I'm not sure about the written warning.
13 Depending on the infraction, people can skip steps.
14    Q.   Okay.  Okay.
15    A.   And so she could have gone from a
16 documented verbal warning to a final termination
17 warning, depending on how many occurrences she had.
18    Q.   Okay.
19    A.   So . . .
20    Q.   And so any of these absences prior to her
21 self-disclosure, do -- do you have any recollection
22 what they were, why she was absent --
23    A.   No.
24    Q.   -- or anything like that?
25    A.   No.

192

1    Q.   Okay.
2    A.   I do not.
3    Q.   Okay.  Now I will hand you Exhibit 12, and
4 let me send it to Danielle.  Okay.  And same drill as
5 always.  Give it a review and let me know once you've
6 reviewed.
7    A.   I'm opening it up now.
8    Q.   Thank you.
9    A.   Okay.
10    Q.   Okay.  This Investigation Notes and
11 Tracking Form, do you know what this form is?  Have
12 you seen these before?
13    A.   I have, yes.
14    Q.   What are these forms used for?
15    A.   This was actually my form.  I created this
16 anytime I tracked my conversations with employees, so
17 this would have been in her file that I housed in the
18 HR department.
19    Q.   Okay.  And --
20    A.   Just a reminder of what I -- what --
21 previous conversations.
22    Q.   Got it.  Okay.  And this is -- and you know
23 it's your form because it's your handwriting,
24 obviously?
25    A.   That is correct.

## ROCKY MOUNTAIN REPORTING
### (720) 872-9910

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

193

1    Q.   Okay.  But -- so during the time period
2  relevant to this deposition, which is end of 2011
3  through the end of 2015 --
4    A.   Uh-huh.
5    Q.   -- did you -- did Frontier carry insurance
6  for employment-related claims?
7    A.   Can you elaborate?
8    Q.   So when -- so, for example, Ms. Brigham's
9  lawsuit against Frontier alleges that Frontier
10 discriminated against her in violation of the ADA.
11   A.   Uh-huh.
12   Q.   So are you aware of that?
13   A.   I am.
14   Q.   Okay.  And does -- did Frontier carry
15 insurance during this time period, 20 -- end of 2011
16 through end of 2015, for those types of claims?  So
17 if an employee brings a claim for unlawful
18 discrimination, is Frontier insured for it?
19         MS. KITSON:  Object to the form, outside
20 the scope of the topics.  He can answer, but it will
21 be in his individual capacity.
22         MR. CRONE:  Well, and -- and -- and that's
23 okay.  I mean, however we get the information.
24   A.   I do not know.
25   Q.   (BY MR. CRONE)  Don't know.  Okay.

194

1          Let's -- so your lawyer just sent a
2  document.  I want to take a look at it.  Believe it
3  or not, I am very close to the end of what I had
4  planned.
5          MS. KITSON:  Sorry.  Making it worse.
6          MR. CRONE:  No, you're okay.  I just wanted
7  to -- oh, okay.
8    Q.   (BY MR. CRONE)  And then --
9          MR. CRONE:  Don't worry, we don't have to
10 add that, too, but thank you, Danielle, for that.
11   Q.   (BY MR. CRONE)  And then -- okay.  I think
12 we've got just a couple more.  Okay.  Yeah.  So this
13 one's marked Exhibit 25.  I'll send it to Danielle.
14 I'll send it to you.
15         And same, Mr. Arellano, if you can review
16 once you've received it.
17   A.   Okay.  I'm in there now.
18   Q.   Thank you.
19   A.   Okay.
20   Q.   Okay.  So here, this is an e-mail from
21 Shelly Leyner to yourself dated June 4, 2015; is that
22 correct?
23   A.   That is correct.
24   Q.   Okay.  And -- and Ms. Leyner says, Jerry, I
25 looked at the cert, and Tammy approved IFM for

195

1  relapse prevention counseling and support group
2  meetings.  It states approaching nine months of
3  sobriety.  Let me know what you would like us to do
4  from here.
5    A.   Okay.
6    Q.   So who is -- who's Tammy?
7    A.   Tammy would have been somebody -- I'm
8  trying to think.  She was temporarily -- no, I
9  think she was one of our coordinators in our
10 leave-of-absence department.
11   Q.   And then --
12   A.   Like the LOA coordinator.
13   Q.   Okay.
14   A.   Yeah.
15   Q.   Okay.  And then -- and then the cert that
16 Ms. Leyner is referring to, what -- what's the cert
17 that she's referring to?
18   A.   The medical certification form that's
19 attached to the intermittent FMLA application.
20   Q.   Okay.
21   A.   There's a section that the medical
22 physician will complete, and that's returned, and
23 that's how they determine if the leave will be
24 approved or not based on what's noted in that
25 certification form.

196

1    Q.   Got it.  Okay.  So based on what was in
2  that form, IFM, intermittent FMLA leave, was approved
3  for prevention counseling and support group meetings.
4  Is that -- is that -- is that what Ms. Leyner is
5  stating here?
6    A.   Yes.  Tammy reviewed and approved it for
7  that specific reason, correct.
8    Q.   Okay.  Great.  Okay.
9          And if we're all lucky, I'm handing you the
10 last one.  And I'll send it to -- this is a longer
11 document, so when you get it, if you could open it
12 and tell me if you've seen the document before,
13 because we don't necessarily need to review it all,
14 but maybe we do.
15   A.   Okay.  Yes, I have.
16   Q.   Okay.  And this is exactly what it's
17 titled, right?  This is Frontier's answer to
18 Rebecca Brigham's lawsuit and Frontier's defenses to
19 the lawsuit; is that correct?
20   A.   Yes, that's what the document states.
21   Q.   Okay.  Can you skip down to page 9?
22         MS. KITSON:  9?
23         MR. CRONE:  Yeah, please.
24   A.   Okay.
25   Q.   (BY MR. CRONE)  So do you see the head --

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

197

1 the heading "Defenses" kind of in the middle of the
2 page?

3     A.   I do.

4     Q.   And then there's a numbered list of
5 defenses.  And these are Frontier's defenses to
6 Ms. Brigham's lawsuit, right?

7          MS. KITSON:  Object to the form.

8     A.   I would have to read it.  I don't know.

9     Q.   (BY MR. CRONE)  Okay.  Feel free to read
10 it, and then just the -- I'm only going to ask you
11 about the list of defenses, and not all of them.

12     A.   Okay.

13     Q.   But -- so that's Numbers 1 through 17.  I
14 just have a few questions about those.

15     A.   Okay.  Okay.

16     Q.   Okay.  So on -- on page 9, Number 3, do you
17 see where Frontier wrote, Upon information and
18 belief, Plaintiff has failed to mitigate her damages,
19 if any?  Do you see that line?

20     A.   I do.

21     Q.   What does Frontier mean by Plaintiff has
22 failed to mitigate her damages?

23          MS. KITSON:  Object to the form, calls for
24 a legal conclusion, and outside the scope of the
25 topics.

198

1          So Mr. Arellano can answer to the extent he
2 can, but it will be in his individual capacity.

3          MR. CRONE:  And -- and -- and we can -- we
4 can -- we can argue about whether his testimony is
5 inside or outside of the scope.  Of course that's a
6 question we can brief down the road, and I'm happy to
7 do that if -- if we -- if we need to.

8     Q.   (BY MR. CRONE)  But, again, Mr. Arellano,
9 the question is, for Number 3 where Frontier wrote,
10 Plaintiff has failed to mitigate her damages, what
11 is -- what is Frontier alleging there?

12          MS. KITSON:  Same objections.

13          You can answer.

14     A.   All right.  I'm not sure.  I'm not a -- not
15 a lawyer to be able to answer it.

16     Q.   (BY MR. CRONE)  That's fine.

17     A.   Yeah.

18     Q.   That's fine.

19     A.   Yeah.

20     Q.   In many more ways than you know, you're
21 very lucky to not be a lawyer, so . . .

22          And then Number 5, which is on page 10, it
23 says, Plaintiff's claim is barred because no adverse
24 employment action was taken because of any
25 disability.

199

1          Do you know what -- what -- what Frontier
2 is getting at there?

3          MS. KITSON:  Same objections.  Legal
4 conclusion, outside of the scope.  He can answer but
5 in his individual capacity.

6     A.   Again, I'm not a lawyer, so I can't speak
7 to that.

8     Q.   (BY MR. CRONE)  Okay.  Number 6, it says,
9 The challenged actions about which Plaintiff
10 complains would still have been taken irrespective of
11 any alleged impermissible motivating factor.

12          Any idea what that means?

13          MS. KITSON:  Same objections.

14     A.   Again, I'm not a lawyer to be able to
15 respond to that.

16     Q.   (BY MR. CRONE)  Sure.  And Number 8, it
17 says, The accommodations requested by Plaintiff were
18 not reasonable and would have imposed an undue burden
19 on Frontier.

20          What's Frontier getting at in Number 8?

21          MS. KITSON:  Same objections.

22     A.   Again, I'm not a -- I don't have the legal
23 knowledge to be able to respond to that.

24     Q.   (BY MR. CRONE)  So which accommodations did
25 Plaintiff request of Frontier?

200

1     A.   I mean, I --

2     Q.   You -- you -- you've testified to that
3 today, haven't you?

4     A.   I have.

5     Q.   Okay.

6     A.   And so what accommodations have we
7 accommodated Ms. Brigham?

8     Q.   No, no.  Which -- which were requested by
9 Ms. Brigham?  I'm -- I'm pretty sure you testified to
10 that already today.

11     A.   Yeah.  In the form of time off, so we did
12 accommodate her in that form.

13          MS. KITSON:  I think the question is what
14 did she request.

15     Q.   Oh, what was the question?  What did she
16 request?

17     Q.   Yeah, yeah, yeah.  What did Ms. Brigham
18 request of Frontier?

19     A.   Oh.  She requested adjustments to her
20 schedule.  She requested no layovers, no overnights.
21 She requested roles or responsibilities at the GO at
22 the time.  She requested that trips be dropped for
23 her.  She requested -- yeah, pretty much, that was
24 it.  Oh, and to be able to pick up trips in open
25 time.

## FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020

201

1    Q.   Okay.  And so looking back at Number 8,
2 just the first part of the sentence, "The
3 accommodations requested by Plaintiff," you're
4 aware of what accommodations were requested by
5 Plaintiff.  You don't have to be a lawyer to get that
6 part of the sentence, right?
7    A.   Right.
8    Q.   Okay.  And the next few words, "were not
9 reasonable."  What was not reasonable?  Let's just
10 take it one little bit at a time.  What was not
11 reasonable about those requested accommodations?
12         MS. KITSON:  Same objections.  If
13 Mr. Arellano wants to testify regarding why the
14 accommodations were denied, that's fine.  This is a
15 question about whether they're reasonable or pose an
16 undue burden under the law, under the ADA.
17    Q.   (BY MR. CRONE)  So, Mr. Arellano, are you
18 able to testify about what was not reasonable about
19 those requested accommodations?
20    A.   No, I am not.
21    Q.   Okay.  I'm going to try to short-circuit
22 this.  You've reviewed the rest of these asserted
23 defenses.  Are you able to testify about the facts
24 underlying any of these asserted defenses by
25 Frontier?

202

1         MS. KITSON:  Same objections.  Legal
2 conclusion, outside the scope.  He can answer in his
3 individual capacity.
4    A.   Unfortunately, I'm not able to.  I don't
5 have the legal knowledge to be able to speak to them.
6    Q.   (BY MR. CRONE)  That's -- that's okay.
7 Thank you.  And that will save us a few more minutes
8 at the end here.
9         MR. CRONE:  So if you -- if you will -- if
10 you -- if we could take a five-minute break, I want
11 to just sort of do a quick circle through my notes,
12 make sure we didn't miss anything important, and then
13 after that, your lawyer may or may not have some
14 follow-up questions.  And then maybe we will be done
15 by 3:00.
16         So I will -- we can go off the record now,
17 and I'll see you in just a few minutes.
18         THE WITNESS:  Sounds good.
19         THE VIDEOGRAPHER:  The time now is 2:49.
20 We're off the record.
21         (Recess from 2:49 p.m. to 3:01 p.m.)
22         THE VIDEOGRAPHER:  The time now is 3:01.
23 We're back on the record.
24    Q.   (BY MR. CRONE)  Okay.  Thanks,
25 Mr. Arellano.  I just have a couple follow-up

203

1 questions on the bid process.
2    A.   Okay.
3    Q.   So that's -- so how flight attendants bid
4 for their -- for the trips.
5    A.   Okay.
6    Q.   And so is it correct that flight attendants
7 bid once a month for the trips that will go on their
8 schedule?
9    A.   Yes.
10    Q.   And then after all the flight attendants
11 bid by whatever the date is -- whatever the deadline
12 is for them to bid, then the schedule's created,
13 right?
14    A.   Shortly after, yes.  So the bid closes on
15 the 15th.
16    Q.   On the 15th.  And then shortly after the
17 15th, the schedule's created.  And after the
18 schedule's created, not all of the trips are covered,
19 are they?
20    A.   What do you mean, "covered"?
21    Q.   So -- so -- so trips that weren't bid on
22 and nobody's -- there's no coverage, they go into
23 something called open time, right, that anybody can
24 then further bid on; is that correct?
25    A.   That is correct.

204

1    Q.   Okay.  Now, was Ms. Brigham, as part of her
2 request for a modified schedule -- was she -- did she
3 ask Frontier to be allowed to just bid on that open
4 time so -- in order to -- in order to deal with
5 Frontier's anxiety that -- that the modified schedule
6 might violate the CBA?
7    A.   It's a little bit different.  It's not that
8 you bid for open time.  You can pick up trips in open
9 time.  Open time is not seniority-based.  It's first
10 come first serve.
11    Q.   So -- so Ms. Brigham could have built her
12 schedule solely from open time?
13    A.   Open time is only allowed in certain
14 circumstances, and people who have access to that,
15 essentially, were not allowed to bid.
16         And so if you're returning from a leave of
17 absence and you didn't have an opportunity to submit
18 a bid, then you had the opportunity -- meaning
19 continuously, I should say -- then you would have
20 the ability -- to not penalize them, you would have
21 the opportunity to then pick up trips out of open
22 time.
23    Q.   Okay.  See, I'm -- so I guess that's my
24 question is that if Frontier granted Ms. Brigham
25 permission to build her schedule only from open time

**ROCKY MOUNTAIN REPORTING**
**(720) 872-9910**

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

205

1 rather than bid --

2    A.  Uh-huh.

3    Q.  -- then the seniority provision in the CBA

4 would not have been implicated at all?

5    A.  But you also have to look at her status,

6 and I think we talked about this earlier.  It's her

7 active status in the system.

8        So if an employee is on active status, then

9 the rules and regulations regarding bidding apply.

10 And so Ms. Brigham was an active flight attendant,

11 so, therefore, she had to follow the rules and

12 regulations outlined under the eligible-to-bid

13 section of the contract --

14   Q.  Do you know --

15   A.  -- therefore, did not --

16   Q.  I'm sorry.  Go ahead.

17   A.  Therefore, did not have access to pick up

18 or build her trips through open time.  That's only

19 for individuals who are considered on leave status in

20 the system.

21   Q.  Yeah.  Do you know if the union requested

22 that Ms. Brigham be allowed to build her schedule

23 from open time?

24   A.  Outside of that document you showed me

25 earlier, no, I was not aware of it.

206

1    Q.  Okay.  And by "that document," are you

2 referring to Adrienne Prince's declaration?

3    A.  That is correct.

4    MR. CRONE:  Okay.  Those are all the

5 questions I have for you, Mr. Arellano, and I thank

6 you very much.

7        And I don't know if your lawyer has any

8 follow-up, but barring that, then that's all we have

9 for you today.

10   THE WITNESS:  Okay.

11   MS. KITSON:  John, when you say that's all

12 you have, are you done completely, or are you

13 reconvening tomorrow for the individual dep, or

14 what's your plan?

15   MR. CRONE:  Yeah, that's -- do you want to

16 talk off the record about that, or do you want to

17 stay --

18   MS. KITSON:  Sure.  Yeah, let's go off the

19 record for a moment.

20   THE VIDEOGRAPHER:  The time now is

21 3:04 p.m.  We're off the record.

22   (Discussion off the record.)

23   THE VIDEOGRAPHER:  The time now is

24 3:06 p.m.  This concludes today's portion of the

25 videotaped deposition of our 30(b)(6) witness.  We're

207

1 off the record.

2        (The following proceedings were held on the

3 stenographic record only:)

4    THE REPORTER:  Would you both like a copy

5 of the transcript?

6    MR. CRONE:  Plaintiff says yes.

7    MS. KITSON:  Yes as well.

8    THE REPORTER:  Okay.  Both electronic?

9    MR. CRONE:  Yeah, please.

10   THE REPORTER:  And a copy of the exhibits?

11   MR. CRONE:  Please, yeah.

12   MS. KITSON:  Yes.

13   THE REPORTER:  Okay.  And you'll handle

14 reading and signing, Ms. Kitson?

15   MS. KITSON:  Yes, for sure.

16   THE REPORTER:  Okay.

17   MR. CRONE:  Thank you very much.

18   THE REPORTER:  Thank you.

19   WHEREUPON, the foregoing deposition was

20 concluded at the hour of 3:07 p.m. on July 13, 2020.

21        *   *   *   *   *

22

23

24

25

208

1        I, GERARDO ARELLANO, do hereby certify that

2 I have read the foregoing transcript and that the

3 same and accompanying amendment sheets, if any,

4 constitute a true and complete record of my

5 testimony.

6

7

8        _____

         GERARDO ARELLANO

9

10   ( ) No Amendments

11   ( ) Amendments Attached

12

     Subscribed and sworn to before me this

13

_____ day of _____, 2020.

14

15

     Notary Public:_____

16

     Address: _____

17

         _____

18

19

     My Commission Expires: _____

20

     Seal:

21

22

23

24

25

**FRONTIER AIRLINES / GERARDO ARELLANO - July 13, 2020**

209

1 WITNESS:  GERARDO ARELLANO

2 DATE OF DEPOSITION:  July 13, 2020

3 CASE:  Brigham v. Frontier Airlines, Inc.

4                    ERRATA SHEET

5 PAGE    LINE            CHANGE          REASON

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 Signature_____Date_____

210

1              REPORTER'S CERTIFICATE

2 STATE OF COLORADO      )

                         ) ss.

3 COUNTY OF DENVER       )

4       I, JILL S. NIELSEN, do hereby certify that I

  am a Registered Professional Reporter and Notary

5 Public within the State of Colorado; that previous to

  the commencement of the examination, the witness was

6 duly sworn by me to testify to the truth.

7       I further certify this deposition was taken

  remotely in shorthand by me at the time herein set

8 forth, and that it was thereafter reduced to

  typewritten form, and that the foregoing constitutes

9 a true and correct transcript.

10       I further certify that I am not related to,

  employed by, nor of counsel for any of the parties or

11 attorneys herein, nor otherwise interested in the

  result of the within action.

12

       IN WITNESS WHEREOF, I have hereunto affixed

13 my hand and seal this 22nd day of July, 2020.

14 My commission expires July 7, 2023.

15 _____

     JILL S. NIELSEN, RPR

16   Notary Public in and for the

     State of Colorado

17

18

19

20

21

22

23

24

25

**ROCKY MOUNTAIN REPORTING**
**(720) 872-9910**