Page 1

1

        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLORADO
3    Civil Action No. 19-cv-03417-STV

4    _____

5    REBECCA BRIGHAM,
6            Plaintiff,
7    vs.
8    FRONTIER AIRLINES, INC.,
9            Defendant.
10   _____
11        VIDEO VIDEOCONFERENCED DEPOSITION OF
               REBECCA LEIGH BRIGHAM
12               August 31, 2020
     _____
13

     VIDEOCONFERENCED APPEARANCES:
14

     ON BEHALF OF THE PLAINTIFF:
15           JOHN REILY CRONE, ESQ.
             EVAN GRIMES, ESQ.
16           John R. Crone, LLC
             4550 East Cherry Creek Drive South, Suite 1003
17           Glendale, Colorado  80246
             Phone:  303-598-3526
18           Email:  john@crone-law.com
             Email:  evan@crone-law.com
19

     ON BEHALF OF THE DEFENDANT:
20           DANIELLE L. KITSON, ESQ.
             CAROLYN THEIS, ESQ.
21           Littler Mendelson, P.C.
             1900 16th Street, Suite 800
22           Denver, Colorado  80202
             Phone:  303-629-6200
23           Email:  dkitson@littler.com
             Email:  ctheis@littler.com
24

     ALSO PRESENT: Cole Bartelt, Videographer
25               Jacalyn Peter
     Job No. CS4229140

Page 2

```
 1            PURSUANT TO WRITTEN NOTICE and the
 2   appropriate rules of civil procedure, the video
 3   videoconferenced deposition of REBECCA LEIGH BRIGHAM,
 4   called for examination by the Defendant, was taken
 5   remotely, commencing at 8:07 a.m  on August 31, 2020,
 6   before Laurel S  Tubbs, a Registered Professional
 7   Reporter, Certified Realtime Reporter and Notary Public
 8   in and for the State of Colorado
 9                     INDEX
10   EXAMINATION:                   PAGE
11   By Ms  Kitson                     8
     By Mr  Crone                    220
12
13   EXHIBITS:                      PAGE
14   Exhibit 3   2016 W-2 from Great West Painting and   203
          Repair
15   Exhibit 4   2016 W-2 from EmployerBridge       50
          Southwest
16
     Exhibit 5   2017 W-2 from Great West Painting and   50
17        Repair
18   Exhibit 6   2018 W-2 from Great West Painting and   51
          Repair
19
     Exhibit 7   2015 1099-G from Colorado Department   203
20        of Labor and Employment
21   Exhibit 11  Certification of Healthcare Provider   145
          for Employee's Serious Health
22        Condition (Family and Medical Leave
          Act) Intermittent Leave of Absence
23
     Exhibit 12  Certification of Healthcare Provider   157
24        for Employee's Serious Health
          Condition (Family and Medical Leave
25        Act) Intermittent Leave of Absence
```

Page 3

```
 1   EXHIBITS (Cont'd):                PAGE
 2   Exhibit 14  Email Stream           167
 3   Exhibit 15  Email Stream           179
 4   Exhibit 16  Inflight Dependability Performance    33
          Counseling Record
 5
 6   Exhibit 17  Certification of Healthcare Provider   134
          for Employee's Serious Health
 7        Condition (Family and Medical Leave
          Act)
 8   Exhibit 23  Frontier Airlines Job Description   118
 9   Exhibit 24  Treatment Plan Dated May 1, 2015      152
10   Exhibit 32  Transcription of Recording by Hunter   163
          + Geist, Inc
11
12   Exhibit 33  Transcription of Recording by Hunter   173
          + Geist, Inc
13   Exhibit 34  Transcription of Recording by Hunter   182
          + Geist, Inc
14
     Exhibit 36  Fax Cover Sheet Dated November 8,    139
15        2014, from Mr  Riemann re: Rebecca
          Brigham Release
16
     Exhibit 37  Email Stream           114
17
     Exhibit 41  Comanche Crossing Counseling, LLC    119
18        Intake Sheet
19   Exhibit 42  Number 1 Audio-recorded Transcription   161
20   Exhibit 43  Number 2 Audio-recording      171
          Transcription
21
22   Exhibit 44  Investigatory Meeting       182
23   Exhibit 46  Text Messages Between Ms  Coppedge   184
          and Ms  Brigham
24   Exhibit 47  Text Messages Between Mr  Dale Kinsey   200
          and Ms  Brigham
25
```

Page 4

```
 1   PREVIOUSLY MARKED EXHIBITS:         PAGE
 2   Exhibit 1   Association of Flight Attendants-CWA   84
          AFL-CIO
 3        Frontier Airlines Flight Attendant
          Contract 2011-2016
 4
     Exhibit 20  Document Entitled "Untitled"       112
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1             P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  Good morning.  We're on
 3   the record at 8:07 a.m. on Monday, August 31st, 2020.
 4   Please note that the microphones are sensitive and may
 5   pick up whispering, private conversations, and cellular
 6   interference.  Please turn off all cell phones or place
 7   them away from the microphones, as they can interfere
 8   with the deposition audio.  Audio and video recording
 9   will continue to take place unless all parties agree to
10   go off the record.
11        This is Media Unit 1 of the video-recorded
12   deposition of Rebecca Brigham, being taken by counsel for
13   the Defendant in the matter of Rebecca Brigham versus
14   Frontier Airlines, filed in the United States District
15   Court for the District of Colorado, Case Number
16   19-cv-03417.  This deposition is being held via remote
17   video deposition located in Genesee County, Michigan.
18        My name is Cole Bartelt from the firm
19   Veritext, and I'm the videographer.  The court reporter
20   is Laurel Tubbs from the firm Veritext.
21        I am not authorized to administer an oath.
22   I'm not related to any party in this action, nor am I
23   financially interested in the outcome.  Counsel and
24   all -- counsel and all present and appearing remotely
25   will now go ahead and state their appearances and
```

Page 6

1  affiliations for the record.
2      MR. CRONE:  John Crone for the Plaintiff,
3  Rebecca Brigham.
4      MR. GRIMES:  Evan Grimes for the
5  Plaintiff.
6      MS. KITSON:  Danielle Kitson for the
7  Defendant, Frontier Airlines, and with me is
8  Caroline Theis from my firm and Jacalyn Peter from
9  Frontier.
10      MS. BRIGHAM:  And Rebecca Brigham,
11  Plaintiff.
12      THE VIDEOGRAPHER:  And will the court
13  reporter please enter the statement for remote
14  proceedings into the record.
15      THE REPORTER:  The attorneys participating
16  in this deposition acknowledge that I am not physically
17  present in the deposition room and that I will be
18  reporting this deposition remotely.  They further
19  acknowledge that in --
20      (Discussion off the record.)
21      THE VIDEOGRAPHER:  We're going off the
22  record at 8:09 a.m.
23      (Discussion off the record.)
24      THE VIDEOGRAPHER:  We're going back on the
25  record at 12:00 a.m. (sic).

Page 7

1      Will the court reporter please read the
2  statement for remote proceeding on the record.
3      THE REPORTER:  The attorneys participating
4  in this deposition acknowledge that I am not physically
5  present in the deposition room and that I will be
6  reporting this deposition remotely.  They further
7  acknowledge that in lieu of an oath administered in
8  person, the witness will verbally declare his/her
9  testimony in this matter is under penalty of perjury.
10  The parties and their counsel consent to this arrangement
11  and waive any objections to this manner of reporting.
12      Please indicate your agreement by stating
13  your name and your agreement on the record, beginning
14  with the taking attorney.
15      MS. KITSON:  This is Danielle Kitson.  I
16  agree.
17      MR. CRONE:  John Crone.  Agree.
18      MR. GRIMES:  Evan Grimes.  I agree.
19      MS. THEIS:  Caroline Theis.  I agree.
20      THE VIDEOGRAPHER:  And will the court
21  reporter please swear in the witness.
22      REBECCA LEIGH BRIGHAM,
23  having been first duly sworn or affirmed, was examined and
24  testified as follows:
25      THE REPORTER:  Thank you.

Page 8

1      EXAMINATION
2  BY MS. KITSON:
3      Q.  Good morning, Ms. Brigham.  How are you
4  today?
5      A.  Good morning.  Good.  How are you?
6      Q.  Good.  Thank you.
7      Would you please state your full name for
8  the record.
9      A.  Rebecca Leigh Brigham.
10      Q.  And what's your current address?
11      A.  10148 Green Road, Goodrich, Michigan
12  48438.
13      Q.  Have you ever been deposed before?
14      A.  No.
15      Q.  Okay.  Do you understand that you're under
16  oath here today?
17      A.  Yes.
18      Q.  Do you understand that that oath is the
19  same oath that you would take in a court of law?
20      A.  Yes.
21      Q.  Have you ever participated in an online
22  deposition in this case in the past?
23      A.  Not participated, but watched.
24      Q.  Okay.  And which deposition was that?
25      A.  Both Jerry Arellano's.

Page 9

1      Q.  So then you know a little bit of the drill
2  then?
3      A.  Yeah.
4      Q.  Do you understand that you're being
5  recorded here today?
6      A.  Yes.
7      Q.  And do you understand that your words are
8  also being taken down by the court reporter, Laurel, who
9  you see on the screen there?
10      A.  Yes.
11      Q.  Would you agree to give verbal responses
12  for Laurel today, for the court reporter, with a Yes or a
13  No, instead of a shake of your head or an uh-huh, huh-uh?
14  It makes it a little bit easier for us to have a clean
15  record.
16      A.  Yes.  And I do have to warn you, Danielle,
17  I have like head tremors, and this tends to make them
18  worse.  So if you see me shaking my head no, it is not me
19  saying no.  It is my head tremors.
20      Q.  Thank you for clarifying that.  So I may
21  ask you then -- if I see that at any point today, and I
22  have a question about it or want to ask you --
23      A.  Yes.
24      Q.  -- I will definitely clarify.  So thank you
25  for that.

3 (Pages 6 - 9)

Page 10

1    A.  Okay.  I also want to point out that it's
2  just me here with my two children.  My husband is
3  actually up north.  So we may need to take a few more
4  breaks than normal.  And my kids are instructed that they
5  can come get me if it's like super important.  So I'm
6  going to apologize in advance if we get interrupted, but
7  we'll just have to kind of deal with it.
8    Q.  No problem.  That's what I call the COVID
9  new normal, right?  Mine are downstairs doing their online
10  assignments right now too.  So...
11    Is there anybody in the room with you right
12  now?
13    A.  No.  No.
14    Q.  Will you tell me at any point if there is
15  someone in the room with you that I can't see on the
16  screen?
17    A.  Yes.  And you'll see right through there
18  (indicating.
19    G).  That door is where my kids would come
20  busting through.
21    Q.  Okay.  This is an interesting format for a
22  deposition.  So I'm going to ask you a few questions I
23  don't usually ask.
24    A.  Okay.
25    Q.  But will you agree not to communicate with

Page 11

1  your counsel via text or instant message or any other
2  means while you are on the record --
3    A.  Yes.
4    Q.  -- answering my questions?
5    A.  Yes.
6    Q.  Okay.  If at any point --
7    MS. KITSON:  And -- and can I then also get
8  that commitment too from Mr. Crone and Mr. Grimes?  Will
9  you commit to not communicating with your client -- or
10  your client while she's on the record answering questions
11  in a text message format or an instant message?
12    MR. CRONE:  Danielle, of -- of course.  So
13  neither I nor Mr. Grimes would do anything improper
14  during -- during the deposition.
15    Q.  (By Ms. Kitson)  Ms. Brigham, your counsel,
16  Mr. Grimes and Mr. Crone, may make objections today.  As
17  you probably saw from Mr. Arellano's deposition, those
18  objections are for the record, unless they specifically
19  instruct you not to answer.  So the typical process is I
20  ask questions, they may object, and then you can answer
21  the questions.
22    Do you understand that?
23    A.  Yes.
24    Q.  Will you agree to give me full and complete
25  answers to my questions?

Page 12

1    A.  Yes.
2    Q.  Will you let me know at any point if
3  there's something you want to add to a prior answer?
4    A.  Yes.
5    Q.  At any point today if there's something you
6  do not understand about the questions that I'm asking you,
7  will you let me know that?
8    A.  Yes.
9    Q.  At any point today if you experience
10  technical difficulties, you're having difficulty hearing
11  me or hearing anyone else on the call, will you let me
12  know that right away?
13    A.  Yes.
14    Q.  We can take breaks whenever you need, for
15  your children or any other reason.  If you need a restroom
16  break, what have you.  But I would just ask that you
17  answer the question that's pending before we break.
18    Is that fair?
19    A.  Okay.  Sure.
20    Q.  At the end of this, you'll have an
21  opportunity to review the transcript that our court
22  reporter is taking down.
23    Will you agree to do that and fix any
24  inaccuracies in the record?
25    A.  Yes.

Page 13

1    Q.  How are you feeling today?
2    A.  Ready to get this over with.
3    Q.  Are you feeling sick at all?
4    A.  No.  I developed a little bit of a cough
5  this morning, but I don't think it's anything serious.
6    Q.  Is it anything that in any way impacts your
7  ability to think clearly or answer questions?
8    A.  No.
9    Q.  Is it anything that impacts your ability to
10  recall events clearly?
11    A.  No.
12    Q.  Have you taken any drugs in the past
13  24 hours?
14    A.  No.  Well, I mean, I took levothyroxine
15  this morning, which is because I don't have a thyroid.
16    Is that what you're considering drugs?
17    Q.  Well, however you consider it.  So --
18    A.  Okay.
19    Q.  -- sure.  Are there any drugs that you've
20  taken in the past 24 hours that would impact your ability
21  to think clearly?
22    A.  No.
23    Q.  Have you had any alcohol in the past
24  24 hours?
25    A.  No.

4 (Pages 10 - 13)

Page 14

1    Q.   Are you currently under a doctor's care for
2    any medical condition?  You mentioned a thyroid issue?
3        A.   Yeah.  That was taken out when my daughter
4    was about a year old.  And I've been on levothyroxine
5    since.
6        Q.   And what is levo- -- can you pronounce that
7    again.  I'm sorry.
8        A.   Levothyroxine.  It's thyroid hormone
9    replacement drug since I don't have a thyroid to produce
10   any of those natural stuff, it just -- yeah.
11       Q.   And do you take that daily?
12       A.   Every morning.
13       Q.   And do you know what the dosage is?
14       A.   I believe I'm on 200 milligrams right now.
15       Q.   Are there any other medications that you're
16   taking?
17       A.   Occasionally at nighttime, I'll take
18   Trazodone for sleep.
19       Q.   Anything else?
20       A.   That's it.
21       Q.   And I asked you if you were currently under
22   a doctor's care for any medical condition.
23           Other than your thyroid condition, are
24   there any other medical conditions that you're being
25   treated for?

Page 15

1        A.   Not currently.
2        Q.   Is there anything at all that would affect
3    your ability to testify truthfully and accurately here
4    today?
5        A.   No.
6        Q.   At any point if you have trouble
7    understanding me or thinking clearly or recalling events,
8    will you let me know that?
9        A.   Yes.
10       Q.   I want to ask you a little bit about what
11   you did to prepare for your deposition today.
12           First of all, you're represented here today
13   by Mr. Crone and Mr. Grimes; is that correct?
14       A.   Correct.
15       Q.   Before Mr. Crone and Mr. Grimes, did you
16   consult with any other attorney?
17       A.   My brother.
18       Q.   What's your brother's name?
19       A.   Joshua Kruger.
20       Q.   When did you first speak with Mr. Kruger,
21   without telling me what you discussed with him?
22       A.   Well, my brother I've talked to about this
23   since basically I was fired.  He helped me do the
24   rebuttal.  He helped me out in the beginning before I
25   hired Mr. Crone.  And I had also hired -- well, not

Page 16

1    really hired.  I had met another attorney, his name was
2    Jeff Bram (phonetic), right after this, and I had met him
3    through another guy, and they're the ones that sort of
4    told me more about the ADA.  And they were supposedly
5    working on my case, and then that just turned out weird.
6           They -- I -- from what I remember,
7    Mr. Bram was disbarred or something weird.  He was also
8    an alcoholic.  So I don't know if he, like, relapsed or
9    what happened, but I just lost contact with them.  And
10   it's -- I never had any type of an agreement with either
11   of them.  They were just kind of working on the case.
12       Q.   Okay.
13       A.   It was more of like a fun thing.
14       Q.   So they weren't your attorneys?
15       A.   No, no.
16       Q.   What did they tell you that they thought of
17   your case?
18       A.   They thought it was a decent case and I
19   should definitely take it forward.
20       Q.   Did they say anything about, you know,
21   weaknesses or problems with your case?
22       A.   Not that I can recall.
23           MR. CRONE:  I'm -- I'm going -- I'm going
24   to put an objection on the record too on the basis of
25   attorney-client privilege.

Page 17

1        Q.   (By Ms. Kitson)  When did you consult with
2    Mr. Bram first?
3        A.   I met him through a -- it was a chance
4    meeting at a Jiffy Lube right before my final termination
5    hearing from Frontier.  I was at Jiffy Lube, and I had a
6    bunch of stuff on the ADA, and I was working on my case
7    to present to Frontier at my final termination.
8           And there happened to be a gentleman
9    sitting next to me who had asked me what I was working
10   on.  And I basically told him, you know --
11           MR. CRONE:  Hold on.  Hold on, Rebecca.
12           Objection.  So Rebecca's not going to talk
13   about her conversations with counsel, whether it was in,
14   you know, a prospective attorney-client relationship,
15   which is also confidential and privileged, or they
16   actually formed an attorney-client relationship.
17           Don't answer any more of these questions,
18   Rebecca.
19           THE DEPONENT:  Okay.
20       Q.   (By Ms. Kitson)  And I believe my question,
21   Ms. Brigham, was when did you meet.  I think you answered
22   that.  It was right around the time of your termination
23   in --
24       A.   It would have been in late October, I
25   believe.

Veritext Legal Solutions
800-567-8658                                                    973-410-4098

Page 18

1    Q.  Okay.  And how long were you talking with
2  Mr. Bram before you ended your communication with him?
3    A.  Two or three months.
4    Q.  After those two or three months, when was
5  the next time that you consulted an attorney about this?
6    A.  My brother.  And he's the one that helped
7  me --
8    MR. CRONE:  Again, hold on, Rebecca.
9    Let me put an objection on the record on
10  the basis of attorney-client privilege.  When she talked
11  to her brother, of course, is fine.
12    But don't testify about what you talked
13  about.
14    THE DEPONENT:  Okay.
15    MR. CRONE:  Thanks.
16    Q.  (By Ms. Kitson)  So I'll just repeat that
17  question.
18    I believe you said you began speaking with
19  your brother about this about two or three months after
20  you had stopped communicating with Mr. Bram; is that
21  correct?
22    A.  Well, he knew about it the whole time.
23    Q.  How long was it that you -- before you
24  started speaking with Mr. Crone and/or Mr. Grimes?
25    A.  It was after I had spoke with you on the

Page 19

1  phone and said that I would like to contact an attorney.
2  That's when I got hooked up with Mr. Crone.
3    Q.  That would have been -- my memory is really
4  bad.
5    Was that about a year ago; would you say?
6    A.  Yeah.  Approximately.
7    Q.  And other than Mr. Crone and Mr. Grimes,
8  have you ever spoken with another attorney about this
9  case, other than also Mr. Bram and your brother?
10    A.  I had spoke with a few attorneys while I
11  was looking for them -- for somebody to represent me, at
12  the time that I hired Mr. Crone.
13    Q.  But you never formed an attorney-client
14  relationship with any of them?
15    A.  No.
16    Q.  What did you do to prepare for your
17  deposition today?
18    A.  The one today?  Or the one that was
19  supposed to happen last week.
20    Q.  Let's take them both.
21    A.  Okay.  So the one that was supposed to
22  happen last week when I flew out to Colorado, I met with
23  John and Evan, and we reviewed the lawsuit and some of
24  the things that we had submitted and also the economist's
25  report.

Page 20

1    Q.  How long did you meet?
2    A.  I want to say it was maybe three or four
3  hours.
4    Q.  Was there anyone else present when you met
5  with the two of them?
6    A.  My brother did come for lunch.
7    Q.  Anyone else?
8    A.  No.
9    Q.  Okay.  I believe you said that you also
10  prepared for the call today; is that right?
11    A.  Yeah.  And I just spent a few minutes last
12  night sort of reviewing the lawsuit again, and I
13  re-listened to some of those parts of those recordings
14  that I have.
15    Q.  How many times have you met with Mr. Crone
16  or Mr. Grimes in person?
17    A.  Once.
18    Q.  Just the time that you came out here for
19  your deposition a couple weeks ago -- a week ago?
20    A.  Yeah.
21    Q.  How many times have you spoken with them on
22  the phone?
23    A.  Lots.
24    Q.  About how frequently?
25    A.  It just depends on what's going on in the

Page 21

1  case.  Sometimes, it's every couple of days.  Sometimes,
2  it would be two weeks before we talk again.
3    Q.  Who's paying your legal bills?
4    A.  Nobody.  I'm on a contingency.
5    Q.  Full contingency?
6    A.  Yes.
7    Q.  So you haven't paid any money for this case
8  to date?
9    A.  No.
10    Q.  And what is your contingency fee
11  arrangement?
12    MR. CRONE:  Hold on.  Objection.  So the
13  terms of the fee agreement are, of course, confidential
14  and privileged.
15    MS. KITSON:  They actually are not.  10th
16  Circuit law says that the terms of the fee arrangement
17  are discoverable.
18    MR. CRONE:  If you really want to know,
19  send me the case, and I'll review it.  But for now,
20  I'm -- I'm instructing her to not answer.
21    MS. KITSON:  All right.  It's Chimney Ross
22  Public Power District versus Tri-State Generation &
23  Transmission.  I'll give you that cite here.  It's
24  2013 U.S. District Lexis 67714.  And that's citing to the
25  10th Circuit authority.

6 (Pages 18 - 21)

Page 22

1     Q.  (By Ms. Kitson)  So after the next break,
2  I'll go ahead and ask you that question, Ms. Brigham.
3     A.  Okay.
4     Q.  Have you spoken with any attorneys from the
5  ACLU.
6     A.  No.
7     Q.  Okay.  Have you spoken with any attorneys
8  about other cases that are pending against Frontier
9  Airlines right now?
10     A.  Repeat that question.
11     Q.  Have you spoken with any attorneys about
12  other cases that are pending against Frontier Airlines?
13     A.  Have I?  No.
14     Q.  Are you aware of other cases that are
15  pending against Frontier Airlines?
16     A.  Yes.
17     Q.  Okay.  And what cases are you aware of?
18     A.  I know of a giant breast-feeding and
19  pregnancy discrimination.
20     Q.  And have you --
21     A.  Before you ask -- hold on, Danielle,
22  before you ask your next question, one of my children
23  just knocked.
24     Q.  Oh, okay.
25     MR. CRONE:  Danielle, do you know what the

Page 23

1  date is on that cite you gave me?
2     MS. KITSON:  It's May 13, 2013.
3     MR. CRONE:  Thank you.
4     A.  And I'm back.
5     Q.  (By Ms. Kitson)  Okay.  Actually, let me
6  step back for one moment.
7     Has Mr. Crone given you any kind of
8  statement of the number of hours that he or Mr. Grimes
9  have spent on the case?
10     A.  No.
11     MR. CRONE:  Again, an -- an objection
12  to -- to communications of -- regarding the
13  representation.  So -- so attorney-client privilege is
14  the objection.
15     MS. KITSON:  Yeah.  It's not -- it's
16  discoverable.  But I think she's answered. .
17     Q.  (By Ms. Kitson)  So you mentioned that
18  you're aware of these cases against Frontier involving
19  breast-feeding.
20     Have you spoken with anyone -- anyone about
21  this?
22     A.  Nobody from those cases, no.
23     Q.  Okay.  So no attorneys, no Frontier
24  employees, no one?
25     A.  I have not, no.

Page 24

1     Q.  Okay.  I have some general questions for
2  you about your background.
3     Where are you from, originally?
4     A.  From?  Golden, Colorado.
5     Q.  What states have you lived in?
6     A.  Just Colorado and Michigan, and for a
7  brief time when I was in treatment, I lived in
8  California.
9     Q.  Are you married currently?
10     A.  Yes.
11     Q.  And I believe you mentioned you have
12  children; is that correct?
13     A.  Yes, yes.
14     Q.  How many children do you have?
15     A.  I have two living children.
16     Q.  And one deceased; is that correct?
17     A.  Correct.
18     Q.  What's your husband's name?
19     A.  Sean Brigham.
20     Q.  How long have you been married?
21     A.  We got married in September of 2009.
22     Q.  Have you ever been married before
23  Mr. Brigham?
24     A.  No.
25     Q.  And what are the names and ages of your

Page 25

1  children?
2     A.  My daughter is Sylvia, and she will turn
3  10 tomorrow.  And my son is Kason Brigham, and he just
4  turned 6 April 14th.
5     Q.  Well, happy birthday to her, tomorrow.
6     A.  Thanks.  She's excited.
7     Q.  Yeah.  Mine just turned 9 in July.  So --
8     A.  Close to double digits.
9     Q.  Yeah.  I know.
10     Can you tell us a bit about your
11  educational history?
12     A.  Uh-huh.  I graduated high school.  I went
13  to Northeastern Junior College for a semester, and then I
14  did a few classes at Red Rocks Community College.
15     Q.  And when did you attend Red Rocks?
16     A.  It would have been when I was 19 or 20.
17     Q.  Have you ever had any military service?
18     A.  No.
19     Q.  What employers have you worked for?
20     A.  Oh, gosh.  I worked for Casa Bonita.  I
21  worked for Dairy Queen.  I worked for Pizza Hut.  I
22  worked for Andolini's.  I worked for a bowling alley that
23  was down the street from my parents' house.  And flight
24  attendant was what I had chosen for my career.
25     And then -- do you want me to keep going

7 (Pages 22 - 25)

Page 26

1  after?
2      Q.  Mm-hmm, sure.
3      A.  And then after I was terminated from
4  Frontier, I began work through a temp agency at --
5      THE REPORTER:  I'm sorry.  The name again
6  of the bakery?
7      THE DEPONENT:  Cakes -- Cakeheads Bakery.
8  And then I began working for Great West Painting &
9  Repair.
10     Q.  (By Ms. Kitson)  Any other employers?
11     A.  Not that I can think of right now.
12     Q.  So before beginning your career as a flight
13 attendant, you had a number of jobs at restaurants,
14 bowling alleys; is that correct?
15     A.  Yes.
16     Q.  And when did you begin working for
17 Frontier?
18     A.  In May of 2007.
19     Q.  When did you stop working for Frontier?
20     A.  November of 2015.
21     Q.  When did you begin working for Cakeheads
22 through the temp agency?
23     A.  On this, my dates are a little fuzzy.  But
24 I want to say I was on unemployment for about -- not even
25 three months when I got hooked up with the temp agency,

Page 27

1  and they had me go to the bakery.
2      Q.  How long did you work at Cakeheads?
3      A.  Four or five months maybe.
4      Q.  And when did you work for Great West
5  Painting?
6      A.  It was right after Cakeheads through the
7  end of 2018.
8      Q.  And you haven't worked for any other
9  employer since?
10     A.  No.  Well, I mean, technically I do take
11 care of my -- my husband's 94-year-old grandmother, if
12 you consider her an employer.
13     Q.  Do you receive any income?
14     A.  I do.  Yes.
15     Q.  What income do you receive?
16     A.  $12 an hour.  And pre-COVID, I would get
17 my kids on the bus in the morning.  And then I would go
18 over to her house, take care of her, hang out with her,
19 get her lunch, clean, do whatever she needed me to do.
20 And then I would be home by the time my kids got off the
21 bus.
22     Q.  How much income have you received in total
23 from working and taking care of your mother-in-law --
24 right?
25     A.  No.  My husband's grandmother.

Page 28

1      Q.  Grandmother.  Okay.
2      A.  I couldn't even give you a total.  It's
3  sort of varied.  And right now, I'm only going over there
4  one day a week because of COVID, trying to limit, you
5  know, possible spread.
6      Q.  Have you filed any tax documentation
7  related to your income from taking care of your husband's
8  grandma?
9      A.  No.  They're going to give me a 1099 at
10 the end of the year.
11     Q.  When did you begin taking care of her?
12     A.  I want to say it was probably starting in
13 February of this year.
14     Q.  Have you provided your counsel with any
15 kind of records of your earnings --
16     A.  No.
17     Q.  -- with taking care of her?  Okay.
18         And will you do that?
19     A.  I can.  I mean, she just -- she has a
20 trust account that her son writes me a check.  I just
21 keep track of my hours, and she -- or he writes me a
22 check from her trust account.
23     Q.  Ballpark it for me.  About how much do you
24 think you've earned?
25     A.  Maybe 3 -- 3,000.  That's my best guess.

Page 29

1      Q.  Okay.  I have just some general questions
2  for you about your legal background.
3         Have you ever been known by another name?
4      A.  Rebecca Kruger.
5      Q.  Any other name?
6      A.  My maiden name.
7      Q.  Any other name?
8      A.  No.
9      Q.  Have you ever been involved in a lawsuit
10 before this?
11     A.  No.
12     Q.  Have you ever been involved in any other
13 kind of legal proceeding, as a witness, or in any kind of
14 hearing or proceeding?
15     A.  No.
16     Q.  Have you ever been arrested?
17     A.  Yes.
18     Q.  Okay.  How many times have you been
19 arrested?
20     A.  I was arrested for DUI when I was in
21 Northeastern Junior College.
22     Q.  What year was that?
23     A.  That would have been 2003, 2004, maybe.
24     Q.  Is that the only time you've been arrested?
25     A.  Yes.

8 (Pages 26 - 29)

Page 30

1    Q.  Were you convicted of a crime in connection
2  with the DUI?
3        A.  I -- I believe that outcome was -- sorry.
4  I'm trying to think.  I went to Court and pled, I think,
5  no contest.  So it will show as an arrest, but never a
6  conviction.
7        And then there was one time -- I don't
8  know actually if I was arrested or not.  But when I was
9  16, I didn't have a driver's license, and I stole my
10  parents' car.  It was my mom's car.  I stole it.  I
11  rear-ended somebody, and I left the scene.  My dad turned
12  me in to the police the next morning.  And I wasn't like
13  slapped with handcuffs or anything, but they let me go
14  home with my parents.  I don't know if that shows on my
15  record as an arrest or not.
16       Q.  And that was here in Colorado?
17       A.  Yes.
18       Q.  And in connection with the DUI, did you
19  have any kind of sentence or --
20       A.  I had to do alcohol classes and pay, I
21  believe, a fine.
22       Q.  Have you ever filed for bankruptcy?
23       A.  No.
24       Q.  Other than Frontier, have you ever been
25  fired from a job?

Page 31

1        A.  Yes.
2        Q.  Which jobs have you been fired from?
3        A.  Cakeheads Bakery.  There was like a
4  two-week stretch where my kids kept getting sick and I
5  kept getting sick.  As I went back to work, and the kids
6  were having to do daycare and school and stuff like that,
7  everybody kept getting sick.
8        So there was like a two-week period where
9  I had to call out quite a few times because of illnesses.
10  I didn't have any sick time built up.  It was through the
11  temp agency, and I had no options.  So he got mad and
12  fired me, and then called me back a week or two later and
13  asked for me to come back.  But at that point, I had
14  already started my career -- or my job with Great West
15  Painting & Repair.
16       Q.  So you worked for Cakeheads for four to
17  five months; is that correct?
18       A.  Yes.
19       Q.  And then you were fired for attendance; is
20  that correct?
21       A.  Yes.
22       Q.  Other than Cakeheads and Frontier, have you
23  ever been fired from any other job?
24       A.  No.
25       Q.  Have you ever received discipline at any

Page 32

1  other job?  And by "discipline," I mean a write-up or a
2  coaching or a counseling, anything like that?
3        A.  No.
4        Q.  Other than Frontier and Cakeheads, have you
5  ever had any attendance issues with any other employer?
6        A.  No.  And, Danielle, hold on.  My kids are
7  knocking again.
8        Q.  Sure.
9        MS. KITSON:  Could we go off the record.
10       THE VIDEOGRAPHER:  Yeah, I was just going
11  to ask if you wanted to.  We're going off the record at
12  8:44 a.m. GMT (sic) time.
13       (Recess from 8:44 a.m. to 8:44 a.m.)
14       THE VIDEOGRAPHER:  We're going back on the
15  record at 8:44 a.m.
16       Q.  (By Ms. Kitson)  Ms. Brigham, do you
17  understand that you're still under oath?
18       A.  Yes.
19       Q.  Let's talk about your employment history
20  with Frontier.
21       During your time at Frontier, who was your
22  supervisor -- your direct supervisor?
23       A.  You're cutting out, kind of.
24       Q.  Oh, I think my -- I had a little alarm go
25  off here or something.  Let me ask that again.

Page 33

1        A.  Okay.
2        Q.  Over your time at Frontier, who were your
3  direct supervisors?
4        A.  At one point Jamie Shupernot (phonetic)
5  was a direct supervisor.  Mitch -- I don't remember his
6  -- his last name.  Stefanie Coppedge, and I think at one
7  point Kari Thompson.
8        Q.  Anyone else?
9        A.  Not that I can think of.
10       Q.  Over your time at Frontier, you were
11  subject to several disciplinary actions because of
12  attendance; is that correct?
13       A.  Correct.
14       Q.  And how many times?
15       A.  You mean throughout my whole time at
16  Frontier?
17       Q.  Yes.
18       A.  I don't know.  I would have to go back and
19  count.  Frontier's attendance policy changed a few times
20  throughout my career there.  At one point, it got
21  switched over to a point system.  So I -- I honestly
22  can't give you an accurate number of how many times.
23       Q.  Okay.  I'm going to introduce an exhibit.
24  This will be Brigham Exhibit 16.  And I believe that the
25  court reporter should have this exhibit and opposing

9 (Pages 30 - 33)

Page 34

1  counsel as well.  But in any event I'm going to share my
2  screen with you, if that works.
3       A.  Okay.  That's fine.
4       Q.  Ms. -- Ms. Brigham, I'm showing you Brigham
5  Exhibit 16 --
6       A.  Mm-hmm.
7       Q.  -- which bears the Bates stamp
8  FRONTIERAIRLINES(R.BRIGHAM)-0001115.
9            Do you see that?
10      A.  No.
11      Q.  In the lower right?  Are you seeing my
12  screen?
13      A.  My screen is blocking it.  Hold on.
14           0001115?
15      Q.  Yes.  And this appears to be an Inflight
16  Dependability Performance Counseling Record for
17  Rebecca Kruger, dated September 5th, 2007.
18           Do you see that?
19      A.  Yes.
20      Q.  And is this a true and correct copy of a
21  final termination warning you received based on
22  attendance?
23      A.  Probably.  Attendance was a running joke
24  with the flight attendants, because everybody got
25  warnings all the time because the dependability policy

Page 35

1  was a joke.
2       Q.  Well, let me ask you this:  Do you have any
3  reason to dispute the accuracy of the attendance points
4  that were assessed here that resulted in your final
5  termination warning?
6       A.  I would have to look back through and
7  figure out if any of those should have been coded
8  differently.  I mean, by seeing this, and I'm sure I
9  signed it, I mean, yes, this is probably accurate.
10      Q.  I'll keep scrolling down here.  The next
11  document is a memo from Kari Thompson to Rebecca Kruger,
12  dated August 23rd, 2007.
13           Do you see that?
14      A.  Yes.
15      Q.  Is that a true and correct copy of a memo
16  that you received from Kari Thompson?
17      A.  Sure.
18      Q.  I'm now showing you a memo from
19  Robert Mitchell, Inflight manager, to Rebecca Kruger,
20  dated 17 November of 2008.
21           Do you see that?
22      A.  Yes.
23      Q.  Is this a true and correct copy of a memo
24  that you received regarding attendance infractions in
25  2008?

Page 36

1       A.  I would like to see the whole thing,
2  please.
3       Q.  Mm-hmm.  Yeah.  Go ahead and read it, and
4  let me know when you'd like me to scroll down.  By the
5  way, these yellow highlights are mine.
6       A.  Okay.
7       Q.  It's just where I'm going to be pointing
8  you to.
9       A.  Right.  So can I just point out something,
10  where it says 4 sick instances in a rolling 12-month
11  period?
12      Q.  Sure.
13      A.  That's four times of being sick in a year,
14  when you're working with the public, who are sick.  And I
15  just -- I will argue all day that Frontier's attendance
16  policy was ridiculous.  We even tried to strike over it.
17      Q.  Let me stop you there, because I want to
18  make sure I understand this.
19           So the company has a dependability
20  attendance policy, correct?
21      A.  Correct.
22      Q.  And under the Collective Bargaining
23  Agreement, you have to follow that policy, correct?
24      A.  Correct.
25      Q.  And over the time that you were employed

Page 37

1  with Frontier, you don't have any reasons to dispute the
2  accuracy of the coding of the points that you received,
3  correct?
4       A.  At the end, after I self-disclosed to the
5  company, I would argue a lot of those.
6       Q.  Well, let me -- let me clarify that,
7  because I understand that you disagree with the company's
8  policy; is that right?
9       A.  Right.
10      Q.  You think that it was not a good policy,
11  correct?
12      A.  I mean, they're allowed to have whatever
13  policy they want.  I'm just saying this does not show
14  anything.  Everybody had these type of sick things.  It
15  was a running joke with the flight attendants.  Oh, how
16  many are you at?  Oh, how many are you at?
17      Q.  Yeah.
18      A.  Yeah.
19      Q.  I understand.  And I think that I really
20  just want to understand.  You know, setting aside the
21  document, there's a difference between saying, I was
22  assessed these points, and I disagree with the policy,
23  because I don't think that this should be something that
24  merits getting points; and I, at this point, was not
25  accurately assessed under the existing policy.

10 (Pages 34 - 37)

Page 38

1    Do you follow me?
2    A.  I get it.  So, yes, this was -- based on
3  theirs, yes, I would agree with it.  But when it gets
4  later on after I self-disclosed to the company, I do not
5  agree with those ones.
6    Q.  Okay.  Let me just stop sharing for a
7  minute, because I want you to set aside the document.
8    A.  Okay.
9    Q.  So let me ask you a little bit more about
10  that.
11    So during your time with Frontier, you did
12  not agree with the dependability policy, correct?
13    A.  Correct.  And along with a lot of other
14  people.
15    Q.  During your time at Frontier, though, did
16  you ever have any reason to dispute the accuracy of the
17  points that were assessed to you under the policy?
18    And by "accuracy," I mean that the policy
19  was followed.
20    A.  Explain.
21    Q.  So in 2015, the attendance points that you
22  accrued --
23    A.  Right.
24    Q.  -- do you have any reason to dispute that
25  they were accrued correctly under the terms of the policy

Page 39

1  as written?
2    A.  I would dispute a bunch of them.
3    Q.  Okay.  Tell me exactly why you dispute
4  them.
5    A.  My FMLA coded days shouldn't -- I don't
6  think should have been coded FMLA.  They were having me
7  use the Family Medical Leave Act to take over off my
8  overnights.  And when I would have my meetings with the
9  company to try and figure out what else we could do --
10  because I would run out of my intermittent FMLA time;
11  therefore, I would get sick points.
12    Those should not have been coded as sick.
13  I was not sick.  I was trying to adhere to my program,
14  which Frontier requires me to do.  I completely disagree
15  with all of those points.
16    Q.  But you missed a day, and under the policy,
17  they were coded as sick.
18    So, you disagree that they should have
19  been, but you missed a day, and they were coded as sick,
20  correct?
21    A.  Coded as sick should not have happened had
22  they reasonably accommodated me.
23    Q.  Okay.  So I -- I think we're going round
24  and round.  I want to make sure I clarify this.  So --
25    A.  Okay.  After this, can we take a little

Page 40

1  break?  I hear my kids getting loud.
2    Q.  Yes.  Let me just look here.  Can we go
3  about ten more minutes; do you think?
4    A.  Sure.
5    Q.  Okay.  So you -- these absences were coded
6  as sick, correct?
7    A.  Correct.  When I would run out of my
8  intermittent FMLA time, which was in a rolling calendar,
9  and I waited for days to drop off, yes, they would be
10  coded as sick.  I was not sick.  I was adhering to my
11  program, which Frontier requires that I do.  Those should
12  not have been coded as sick.  Frontier had the ability to
13  just remove that.  Frontier had the ability to do
14  multiple things, Danielle, and they decided not to do it.
15    Q.  Okay.  I think I get it now.  So let
16  me -- let me try again.
17    So you have certain days where you called
18  out, and these were intermittent FMLA, correct?
19    A.  Correct.
20    Q.  And you had certain days where you called
21  out, and you didn't have any intermittent FMLA left,
22  correct?
23    A.  Right.  And I would still call in
24  intermittent FMLA, but then later on, they'd be like, Oh,
25  by the way, you ran out of intermittent FMLA.  This is

Page 41

1  coded as sick.  You're getting a point.  I should have
2  never gotten that sick point.  I should have not -- it
3  should not have even shown up as sick on my schedule, had
4  Frontier reasonably accommodated me.
5    Q.  Okay.  So let me ask you this:  So you had
6  days when you called in intermittent FMLA, and it was
7  coded that way, correct?
8    A.  Yes, when I had intermittent FMLA days.
9    Q.  And you had days where, for whatever
10  reason, you didn't have any intermittent FMLA left,
11  correct?
12    A.  Correct, and I could not do overnights.
13  And I could not do overnights.  It's not that I didn't
14  want to do these trips, Danielle.  I could not do
15  overnights in order to adhere to my program.  Frontier
16  knew this.  We had multiple meetings about this.  I asked
17  multiple times for reasonable accommodations that they
18  denied, denied, denied.  And then give me sick points,
19  and then ultimately fired me for said sick points.  It
20  was not fair, and I will argue that till the day I die.
21    Q.  I -- I understand.  I'm trying to
22  understand your position.  So we had days that were I --
23  IFMLA.  We had days where you had run out, and they were
24  coded sick, correct?
25    You don't agree with it --

11 (Pages 38 - 41)

1    A.  Correct.

2    Q.  -- but they were coded sick, correct?

3    A.  Correct.

4    Q.  Okay.  And then on at least one occasion,

5  you had neglected to mention that it was an intermittent

6  FMLA day for timing, correct?

7    A.  Correct.  And if you're talking about that

8  final one when I forgot to send an email, the exact

9  reason why I forgot to send that email is because they

10  had removed a trip from my schedule, which they had done

11  in the past, which is part of them driving me crazy on

12  purpose.  They all of a sudden told me I couldn't do a

13  turn at the end.

14      So I was more worried about why can't I do

15  this turn than sending an email.  So I called my

16  Inflight manager, I talked to Stefanie, and she was like,

17  I don't know, you've always been allowed to do it before.

18  Let me see.  And I forgot to send the email within the

19  24 hours or whatever it was, because I was trying to

20  figure out why that turn was taken off of my schedule.

21    Q.  So you did not follow the call-out

22  procedures that were required, correct?

23    A.  I did not send the email in time, no.

24    Q.  Okay.  So you didn't -- okay.  So getting

25  back to this, so we've got these categories:  You called

1  in for intermittent FMLA, and those were coded under the

2  dependability policy, not assessed points, correct?

3    A.  Say that again.

4    Q.  Let me start over again.

5      We've talked about the different type of

6  call-outs that you did.  One was calling out under

7  intermittent FMLA, correct?

8    A.  Correct, when I had intermittent FMLA to

9  cover those overnights.

10    Q.  One was when you didn't have any

11  intermittent FMLA left, correct?

12    A.  Well, I would --

13    Q.  There were some days where you called in,

14  and you didn't have any left, correct?

15    A.  Correct.  But I hadn't really known --

16    Q.  I'm not asking for the reason.

17    A.  -- that at this time.  Okay.

18    Q.  I'm not asking for the reason.  I just want

19  to establish that.

20    A.  Okay.

21    Q.  And there was at least one time where you

22  neglected to follow the required call-out procedures,

23  correct?

24    A.  Yes.

25    Q.  Okay.  And all of those were coded

1  correctly under the policy -- strike that.

2      You mentioned that some of those should not

3  have been coded as sick, correct?

4    A.  Correct.

5    Q.  Okay.  And your belief as to why they

6  shouldn't have been coded as sick is because you believe

7  they should have been excused under the ADA; is that

8  correct?

9    A.  Correct.

10    Q.  And there's no other reason that you

11  believe they should have been excused?  It's just that you

12  believe that you should have been accommodated under the

13  ADA; is that correct?

14    A.  Correct.

15    Q.  Okay.  So the company coded the points

16  accurately, they just did not accommodate you in the way

17  that you believe you should have been; is that right?

18    A.  I feel like this is kind of a trick

19  question.  They did not code them correctly.  I was not

20  sick.  I was following their rules for their

21  self-disclosure policy, which stated I have to adhere to

22  every aspect of my recovery, otherwise, I could be

23  terminated from that one.

24      But then on the other hand, Danielle, I'm

25  going to be terminated if I don't do these overnights

1  because of my sick points.

2    Q.  When you called in -- when you called in,

3  you were calling in because you could not work due to a

4  medical condition, which was alcoholism, correct?

5    A.  Correct.

6    Q.  So the reason you were calling is that you

7  couldn't medically perform your job, correct?

8    A.  Correct.  Well, it's more like -- well, I

9  guess as a general term, yes.

10    Q.  Okay.  We got a little bit off track there.

11  So that -- that helps.  Let's look back then at this

12  Exhibit 16 very quickly here.

13    A.  Okay.

14    Q.  I just want to establish -- and -- and tell

15  me -- hold on one second.  I've got it up.  I just want to

16  make sure that you recognize each of these as an

17  attendance point that you actually did receive.

18    A.  Yes.

19    Q.  So there are several pages here.  Tell me

20  when I can scroll.

21    A.  Scroll.

22    Q.  Tell me if these are all true and accurate

23  copies of attendance points that you received while at

24  Frontier.  Okay?

25    A.  Okay.  You can just scroll.

Page 46

1    Q.  Okay.  All right.  So I am looking at a
2  December 29, 2008, memo from Robert Mitchell to you.
3         Do you see that?
4    A.  Yes.
5    Q.  Is that a true and accurate copy of a memo
6  that you received at Frontier?
7    A.  I mean, I don't specifically remember
8  this, but I'm sure it is.
9    Q.  Okay.  I'm going to scroll down.  I'm now
10  looking at a February 16, 2009 Performance Counseling
11  Record from Inflight to you.
12        Do you see that?
13    A.  Yeah.  The documented verbal warning?
14    Q.  Yeah.  Is this a true and correct copy of a
15  counseling record that you received?
16    A.  I'm sure it is.
17    Q.  I'm going to keep scrolling.
18    A.  All right.
19    Q.  And let me know if you need me to stop at
20  any point.  When I get to the end, I'm going to ask you if
21  these are all true and accurate copies of documents that
22  you received while at Frontier.
23        Okay?
24    A.  Okay.
25    Q.  I'm going to start scrolling.  Let me know

Page 47

1  if you need me to stop.
2    A.  Okay.  Can you stop for a second,
3  Danielle.
4    Q.  Yep, you bet.
5    A.  Will you go up a little bit.
6    Q.  Yeah.
7    A.  Now, did any of these dates overlap?  Did
8  you look at that?  Like, do I have dates that are on this
9  one that are actually on the other ones too, or are they
10  all just different days?
11    Q.  I -- these are just copies of attendance
12  warnings that you received.  So I don't know in terms of,
13  you know, what infractions are what.  I just want to
14  verify that these are true and correct copies of
15  attendance points that you received.
16    A.  I don't know what UNA is on this one.  And
17  then that's a medical --
18    Q.  Did you receive this attendance warning
19  though?
20    A.  I mean, it looks like every other one that
21  I have received.
22    Q.  Okay.  Do you have any --
23    A.  I just don't know of any code -- I just
24  don't know what the code UNA is.
25    Q.  Do you have any reason to dispute that you

Page 48

1  received this?
2    A.  No, not at all.
3    Q.  Okay.  All right.  Let me keep going.  Let
4  me know if you need to stop at any point.
5    A.  Okay.
6    Q.  Okay.  I'm at the end.
7        Are these documents all true and correct
8  copies of documents that you received from Frontier?
9    A.  I believe so.
10    Q.  All right.  I'm going to stop sharing my
11  screen.  And then, did you want to take that break?
12    A.  Yes, please.
13        MS. KITSON:  Okay.  We can go off the
14  record.
15        THE REPORTER:  Cole?  Cole?
16        THE VIDEOGRAPHER:  Yes.  Give me one
17  second.  We're going off the record at 9:04 a.m.
18        (Recess from 9:04 a.m. to 9:16 a.m.)
19        THE VIDEOGRAPHER:  We are going back on
20  the record at 9:16 a.m.
21    Q.  (By Ms. Kitson)  Ms. Brigham, do you
22  understand that you're still under oath?
23    A.  Yeah.
24    Q.  We talked a little bit before the break
25  about your work for other employers.

Page 49

1        I wanted to ask you if you've ever made a
2  request for accommodation of other employers other than
3  Frontier?
4    A.  No.
5    Q.  And how much money did you make with
6  Cake --
7    A.  Cakeheads?
8    Q.  Mm-hmm.  Yes.
9    A.  I couldn't tell you without looking at my
10  W-2s.
11    Q.  Ballpark?
12    A.  I don't even know if I can ballpark it for
13  you, Danielle.
14    Q.  Less than $10,000?
15    A.  Yes.
16    Q.  How about at Great West Painting?
17    A.  Maybe like $30,000 total.
18    Q.  Okay.
19    A.  And that's just a guess.
20    Q.  I'm going to show you your W-2s quickly
21  here.
22    A.  Okay.
23    Q.  And the reason I'm going to do that is
24  because it just shows your W-2 wages and not your gross
25  wages, and so I want to see if you --

13 (Pages 46 - 49)

Page 50

1    A.  The gross isn't on the W2?
2        Q.  It's says, W-2 reportable wages.  So let me
3   just show you really quick here.  This will be Brigham
4   Exhibit 4.  It's little bit fuzzy on my screen.  Let's
5   see.  I'm showing you bringing Exhibit 4, which is a 2016
6   W-2 for Employbridge Southwest.
7        Do you see that?
8    A.  I do.
9        Q.  And is that the temp agency you worked for?
10   A.  Yeah, I believe so.
11       Q.  Was this the -- the engagement that you had
12  with Cakeheads?
13   A.  Yes.
14       Q.  And it shows here that your wages, tips,
15  and other compensation was $2,922.78.
16       Do you see that?
17   A.  Yes.
18       Q.  Was that your gross income, or was your
19  gross income higher than that?
20   A.  That was my gross income --
21       Q.  Okay.
22   A.  -- for Cakeheads, yeah.
23       Q.  Okay.  Let me show you then the Brigham
24  Exhibit 5.
25       Are you seeing your 2017 W-2 for Great West

Page 51

1   Painting & Repair?
2    A.  Yes.
3        Q.  And is this a true and correct copy of your
4   W-2?
5    A.  Yes.
6        Q.  And it shows that you earned wages, tips,
7   other comp of $15,550.05 for 2017, correct?
8    A.  It looks like it, yes.
9        Q.  Okay.  And then I'll show you Exhibit 6.
10       Are you seeing your W-2 for Great West
11  Painting & Repair for 2018?
12   A.  Yes.
13       Q.  And this -- in case I didn't state it
14  clearly for the record, this is Brigham Exhibit 6 that's
15  been supplied to the court reporter and opposing counsel.
16  And it shows that your wages, tips, and other compensation
17  was $7,295.
18       Do you see that?
19   A.  Yes.
20       Q.  Was that your total compensation for 2018
21  from Great West Painting?
22   A.  Yes.
23       Q.  Okay.  I'll stop sharing my screen.
24       Other than Cakeheads, Great West Painting,
25  and the income that you've received from taking care of

Page 52

1   your husband's grandmother, did you have any other sources
2   of income since leaving Frontier?
3        A.  I -- a few weeks ago, I went and helped my
4   husband's friend -- my husband's friend on his farm.  He
5   owns a hops farm.  And I helped him propagate like 3,000
6   hops plants.  And I think he gave me like a $150, which
7   I'll claim come tax time.
8        Q.  $150, you said?
9        A.  Yeah.  It was like $158, I want to say.
10       Q.  Any other sources of income since you left
11  Frontier?
12       A.  Nothing that -- actual income, no.
13       Q.  Okay.  Are you running a business right
14  now, an online business?
15       A.  No.
16       Q.  And I believe there was something we found
17  on social media about cups?
18       A.  About what?
19       Q.  Cups or something along those lines that
20  you were --
21       A.  Oh, Recovery Hope Cups?
22       Q.  Yes.
23       A.  That was -- so my best friend from high
24  school reached out to me saying that she had a problem
25  with alcohol.  And we set up a GoFundMe for her to be

Page 53

1   able to afford treatment.  So we got her into a treatment
2   center in Minnesota, and she was living with me after she
3   got out.  Just staying sober, I was helping her with
4   that.  And we were trying to figure out a way
5   to -- for her to make enough money to afford first and
6   last months' rent on an apartment in Denver, so she could
7   move out of my house and be independent.
8        So we started this Facebook group of
9   Recovery Hope Cups, where we would make these
10  fabric-covered tumblers, and people would donate money to
11  her getting her apartment.  But none of that was income
12  to me.  And honestly, it sort of flopped on its face.  We
13  didn't -- we didn't even have that much interest, so...
14       Q.  So no dollars came directly to you from
15  Recovery Hope Cups?
16       A.  No.  If anything, I think it might have
17  cost me money.  And then at one point, I was making flour
18  arrangements out of wood flowers and trying to sell
19  those.  I ended up probably $1,500 in the hole, because I
20  still have all the flowers, and I don't do it anymore.
21       So I -- I mean, I have all these great
22  ideas where I'm going to make money crafting, but then it
23  never pans out, and then it actually costs me money.
24       Q.  But you never received actual income
25  dollars from those?

14 (Pages 50 - 53)

Page 54

1    A.  No.
2        Q.  Since leaving Frontier, will you describe
3    for us what efforts you've made to find employment?
4        A.  Basically, the Cakeheads, I found that.
5    And then immediately after that, I got hired by
6    Great West.  I had -- I was collecting unemployment after
7    Frontier wrongfully terminated me.  And I had to
8    apply -- I think it was three jobs a week.  And I did
9    that, and then finally got hired by the temp agency, who
10   hooked me up with Cakeheads.
11       I don't have a bunch of schooling.  I
12   don't -- I mean, I was lucky to get the flight attendant
13   job, and that was like my career.  So for me to get a job
14   that would actually pay anything over what my daycare
15   costs would be would be difficult.
16       Q.  After you left Frontier, did you ever look
17   for any flight attendant position?
18       A.  No, I couldn't.  I wish I could have.  But
19   when you get hired on as a flight attendant, you start at
20   the very bottom.  And you're on what's called reserve,
21   which is where you have to be on call pretty much 24/7.
22       With Frontier, it was you had 11 days off
23   in which they couldn't call you.  They could
24   junior-assign you if you answered the phone.  However, I
25   couldn't go back to being on reserve again and still

Page 55

1    maintain my sobriety.  I just couldn't do it.  I wish I
2    could.
3        Q.  But you didn't even try to look; is that
4    correct?
5        A.  Because it wouldn't have worked out.
6        Q.  All right.  And what other fields did you
7    look at?
8        A.  Admin-type of positions, which is what I
9    ultimately got with Cakeheads and Great West.  I was a
10   house painter at first with Great West, and then they
11   switched me over to admin.
12       Q.  What was your hourly rate at Frontier when
13   you left?
14       A.  I want to say 32-something.
15       Q.  What was your hourly rate at Cakeheads?
16       A.  $12 an hour.
17       Q.  What was your hourly rate at Great West?
18       A.  I believe I was hired at $13 an hour, and
19   then when I left there, I believe I was at 18.75.
20       Q.  After you were fired from Cakeheads, you
21   got the Great West job a week after; is that right?
22       A.  Correct.
23       Q.  And is Great West affiliated with your
24   family in any way?
25       A.  Yes.  It's my dad's business and my

Page 56

1    husband's.
2        Q.  And were you working full-time for
3    Great West?
4        A.  I was working, I want to say, like
5    30 hours-ish in the beginning when I was painting houses.
6    So basically I would get my kids on the bus, and then I
7    would go paint, and then I would have to be home by the
8    time my kids got off the bus.
9        Q.  After Great West, what efforts did you make
10   to find a job, if any?
11       A.  Well, we moved to Michigan.  I was still
12   working for Great West doing all the paperwork and the
13   invoicing and stuff like that.  Hold on.  Doing all the
14   invoicing and stuff remotely.  And then the company that
15   we subcontracted with restructured.  It was Tesla Energy
16   restructured their whole thing.  So they no longer needed
17   us as subcontractors.  So we dissolved the business as it
18   was.
19       Q.  What efforts after that did you make to
20   find a job, if any?
21       A.  There's not much around here that would
22   pay me anything that would even come close to paying for
23   daycare.  So at that point -- and you have to understand,
24   Danielle, we are in Goodrich, Michigan, which is a little
25   one-stoplight town.  We have, like, a Dollar General.  We

Page 57

1    have a gas station called Beacon & Bridge.  And nobody
2    around here is really hiring.  Even if I were to go to
3    Flint, I still wouldn't be able to get anything even
4    remotely close to paying what I would have to pay in
5    childcare.
6        Q.  How far is the airport from where you live?
7        A.  About an hour and a half.  Definitely over
8    two hours, if there's traffic.
9        Q.  And that's the closest airport?
10       A.  That's the main Detroit airport.  There's
11   a Flint airport somewhere, but no carriers fly out of
12   that that I'm aware of.
13       Q.  Why did you move to Goodrich, Michigan?
14       A.  Cost of living is a lot cheaper out here,
15   and my husband's whole family is here.
16       Q.  So it wasn't to pursue a job opportunity
17   for your husband or anything.  It was to be closer to
18   family and lower cost of living?
19       A.  Yes.
20       Q.  Okay.  You mentioned that you did not apply
21   for flight attendants positions.
22       And that's because of your childcare,
23   correct?
24       A.  Correct.  And to be honest, Danielle, I'm
25   a bit terrified of getting another flight attendant job

15 (Pages 54 - 57)

Page 58

1  after what happened with Frontier.
2      Q.  Is that part of the reason you did not
3  apply for a flight attendant job?
4      A.  I'm sure it was part of it, yeah.
5      Q.  So it's because of your experience with
6  Frontier and your childcare needs that you did not apply
7  for a flight attendant job, correct?
8      A.  It just wouldn't have worked.  I mean, I
9  would have had to start -- if I could honestly keep my
10  eight-year seniority that I had with Frontier and just
11  take that over to another airline, that would be easy.  I
12  would have a schedule.  I would be able to manipulate
13  that schedule.  I could not go back on reserve.
14      Q.  And I think --
15      A.  It would be impossible.
16      Q.  Yeah.  And I think I understand.  And I
17  just want to make sure I understand the reasons.
18      So --
19      A.  Yeah.
20      Q.  -- one of reasons you didn't apply is
21  because of your experience with Frontier, correct?
22      A.  Correct.
23      Q.  One of the reasons you didn't apply is,
24  because of your childcare situation, you would not in your
25  view have been able to accommodate that childcare schedule

Page 59

1  with a flight attendant's work schedule at any new
2  airline; is that correct?
3      A.  Correct.
4      Q.  Okay.  And are there any other reasons you
5  did not apply for a flight attendant?
6      A.  Not that I can think of right now.  But if
7  I think of something, I'll tell you.
8      Q.  Okay.  So since you stopped working for
9  Great West Painting, you've not attempted to apply for
10  other jobs because of your childcare situation; is that
11  correct?
12      A.  That, and there's nothing around me that I
13  could do that would pay me nearly enough to even afford
14  daycare for my children.
15      Q.  Have you looked?
16      A.  I have looked a few times about what is
17  around me, and there's really almost nothing that I --
18      Q.  When have you looked?
19      A.  -- qualify for.
20      THE REPORTER:  I'm sorry.  The question?
21      A.  When we first --
22      THE REPORTER:  What was the question?  It
23  cut out.
24      Q.  (By Ms. Kitson)  When have you looked?
25  Sorry.  When have you looked?

Page 60

1      A.  When we first dissolved the company, and
2  we were sort of looking at childcare cost, and then, I
3  just wanted to go on -- I went -- I think I did
4  like -- what's the website -- jobsdot.com or something,
5  just to kind of see what was out there.
6      And I actually -- now, it comes to memory,
7  I did go -- there was a position for like -- they made it
8  sound like a media -- multimedia consultant, something or
9  another, and they made the job sound great.  And I went
10  to an interview.  And it was -- you know the people that
11  set up at, like, grocery stores and try to sell you those
12  bamboo pillows or whatever?  It actually ended up being
13  that.  And it's all commission-based, and I'm not good at
14  sales.  I -- yeah.  I --
15      Q.  Were you qualified for that job?
16      A.  I -- I don't think there were -- I think
17  anybody would qualify for that job.
18      Q.  And were you offered that job?
19      A.  No, I was not.  I did not pursue it after
20  I went to their little orientation and found out what it
21  was, and that it was commission-based, and I wouldn't be
22  able to afford daycare and work that job.
23      Q.  Is it fair to say that there were positions
24  that you were qualified for that you did not apply for,
25  because, for whatever reason, you did not think it would

Page 61

1  fit your childcare?
2      A.  I wouldn't be able to make enough money to
3  even afford childcare.  It would have cost me money to
4  work.
5      Q.  Okay.  And -- and that's why you didn't
6  apply for anything?
7      A.  Right.  And then it ended up being a
8  blessing in disguise, because his grandmother fell ill,
9  was in the hospital for about three weeks.  And when she
10  came out, she had major loss of motor skills, and I
11  happened to be the one that was able to take care of her.
12  So that filled my -- all my needs right there.
13      Q.  I wanted to -- and I'm sorry.
14      You said after Great West, you looked on
15  jobsdot.com?
16      A.  Mm-hmm.
17      Q.  When was the last time you looked on any
18  kind of website or looked for a job at all?
19      A.  Pretty much I haven't.  I work for Sean's
20  grandma.
21      Q.  And how many hours a week is that?  I'm
22  sorry.
23      A.  Right now, it's only about maybe six to
24  eight hours a week because of COVID.
25      Q.  And before COVID, how many hours?

16 (Pages 58 - 61)

Page 62

1    A.  It just depended.  It depended on like if
2    the kids were in school, like if they had a day off
3    school, if my kids were sick.  It varied.  It was
4    anywhere from 15 to 35 hours a week.  It just depended on
5    the week.
6        Q.  How many hours on average were you flying
7    for Frontier per week or --
8        A.  When -- that's -- so that's kind of a hard
9    question.  With them not reasonably accommodating me, I
10   was working minimal hours.  I got my power shut off.  I
11   wasn't able to make any money.  So that's not really a
12   true test to what I wanted to be working.
13       Q.  Well, regardless of that, how many actual
14   hours on average were you flying with Frontier toward the
15   end of your employment?
16       A.  I couldn't even tell you.  My guess would
17   be maybe 20, 30 hours a month max maybe, but I would have
18   to look at my schedule in front of me to be able to give
19   you an accurate.
20       Q.  Okay.  I want to talk to you a little bit
21   now about your alcoholism.
22       A.  Mm-hmm.
23       Q.  How long have you been an alcoholic?
24       A.  I mean, that's hard.  I have -- since I
25   was a teenager, I have always liked alcohol.  It was my

Page 63

1    escape from reality.  It was my best friend.  And I've
2    always -- I was always sort of like a binge drinker,
3    where if I had 1, I had to have 20 more.  And I was the
4    life of the party.  I was just a party girl, and it was
5    all fine and dandy.
6            And then there was a major shift in my
7    drinking after my first daughter passed away.  She -- she
8    passed away in 2009.  And that's when my drinking
9    switched from happy-go-lucky party to sort of drinking
10   more out of sadness and to numb and -- yeah.
11       Q.  And let me ask it a different way.
12           When were you first diagnosed with
13   alcoholism?
14       A.  You don't really get diagnosed with
15   alcoholism.  It's either you are or you're not.  You're
16   the only one that can decide really if you are an
17   alcoholic or not.  And the fact that I couldn't stop
18   drinking when I wanted to made me an alcoholic.
19       Q.  When did you realize you were an alcoholic?
20       A.  Probably shortly after my daughter passed.
21       Q.  When was the first time that you disclosed
22   to Frontier that you were an alcoholic?
23       A.  When I needed to get treatment, and I had
24   to have the time off of work.
25       Q.  When was that?

Page 64

1        A.  That would have been in September of 2014.
2        Q.  When you disclosed to Frontier in September
3    2014, you went out on a continuous leave of absence; is
4    that correct?
5        A.  Correct.
6        Q.  And Frontier approved that continuous leave
7    of absence, correct?
8        A.  Correct.
9        Q.  That was a leave of absence that was
10   offered under the Collective Bargaining Agreement,
11   correct?
12       A.  I guess.  I wouldn't know.
13       Q.  After that continuous leave of absence that
14   you took, did you ever apply or ask for any other form of
15   continuous leave of absence?
16       A.  No.
17       Q.  As opposed to you -- you know, let me ask
18   it again for the record.
19           As opposed to intermittent FMLA work?
20       A.  No.
21       Q.  So you knew that a continuous leave of
22   absence for medical was available, correct?
23       A.  Correct.
24       Q.  But you did not apply for one after your
25   initial leave for rehab; is that correct?

Page 65

1        A.  That is correct.
2        Q.  And at some point, I think that you and
3    Jerry Arellano discussed the possibility of continuous
4    medical leave, but you decided you did not want to have
5    one, correct?
6        A.  Correct.  I needed money coming in.  And
7    had they accommodated me, I would have had that.
8        Q.  Your alcoholism -- let's say from
9    September 2014 forward -- well, strike that.
10           How long were you in rehab in that
11   September 2014 era?
12       A.  60 days.
13       Q.  After that 60 days, did you return to work?
14       A.  I came back, and I tried to return to
15   work, and I had to meet certain criteria in order to come
16   back.  I had to meet with a DOT specialist, where -- I
17   don't even know why I had to do half the stuff.
18           But I had to meet with DOT.  I had to get
19   paperwork in.  I had to -- I believe during that time,
20   they decided that I needed to see a therapist, which I
21   was seeing a therapist.  There were a bunch of, like,
22   hoops I had to jump through to come back, which I did.
23           And I want to say in -- because I got back
24   November 7th, and all that was done within the first
25   three weeks that I came back, I want to say.  And it was

17 (Pages 62 - 65)

Page 66

1  all sent in, but because Jerry Arellano had left the
2  company since I came back, my paperwork was kind of just
3  sitting there, and nobody was doing anything with it. So
4  it delayed me getting back to work.
5       So finally after a bunch of phone calls, I
6  finally figured out that it was because Jerry had left my
7  paperwork was just sitting there. And then eventually I
8  finally was able to come back.
9       Q. Since you came back to the company --
10  strike that.
11       After you returned to the company, after
12  your rehab for 60 days, how has the alcoholism affected
13  your ability to work?
14       A. Explain that, please.
15       Q. Well, you came back to Frontier after
16  rehab, correct?
17       A. Correct.
18       Q. And then from that point to the end of your
19  employment with Frontier, how did alcoholism affect your
20  ability to work?
21       A. Well, basically, I was told it was a good
22  idea to avoid overnights, and the reason for that is
23  because there's really no accountability. And it's an
24  environment that I was so used to drinking in. You're
25  supposed to avoid what are called triggers. And you're

Page 67

1  supposed to basically, they say, change your playground,
2  which is what I was doing. And I needed Frontier's help
3  to do it.
4       Q. When was the last time you had a drink?
5       A. My sobriety date is September 5th of 2014.
6  I got some treatment September 7th of 2014. When I got
7  the scholarship, it was on September 4th, and I had been
8  drinking that day and told the guy on the phone that I
9  would dump out what I had, and they put me on a plane on
10  the 7th.
11       Q. What scholarship are you referring to?
12       A. I got, like, a scholarship to go to a
13  treatment center. We wouldn't have been able to afford
14  it. And I just called the right person -- I called a
15  bunch of people that day, just trying to figure out where
16  I could go get treatment. And I happened to get on the
17  phone with the right person, and I got a -- what they
18  call a scholarship. It cost me $100 to do my whole
19  treatment.
20       Q. So since September 5th, 2014, you have not
21  had a drink, correct?
22       A. No. Correct.
23       Q. Your alcoholism has been under control?
24       A. Correct.
25       Q. Before that, did you ever have a drink

Page 68

1  while on the job at Frontier?
2       A. No. Luckily, I had never crossed that
3  boundary. Oh, and I feel like I need to qualify -- or
4  clarify. So never while on duty. However, on
5  overnights, after you're done, it's -- it was just kind
6  of a culture where you would take off all your flight
7  attendant gear, put on normal clothes, and go meet at the
8  bar. Nine times out of ten, that's what you did.
9       Q. But it never impacted your ability to work
10  the next day, for instance; is that right?
11       A. What do you mean?
12       Q. So let's -- let's take pre-September 5th,
13  2014.
14       You would drink in hotel bars on layovers,
15  correct?
16       A. Right.
17       Q. Was there ever a time that you could not
18  fly because you were drunk or because of the aftereffects
19  of that?
20       A. No, not while I was already on a trip at
21  all. I mean, there were plenty of times that I flew
22  pretty hung over, but never intoxicated.
23       Q. So is it fair to say that your alcoholism
24  did not prevent you from working before September 5th,
25  2014? Is that fair?

Page 69

1       A. Kind of. There were plenty of times, like
2  if I had gone on a bender, I remember a few times that I
3  would have to call in sick, because I was too hung over
4  or too shaky to do my job.
5       Q. But, in general, you were able to keep your
6  job?
7       A. Correct.
8       Q. You were able to meet --
9       A. Yes.
10       Q. -- the attendance requirements?
11       A. Yes.
12       Q. So prior to September 5th, 2014, you were
13  able to work in general, correct?
14       A. Yes.
15       Q. Since September -- sorry.
16       Since September 5th, 2014, alcoholism has
17  not impacted your ability to live your life, correct?
18       A. Since 2014?
19       Q. Yes.
20       A. Yes. Yes.
21       Q. And let me ask that question again just so
22  the record is clear.
23       Since September 5th, 2014, alcoholism has
24  not impacted your ability to live your life, correct?
25       A. I mean, you sort of have to clarify that.

18 (Pages 66 - 69)

Page 70

1 My recovery is part of my life now.
2     Q. Right. So since September 5th, 2014,
3 you've been able to live your life, correct?
4     A. Correct.
5     Q. You've been able to care for your husband's
6 grandmother, correct?
7     A. Correct.
8     Q. You've been able to care for your kids,
9 correct?
10     A. Correct.
11     Q. You've been able to work, correct?
12     A. Correct.
13     Q. Is there any area of your life that the
14 alcoholism has impacted you in terms of your ability to
15 live a daily life?
16     A. After I got sober, we're still talking,
17 correct?
18     Q. Correct.
19     A. Yes. It's just different now. My life is
20 better since getting sober.
21     Q. So there's no area of your life where it's
22 impacting your ability to function; is that correct?
23     A. Not currently, but that could change
24 tomorrow, Danielle. That's why I continue to work my
25 program. Something could happen, and tomorrow is not

Page 71

1 guaranteed for me to be sober. I can just take it one
2 day, one minute, at a time. Anything could change.
3     Q. Okay. I understand that.
4     So --
5     A. So far, it hasn't impacted anything.
6     Q. Okay. Yeah. So let me just clarify for
7 the record.
8     So anything could change at any moment,
9 right?
10     A. Right.
11     Q. But from September 5th, 2014 to the
12 present, alcoholism has not impacted any of your major
13 life activities; is that right?
14     A. Correct.
15     Q. From September 5th, 2014 to the
16 present -- strike that.
17     From September 5th, 2014 to the end of your
18 employment at Frontier, you were always able to perform
19 the essential functions of your job while on duty,
20 correct?
21     A. Correct.
22     Q. Okay. I want to talk to you now about what
23 accommodations you requested from Frontier.
24     So tell me about the accommodations that
25 you requested from Frontier from September 5th, 2014 to

Page 72

1 the end of your employment.
2     A. Okay. I asked to work at the general
3 office for a little while, since my attendance was so
4 bad, and it kept getting worse the more my -- basically,
5 my seniority would go down, because they opened an
6 Orlando base. So I was not able to hold the kind of
7 trips that I needed to maintain my sobriety.
8     I had asked to maybe work at the GO, which
9 is what they let people do when they're injured on the
10 job. I asked to start off with a blank schedule to be
11 able to create my own schedule out of open time and the
12 TradeBoard, which is pretty much what's leftover after
13 they run a schedule. But that would take Frontier
14 starting me out with a blank schedule. It was not
15 something that I could have just done without their help.
16     Q. What other accommodations did you request,
17 if any?
18     A. I requested they just remove the
19 overnights from my schedule, which they had done a few
20 times prior. When I needed to, they had just removed
21 them and said, We'll do it this one time, but we can't do
22 it forever. I mean -- yeah. I had multiple meetings
23 with them trying to figure out what we could do in order
24 to get this to work.
25     Q. What other accommodations did you request,

Page 73

1 if any?
2     A. That's all can I think of. Those were the
3 major ones.
4     Q. And you did request an accomodation in the
5 form of a continuous medical leave at the beginning for
6 the reentry --
7     A. At the beginning.
8     Q. -- and that was -- that was granted,
9 correct?
10     A. Correct.
11     Q. At some point, you talked to the folks at
12 Frontier about applying for open positions; is that
13 correct?
14     A. They had suggested it, and I looked into
15 it and figured out that, after 90 days, you're seniority.
16 And if you can't go back to inflight flight attendant,
17 which was what I wanted to do for pretty much the rest of
18 my career, you can't do it after 90 days. You would have
19 to start all over from the bottom, which we discussed
20 earlier that was impossible for me to do.
21     Q. Which you didn't want to do, correct?
22     A. Correct.
23     Q. Okay. So open positions, and applying for
24 open positions, is an accommodation that was offered to
25 you, but you decided not to apply; is that right?

19 (Pages 70 - 73)

1    A.  It was not an accommodation.  It was
2  something that was available for everybody.  Anybody
3  could have transferred within the company.  That was not
4  an accommodation for just me.
5    Q.  Are you aware that Frontier provides
6  preferential hiring for anyone who needs an accommodation
7  under the Americans with Disabilities Act for positions
8  for which they're minimally qualified?
9    A.  They never told me anything about that.
10    Q.  You did not know that at the time?
11    A.  No.
12    Q.  Did you ask?
13    A.  I asked multiple times what could be done
14  to help me in this situation.  I was never aware of
15  whatever you're talking about.  They never mentioned
16  anything to me.  All they said was that they could not
17  help me.
18    Q.  We -- strike that.
19        I have listened to the recordings that you
20  provided --
21    A.  Mm-hmm.
22    Q.  -- in the course of discovery in this case.
23    A.  Mm-hmm.
24    Q.  Are you familiar with those recordings?
25    A.  Yes, I am.

1    Q.  Okay.  Did you tape those recordings?
2    A.  I did.
3    Q.  On those recordings, I heard you speaking
4  about open positions with Frontier representatives.
5        Is that your recollection as well?
6    A.  Correct.
7    Q.  Did you speak with them about open
8  positions?
9    A.  Correct.
10    Q.  Who --
11    A.  It was mentioned to me that I could
12  transfer within the company, that that was an option.
13  And at one point, I even looked into it, and I saw a
14  bunch of jobs that really I didn't qualify for.  They
15  were like statistics, ops, stuff like that that I didn't
16  qualify for.  And then I found out from another flight
17  attendant that you don't want to do that if you want to
18  go back to inflight.
19    Q.  So transfer was an option, but it was not
20  attractive to you because of loss of seniority and
21  inability to transfer back.
22        Do I have that correct?
23    A.  Correct.
24    Q.  Let's go back to the general
25  office -- well, strike that.

1        So I have that you discussed with the
2  company a potential light-duty assignment in the general
3  office; is that correct?
4    A.  Correct.
5    Q.  And you would have taken that on an
6  intermittent basis.  So whenever you had a layover that
7  involved an overnight, your idea was that you would drop
8  that trip and work at the general office.
9        Do I have that correct?
10    A.  That was one.  The other one was just put
11  me as a GO for a while so that I don't have to do
12  overnights, until I can get further along in my recovery
13  where my therapist suggested, Hey, I think you're okay to
14  do overnights now.  I think you're at a place in your
15  recovery when you would be okay.  That's all we were
16  waiting for.
17    Q.  So then there's two different things there,
18  and I'm breaking that out.
19        So number one, you wanted potentially to be
20  in a temporary position in the general office full-time
21  indefinitely; is that correct?
22    A.  Not indefinitely.  Temporarily, until I
23  got to a point in my recovery when I could pick up the
24  overnights again.
25    Q.  But you didn't have an exact end date for

1  when that would be, correct?
2    A.  No.  It was open-ended, and that was
3  pretty much up to my therapist, when she thought I was
4  ready, and when I felt I was ready.
5    Q.  Which could have been a year, or maybe
6  never.
7        You don't -- you didn't know, right?
8    A.  We were getting a lot further along in my
9  recovery, and it would have been pretty soon after.
10  However, with all the stuff that Frontier put me through
11  and everything that was going on, honestly, that set back
12  my recovery quite a bit.  So it was just making the
13  problem worse.
14    Q.  And the question I have for you,
15  Ms. Brigham, is you did not know exactly when you would be
16  able to fly overnights again, correct?
17    A.  Correct.
18    Q.  It was open-ended, correct?
19    A.  Open-ended, but ended.  It's -- it would
20  never have been indefinitely.
21    Q.  But you didn't know when, correct?
22    A.  Correct.
23    Q.  And the other option that you had discussed
24  with Frontier is this intermittent concept, where whenever
25  you couldn't fly a layover, you would then work in the

Page 78

1 general office, drop that layover intermittently, correct?
2    A. Jerry at one point had suggested that I
3 was basically trying to use the system to not work, which
4 I was trying to show him, That's not the case, Jerry.
5 The case is I want to be at work. I need to make money
6 for my family. Send me to the GO. He thought I was just
7 calling out for the overnights, because, oh, I just
8 didn't want to show up for work on the weekend. The reality of it
9 was I wanted to work. I was terrified to do layovers.
10    Q. I understand. I'm just trying to make sure
11 I understand the -- the exact accommodations that you
12 requested.
13    A. Okay.
14    Q. Are you with me?
15    A. One was intermittently. If -- if they
16 needed me at the GO, and I had called out, sure, I'll
17 come work. That was to prove to Jerry that I'm not just
18 trying to get out of work just -- which he insinuated
19 multiple times that that's what I was trying to do. And
20 it's just inaccurate.
21    And I said I'll come work at the GO. I'll
22 do whatever you want me to do except overnights.
23 Temporarily reassign me. Reassign me the whole time at
24 the GO. I was willing to do whatever I could to try and
25 make this work.

Page 79

1    Q. So you were requesting the accommodation of
2 when you had an overnight trip, you would call out for
3 that instead work in the general office, correct?
4    A. Correct.
5    Q. And not be assessed any attendance points,
6 correct?
7    A. Correct.
8    Q. And be paid, correct?
9    A. Correct.
10    Q. Are you aware of anyone else who was given
11 that accommodation?
12    A. Yes. Lots of people, after they were
13 injured on the job, would go work at the GO.
14    Q. Are you aware of anyone who was allowed to
15 do that outside the context of an injury on the job?
16    A. No.
17    Q. In terms of the blank schedule, describe
18 for me exactly what you requested.
19    How would that work?
20    A. So basically -- okay. When -- every
21 month, a flight attendant has to bid their preferred
22 schedule, and it goes by seniority. So basically, I was
23 asking to not be awarded a schedule at all. Leave me
24 with nothing. Leave me with nothing. Leave me with a
25 blank schedule, and then at the end of the bidding

Page 80

1 period -- at the end, there's what we call open time and
2 TradeBoard, which are the leftovers that nobody wants
3 that a reserve is going to have to fly or that other
4 people can swap and trade their trips out with.
5    What I was asking to do was just be left
6 with nothing. It would not have gone above seniority.
7 It would not have violated anything in the CBA. Leave me
8 with nothing. And I -- it will be my responsibility to
9 build my schedule up to 60 hours, which was the
10 requirement, out of stuff that was left over and the
11 stuff that nobody wanted.
12    Q. Tell me a little bit more about how the
13 bidding process work.
14    So every month you bid, correct?
15    A. Mm-hmm.
16    Q. And every month, if you are an active
17 employee, you have to bid, correct?
18    A. Correct.
19    Q. And if you don't bid, the CBA provides that
20 you are given a line, correct?
21    A. Correct.
22    Q. And a line is a --
23    A. I mean, so you would bid for reserve if
24 you wanted, which then you'd have a reserve schedule.
25    Q. And describe for us, what is a reserve

Page 81

1 schedule?
2    A. Basically, it's the days that you are on
3 call.
4    Q. So you're basically just on call until
5 you get --
6    A. 24/7.
7    Q. Until you get up to 60 hours?
8    A. No. You're on call -- the days that
9 you're on call, you're on call. It doesn't matter how
10 many hours you work. You're guaranteed to be paid for
11 75, I believe, whether you fly them or you fly over. Of
12 course, they're going to pay you over. But, yeah, you're
13 on call 24/7 except for 11 days that you have off in the
14 month.
15    Q. Okay. So at the beginning of the
16 month -- strike that.
17    So every month, as an active flight
18 attendant, you have to bid, correct?
19    A. Correct. And even if you don't bid,
20 they're going to give you what's left over after
21 everybody else anyway.
22    Q. So if you don't bid, you get an automated
23 line that is given to you, correct?
24    A. Correct.
25    Q. And you also have the option of bidding

21 (Pages 78 - 81)

Page 82

1  reserve, correct?
2      A.  Correct.
3      Q.  And if you bid reserve, the only
4  requirement is you just have to fly any time they ask you,
5  correct?
6      A.  Correct.
7      Q.  Okay.  Were there any other options for
8  bidding other than what you've just described?
9      A.  No, not that I can remember.
10      Q.  Now, once you have a line assigned to you
11  through the bidding process, you can begin swapping,
12  dropping, trading, picking up trips on overtime; is that
13  correct?
14      A.  Open time.
15      Q.  Open time.  Sorry.
16      A.  Yes.  As soon as it opens -- you're fine.
17          As soon as it opens, I believe it was the
18  18th or the 19th.  I can't -- it's been five years, I
19  can't remember the exact date.
20      Q.  Okay.  And -- and I'll show you the
21  Collective Bargaining Agreement a little bit later.  I
22  just want to get a general sense of what your
23  understanding is.  So let me make sure I'm following you.
24          So every month, you have to bid, correct?
25      A.  Correct.

Page 83

1      Q.  And every month, unless you bid reserve,
2  you're assigned a line, correct?
3      A.  Correct.
4      Q.  That line is at least 60 hours, correct?
5      A.  Correct.
6      Q.  At some point in the month, then, you can
7  begin to swap, drop, and trade on a TradeBoard and open
8  time, correct?
9      A.  Correct.
10      Q.  During that process, is it true that you're
11  never allowed to drop below 45 hours --
12      A.  I thought --
13      Q.  -- for each --
14      THE REPORTER:  I'm sorry.
15      A.  I thought it was 60.
16      THE REPORTER:  Can I have the question
17  again, please.  The overlap.
18      Q.  (By Ms. Kitson)  Yeah.  In the process of
19  trading, dropping, swapping, you're allowed to drop down
20  to 45, but you have to get back up to 60 by the end of the
21  process, correct?
22      A.  I don't remember anything about the 45.
23  But who knows?  That was five years ago.
24      Q.  All right.
25      A.  I thought it was you couldn't drop below

Page 84

1  60.
2      Q.  Let's go ahead and look at the Collective
3  Bargaining Agreement then.
4      A.  Is this the one that was current when I
5  was there?
6      Q.  Yes.  I am going to show you what's been
7  marked as Brigham Exhibit 1.  Brigham Exhibit 1 is a
8  document entitled -- entitled Association of Flight
9  Attendants-CWA, AFL-CIO.
10          Do you see that?
11      A.  Okay.  Yes.
12      Q.  And if I scroll down here, it says,
13  Frontier Airlines Flight Attendant Contract, 2011 to 2016.
14          Do you see that?
15      A.  Correct.
16      Q.  And the Bates number begins with
17  FRONTIERAIRLINES(R.BRIGHAM)- 815.
18          Do you see that?
19      A.  Yeah.  I've got to move my screen.  Hold
20  on.  Yes, I see that.
21      Q.  Okay.  And this is a copy of the Collective
22  Bargaining Agreement that was in place during the time
23  that you were a flight attendant with Frontier, correct?
24      A.  If that's what it says, correct.
25      Q.  All right.  I'm just going to try to search

Page 85

1  here for 45 to get us quickly to where the language is, if
2  I can  There was a 45 in here
3      A  A bad number
4      Q  Yeah  Here we go  Okay  So I'm looking
5  at Section L, Open Time, Minimum Credit Requirements
6          Do you see that?
7      A  Yep
8      Q  And in the lower right-hand corner, just
9  for the record, we're at FRONTIERAIRLINES(R BRIGHAM)- 869
10          Are you with me?
11      A  Yep
12      Q  And if you scroll up, it says, number 1, At
13  the completion of each bid period, each flight attendant
14  must accumulate a minimum of 60 credit hours
15          Do you see that?
16      A  Yep
17      Q  Is that correct?
18      A  Yes
19      Q  Okay  It says, At no time will a flight
20  attendant be allowed to drop below 45 credit hours
21          Do you see that?
22      A  Yep
23      Q  Does that refresh your recollection that in
24  the trade/swap/drop process, you were never allowed to go
25  below 45 in that process, correct?

22 (Pages 82 - 85)

1    A.  I don't ever remember the 45 hours, to be
2  honest, Danielle.  I thought it was you can't drop below
3  60.
4    Q.  Do you have any reason to dispute that this
5  was the rule?
6    A.  No, I don't.  I just don't remember the
7  45.
8    Q.  But you know for sure that you weren't
9  allowed to drop your own schedule, right?
10    A.  Yes, for sure, unless it would be a
11  reasonable accommodation.
12    Q.  Got it.  So the Collective Bargaining
13  Agreement did not allow you to do that.
14        You wanted it as an accommodation, correct?
15    A.  I spoke with the union, Danielle, and the
16  union said that it was acceptable.  Frontier said they
17  couldn't do it, because they would have the union
18  breathing down my -- their necks.
19        So I went to the --
20    Q.  So let me --
21    A.  No, no, no, let me finish.  I went to the
22  union.  I had union permission.  Frontier knew that, and
23  they still said no.  They're whole reason for saying no
24  is because they were worried about the union.  They had
25  union permission to do it.

1    Q.  Okay.  That wasn't my question.  My
2  question is, this is something that wasn't permitted by
3  the Collective Bargaining Agreement?
4        Now, you're saying that you then later went
5  to the union and sought permission for an exception,
6  correct?
7    A.  Yes.  Correct.
8    Q.  Okay.  So let's ask that in pieces then.
9        What you wanted to do in dropping your
10  entire schedule was not permitted by the terms of the
11  Collective Bargaining Agreement, correct?
12    A.  As it's stated right there, correct.
13    Q.  You sought permission from the union,
14  correct?
15    A.  Correct.
16    Q.  Okay.  And what makes you think that the
17  union gave you permission to do that, as you put it?
18    A.  From my conversations with
19  Adrienne Prince.  We sat in that last meeting, where she
20  told Frontier that it would not violate the contract at
21  all.
22    Q.  Okay.  Let me first understand exactly what
23  you were proposing.  So -- I want to make sure I
24  understand it.
25        So you were proposing that you would go

1  through this process; is that right?
2    A.  No.  No.
3    Q.  Okay.
4    A.  Just leave me with nothing.  Don't even
5  put me on the award.  It would be very easy for them to
6  just leave me off of the bidding.  And then add me back
7  on before TradeBoard opens, as if I was coming back from
8  leave.
9    Q.  All right.  So then let me ask you this:
10  The accommodation you were seeking then was to not bid at
11  all and to be let in to open time after bidding was over.
12        Do I have that right?
13    A.  Leave me with a blank schedule, yes.
14    Q.  Okay.  So in your accommodation example,
15  you would not bid; is that right?
16    A.  Correct.
17    Q.  And you would not have to hold 45 hours; is
18  that correct?
19    A.  Correct.
20    Q.  And your idea was that you would build your
21  own 60 hours out of open time, correct?
22    A.  Correct, all the leftover stuff that
23  people did not want.
24    Q.  And open time was first come, first serve,
25  correct?

1    A.  Correct.
2    Q.  And in your accommodation request, were you
3  envisioning that you would be the first one to pick up
4  those flights?
5    A.  Nope, not at all.  I -- I would go in at
6  the same time; first come, first serve.
7    Q.  All right.  I want to go through in pretty
8  great detail your conversations with the union about this.
9        So when was the first time that you --
10        MR. CRONE:  Danielle, can I cut in?  I'm
11  sorry.  I just heard you want to go into great detail on
12  this.  We've been going almost an hour.
13        Is there any way we can do a break
14  relatively soon?
15        MS. KITSON:  Absolutely.  So --
16        THE DEPONENT:  Plus my kids are getting
17  loud.
18        MS. KITSON:  What was that?
19        THE DEPONENT:  Plus my kids are getting
20  loud.
21        MS. KITSON:  Oh.  Yeah, no, we can break
22  at any time.  I mean, I -- I'll just say, you know, I
23  definitely am going to be using the full seven record
24  hours.  So just keep that in mind.
25        THE DEPONENT:  That's fine.

23 (Pages 86 - 89)

Page 90

1      MS. KITSON:  But I -- yeah, that's totally
2  fine.
3          Do you want to go off the record now?
4      MR. CRONE:  Yeah, that's -- that's fine.
5  I just -- it just seemed like a natural stopping point
6  before you kind of, you know, jump into the next
7  topic area.  So if we could do ten minutes now, that
8  would be great.
9      MS. KITSON:  Okay.
10      THE VIDEOGRAPHER:  We are going off the
11  record at 10:08 a.m.
12      (Recess from 10:08 a.m. to 10:23 a.m.)
13      THE VIDEOGRAPHER:  We're going back on the
14  record at 10:23 a.m.
15      Q.  (By Ms. Kitson)  Ms. Brigham, do you
16  understand that you're still under oath?
17      A.  Yes.
18      Q.  I want to circle back -- before we dive in
19  on your conversations with the union, I want to circle
20  back to a couple of follow-up items from earlier this
21  morning.
22          The first one being, what is your attorney
23  fee arrangement, your contingency arrangement, with your
24  counsel?
25      MR. CRONE:  So, Danielle, I'm -- I'm going

Page 91

1  to lodge the same objection on the basis of
2  attorney-client privilege.  I -- I've reviewed the case
3  that you cited me to.  It doesn't stand for the
4  proposition you say it does.  In that case, the Court
5  protected the contents of the representation agreement,
6  because, while theoretically perhaps broadly discoverable
7  in that sense, the party had not put the document at
8  issue in any way.  In other words, it wasn't relevant to
9  any of the claims or defenses, and -- and the document,
10  of course, would have included certain information that
11  was absolutely privileged.  That's exactly what we're
12  dealing with here.
13          And --
14      MS. KITSON:  Okay.  Let me just make a
15  record then.
16      Q.  (By Ms. Kitson)  So, Ms. Brigham, you're
17  seeking attorney's fees in this case, correct?
18      A.  Correct.
19      Q.  And you're seeking an award of attorney's
20  fees, correct?
21      A.  Correct.
22      Q.  What is your attorney fee arrange with your
23  counsel?  You mentioned that it's a contingency basis.
24          What is the percentage --
25      MR. CRONE:  Objection.

Page 92

1      MS. KITSON:  And -- and, John, I'm making
2  a record.  So here's what I'm going to ask her.  You
3  instruct her not to answer.  And then I'll ask her if
4  she's going to adhere to the instruction.  And I'll have
5  a record.
6      MR. CRONE:  I -- I don't know exactly what
7  you're doing.  I -- you asked the question.  I'm
8  objecting.
9          Don't answer.
10      MS. KITSON:  Right.  That's what I'm
11  trying to get is a clear record.
12      Q.  (By Ms. Kitson)  Ms. Brigham, I'm asking
13  you, so the record is clear, what is the contingency fee
14  arrangement that you have with your counsel in terms of
15  the percentage that he will get if you were to win?
16      MR. CRONE:  Objection, attorney-client
17  privilege.
18          Don't answer.
19      Q.  (By Ms. Kitson)  Are you following your
20  counsel's instruction --
21      A.  Of course.
22      Q.  -- not to answer the question?
23      A.  Of course.
24      MS. KITSON:  Okay.  I am going to hold
25  this deposition open.  I am going to take this to the

Page 93

1  judge on a discovery dispute.  I believe that you're
2  wrong, Mr. Crone.  So we can talk offline about having
3  the discovery dispute hearing set up.
4          So --
5      MR. CRONE:  Yeah.  And let -- and let
6  me -- let me just -- let me complete the record on this,
7  Danielle, because maybe over the lunch we can resolve
8  this.
9          So the case that you cited to me says --
10  says exactly this, The privileged information in this
11  document -- that's referring to the engagement
12  agreement -- does not, however, contain information that,
13  through one of the parties' affirmative acts, that party
14  put the protected information at issue by making it
15  relevant to the case.  In other words, the privileged
16  information contained in the engagement letter does not
17  relate to the claims that the party intentionally
18  asserted against the other party and -- and another
19  party, for breach of fiduciary duty, and whatever --
20  the -- and the defense on statute of limitations.
21          So here, this is exactly -- exactly the
22  same issue.  The -- the -- the terms of the
23  representation, including the terms of the contingency
24  itself, are not relevant to any claims or defenses here.
25  And so that's --

1       MS. KITSON:  I --
2       MR. CRONE:  -- my point.  I just want to
3   make --
4       MS. KITSON:  I don't -- I don't want to
5   take time debating it on the record.  We can talk -- you
6   and I can talk about it over lunch.
7       MR. CRONE:  Look, you made your record;
8   I'm making mine.  Okay?  And so to the extent that I'm
9   being helpful in resolving this, instead of holding the
10  deposition open, that's what I'm doing.
11      MS. KITSON:  Okay.
12      MR. CRONE:  Now, I'm done.  Thank you.
13      Q.  (By Ms. Kitson)  Okay.  Ms. Brigham, let's
14  circle back to the discussion we were having about open
15  time.
16          So, in general, what are the types of trips
17  that flight attendants would tend to drop?  I mean, it
18  seems to me that they would be tending to drop overnights
19  and layovers.
20          I mean, doesn't most -- don't most flight
21  attendants want to come home at night?
22      A.  No, that's actually -- most trips that are
23  on the TradeBoard are victory laps, which is the turn
24  that is after your whole, let's say, three- or four-day
25  trip.  Most people want to be done when they first fly

1   into Denver.  They don't want to do Salt Lake City and
2   then back to Denver.  There were so many turns on the
3   TradeBoard that people were trying to get rid of, so they
4   wouldn't have to fly.
5       Q.  Did you ever look to see if you actually
6   could build a schedule of 60 hours with no overnights at
7   all?
8       A.  I tried every month.
9       Q.  And you were not able to do that, correct?
10      A.  No.  At the time, what they called the
11  reserve grid was always in the red, and you can't move
12  anything around or do anything when there's not enough
13  reserves to cover it.
14      Q.  So why is it you think it would have helped
15  you to be able to build a schedule from scratch?
16      A.  Because that's the -- the open time was
17  there.  It was what was left over.  There were multiple
18  turns.  TradeBoard -- there were so many turns that I
19  could have picked up and built a schedule of just day
20  trips with no overnights easily.
21      Q.  Right.  But you weren't able to do that
22  under the regular bidding rules, right?
23      A.  No.  I needed an accomodation of a blank
24  schedule.  The problem is I could not -- so you have to
25  go day for day.  You can trade a four-day for a four-day.

1   You can trade a three-day for a three-day.  Unless the
2   reserve grid is in the green, you can get rid of that
3   whole trip and then pick up turns.  But if the reserve
4   grid is in the red, you can't do almost anything besides
5   day for day.
6       Q.  Yeah.  I think maybe I'm not understanding
7   you.  Because you're saying on the one hand that there
8   were just a ton of these turns, you know, plenty, a
9   plethora of turns, and those were the ones you wanted, but
10  that you still weren't able to make it work.  That's where
11  I'm disconnecting.
12      A.  Correct.  So open time and TradeBoard
13  works differently.  Open time is tied to the reserve
14  grid.  If the reserve grid is in the red, it means they
15  don't have enough employees to cover what's in open time.
16  So, therefore, you can't do much with swapping out.
17          At the time, when -- the reason all this
18  was so bad is because we were short in Denver.  Frontier
19  was shorthanded in Denver.  They did not have enough
20  reserves to cover the trips.
21      Q.  Okay.  So --
22      A.  It would have -- it would have taken
23  Frontier leaving me with nothing in order for me to do
24  what I wanted to do.  I can't start with a schedule and
25  swap.  I tried multiple times every month.  It was just

1   nearly impossible.
2       Q.  Okay.  Nearly impossible for you to pick up
3   enough of these turns that you wanted under the regular
4   Collective Bargaining Agreement rules, correct?
5       A.  No.  You're putting words in my mouth.  To
6   swap.  You can't swap a four-day for four turns in open
7   time, because they're not -- it's not set up the way
8   the -- the reserve grid is.
9       Q.  And part of that is because you can't drop
10  below 45, right?
11      A.  Correct.
12      Q.  Okay.
13      A.  And you couldn't -- at the time, you
14  couldn't drop anything at the time, because the reserve
15  grid has to be in the green.  Green means go.  If you
16  have a reserve grid that's green -- let's say I was
17  awarded 80 hours in four-day trips, and that reserve grid
18  was all in the green.
19          I could drop a four-day, get rid of it,
20  and then add turns in those days, and then that takes
21  care of that.  The reserve grid is still in the green.  I
22  could drop another four-day and pick up all turns.  But
23  when the reserve grid is in the red, it doesn't let you
24  drop anything, and I would have had to drop everything or
25  drop the whole thing in order to add stuff.

Page 98

1    Q.  Okay.  I think I understand.
2        All right.  So let's talk about your
3    conversations with the union about the -- and I'm just
4    going to call it the "blank schedule accommodation."
5    A.  Okay.
6    Q.  And when I'm referring to the "blank
7    schedule accommodation," I'm referring to what we've been
8    talking about where you wanted to not bid and start from
9    scratch.
10       Are you with me?
11   A.  Yes.
12   Q.  Okay.  So when did you first talk about the
13   blank schedule accommodation with the union?
14   A.  It was sometime, I believe, in October
15   when I finally got the union involved in what was going
16   on with Frontier.
17   Q.  Okay.  October 2015?
18   A.  Yes, somewhere around there.  It may have
19   been before.  I don't remember.
20   Q.  Who with the union did you speak to about
21   the blank schedule accommodation?
22   A.  Adrienne Prince, and I believe Kim --
23   Kim Mayne-Sasser or Sayser (sic) or something.
24   Q.  Anyone else from the union?
25   A.  Not that I can think of right now.

Page 99

1    Q.  Okay.  On how many occasions did you
2    discuss the blank schedule accommodation with
3    Adrienne Prince?
4    A.  Multiple times.
5    Q.  About how many?
6    A.  I would say at least three or four times
7    throughout talking, and then we talked about it more
8    during that final investigatory or termination meeting.
9    Q.  What did you discuss with Ms. Prince with
10   respect to the blank schedule accommodation?
11   A.  I explained to her the accommodation that
12   I was seeking, and I told her that Jerry Arellano said
13   that it would violate the CBA.  And she took that back to
14   whoever she took it to and then came and told me that it
15   would not violate the union contract.
16   Q.  You don't know who she took it back to at
17   the union?
18   A.  My guess would be Angie Reef Piller (sic),
19   and I know that the attorney was involved at some point.
20   Q.  But you don't know that for sure?
21   A.  That's from what -- my conversations were
22   mostly with Adrienne.
23   Q.  Okay.  And you don't know for sure who
24   Adrienne spoke with about the blank schedule
25   accommodation?

Page 100

1    A.  I know Angie Reef Piller was involved, and
2    Kim --
3    Q.  How do you know that?
4    A.  From Adrienne.
5    Q.  Any other reason you would know that?
6    A.  She was our union president, so she was
7    involved in most stuff.
8    Q.  Okay.  So that's an assumption?
9    A.  From what Adrienne had told me, Angie Reef
10   Piller was involved.
11   Q.  Yeah.
12       What were the exact words that Ms. Prince
13   used?  Because earlier when you were testifying, you
14   phrased it as it was a violation of the Collective
15   Bargaining Agreement, but the union had granted you an
16   exception.
17       Do you remember that?
18   A.  No.
19   Q.  Okay.  Did Ms. Prince say to you that the
20   union was making an exception?
21   A.  No.  She said it would not violate.
22   Q.  Okay.  Tell me exactly the words she used.
23   A.  I can't tell you exactly.  Those
24   conversations were not recorded.  That happened five
25   years ago.  From my memory as it is today, she told me

Page 101

1    that it would not violate the seniority provision in the
2    CBA.  And she even stated it in that last meeting, and
3    that is recorded.
4    Q.  Anything else you remember about her exact
5    words?
6    A.  Not that I can think of.
7    Q.  She testified in a deposition recently.
8        Were you aware of that?
9    A.  Yes.
10   Q.  And if she said, I -- I didn't see this as
11   something that was permitted by the Collective Bargaining
12   Agreement, would you disagree with her?
13   A.  Absolutely.
14   Q.  Okay.  And do you believe she's lying then?
15   A.  Maybe she is misinformed, or maybe she was
16   led down the wrong path and had a crappy attorney on her
17   side.
18   Q.  So if Adrienne Prince testified that what
19   you wanted to do was a violation of the Collective
20   Bargaining Agreement, you believe that she was either
21   lying or misinformed?
22   A.  Yes.
23       MR. CRONE:  Hold on.  Also object.  It
24   mischaracterizes Plaintiff's prior testimony.
25   Q.  (By Ms. Kitson)  Is there anything else

26 (Pages 98 - 101)

Page 102

1  that Ms. Prince told you about the blank schedule
2  accommodation?
3      A.  Not that I recall.
4      Q.  How many times did you discuss this blank
5  schedule accommodation with Kim Sasser?
6      A.  I believe -- and I don't remember if it
7  was the blank -- I remember communicating with Kim about
8  something, and I can't remember if it was this blank
9  schedule accommodation.  I know it was probably
10  mentioned, because that was part of the accommodation
11  that I was asking.
12      Q.  You have no specific recollection, though,
13  of discussing that with her?
14      A.  No specific.  I remember seeing an email
15  at one point, but I don't have any of that in front of me
16  to tell you accurately.
17      Q.  Do you remember anything specifically that
18  you discussed with Kim Sasser?
19      A.  Not to be able to tell you accurately.
20      Q.  What other accommodations, if any, did you
21  discuss with the union representative?
22      A.  Working at the GO.
23      Q.  And what did they say about that?
24      A.  I honestly don't remember.  I know it was
25  part of the argument between Frontier and the union,

Page 103

1  especially during my grievance.
2      Q.  All right.  Did you ever speak to the union
3  about removing overnights?
4      A.  I don't recall.  I'm assuming it was
5  talked about.
6      Q.  But you don't have a specific recollection?
7      A.  No.
8      Q.  Now, ultimately, the union did not proceed
9  to arbitration on your grievance, correct?
10      A.  Correct.
11      Q.  They dropped it, correct?
12      A.  Correct.  But it was because they had
13  exhausted -- supposedly it was because they had gone to
14  the end of the line.  It's not like -- they basically
15  just dismissed it, so that I could go on about my stuff
16  that I was going to do for it.  They didn't dismiss it
17  because there wasn't a claim.
18      Q.  Well, they could have taken it to
19  arbitration, correct?
20      A.  I don't know.
21      Q.  I was not privy to any of that stuff after
22  termination.
23      A.  I know that Frontier's attorney and the
24  union attorney spoke.  I don't -- I don't remember the
25  outcome of any of that, really.  It's all --

Page 104

1      Q.  So, you don't know why -- you don't know
2  why they dropped it then, correct?  You're just agreeing?
3      A.  Correct.
4      Q.  The accomodation of removing overnights,
5  tell me about that.  So you would have bid, you would have
6  received a line.  You would have gone through the whole
7  drop/swap/trade process.
8          And then at the end of that, you would have
9  been requesting that these overnights just be removed from
10  your schedule?
11      A.  Yeah, just take them off, put them in open
12  time for another flight attendant to pick up if they
13  wanted or have a reserve fly them.  So if they were to
14  just remove them, then I would have nothing on my
15  schedule for that time, and I could pick up turns.
16          But you can't pick anything up when you
17  call in FMLA or even sick.  You can't add anything.  It
18  blocks your schedule.  So I was asking them to just
19  remove those overnights, which they had done a few times
20  in the past, and then I can add turns.
21      Q.  And that's something you would have done
22  after you were already flying during the month after you
23  bid?
24      A.  What do you mean?
25      Q.  Well, I'm confused about when that would

Page 105

1  happen.
2          So you would bid a line, correct?
3      A.  Right.
4      Q.  You would be given a line, correct?
5      A.  Uh-huh.
6      Q.  You could drop/swap and trade, but you
7  couldn't drop below 45 hours, correct?
8      A.  I would do what I could, and then before
9  that month of flying starts, I would request that any
10  overnights that I wasn't able to get rid of, they just
11  take them away.  And then that leaves me those days
12  when -- let's say I would have had a four-day, Danielle.
13          Okay.  So if they remove those three
14  overnights, that opens up two days in my schedule where
15  there would be nothing on it.  Therefore, I could go into
16  open time and TradeBoard, where there's a plethora of
17  turns and just add something.
18      Q.  But that's not something that you can do
19  under the regular process, correct?
20      A.  Correct.
21      Q.  So --
22      A.  Unless -- well, hold on.  Unless the
23  reserve grid was in the green.  If the reserve grid was
24  in the green, you can just dump whatever you want as long
25  as you don't go below what I remember as 60 hours.

27 (Pages 102 - 105)

1    Q.  So the accommodation you were -- were
2  requesting, then, was to be able to do this when the
3  reserve was in the red, correct?
4    A.  Correct.  If --
5    Q.  Because otherwise, you could have done it,
6  right?
7    A.  Correct.  For them to just be able to
8  remove them, put them in open time, and those would be
9  covered by either other flight attendants with a line or
10  a reserve.
11    Q.  So --
12    A.  Because I would be freeing up -- so I
13  would be freeing up whatever turns are in there, so it's
14  not like they would have to hire a whole new flight
15  attendant.  I would still be flying something that a
16  reserve would be flying.  It just did not let me do it.
17    Q.  So the rule is that if reserve was red, you
18  couldn't do this, correct?
19    A.  Correct.
20    Q.  And you were asking for an exception to
21  that rule, correct?
22    A.  An accommodation, yes.
23    Q.  An exception, correct?
24    A.  Accommodation, I would call it.
25    Q.  Well, I mean, that's the rule, and you're

1  asking to be --
2    A.  Danielle, I was asking that for a specific
3  accommodation.
4    Q.  But that's an exception that other people
5  did not get, correct?
6    A.  Correct.  It would be an accommodation.
7    Q.  How many times were you given this
8  exception?
9    A.  What exception?
10    MR. CRONE:  Hold on.  Objection to the
11  question.  Mischaracterizes the witness' prior testimony.
12    Q.  (By Ms. Kitson)  You mentioned in your
13  earlier testimony that, on a few occasions, Frontier had
14  allowed you to remove overnights?
15    A.  Yes.
16    Q.  And that was back when the reserve was in
17  the red, correct?
18    A.  Correct.
19    Q.  On how many occasions did Frontier do that?
20    A.  I think it was one or two times that they
21  had just removed the overnights.  And I don't remember
22  any specifics around that.  I know it -- I think at one
23  point I had talked to Cassandra Micklich, and she -- I
24  was very upset because a turn was removed from my
25  schedule and nobody knew why.  And I was upset.  And then

1  at one point, she had removed an overnight that I was
2  supposed to fly.  I -- I don't know how she did it, but
3  she made it go away.
4    Q.  And I believe you said that you were told
5  they could do it on that occasion, but they can't be doing
6  it regularly.
7    Do I have that correct?
8    A.  Correct.
9    Q.  Okay.  And are you aware of any other
10  flight attendants who were allowed to do this, to drop
11  trips when the reserve is in the red?
12    A.  Not that I'm aware of.
13    Q.  Throughout the process that we've been
14  discussing of your discussions with Frontier about
15  possible accommodations, you spoke with Frontier
16  representatives on a number of occasions about the
17  possible accommodations, correct?
18    A.  Correct.
19    Q.  At any point, did they stop talking to you
20  about this?
21    A.  Yes.  I had emailed the director of
22  Inflight, Laura Rush -- oh, hold on.
23    Hold on, kids.
24    I had emailed Laura Rush, and she said, At
25  this point, I am going to direct you to Shelly Leyner for

1  a leave of absence.  So basically saying that she could
2  not do anything, and -- yeah.
3    Q.  So you continued a process of discussing
4  these schedule accommodations with Frontier, correct?
5    A.  Correct.
6    Q.  I want to take a look at a document here.
7  Let me find it.  It will be --
8    A.  Danielle, hold on just a second.
9    Q.  Oh, sure.  Yeah.  Go ahead.
10    THE VIDEOGRAPHER:  Do you want me go off
11  the record?
12    MS. KITSON:  Yeah.  Let's go off the
13  record.
14    THE VIDEOGRAPHER:  We're going off the
15  record at 10:47 a.m.
16    (Recess from 10:47 a.m. to 10:49 a.m.)
17    THE VIDEOGRAPHER:  We're going back on the
18  record at 10:49 a.m.
19    Q.  (By Ms. Kitson)  Ms. Brigham, do you
20  understand that you're still under oath?
21    A.  Yes.
22    Q.  In this case, I believe that you're
23  contending -- strike that.
24    Are you contending in this case that
25  Frontier failed to engage in an interactive process with

Page 110

1  you; in other words, an interactive dialog about what
2  accommodations might be available to you?
3      A.  Yes.
4      Q.  Okay.  And on what do you base that claim?
5      A.  They never came up with any suggestions of
6  stuff that I could do that would be reasonable for me to
7  be able to keep flying like I needed to and to be able to
8  make hours.
9      Q.  Is there any other basis on which you're
10  basing your claim that Frontier failed to engage in an
11  interactive dialog?
12      A.  Other than they didn't come up with
13  anything that would have helped me.
14      Q.  We talked earlier about various potential
15  accommodations that you did discuss with them, correct?
16      A.  Correct, but none of those would have
17  worked for me.
18      Q.  Okay.  And for the reasons that we've
19  discussed, correct?
20      A.  Correct.
21      Q.  But they never refused to at least talk to
22  you about it, correct?
23      A.  Oh, right, they always talked about it.
24      Q.  And at the end of the day, you just
25  disagreed about what was reasonable and what wasn't,

Page 111

1  correct?
2      A.  What do you mean by "disagree"?
3      Q.  Well, you would put something forward or
4  they would put something forward.  And, you know, what
5  they offered, you didn't believe was reasonable; and what
6  you offered, they didn't believe was reasonable.
7      Does that make sense?
8      A.  It does.
9      Q.  Okay.  So you discussed possible
10  accommodations, but you just disagreed with one another
11  about what would be a reasonable accommodation, correct?
12      A.  If you put it that way, then yes.
13      Q.  At any point, did anyone refuse to talk to
14  you?
15      A.  Not that I can remember.
16      Q.  Okay.  I'm --
17      A.  I think it was a Laura Rush thing.
18      Q.  And the Laura Rush thing, I mean, she
19  basically directed you to someone else within the company,
20  correct?
21      A.  Right.  Right.  But as the director of
22  Inflight, I mean, I personally think that she should have
23  at least -- to see what was going on, I feel like if
24  Laura Rush had gotten involved, maybe something would
25  have been different.

Page 112

1      Q.  But she didn't refuse the company speaking
2  to you further; she just said, I'm going to need to direct
3  you to Shelly Leyner, correct?
4      A.  Correct.
5      Q.  And did you actually talk to Shelly Leyner?
6      A.  She was copied on that email.  I talked to
7  Shelly multiple times.
8      Q.  So no one prevented you from talking to her
9  or to Mr. Arellano, et cetera?
10      A.  No.
11      Q.  Okay.  I'm going to show you Brigham
12  Exhibit 20.  So Brigham Exhibit 20 is a document bearing a
13  Bates stamp FRONTIERAIRLINES(R.BRIGHAM)- 1766.
14      Do you see that?
15      A.  Yes.
16      Q.  Do you recognize this document?
17      A.  I do.
18      Q.  What is it?
19      A.  I had turned this in at my investigatory
20  meeting.
21      Q.  Your investigatory meeting was on or about
22  November 3rd of 2015; is that right?
23      A.  Correct.
24      Q.  And did you bring this into the meeting?
25      A.  I did.

Page 113

1      Q.  Okay.  And is this the last accommodation
2  request that you made?
3      A.  I believe so.
4      Q.  Okay.  And you say, Ideas, just remove me
5  from the overnights, have me build my own schedule out of
6  open time and TradeBoard.
7      Do you see that?
8      A.  Yes.
9      Q.  Are those the accommodations that we've
10  been talking about?
11      A.  Except not the one where I would go work
12  at the general office.  They had told me that that was
13  impossible because that was just for people that got back
14  from OJI.
15      Q.  Okay.  So other than that, this was the
16  final accommodation request that you made, if you will; is
17  that correct?
18      A.  Correct.
19      Q.  And what happened with this request?
20      A.  I retired.
21      Q.  So Frontier denies this request; is that
22  correct?
23      A.  Yes.  They wrongfully terminated me, I
24  would say.
25      Q.  Are you bringing any claim in this case

29 (Pages 110 - 113)

Page 114

1 under the FMLA?
2        A.  What do you mean?
3        Q.  You have not asserted a legal claim based
4 on the FMLA, correct?
5        A.  You're going to have to explain further.
6 I don't know what you mean.
7        Q.  You brought claims under the Americans with
8 Disabilities Act, correct?
9        A.  Correct, correct.
10       Q.  But you're not claiming a violation of the
11 Family Medical Leave Act, FMLA, correct?
12       A.  I think I shouldn't have had to have been
13 using it.
14       Q.  But it wasn't -- the law wasn't violated,
15 correct?
16       A.  Not that I'm aware of.
17       Q.  All right.  I'm going to show you what has
18 been marked as Exhibit 37.  Brigham Exhibit 37 is an email
19 to you from Leave of Absence Frontier Employees, dated
20 January 22, 2014.
21          Do you see that?
22       MR. CRONE:  Danielle, I'm trying to --
23 sorry to cut in.
24          I -- I can't find Exhibit 37 in what you
25 sent me.  I think that was part of that original part 4

Page 115

1 that never came through.  Is there any way you could just
2 email that to me?
3        MS. KITSON:  You bet.  Let me just send it
4 off now.
5        MR. CRONE:  Thank you.
6        MS. KITSON:  Hold on.  I have to stop
7 sharing to do this.  I've got multiple screens going on
8 here.  Hold on a second.
9        MR. CRONE:  That -- that's fine.  Thanks.
10       MS. KITSON:  All right.  It should be
11 coming your way now.
12       Q.  (By Ms. Kitson)  Ms. Brigham, are you still
13 seeing the document?
14       A.  I am.
15       Q.  Okay.
16       MS. KITSON:  John, do you want to let me
17 know when it comes through?
18       MR. CRONE:  Yeah, I will.
19       MS. KITSON:  That's all right.
20       MR. CRONE:  If you want -- if you want to
21 go ahead, I'll let you know if I don't get it.
22       MS. KITSON:  Okay.  Great.  And I mean,
23 you can see my screen, right?
24       MR. CRONE:  Yes, yes.
25       MS. KITSON:  Okay.  Good.

Page 116

1        Q.  (By Ms. Kitson)  Ms. Brigham, is this a
2 true and correct copy of an email that you received from
3 Frontier's Leave of Absence Department on January 22nd,
4 2014?
5        A.  I mean, I don't remember this specific
6 document, but, yeah.
7        Q.  Okay.  And it's got an attachment here, DOL
8 Employee Guide New and FMLA attachment.
9          Do you see that?
10       A.  Yes.
11       Q.  Let me scroll up.  And this is in response
12 to an email that you sent the Leave of Absence Department
13 on January 22nd, 2014, where you say, My name is
14 Rebecca Brigham, number 413206, and am requesting
15 intermittent FMLA paperwork.
16          Do you see that?
17       A.  Yes.
18       Q.  Do you recall requesting FMLA paperwork in
19 January 2014?
20       A.  Yes.
21       Q.  Okay.  And the company provided it to you,
22 correct?
23       A.  Correct.
24       Q.  Okay.  And did you review this information
25 in the employee guide to the Family Medical Leave Act?

Page 117

1        A.  Probably not.
2        Q.  Were you generally familiar with FMLA
3 guidelines and how the company employed them?
4        A.  Generally, yes.
5        Q.  Okay.  I just wanted to point you to
6 one -- we are on page 10 of the PDF, which it is
7 BRIGHAM -- or FRONTIERAIRLINES(R.BRIGHAM)- 1458.
8          Are you with me?
9        A.  Yes.
10       Q.  And it says, How do I request FMLA leave?
11 To take FMLA leave, you must provide your employer with
12 appropriate notice.
13          Do you see that?
14       A.  Yes.
15       Q.  Were you aware of that rule?
16       A.  Yes.
17       Q.  And then I wanted to show you down here
18 (indicating), the third yellow highlight.  It says, You
19 must follow.
20          Do you see that?
21       A.  Uh-huh.
22       Q.  It states, You must follow your employer's
23 usual notice or call-in procedures unless you are unable
24 to do so, for example, if you are receiving emergency
25 medical care.

30 (Pages 114 - 117)

Page 118

1    Do you see that?
2    A.  Yes.
3    Q.  And were you aware that that was a
4  requirement under the FMLA?
5    A.  Yes.
6    Q.  Okay.  We can set that aside.
7    I'm going to open what has been marked as
8  Exhibit 23.  It's such a crazy world like sharing and
9  using exhibits.
10    Okay.  Are you seeing a document, Brigham
11  Exhibit 23, which is a Frontier Airlines job description?
12    A.  Yes.
13    Q.  Okay.  And just for the record, this is
14  FRONTIERAIRLINES(R.BRIGHAM)- 93.
15    Are you with me?
16    A.  Yep.
17    Q.  Do you recognize this document?
18    A.  The job description, yes.
19    Q.  And is it familiar to you, the flight
20  attendant for Frontier Airlines?
21    A.  Yes.
22    Q.  And Section 2 is Essential functions.  And
23  then there are a list of bullet points.
24    Do you see that?
25    A.  Yep.

Page 119

1    Q.  And the first one is, Follow all aviation
2  regulations as required, as well as established
3  Frontier Airlines policies and procedures.
4    Do you see that?
5    A.  Yes.
6    Q.  Was that an essential function?
7    A.  Yes.
8    Q.  It says, Initializes and conducts emergency
9  evacuations of cabin, if necessary.
10    Was that an essential function?
11    A.  Yes.
12    Q.  Were all of these on this list an essential
13  function, in your view, of the job?
14    A.  Yes.
15    Q.  And just to confirm, your alcoholism did
16  not impede you from performing these essential functions
17  of the job, correct?
18    A.  Correct.
19    Q.  Okay.  I'm going to open another document.
20  It will be Brigham Exhibit 41.  Brigham Exhibit 41 is a
21  document entitled, Comanche Crossing Counseling, LLC.  And
22  the Bates stamp is BrighamR_PlaintiffRecords 1029.
23    Do you see that?
24    A.  Yes.
25    Q.  Okay.  And do you recognize this document?

Page 120

1    A.  Yes.
2    Q.  What is it?
3    A.  It's the intake sheet for seeing my
4  counselor after I got back from treatment.
5    Q.  So --
6    A.  Or nope, this is before I went to
7  treatment.
8    Q.  Who was your counselor?
9    A.  Her name is Marla Madrid.
10    Q.  How long have you been seeing Ms. Madrid?
11    A.  Since probably around this date.
12    Q.  So this would have been your initial
13  contact with her, roughly?
14    A.  I believe so, yeah.
15    Q.  And do you continue to see her today?
16    A.  No.  I'm in Michigan.  So there's not
17  really a way for me to see her.
18    Q.  And I ask you that because I'm actually
19  still seeing my doctors via Telehealth Zoom.  So I didn't
20  know if that was something you were doing.
21    A.  I actually did ask her, and because we're
22  in Michigan and her license is for Colorado, she can't
23  see me.
24    Q.  I see.  Are you seeing anyone else in
25  Michigan?

Page 121

1    A.  No.
2    Q.  Okay.
3    A.  We currently don't have healthcare, and we
4  can't -- with COVID going on, we can't afford to see
5  anybody right now.
6    Q.  Are you seeing any doctor for any medical
7  care, including a primary care physician?
8    A.  I mean, I have a primary care physician.
9  I haven't had to go for like nine months.
10    Q.  And who is your primary care physician?
11    A.  Her name is Tara Taylor.  She's actually
12  the PA, and I believe the doctor that's at that office is
13  Rachel Young.
14    THE REPORTER:  I'm sorry.  Last name again
15  of the doctor?
16    THE DEPONENT:  Rachel Young.
17    Q.  (By Ms. Kitson)  Any other doctors that you
18  are seeing or have seen recently?
19    A.  Nope.
20    Q.  And are you going to A.A. meetings?  What
21  are you doing to manage your alcoholism today?
22    A.  Continuing to do A.A. meetings.  However,
23  it's not as frequent as it was in the beginning.  I also
24  have an online support group called She Recovers, and I'm
25  on their Facebook page, where we discuss what we're

31 (Pages 118 - 121)

Page 122

1    dealing with as it relates to alcoholism.
2        Q.   At the bottom of Brigham Exhibit 41, it
3    says, Reason for appointment, deal with triggers of
4    alcohol.
5            Do you see that?
6        A.   Yep.
7        Q.   Did you discuss those triggers with
8    Ms. Madrid?
9        A.   Yes.
10       Q.   In the Frontier world of your job duties as
11   a flight attendant, you were not triggered by serving
12   drinks on the airplane; is that correct?
13       A.   Correct.
14       Q.   And you, in your daily life, were not
15   triggered by going to a liquor store or driving by a
16   liquor store; is that correct?
17       A.   Correct.  I mean, at the time before I had
18   been to treatment, for sure, it was hard for me to pass a
19   liquor store and not go in.  Yeah.
20       Q.   Let's talk about your job at Frontier.
21           In terms of your job, what were the
22   triggers?
23       A.   What do you mean?
24       Q.   You had mentioned earlier that being at a
25   hotel on an overnight was a trigger; is that correct?

Page 123

1        A.   After treatment, yes.  It was -- and it's
2    not really even -- well, I guess you could call it a
3    trigger.  It was sort of -- when I went through
4    treatment, they teach us how to deal with these types of
5    things.  And in the beginning, usually they say, For the
6    first year, don't make any major changes to your life.
7            So don't, like, go home and get a divorce.
8    Don't go home and quit your job.  Don't -- keep
9    everything relatively normal, but start changing your
10   playground.  Don't associate with the people that you
11   used to drink with, if that's a trigger for you.  Stuff
12   like that.
13           And one area that I -- at the treatment
14   center, we discovered that one of those areas that I
15   should try to avoid is overnight trips.
16       Q.   Were there any other triggers while you
17   were on the job or related to your job?
18       A.   Basically dealing with Frontier was a huge
19   trigger.  Every time they removed trips from my
20   schedule -- I mean, at one point, it felt like Frontier
21   was just trying to get rid of me, just almost trying to
22   torture me.
23           They just would not listen.  They would
24   not -- it felt like nobody understood that this, to me,
25   is life and death.  Like, I have to do these certain

Page 124

1    thing if I want to remain sober and change my life.
2        Q.   So overnight trips is a trigger, correct?
3        A.   Correct.
4        Q.   Dealing with Frontier, kind of the stress
5    of that, was a trigger, correct?
6        A.   It was.  And would --
7        Q.   Any other --
8        A.   Oh, go ahead.
9        Q.   Any other triggers, job-related triggers,
10   or while you were on the job?
11       A.   Not that I can think of.
12       Q.   From the date that you went into rehab,
13   that September 5th, 2014 date --
14       A.   It was September 7th.
15       Q.   Oh, September 7th.  Sorry about that.
16           From the date you went into rehab on
17   September 7th of 2014, after that, did you take any
18   overnight trips with Frontier?
19       A.   Not that I recall.
20       Q.   Okay.  So every time you had an overnight
21   trip that you could not drop through collective bargaining
22   bidding, you called out for that trip; is that correct?
23       A.   Yes.  And Frontier told me to use
24   intermittent FMLA for that.
25       Q.   So you never tried it to see if it would be

Page 125

1    an actual trigger?
2        A.   No.  That's like playing Russian roulette.
3        Q.   Okay.  I'm looking back at this Brigham
4    Exhibit 41.  And this is a second page of the document,
5    Comanche Crossing Counseling, Diagnostic Intake Summary.
6            Do you see that?
7        A.   Yes.
8        Q.   Have you reviewed this document before?
9        A.   I don't think so.
10       Q.   Looking at it, does it appear to be a
11   summary of your conversation with Ms. Madrid -- or
12   Dr. Madrid on June 13th, 2014?
13       A.   Yes.
14       Q.   Do you remember discussing these topics
15   with her?
16       A.   And will you scroll down, Danielle.
17       Q.   You bet.  And you can read the whole
18   document.  Just tell me when you want me to scroll.
19       A.   Okay.
20       Q.   The yellow highlighting is what I'm going
21   to ask you about.
22       A.   Okay.  Okay.
23       Q.   Okay.  You want to keep reading here?
24       A.   Yeah, I would like to, if that's okay.
25       Q.   Yeah.  No, you're fine.

32 (Pages 122 - 125)

Page 126

1    A.  All right.  Will you scroll, Danielle.
2    Q.  Mm-hmm.
3    A.  Okay.  Okay.
4    Q.  This is the end of it.
5    A.  Okay.
6    Q.  Let me know when you're done.
7    A.  Okay.
8    Q.  The question I have is really with respect
9  to this second page of the Diagnostic Intake Summary.
10  Ms. Madrid or Dr. Madrid is -- states, Rebecca is
11  currently struggling with admitting to being an alcoholic.
12  At this time, she is ready to take a path to recovery.
13       Do you see that?
14    A.  Yes.
15    Q.  Do you remember discussing that with
16  Dr. Madrid?
17    A.  Yes.
18    Q.  She goes on to say, Rebecca and husband
19  have been in couple's treatment prior.
20       Do you see that?
21    A.  Yes.
22    Q.  Was that true?
23    A.  Yes.
24    Q.  Why were you --
25    A.  We were in marriage counseling before,

Page 127

1  after the loss of our daughter.
2    Q.  And why were you in couple's treatment?
3    A.  Because of the loss of our daughter is
4  what started it, and my alcoholism.
5    Q.  Okay.  She goes on to say, Rebecca
6  currently uses alcohol in private.  She stated she has
7  been drinking since the age of 14.  She noted that her
8  parents are functioning alcoholics.  Her mother has
9  anywhere from 2 to 5 glasses of wine at night on average.
10  Her father has 10 beers.  Rebecca currently drinks alone.
11  She noted that her husband smokes pot.
12       Do you see that?
13    A.  Yes.
14    Q.  Is all of that accurate?
15    A.  Yes.
16    Q.  Okay.  Under Treatment Requested and
17  Rationale For Request, it states, Rebecca is currently
18  utilizing her employee assistance program benefits.  She
19  would like to work on sobriety in a therapeutic setting.
20  She would like to get at the root of the triggers, which
21  currently she believes are fighting and stressors with
22  husband.
23       Do you see that?
24    A.  Yes.
25    Q.  Is that an accurate statement at the time?

Page 128

1    A.  Yes.
2    Q.  Is there a reason that you didn't mention
3  to Dr. Madrid this issue of overnights being a trigger?
4    A.  Because we didn't realize -- or I didn't
5  realize at the time that -- because I hadn't done
6  treatment yet.  This was before, when I thought I could
7  get sober on my own.
8       And after I got to treatment is when they
9  said, Change your playground.  These are the areas where
10  you're going to want to avoid, you know, anywhere that
11  you're used to being around people drinking, in the
12  beginning.
13    Q.  Okay.  But at least as of June 13th, 2014,
14  that's not something that you had recognized as a trigger?
15    A.  No.
16    Q.  We're done with that one.
17       I have a follow-up question for you about
18  the union.  Typically, the union would send out a closeout
19  letter?
20    A.  What?
21    Q.  A closeout letter.
22    A.  Okay.
23    Q.  Did you receive any kind of closeout letter
24  from the union saying that they were done with your
25  grievance?

Page 129

1    A.  Not that I can recall.
2    Q.  Okay.  Have you turned over to your counsel
3  all correspondence that you had with the union?
4    A.  Yes.
5    Q.  And is there any place that you might have
6  additional correspondence that you haven't looked?
7    A.  Not that I can think of.
8       MS. KITSON:  I actually think we could go
9  off the record for lunch, if that works for everybody.  I
10  know you're on a later time zone, Ms. Brigham, and I'm
11  kind of an early eater.
12       So does that work, John, or do you want
13  to --
14       MR. CRONE:  Yeah.  Yeah, that -- that
15  works great.
16       MS. KITSON:  Okay.  Let's go off the
17  record for lunch.
18       THE VIDEOGRAPHER:  We're going off the
19  record at 11:37 a.m.
20       (Recess from 11:17 a.m. to 12:20 p.m.)
21       THE VIDEOGRAPHER:  We're going back on the
22  record at 12:20 p.m.
23    Q.  (By Ms. Kitson)  Ms. Brigham, do you
24  understand you're still under oath?
25    A.  Yes.

33 (Pages 126 - 129)

Page 130

1    Q.  I wanted to show you a series of documents,
2    and starting with the Collective Bargaining Agreement
3    again.  This is going to be Brigham Exhibit 1.  One second
4    while I get that up in front of you.
5        Are you seeing the Collective Bargaining
6    Agreement?
7    A.  Yes.
8    Q.  I want to show you just one provision of
9    this that I'm hoping will refresh your recollection about
10   what happens to your seniority if you transfer within the
11   company.  So this is going to be PDF 102, which is
12   FRONTIER AIRLINES (R. BRIGHAM) - 916.
13       Are you with me?
14   A.  Yes.
15   Q.  Okay.  And I just wanted to show you this
16   to refresh your recollection.  It states, number 4, If a
17   flight attendant is permitted by the company to transfer
18   to a position outside the flight attendant craft or class
19   on account of physical incapacity, illness or injury,
20   he/she will retain and accrue seniority for a period not
21   to exceed two years of continuous service in such
22   position, after which the flight attendant will be removed
23   from the seniority list.  A period of service will be
24   deemed continuous service until it is broken by a transfer
25   back to the position of flight attendant.

Page 131

1        Do you see that?
2    A.  I do, but that's not what I was told by
3    the company.
4    Q.  Do you have any reason to -- strike that.
5        Did you have the Collective Bargaining
6    Agreement available to you when you were a flight
7    attendant with Frontier?
8    A.  I think I could have gotten it somewhere
9    online.
10   Q.  Yeah.
11   A.  But it's not something like they hand it
12   out to us.
13   Q.  And who specifically told you something
14   contrary to this?
15   A.  I believe it was Jeff Varney told me that
16   after 90 days, you lose your seniority or your ability to
17   go back to Inflight at your seniority.
18       And, I mean, I'm not an attorney.  I --
19   that's why I hired an attorney to understand some of
20   these things.  But if this is the case, then Frontier
21   would have been admitting that I was ill or had an
22   injury, which they said I didn't.  Because if I had an
23   injury, then I should have been able to work at the GO.
24   Q.  And I believe, Ms. Brigham, that every
25   flight attendant was given a hard copy of the Collective

Page 132

1    Bargaining Agreement; isn't that right?
2    A.  No.  I never got a hard copy.
3    Q.  Who's Jeff Varney?
4    A.  He was an Inflight supervisor.
5    Q.  And is that spelled with a V, as in Victor?
6    A.  Yes.
7    Q.  And is it possible that he could have been
8    mistaken about what the terms of the Collective Bargaining
9    Agreement say?
10   A.  Of course.
11   Q.  Do you have any reason to believe that this
12   policy that we're looking at under the Collective
13   Bargaining Agreement on PDF page 102 of the document is
14   incorrect?
15   A.  I have no reason to believe that, but why
16   didn't they tell me this when they were talking about
17   transferring?  The reason I told them I did not want to
18   transfer was because of the 90 day.  If they knew this
19   existed they should have told me.
20   Q.  Are you aware of anyone who lost their
21   seniority after 90 days?
22   A.  No, but I've heard about flight attendants
23   who go -- who have been injured or anything like that,
24   and they're not allowed to come back to Inflight after a
25   certain amount of time.

Page 133

1    Q.  Who specifically are you referring to?
2    A.  I couldn't even tell you.
3    Q.  And you don't know what that period of time
4    was?
5    A.  I want to say it was the 90 days.
6    Q.  But you don't know of anyone specific,
7    correct?
8    A.  Correct.
9    Q.  And was this just kind of a rumor you
10   heard?
11   A.  Yeah, flight attendants talking.
12   Q.  Okay.  Did anyone else at Frontier ever
13   indicate to you that you lost seniority after 90 days?
14   A.  Not that I can think of right now, but I
15   know I heard it a few different times.
16   Q.  But all rumors, correct?
17   A.  Rumors, or came from a direct supervisor.
18   Q.  And that's the reference you're making to
19   Mr. Varney?
20   A.  Yes.
21   Q.  And is it only on one occasion that he
22   mentioned that?
23   A.  That I have memory of.
24   Q.  Yeah.  And when was that approximately?
25   A.  I want to say it was at one of our

34 (Pages 130 - 133)

Page 134

1 meetings.
2     Q.  Was anyone else present?
3     A.  Maybe Kari Thompson.
4     Q.  And when you say "our meetings," what are
5 you referring to?
6     A.  When I would have to go to the general
7 office to try and ask for reasonable accommodations, ask
8 for ways to get this to work out, so that I could
9 continue to do my job.
10     Q.  I'm going to show you a different document.
11 This will be Brigham Exhibit 17.
12         Do you recognize Exhibit 17?  And I'll
13 scroll down, so you probably see.
14         Do you see in the right-hand corner, it
15 says, From The Discovery House?
16     A.  Yes.
17     Q.  And it's dated September 12th, 2014?
18     A.  Yes.
19     Q.  And it's entitled, Certification of
20 Healthcare Provider for Employee's Serious Health
21 Condition.
22         Do you see that?
23     A.  Yes.
24     Q.  And it says, Family Medical Leave Act.
25         Do you see that?

Page 135

1     A  Yes
2     Q  Do you recognize this document?
3     A  It would be the FMLA paperwork
4     Q  Is this your handwriting on the first
5 page of the document?
6     A  It is
7     Q  I'll scroll down here  I'll also note that
8 the document begins with FRONTIERAIRLINES(R BRIGHAM)- 1118
9 just for the record  And I wanted to just walk through
10 this with you  It says, Approximate date condition
11 commenced, 9/7/14
12         Do you see that?
13     A  Yep
14     Q  And that is the date that you were checked
15 into rehab  is that right?
16     A  Correct
17     Q  And it says, Probable duration of
18 condition, 30 to 90 days
19         Do you see that?
20     A  Yes
21     Q  And I believe you said you were in rehab
22 for 60
23         Is that right?
24     A  Correct
25     Q  Okay  And it says, Dates you treated the

Page 136

1 patient for condition, September 8th, 2014.
2         Do you see that?
3     A.  Let me move my people screen.  Hold on.
4     Yes.
5     Q.  Okay.  And what treatment did you receive
6 on the 8th?  Was that the first day you were in rehab?
7     A.  Yes.  I met with a doctor to talk about
8 the medications that I was on, and I think I did like a
9 questionnaire, and that's all I remember.
10     Q.  Okay.  You mentioned that the Collective
11 Bargaining Agreement was available online, correct?
12     A.  I believe so, yeah.  That's how I found
13 it.
14     Q.  And you certainly would agree that it was
15 your responsibility -- as a flight attendant, under the
16 Collective Bargaining Agreement that applied to you, that
17 it was your responsibility to be familiar with the
18 contract, correct?
19     A.  Not after being told by somebody who's
20 supposed to know what the rule is.  I didn't even -- and,
21 Danielle, why would they not tell me that?
22     Q.  And my question is, in general, it was your
23 responsibility to be familiar with the terms, correct?
24     A.  Sure.
25     Q.  Okay.  All right.  So looking back at that

Page 137

1 Brigham Exhibit 17, I've also yellow highlighted here,
2 Client in residential treatment for chemical dependence.
3         I'm guessing that's "dependency"?
4     A.  Chemical dependency.
5     Q.  Or "dependence."
6         Is that alcoholism?
7     A.  Yes.
8     Q.  Okay.  And then page 3 is a PDF.  It says,
9 Please indicate if any of the following apply to the
10 patient.  And the box is checked for, They will experience
11 a period of continuous incapacity, during which they will
12 be unable to perform the functions of their job as
13 detailed in the accompanying job description, or if no --
14 no job description is included by the employee.
15         Do you see that?
16     A.  Yes.
17     Q.  And it was true that during this 60 days of
18 time, you were unable to perform the functions of your
19 job, correct?
20     A.  Correct.
21     Q.  And you were given medical leave, correct?
22     A.  Correct.
23     Q.  And your seniority continued to accrue
24 while you were on that medical leave, correct?
25     A.  Correct.

35 (Pages 134 - 137)

1    Q.  At the end here, it states that your
2  provider's name is Walter Thomas, MD.
3         Do you see that?
4    A.  Yes.
5    Q.  Is that the doctor that you saw?
6    A.  I believe so.  But I -- honestly, I saw
7  him for a whole 15 minutes.
8    Q.  There's a whole list of medications on this
9  last page of the document.
10        Do you see that?
11   A.  Mm-hmm, yep.
12   Q.  And there is a reference to that levo- --
13   A.  Levothyroxine.
14   Q.  -- levothyroxine.  There are also several
15 other medications here.
16        Do you see that?
17   A.  Uh-huh.  I do.
18   Q.  Are you still on any of those today?
19   A.  I am not.
20   Q.  Okay.  All right.
21   A.  At one point on this list, there should
22 have been the trazodone.  I originally started taking
23 trazodone about halfway through my treatment for issues
24 with sleeping.  So -- but that's when I started taking
25 trazodone, and then I weaned myself off of the gabapentin

1  and the lamotrigine.
2         Like I stated early, I don't really like
3  being on pharmaceuticals if I don't have to be.  The
4  levothyroxine, I don't have a choice about.
5    Q.  Okay.  Let me show you what's been marked
6  as Exhibit 36 -- Brigham Exhibit 36.  Brigham Exhibit 36
7  is a fax cover sheet from Matt Riemann to a phone number
8  listed above.  But it is -- it appears to be a fax of an
9  additional medical document.
10        Are you familiar with this document at all?
11 I'm scrolling through for you.
12   A.  I'm not.
13   Q.  Here's the fax.  On the fourth page of the
14 document, it states it's from Discovery Transitions
15 Outpatient.  It's dated November 7th, 2014, and it's to
16 Frontier's leave department.
17        Do you see that?
18   A.  Yes.
19   Q.  And what is Discovery Transitions?
20   A.  So my recovery in treatment was in two
21 sections.  The first 30 days was the complete in-person
22 residential treatment.  And then the next 30 days, it
23 was -- I would do IOP, while I lived in a house with
24 other people in recovery.  It was more of an outpatient
25 program.

1    Q.  Mm-hmm.
2         If you take a look here toward -- this is
3  PDF page 6 of the document, which is
4  FRONTIERAIRLINES(R.BRIGHAM)- 1432.
5         Are you with me?
6    A.  Yeah.
7    Q.  And this states that your medical condition
8  began on September 7th, 2014.
9         Do you see that?
10   A.  Yes.
11   Q.  And it says, Please check one of the
12 following.  And the box is checked for, Employee is able
13 to work a full, regular schedule with no restrictions
14 beginning November 17th, 2014.
15        Do you see that?
16   A.  Yep.
17   Q.  And was that correct at the time?
18   A.  I would have to disagree here, just
19 because it was in treatment that we first decided that I
20 should try to avoid layovers.  And in the beginning, it
21 was fine.  I was able to avoid layovers.  It wasn't until
22 Frontier opened the second base and everybody junior went
23 to Orlando, that we then started having issues.  So had
24 we known it was going to be an issue, it would have been
25 written on here.

1    Q.  So take a look at this last page.  It's
2  signed by Dr. Walter Thomas.
3         Do you see that?
4    A.  Yep.
5    Q.  Is that the same doctor that treated you on
6  the prior medical certification form?
7    A.  Yes.
8    Q.  So Dr. Thomas is saying here that you're
9  able to work a full, regular schedule, correct?
10   A.  Correct.
11   Q.  And he states that you have no
12 restrictions.  He says that --
13   A.  It was to --
14   Q.  -- correct?
15   A.  It was to, basically, my physical
16 abilities is what I see.  Standing, walking, sitting,
17 lifting, pushing, pulling, carrying, use of hands.
18   Q.  And he says -- Detail any additional
19 restrictions below.  He states, None, correct?
20   A.  Correct.
21        But I also want to just add in there that
22 at first, it was fine.  I didn't need any accommodations.
23 It wasn't until later.
24   Q.  But he doesn't state anything about your
25 need to avoid layovers, correct?

36 (Pages 138 - 141)

Page 142

1    A.  He's not a psychic.  He did not know that
2  Frontier was going to open another base and my seniority
3  would go down.
4    Q.  Yeah.  But you were avoiding layovers,
5  correct?
6    A.  Correct.
7    Q.  And he didn't state that that was medically
8  necessary on that form, correct?
9    A.  He also was not my therapist there.  He
10  was just the doctor that checked the boxes and did
11  whatever to get me to be able to go back to work.  He was
12  not my therapist who I had discussed everything with.
13    Q.  This was sent on November 8th, 2014,
14  correct?
15        I'm showing you that fax -- that date in
16  the center.
17        Do you see that?
18    A.  I -- no, it's not on my screen anymore.
19    Q.  Oh, it would help if I shared it with you
20  again.
21        Okay.  Do you see it now?
22    A.  No.  Well, I see it, but not the date.
23    Q.  Yeah.  Okay.  So this is Brigham
24  Exhibit 36, again.  And I'm trying to yellow highlight the
25  date.

Page 143

1        Did that work?
2    A.  Yeah, there we go.
3    Q.  Can you see my mouse, by the way, moving?
4    A.  I see a circle.
5    Q.  Okay.  Good.  Learning every day how this
6  works with the Zoom, right?
7        Okay.  So we're looking at the PDF page 7
8  of Brigham Exhibit 36, and there's a date stamp at the
9  top.
10        Do you see that?
11    A.  Yep.
12    Q.  And it states, November 8th, 2014.
13        Do you see that?
14    A.  Yep.  That was the day after I left
15  treatment.
16    Q.  Okay.  And that was the day -- strike that.
17        So that's the date on which this was sent
18  to Frontier, correct?
19    A.  Correct.
20    Q.  Okay.  And as of that day, you were aware
21  that you needed to avoid layovers.
22        Am I right about that?
23    A.  It was talked about, yes, but it wasn't
24  until I saw Marla again that -- so Frontier had their
25  self-disclosure policy, which I'm sure you've seen it,

Page 144

1  where it says I have to adhere to all aspects of my
2  program.  So Marla Madrid and I came up with a treatment
3  plan, and that was one of the things that we had
4  discussed avoiding due to relapse.
5    Q.  But as of that date, November --
6    A.  So this was talked about -- this was
7  talked about with my therapist at The Discovery House,
8  not with this doctor.
9    Q.  Okay.  This doctor was the one filling out
10  your fitness for duty form, correct?
11    A.  Correct.  And all he -- all I see are
12  basically, physically, I'm able to do the job.
13    Q.  And, Ms. Brigham, these are yes-or-no
14  questions.
15        This is the doctor who filled out your
16  fitness for duty form, correct?
17    A.  Correct.
18        MR. CRONE:  Hold on.  Objection.
19    Q.  (By Ms. Kitson)  And --
20        MR. CRONE:  Hold on.  Hold on.  I just want
21  to put an objection on the record.  Ms. -- Ms. Brigham's
22  entitled to answer the questions.
23        MS. KITSON:  Okay.  Thank you, Mr. Crone.
24  You've made your record.
25    Q.  (By Ms. Kitson)  And this doctor who's

Page 145

1  evaluating your fitness for duty is stating that you were
2  available to work a regular -- and able to work a full,
3  regular schedule, correct?
4    A.  That's what this says, correct.
5    Q.  And at this time, you, yourself, were aware
6  of your need to avoid layovers; is that correct?
7    A.  I knew that it may have been a
8  possibility.
9    Q.  Okay.
10    A.  But it was not in part of my treatment
11  plan yet, because there was not a treatment plan yet.  It
12  wasn't until I met with Frontier and had to come up with
13  a treatment plan that I had to adhere to and see a
14  counselor, do random drug tests, I had to do all of that
15  stuff in order to come back to work.
16    Q.  Okay.  I'm going to show you what has been
17  marked as Brigham -- Brigham Exhibit 11.
18    A.  Hold on.  My -- if my computer messes up,
19  I'm sorry.  It's downloading software, doing something
20  weird.
21    Q.  It's taking me a second to get this
22  document up anyway, so...
23    A.  Okay.
24    Q.  Let me know when you're clear.
25    A.  Can you see me?

37 (Pages 142 - 145)

Page 146

1    Q.  I can see you.
2    A.  Okay.  I can't see you.
3    Q.  Oh, it says my screen sharing is paused.
4    A.  Yeah, my computer is doing something
5  weird.  Hold on.
6    Q.  I've got it up again.
7    A.  Okay.  I'm back.  I think we've got it.
8    Q.  Okay.  I've pulled up for you Brigham
9  Exhibit 11.
10    A.  Okay.
11    Q.  And the Bates stamp on this is
12  BrighamR_PlaintiffRecords 670-1.
13        Do you see that?
14    A.  Yes.
15    Q.  Okay.  And this is a Certification of
16  Healthcare Provider for Employee's Serious Health
17  Condition.
18        Do you see that?
19    A.  I do.
20    Q.  Is this your handwriting on the first
21  page of the document?
22    A.  That is not.
23    Q.  Okay.  Do you know who filled this out?
24    A.  No clue by this handwriting.
25    Q.  Okay.  Let me -- I'm just going to go down

Page 147

1  to the end.
2        Have you seen this document before?
3    A.  You have to go slower, so I can read it.
4    Q.  Okay.  It's dated the 10th of March, 2015.
5        Do you see that?
6    A.  Yep.
7    Q.  And by Marla M. Madrid.
8        Do you see that?
9    A.  Yes.
10    Q.  Does that help refresh your recollection on
11  whether you've seen this before?
12    A.  I would have to see what's in the
13  document, Danielle.  Of course, she signed it.  It's
14  dated, but I need to see the document to let you know if
15  I have seen it before.
16    Q.  Well, we're going to go through it.  I'm --
17  and I'm -- I'm just asking, does this refresh your
18  recollection.  It sounds like the --
19    A.  No.
20    Q.  -- answer to that is no?
21    A.  Yes.
22    Q.  Okay.  All right.  We've got a part A,
23  Medical Facts.  Looking this over, have -- does this
24  refresh your recollection as to whether you've seen this
25  document before?

Page 148

1    A.  Yes.
2    Q.  Okay.  And have you?
3    A.  Yes.
4    Q.  And is this the true and correct copy of
5  the medical certification that was submitted to Frontier?
6    A.  It -- from what I seen, it appears to
7  be, what I have seen.
8    Q.  Okay.  It states that, The approximate date
9  condition commenced was June 2014.
10        Do you see that?
11    A.  Yes.
12    Q.  And is that when you first began seeing
13  Dr. Madrid?
14    A.  Yes.
15    Q.  And actually, let me clear something up.
16        Is -- is Marla Madrid a doctor.
17    A.  She is -- well, was my therapist.
18    Q.  Okay.  Is she a medical doctor?
19    A.  I don't know.
20    Q.  You don't know either way?
21    A.  I don't know if she is -- went to school
22  and got her Ph.D. and stuff like that.  I don't -- I
23  mean, she's not a medical doctor that was treating like a
24  cough for me.  She was my mental health doctor.
25    Q.  Okay.  In number 6 on PDF page 2 of the

Page 149

1  document, it says, Is the employee unable to perform any
2  of his/her job functions due to their condition?
3        Do you see that?
4    A.  Yes.
5    Q.  And she marked the box no, correct?
6    A.  Correct.  What you had put up in front of
7  me before were the --
8    Q.  I just asked the question --
9    A.  No.  You --
10    Q.  The question, Ms. Brigham, is --
11    A.  No.
12    Q.  -- she marked the box no?  That's the
13  question.
14    A.  But I'm allowed to talk after you.  You
15  wanted me to give clear, concise answers, and you asked
16  me in the beginning, if there's something you need to
17  add, if you -- even later on, do so.  So this is what I
18  am doing.  So if you could go back to the page that you
19  were on, that would be great.
20        And, yes, the functions of my job, the
21  ones that are in the description, I could perform all of
22  those.
23    Q.  Okay.  But number 7 -- it says, Describe
24  other relevant medical facts.  And I had highlighted the
25  language, Results in anxiety, psychomotor agitation,

38 (Pages 146 - 149)

Page 150

1  insomnia episodes, and at times inability to carry out
2  daily activity.
3          Do you see that?
4      A.  Yes.
5      Q.  Was that accurate?
6      A.  Yes.
7      Q.  Okay.  And is there any mention here of a
8  need to avoid layovers?
9      A.  No.
10      Q.  Okay.  And on the next page, it says,
11  Please indicate if any of the following apply to the
12  patient.  She has checked, They will experience
13  intermittent incapacitation.
14          Do you see that?
15      A.  Yep.
16      Q.  And they will require treatment
17  appointments for their condition.
18          Do you see that?
19      A.  Yep.
20      Q.  And then she certifies you for four days a
21  month.
22          Is that right?
23      A.  Yep.
24      Q.  Okay.  And you'll be attending followup
25  treatment one time per week for about two hours a week; is

Page 151

1  that correct?
2      A.  Correct.
3      Q.  Okay.  And she states, Rebecca is in the
4  first phase of recovery from alcoholism.  She is provided
5  weekly therapeutic support and attends up to two group
6  sessions a week to avoid relapse at this time.
7          Was that correct at the time?
8      A.  Correct.
9      Q.  She says, Within a year time frame, she is
10  hopeful to be in a place that will allow her to scale back
11  on the levels of support she currently needs.  She
12  continues to have setbacks and struggles, as she is
13  learning new skills, and a shift in mindset to see
14  recovery through her lifetime.
15          Do you see that?
16      A.  Yep.
17      Q.  So here, Ms. Madrid or Dr. Madrid is saying
18  that it would be at least a year until you were able to
19  scale this back, and that was hopeful, correct?
20      A.  Correct.
21      Q.  Okay.  All right.  I'm going to stop with
22  that one.  And I'm pull up a website -- this is the beauty
23  of Zoom -- for Dr. -- for Ms. Marla Madrid, and it states
24  that she is an LCSW, which is a clinical social worker.
25          Do you see that?

Page 152

1      A.  I don't see anything.
2      Q.  And I'm showing you the LCSW.
3      A.  All I see is you and John and Caroline and
4  Laurel.
5      Q.  Sorry.  I forgot to share my screen again.
6  Here you go.
7          Are you seeing the document now?
8      A.  Yes.
9      Q.  And this is Brigham Exhibit 11.  I'm
10  highlighting here this LCSW.
11      A.  Okay.
12      Q.  And I believe that stands for licensed
13  clinical social worker.
14          Is that your understanding?
15      A.  No.  I have no understanding of the ending
16  after people's names, except for doctor.
17      Q.  Do you have any reason to believe she's not
18  a licensed clinical social worker?
19      A.  No.
20      Q.  Bear with me a minute here.  All right.
21  I'm pulling up Exhibit 24.
22          Are you seeing a document entitled,
23  Treatment Plan?
24      A.  Yes.
25      Q.  Okay.  Do you recognize this document?

Page 153

1      A.  Yes.
2      Q.  And what is it?
3      A.  My original treatment plan.
4      Q.  And this is dated May 1st, 2015; is that
5  correct?
6      A.  Yep.
7      Q.  Okay.  So at this point, you'd been back to
8  work several months, correct?
9      A.  Correct.
10      Q.  About six months actually, right?
11      A.  Yep.
12      Q.  Okay.  It states that your DMS (sic)
13  diagnosis is alcohol withdrawal, general -- strike that.
14          It states a number of DMS diagnoses here on
15  the left-hand side of the page.
16          Do you see that?
17      A.  I see it.
18      Q.  And one of those is, Axis I, secondary
19  alcohol withdrawal.
20          Do you see that?
21      A.  Yes.
22      Q.  And was that your -- in your view, your
23  diagnosis of alcoholism?
24      A.  No.  After you quit drinking, you have
25  what they call PAWS, post-acute withdrawal symptoms, that

39 (Pages 150 - 153)

Page 154

1 can continue up to even 18 months.  You can get agitated.
2 You can get really bad anxiety.  And it's all sort of
3 post-acute withdrawal symptoms.
4      Q.  Okay.  And the question I wanted to ask you
5 is really just these two yellow highlighted items
6 (indicating).
7          Did you fill out this document, or did
8 someone else?
9      A.  I did not fill this out.
10     Q.  Do you believe, being familiar with this
11 document, that this is an accurate representation of what
12 you discussed with Ms. Madrid?
13     A.  At the time, yes.
14     Q.  And she had circled, Problems related to
15 the social environment, yes.
16         Do you see that?
17     A.  Yes.
18     Q.  But occupational problems, no.
19         Do you see that?
20     A.  Because at the time -- the only reason she
21 put no there is because, at the time, I think I was able
22 to avoid layovers.  It wasn't until, I think, after this
23 that it started becoming a problem.  But I didn't fill
24 this out.  I don't -- I can't speak to her mindset when
25 she was filling it out.

Page 155

1      Q.  It states here, Criteria For Discharge,
2 Rebecca will have maintained a full-time job without
3 modifications for six full months.
4          Do you see that?
5      A.  I do.
6      Q.  Okay.  And it's dated June 15th -- sorry,
7 June 16th, 2015, I believe.
8          Is that right?
9      A.  Yes.
10     Q.  Okay.
11     A.  And what she means there, I believe, is
12 when I'm able to start doing layovers again, and I
13 continue to see her for six months after everything goes
14 back to normal, then I can be done with therapy.
15     Q.  And actually, I think this is going to help
16 refresh.  So at the last page of the document, which is
17 PDF page 2 of document, it states, Date of update,
18 May 1st, 2015.
19         Do you see that?
20     A.  Yep.
21     Q.  And it says, Rebecca has identified
22 triggers to cravings and opportunities to consume alcohol,
23 and those are on overnight trips or anything longer than a
24 given workday in her professional arena.  At this time, it
25 would not be a good idea to encourage a vulnerable

Page 156

1 situation with a work schedule that serves as a
2 temptation, if possible.  Her treatment plan and progress
3 towards goals will be reviewed every 90 days.
4          Do you see that?
5      A.  Yes.
6      Q.  So this is your treatment plan, right, that
7 you've talked about today?
8      A.  Yes.
9      Q.  But this --
10     A.  I believe so.
11     Q.  -- wasn't submitted -- at least this
12 particular form was not submitted in the form of a medical
13 certification like the ones we've seen in the prior
14 exhibits leading up to this, correct?
15     A.  I don't know how this was submitted or why
16 it was submitted.  I know that we were going
17 through -- it might have been the DOT people.  There was
18 another agency that was involved that was requesting
19 information from Marla.  And I believe this was one of
20 those requests.  But I -- honestly, I don't know.
21     Q.  Okay.  But this at least was not on the
22 same medical certification form -- the FMLA form that we
23 saw, for instance, in Exhibit 11 --
24     A.  No.
25     Q.  -- which is right here?

Page 157

1      A.  No.  This one isn't -- didn't come out
2 until May, it says.
3      Q.  Right.  But it's not on the same form,
4 correct?
5      A.  Correct, the way it looks right here.
6      Q.  All right.  I'll pull up another exhibit.
7 This will be Brigham Exhibit 12.
8      A.  Okay.
9      Q.  And here we see -- oh, wait.  I didn't
10 share my screen, did I?
11     A.  No.
12     Q.  I've gotten a little better.  The last
13 deposition, I kept scrolling through and not realizing I
14 was scrolling through, and the witness couldn't see what I
15 was looking at -- or could only see what I was looking at.
16         Okay.  So Brigham Exhibit 12 is
17 Certification of Healthcare Provider for Employee's
18 Serious Health Condition.
19         Do you see that?
20     A.  Yes.
21     Q.  And this is that same form that we've seen
22 in prior exhibits such as Brigham Exhibit 11, correct?
23     A.  Correct.
24     Q.  Okay.  And I'm just going to scroll through
25 it.

40 (Pages 154 - 157)

**Page 158**

1 Is this your handwriting on the first page?
2 A. That is.
3 Q. Okay. And did you submit the form to
4 Frontier?
5 A. I believe so.
6 Q. Okay. I'm just going through scroll down
7 again. Actually, let me go to the end.
8 This is Marla M. Madrid again, correct?
9 A. Yes. And I believe she's the one that
10 faxed it over to Frontier or that other agency. I don't
11 think I ever actually possessed these and handed them to
12 Frontier. I believe it was all done via fax or email.
13 Q. Okay. And this one's dated May 28th, 2015;
14 is that right?
15 A. Yes.
16 Q. Okay. I'm just going to go through this
17 one. And again, it says at the top that your approximate
18 date condition commented was June of 2014, correct?
19 A. Correct. Yes, and it's not when my
20 condition commenced. That's when I started seeing Marla.
21 Q. Mm-hmm.
22 Okay. Number 6, Is the employee unable to
23 perform any of his/her job functions due to their
24 condition?
25 She checks no, correct?

**Page 159**

1 A. Correct.
2 Q. And under number 7, it states, Update,
3 Rebecca continues to struggle with cravings for alcohol,
4 and vulnerable situations are challenging. Relapse
5 prevention continues to be the priority in treatment, as
6 she has noticed desire has increased, as home life is
7 stressful, as she continues to adjust to sobriety.
8 A. Yeah.
9 Q. Was that an accurate statement at the time?
10 A. Yes.
11 Q. Okay. I'm scrolling down.
12 She states that you'll need intermittent
13 FMLA; is that correct?
14 A. Yep.
15 Q. And she certifies for you 12 days a month,
16 correct?
17 A. Yep.
18 Q. Okay. And again, she says, Frequency, one
19 time per week, group two times per week for two hours at a
20 time.
21 Is that right?
22 A. Yep.
23 Q. Okay. And then at the end, she says,
24 Rebecca is receiving support to prevent relapse. She is
25 now in her eighth to ninth month of sobriety, and her

**Page 160**

1 increase in cravings is frightening her. She is
2 increasing face-to-face time in individual group and
3 sponsorship arenas.
4 Was that all true at the time?
5 A. Yes. This is when I was dealing with all
6 the Frontier stuff.
7 Q. It states, Rebecca and her husband are
8 adapting to various stages in recovery. Within the next
9 six months, she will work diligently at being proactive in
10 reaching out to supports, as she is doing now. She will
11 have reached a milestone in recovery, first anniversary in
12 sobriety, and will have -- I'm not sure what that word
13 is -- something further her self-regulation skills.
14 Do you see that?
15 A. Yes. I don't know what --
16 Q. Is it --
17 A. -- the word is either.
18 Q. -- "crafted"? "Will have crafted further"?
19 Was it true, at the time, that you were
20 working through all of this and working on your
21 self-regulation skills?
22 A. Yes.
23 Q. Okay. It says, Initially, after a year of
24 sobriety, she will undergo full physical exam, and the
25 hope is that her mindset is strong and changed.

**Page 161**

1 Do you see that?
2 A. Yes.
3 Q. And nowhere on this document does she say
4 that you need any kind of accommodation for avoiding
5 overnights or layovers, correct?
6 A. Not that I see, nope.
7 Q. I'll stop the screen.
8 I'm going to pull up Exhibit 42 -- Brigham
9 Exhibit 42. I'm showing you what has been marked as
10 Brigham Exhibit 42.
11 Do you recognize this document?
12 A. Yes.
13 Q. What is it?
14 A. It's a transcript of some recording that I
15 have.
16 Q. Is this -- well, strike that.
17 On June 4th, 2015, did you attend a meeting
18 at Frontier's general office?
19 A. Yes.
20 Q. Did you record that meeting?
21 A. I did.
22 Q. Is this your transcription of the
23 recording?
24 A. No. I had a lady that my mom works with
25 transcribe it for me.

41 (Pages 158 - 161)

Page 162

1    Q.   After having had that lady transcribe it,
2  did you review the transcript to see if it was true and
3  accurate?
4    A.   Yes.  And there were a bunch of -- a bunch
5  of discrepancies with names and stuff that she couldn't
6  hear.  But...
7    Q.   Did you correct those?
8    A.   No.  I think a few places where I thought
9  it was relevant, I kind of wrote in.  But I never went in
10  and altered the document in any way.
11    Q.   On the first page -- well, strike that.
12        Was there anything inaccurate about the
13  words that are taken down here?
14    A.   Not in this that I see right here.
15    Q.   Okay.  And look --
16    A.   But honestly, Danielle, I'd have to have
17  the recording playing to know if there was a word off.
18    Q.   Right.  And I guess the question I have for
19  you is, did you read through it at the time or at any time
20  prior to this deposition for accuracy, and if so, did you
21  find anything inaccurate about the words that were spoken?
22    A.   I couldn't tell you what, but, yes, there
23  were inaccuracies.
24    Q.   Okay.  Well, let's go through -- let's just
25  go through the point -- parts that I was going to ask you

Page 163

1  about.  I'm actually going to only ask you about one
2  page here, and we can talk about whether there's anything
3  inaccurate on that page.
4    A.   Okay.
5    Q.   This is going to be PDF 12.
6    A.   And then whenever it's convenient, if we
7  could take another quick break, so I could check on the
8  kids.
9    Q.   Absolutely.  Okay.  So we're on PDF
10  page 12.  And there appears to be a discussion between you
11  and Cassie.
12        Do you see that?
13    A.   Yeah, that's not correct.
14    Q.   And what's not correct about it?
15    A.   "Options for FMLA transfers," I --
16    Q.   Okay.
17    A.   I don't know what an FMLA transfer is.
18    Q.   Let me -- I'm just pulling up another
19  exhibit.
20        Are you seeing a document called, Civil
21  Action Number 19 CV?
22    A.   Yes.
23    Q.   Okay.  And this has been marked Brigham
24  Exhibit 32.  The Bates stamp is
25  FRONTIERAIRLINES(R.BRIGHAM)- 4274.

Page 164

1        Do you see that?
2    A.   Yes.
3    Q.   And I'll represent to you, Ms. Brigham,
4  that this is a transcription that we had made of the
5  recording by a court reporter's office.
6    A.   Okay.
7    Q.   I'm just trying to find that same language.
8        Are you seeing my search box, by the way?
9    A.   Yes.
10    Q.   Okay.
11    A.   Yes, where it says, Options for internal
12  transfers, not FMLA transfers.
13    Q.   Got it.  Okay.  So this transcript looks
14  more accurate; is that right?
15    A.   Yes.  Yes.
16    Q.   Okay.  Okay.  So it states from you,
17  Rebecca Brigham, Okay.  Awesome.  And then my other
18  question is, how do I find out if there are any other
19  options for internal transfers besides, like, inflight
20  managers, I mean?
21        Do you see that?
22    A.   Yes.
23    Q.   And is that a question that you asked?
24    A.   Yes.
25    Q.   And then Cassandra -- who's Cassandra?

Page 165

1    A.   Cassandra Micklich.  She was sort of, I
2  think, below Jerry.  I don't know her exact title.  But
3  we have tried to find her to get a statement, and we
4  can't find her.
5    Q.   Okay.  She says, Did you check the website?
6        Do you see that?
7    A.   Yes.
8    Q.   Were you aware that there was a website you
9  could check for open positions?
10    A.   No, not at that time.
11    Q.   And you say, I don't know, what is it, just
12  on the --
13        Do you see that?
14    A.   Yes.
15    Q.   And she directs you to myfrontier.org.
16        Do you see that?
17    A.   Correct.
18    Q.   Did you then go to myfrontier.org to look
19  for positions that you could potentially transfer into?
20    A.   It was later on that day or the following
21  day that I did.
22    Q.   So you were able to successfully look for
23  potential transfer options; is that right?
24    A.   Yes.
25    Q.   And what did you find when you looked?

42 (Pages 162 - 165)

okay

Page 170

1    Q. Well, this is the exact same day that you
2 met with Ms. Micklich, correct?
3    A. Correct.
4    Q. And on that exact same day, we saw in the
5 transcript you talked about internal transfers, correct?
6    A. Correct.
7    Q. And she said she'd have to look into it,
8 correct?
9    A. Correct.
10    Q. And she's now coming back to you on the
11 exact same day saying, Please refer to page 1 -- 81 of
12 123; is that right?
13    A. Yes, but it doesn't say what document
14 she's referring to. Page 81 of what?
15    Q. Did you ask her? Did you --
16    A. No, I did not.
17    Q. You say, The reason --
18    A. I had no reason.
19        THE REPORTER: One at a time.
20    Q. (By Ms. Kitson) You just testified that it
21 could be the handbook, it could be the Collective
22 Bargaining Agreement.
23    A. I --
24    Q. Did you look at any one of those?
25    A. I did not.

Page 171

1        MR. CRONE: Danielle, can I ask for a
2 point of clarification?
3        MS. KITSON: It depends.
4        MR. CRONE: Well, I guess I just have to
5 ask. Is -- is Frontier stipulating that it would have
6 treated this transfer as -- as on account of physical
7 injury or illness right now? Is -- is --
8        MS. KITSON: Well, no, I'm not going to
9 answer substantive questions about the case, John. This
10 is a deposition. I -- I'm questioning a witness,
11 so -- all right.
12        MR. CRONE: And -- and you're free to do
13 so. I was just asking for -- if I could ask a point of
14 clarification. The answer apparently is no.
15    Q. (By Ms. Kitson) Okay. I am going to pull
16 up the next document, Exhibit 43.
17        Do you recognize Brigham Exhibit 43?
18    A. Yes.
19    Q. And what is this document?
20    A. This is the second transcript of the
21 recording.
22    Q. I want to ask you too about the last
23 document we just looked at. Ms. Micklich said that the
24 document would provide the answer about seniority and the
25 process.

Page 172

1        Wouldn't that suggest to you that it's the
2 Collective Bargaining Agreement she's talking about?
3    A. Not really, necessarily. I would
4 have -- personally, when I looked at that, I figured it
5 was probably the handbook, not the Collective Bargaining
6 Agreement.
7    Q. The handbook doesn't address seniority,
8 correct, that's the CBA?
9    A. I don't know. I believe the handbook
10 addresses it as well.
11    Q. All right. Looking at Exhibit 43 --
12    A. And to be honest, Danielle, I remember
13 seeing somewhere about -- I'm trying to think where I saw
14 it -- about seniority, and I couldn't keep my -- go back
15 to inflight. And I'm not going to remember.
16    Q. I'm just kind of looking through the
17 handbook here to see if there's something there.
18    A. Yeah.
19    Q. Hold on. I'm almost through it. No, I
20 don't think so. All right.
21        Well, in any event, let's look back at
22 this --
23    A. Okay.
24    Q. -- Exhibit 43.
25        And you had testified that this is a

Page 173

1 transcript that was made of a recording that you took at a
2 meeting at Frontier headquarters on October 9th, 2015.
3        Is that correct?
4    A. Correct.
5    Q. And once again, is this a transcription
6 that a friend of yours made?
7    A. Yes.
8    Q. Okay. And did you review it for accuracy?
9    A. Not in its entirety.
10    Q. Were there any things that you found to be
11 inaccurate?
12    A. Yes. In all of them, there were stuff
13 that was inaccurate.
14    Q. I'm going to cross-reference -- oops. Bear
15 with me. Brigham Exhibit 33 that I'm showing you is
16 another transcription that we had made --
17    A. Okay.
18    Q. -- with Hunter + Geist, which is a court
19 reporter service.
20    A. Okay.
21    Q. And I'm showing you -- it's, Transcription
22 of Recording, October 9th, 2015.
23        Do you see that?
24    A. Yep.
25    Q. I'm just going to use that to -- for the

44 (Pages 170 - 173)

Page 174

1  part that I'm questioning you about, I just want to make
2  sure we cross-reference, so that there's no -- you know,
3  no question about whether the wording is accurate.
4       And on Brigham Exhibit 44 -- sorry -- 43,
5  I'm looking at PDF pages 3 and 4.  So let me go to 3 here.
6  The red highlighting here (indicating) and the
7  highlighting throughout the document.  I saw some red
8  highlighting, some yellow highlighting, some blue
9  highlighting.
10       Is that your highlighting throughout?
11      A.  Yes.
12      Q.  Okay.  So this red here (indicating) is
13  your highlight, correct?
14      A.  Correct.
15      Q.  Okay.  Okay.  And then I wanted to just
16  walk you through -- there's a conference that you had with
17  Kari.
18       Do you see that?
19      A.  Yes.
20      Q.  Who is Kari?
21      A.  Kari Thompson.
22      Q.  Okay.  And who was she with respect to you?
23  Is she your manager?
24      A.  She was not my direct manager.  She was a
25  different Inflight supervisor who happened to be the one

Page 175

1  who was at the general office that day.
2       Q.  Okay.  She says, Have you ever looked at
3  other positions within the company, or are you not
4  interested in it?  You answer, No, I talked to training at
5  one point, and that might be good, or I just -- I don't
6  know where to look.  I don't know.
7       Do you see that?
8       A.  Yes.
9       Q.  And then Ms. Thompson says, On UltiPro.
10       Are you aware what she's referring to
11  there?
12       A.  UltiPro, I believe, was a system that we
13  used at the time.  UltiPro would have been like where our
14  paycheck stubs and stuff were.
15       Q.  Mm-hmm.  So you knew where to look on
16  UltiPro, and you knew what she was talking about.  I
17  believe it's UltiPro, with a U, but --
18       A.  I --
19       Q.  -- you knew that -- you knew what she was
20  talking about?
21       A.  I knew that she was talking about UltiPro,
22  but I didn't know like where to sort of look in there.
23  Cassie had told me to go to flyfrontier.com, which I had
24  done.  I don't remember if I went to UltiPro or not.
25       Q.  Okay.  But you knew what UltiPro was in

Page 176

1  her --
2       A.  Correct, yes.
3       Q.  Okay.  And she suggested you go and look
4  there for job listings, correct?
5       A.  Correct.
6       Q.  And she states -- I'm back on Brigham
7  Exhibit 43 -- and, I mean, I would strongly suggest --
8  like start looking at it, and you might want to look at it
9  every week, because a lot of times jobs are only posted
10  for one week.  So I would just get in the habit, in fact,
11  every Monday, getting on there and seeing what's new on
12  there.  Every Monday and every Friday and see what's in
13  there, because there is all these different opportunities
14  that you probably aren't even aware that exist, right?
15  And it might not necessarily be an inflight, but there
16  is -- you know, there is a lot happening.  So, I mean,
17  it's -- since you want to stay with Frontier, and I know
18  it's the flight attendant job, but I don't think it's
19  going to get easier with the schedule.
20       Do you see that language?
21       A.  Yes.
22       Q.  And did she, in fact, suggest that you go
23  into UltiPro at least weekly?
24       A.  Yes.
25       Q.  If not every Monday and every Friday?

Page 177

1       A.  Yes.
2       Q.  And did you do that?
3       A.  Occasionally, I would go on there, but
4  most of -- it either did not interest me or I didn't
5  qualify, frankly.
6       Q.  Okay.  And at this point, was it your
7  understanding that you would not be able to keep your
8  seniority after 90 days?  Was that your understanding at
9  this time?
10       A.  Yes.
11       Q.  And did you continue to look after that?
12       A.  Occasionally.
13       Q.  Okay.  Why'd you --
14       A.  But it was something that -- it was
15  something that was not -- at the time -- I mean, I know
16  better now, because I've seen it.
17       But at the time, when I thought I was
18  going to lose my seniority after 30 days, it sort of
19  wasn't exactly in my realm of possibilities.  I mean, I
20  still looked.  You never know, there could be some
21  awesome job listed that was like, Oh, hey, I could do
22  this.  But it was not looking with the intent to actually
23  transfer, because I was a flight attendant.  That's what
24  I was good at.  That's what I loved doing.  That's all I
25  wanted to do.  And had Frontier, honestly, reasonably

45 (Pages 174 - 177)

1 accommodated me, it would have been easy to keep that
2 job.
3      Q. I'm struggling with this, because you said
4 you would not entertain a transfer because of the 90-day
5 seniority thing, but then you're looking, but then you're
6 testifying that you're looking, but not to actually
7 transfer.
8      Do I have that right?
9      A. You do. I still looked in there. You
10 never know. There may have been an at-home --
11 work-from-home position doing something that I qualified
12 for, in which case, something like that, I would have
13 considered. However, I did not want to lose my
14 seniority.
15      Q. Hold on one second here. I'm just
16 searching for something really quick. All right. Bear
17 with me one moment.
18      I want to show -- go back to an exhibit I
19 just showed you --
20      A. Okay.
21      Q. -- a moment ago. This is Brigham
22 Exhibit 32. And this, just to remind you, is the
23 transcript of the meeting you had with Cassie Micklich on
24 June 4th, 2015.
25      Do you see that?

1      A. Yes.
2      Q. And to try to refresh your recollection, in
3 that conversation, it looks like you and Mr. Arellano are
4 having a discussion here on page 32 of the PDF. And
5 you're talking about medical leave.
6      Do you see that?
7      A. Mm-hmm.
8      Q. And you say, As per our contract, it counts
9 as a point.
10      Do you see that?
11      A. Yes.
12      Q. Is the contract you were referring to the
13 CBA?
14      A. Yes.
15      Q. Okay. So you did review the CBA in terms
16 of --
17      A. No. It was all what I had been told. To
18 be honest with you, Danielle, I don't know if I ever even
19 looked at the contract. It was stuff that I had been
20 told by other people that I trust. And it was something
21 that we dealt with previously, where I was told that if I
22 reach termination points, then that medical point will be
23 taken off. But, obviously, it still counts as a point.
24      Q. I'll show you another document. This is
25 Exhibit 15. Exhibit 15 is an email from yourself to LOA

1 Frontier employees, dated Monday October 6 -- 26, 2015.
2      Do you see that?
3      A. Yes.
4      Q. Is this a true and correct copy of an email
5 that you sent to the Leave of Absence Department?
6      A. Yes.
7      Q. It says, I woke up this morning in a panic.
8 I forgot to send you an email on Friday. I had to use my
9 intermittent FMLA on 10-23 for a four-day, but I kept the
10 PDX turn on the end.
11      Do you see that?
12      A. Yes.
13      Q. And I think we talked about this earlier,
14 but is it true that you did not follow the required
15 call-out procedures for that 10-23 trip?
16      A. Correct.
17      Q. Okay.
18      A. And I already explained that there was a
19 turn that was taken off, that I had to call
20 Stefanie Coppedge and do all that stuff, to figure out
21 why they were not allowing me to do what I had been
22 doing, if something had changed, which I'll take that
23 point. That's fine. That is my fault.
24      I'm arguing about all the points before
25 that were coded as sick, when, if Frontier would have

1 just reasonably accommodated me, I would not have.
2      Q. Okay. I'm going to show you another
3 document here. Just a second. Hold on one second. I'm
4 looking at the final transcript. I'm just trying to do
5 the cross-reference thing real quick.
6      A. And I noticed on one of the other
7 transcripts that you had put out that was your guys', I
8 believe the name of the person that was talking was
9 incorrect.
10      Q. Yeah. It said, Meredith. I think that was
11 a --
12      A. Yeah.
13      Q. -- phonetic, because we also did not help
14 the transcriptionist --
15      A. Okay.
16      Q. -- with names or anything like that.
17      A. Okay.
18      Q. So it's kind of -- I mean, we'll probably
19 have to listen to the exact recording, but --
20      A. Yeah.
21      Q. -- that's so cumbersome for, you know,
22 deposition purposes, that they're going to just kind of try
23 to do our best.
24      A. Right.
25      Q. Okay. I'm going to share my screen with

Page 182

1  you here. Okay. This is Brigham Exhibit 44.
2       Do you recognize this document?
3       A. Yes.
4       Q. Okay. And what is it?
5       A. It is the final meeting.
6       Q. Okay.
7       A. On -- the investigatory meeting.
8       Q. Okay. And what was the purpose of this
9  meeting?
10      A. It's what -- hold on. I have -- it's what
11 we call the final termination hearing. It's basically,
12 they're going to fire you, but this is your one chance to
13 try and argue that they shouldn't, basically.
14      Q. Okay. I'm going to show you pages 2 and 3
15 of the PDF. And this is just going over again. I think
16 you just said it. You say here on PDF page 2, And that is
17 honestly -- like I take that. It is my fault for not
18 sending the email right away.
19      So is that -- what you're saying right
20 there what you just testified to, which is basically that,
21 yes, that point was fairly assessed to you?
22      A. Yes.
23      Q. Okay. I think that's all I wanted to ask
24 you about. Okay. On the same transcript -- so Brigham
25 Exhibit 34 is a transcription that we had made for the

Page 183

1  same meeting, November 3rd, 2015.
2       Do you see that date here?
3       A. Yes.
4       Q. And this is, again, our court reporter,
5  Hunter + Geist. And I'm just going to ask you, again,
6  about the CBA and the contract.
7       A. Okay.
8       Q. You're speaking with someone in this
9  meeting -- let me scroll up just a bit. Someone named
10 Female 2. And then you say, And then all of a sudden, I
11 was on hold for about five minutes, and then she came
12 back, and she's like, Let me call you back. So she called
13 me back and said, One of the days on either end has to be
14 all intermittent FMLA, which has never happened to me
15 before.
16      Do you see that?
17      A. Yes.
18      Q. And is this reference, again, to that
19 October 23rd trip and what happened?
20      A. Yes.
21      Q. Okay. Female 2 says, Right. And you
22 continue on, So I was kind of flustered with that, but
23 anyways, I told her, Okay. Well, then the Portland turn
24 is worth more, I'll keep the Portland turn. So after that
25 happened, I went to try to figure -- and figure out --

Page 184

1  find the contract and figure out if that is, in fact,
2  legal.
3       Do you see that?
4       A. Yes.
5       Q. Did you find the contract?
6       A. I honestly can't remember if I found it or
7  not.
8       Q. And is the contract a reference to the
9  Collective Bargaining Agreement?
10      A. Yes.
11      Q. Did you ever go over any provisions of the
12 Collective Bargaining Agreement with the union in the
13 grievance process?
14      A. Not that I can remember specifically. I
15 just remember them saying that what I was asking for
16 would not violate the Collective Bargaining Agreement.
17      Q. I'm going to pull up another document here.
18 This will be Brigham Exhibit 46.
19      Do you recognize Exhibit 46?
20      It appears to be a -- a photo of a phone,
21 and --
22      A. Yes.
23      Q. -- on the top, it says, Stefanie Coppedge.
24      Do you see that?
25      A. Yes.

Page 185

1       Q. What is this document?
2       A. These were text messages between me and my
3  direct supervisor.
4       Hold on just a second, Danielle.
5       Q. Oh, sure.
6       A. Okay. My kids are kind of getting
7  restless. I apologize.
8       Q. Okay. Let me pull that document back
9  up for you. Hold on.
10      A. Okay.
11      Q. Okay. We're back looking at Brigham
12 Exhibit 46. And you stated that these are text messages
13 that you exchanged with your direct supervisor.
14      Is that right?
15      A. Yes, Stefanie Coppedge -- Coppedge,
16 however she says it.
17      Q. And in these text messages, are you the
18 blue bubbles throughout, and she's the yellow bubbles?
19      A. I believe so, but hold on. Stop scrolling
20 for a second. Yep, I'm the blue.
21      Q. Okay. And I wanted to just ask you about a
22 couple of different pages here.
23      A. Okay.
24      Q. This is page 22 of PDF.
25      And are these photos that you took of these

47 (Pages 182 - 185)

1 texts?
2     A.  Yes.
3     Q.  Okay.
4     A.  That phone is no longer -- that phone is
5 no longer on service for any carrier, so I couldn't,
6 like, screenshot and email them.  So I just took pictures
7 of them.
8     Q.  Okay.  At the top of this text message, on
9 Wednesday, November 12th, 2014, you're exchanging text
10 messages.
11        Do you see that?
12     A.  Yes.
13     Q.  That was the day after your final
14 investigatory meeting; is that right?
15     A.  Yep.
16     Q.  Okay.  You say, They are taking forever, at
17 1:46 p.m.
18        Do you see that?
19     A.  Yeah.
20     Q.  And then Ms. Coppedge responds, Yes.
21 Andrea said she would know something around 3:00.  Not
22 sure what that means.
23        Do you see that?
24     A.  Yes.
25     Q.  You respond, Okay, thanks.  They probably

1 turned it over to legal, or maybe they will just offer me
2 money to go away.
3        Do you see that?
4     A.  Yes.
5     Q.  Did you want them to offer money to go
6 away?
7     A.  No, it was -- honestly -- no.  We had
8 discussed that Frontier -- from my memory, we had
9 discussed that Frontier tends to just offer money to have
10 it be settled.
11     Q.  Were you hoping that they would offer you
12 money to settle?
13     A.  No.  I wanted my job.  I wanted to keep my
14 job.  And that's what I was fighting for in that
15 investigatory meeting.
16     Q.  I'm going to show you page 25 of the PDF.
17 I'm going to scroll down here.  Ms. Coppedge says, Hmm,
18 Jerry said he mentioned to you to apply for other jobs at
19 Frontier, and you haven't.  I said I know you sent an
20 email to either Laura or Kari inquiring.  Hadn't applied
21 for any of those jobs.
22     A.  These ones are switched around.
23     Q.  These ones are split up, right?
24     A.  Yeah, Inquiring...
25     Q.  It looks like Ms. Coppedge is asking you

1 about whether you applied for jobs; is that right?
2     A.  Correct.
3     Q.  And then she's asking about helping in
4 Inflight.  Okay.  And she's -- this is the question I had.
5     A.  Mm-hmm.
6     Q.  You text back, That, and all of the jobs I
7 saw on UltiPro, I didn't qualify for.
8        Did you see that?
9     A.  Yes.
10     Q.  Is it true that all of the jobs you looked
11 at, you didn't qualify for?
12     A.  All the jobs that I looked at, yes.  Not
13 every single job on that page.  Of course, I could have
14 been a -- I could have probably transferred to baggage
15 handling or something like that, but that is in no way
16 what I wanted to do.
17     Q.  Okay.  You say, I also don't want to lose
18 my seniority by switching out of inflight.
19        Do you see that?
20     A.  Yes.
21     Q.  And that's what we -- you had testified
22 for -- about before, correct?
23     A.  Yes.
24     Q.  I want to ask you in general about your
25 conversations with Stefanie Coppedge about all of these

1 issues you've been testifying about today.
2     A.  Yes.
3     Q.  So at some point in time, did you discuss
4 with Ms. Coppedge your various requests for accommodation
5 with Frontier?
6     A.  Yes.
7     Q.  On how many occasions did you speak with
8 her?
9     A.  Lots.  She and I talked quite a bit.  She
10 was also the one that told me that I was protected under
11 the ADA, and that I should look into that, which is what
12 made me start going down -- realizing that I was a
13 protected person by the ADA.  And that's why, in that
14 investigatory meeting, I mentioned that it was illegal
15 what was happening and that I was under the category of
16 the ADA.
17     Q.  What specifically did Ms. Coppedge tell you
18 about that topic?
19     A.  I don't remember really exact words or
20 anything.  But I think she just mentioned that, Hey, you
21 need to look into the Americans with Disabilities Act,
22 what they're doing is illegal.
23     Q.  Did she use those words, "what they're
24 doing is illegal"?
25     A.  I can't tell you if those were the

48 (Pages 186 - 189)

Page 190

1  specific words. But I can tell you, from my
2  conversations with Stefanie, she was not happy about what
3  was happening.
4      Q.  And you don't know if she used those words,
5  correct?
6      A.  Not definitively, I couldn't tell you.
7  But that was the general idea.
8      Q.  Who else at the company did you speak with
9  about your requests for accommodation?
10      You spoke with Stefanie Coppedge, correct?
11      A.  Mm-hmm.
12      Q.  You spoke with Jerry Arellano, correct?
13      A.  Correct.
14      Q.  You spoke with Kari Thompson, correct?
15      A.  Mm-hmm.
16      Q.  You spoke with --
17      A.  Cassandra Micklich.
18      Q.  Cassie Micklich, correct?
19      A.  Yep.
20      Q.  Who else?
21      A.  Adrienne Prince.
22      Q.  And who else?
23      A.  I tried to talk to Laura Rush about it,
24  but that's when she sent me to Leave of Absence instead.
25  I mean, I had talked to quite a few people that I

Page 191

1  couldn't even tell you who they were now.
2      Q.  Well, let me ask you this: In all of your
3  conversations with Frontier personnel --
4      A.  Mm-hmm.
5      Q.  -- did anyone ever say to you that they
6  believed you were being discriminated against on the basis
7  of a disability?
8      A.  Yes.
9      Q.  Who told you that?
10      A.  I believe Stefanie.
11      Q.  What exact words did she use?
12      A.  I couldn't tell you with 100-percent
13  certainty, Danielle.
14      Q.  So what you recall is that she referred you
15  to the ADA and suggested that you look into it, correct?
16      A.  Yes. And she said that you
17  are -- alcoholism is covered under the ADA, and what
18  they're doing is illegal. And I couldn't tell you if she
19  used those exact words or not, but that was what I got
20  out of it.
21      Q.  That's what you inferred, but you -- she
22  didn't say -- at least you don't --
23      A.  I can't tell what she did or --
24      Q.  -- you don't recall her saying --
25      A.  -- didn't say.

Page 192

1      Q.  Okay. And you've got to let me get my
2  questions out for the record. That's for -- for Laurel,
3  who probably has her hands up, although I can't see.
4      Okay. So let me -- let me get this out
5  again, okay? Because I want to make sure I have this
6  down.
7      Are you saying that Stefanie Coppedge
8  definitely told you that she believed that the
9  company -- what the company was doing was illegal?
10      A.  I'm 99 percent sure, Danielle.
11      Q.  She didn't use those words, correct?
12      A.  I don't know if she did or not.
13      Q.  And she --
14      A.  That's what I have -- so this is what I
15  have in my memory from, what, five years ago.
16      Q.  Yeah. And so here's a question I have. I
17  mean, clearly you have a recollection of her referring her
18  to the ADA, correct?
19      A.  Correct.
20      Q.  And you have a recollection of her telling
21  you that alcoholism was a protected category, correct?
22      A.  Correct, and that what Frontier was doing
23  was wrong. I know for a fact that was said. I don't
24  know if she said "illegal." But she said, What Frontier
25  is doing is wrong.

Page 193

1      Q.  Okay. Because that is a distinction in my
2  mind --
3      A.  Okay.
4      Q.  -- between those two thing.
5      So here's what I want to ask you: Did you
6  ever talk with her about the specific accommodations that
7  you requested?
8      A.  Yes.
9      Q.  Okay.
10      A.  She knew everything that I was trying to
11  do.
12      Q.  Did she ever say to you that she believed
13  these accommodation requests were reasonable as a legal
14  matter under the ADA?
15      A.  She did say that, I don't understand why
16  they're not giving you any of these, from my memory.
17      Q.  Did she ever say to you anything along the
18  lines that she thought that these accommodation requests
19  were reasonable requests that had to be given to you as a
20  legal matter under the ADA?
21      A.  Not in the legal mumbo-jumbo that you just
22  said, but she said, I don't see why Frontier won't
23  reasonably accommodate you.
24      Q.  Okay. And did she say that in general, or
25  was --

49 (Pages 190 - 193)

Page 194

1     A. I guess.
2     Q. -- it specific -- I guess, let me ask it
3 this way: Was her -- were her comments just, in general,
4 I don't understand why they won't reasonably accommodate,
5 or was it specific as to -- you know, as to this
6 accommodation request you made, I don't understand why?
7     A. I think it was specific, from my memory.
8     Q. Okay. Which specific request?
9     A. The blank schedule, because she was there
10 when I was talking to Adrienne Prince before the meeting
11 as well when we were discussing that what I was doing
12 would not violate the CBA, according to Adrienne Prince,
13 and Stefanie agreed.
14     Q. Well, I mean, Stefanie, in that transcript,
15 she never says anything along the lines of a -- never
16 mind. Strike that.
17     A. This is a conversation we had before we
18 went into the meeting.
19     Q. Okay. And tell me exactly what she said in
20 that conversation.
21     A. And I can't tell you exactly, Danielle.
22 It's not recorded. But this is what I remember from my
23 memory. Stefanie was great with me. She was the one
24 person that was, like, on my side, what they're doing is
25 wrong. She is the one that helped me out so much.

Page 195

1     Q. And what was your recollection of what she
2 said? You said you can't remember exactly. But what was
3 your general recollection?
4     A. Basically, she didn't agree with what
5 Frontier was doing. She didn't -- she wanted them --
6     Q. But she didn't, as a legal -- she didn't,
7 as a legal matter, tell you that Frontier was
8 discriminating against you, correct?
9     A. She's not an attorney. No, she
10 didn't -- I mean, we weren't discussing it in attorney
11 terms. We were talking about the ADA and that I was
12 protected as being an alcoholic, and that what they were
13 doing was wrong. That's the whole reason she steered me
14 to the ADA.
15     Q. Do you remember her at any point saying
16 specifically that this blank schedule concept would not
17 violate the contract?
18     A. I do remember discussing it before we went
19 into the meeting with Adrienne.
20     Q. To the best of your recollection, what
21 specific words did she use in that regard?
22     A. And I can't tell you specific words,
23 Danielle, because I don't know. I just told you what I
24 recall from my memory. We were discussing what I was
25 asking, and I sort of told them where I was going with my

Page 196

1 argument kind of thing in the meeting. And we had
2 discussed -- Adrienne and I were discussing how that
3 wouldn't have violated the CBA, and they think
4 that -- they both said, Oh, I think you're going to be
5 okay here. Frontier can't legally fire you.
6     Q. You just said that she didn't say anything
7 about legalities.
8     A. Right. This is Adrienne.
9     Q. Right. But either way, I mean -- what did
10 Adrienne say about this specifically?
11     A. I just told you. This is from my memory.
12 It is not word-for-word. But this is what I remember
13 being said, Danielle.
14     Q. Well, in that transcript, I didn't see
15 anything about Adrienne commenting one way or the other
16 about legalities, did you?
17     MR. CRONE: Let me -- let me just put an
18 objection on the record. It's been asked and answered.
19 I think she's gone to great lengths to try to give you
20 the answer. That's the objection.
21     Q. (By Ms. Kitson) You can answer.
22     A. What was the question?
23     Q. In the transcript, I didn't see Adrienne
24 anywhere commenting on legalities, did you?
25     A. You would have to put the transcript up in

Page 197

1 front of me, and I would have to read it word-for-word.
2     Q. Do you have any recollection of that being
3 mentioned in that specific meeting?
4     A. You'd have to put the transcript in front
5 of me, Danielle.
6     Q. I'm asking you about what you remember.
7     A. I remember her saying that what I was
8 requesting to do would not violate the CBA.
9     Q. Okay. But you do not remember her saying
10 something along the lines of it would be illegal to fire
11 you, correct?
12     A. I do remember something along those lines
13 being said, by both Stefanie and Adrienne. Now, if it
14 was being said --
15     Q. But you testified earlier that you don't --
16 you testified earlier that you don't remember the exact
17 words, correct?
18     A. I don't understand where the disconnect is
19 here, Danielle. I do not remember the exact words. But
20 that is generally my memory. I do remember that. And I
21 remember saying that, What they are doing is illegal.
22 And nobody said, Oh, no, wait, hold on.
23     Q. One second. So I'm showing you again
24 Brigham Exhibit 33. Oops, this is the wrong one. We're
25 looking for the 11/3 meeting, right? 44. Actually, I

50 (Pages 194 - 197)

Page 198

1  want to text searchable, so I'm going to go to 34.
2       A.  And I'm going to need a quick break after
3  this, please.
4       Q.  Okay.  And I am in -- just for the record,
5  I'm looking at Brigham Exhibit 34, which is the
6  transcription that we had made of the November 3rd, 2015
7  meeting.
8           Do you see that?
9       A.  Correct.
10      Q.  Okay.  And I'm going to do a word search
11  here for "legal."  And we're going to get "Legal Videography"
12  for all 29 pages.  So instead, let me look for "illegal."
13          So no one used the word "illegal" in
14  this --
15      A.  Not during that transcript, no.
16      Q.  Or in that meeting in general, did they?
17      A.  No.
18      Q.  Okay.
19      A.  Obviously.
20      Q.  I'm going to put in the word "law."
21          No one talked about the law, did they?
22      A.  Apparently not.
23      Q.  Okay.
24      A.  Put in "ADA," which is a law.
25      Q.  Nobody said anything that anything was

Page 199

1  wrong, correct?
2           MR. CRONE:  Danielle, maybe try "undue
3  hardship."
4       Q.  (By Ms. Kitson)  You can answer the
5  question, Ms. Brigham.
6       A.  Clearly not.
7       Q.  All right.  So just one last time for the
8  record, you don't recall the exact words that anyone
9  used --
10          MR. CRONE:  Objection, asked and answered.
11      Q.  (By Ms. Kitson)  -- with respect to --
12      A.  I don't know how many times I have to --
13      Q.  Can you let me get the question out?
14          MR. CRONE:  Yeah, I -- I apologize.  And
15  then when you do, the objection's going to be asked and
16  answered.
17          MS. KITSON:  That's lovely.
18          (By Ms. Kitson)  Ms. Brigham, the question
19  is, at no point do you remember the exact wording that
20  Frontier personnel used in terms of whether any conduct
21  concerning you was illegal, correct?
22      A.  Correct, but that was the general idea,
23  they were violating the law.
24      Q.  Okay.  Do you want to take a break now?
25      A.  Yes, please.

Page 200

1           THE VIDEOGRAPHER:  We're going off the
2  record at 2:00 p.m.
3           (Recess from 2:00 p.m. to 2:14 p.m.)
4           THE VIDEOGRAPHER:  We're going back on the
5  record at 2:14 p.m.
6       Q.  (By Ms. Kitson)  Ms. Brigham, do you
7  understand you're still under oath?
8       A.  Yes.
9       Q.  We're almost done, actually.  I'm just
10  going to show you a few more exhibits.  Hold on one second
11  here.  I'm showing you what has been marked as Brigham
12  Exhibit 47.
13          Do you recognize this exhibit?
14      A.  Yes.
15      Q.  What is it?
16      A.  This is a pilot for Frontier Airlines that
17  was trying to get me into a network marketing thing.
18      Q.  His name is Dale Kinsey; is that correct?
19      A.  Correct.
20      Q.  Mr. Kinsey was not a manager at Frontier,
21  correct?  Did you hear the question?  I'm sorry.
22      A.  I said, Correct.
23      Q.  Oh, okay.  And Mr. Kinsey didn't have any
24  position with the union to your knowledge, correct?
25      A.  Correct.

Page 201

1       Q.  Okay.  I'm just going to ask you about a
2  couple of pages here.  The first one is PDF page 7.  And
3  I'm actually going to PDF page 6.
4           It appears that Mr. Kinsey's texts are in
5  yellow; is that correct?
6       A.  Yes.
7       Q.  And yours are in blue?
8       A.  Correct.
9       Q.  Okay.  And again, we have Wednesday,
10  November 4th, 2015.
11          Do you see that here in the document?
12      A.  Yep.
13      Q.  And that was the day after your final
14  investigatory meeting, correct?
15      A.  Correct.
16      Q.  Okay.  And you're talking about -- you say,
17  I should know something by 3:00.  I'm on pins and needles.
18          Do you see that?
19      A.  Correct.
20      Q.  What were you waiting to learn?
21      A.  I was hoping that I would still have my
22  job, but I was just waiting to see the final outcome of
23  that investigatory meeting.
24      Q.  Okay.  And you say, LOL.  I just want to
25  know either way, those fuckers.  I'm sure they are doing

51 (Pages 198 - 201)

Page 202

1  it on purpose.
2       Do you see that?
3       A.  Yes.
4       Q.  What is that a reference to?
5       A.  Torturing me.
6       Q.  Okay.  And did you view the personnel at
7  Frontier to be, quote, fuckers?
8       A.  In this instance, yes.
9       Q.  So page 11.  And again, he has a text from
10  you, and I'm just going to ask you about the last part.
11  You say, I want punitive damages, because this is
12  bullshit.
13       Do you see that?
14       A.  Yes.
15       Q.  Are you seeking punitive damages in this
16  case?
17       A.  Absolutely.
18       Q.  And how much money are you going to ask a
19  jury for?
20       A.  I don't want what happened to me to happen
21  to anybody else.  So I will ask the jury for the maximum
22  amount that they can give.  Frontier knew what they were
23  doing was wrong and continued to terminate me anyways,
24  even after I brought up the ADA.  They knew what they
25  were doing was wrong and did it anyways, and that is

Page 203

1  grounds for punitive damages.
2       Q.  Page 12, same reference.  Still nothing
3  from the company, fuckers.  I'm speaking with an attorney
4  today.
5       Is that, again, a reference to Frontier's
6  personnel?
7       A.  Yes.
8       Q.  I'll show you Exhibit 7.  This is just
9  following up on a line of questioning earlier today.
10  Brigham Exhibit 7 is a document from the Colorado
11  Department of Labor and Employment to you.
12       Is this a true and correct copy of the
13  unemployment benefits that you received in 2015?
14       A.  It looks like it.
15       Q.  And was that $890?  Does that sound about
16  right?
17       A.  Yeah.
18       Q.  And then -- okay.  This will be Exhibit 3.
19  Brigham Exhibit 3, which is your 2016 W-2 from Great West
20  Painting & Repair; is that correct?
21       A.  Yep.
22       Q.  And does it show you made $14,502.69 from
23  Great West Painting in 2016?
24       A.  Yes.
25       MS. KITSON:  Okay.  All right.  In

Page 204

1  general, I think I'm almost done.  If I could just have
2  five minutes here to organize my notes so that I can kind
3  of close out, that would be great.
4       Could we go off the record?
5       THE DEPONENT:  Yeah.
6       MR. CRONE:  Hey, Danielle, do you mind if
7  we did ten minutes again?  I know we just did it, but
8  then I can organize my notes.  I just have a few
9  follow-up questions, and then I'll be ready to go.
10       MS. KITSON:  Absolutely.  We have plenty
11  of time.  So yeah.
12       THE VIDEOGRAPHER:  We're going off the
13  record at 2:20 p.m.
14       (Recess from 2:20 p.m. to 2:33 p.m.)
15       THE VIDEOGRAPHER:  We're going back on the
16  record at 2:33 p.m.
17       Q.  (By Ms. Kitson)  Ms. Brigham, do you
18  understand you're still under oath?
19       A.  Yes.
20       Q.  I wanted to ask you about your case.  We
21  were talking about the fact that you'd be seeking punitive
22  damages.
23       Is that -- do you remember that testimony?
24       A.  Yes.
25       Q.  As part of your damages, will you be

Page 205

1  seeking emotional distress damages, so damages --
2       A.  Yes.
3       Q.  -- for how you've been impacted?
4       A.  Yes.
5       Q.  And can you tell us, how have you been
6  impacted by your termination of employment from Frontier?
7       A.  It literally changed the course of my
8  life.  Part of my identity and who I was so proud to be
9  was being a flight attendant.  I loved my job.  I told
10  everybody about my job.  I was proud of my job.  I -- I
11  just loved it.  I loved working with the customers.  It
12  was great.
13       So to have that suddenly torn away from me
14  was awful.  It changed my sort of view on -- I tend to be
15  very Pollyanna, like everything's going to work out,
16  everything's going to be fine, and it kind of crushed
17  that when it didn't work out that way even though the law
18  was on my side.
19       It sort of changed my whole world view on
20  everybody should do what is right, and that didn't happen
21  in this case, and that hurt.  That was terrible.  You
22  couldn't pay me enough money to go through what I went
23  through again.  At a time when I got home from treatment,
24  at a time when I'm supposed to be mending my
25  relationships with my family, my friends, and all the

52 (Pages 202 - 205)

1  people that I had done harm to during my active
2  alcoholism, I was dealing with stuff with Frontier. And
3  then all of a sudden, I didn't have health insurance for
4  my family. I wasn't able to provide any type of money
5  for my family. I -- I didn't know what to do. I didn't
6  know how to be for a while.
7       I mean, I was a flight attendant, and I
8  was dang proud of it. I also was sort of -- it changed
9  the dynamics in my marriage. I was working, so was my
10 husband, and at times, I was the main breadwinner. So
11 for me to get knocked all the way down to unemployed was
12 awful.
13      It -- I mean, it's hard to even describe.
14 The anxiety that I went through, having to change my
15 whole life, was awful. I feel like I wouldn't be in
16 Michigan. I wouldn't be -- yeah. It would just be a
17 completely different life.
18      Q. Okay. I'm going to show you again an
19 exhibit that we looked at before, which is Exhibit 33,
20 which is the transcript of that October 9th, 2015 meeting
21 that you had.
22      A. Yes.
23      Q. Do you recall -- so it looks like you're
24 speaking with a Jeff here.
25      A. Jeff Varney.

1       Q. That's Jeff Varney?
2       A. Yes.
3       Q. And you're talking with him about -- he
4  says, I look like a hillbilly. You say, Here's your
5  flight attendant for the day. He say, Yep, exactly. I'm
6  from Denver. And you say, Too funny. Yeah, I just don't
7  know what else I'd want to do, Jeff, and this gives me
8  enough time off, because I'm going to start school in
9  November.
10      Do you see that?
11      A. Yes.
12      Q. So in the time that you were going through
13 this disciplinary process with Frontier --
14      A. Yes.
15      Q. -- were you planning to start school in
16 November?
17      A. Yes, I was going to do -- it's called
18 Trinity College. They had a naturopath program, a few
19 different programs that I wanted to take. I was
20 interested in learning more about holistic medicines and
21 the naturopath. It wasn't to change a career. It was
22 more for my -- myself. And, of course, I could have
23 turned that into a career and had something to fall back
24 on.
25      Q. And why didn't you end up going to school

1  after your termination of employment?
2       A. There's no way I would have been able to
3  afford it.
4       Q. If you take a look here, we're on page 43
5  of the PDF, you say -- you're talking with Jeff again?
6       A. Mm-hmm.
7       Q. And you're talking about flight
8  attendant -- being a flight attendant?
9       A. Mm-hmm.
10      Q. And he's talking about an office job, and
11 you say, Yeah. And he says, You lose so much time off.
12 And you say, Do you? And then Meredith, who I believe is
13 Cassie, says, Yeah, I feel like, God, I get -- I get up, I
14 come to work, I go home, eat dinner, and I go to bed. I'm
15 like it's five days a week. You say, Yeah.
16      You continue talking about it. And Jeff
17 says, You know, I so look forward to my weekends, and it's
18 like, shit, Sunday night, I have to go to work again -- or
19 no work again.
20      Do you remember having that conversation
21 with him?
22      A. Yes.
23      Q. And was he expressing that kind of a
24 regular 8-to-5 job is difficult?
25      A. Yes.

1       Q. And you say, Yeah, that's why I want to
2  keep doing turns if I can, because then I'll be able to go
3  back to school, and in 22 months, have my degree.
4       Do you see that?
5       A. Yeah.
6       Q. So is part of the reason that you wanted to
7  do turns and not have overnights is so that you could go
8  back to school?
9       A. This actually is -- when I said "keep
10 doing turns," it was even after I was able to do layovers
11 and stuff through my treatment. Yeah.
12      Q. And -- so that's part of the reason you
13 wanted to keep doing turns is so you could go to school?
14      A. Yes, but I could have done that even if I
15 was doing layovers too, in an online program.
16      Q. But it says here that that's why you want
17 to keep doing turns, right?
18      A. Yes, keep doing turns even after -- like
19 after everything was all said and done and I was done
20 with therapy and all that stuff. That's why I said "keep
21 doing turns."
22      Q. Okay. And --
23      A. To my memory.
24      Q. And you -- Jeff says, What are you looking
25 for? And then you talk about becoming a naturopath,

53 (Pages 206 - 209)

Page 210

1  correct?
2      A.  Yeah.
3      Q.  And that would have been a 22-month
4  program; is that correct?
5      A.  I believe so.
6      Q.  Okay.  I believe you also talked in this
7  meeting about wanting to spend time with your children and
8  that being why -- part of the reason why you wanted to
9  remain a flight attendant and have turns instead of
10  overnights; is that correct?
11      A.  That's why I wanted to be a flight
12  attendant.  With a flight attendant job, you get much
13  more time at home.  I mean, you're gone for a chunk of
14  time usually, but then you have -- on average, you have
15  like up to 15, to 20 sometimes, days off a month.
16      Q.  And with those turns, I think you said that
17  you're able to pick your kids up from school, for
18  instance?
19      A.  It just depends on when the turn was.
20      Q.  And it was your preference to not have to
21  do overnights in part so that you could stay home with
22  your family, correct?
23      A.  No, that was strictly because of my
24  recovery.
25      Q.  So you wouldn't mind the overnights, even

Page 211

1  though you'd be away from your kids?
2      A.  No, not at all.  Sometimes it's a nice
3  break.  But it was not safe for me to do that in my
4  recovery at the time.  I missed layovers.  I really did.
5      Q.  And you were a flight attendant for eight
6  years; is that correct?
7      A.  A little over.
8      Q.  And I'm sure you had contact with a lot of
9  flight attendants in that time; is that correct?
10      A.  Correct.
11      Q.  You were friends with flight attendants,
12  right?
13      A.  Yeah.
14      Q.  And --
15      A.  That was the majority of my social life
16  was being a flight attendant.
17      Q.  To your knowledge, who generally gets to do
18  turns?
19      A.  Senior flight attendants, and at one
20  point, I was not considered a super senior, but I was
21  senior enough to hold turns.  Little turns.  I couldn't
22  hold the big high-hour New York/LaGuardia turns, but I
23  was able to hold the super early in the morning Dallas
24  turn that had me home by 11:00 in the afternoon.
25          And then Frontier opened up -- Frontier

Page 212

1  opened the new base in Orlando, and everybody junior to
2  me went over there to get a line.  So, therefore, because
3  I couldn't obviously move to Orlando, I -- my seniority
4  went down, and that's when we started having problems.
5  And that's when I started asking for reasonable
6  accommodations so that this could work with my recovery.
7      Q.  So turns is what people typically --
8  that -- that was the premium, right, what people wanted?
9      A.  Not necessarily.  Everybody was different.
10      Q.  But for the most part?
11      A.  No.  I knew lots of people that would
12  prefer two days, and lots of people that preferred to fly
13  up to six days in a row.  That way they could have, like,
14  two weeks off.  It just depended on the person.  I mean,
15  super senior people were the ones that were able to hold
16  those long LaGuardia turns, which are eight flight hours
17  in a single day.  But there were also lots of super
18  senior people that liked to fly trips.
19      Q.  Did you ever apply for a transfer to
20  Orlando?
21      A.  Absolutely not.
22      Q.  Why not?
23      A.  Because I couldn't uproot my family and
24  move to Orlando.
25      Q.  If you had moved to Orlando, could you have

Page 213

1  held turns?
2      A.  I'm assuming.
3      Q.  And could you have commuted to Orlando?
4      A.  No.  And not -- well, I mean, technically
5  somebody can commute, but for me, for my recovery, I did
6  not feel comfortable being on an overnight or away from
7  my recovery and my support system at home overnight,
8  which commuting would have meant that I had to fly in the
9  day early, I'd have to stay in a hotel in Orlando to do
10  turns.  So it's pointless.  I might as well at that point
11  have done overnights.
12      Q.  What other reasons other than alcoholism
13  did you not want to do overnights?
14      A.  Alcoholism was the main one.
15      Q.  Were there others?
16      A.  Not that I can recall at this time.
17      Q.  So it didn't bother you at all to do
18  overnights for family reasons?
19      A.  I mean, it was nice when I was home, but
20  it wasn't the reason why I was asking for a reasonable
21  accommodation.
22      Q.  I want to talk to you a little bit about
23  the other stressors in your life in terms of other things
24  that have contributed to your emotional distress that are
25  not related to Frontier.

54 (Pages 210 - 213)

Page 214

1      What are the major emotional stressors that
2  you've experienced in your life?
3      A.  The death of my daughter in 2009.
4      Q.  Okay.  Tell me about that.
5      A.  I was five and a half months pregnant, and
6  I got an infection in the lining of my uterus, because I
7  have an incompetent cervix, which we didn't know then.
8  And I got an infection in the lining of my uterus, and my
9  body went into labor to try and get rid of the infection.
10 My daughter, Cindy Lee Brigham, was born, and lived for
11 45 minutes and died in my arms.
12     Q.  How does that still impact you today?
13     A.  It's hard.  I would have a 12-year old.
14 It's really hard.  I'm not going to lie.
15     Q.  And I'm so sorry for your loss.
16     A.  I did lots of therapy about it, so I'm way
17 better than, of course, I was.  Prior to going to
18 treatment, I just hadn't even dealt with it emotionally.
19 I ignored it.  I drank it away.  And when it comes to
20 treatment, I did a bunch of therapy around it.
21     And I did a bunch of, like, psychoactive
22 therapy.  I don't know what they call it.  It's like
23 psychotherapy or something.  And it was very -- it was so
24 hard.  It was the first time that I allowed myself to
25 feel those feelings and to feel them sober.  It was hard,

Page 215

1  but it helped.
2      Q.  And that was happening all in this same
3  time period of 2014/2015, as you were --
4      A.  2014 is when I finally faced it and dealt
5  with it in treatment.
6      Q.  And so that period must have been very
7  hard, the 2014/2015 period, dealing with that at the same
8  time that you were going through this disciplinary
9  process, I would imagine?
10     A.  Of course.
11     Q.  What other major emotional stressors have
12 you had in your life, not counting Frontier?
13     A.  I honestly -- Frontier.  I put my daughter
14 and Frontier in pretty much the same category.  They both
15 destroyed my happiness, what I thought was going to be my
16 life, and just destroyed it.  I was worth something when
17 I was a flight attendant.  I was proud.  It was what I
18 wanted to do when I grew up.
19     Can I have a minute?
20     Q.  Yes.  Absolutely.
21     A.  Thank you.
22     Q.  Do you want to go off the record for five
23 or --
24     A.  Yes, please.
25     Q.  Okay.

Page 216

1      THE VIDEOGRAPHER:  We're going off the
2  record at 2:49 p.m.
3      (Recess from 2:49 p.m. to 2:57 p.m.)
4      THE VIDEOGRAPHER:  We're going back on the
5  record at 2:57 p.m.
6      Q.  (By Ms. Kitson)  Ms. Brigham, do you still
7  understand you're under oath?
8      A.  Yes.
9      Q.  I just have some wrap-up questions for you.
10 I want to make sure I understand your position in the
11 lawsuit.
12     So you wanted to be able -- every time you
13 had overnight trips, to just drop those and work in the
14 general office, correct?
15     A.  That was one of them, correct.
16     Q.  Even though no one else got to do that
17 other than on-the-job-injured individuals, correct?
18     A.  I don't know if they allowed other
19 individuals to do that, Danielle.  I can just speak to my
20 position.
21     Q.  But you wanted to be treated better than
22 everyone else in that regard, correct?
23     A.  I was asking for a reasonable
24 accommodation.
25     Q.  And you wanted to be able to drop your

Page 217

1  entire schedule after bidding and build it up from --
2      A.  Not drop my entire schedule.  Don't award
3  me anything.
4      Q.  All right.  Let me put it a different way.
5      You wanted to not even have to bid and get
6  to start off with scratch with no schedule?
7      A.  Correct.
8      Q.  Where everybody else had the whole 45,
9  correct?
10     A.  Correct.
11     Q.  But you get to be treated better than
12 everyone else, right?
13     A.  I was asking for a reasonable
14 accomodation, and that is my right under the ADA.
15     MR. CRONE:  And -- and -- and I want to
16 put an objection on the record that the question's
17 mischaracterizing the witness' prior testimony.
18     Q.  (By Ms. Kitson)  And, Ms. Brigham, you also
19 wanted to, after you bid a full schedule, have your
20 overnight trips just magically taken off, correct?
21     A.  Correct.
22     Q.  Even though no one else got to do that,
23 correct?
24     A.  I don't know what they did for other
25 people, Danielle.  They did it for me a few times,

55 (Pages 214 - 217)

Page 218

1 proving that they could have done it very quickly with a
2 stroke of a key.
3      Q.  But you wanted to be able to do that when
4 not everybody could, correct?
5      A.  That was one of my reasonable
6 accommodation requests, correct.
7      Q.  And people senior to you would not have
8 been able to do that, correct?
9      A.  I don't know.  I at one point talked to
10 Frontier about setting up a program for people who have
11 self-disclosed to the company, and that was actually
12 during my October 9th meeting with them.  And they said I
13 would have had to go to the union in order to do that.
14 And then they fired me before I could even set anything
15 up to help people that are in our position.
16      Q.  You're not aware of anyone more senior to
17 you getting to do that, just drop overnight trips whenever
18 they do that, correct?
19      A.  If the reserve grid was in the green, they
20 could, but if they didn't have -- that I'm aware of --
21 somebody being able to just go take them away.
22      Q.  Okay.  Let me ask it a different way.
23         Reserve's in the red, no one is allowed to
24 drop.  You're not aware of anyone more senior to you being
25 allowed to just drop trips in that situation, correct?

Page 219

1      A.  Correct.
2      Q.  Okay.  With respect to the blank schedule,
3 then -- and I asked you if, you know, everyone else would
4 have to hold 45 -- people more senior to you would have
5 had to hold 45, correct?
6      A.  Again, I was asking for that as a
7 reasonable accommodation.
8      Q.  But people more senior to you would have
9 been able to hold -- or forced to hold 45, correct?
10      A.  People more senior than me would have been
11 able to bid what they wanted.
12      Q.  But they always had to hold 45 hours,
13 correct?
14      A.  Correct.
15      Q.  And you wouldn't have had to do that,
16 correct?
17      A.  Correct.  It was part of what I was asking
18 as my reasonable accommodation.
19      Q.  All right.
20         MS. KITSON:  Those are my only questions.
21 John, did you have questions?
22         MR. CRONE:  I have -- yeah, just a few,
23 though.  Give me just one second, Danielle.
24         MS. KITSON:  Sure.
25         THE DEPONENT:  And can I actually have

Page 220

1 like two minutes?  My dog is barking at the kids, I
2 think.
3         MS. KITSON:  Yeah.
4         THE DEPONENT:  Thank you.
5         THE VIDEOGRAPHER:  We're going off the
6 record at 3:01 p.m.
7         (Recess from 3:01 p.m. to 3:04 p.m.)
8         THE VIDEOGRAPHER:  We're going back on the
9 record at 3:04 p.m.
10         EXAMINATION
11 BY MR. CRONE:
12      Q.  So, Rebecca, how many hours did you want to
13 hold?  So the accommodation that you were just discussing
14 with Ms. Kitson, she was stating that -- that you wanted
15 to be able to, you know, build your schedule from scratch,
16 and everyone else would have to hold 45 hours.
17         How many hours were you proposing to hold?
18      A.  As many as I could get to fit.  I
19 mean -- and I didn't -- I don't think I remember about
20 the 45 hours being something that I remember now.  But I
21 remember I would have to be up to 60 hours, which would
22 have been very doable had they reasonably accommodated
23 me.
24         My goal -- financially for my family, my
25 goal was to fly about 100 hours a month.  That was my

Page 221

1 ultimate goal.
2      Q.  Okay.  So ideally, then, were you looking
3 to get a schedule of 100 hours per month with that
4 accomodation?
5      A.  Yes.
6      Q.  And then if you couldn't get the number of
7 hours you wanted, then you just be out of luck?
8      A.  I would be -- actually, at that point, I
9 would have been fine with 60 hours.
10      Q.  Okay.  Much earlier in the day, Ms. Kitson
11 asked you about whether or not you've applied for flight
12 attendant jobs -- flight attendant positions since being
13 terminated from Frontier.
14         Do you recall that?
15      A.  Yes.
16      Q.  And then you testified that currently you
17 live roughly two hours in traffic away from the Detroit
18 airport; is that correct?
19      A.  Yes.
20      Q.  And I wasn't clear, so I just want
21 to -- you had -- you had told Ms. Kitson, I think, that
22 one reason you couldn't get another flight attendant job
23 is now because you don't have the -- you wouldn't have the
24 seniority; is that right?
25      A.  Yes.  The seniority, and I was too far

56 (Pages 218 - 221)

Page 222

1  away from the airport, and I -- I could not have
2  commuted.
3       Q.  Couldn't have commuted.  And I thought
4  there was one other -- well, it doesn't matter, we can
5  look back at the transcript.
6            The -- so when you -- Ms. Kitson also asked
7  you about being granted leave time when you went to
8  inpatient treatment.
9            Do you recall that?
10      A.  Yes.
11      Q.  How did that actually happen?  So did
12 you -- did you go to treatment, then request leave?  Did
13 you request leave, go to treatment?  What was the actual
14 sort of detail on the timeline?
15      A.  I went to treatment, and they granted me
16 the permission to use a computer, so that I could check
17 to see if my schedule was clear or what I had.  And at
18 that point, I was still on the schedule.  So that's when
19 I had to self-disclose to the company, and they granted
20 the medical leave.
21      Q.  Okay.  And why did you have to ask
22 permission to use the computer?
23      A.  Because the first week in treatment,
24 you're not supposed to have any phone calls, any access
25 to computers, anything for the first seven days.

Page 223

1       Q.  Do you remember who you emailed at Frontier
2  about it?
3       A.  I don't remember who I emailed.  I do
4  remember calling Claudia Galvez, and she's the one I
5  talked to on the phone, and told her my situation.
6       Q.  Okay.  And what did she tell you?
7       A.  Get better.  We'll handle everything else
8  on our end.  Just get better.
9       Q.  Okay.  Do you remember -- Danielle referred
10 you to various provisions of the CBA.
11           Do you recall those questions?
12      A.  Yes.
13      Q.  Is there anything, to your knowledge, in
14 the CBA that would prevent Frontier from granting you the
15 accommodations you requested?
16      A.  No.
17           MS. KITSON:  Object to form.
18      Q.  (By Mr. Crone)  And do you recall --
19 Ms. Kitson asked you if you should have been familiar with
20 the terms in the Collective Bargaining Agreement.
21           Do you recall that question?
22      A.  Yes.
23      Q.  I want to ask you the sort of mirror image
24 to that question.
25           Do you think Frontier should have been

Page 224

1  familiar with the terms of the Collective Bargaining
2  Agreement as well?
3            MS. KITSON:  Object to form.
4       A.  Yes.
5       Q.  (By Mr. Crone)  Okay.  Ms. Kitson put in
6  front of you a position description for a flight
7  attendant.
8            Do you remember that?
9       A.  Yes.
10      Q.  And it listed a bunch of essential job
11 functions.
12           Do you recall those?
13      A.  Yes.
14      Q.  And when -- when you -- when you -- after
15 you self-disclosed your disability of alcoholism, were you
16 able to complete those essential job functions?
17      A.  With my reasonable accommodation being
18 granted, yes.
19      Q.  Okay.  And what about without it?
20      A.  Without it, no, because if I had to do
21 overnights, I wouldn't have my sobriety.  Therefore, I
22 would be terminated by Frontier.
23      Q.  Okay.  And do you recall -- or actually,
24 let me start over.  Let me formulate the question a
25 different way.

Page 225

1            After you self-disclosed your disability of
2  alcoholism, did you have any trouble with your day-to-day
3  life?
4       A.  Yes.
5       Q.  Okay.  Do you recall being asked a
6  discovery -- a written discovery question by Frontier
7  about that topic?
8       A.  Yes.
9       Q.  And did you answer that honestly when you
10 answered it?
11      A.  Yes.
12      Q.  And are you still suffering any of those
13 issues; that is, your ability to complete day-to-day life
14 activity?  Do you have any issues with that now?
15      A.  The sleeping part, which is why I still
16 take trazodone.  But my life now is nowhere near what it
17 was early in recovery, when it comes to those post -- the
18 post-withdrawal symptoms.
19      Q.  So you've improved a good deal now?
20      A.  Yes.
21      Q.  And -- but what about right after the
22 self-disclosure, you know, from that time until you were
23 fired by Frontier, how was it then?
24      A.  I was still early in my recovery.  I had
25 issues sleeping.  And honestly, the Frontier stuff just

57 (Pages 222 - 225)

Page 226

1  made it worse.  I -- yeah.
2       Q.  I want to pull up Exhibit -- what was
3  Exhibit 43 in the deposition.  So Ms. Kitson marked it as
4  Exhibit 43.  I'm going to try to share my screen here and
5  see if I can make this work.  Oh, there we go.  Okay.
6            Okay.  Can you see that, Rebecca?
7       A.  Yes.
8       Q.  Okay.  So I'm at page 19 of Exhibit 43
9  which is Bates number Brigham LM, a bunch of 0s, 36?
10      A.  Yes.
11      Q.  And do you see at the top where it says,
12  Rebecca, it says, I don't know if I qualify?
13      A.  Yes.
14      Q.  Is that you speaking?
15      A.  Yes.
16      Q.  And then Kari below says, And you may or
17  may not, but I would -- I was telling her earlier, I mean,
18  there's so many opportunities, right?  And then a bunch of
19  other stuff.
20           Is that Kari Thompson?
21      A.  Yes.
22      Q.  And then below you say, Right.  Do you lose
23  your seniority?  Kari says, after, question mark?  And
24  then Jerry says, 90 days.
25           Is that --

Page 227

1       A.  That's where I heard it.
2       Q.  Is that Jerry --
3       A.  There it is.
4       Q.  Yeah.  And is that Jerry Arellano?
5       A.  Yes.
6       Q.  And then Kari says, Oh, is it 90 days if
7  you stay with -- within the inflight?  Jerry says, If you
8  stay within the company.  Kari says, It's two years.  If
9  you leave inflight, it's 90 days.  And then Jerry says, Or
10  if you leave the company, it's 90 days.
11      A.  Correct.
12      Q.  Is that all -- is that all an accurate
13  transcript of the conversation, as you remember it?
14      A.  Yes.
15      Q.  Okay.  And what does that mean to you, the
16  90 days?  What -- what is -- what are they saying to you
17  there?
18      A.  After three months in a temporary
19  position, you can't go back to inflight and keep your
20  seniority.
21      Q.  Okay.
22      A.  Which is what I remembered being told.
23      Q.  Now, I want to move over to what was marked
24  Exhibit 46, and these are your text messages with
25  Stefanie Coppedge.

Page 228

1            Do you remember looking at these earlier?
2       A.  Yes.
3       Q.  Okay.  And I'm going to go to what's
4  page 44 in the PDF.  And just to refresh our memories, the
5  yellow is Stefanie, and the blue is you, right?
6       A.  Correct.
7       Q.  And here -- do you see right in the middle,
8  Ms. Coppedge says, My lovely husband says no grievance.
9  Fuck those mother fuckers, just sue?
10      A.  Yes.
11      Q.  First of all, is -- is -- is
12  Ms. Coppedge -- I mean, she used profanity in the text
13  message.
14           Does that make her a bad person in any way?
15      A.  No, not at all.
16      Q.  I mean, you -- you -- we've looked at some
17  text messages where you use profanity.
18           Does it make you a bad person?
19      A.  No.
20      Q.  But here, Ms. Coppedge is telling you to
21  sue Frontier, isn't she?
22      A.  Yes.
23           MS. KITSON:  Object to form.
24      A.  Yes.
25      Q.  (By Mr. Crone)  Okay.  And is she -- to

Page 229

1  your --
2       A.  She wouldn't have said that if she didn't
3  know what they were doing was wrong.
4       Q.  Okay.  Do you think she thought it was
5  against the law?
6       A.  Yes.
7           MS. KITSON:  Object to the form.
8       A.  Otherwise -- otherwise, she wouldn't have
9  said "sue."  You have to have a legal case in order to
10  sue somebody, not that you just don't like what they're
11  doing to you.
12      Q.  (By Mr. Crone)  Okay.  I'm going to move to
13  page 14 of this same Exhibit 46.  At the bottom, it's a
14  text message from Stefanie to you that says, American
15  Disabilities, discrimination, alcoholics.
16           Do you recall that text?
17      A.  Yes.
18      Q.  What's she telling you there?
19           MS. KITSON:  Object to the form.  Lack of
20  foundation.
21      A.  To look into the ADA, because I was a
22  protected class in being an alcoholic.  And that they
23  were discriminating against me basically for being an
24  alcoholic.
25      Q.  (By Mr. Crone)  Okay.

58 (Pages 226 - 229)

Page 230

1    MS. KITSON: And, Ms. -- Ms. Brigham, if
2  you could wait a tick after Mr. Crone asks the questions
3  so that I could get my objection in there on the record,
4  that would be great.
5    THE DEPONENT: Okay. Sure.
6    Q. (By Mr. Crone) Okay. I'm going to move to
7  page 30 of Exhibit 46. Down at the bottom, Ms. Coppedge
8  says, Seriously, sue for stress and anxiety, shit.
9    What's she telling you there?
10   A. That --
11   MS. KITSON: Object to the form.
12   A. She basically was telling me to sue for
13 stress and anxiety because of what Frontier was putting
14 me through.
15   Q. (By Mr. Crone) At page 44 of the same
16 exhibit, we're going to go back to where we started at the
17 bottom, she tells you, You should reach out to
18 Julia Jones. She sued and won, exclamation point! Maybe
19 she can help you attorney-wise.
20    What was that about?
21   MS. KITSON: Object to the form.
22   A. Trying to help me find an attorney to sue
23 Frontier.
24   Q. (By Mr. Crone) Okay. And give me just one
25 second. I think I only have -- oh, yeah. Last couple of

Page 231

1  questions, Rebecca. So let me get rid of this.
2    Earlier you had testified that you had
3  considered going to school at one point and that that
4  program would take roughly 22 months.
5    Do you recall that?
6    A. Yes.
7    Q. So at one point, you considered going to
8  school.
9    And did you do that because you were
10 interested in the subject matter?
11   A. Yes.
12   Q. Did you also think it might lead to a
13 better job?
14   A. Yes, down the road, it could have
15 possibly, especially if things went south with Frontier.
16   Q. But ultimately, you didn't go, because you
17 couldn't afford it because you got fired.
18    Is that -- was that --
19   A. Correct.
20   Q. Okay.
21   MR. CRONE: That's it, Rebecca. Thank
22 you. I appreciate it.
23   A. Thank you.
24   MS. KITSON: Can we just take two minutes
25 off the record, John, and then, I don't think I have

Page 232

1  anything, but let me just double-check, okay?
2    MR. CRONE: Sure. Sounds good.
3    THE VIDEOGRAPHER: We're going off the
4  record at 3:17 p.m.
5    (Recess from 3:17 p.m. to 3:21 p.m.)
6    THE VIDEOGRAPHER: We're going back on the
7  record at 3:21 p.m.
8    MS. KITSON: I don't have any further
9  questions. Thank you, Ms. Brigham.
10   THE DEPONENT: Thank you.
11   MR. CRONE: Thanks, Danielle.
12   MS. KITSON: And, Laurel, did you want to
13 ask us about the order?
14   THE REPORTER: Yes. First, Ms. Kitson,
15 your order, is it the same?
16   MS. KITSON: It will be our standard
17 order, whatever we ordered last time.
18   THE REPORTER: Mr. Crone?
19   MR. CRONE: Whatever is regular and
20 formal. So slow and cheap.
21   THE REPORTER: And then signature, do you
22 want to handle it?
23   MR. CRONE: Yeah, please. Thank you.
24   THE REPORTER: Okay. Thanks.
25   THE VIDEOGRAPHER: This concludes the

Page 233

1  videotaped deposition of Rebecca Brigham. We're going
2  off the record at 3:22 p.m.
3    * * * * * * *
4    WHEREUPON, the foregoing deposition was
5  concluded at the hour of 3:22 p.m. Total time on the
6  record was 4 hours and 47 minutes.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

59 (Pages 230 - 233)

Page 235

```
 1              REPORTER'S CERTIFICATE
 2
 3
 4          I, Laurel S. Tubbs, a Registered
 5  Professional Reporter, Certified Realtime Reporter, and
 6  Notary Public within the State of Colorado, do hereby
 7  certify that previous to the commencement of the
 8  examination, the deponent was duly sworn by me to testify
 9  to the truth.
10          I further certify that this deposition was
11  taken in shorthand by me remotely and thereafter reduced
12  to a typewritten form; that the foregoing constitutes a
13  true and correct transcript.
14          I further certify that I am not related
15  to, employed by, nor of counsel for any of the parties or
16  attorneys herein, nor otherwise interested in the result
17  of the within action.
18          My commission expires September 1, 2023.
19
20
       LAUREL S. TUBBS
21     Registered Professional Reporter
       Certified Realtime Reporter
22     and Notary Public
23
24
25
```

Page 236

```
 1  John Crone, Esq.
 2  john@crone-law.com
 3          September 18, 2020
 4  RE:   Brigham, Rebecca v. Frontier Airlines, Inc.
 5  8/31/2020, Rebecca Brigham (#4229140)
 6    The above-referenced transcript is available for
 7  review.
 8    Within the applicable timeframe, the witness should
 9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25
```

Page 237

```
 1  Brigham, Rebecca v. Frontier Airlines, Inc.
 2  Rebecca Brigham (#4229140)
 3        E R R A T A  S H E E T
 4  PAGE____ LINE____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE____ LINE____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE____ LINE____ CHANGE_____
11  _____
12  REASON_____
13  PAGE____ LINE____ CHANGE_____
14  _____
15  REASON_____
16  PAGE____ LINE____ CHANGE_____
17  _____
18  REASON_____
19  PAGE____ LINE____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Rebecca Brigham              Date
25
```

Page 238

```
 1  Brigham, Rebecca v. Frontier Airlines, Inc.
 2  Rebecca Brigham (#4229140)
 3        ACKNOWLEDGEMENT OF DEPONENT
 4    I, Rebecca Brigham, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____  _____
12  Rebecca Brigham              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25
```

60 (Pages 235 - 238)

**[& - 203]**

| & |
| --- |

**&**   21:22 26:8
  31:15 51:1,11
  57:1 203:20

| 0 |
| --- |

**0001115**   34:8,14
**03417**   1:3 5:16
**0s**   226:9

| 1 |
| --- |

**1**   3:9,19 4:2 5:11
  63:3 84:7,7 85:12
  130:3 167:17
  168:25 170:11
  235:18
**1,500**   53:19
**10**   25:3 117:6
  127:10
**10,000**   49:14
**10-23**   180:9,15
**100**   67:18 191:12
  220:25 221:3
**1003**   1:16
**10148**   8:11
**102**   130:11 132:13
**1029**   119:22
**1099**   2:19 28:9
**10:08**   90:11,12
**10:23**   90:12,14
**10:47**   109:15,16
**10:49**   109:16,18
**10th**   21:15,25
  147:4
**11**   2:21 54:22
  81:13 145:17
  146:9 152:9
  156:23 157:22
  202:9
**11/3**   197:25
**1118**   135:8

**112**   4:4
**114**   3:16
**118**   3:8
**119**   3:17
**11:00**   211:24
**11:17**   129:20
**11:37**   129:19
**12**   2:23 27:16
  36:10 55:16 157:7
  157:16 159:15
  163:5,10 203:2
  214:13
**123**   168:4,21 169:2
  169:21,23 170:12
**12:00**   6:25
**12:20**   129:20,22
**12th**   134:17 186:9
**13**   23:2 55:18
**134**   3:5
**139**   3:14
**13th**   125:12
  128:13
**14**   3:2 127:7 167:3
  168:16 229:13
**14,502.69**   203:22
**1432**   140:4
**145**   2:21
**1458**   117:7
**14th**   25:4
**15**   3:3 62:4 138:7
  179:25,25 210:15
**15,550.05**   51:7
**150**   52:6,8
**152**   3:9
**157**   2:23
**158**   52:9
**15th**   155:6
**16**   3:4 30:9 33:24
  34:5 45:12 46:10
**161**   3:19

**163**   3:10
**167**   3:2
**16th**   1:21 155:7
**17**   3:5 35:20
  134:11,12 137:1
**171**   3:20
**173**   3:11
**1766**   112:13
**179**   3:3
**17th**   140:14
**18**   154:1 236:3
**18.75.**   55:19
**182**   3:13,21
**184**   3:22
**18th**   82:18
**19**   1:3 5:16 25:16
  163:21 226:8
**1900**   1:21
**19th**   82:18
**1:03**   166:16,17
**1:17**   166:17,19
**1:46**   186:17
**1st**   153:4 155:18

| 2 |
| --- |

**2**   2:13,15,16,18
  3:20 49:24 50:2,6
  50:25 51:4,10
  118:22 127:9
  148:25 155:17
  167:24 182:14,16
  183:10,21 203:19
**2,922.78.**   50:15
**20**   4:4 25:16 62:17
  63:3 112:12,12
  210:15 238:15
**200**   3:24 14:14
**2003**   29:23
**2004**   29:23
**2007**   26:18 34:17
  35:12

**2008**   35:20,25 46:2
**2009**   24:21 46:10
  63:8 214:3
**2011**   84:13
**2011-2016**   4:3
**2013**   21:24 23:2
**2014**   3:15 64:1,3
  65:9,11 67:5,6,20
  68:13,25 69:12,16
  69:18,23 70:2
  71:11,15,17,25
  114:20 116:4,13
  116:19 124:13,17
  125:12 128:13
  134:17 136:1
  139:15 140:8,14
  142:13 143:12
  148:9 158:18
  186:9 215:4
**2014/2015**   215:3,7
**2015**   2:19 3:9
  26:20 38:21 98:17
  112:22 147:4
  153:4 155:7,18
  158:13 161:17
  167:4,15 173:2,22
  178:24 180:1
  183:1 198:6
  201:10 203:13
  206:20
**2016**   2:13,15 50:5
  84:13 203:19,23
**2017**   2:16 50:25
  51:7
**2018**   2:18 27:7
  51:11,20
**2020**   1:12 2:5 5:3
  236:3
**2023**   235:18
**203**   2:13,19

**22**   114:20 185:24 209:3 210:3 231:4
**220**   2:11
**22402**   235:20
**22nd**   116:3,13
**23**   3:8 118:8,11
**23rd**   35:12 183:19
**24**   3:9 13:13,20,24 42:19 152:21
**24/7**   54:21 81:6,13
**25**   187:16
**26**   180:1
**28th**   158:13
**29**   46:2 198:12
**2:00**   200:2,3
**2:14**   200:3,5
**2:20**   204:13,14
**2:33**   204:14,16
**2:49**   216:2,3
**2:57**   216:3,5
**2s**   49:10,20

### 3

**3**   2:13 28:25 137:8 174:5,5 182:14 203:18,19
**3,000**   28:25 52:5
**30**   56:5 62:17 135:18 139:21,22 177:18 230:7 236:17
**30,000**   49:17
**303-598-3526**   1:17
**303-629-6200**   1:22
**31**   1:12 2:5
**31st**   5:3
**32**   3:10 55:14 163:24 178:22 179:4
**33**   3:4,11 173:15 197:24 206:19

**34**   3:13 182:25 198:1,5
**35**   62:4
**36**   3:14 139:6,6,6 142:24 143:8 226:9
**37**   3:16 114:18,18 114:24
**3:00**   186:21 201:17
**3:01**   220:6,7
**3:04**   220:7,9
**3:17**   232:4,5
**3:21**   232:5,7
**3:22**   233:2,5
**3rd**   112:22 183:1 198:6

### 4

**4**   2:15 36:10 50:4 50:5 114:25 130:16 174:5 233:6
**41**   3:17 119:20,20 122:2 125:4
**413206**   116:14
**42**   3:19 161:8,9,10
**4229140**   236:5 237:2 238:2
**4274**   163:25
**43**   3:20 171:16,17 172:11,24 174:4 176:7 208:4 226:3 226:4,8
**44**   3:21 174:4 182:1 197:25 228:4 230:15
**45**   83:11,20,22 85:1,2,20,25 86:1 86:7 88:17 97:10 105:7 214:11 217:8 219:4,5,9,12

220:16,20
**4550**   1:16
**46**   3:22 184:18,19 185:12 227:24 229:13 230:7
**47**   3:24 200:12 233:6
**48438**   8:12
**4th**   67:7 161:17 167:4,15 178:24 201:10

### 5

**5**   2:16 50:24 127:9 208:24
**50**   2:15,16
**51**   2:18
**5th**   34:17 67:5,20 68:12,24 69:12,16 69:23 70:2 71:11 71:15,17,25 124:13

### 6

**6**   2:18 25:4 51:9 51:14 140:3 148:25 158:22 180:1 201:3
**60**   65:12,13 66:12 80:9 81:7 83:4,15 83:20 84:1 85:14 86:3 88:21 95:6 105:25 135:22 137:17 220:21 221:9
**670-1**   146:12
**67714**   21:24

### 7

**7**   2:19 143:7 149:23 159:2 201:2 203:8,10

**7,295**   51:17
**75**   81:11
**7th**   65:24 67:6,10 124:14,15,17 139:15 140:8

### 8

**8**   2:11 3:14 208:24
**8/31/2020**   236:5
**80**   97:17
**800**   1:21
**80202**   1:22
**80246**   1:17
**81**   168:3,21 169:2 169:21,22 170:11 170:14
**815**   84:17
**84**   4:2
**869**   85:9
**890**   203:15
**8:07**   2:5 5:3
**8:09**   6:22
**8:44**   32:12,13,13 32:15
**8th**   136:1,6 142:13 143:12

### 9

**9**   25:7
**9/7/14**   135:11
**90**   73:15,18 131:16 132:18,21 133:5 133:13 135:18 156:3 166:6 169:19 177:8 178:4 226:24 227:6,9,10,16
**916**   130:12
**93**   118:14
**94**   27:11
**99**   192:10

**9:04** 48:17,18
**9:16** 48:18,20
**9th** 173:2,22
  206:20 218:12

**a**

**a.a.** 121:20,22
**a.m.** 2:5 5:3 6:22
  6:25 32:12,13,13
  32:15 48:17,18,18
  48:20 90:11,12,12
  90:14 109:15,16
  109:16,18 129:19
  129:20
**abilities** 141:16
**ability** 13:7,9,20
  15:3 40:12,13
  66:13,20 68:9
  69:17,24 70:14,22
  131:16 225:13
**able** 53:1 57:3
  58:12,25 60:22
  61:2,11 62:11,18
  66:8 67:13 69:5,8
  69:13 70:3,5,8,11
  71:18 72:6,11
  77:16 95:9,15,21
  96:10 102:19
  105:10 106:2,7
  110:7,7 131:23
  140:12,21 141:9
  142:11 144:12
  145:2 151:18
  154:21 155:12
  165:22 166:5
  177:7 206:4 208:2
  209:2,10 210:17
  211:23 212:15
  216:12,25 218:3,8
  218:21 219:9,11
  220:15 224:16

**absence** 2:22,25
  64:3,7,9,13,15,22
  109:1 114:19
  116:3,12 180:5
  190:24
**absences** 40:5
**absolutely** 89:15
  91:11 101:13
  163:9 202:17
  204:10 212:21
  215:20
**acceptable** 86:16
**access** 222:24
**accommodate**
  44:16 58:25
  167:19 193:23
  194:4
**accommodated**
  39:22 41:4 44:12
  65:7 178:1 181:1
  220:22
**accommodating**
  62:9
**accommodation**
  49:2 73:24 74:1,4
  74:6 79:1,11
  86:11,14 88:10,14
  89:2 98:4,7,13,21
  99:2,10,11,25
  102:2,5,9,10 106:1
  106:22,24 107:3,6
  111:11 113:1,16
  161:4 189:4 190:9
  193:13,18 194:6
  213:21 216:24
  218:6 219:7,18
  220:13 224:17
**accommodations**
  41:17 71:23,24
  72:16,25 78:11
  102:20 108:15,17

109:4 110:2,15
  111:10 113:9
  134:7 141:22
  193:6 212:6
  223:15
**accomodation**
  73:4 95:23 104:4
  217:14 221:4
**accompanying**
  137:13
**account** 28:20,22
  130:19 171:6
**accountability**
  66:23
**accrue** 130:20
  137:23 169:8
**accrued** 38:22,25
**accumulate** 85:14
**accuracy** 35:3
  37:2 38:16,18
  162:20 173:8
  236:9
**accurate** 33:22
  35:9 45:22 46:5
  46:21 62:19
  127:14,25 150:5
  154:11 159:9
  162:3 164:14
  174:3 227:12
**accurately** 15:3
  37:25 44:16
  102:16,19
**acknowledge** 6:16
  6:19 7:4,7
**acknowledgement**
  238:3
**acknowledgment**
  236:12
**aclu** 22:5
**act** 2:22,25 3:7
  39:7 74:7 114:8

114:11 116:25
  134:24 189:21
**action** 1:3 5:22
  163:21 235:17
**actions** 33:11
**active** 80:16 81:17
  206:1
**activities** 71:13
**activity** 150:2
  225:14
**acts** 93:13
**actual** 52:12 53:24
  62:13 125:1
  222:13
**acute** 153:25
  154:3
**ada** 16:4 17:6 44:7
  44:13 189:11,13
  189:16 191:15,17
  192:18 193:14,20
  195:11,14 198:24
  202:24 217:14
  229:21
**adapting** 160:8
**add** 12:3 88:6
  97:20,25 104:17
  104:20 105:17
  141:21 149:17
**additional** 129:6
  139:9 141:18
**additions** 238:6
**address** 8:10
  172:7
**addresses** 172:10
**adhere** 39:13
  41:15 44:21 92:4
  144:1 145:13
**adhering** 40:10
**adjust** 159:7
**admin** 55:8,11

**administer** 5:21
**administered** 7:7
**admitting** 126:11
  131:21
**adrienne** 87:19
  98:22 99:3,22,24
  100:4,9 101:18
  190:21 194:10,12
  195:19 196:2,8,10
  196:15,23 197:13
**advance** 10:6
**affect** 15:2 66:19
**affiliated** 55:23
**affiliations** 6:1
**affirmative** 93:13
**affirmed** 7:23
**afford** 53:1,5
  59:13 60:22 61:3
  67:13 121:4 208:3
  231:17
**afl** 4:2 84:9
**aftereffects** 68:18
**afternoon** 211:24
**age** 127:7
**agency** 26:4,22,25
  31:11 50:9 54:9
  156:18 158:10
**ages** 24:25
**agitated** 154:1
**agitation** 149:25
**ago** 19:5 20:19,19
  52:3 83:23 100:25
  178:21 192:15
**agree** 5:9 7:16,17
  7:18,19 9:11
  10:25 11:24 12:23
  38:3,5,12 41:25
  136:14 195:4
**agreed** 194:13
**agreeing** 104:2

**agreement** 7:12,13
  16:10 21:13 36:23
  64:10 82:21 84:3
  84:22 86:13 87:3
  87:11 91:5 93:12
  97:4 100:15
  101:12,20 130:2,6
  131:6 132:1,9,13
  136:11,16 168:8
  169:1,17 170:22
  172:2,6 184:9,12
  184:16 223:20
  224:2
**ahead** 5:25 22:2
  36:3 84:2 109:9
  115:21 124:8
**airline** 58:11 59:2
**airlines** 1:8 3:8 4:3
  5:14 6:7 22:9,12
  22:15 84:13
  118:11,20 119:3
  200:16 236:4
  237:1 238:1
**airplane** 122:12
**airport** 57:6,9,10
  57:11 221:18
  222:1
**alarm** 32:24
**alcohol** 13:23
  30:20 52:25 62:25
  122:4 127:6
  153:13,19 155:22
  159:3
**alcoholic** 16:8
  62:23 63:17,18,19
  63:22 126:11
  195:12 229:22,24
**alcoholics** 127:8
  229:15
**alcoholism** 45:4
  62:21 63:13,15

  65:8 66:12,19
  67:23 68:23 69:16
  69:23 70:14 71:12
  119:15 121:21
  122:1 127:4 137:6
  151:4 153:23
  191:17 192:21
  206:2 213:12,14
  224:15 225:2
**alley** 25:22
**alleys** 26:14
**allotted** 236:20
**allow** 86:13
  151:10
**allowed** 37:12
  42:17 79:14 83:11
  83:19 85:20,24
  86:9 107:14
  108:10 132:24
  149:14 214:24
  216:18 218:23,25
**allowing** 180:21
**altered** 162:10
**american** 229:14
**americans** 74:7
  114:7 189:21
**amount** 132:25
  202:22
**andolini's** 25:22
**andrea** 186:21
**angie** 99:18 100:1
  100:9
**anniversary**
  160:11
**answer** 11:19,20
  12:3,17 13:7
  17:17 21:20 92:3
  92:9,18,22 144:22
  147:20 171:9,14
  171:24 175:4
  196:20,21 199:4

  225:9
**answered** 17:21
  23:16 54:24
  196:18 199:10,16
  225:10
**answering** 11:4,10
**answers** 11:25
  149:15 167:11
**anxiety** 149:25
  154:2 206:14
  230:8,13
**anybody** 10:11
  60:17 74:2 121:5
  202:21
**anymore** 53:20
  142:18
**anyway** 81:21
  145:22
**anyways** 183:23
  202:23,25
**apartment** 53:6,11
**apologize** 10:6
  185:7 199:14
**apparently** 171:14
  198:22
**appear** 125:10
**appearances** 1:13
  5:25
**appearing** 5:24
**appears** 34:15
  139:8 148:6
  163:10 167:3
  184:20 201:4
**appended** 238:7
**applicable** 236:8
**applied** 136:16
  187:20 188:1
  221:11
**apply** 54:8 57:20
  58:3,6,20,23 59:5
  59:9 60:24 61:6

[apply - avoid]

64:14,24 73:25
137:9 150:11
187:18 212:19
**applying** 73:12,23
**appointment**
122:3
**appointments**
150:17
**appreciate** 231:22
**appropriate** 2:2
117:12
**approved** 64:6
**approximate**
135:10 148:8
158:17
**approximately**
19:6 133:24
**april** 25:4
**arbitration** 103:9
103:19
**area** 70:13,21 90:7
123:13
**areas** 123:14
128:9
**arellano** 65:3 66:1
99:12 112:9 179:3
190:12 227:4
**arellano's** 8:25
11:17
**arena** 155:24
**arenas** 160:3
**argue** 36:15 37:5
41:20 182:13
**arguing** 180:24
**argument** 102:25
196:1
**arms** 214:11
**arrange** 91:22
**arrangement** 7:10
21:11,16 90:23,23
92:14

**arrangements**
53:18
**arrest** 30:5,15
**arrested** 29:16,19
29:20,24 30:8
**aside** 37:20 38:7
118:6
**asked** 14:21 17:9
31:13 41:16 72:2
72:8,10 74:13
92:7 149:8,15
164:23 196:18
199:10,15 219:3
221:11 222:6
223:19 225:5
**asking** 12:6 43:16
43:18 79:23 80:5
92:12 102:11
104:18 106:20
107:1,2 147:17
171:13 184:15
187:25 188:3
195:25 197:6
212:5 213:20
216:23 217:13
219:6,17
**asks** 230:2
**aspect** 44:22
**aspects** 144:1
**asserted** 93:18
114:3
**assessed** 35:4
37:22,25 38:17
43:2 79:5 182:21
**assign** 54:24
**assigned** 82:10
83:2
**assignment** 76:2
**assignments** 10:10
**assistance** 127:18

**associate** 123:10
**association** 4:2
84:8
**assuming** 103:4
213:2
**assumption** 100:8
**attached** 236:11
**attachment** 116:7
116:8
**attempted** 59:9
**attend** 25:15
161:17
**attendance** 31:19
32:5 33:12,19
34:22,23 35:3,24
36:15,20 38:21
45:17,23 47:11,15
47:18 69:10 72:3
79:5
**attendant** 4:3
25:24 26:13 54:12
54:17,19 57:25
58:3,7 59:5 68:7
73:16 75:17 79:21
81:18 84:13,23
85:13,20 104:12
106:15 118:20
122:11 130:17,18
130:22,25 131:7
131:25 136:15
176:18 177:23
205:9 206:7 207:5
208:8,8 210:9,12
210:12 211:5,16
215:17 221:12,12
221:22 224:7
**attendant's** 59:1
**attendants** 4:2
34:24 37:15 57:21
84:9 94:17,21
106:9 108:10

132:22 133:11
211:9,11,19
**attending** 150:24
**attends** 151:5
**attorney** 7:14
15:16 16:1,25
17:14,16 18:5,10
19:1,8,13 23:13
90:22 91:2,22
92:16 99:19
101:16 103:23,24
131:18,19 195:9
195:10 203:3
230:19,22 236:13
**attorney's** 91:17
91:19
**attorneys** 6:15 7:3
16:14 19:10 22:4
22:7,11 23:23
235:16
**attractive** 75:20
**audio** 3:19,20 5:8
5:8
**august** 1:12 2:5
5:3 35:12
**authority** 21:25
**authorized** 5:21
**automated** 81:22
**available** 64:22
74:2 110:2 131:6
136:11 145:2
236:6
**average** 62:6,14
127:9 210:14
**aviation** 119:1
**avoid** 66:22,25
123:15 128:10
140:20,21 141:25
143:21 145:6
150:8 151:6
154:22

**avoiding** 142:4 144:4 161:4
**award** 88:5 91:19 217:2
**awarded** 79:23 97:17
**aware** 22:14,17 23:18 57:12 74:5 74:14 79:10,14 101:8 108:9,12 114:16 117:15 118:3 132:20 143:20 145:5 165:8 175:10 176:14 218:16,20 218:24
**awesome** 164:17 177:21
**awful** 205:14 206:12,15
**axis** 153:18

**b**

**back** 6:24 23:4,6 31:5,12,13 32:14 33:18 35:6 42:25 45:11 48:19 54:25 58:13 65:14,16,22 65:23,25 66:2,4,8 66:9,15 73:16 75:18,21,24 77:11 83:20 88:6,7 90:13,18,20 94:14 95:2 99:13,16 107:16 109:17 113:13 120:4 125:3 129:21 130:25 131:17 132:24 136:25 142:11 145:15 146:7 149:18 151:10,19 153:7

155:14 166:5,18 170:10 172:14,21 176:6 178:18 183:12,12,13 185:8,11 188:6 200:4 204:15 207:23 209:3,8 216:4 220:8 222:5 227:19 230:16 232:6
**background** 24:2 29:2
**bad** 19:4 72:4 85:3 96:18 154:2 228:14,18
**baggage** 188:14
**bakery** 26:6,7 27:1 31:3
**ballpark** 28:23 49:11,12
**bamboo** 60:12
**bankruptcy** 30:22
**bar** 68:8
**bargaining** 36:22 64:10 82:21 84:3 84:22 86:12 87:3 87:11 97:4 100:15 101:11,20 124:21 130:2,5 131:5 132:1,8,13 136:11 136:16 168:8 169:1,17 170:22 172:2,5 184:9,12 184:16 223:20 224:1
**barking** 220:1
**bars** 68:14
**bartelt** 1:24 5:18
**base** 72:6 110:4 140:22 142:2 212:1

**based** 34:21 38:2 60:13,21 114:3
**basically** 15:23 17:10 54:4 56:6 66:21 67:1 72:4 78:3 79:20,22 81:2,4 103:14 109:1 111:19 123:18 141:15 144:12 182:11,13 182:20 195:4 229:23 230:12
**basing** 110:10
**basis** 16:24 18:10 76:6 91:1,23 110:9 191:6
**bates** 34:7 84:16 112:13 119:22 146:11 163:24 226:9
**beacon** 57:1
**bear** 152:20 168:12 173:14 178:16
**bearing** 112:12
**bears** 34:7
**beauty** 151:22
**becoming** 154:23 209:25
**bed** 208:14
**beers** 127:10
**began** 18:18 26:4 26:8 140:8 148:12
**beginning** 7:13 15:24 26:12 56:5 73:5,7 81:15 121:23 123:5 128:12 140:14,20 149:16
**begins** 84:16 135:8

**behalf** 1:14,19
**belief** 44:5
**believe** 14:14 17:20,25 18:18 20:9 24:11 30:3 30:21 33:24 44:6 44:11,12,17 48:9 50:10 52:16 55:18 55:19 65:19 81:11 82:17 93:1 98:14 98:22 101:14,20 102:6 108:4 109:22 111:5,6 113:3 120:14 121:21 131:15,24 132:11,15 135:21 136:12 138:6 152:12,17 154:10 155:7,11 156:10 156:19 158:5,9,12 166:9,11 167:16 172:9 175:12,17 181:8 185:19 191:10 208:12 210:5,6
**believed** 191:6 192:8 193:12
**believes** 127:21
**bender** 69:2
**benefits** 127:18 203:13
**best** 28:25 52:23 63:1 181:23 195:20
**bet** 47:4 115:3 125:17
**better** 70:20 157:12 177:16 214:17 216:21 217:11 223:7,8 231:13

**bid**  79:21 80:14,17
   80:19,23 81:18,19
   81:22 82:3,24
   83:1 85:13 88:10
   88:15 98:8 104:5
   104:23 105:2
   217:5,19 219:11
**bidding**  79:25
   80:13 81:25 82:8
   82:11 88:6,11
   95:22 124:22
   217:1
**big**  211:22
**bills**  21:3
**binge**  63:2
**birthday**  25:5
**bit**  9:1,14 13:4
   15:10 25:10 38:9
   45:10 47:5 48:24
   50:4 57:25 62:20
   77:12 80:12 82:21
   183:9 189:9
   213:22
**blank**  72:10,14
   79:17,25 88:13
   95:23 98:4,6,13,21
   99:2,10,24 102:1,4
   102:7,8 194:9
   195:16 219:2
**blessing**  61:8
**blocking**  34:13
**blocks**  104:18
**blue**  174:8 185:18
   185:20 201:7
   228:5
**body**  214:9
**bonita**  25:20
**born**  214:10
**bother**  213:17
**bottom**  54:20
   73:19 122:2 169:4

**boundary**  68:3
**bowling**  25:22
   26:14
**box**  137:10 140:12
   149:5,12 164:8
**boxes**  142:10
**bram**  16:2,7 17:2
   18:2,20 19:9
**breach**  93:19
**breadwinner**
   206:10
**break**  12:16,17
   22:1 40:1 48:11
   48:24 89:13,21
   163:7 166:13
   198:2 199:24
   211:3
**breaking**  76:18
**breaks**  10:4 12:14
**breast**  22:18 23:19
**breathing**  86:18
**bridge**  57:1
**brief**  24:7
**brigham**  1:5,11
   2:3 3:15,23,24
   5:12,13 6:3,10,10
   7:22 8:3,9 11:15
   17:21 22:2 24:19
   24:23 25:3 32:16
   33:24 34:4,4
   48:21 50:3,23
   51:14 77:15 84:7
   84:7 90:15 91:16
   92:12 94:13
   109:19 112:11,12
   114:18 115:12
   116:1,14 117:7
   118:10 119:20,20
   122:2 125:3
   129:10,23 130:3

229:13 230:7,17

131:24 134:11
137:1 139:6,6
142:23 143:8
144:13 145:17,17
146:8 149:10
152:9 157:7,16,22
161:8,10 163:23
164:3,17 166:20
167:3 168:16,25
171:17 173:15
174:4 176:6
178:21 182:1,24
184:18 185:11
197:24 198:5
199:5,18 200:6,11
203:10,19 204:17
214:10 216:6
217:18 226:9
230:1 232:9 233:1
236:4,5 237:1,2,24
238:1,2,4,12
**brigham's**  144:21
**brighamr**  119:22
   146:12
**bring**  112:24
**bringing**  50:5
   113:25
**broadly**  91:6
**broken**  130:24
**brother**  15:17,22
   18:6,11,19 19:9
   20:6
**brother's**  15:18
**brought**  114:7
   202:24
**bubbles**  185:18,18
**build**  80:9 88:20
   95:6,15 113:5
   217:1 220:15
**built**  31:10 95:19

**bullet**  118:23
**bullshit**  202:12
**bunch**  17:6 39:2
   54:11 65:21 66:5
   67:15 75:14 162:4
   162:4 166:2
   214:20,21 224:10
   226:9,18
**bus**  27:17,21 56:6
   56:8
**business**  52:13,14
   55:25 56:17
**busting**  10:20

## c

**c**  5:1
**cabin**  119:9
**cake**  49:6
**cakeheads**  26:7,21
   27:2,6 31:3,16,22
   32:4 49:7 50:12
   50:22 51:24 54:4
   54:10 55:9,15,20
**cakes**  26:7
**calendar**  40:8
**california**  24:8
**call**  10:8 12:11
   20:10 31:9 40:23
   42:21 43:6,22
   54:21,23 67:18
   69:3 79:2 80:1
   81:3,4,8,9,9,13
   98:4 104:17
   106:24 117:23
   123:2 153:25
   180:15,19 182:11
   183:12 214:22
**called**  2:4 31:12
   40:17,20 41:6
   42:15,25 43:13
   45:2,2 54:20 57:1
   66:25 67:14,14

78:16 95:10
121:24 124:22
163:20 183:12
207:17
**calling** 43:6 45:3,6
78:7 223:4
**calls** 66:5 222:24
**car** 30:10,10
**care** 14:1,22 27:11
27:18,23 28:7,11
28:17 51:25 61:11
70:5,8 97:21
117:25 121:7,7,8
121:10
**career** 25:24 26:12
31:14 33:20 54:13
73:18 207:21,23
**caroline** 6:8 7:19
152:3
**carolyn** 1:20
**carrier** 186:5
**carriers** 57:11
**carry** 150:1
**carrying** 141:17
**casa** 25:20
**case** 5:15 8:22
16:5,11,17,18,21
17:6 19:9 21:1,7
21:19 23:9 51:13
74:22 78:4,5 91:2
91:4,17 93:9,15
109:22,24 113:25
131:20 171:9
178:12 202:16
204:20 205:21
229:9
**cases** 22:8,12,14
22:17 23:18,22
**cassandra** 107:23
164:25,25 165:1
167:4 190:17

**cassie** 163:11
175:23 178:23
190:18 208:13
**categories** 42:25
**category** 189:15
192:21 215:14
**cba** 80:7,19 99:13
101:2 169:23
172:8 179:13,15
183:6 194:12
196:3 197:8
223:10,14
**cell** 5:6
**cellular** 5:5
**center** 53:2 67:13
123:14 142:16
**certain** 40:17,20
65:15 91:10
123:25 132:25
**certainly** 136:14
**certainty** 191:13
**certificate** 235:1
**certification** 2:21
2:23 3:5 134:19
141:6 146:15
148:5 156:13,22
157:17
**certified** 2:7 235:5
235:21
**certifies** 150:20
159:15
**certify** 235:7,10
235:14
**cervix** 214:7
**cetera** 112:9
**challenging** 159:4
**chance** 17:3
182:12
**change** 67:1 70:23
71:2,8 124:1
128:9 206:14

207:21 237:4,7,10
237:13,16,19
**changed** 33:19
160:25 180:22
205:7,14,19 206:8
**changes** 123:6
236:10 238:6
**changing** 123:9
**cheap** 232:20
**cheaper** 57:14
**check** 28:20,22
140:11 163:7
165:5,9 222:16
232:1
**checked** 135:14
137:10 140:12
142:10 150:12
**checks** 158:25
**chemical** 137:2,4
**cherry** 1:16
**childcare** 57:5,22
58:6,24,25 59:10
60:2 61:1,3
**children** 10:2
12:15 22:22 24:12
24:14,15 25:1
59:14 210:7
**chimney** 21:21
**choice** 139:4
**chosen** 25:24
**chunk** 210:13
**cindy** 214:10
**cio** 4:2 84:9
**circle** 90:18,19
94:14 143:4
**circled** 154:14
**circuit** 21:16,25
**cite** 21:23 23:1
**cited** 91:3 93:9
**citing** 21:24

**city** 95:1
**civil** 1:3 2:2
163:20
**claim** 52:7 103:17
110:4,10 113:25
114:3
**claiming** 114:10
**claims** 91:9 93:17
93:24 114:7
**clarification** 171:2
171:14
**clarify** 9:24 37:6
39:24 68:4 69:25
71:6
**clarifying** 9:20
**class** 130:18
229:22
**classes** 25:14
30:20
**claudia** 223:4
**clean** 9:14 27:19
**clear** 69:22 92:11
92:13 145:24
148:15 149:15
221:20 222:17
**clearly** 13:7,10,21
15:7 51:14 192:17
199:6
**client** 11:9,10
16:25 17:14,16
18:10 19:13 23:13
91:2 92:16 137:2
**clinical** 151:24
152:13,18
**close** 25:8 56:22
57:4 204:3
**closeout** 128:18,21
128:23
**closer** 57:17
**closest** 57:9

**clothes** 68:7
**clue** 146:24
**coaching** 32:2
**code** 44:19 47:23
  47:24
**coded** 35:7 39:5,6
  39:12,17,19,21
  40:5,10,12 41:1,7
  41:24 42:2 43:1
  43:25 44:3,6,15
  180:25
**coding** 37:2
**cole** 1:24 5:18
  48:15,15
**collecting** 54:6
**collective** 36:22
  64:10 82:21 84:2
  84:21 86:12 87:3
  87:11 97:4 100:14
  101:11,19 124:21
  130:2,5 131:5,25
  132:8,12 136:10
  136:16 168:7
  169:1,17 170:21
  172:2,5 184:9,12
  184:16 223:20
  224:1
**college** 25:13,14
  29:21 207:18
**colorado** 1:2,17,22
  2:8,19 5:15 19:22
  24:4,6 30:16
  120:22 203:10
  235:6
**comanche** 3:17
  119:21 125:5
**come** 10:5,19 20:6
  31:13 52:7 56:22
  65:15,22 66:8
  78:17,21 88:24
  89:6 94:21 110:12

132:24 145:12,15
  157:1 208:14
**comes** 60:6 115:17
  214:19 225:17
**comfortable** 213:6
**coming** 65:6 88:7
  115:11 167:10
  170:10
**commenced**
  135:11 148:9
  158:20
**commencement**
  235:7
**commencing** 2:5
**commented**
  158:18
**commenting**
  196:15,24
**comments** 194:3
**commission** 60:13
  60:21 235:18
**commit** 11:9
**commitment** 11:8
**communicate**
  10:25
**communicating**
  11:9 18:20 102:7
**communication**
  18:2
**communications**
  23:12
**community** 25:14
**commute** 213:5
**commuted** 213:3
  222:2,3
**commuting** 213:8
**comp** 51:7
**company** 36:19
  37:5 38:4 39:9
  44:15 56:14 60:1
  66:2,9,11 74:3

75:12 76:2 111:19
  112:1 116:21
  117:3 130:11,17
  131:3 167:25
  169:13 175:3
  190:8 192:9,9
  203:3 218:11
  222:19 227:8,10
**company's** 37:7
**compensation**
  50:15 51:16,20
**complete** 11:24
  93:6 139:21
  224:16 225:13
  238:8
**completed** 236:17
**completely** 39:14
  206:17
**completion** 85:13
**computer** 145:18
  146:4 222:16,22
**computers** 222:25
**concept** 77:24
  195:16
**concerning** 199:21
**concise** 149:15
**concluded** 233:5
**concludes** 232:25
**condition** 2:22,24
  3:6 14:2,22,23
  45:4 134:21
  135:10,18 136:1
  140:7 146:17
  148:9 149:2
  150:17 157:18
  158:18,20,24
**conditions** 14:24
**conduct** 199:20
**conducts** 119:8
**conference** 174:16

**confidential** 17:15
  21:13
**confirm** 119:15
**confused** 104:25
**connection** 30:1
  30:18
**consent** 7:10
**consider** 13:17
  27:12
**considered** 178:13
  211:20 231:3,7
**considering** 13:16
**constitutes** 235:12
**consult** 15:16 17:1
**consultant** 60:8
**consulted** 18:5
**consume** 155:22
**cont'd** 3:1
**contact** 16:9 19:1
  120:13 211:8
**contain** 93:12
**contained** 93:16
**contending** 109:23
  109:24
**contents** 91:5
**contest** 30:5
**context** 79:15
**contingency** 21:4
  21:5,10 90:23
  91:23 92:13 93:23
**continue** 5:9 70:24
  120:15 134:9
  154:1 155:13
  177:11 183:22
  208:16
**continued** 109:3
  137:23 202:23
**continues** 151:12
  159:3,5,7
**continuing** 121:22

**continuous** 64:3,6
64:13,15,21 65:3
73:5 130:21,24
137:11
**contract** 4:3 84:13
87:20 99:15
136:18 179:8,12
179:19 183:6
184:1,5,8 195:17
**contrary** 131:14
**contributed**
213:24
**control** 67:23
**convenient** 163:6
**conversation**
125:11 166:7
179:3 194:17,20
208:20 227:13
**conversations** 5:5
17:13 87:18 89:8
90:19 98:3 99:21
100:24 188:25
190:2 191:3
**convicted** 30:1
**conviction** 30:6
**copied** 112:6
**copies** 45:23 46:21
47:11,14 48:8
236:14
**coppedge** 3:22
33:6 180:20
184:23 185:15,15
186:20 187:17,25
188:25 189:4,17
190:10 192:7
227:25 228:8,12
228:20 230:7
**copy** 34:20 35:15
35:23 46:5,14
51:3 84:21 116:2
131:25 132:2

148:4 180:4
203:12
**corner** 85:8
134:14
**correct** 15:13,14
18:21 24:12,16,17
26:14 31:17,20
33:12,13 34:20
35:15,23 36:20,21
36:23,24 37:3,11
38:12,13 39:20
40:6,7,18,19,22
41:7,11,12,24 42:1
42:2,3,6,7,22 43:2
43:7,8,11,14,15,23
44:3,4,8,9,13,14
45:4,5,7,8 46:14
47:14 48:7 51:3,7
55:4,22 57:23,24
58:7,21,22 59:2,3
59:11 64:4,5,7,8
64:11,22,23,25
65:1,5,6 66:16,17
67:21,22,24 68:15
69:7,13,17,24 70:3
70:4,6,7,9,10,11
70:12,17,18,22
71:14,20,21 73:9
73:10,13,21,22
75:6,9,22,23 76:3
76:4,9,21 77:1,16
77:17,18,21,22
78:1 79:3,4,6,7,8,9
80:14,17,18,20,21
81:18,19,23,24
82:1,2,5,6,13,24
82:25 83:2,3,4,5,8
83:9,21 84:15,23
84:24 85:17,25
86:14 87:6,7,11,12
87:14,15 88:16,18

88:19,21,22,25
89:1 91:17,18,20
91:21 95:9 96:12
97:4,11 103:9,10
103:11,12,19
104:2,3 105:2,4,7
105:19,20 106:3,4
106:7,18,19,21,23
107:5,6,17,18
108:7,8,17,18
109:4,5 110:15,16
110:19,20,22
111:1,11,20 112:3
112:4,23 113:17
113:18,22 114:4,8
114:9,9,11,15
116:2,22,23
119:17,18 122:12
122:13,16,17,25
124:2,3,5,22 133:7
133:8,16 135:16
135:24 136:11,18
136:23 137:19,20
137:21,22,24,25
140:17 141:9,10
141:14,19,20,25
142:5,6,8,14
143:18,19 144:10
144:11,16,17
145:3,4,6 148:4
149:5,6 151:1,2,7
151:8,19,20 153:5
153:8,9 156:14
157:4,5,22,23
158:8,18,19,25
159:1,13,16 161:5
162:7 163:13,14
165:17 166:10
170:2,3,5,6,8,9
172:8 173:3,4
174:13,14 176:2,4

176:5 180:4,16
188:2,22 190:5,10
190:12,13,14,18
191:15 192:11,18
192:19,21,22
195:8 197:11,17
198:9 199:1,21,22
200:18,19,21,22
200:24,25 201:5,8
201:14,15,19
203:12,20 210:1,4
210:10,22 211:6,9
211:10 216:14,15
216:17,22 217:7,9
217:10,20,21,23
218:4,6,8,18,25
219:1,5,9,13,14,16
219:17 221:18
227:11 228:6
231:19 235:13
238:8
**corrections** 238:6
**correctly** 38:25
44:1,19
**correspondence**
129:3,6
**cost** 53:17 57:14
57:18 60:2 61:3
67:18
**costs** 53:23 54:15
**cough** 13:4 148:24
**counsel** 5:12,23,24
7:10 11:1,15
17:13 28:14 34:1
51:15 90:24 91:23
92:14 129:2
235:15 236:2
**counsel's** 92:20
**counseling** 3:4,17
32:2 34:16 46:10
46:15 119:21

**[counseling - day]**

125:5 126:25
**counselor** 120:4,8
  145:14
**count** 33:19
**counting** 215:12
**counts** 179:8,23
**county** 5:17
**couple** 20:19 21:1
  90:20 185:22
  201:2 230:25
**couple's** 126:19
  127:2
**course** 11:12
  18:11 21:13 74:22
  81:12 91:10 92:21
  92:23 132:10
  147:13 188:13
  205:7 207:22
  214:17 215:10
**court** 1:1 5:15,19
  6:12 7:1,20 8:19
  9:8,12 12:21 30:4
  33:25 51:15 91:4
  164:5 173:18
  183:4
**cover** 3:14 43:9
  95:13 96:15,20
  139:7
**covered** 53:10
  106:9 191:17
**covid** 10:8 27:16
  28:4 61:24,25
  121:4
**craft** 130:18
**crafted** 160:18,18
**crafting** 53:22
**crappy** 101:16
**cravings** 155:22
  159:3 160:1
**crazy** 42:11 118:8

**create** 72:11
**credit** 85:5,14,20
**creek** 1:16
**crime** 30:1
**criteria** 65:15
  155:1
**crone** 1:15,16,18
  1:18 2:11 6:2,2
  7:17,17 11:8,12,16
  15:13,15,25 16:23
  17:11 18:8,15,24
  19:2,7,12 20:15
  21:12,18 22:25
  23:3,7,11 89:10
  90:4,25 91:25
  92:6,16 93:2,5
  94:2,7,12 101:23
  107:10 114:22
  115:5,9,18,20,24
  129:14 144:18,20
  144:23 171:1,4,12
  196:17 199:2,10
  199:14 204:6
  217:15 219:22
  220:11 223:18
  224:5 228:25
  229:12,25 230:2,6
  230:15,24 231:21
  232:2,11,18,19,23
  236:1,2
**cross** 168:11,14
  173:14 174:2
  181:5
**crossed** 68:2
**crossing** 3:17
  119:21 125:5
**crushed** 205:16
**cs** 236:15
**cs4229140** 1:25
**ctheis** 1:23

**culture** 68:6
**cumbersome**
  181:21
**cups** 52:17,19,21
  53:9,15
**current** 8:10 84:4
**currently** 14:1,21
  15:1 24:9 70:23
  121:3 126:11
  127:6,10,17,21
  151:11 221:16
**customers** 205:11
**cut** 59:23 89:10
  114:23
**cutting** 32:23
**cv** 1:3 5:16 163:21
**cwa** 4:2 84:9

## d

**d** 5:1
**dad** 30:11
**dad's** 55:25
**daily** 14:11 70:15
  122:14 150:2
**dairy** 25:21
**dale** 3:24 200:18
**dallas** 211:23
**damages** 202:11
  202:15 203:1
  204:22,25 205:1,1
**dandy** 63:5
**dang** 206:8
**danielle** 1:20 6:6
  7:15 9:16 11:12
  22:21,25 32:6
  40:14 41:14 44:24
  47:3 49:13 56:24
  57:24 70:24 86:2
  86:15 89:10 90:25
  93:7 105:12 107:2
  109:8 114:22
  125:16 126:1

136:21 147:13
162:16 171:1
172:12 179:18
185:4 191:13
192:10 194:21
195:23 196:13
197:5,19 199:2
204:6 216:19
217:25 219:23
223:9 232:11
**date** 21:8 23:1
  67:5 76:25 82:19
  120:11 124:12,13
  124:16 135:10,14
  142:15,22,25
  143:8,17 144:5
  148:8 155:17
  158:18 183:2
  237:24 238:12
**dated** 3:9,14 34:17
  35:12,20 114:19
  134:17 139:15
  147:4,14 153:4
  155:6 158:13
  167:4 180:1
**dates** 26:23 47:7,8
  135:25
**daughter** 14:3
  25:2 63:7,20
  127:1,3 214:3,10
  215:13
**day** 28:4 36:15
  39:16,19 41:20
  42:6 62:2 67:8,15
  68:10 71:2 94:24
  95:19,25,25,25,25
  96:1,1,5,5 97:6,17
  97:19,22 105:12
  110:24 132:18
  136:6 143:5,14,16
  143:20 165:20,21

167:14 170:1,4,11
175:1 178:4 180:9
186:13 201:13
207:5 212:17
213:9 221:10
225:2,2,13,13
238:15
**daycare** 31:6
54:14 56:23 59:14
60:22
**days** 21:1 39:5
40:9,17,20 41:6,8
41:9,22,23 43:13
47:10 54:22 65:12
65:13 66:12 73:15
73:18 81:2,8,13
97:20 105:11,14
131:16 132:21
133:5,13 135:18
137:17 139:21,22
150:20 156:3
159:15 166:6
169:19 177:8,18
183:13 208:15
210:15 212:12,13
222:25 226:24
227:6,9,10,16
236:17
**deal** 10:7 122:3
123:4 225:19
**dealing** 91:12
122:1 123:18
124:4 160:5 206:2
215:7
**dealt** 179:21
214:18 215:4
**death** 123:25
214:3
**debating** 94:5
**deceased** 24:16

**december** 46:2
**decent** 16:18
**decide** 63:16
**decided** 40:14
65:4,20 73:25
140:19
**declare** 7:8 238:4
**deemed** 130:24
238:6
**defendant** 1:9,19
2:4 5:13 6:7
**defense** 93:20
**defenses** 91:9
93:24
**definitely** 9:24
16:19 57:7 89:23
192:8
**definitively** 190:6
**degree** 209:3
**delayed** 66:4
**denied** 41:18,18
41:18
**denies** 113:21
**denver** 1:22 53:6
95:1,2 96:18,19
207:6
**department** 2:19
116:3,12 139:16
180:5 203:11
**dependability** 3:4
34:16,25 36:19
38:12 43:2
**depended** 62:1,1,4
212:14
**dependence** 137:2
137:5
**dependency** 137:3
137:4
**depends** 20:25
171:3 210:19

**deponent** 17:19
18:14 26:7 89:16
89:19,25 121:16
166:14 204:5
219:25 220:4
230:5 232:10
235:8 236:13
238:3
**deposed** 8:13
**deposing** 236:13
**deposition** 1:11
2:3 5:8,12,16,17
6:16,17,18 7:4,5,6
8:22,24 10:22
11:14,17 15:11
19:17 20:19 92:25
94:10 101:7
157:13 162:20
166:25 171:10
181:22 226:3
233:1,4 235:10
**describe** 54:2
79:17 80:25
149:23 206:13
**described** 82:8
**description** 3:8
118:11,18 137:13
137:14 149:21
224:6
**desire** 159:6
**destroyed** 215:15
215:16
**detail** 89:8,11
141:18 222:14
**detailed** 137:13
**detroit** 57:10
221:17
**developed** 13:4
**diagnosed** 63:12
63:14

**diagnoses** 153:14
**diagnosis** 153:13
153:23
**diagnostic** 125:5
126:9
**dialog** 110:1,11
**die** 41:20
**died** 214:11
**difference** 37:21
**different** 43:5
47:10 63:11 70:19
76:17 111:25
133:15 134:10
174:25 176:13
185:22 206:17
207:19 212:9
217:4 218:22
224:25
**differently** 35:8
96:13
**difficult** 54:15
208:24
**difficulties** 12:10
**difficulty** 12:10
**digits** 25:8
**diligently** 160:9
**dinner** 208:14
**direct** 32:22 33:3,5
108:25 112:2
133:17 174:24
185:3,13
**directed** 111:19
**directing** 169:20
**directly** 53:14
**director** 108:21
111:21
**directs** 165:15
**disabilities** 74:7
114:8 189:21
229:15

disability 191:7
224:15 225:1
disagree 37:7,22
39:14,18 101:12
111:2 140:18
disagreed 110:25
111:10
disbarred 16:7
discharge 155:1
disciplinary 33:11
207:13 215:8
discipline 31:25
32:1
disclose 222:19
disclosed 37:4
38:4 63:21 64:2
218:11 224:15
225:1
disclosure 44:21
143:25 225:22
disconnect 197:18
disconnecting
96:11
discoverable
21:17 23:16 91:6
discovered 123:14
discovery 74:22
93:1,3 134:15
139:14,19 144:7
225:6,6
discrepancies
162:5
discriminated
191:6
discriminating
195:8 229:23
discrimination
22:19 229:15
discuss 99:2,9
102:4,21 110:15
121:25 122:7

189:3
discussed 15:21
65:3 73:19 76:1
77:23 102:18
110:19 111:9
142:12 144:4
154:12 187:8,9
196:2
discussing 102:13
108:14 109:3
125:14 126:15
194:11 195:10,18
195:24 196:2
220:13
discussion 6:20,23
94:14 163:10
179:4
discussions 108:14
disguise 61:8
dismiss 103:16
dismissed 103:15
dispute 35:3 37:1
38:16,24 39:2,3
47:25 86:4 93:1,3
dissolved 56:17
60:1
distinction 193:1
distress 205:1
213:24
district 1:1,2 5:14
5:15 21:22,24
dive 90:18
divorce 123:7
dkitson 1:23
dms 153:12,14
doable 220:22
doctor 121:6,12,15
136:7 138:5 141:5
142:10 144:8,9,15
144:25 148:16,18
148:23,24 152:16

doctor's 14:1,22
doctors 120:19
121:17
document 4:4
35:11 37:21 38:7
84:8 91:7,9 93:11
109:6 112:12,16
115:13 116:6
118:10,17 119:19
119:21,25 125:4,8
125:18 132:13
134:10 135:2,5,8
138:9 139:9,10,14
140:3 145:22
146:21 147:2,13
147:14,25 149:1
152:7,22,25 154:7
154:11 155:16,17
161:3,11 162:10
163:20 166:23
169:15 170:13
171:16,19,23,24
174:7 179:24
181:3 182:2
184:17 185:1,8
201:11 203:10
documentation
28:6
documented 46:13
documents 46:21
48:7,8 130:1
166:24
dog 220:1
doing 10:9 56:12
56:13 66:3 67:2
92:7 94:10 108:5
120:20 121:21
145:19 146:4
149:18 155:12
160:10 177:24
178:11 180:22

189:22,24 191:18
192:9,22,25
194:11,24 195:5
195:13 197:21
201:25 202:23,25
209:2,10,13,15,17
209:18,21 229:3
229:11
dol 116:7
dollar 56:25
dollars 53:14,25
donate 53:10
door 10:19
dosage 14:13
dot 65:16,18
156:17
double 25:8 232:1
downloading
145:19
downstairs 10:9
dr 125:12 126:10
126:16 128:3
141:2,8 148:13
151:17,23
drank 214:19
drill 9:1
drink 67:4,21,25
68:14 123:11
drinker 63:2
drinking 63:7,8,9
63:18 66:24 67:8
127:7 128:11
153:24
drinks 122:12
127:10
drive 1:16
driver's 30:9
driving 42:11
122:15
drop 40:9 76:7
78:1 83:7,11,19,25

85:20,24 86:2,9
94:17,18 97:9,14
97:19,22,24,24,25
104:7 105:6,7
108:10 124:21
216:13,25 217:2
218:17,24,25
**dropped**  103:11
104:2
**dropping**  82:12
83:19 87:9
**drug**  14:9 145:14
**drugs**  13:12,16,19
**drunk**  68:18
**due**  45:3 144:4
149:2 158:23
**dui**  29:20 30:2,18
**duly**  7:23 235:8
**dump**  67:9 105:24
**duration**  135:17
**duties**  122:10
**duty**  68:4 71:19
76:2 93:19 144:10
144:16 145:1
**dynamics**  206:9

**e**

**e**  5:1,1 237:3,3,3
**earlier**  73:20
90:20 100:13
107:13 110:14
122:24 168:10
180:13 197:15,16
203:9 221:10
226:17 228:1
231:2
**early**  129:11 139:2
211:23 213:9
225:17,24
**earned**  28:24 51:6
**earnings**  28:15

**easier**  9:14 176:19
**easily**  95:20
**east**  1:16
**easy**  58:11 88:5
178:1
**eat**  208:14
**eater**  129:11
**economist's**  19:24
**educational**  25:11
**efforts**  54:3 56:9
56:19
**eight**  58:10 61:24
211:5 212:16
**eighth**  159:25
**either**  16:10 63:15
101:20 106:9
148:20 160:17
177:4 183:13
187:20 196:9
201:25
**email**  1:18,18,23
1:23 3:2,3,16 42:8
42:9,15,18,23
102:14 112:6
114:18 115:2
116:2,12 158:12
167:3,7 168:16
179:25 180:4,8
182:18 186:6
187:20
**emailed**  108:21,24
223:1,3
**emergency**  117:24
119:8
**emotional**  205:1
213:24 214:1
215:11
**emotionally**
214:18
**employbridge**
50:6

**employed**  36:25
117:3 235:15
**employee**  80:17
116:8,25 127:18
137:14 140:12
149:1 158:22
169:17
**employee's**  2:21
2:24 3:6 134:20
146:16 157:17
**employees**  23:24
96:15 114:19
180:1
**employer**  27:9,12
32:5 117:11
**employer's**  117:22
**employerbridge**
2:15
**employers**  25:19
26:10 48:25 49:2
**employment**  2:20
32:19 54:3 62:15
66:19 71:18 72:1
203:11 205:6
208:1
**encourage**  155:25
**ended**  18:2 30:11
53:19 60:12 61:7
77:2,18,19,19
**energy**  56:15
**engage**  109:25
110:10
**engagement**  50:11
93:11,16
**enter**  6:13
**entertain**  178:4
**entire**  87:10 217:1
217:2
**entirety**  173:9
**entitled**  4:4 84:8,8
119:21 134:19

144:22 152:22
**environment**
66:24 154:15
**envisioning**  89:3
**episodes**  150:1
**era**  65:11
**errata**  236:11,13
236:17
**erratas**  236:15
**escape**  63:1
**especially**  103:1
231:15
**esq**  1:15,15,20,20
236:1
**essential**  71:19
118:22 119:6,10
119:12,16 224:10
224:16
**establish**  43:19
45:14
**established**  119:2
**et**  112:9
**evacuations**  119:9
**evaluating**  145:1
**evan**  1:15,18 6:4
7:18 19:23
**event**  34:1 172:21
**events**  13:10 15:7
**eventually**  66:7
**everybody**  31:7
34:24 37:14 74:2
81:21 129:9
140:22 205:10,20
212:1,9 217:8
218:4
**everything's**
205:15,16
**exact**  42:8 76:25
78:11 82:19
100:12 101:4
165:2 170:1,4,11

181:19 189:19
191:11,19 197:16
197:19 199:8,19
**exactly** 39:3 77:15
79:18 87:22 91:11
92:6 93:10,21,21
100:22,23 177:19
194:19,21 195:2
207:5
**exam** 160:24
**examination** 2:4
2:10 8:1 220:10
235:8
**examined** 7:23
**example** 88:14
117:24
**exceed** 130:21
169:9
**exception** 87:5
100:16,20 106:20
106:23 107:4,8,9
**exchanged** 185:13
**exchanging** 186:9
**excited** 25:6
**exclamation**
230:18
**excused** 44:7,11
**exhausted** 103:13
**exhibit** 2:13,15,16
2:18,19,21,23 3:2
3:3,4,5,8,9,10,11
3:13,14,16,17,19
3:20,21,22,24 4:2
4:4 33:23,24,25
34:5 45:12 50:4,5
50:24 51:9,14
84:7,7 112:12,12
114:18,18,24
118:8,11 119:20
119:20 122:2
125:4 130:3

134:11,12 137:1
139:6,6,6 142:24
143:8 145:17
146:9 152:9,21
156:23 157:6,7,16
157:22 161:8,9,10
163:19,24 167:3
168:16,25 171:16
171:17 172:11,24
173:15 174:4
176:7 178:18,22
179:25,25 182:1
182:25 184:18,19
185:12 197:24
198:5 200:12,13
203:8,10,18,19
206:19,19 226:2,3
226:4,8 227:24
229:13 230:7,16
**exhibits** 2:12 3:1
4:1 118:9 156:14
157:22 200:10
**exist** 176:14
**existed** 132:19
**existing** 37:25
**experience** 12:9
58:5,21 137:10
150:12
**experienced** 214:2
**expires** 235:18
**explain** 38:20
66:14 114:5
**explained** 99:11
180:18
**expressing** 208:23
**extent** 94:8

**f**

**fabric** 53:10
**face** 53:12 160:2,2
**facebook** 53:8
121:25

**faced** 215:4
**fact** 63:17 176:10
176:22 184:1
192:23 204:21
**facts** 147:23
149:24
**failed** 109:25
110:10
**fails** 236:19
**fair** 12:18 41:20
60:23 68:23,25
**fairly** 182:21
**fall** 207:23
**familiar** 74:24
117:2 118:19
136:17,23 139:10
154:10 223:19
224:1
**family** 2:22,24 3:6
39:7 55:24 57:15
57:18 78:6 114:11
116:25 134:24
205:25 206:4,5
210:22 212:23
213:18 220:24
**far** 57:6 71:5
221:25
**farm** 52:4,5
**father** 127:10
**fault** 180:23
182:17
**fax** 3:14 139:7,8
139:13 142:15
158:12
**faxed** 158:10
**february** 28:13
46:10
**fee** 21:10,13,16
90:23 91:22 92:13
**feeding** 22:18
23:19

**feel** 44:18 68:3
111:23 206:15
208:13 213:6
214:25,25
**feeling** 13:1,3
**feelings** 214:25
**fees** 91:17,20
**fell** 61:8
**felt** 77:4 123:20,24
**female** 183:10,21
**fiduciary** 93:19
**fields** 55:6
**fighting** 127:21
187:14
**figure** 35:7 39:9
42:20 53:4 67:15
72:23 180:20
183:25,25 184:1
**figured** 66:6 73:15
172:4
**filed** 5:14 28:6
30:22
**fill** 154:7,9,23
**filled** 61:12 144:15
146:23
**filling** 144:9
154:25
**final** 17:4,7 34:21
35:4 42:8 99:8
113:16 181:4
182:5,11 186:13
201:13,22
**finally** 54:9 66:5,6
66:8 98:15 215:4
**financially** 5:23
220:24
**find** 54:3 56:10,20
109:7 114:24
162:21 164:7,18
165:3,4,25 184:1,5
230:22

**fine** 18:11 30:21
34:3 63:5 82:16
89:25 90:2,4
115:9 125:25
140:21 141:22
180:23 205:16
221:9
**finish** 86:21
**fire** 182:12 196:5
197:10
**fired** 15:23 30:25
31:2,12,19,23
41:19 55:20
218:14 225:23
231:17
**firm** 5:18,20 6:8
**first** 7:23 15:12,20
17:2 53:5 55:10
59:21 60:1 63:7
63:12,21 65:24
87:22 88:24,24
89:3,6,6,9 90:22
94:25 98:12 119:1
123:6 135:4 136:6
139:21 140:19
141:22 146:20
148:12 151:4
158:1 160:11
162:11 201:2
214:24 222:23,25
228:11 232:14
**fit** 61:1 220:18
**fitness** 144:10,16
145:1
**five** 27:3 31:17
82:18 83:23
100:24 183:11
192:15 204:2
208:15 214:5
215:22

**fix** 12:23
**flew** 19:22 68:21
**flight** 4:2,3 25:23
26:12 34:24 37:15
54:12,17,19 57:21
57:25 58:3,7 59:1
59:5 68:6 73:16
75:16 79:21 81:17
84:8,13,23 85:13
85:19 94:17,20
104:12 106:9,14
108:10 118:19
122:11 130:17,18
130:22,25 131:6
131:25 132:22
133:11 136:15
176:18 177:23
205:9 206:7 207:5
208:7,8 210:9,11
210:12 211:5,9,11
211:16,19 212:16
215:17 221:11,12
221:22 224:6
**flights** 89:4
**flint** 57:3,11
**flopped** 53:12
**flour** 53:17
**flowers** 53:18,20
**flustered** 183:22
**fly** 57:11 68:18
77:16,25 80:3
81:11,11 82:4
94:25 95:4 104:13
108:2 212:12,18
213:8 220:25
**flyfrontier.com**
175:23
**flying** 62:6,14
104:22 105:9
106:15,16 110:7

**fmla** 39:5,6,10
40:8,18,21,24,25
41:6,8,10 42:6
43:1,7,8,11 64:19
104:17 114:1,4,11
116:8,15,18 117:2
117:10,11 118:4
124:24 135:3
156:22 159:13
163:15,17 164:12
180:9 183:14
**folks** 73:11
**follow** 36:23 38:1
42:21 43:22 90:20
117:19,22 119:1
128:17 180:14
204:9
**followed** 38:19
**following** 44:20
82:23 92:19 137:9
140:12 150:11
165:20 203:9
**follows** 7:24
**followup** 150:24
**forced** 219:9
**foregoing** 233:4
235:12 238:5
**forever** 72:22
186:16
**forgot** 42:8,9,18
152:5 180:8
**form** 64:14 73:5
141:6 142:8
144:10,16 156:12
156:12,22,22
157:3,21 158:3
223:17 224:3
228:23 229:7,19
230:11,21 235:12
**formal** 232:20

**format** 10:21
11:11
**formed** 17:16
19:13
**formulate** 224:24
**forward** 16:19
65:9 111:3,4
208:17
**found** 52:16 54:4
60:20 75:16
136:12 173:10
184:6
**foundation** 229:20
**four** 20:2 27:3
31:16 36:13 94:24
95:25,25 97:6,6,17
97:19,22 99:6
105:12 150:20
180:9
**fourth** 139:13
**frame** 151:9
**frankly** 177:5
**free** 171:12
**freeing** 106:12,13
**frequency** 159:18
**frequent** 121:23
**frequently** 20:24
**friday** 176:12,25
180:8
**friend** 52:4,4,23
63:1 173:6
**friends** 205:25
211:11
**frightening** 160:1
**front** 62:18 102:15
130:4 149:6
168:10 197:1,4
224:6
**frontier** 1:8 3:8
4:3 5:14 6:7,9
17:5,7 22:8,12,15

23:18,23 26:4,17
26:19 30:24 31:22
32:4,20,21 33:2,10
33:16 37:1 38:11
38:15 39:14 40:11
40:12,13 41:4,15
45:24 46:6,22
48:8 49:3 52:2,11
54:2,7,16,22 55:12
58:1,6,10,21 62:7
62:14 63:22 64:2
64:6 66:15,19
68:1 71:18,23,25
72:13 73:12 74:5
75:4 77:10,24
84:13,23 86:16,22
87:20 96:18,23
98:16 102:25
107:13,19 108:14
108:15 109:4,25
110:10 113:21
114:19 118:11,20
119:3 122:10,20
123:18,20 124:4
124:18,23 131:7
131:20 133:12
140:22 142:2
143:18,24 145:12
148:5 158:4,10,12
160:6 171:5 173:2
176:17 177:25
180:1,25 187:8,9
187:19 189:5
191:3 192:22,24
193:22 195:5,7
196:5 199:20
200:16,20 202:7
202:22 205:6
206:2 207:13
211:25,25 213:25
215:12,13,14

218:10 221:13
223:1,14,25
224:22 225:6,23
225:25 228:21
230:13,23 231:15
236:4 237:1 238:1
**frontier's** 33:19
36:15 67:2 103:23
116:3 139:16
161:18 203:5
**frontierairlines**
34:8 84:17 85:9
112:13 117:7
118:14 130:12
135:8 140:4
163:25
**fuck** 228:9
**fuckers** 201:25
202:7 203:3 228:9
**full** 8:7 11:24 21:5
56:2 76:20 89:23
140:13 141:9
145:2 155:2,3
160:24 217:19
**fun** 16:13
**function** 70:22
119:6,10,13
**functioning** 127:8
**functions** 71:19
118:22 119:16
137:12,18 149:2
149:20 158:23
224:11,16
**funny** 207:6
**further** 6:18 7:6
76:12 77:8 112:2
114:5 160:13,18
232:8 235:10,14
**fuzzy** 26:23 50:4

# g

**g** 2:19 5:1 10:19
**gabapentin** 138:25
**galvez** 223:4
**gas** 57:1
**gear** 68:7
**geist** 3:10,12,13
173:18 183:5
**general** 24:1 29:1
45:9 56:25 69:5
69:13 72:2 75:24
76:2,8,20 78:1
79:3 82:22 94:16
113:12 134:6
136:22 153:13
161:18 175:1
188:24 190:7
193:24 194:3
195:3 198:16
199:22 204:1
216:14
**generally** 117:2,4
197:20 211:17
**generation** 21:22
**genesee** 5:17
**gentleman** 17:8
**getting** 31:4,5,7
37:24 40:1 41:1
42:24 53:11 57:25
66:4 70:20 72:4
77:8 89:16,19
176:11 185:6
218:17
**giant** 22:18
**girl** 63:4
**give** 9:11 11:24
21:23 28:2,9
33:22 41:18 48:16
62:18 81:20
149:15 196:19
202:22 219:23

230:24
**given** 23:7 79:10
80:20 81:23 105:4
107:7 131:25
137:21 155:24
193:19 238:9
**gives** 207:7
**giving** 193:16
**glasses** 127:9
**glendale** 1:17
**gmt** 32:12
**go** 5:10,25 22:2
27:1,17 30:13
32:9,24 33:18
36:3 40:2 47:5
48:13 54:25 56:7
57:2 58:13 60:3,7
63:9 67:12,16
68:7 72:5,8 73:16
75:18,24 76:11
78:6,16,21,24
79:13,13 84:2
85:4,24 87:25
89:5,7,11 90:3
95:25 97:15
102:22 103:15
105:15,25 108:3
109:9,10,12
113:11 115:21
121:9 122:19
123:7,8 124:8
129:8,16 131:17
131:23 132:23
134:6 142:3,11
143:2 146:25
147:3,16 149:18
152:6 158:7,16
162:24,25 165:18
166:5,12 167:18
167:19 172:14
174:5 175:23

[go - happen]

176:3,22 177:3
178:18 184:11
187:2,5 198:1
204:4,9 205:22
208:14,14,18
209:2,7,13 215:22
218:13,21 222:12
222:13 226:5
227:19 228:3
230:16 231:16
**goal** 220:24,25
221:1
**goals** 156:3
**god** 208:13
**goes** 79:22 126:18
127:5 155:13
**gofundme** 52:25
**going** 6:21,24 10:6
10:22 16:23,23
17:12 20:25 25:25
28:3,9 32:10,11,14
33:23 34:1 36:7
39:23 44:25 46:9
46:17,20,25 48:3
48:10,17,19 49:20
49:23 53:22 77:11
80:3 81:12,20
84:6,25 89:12,23
90:10,13,25 92:2,4
92:24,25 98:4,15
103:16 108:25
109:14,17 111:23
112:2,11 114:5,17
115:7 118:7
119:19 121:4,20
122:15 125:20
128:10 129:18,21
130:3,11 134:10
140:24 142:2
145:16 146:25
147:16 151:21

155:15 156:16
157:24 158:6,16
161:8 162:25
163:1,5 166:15,18
166:23 168:15
171:8,15 172:15
173:14,25 176:19
177:18 181:2,22
181:25 182:12,14
182:15 183:5
184:17 187:16,17
189:12 195:25
196:4 198:1,2,10
198:11,20 199:15
200:1,4,10 201:1,3
202:10,18 204:12
204:15 205:15,16
206:18 207:8,12
207:17,25 214:14
214:17 215:8,15
216:1,4 220:5,8
226:4 228:3
229:12 230:6,16
231:3,7 232:3,6
233:1
**golden** 24:4
**good** 5:2 8:3,5,5,6
37:10 60:13 66:21
115:25 143:5
155:25 175:5
177:24 225:19
232:2
**goodrich** 8:11
56:24 57:13
**gosh** 25:20
**gotten** 41:2 111:24
131:8 157:12
**graduated** 25:12
**grandma** 28:8
61:20

**grandmother**
27:11,25 28:1
52:1 61:8 70:6
**granted** 73:8
100:15 222:7,15
222:19 224:18
**granting** 223:14
**great** 2:13,16,18
26:8 27:4 31:14
49:16 50:25 51:10
51:21,24 53:21
54:6 55:9,10,17,21
55:23 56:3,9,12
59:9 60:9 61:14
89:8,11 90:8
115:22 129:15
149:19 194:23
196:19 203:19,23
204:3 205:12
230:4
**green** 8:11 96:2
97:15,15,16,18,21
105:23,24 218:19
**grew** 215:18
**grid** 95:11 96:2,4
96:14,14 97:8,15
97:16,17,21,23
105:23,23 218:19
**grievance** 103:1,9
128:25 184:13
228:8
**grimes** 1:15 6:4,4
7:18,18 11:8,13,16
15:13,15 18:24
19:7 20:16 23:8
**grocery** 60:11
**gross** 49:24 50:1
50:18,19,20
**grounds** 203:1
**group** 53:8 121:24
151:5 159:19

160:2
**guaranteed** 71:1
81:10
**guess** 28:25 45:9
49:19 62:16 64:12
99:18 123:2
162:18 171:4
194:1,2
**guessing** 137:3
**guide** 116:8,25
**guidelines** 117:3
**guy** 16:3 67:8
**guys** 181:7

**h**

**h** 237:3
**habit** 176:10
**half** 57:7 65:17
214:5
**halfway** 138:23
**hand** 44:24 85:8
96:7 131:11
134:14 153:15
**handbook** 169:17
169:23 170:21
172:5,7,9,17
**handcuffs** 30:13
**handed** 158:11
**handle** 223:7
232:22
**handling** 188:15
**hands** 141:17
192:3
**handwriting**
135:4 146:20,24
158:1
**hang** 27:18
**happen** 19:19,22
70:25 105:1
202:20 205:20
222:11

**happened** 16:9
17:8 39:21 58:1
61:11 67:16
100:24 113:19
174:25 183:14,19
183:25 202:20
**happening** 176:16
189:15 190:3
215:2
**happens** 130:10
**happiness** 215:15
**happy** 25:5 63:9
190:2
**hard** 62:8,24
122:18 131:25
132:2 206:13
214:13,14,24,25
215:7
**hardship** 199:3
**harm** 206:1
**head** 9:13,17,18
9:19
**headquarters**
173:2
**health** 2:21,24 3:6
134:20 146:16
148:24 157:18
206:3
**healthcare** 2:21,23
3:5 121:3 134:20
146:16 157:17
**hear** 40:1 162:6
200:21
**heard** 75:3 89:11
132:22 133:10,15
227:1
**hearing** 12:10,11
17:5 29:14 93:3
182:11
**held** 5:16 213:1

**help** 67:2 72:15
74:14,17 142:19
147:10 155:15
181:13 218:15
230:19,22
**helped** 15:23,24
18:6 52:3,5 95:14
110:13 194:25
215:1
**helpful** 94:9
**helping** 53:3 188:3
**helps** 45:11
**hereto** 238:7
**hey** 76:13 177:21
189:20 204:6
**high** 25:12 52:23
211:22
**higher** 50:19
**highlight** 117:18
142:24 174:13
**highlighted** 137:1
149:24 154:5
**highlighting**
125:20 152:10
174:6,7,8,8,9,10
**highlights** 36:5
**hillbilly** 207:4
**hire** 106:14
**hired** 15:25,25
16:1 19:12 54:5,9
54:19 55:18
131:19
**hiring** 57:2 74:6
**history** 25:11
32:19
**hmm** 26:2 34:6
36:3 49:8 61:16
62:22 74:21,23
80:15 126:2
138:11 140:1
158:21 175:15

179:7 187:17
188:5 190:11,15
191:4 208:6,9
**hold** 17:11,11 18:8
21:12 22:21 32:6
34:13 45:15 56:13
72:6 84:19 88:17
92:24 101:23
105:22 107:10
108:22,23 109:8
115:6,8 136:3
144:18,20,20
145:18 146:5
168:12 172:19
178:15 181:3
182:10 183:11
185:4,9,19 197:22
200:10 211:21,22
211:23 212:15
219:4,5,9,9,12
220:13,16,17
**holding** 94:9
**hole** 53:19
**holistic** 207:20
**home** 27:20 30:14
56:7 94:21 123:7
123:8 159:6
178:10,11 205:23
208:14 210:13,21
211:24 213:7,19
**honest** 57:24 86:2
169:18 172:12
179:18
**honestly** 33:21
53:12 58:9 77:11
102:24 138:6
156:20 162:16
166:1 177:25
182:17 184:6
187:7 215:13
225:9,25

**hooked** 19:2 26:25
54:10
**hoops** 65:22
**hope** 52:21 53:9
53:15 160:25
**hopeful** 151:10,19
**hoping** 130:9
187:11 201:21
**hops** 52:5,6
**hormone** 14:8
**hospital** 61:9
**hotel** 68:14 122:25
213:9
**hour** 27:16 55:16
55:18 57:7 89:12
211:22 233:5
**hourly** 55:12,15
55:17
**hours** 13:13,20,24
20:3 23:8 28:21
42:19 56:5 57:8
61:21,24,25 62:4,6
62:10,14,17 80:9
81:7,10 83:4,11
85:14,20 86:1
88:17,21 89:24
95:6 97:17 105:7
105:25 110:8
150:25 159:19
212:16 219:12
220:12,16,17,20
220:21,25 221:3,7
221:9,17 233:6
**house** 25:23 27:18
53:7 55:10 134:15
139:23 144:7
**houses** 56:5
**huge** 123:18
**huh** 9:13,13 25:12
105:5 117:21
138:17

**hung** 68:22 69:3
**hunter** 3:10,11,13
  173:18 183:5
**hurt** 205:21
**husband** 10:2
  57:17 126:18
  127:11,22 160:7
  206:10 228:8
**husband's** 24:18
  27:11,25 28:7
  52:1,4,4 56:1
  57:15 70:5
**hut** 25:21

**i**

**idea** 66:22 76:7
  88:20 155:25
  190:7 199:22
**ideally** 221:2
**ideas** 53:22 113:4
**identified** 155:21
**identity** 205:8
**ifmla** 41:23
**ignored** 214:19
**illegal** 189:14,22
  189:24 191:18
  192:9,24 197:10
  197:21 198:12,13
  199:21
**illness** 130:19
  171:7
**illnesses** 31:9
**image** 223:23
**imagine** 215:9
**immediately** 54:5
**impact** 13:20
  214:12
**impacted** 68:9
  69:17,24 70:14
  71:5,12 205:3,6
**impacting** 70:22

**impacts** 13:6,9
**impede** 119:16
**important** 10:5
**impossible** 58:15
  73:20 97:1,2
  113:13
**improper** 11:13
**improved** 225:19
**inability** 75:21
  150:1
**inaccuracies** 12:24
  162:23
**inaccurate** 78:20
  162:12,21 163:3
  173:11,13
**incapacitation**
  150:13
**incapacity** 130:19
  137:11
**included** 91:10
  137:14
**including** 93:23
  121:7
**income** 27:13,15
  27:22 28:7 50:18
  50:19,20 51:25
  52:2,10,12 53:11
  53:24
**incompetent** 214:7
**incorrect** 132:14
  181:9
**increase** 160:1
**increased** 159:6
**increasing** 160:2
**indefinitely** 76:21
  76:22 77:20
**independent** 53:7
**index** 2:9
**indicate** 7:12
  133:13 137:9
  150:11

**indicating** 10:18
  117:18 154:6
  174:6,12
**individual** 160:2
**individuals** 216:17
  216:19
**infection** 214:6,8,9
**inferred** 191:21
**inflight** 3:4 34:15
  35:19 42:16 46:11
  73:16 75:18
  108:22 111:22
  131:17 132:4,24
  164:19 166:5
  172:15 174:25
  176:15 188:4,18
  227:7,9,19
**information** 91:10
  93:10,12,14,16
  116:24 156:19
**infractions** 35:24
  47:13
**initial** 64:25
  120:12
**initializes** 119:8
**initially** 160:23
**injured** 72:9 79:13
  132:23 216:17
**injury** 79:15
  130:19 131:22,23
  167:22 171:7
**inpatient** 222:8
**inquiring** 187:20
  187:24
**insinuated** 78:18
**insomnia** 150:1
**instance** 68:10
  156:23 202:8
  210:18
**instances** 36:10

**instant** 11:1,11
**instruct** 11:19
  92:3
**instructed** 10:4
**instructing** 21:20
**instruction** 92:4
  92:20
**insurance** 206:3
**intake** 3:18 120:3
  125:5 126:9
**intent** 177:22
**intentionally**
  93:17
**interactive** 109:25
  110:1,11
**interest** 53:13
  177:4
**interested** 5:23
  175:4 207:20
  231:10 235:16
**interesting** 10:21
**interfere** 5:7
**interference** 5:6
**intermittent** 2:22
  2:25 39:10 40:8
  40:18,21,24,25
  41:6,8,10 42:5
  43:1,7,8,11 64:19
  76:6 77:24 116:15
  124:24 150:13
  159:12 180:9
  183:14
**intermittently**
  78:1,15
**internal** 164:11,19
  170:5
**internally** 167:25
**interrupted** 10:6
**interview** 60:10
**intoxicated** 68:22

**introduce** 33:23
**investigatory** 3:21
99:8 112:19,21
182:7 186:14
187:15 189:14
201:14,23
**invoicing** 56:13,14
**involved** 29:9,12
76:7 98:15 99:19
100:1,7,10 111:24
156:18
**involving** 23:18
**iop** 139:23
**ish** 56:5
**issue** 14:2 91:8
93:14,22 128:3
140:24
**issues** 32:5 138:23
140:23 189:1
225:13,14,25
**items** 90:20 154:5

**j**

**jacalyn** 1:25 6:8
**jamie** 33:4
**january** 114:20
116:3,13,19
**jeff** 16:2 131:15
132:3 166:8
206:24,25 207:1,7
208:5,16 209:24
**jerry** 8:25 65:3
66:1,6 78:2,4,17
99:12 165:2
187:18 190:12
226:24 227:2,4,7,9
**jiffy** 17:4,5
**job** 1:25 3:8 30:25
31:14,23 32:1
45:7 54:13,13
55:21 56:10,20
57:16,25 58:3,7

60:9,15,17,18,22
61:18 68:1 69:4,6
71:19 72:10 79:13
79:15 118:11,18
119:13,17 122:10
122:20,21 123:8
123:17,17 124:9
124:10 134:9
137:12,13,14,19
144:12 149:2,20
155:2 158:23
167:22 176:4,18
177:21 178:2
187:13,14 188:13
201:22 205:9,10
205:10 208:10,24
210:12 216:17
221:22 224:10,16
231:13
**jobs** 26:13 31:2
54:8 59:10 75:14
176:9 187:18,21
188:1,6,10,12
221:12
**jobsdot.com** 60:4
61:15
**john** 1:15,16,18
6:2 7:17 19:23
92:1 115:16
129:12 152:3
171:9 219:21
231:25 236:1,2
**joke** 34:23 35:1
37:15
**jones** 230:18
**joshua** 15:19
**judge** 93:1
**julia** 230:18
**july** 25:7
**jumbo** 193:21

**jump** 65:22 90:6
**june** 125:12
128:13 148:9
155:6,7 158:18
161:17 167:4,15
178:24
**junior** 25:13 29:21
54:24 140:22
212:1
**jury** 202:19,21

**k**

**kari** 33:7 35:11,16
134:3 174:17,20
174:21 187:20
190:14 226:16,20
226:23 227:6,8
**kason** 25:3
**keep** 25:25 28:21
35:10 46:17 48:3
58:9 69:5 89:24
110:7 123:8
125:23 172:14
177:7 178:1
183:24 187:13
209:2,9,13,17,18
209:20 227:19
**kept** 31:4,5,7 72:4
157:13 180:9
**key** 218:2
**kids** 10:4,19 27:17
27:20 31:4,5 32:6
40:1 56:6,8 62:2,3
70:8 89:16,19
108:23 163:8
185:6 210:17
211:1 220:1
**kim** 98:22,23
100:2 102:5,7,18
**kind** 10:7 16:11
23:7 28:15 29:13
29:13 30:19 32:23

44:18 60:5 61:18
62:8 66:2 68:5
69:1 72:6 90:6
124:4 128:23
129:11 133:9
161:4 162:9
172:16 181:18,22
183:22 185:6
196:1 204:2
205:16 208:23
**kinsey** 3:24 200:18
200:20,23
**kinsey's** 201:4
**kitson** 1:20 2:11
6:6,6 7:15,15 8:2
11:7,15 17:1,20
18:16 21:15,21
22:1 23:2,5,15,17
26:10 32:9,16
48:13,21 59:24
83:18 89:15,18,21
90:1,9,15 91:14,16
92:1,10,12,19,24
94:1,4,11,13
101:25 107:12
109:12,19 115:3,6
115:10,12,16,19
115:22,25 116:1
121:17 129:8,16
129:23 144:19,23
144:25 166:12,20
170:20 171:3,8,15
196:21 199:4,11
199:17,18 200:6
203:25 204:10,17
216:6 217:18
219:20,24 220:3
220:14 221:10,21
222:6 223:17,19
224:3,5 226:3
228:23 229:7,19

230:1,11,21
231:24 232:8,12
232:14,16
**knew** 18:22 41:16
64:21 86:22
107:25 132:18
145:7 175:15,16
175:19,19,21,25
193:10 202:22,24
212:11
**knocked** 22:23
206:11
**knocking** 32:7
**know** 9:1 12:2,7
12:12 14:13 15:8
16:8,20 17:10,14
21:18 22:18,25
25:9 28:5 30:8,14
33:18 36:4 37:20
42:17 46:19,25
47:12,13,16,23,24
48:4 49:12 60:10
64:12,17 65:17
74:10 77:7,15,21
86:8 89:22 90:6
92:6 96:8 99:16
99:19,20,23 100:1
100:3,5 102:9,24
103:20,23 104:1,1
107:22 108:2
111:4 114:6
115:17,21 120:20
126:6 128:10
129:10 133:3,6,15
136:20 142:1
145:24 146:23
147:14 148:19,20
148:21 156:15,16
156:20 160:15
162:17 163:17
165:2,11 169:15

169:23 172:9
174:2 175:6,6,22
176:16,17 177:15
177:20 178:10
179:18 181:21
186:21 187:19
190:4 192:12,23
192:24 194:5
195:23 199:12
201:17,25 204:7
206:5,6 207:7
208:17 214:7,22
216:18 217:24
218:9 219:3
220:15 225:22
226:12 229:3
**knowledge** 200:24
211:17 223:13
**known** 29:3 43:15
140:24
**knows** 83:23
**kruger** 15:19,20
29:4 34:17 35:11
35:19

**l**

**l** 1:20 85:5
**labor** 2:20 203:11
214:9
**lack** 229:19
**lady** 161:24 162:1
**laguardia** 211:22
212:16
**lake** 95:1
**lamotrigine** 139:1
**language** 85:1
149:25 164:7
169:8 176:20
**laps** 94:23
**late** 17:24
**laura** 108:22,24
111:17,18,24

187:20 190:23
**laurel** 2:6 5:20 9:8
9:12 152:4 192:2
232:12 235:4,20
**law** 8:19 21:16
27:23 114:14
198:20,21,24
199:23 205:17
229:5
**law.com** 1:18,18
236:2
**lawsuit** 19:23
20:12 29:9 216:11
**layover** 76:6 77:25
78:1
**layovers** 68:14
78:9 94:19 140:20
140:21 141:25
142:4 143:21
145:6 150:8
154:22 155:12
161:5 209:10,15
211:4
**lcsw** 151:24 152:2
152:10
**lead** 231:12
**leading** 156:14
**learn** 201:20
**learning** 143:5
151:13 207:20
**leave** 2:22,22,24
2:25 3:6 39:7 64:3
64:6,9,13,15,21,25
65:4 73:5 79:23
79:24,24 80:7
88:4,6,8,13 109:1
114:11,19 116:3
116:12,25 117:10
117:11 134:24
137:21,24 139:16
179:5 180:5

190:24 222:7,12
222:13,20 227:9
227:10
**leaves** 105:11
**leaving** 52:2 54:2
96:23
**led** 101:16
**lee** 214:10
**left** 30:11 40:21
41:10 43:11,14
52:10 54:16 55:13
55:19 66:1,6 80:5
80:10 81:20 95:17
143:14 153:15
**leftover** 72:12
88:22
**leftovers** 80:2
**legal** 21:3 29:2,13
114:3 184:2 187:1
193:13,20,21
195:6,7 198:11,11
229:9 236:23
**legalities** 196:7,16
196:24
**legally** 196:5
**leigh** 1:11 2:3 7:22
8:9
**lengths** 196:19
**letter** 93:16
128:19,21,23
**levels** 151:11
**levo** 14:6 138:12
**levothyroxine**
13:14 14:4,8
138:13,14 139:4
**lexis** 21:24
**leyner** 108:25
112:3,5
**license** 30:9
120:22

**[licensed - manage]**                                                                   Page 23

**licensed** 152:12,18
**lie** 214:14
**lieu** 7:7
**life** 63:4 69:17,24
  70:1,3,13,15,19,21
  71:13 122:14
  123:6,25 124:1
  159:6 205:8
  206:15,17 211:15
  213:23 214:2
  215:12,16 225:3
  225:13,16
**lifetime** 151:14
**lifting** 141:17
**light** 76:2
**liked** 62:25 212:18
**limit** 28:4
**limitations** 93:20
**line** 80:20,22
  81:23 82:10 83:2
  83:4 103:14 104:6
  105:2,4 106:9
  203:9 212:2 237:4
  237:7,10,13,16,19
**lines** 52:19 193:18
  194:15 197:10,12
**lining** 214:6,8
**liquor** 122:15,16
  122:19
**list** 118:23 119:12
  130:23 138:8,21
**listed** 139:8
  177:21 224:10
**listen** 123:23
  181:19
**listened** 20:13
  74:19
**listings** 176:4
**literally** 205:7
**little** 9:1,14 13:4
  15:10 26:23 32:24

38:9 39:25 45:10
  47:5 48:24 50:4
  56:24 60:20 62:20
  72:3 80:12 82:21
  157:12 211:7,21
  213:22
**littler** 1:21
**littler.com** 1:23,23
**live** 57:6 69:17,24
  70:3,15 221:17
**lived** 24:5,7
  139:23 214:10
**living** 24:15 53:2
  57:14,18
**llc** 1:16 3:17
  119:21
**lm** 226:9
**loa** 179:25
**located** 5:17
**lodge** 91:1
**lol** 201:24
**long** 18:1,23 20:1
  24:20 27:2 62:23
  65:10 105:24
  120:10 212:16
**longer** 56:16
  155:23 186:4,5
**look** 35:6 40:2
  45:11 47:8 54:16
  55:3,7 62:18 84:2
  94:7 95:5 109:6
  140:2 141:1
  162:15 165:18,22
  168:25 169:18,24
  170:7,24 172:21
  175:6,15,22 176:3
  176:8 177:11
  189:11,21 191:15
  198:12 207:4
  208:4,17 222:5
  229:21

**looked** 59:15,16
  59:18,24,25 61:14
  61:17,18 73:14
  75:13 129:6
  165:25 171:23
  172:4 175:2
  177:20 178:9
  179:19 188:10,12
  206:19 228:16
**looking** 19:11 46:1
  46:10 49:9 60:2
  85:4 125:3,10
  132:12 136:25
  143:7 147:23
  157:15,15 168:17
  172:11,16 174:5
  176:8 177:22
  178:5,6 181:4
  185:11 197:25
  198:5 209:24
  221:2 228:1
**looks** 47:20 51:8
  157:5 164:13
  179:3 187:25
  203:14 206:23
**lose** 131:16 166:4
  169:19 177:18
  178:13 188:17
  208:11 226:22
**loss** 61:10 75:20
  127:1,3 214:15
**lost** 16:9 132:20
  133:13
**lot** 37:5 38:13
  57:14 77:8 176:9
  176:16 211:8
**lots** 20:23 79:12
  189:9 212:11,12
  212:17 214:16
**loud** 40:1 89:17,20

**loved** 177:24
  205:9,11,11
**lovely** 199:17
  228:8
**lower** 34:11 57:18
  85:8
**lube** 17:4,5
**luck** 221:7
**luckily** 68:2
**lucky** 54:12 63:9
**lunch** 20:6 27:19
  93:7 94:6 129:9
  129:17
**lying** 101:14,21

**m**

**m** 147:7 158:8
**mad** 31:11
**madrid** 120:9,10
  122:8 125:11,12
  126:10,10,16
  128:3 144:2 147:7
  148:13,16 151:17
  151:17,23 154:12
  158:8
**magically** 217:20
**maiden** 29:6
**main** 57:10 206:10
  213:14
**maintain** 55:1
  72:7
**maintained** 155:2
**major** 61:10 63:6
  71:12 73:3 123:6
  214:1 215:11
**majority** 211:15
**making** 53:17
  77:12 92:1 93:14
  94:8 100:20
  133:18
**manage** 121:21

**manager** 35:19
  42:16 174:23,24
  200:20
**managers** 164:20
**manipulate** 58:12
**manner** 7:11
**march** 147:4
  166:24
**mark** 226:23
**marked** 4:1 84:7
  114:18 118:7
  139:5 145:17
  149:5,12 161:9
  163:23 167:3
  200:11 226:3
  227:23
**marketing** 200:17
**marla** 120:9
  143:24 144:2
  147:7 148:16
  151:23 156:19
  158:8,20
**marriage** 126:25
  206:9
**married** 24:9,20
  24:21,22
**matt** 139:7
**matter** 5:13 7:9
  81:9 193:14,20
  195:7 222:4
  231:10
**max** 62:17
**maximum** 202:21
**mayne** 98:23
**md** 138:2
**mean** 13:14 27:10
  28:19 32:1 33:15
  35:8,9 37:12
  38:18 46:7 47:20
  53:21 54:12 58:8
  62:24 68:11,21

69:25 72:22 80:23
  89:22 94:17,20
  104:24 106:25
  111:2,18,22 114:2
  114:6 115:22
  116:5 121:8
  122:17,23 123:20
  131:18 148:23
  164:20 176:7,16
  177:15,19 181:18
  190:25 192:17
  194:14 195:10
  196:9 206:7,13
  210:13 212:14
  213:4,19 220:19
  226:17 227:15
  228:12,16
**means** 11:2 96:14
  97:15 155:11
  186:22
**meant** 213:8
**media** 5:11 52:17
  60:8
**medical** 2:22,24
  3:6 14:2,22,24
  39:7 45:4 47:17
  64:22 65:4 73:5
  114:11 116:25
  117:25 121:6
  134:24 137:21,24
  139:9 140:7 141:6
  147:23 148:5,18
  148:23 149:24
  156:12,22 179:5
  179:22 222:20
**medically** 45:7
  142:7
**medications** 14:15
  136:8 138:8,15
**medicines** 207:20

**meet** 17:21 20:1
  65:15,16,18 68:7
  69:8
**meeting** 3:21 17:4
  87:19 99:8 101:2
  112:20,21,24
  161:17,20 167:10
  173:2 178:23
  182:5,7,9 183:1,9
  186:14 187:15
  189:14 194:10,18
  195:19 196:1
  197:3,25 198:7,16
  201:14,23 206:20
  210:7 218:12
**meetings** 39:8
  41:16 72:22
  121:20,22 134:1,4
**memo** 35:11,15,18
  35:23 46:2,5
**memories** 228:4
**memory** 19:3 60:6
  100:25 133:23
  166:1 187:8
  192:15 193:16
  194:7,23 195:24
  196:11 197:20
  209:23
**mendelson** 1:21
**mending** 205:24
**mental** 148:24
**mention** 42:5
  128:2 150:7
**mentioned** 14:2
  23:17 24:11 44:2
  57:20 74:15 75:11
  91:23 102:10
  107:12 122:24
  133:22 136:10
  187:18 189:14,20
  197:3

**meredith** 181:10
  208:12
**merits** 37:24
**message** 11:1,11
  11:11 186:8
  228:13 229:14
**messages** 3:22,24
  185:2,12,17
  186:10 227:24
  228:17
**messes** 145:18
**met** 16:1,2 17:3
  19:22 20:4,15
  136:7 145:12
  170:2
**michigan** 5:17
  8:11 24:6 56:11
  56:24 57:13
  120:16,22,25
  206:16
**micklich** 107:23
  165:1 167:4,9,17
  168:20 169:20
  170:2 171:23
  178:23 190:17,18
**microphones** 5:4,7
**middle** 228:7
**milestone** 160:11
**military** 25:17
**milligrams** 14:14
**mind** 89:24 193:2
  194:16 204:6
  210:25
**mindset** 151:13
  154:24 160:25
**mine** 10:9 25:7
  36:5 94:8
**minimal** 62:10
**minimally** 74:8
**minimum** 85:5,14

**minnesota** 53:2
**minute** 38:7 71:2
  152:20 215:19
**minutes** 20:11
  40:3 90:7 138:7
  183:11 204:2,7
  214:11 220:1
  231:24 233:6
**mirror** 223:23
**mischaracterizes**
  101:24 107:11
**mischaracterizing**
  217:17
**misinformed**
  101:15,21
**missed** 39:16,19
  211:4
**mistaken** 132:8
**mitch** 33:5
**mitchell** 35:19
  46:2
**mm** 26:2 34:6 36:3
  49:8 61:16 62:22
  74:21,23 80:15
  126:2 138:11
  140:1 158:21
  175:15 179:7
  188:5 190:11,15
  191:4 208:6,9
**modifications**
  155:3
**mom** 161:24
**mom's** 30:10
**moment** 23:6 71:8
  168:12 178:17,21
**monday** 5:3
  176:11,12,25
  180:1
**money** 21:7 49:5
  53:5,10,17,22,23
  61:2,3 62:11 65:6

78:5 187:2,5,9,12
  202:18 205:22
  206:4
**month** 36:10
  62:17 79:21 80:14
  80:16 81:14,16,17
  82:24 83:1,6 95:8
  96:25 104:22
  105:9 150:21
  159:15,25 210:3
  210:15 220:25
  221:3
**months** 18:3,4,19
  26:25 27:3 31:17
  53:6 121:9 153:8
  153:10 154:1
  155:3,13 160:9
  209:3 214:5
  227:18 231:4
**morning** 5:2 8:3,5
  13:5,15 14:12
  27:17 30:12 90:21
  180:7 211:23
**mother** 27:23
  127:8 228:9
**motor** 61:10
**mouse** 143:3
**mouth** 97:5
**move** 53:7 57:13
  84:19 95:11 136:3
  212:3,24 227:23
  229:12 230:6
**moved** 56:11
  212:25
**moving** 143:3
**multimedia** 60:8
**multiple** 40:14
  41:16,17 72:22
  74:13 78:19 95:17
  96:25 99:4 112:7
  115:7

**mumbo** 193:21
**myfrontier.org**
  165:18
**myfrontier.org.**
  165:15

**n**

**n** 5:1
**name** 5:18 7:13
  8:7 15:18 16:1
  24:18 26:5 29:3,5
  29:6,7 33:6
  116:13 120:9
  121:11,14 138:2
  181:8 200:18
**named** 183:9
**names** 24:25
  152:16 162:5
  181:16
**natural** 14:10 90:5
**naturopath**
  207:18,21 209:25
**near** 225:16
**nearly** 59:13 97:1
  97:2
**necessarily** 172:3
  176:15 212:9
**necessary** 119:9
  142:8 238:6
**necks** 86:18
**need** 10:3 12:14,15
  46:19 47:1 48:4
  68:3 78:5 112:2
  141:22,25 145:6
  147:14 149:16
  150:8 159:12
  161:4 189:21
  198:2
**needed** 27:19
  56:16 63:23 65:6
  65:20 67:2 72:7
  72:20 78:16 95:23

110:7 143:21
**needles** 201:17
**needs** 58:6 61:12
  74:6 151:11
**neglected** 42:5
  43:22
**neither** 11:13
**network** 200:17
**never** 16:10 19:13
  30:5 41:2 53:23
  53:24 68:2,4,9,22
  74:9,14,15 77:6,20
  83:11 85:24 110:5
  110:21 115:1
  124:25 132:2
  162:9 177:20
  178:10 183:14
  194:15,15
**new** 10:9 59:1
  106:14 116:8
  151:13 176:11
  211:22 212:1
**nice** 211:2 213:19
**night** 20:12 94:21
  127:9 208:18
**nighttime** 14:17
**nine** 68:8 121:9
**ninth** 159:25
**nope** 89:5 120:6
  121:19 161:6
**normal** 10:4,9
  68:7 123:9 155:14
**north** 10:3
**northeastern**
  25:13 29:21
**notary** 2:7 235:6
  235:22 238:13,19
**note** 5:4 135:7
  236:10
**noted** 127:7,11
  238:7

notes 204:2,8
notice 2:1 117:12
  117:23
noticed 159:6
  181:6
november 3:14
  26:20 35:20 65:24
  112:22 139:15
  140:14 142:13
  143:12 144:5
  183:1 186:9 198:6
  201:10 207:9,16
numb 63:10
number 3:19,20
  5:15 23:8 26:13
  33:22 76:19 84:16
  85:3,12 108:16
  116:14 130:16
  139:7 148:25
  149:23 153:14
  158:22 159:2
  163:21 167:17,24
  221:6 226:9

**o**

o 5:1
oath 5:21 7:7 8:16
  8:18,19 32:17
  48:22 90:16
  109:20 129:24
  166:21 200:7
  204:18 216:7
object 11:20
  101:23 223:17
  224:3 228:23
  229:7,19 230:11
  230:21
objecting 92:8
objection 16:24
  17:12 18:9 21:12
  23:11,14 91:1,25
  92:16 107:10

144:18,21 196:18
  196:20 199:10
  217:16 230:3
objection's 199:15
objections 7:11
  11:16,18
obviously 179:23
  198:19 212:3
occasion 42:4
  108:5 133:21
occasionally 14:17
  177:3,12
occasions 99:1
  107:13,19 108:16
  189:7
occupational
  154:18
october 17:24
  98:14,17 173:2,22
  180:1 183:19
  206:20 218:12
offer 187:1,5,9,11
offered 60:18
  64:10 73:24 111:5
  111:6
office 72:3 75:25
  76:3,8,20 78:1
  79:3 113:12
  121:12 134:7
  161:18 164:5
  175:1 208:10
  216:14
offline 93:2
oh 22:24 25:20
  32:24 37:15,16
  40:24 52:21 68:3
  78:7 89:21 108:22
  109:9 110:23
  124:8,15 142:19
  146:3 157:9
  177:21 185:5

196:4 197:22
  200:23 226:5
  227:6 230:25
oji 113:14 167:17
  167:19,22
okay 8:15,24 10:1
  10:21,24 11:6
  12:19 13:18 16:12
  17:19 18:1,14
  19:21 20:9 22:3,7
  22:17,24 23:5,23
  24:1 28:1,17 29:1
  29:18 33:1,23
  34:3 36:6 38:6,8
  39:3,23,25 40:5,15
  41:5 42:4,24,24
  43:17,20,25 44:5
  44:15 45:10,13,24
  45:25 46:1,9,23,24
  47:2,22 48:3,5,6
  48:13 49:18,22
  50:21,23 51:9,23
  52:13 57:20 59:4
  59:8 61:5 62:20
  71:3,6,22 72:2
  73:23 75:1 76:13
  76:15 78:13 79:20
  81:15 82:7,20
  84:11,21 85:4,19
  87:1,8,16,22 88:3
  88:14 90:9 91:14
  92:24 94:8,11,13
  96:21 97:2,12
  98:1,5,12,17 99:1
  99:23 100:8,19,22
  101:14 105:13
  108:9 110:4,18
  111:9,16 112:11
  113:1,4,15 115:15
  115:22,25 116:7
  116:21,24 117:5

118:6,10,13
  119:19,25 121:2
  124:20 125:3,19
  125:22,22,23,24
  126:3,3,5,7 127:5
  127:16 128:13,22
  129:2,16 130:15
  133:12 135:25
  136:5,10,25 137:8
  138:20 139:5
  142:21,23 143:5,7
  143:16,20 144:9
  144:23 145:9,16
  145:23 146:2,7,8
  146:10,15,23,25
  147:4,22 148:2,8
  148:18,25 149:23
  150:7,10,24 151:3
  151:21 152:11,25
  153:7,12 154:4
  155:6,10 156:21
  157:8,16,24 158:3
  158:6,13,16,22
  159:11,18,23
  160:23 162:15,24
  163:4,9,16,23
  164:6,10,13,16,16
  164:17 165:5
  166:7,12,14
  167:17,24 168:14
  168:15 171:15
  172:23 173:8,17
  173:20 174:12,15
  174:15,22 175:2
  175:25 176:3
  177:6,13 178:20
  179:15 180:17
  181:2,15,17,25
  182:1,4,6,8,14,23
  182:24 183:7,21
  183:23 185:6,8,10

185:11,21,23
186:3,8,16,25
188:4,17 192:1,4,5
193:1,3,9,24 194:8
194:19 196:5
197:9 198:4,10,18
198:23 199:24
200:23 201:1,9,16
201:24 202:6
203:18,25 206:18
209:22 210:6
214:4 215:25
218:22 219:2
221:2,10 222:21
223:6,9 224:5,19
224:23 225:5
226:5,6,8 227:15
227:21 228:3,25
229:4,12,25 230:5
230:6,24 231:20
232:1,24
**old**  14:4 27:11
213:13
**once**  20:17 82:10
173:5
**one's**  158:13
**ones**  16:3 38:5
47:9 73:3 96:9
149:21 156:13
187:22,23 212:15
**online**  8:21 10:9
52:14 121:24
131:9 136:11
209:15
**oops**  173:14
197:24
**open**  72:11 73:12
73:23,24 75:4,7
77:2,18,19 80:1
82:14,15 83:7
85:5 88:11,21,24

92:25 94:10,14
95:16 96:12,13,15
97:6 104:11
105:16 106:8
113:6 118:7
119:19 142:2
165:9
**opened**  72:5
140:22 211:25
212:1
**opens**  82:16,17
88:7 105:14
**opportunities**
155:22 176:13
226:18
**opportunity**  12:21
57:16
**opposed**  64:17,19
**opposing**  33:25
51:15
**ops**  75:15
**option**  75:12,19
77:23 81:25
167:18,19
**options**  31:11 82:7
163:15 164:11,19
165:23
**order**  41:15 65:15
72:23 96:23 97:25
145:15 218:13
229:9 232:13,15
232:17
**ordered**  232:17
**organize**  204:2,8
**orientation**  60:20
**original**  114:25
153:3
**originally**  24:3
138:22
**orlando**  72:6
140:23 212:1,3,20

212:24,25 213:3,9
**outcome**  5:23 30:3
103:25 201:22
**outpatient**  139:15
139:24
**outs**  43:6
**outside**  79:15
130:18
**overlap**  47:7 83:17
**overnight**  76:7
79:2 108:1 122:25
123:15 124:2,18
124:20 155:23
213:6,7 216:13
217:20 218:17
**overnights**  39:8
41:12,13,15 43:9
44:25 66:22 68:5
72:19 76:12,14,24
77:16 78:7,22
94:18 95:6,20
103:3 104:4,9,19
105:10,14 107:14
107:21 113:5
128:3 161:5 209:7
210:10,21,25
213:11,13,18
224:21
**overtime**  82:12
**owns**  52:5

**p**

**p**  5:1
**p.c.**  1:21
**p.m.**  129:20,22
166:16,17,17,19
186:17 200:2,3,5
204:13,14,14,16
216:2,3,3,5 220:6
220:7,7,9 232:4,5
232:5,7 233:2,5

**pa**  121:12
**page**  2:10,12 3:1
4:1 117:6 121:25
125:4 126:9
132:13 135:5
137:8 138:9
139:13 140:3
141:1 143:7
146:21 148:25
149:18 150:10
153:15 155:16,17
158:1 162:11
163:2,3,10 168:3
168:21 169:2,21
169:22 170:11,14
179:4 182:16
185:24 187:16
188:13 201:2,3
202:9 203:2 208:4
226:8 228:4
229:13 230:7,15
237:4,7,10,13,16
237:19
**pages**  45:19 174:5
182:14 185:22
198:12 201:2
**paid**  21:7 79:8
81:10
**paint**  56:7
**painter**  55:10
**painting**  2:13,16
2:18 26:8 27:5
31:15 49:16 51:1
51:11,21,24 56:5
59:9 203:20,23
**panic**  180:7
**pans**  53:23
**paperwork**  56:12
65:19 66:2,7
116:15,18 135:3

parents  25:23
30:10,14 127:8
part  42:11 58:2,4
70:1 97:9 102:10
102:25 114:25,25
145:10 147:22
174:1 202:10
204:25 205:8
209:6,12 210:8,21
212:10 219:17
225:15
participated  8:21
8:23
participating  6:15
7:3
particular  156:12
parties  5:9 7:10
93:13 235:15
parts  20:13 162:25
party  5:22 63:4,4
63:9 91:7 93:13
93:17,18,19
pass  122:18
passed  63:7,8,20
path  101:16
126:12
patient  136:1
137:10 150:12
paused  146:3
paws  153:25
pay  30:20 54:14
56:22 57:4 59:13
81:12 205:22
paycheck  175:14
paying  21:3 56:22
57:4
pdf  117:6 130:11
132:13 137:8
140:3 143:7
148:25 155:17
163:5,9 174:5

179:4 182:15,16
185:24 187:16
201:2,3 208:5
228:4
pdx  180:10
penalty  7:9
pending  12:17
22:8,12,15
people  38:14
53:10 60:10 67:15
72:9 79:12 80:4
88:23 94:25 95:3
107:4 113:13
123:10 128:11
136:3 139:24
156:17 179:20
190:25 206:1
212:7,8,11,12,15
212:18 217:25
218:7,10,15 219:4
219:8,10
people's  152:16
percent  191:12
192:10
percentage  91:24
92:15
perform  45:7
71:18 137:12,18
149:1,21 158:23
performance  3:4
34:16 46:10
performing
119:16
period  31:8 36:11
80:1 85:13 130:20
130:23 133:3
137:11 169:9
215:3,6,7
perjury  7:9
permission  86:22
86:25 87:5,13,17

222:16,22
permitted  87:2,10
101:11 130:17
person  7:8 20:16
67:14,17 139:21
181:8 189:13
194:24 212:14
228:14,18
personally  111:22
172:4
personnel  191:3
199:20 202:6
203:6
peter  1:25 6:8
ph.d.  148:22
pharmaceuticals
139:3
phase  151:4
phone  1:17,22
19:1 20:22 54:24
66:5 67:8,17
139:7 184:20
186:4,4 222:24
223:5
phones  5:6
phonetic  16:2 33:4
181:13
photo  184:20
photos  185:25
phrased  100:14
physical  130:19
141:15 160:24
171:6
physically  6:16
7:4 144:12
physician  121:7,8
121:10
pick  5:5 76:23
89:3 96:3 97:2,22
104:12,15,16
210:17

picked  95:19
picking  82:12
pictures  186:6
pieces  87:8
piller  99:18 100:1
100:10
pillows  60:12
pilot  200:16
pins  201:17
pizza  25:21
place  5:6,9 76:14
84:22 129:5
151:10
places  162:8
plaintiff  1:6,14 6:2
6:5,11
plaintiff's  101:24
plaintiffrecords
119:22 146:12
plan  3:9 144:3
145:11,11,13
152:23 153:3
156:2,6
plane  67:9
planning  207:15
plants  52:6
playground  67:1
123:10 128:9
playing  125:2
162:17
please  5:4,6 6:13
7:1,12,21 8:7 36:2
48:12 66:14 83:17
137:9 140:11
150:11 168:3,20
169:21 170:11
198:3 199:25
215:24 232:23
pled  30:4
plenty  68:21 69:1
96:8 204:10

**plethora**  96:9
  105:16
**plus**  89:16,19
**point**  9:21 10:1,14
  11:6 12:2,5,9 15:6
  31:13 33:4,7,20,21
  36:9 37:24 41:1,2
  45:17 46:20 48:4
  53:17 56:23 65:2
  66:18 73:11 75:13
  76:23 78:2 83:6
  90:5 94:2 99:19
  102:15 107:23
  108:1,19,25
  111:13 117:5
  123:20 138:21
  153:7 162:25
  166:3 171:2,13
  175:5 177:6 179:9
  179:22,23 180:23
  182:21 189:3
  195:15 199:19
  211:20 213:10
  218:9 221:8
  222:18 230:18
  231:3,7
**pointing**  36:7
**pointless**  213:10
**points**  35:3 37:2
  37:22,24 38:17,21
  39:11,15 41:18,19
  43:2 44:15 45:1
  45:23 47:15 79:5
  118:23 179:22
  180:24
**police**  30:12
**policies**  119:3
**policy**  33:19 34:25
  36:16,20,23 37:8
  37:10,13,22,25
  38:12,17,18,25

39:16 43:2 44:1
  44:21 132:12
  143:25
**pollyanna**  205:15
**portion**  166:25
**portland**  183:23
  183:24
**position**  41:22
  54:17 60:7 76:20
  130:18,22,25
  178:11 200:24
  216:10,20 218:15
  224:6 227:19
**positions**  55:8
  57:21 60:23 73:12
  73:23,24 74:7
  75:4,8 165:9,19
  175:3 221:12
**possessed**  158:11
**possibilities**
  177:19
**possibility**  65:3
  145:8
**possible**  28:5
  108:15,17 111:9
  132:7 156:2
**possibly**  231:15
**post**  153:25 154:3
  225:17,18
**posted**  176:9
**pot**  127:11
**potential**  76:2
  110:14 165:23
**potentially**  76:19
  165:19
**power**  21:22 62:10
**pre**  27:16 68:12
**prefer**  212:12
**preference**  210:20
**preferential**  74:6

**preferred**  79:21
  212:12
**pregnancy**  22:19
**pregnant**  214:5
**premium**  212:8
**prepare**  15:11
  19:16
**prepared**  20:10
**present**  1:24 5:24
  6:17 7:5 17:7 20:4
  71:12,16 134:2
**president**  100:6
**pretty**  54:21 61:19
  68:22 72:12 73:17
  77:3,9 89:7
  215:14
**prevent**  68:24
  159:24 223:14
**prevented**  112:8
**prevention**  159:5
**previous**  235:7
**previously**  4:1
  179:21
**primary**  121:7,8
  121:10
**prince**  87:19 98:22
  99:3,9 100:12,19
  101:18 102:1
  190:21 194:10,12
**prior**  12:3 69:12
  72:20 101:24
  107:11 126:19
  141:6 156:13
  157:22 162:20
  214:17 217:17
**priority**  159:5
**private**  5:5 127:6
**privilege**  16:25
  18:10 23:13 91:2
  92:17

**privileged**  17:15
  21:14 91:11 93:10
  93:15
**privy**  103:21
**proactive**  160:9
**probable**  135:17
**probably**  11:17
  28:12 34:23 35:9
  53:19 63:20 102:9
  117:1 120:11
  134:13 172:5
  176:14 181:18
  186:25 188:14
  192:3
**problem**  10:8
  52:24 77:13 95:24
  154:23
**problems**  16:21
  154:14,18 212:4
**procedure**  2:2
**procedures**  42:22
  43:22 117:23
  119:3 180:15
**proceed**  103:8
**proceeding**  7:2
  29:13,14
**proceedings**  6:14
**process**  11:19
  80:13 82:11 83:10
  83:18,21 85:24,25
  88:1 104:7 105:19
  108:13 109:3,25
  168:4,21 171:25
  184:13 207:13
  215:9
**produce**  14:9
**profanity**  228:12
  228:17
**professional**  2:6
  155:24 235:5,21

program 39:13
40:11 41:15 70:25
127:18 139:25
144:2 207:18
209:15 210:4
218:10 231:4
programs 207:19
progress 156:2
pronounce 14:6
propagate 52:5
proposing 87:23
87:25 220:17
proposition 91:4
prospective 17:14
protected 91:5
93:14 189:10,13
192:21 195:12
229:22
proud 205:8,10
206:8 215:17
prove 78:17
provide 117:11
171:24 206:4
provided 28:14
74:20 116:21
151:4
provider 2:21,23
3:5 134:20 146:16
157:17
provider's 138:2
provides 74:5
80:19
proving 218:1
provision 101:1
130:8
provisions 184:11
223:10
psychic 142:1
psychoactive
214:21

psychomotor
149:25
psychotherapy
214:23
public 2:7 21:22
36:14 235:6,22
238:19
pull 151:22 157:6
161:8 171:15
184:17 185:8
226:2
pulled 146:8
pulling 141:17
152:21 163:18
punitive 202:11,15
203:1 204:21
purpose 42:12
182:8 202:1
purposes 181:22
pursuant 2:1
pursue 57:16
60:19
pushing 141:17
put 16:24 18:9
67:9 68:7 76:10
77:10 87:17 88:5
91:7 93:14 104:11
106:8 111:3,4,12
144:21 149:6
154:21 168:10
181:7 196:17,25
197:4 198:20,24
215:13 217:4,16
224:5
putting 97:5
230:13

q

qualified 60:15,24
74:8 166:3 178:11
qualify 59:19
60:17 68:3 75:14

75:16 177:5 188:7
188:11 226:12
queen 25:21
question 9:22
12:17 17:20 18:17
22:2,10,22 44:19
59:20,22 62:9
69:21 77:14 83:16
87:1,2 92:7,22
107:11 126:8
128:17 136:22
149:8,10,13 154:4
162:18 164:18,23
174:3 188:4
192:16 196:22
199:5,13,18
200:21 223:21,24
224:24 225:6
226:23
question's 217:16
questioning
171:10 174:1
203:9
questionnaire
136:9
questions 10:22
11:4,10,20,21,25
12:6 13:7 17:17
24:1 29:1 144:14
144:22 167:11
171:9 192:2 204:9
216:9 219:20,21
223:11 230:2
231:1 232:9
quick 50:3 163:7
178:16 181:5
198:2
quickly 45:12
49:20 85:1 218:1
quit 123:8 153:24

quite 31:9 77:12
166:2 189:9
190:25
quote 202:7

r

r 1:16 5:1 237:3,3
r.brigham 34:8
84:17 85:9 112:13
117:7 118:14
130:12 135:8
140:4 163:25
rachel 121:13,16
ran 40:25
random 145:14
rate 55:12,15,17
rationale 127:17
reach 179:22
230:17
reached 52:24
160:11
reaching 160:10
read 7:1 36:3
125:17 147:3
162:19 197:1
236:9 238:5
reading 125:23
ready 13:2 77:4,4
126:12 204:9
real 181:5
reality 63:1 78:8
realize 63:19
128:4,5
realizing 157:13
189:12
really 16:1 19:3
21:18 37:19 43:15
50:3 57:2 59:17
62:11 63:14,16
66:23 75:14
103:25 120:17
123:2 126:8 139:2

**[really - referred]**

154:2,5 172:3
178:16 189:19
211:4 214:14
**realm**  177:19
**realtime**  2:7 235:5
235:21
**rear**  30:11
**reason**  12:15 35:3
38:16,24 41:10
42:9 43:16,18
44:10 45:6 47:25
49:23 58:2 60:25
66:22 86:4,23
96:17 100:5 122:3
128:2 131:4
132:11,15,17
152:17 154:20
170:17,18 195:13
209:6,12 210:8
213:20 221:22
236:11 237:6,9,12
237:15,18,21
**reasonable**  41:17
86:11 110:6,25
111:5,6,11 134:7
193:13,19 212:5
213:20 216:23
217:13 218:5
219:7,18 224:17
**reasonably**  39:22
41:4 62:9 177:25
181:1 193:23
194:4 220:22
**reasons**  37:1 58:17
58:20,23 59:4
110:18 213:12,18
**reassign**  78:23,23
**rebecca**  1:5,11 2:3
3:15 5:12,13 6:3
6:10 7:22 8:9
17:11,18 18:8

29:4 34:17 35:11
35:19 116:14
126:10,18 127:5
127:10,17 151:3
155:2,21 159:3,24
160:7 164:17
167:9 220:12
226:6,12 231:1,21
233:1 236:4,5
237:1,2,24 238:1,2
238:4,12
**rebecca's**  17:12
**rebuttal**  15:24
**recall**  13:10 16:22
102:3 103:4
116:18 124:19
129:1 167:7
191:14,24 195:24
199:8 206:23
213:16 221:14
222:9 223:11,18
223:21 224:12,23
225:5 229:16
231:5
**recalling**  15:7
**receipt**  236:18
**receive**  27:13,15
45:17 47:18
128:23 136:5
**received**  27:22
31:25 34:21 35:16
35:24 37:2 45:23
46:6,15,22 47:12
47:15,21 48:1,8
51:25 53:24 104:6
116:2 203:13
**receiving**  117:24
159:24 167:7
**recess**  32:13 48:18
90:12 109:16
129:20 166:17

200:3 204:14
216:3 220:7 232:5
**recognize**  45:16
112:16 118:17
119:25 134:12
135:2 152:25
161:11 171:17
182:2 184:19
200:13
**recognized**  128:14
**recollection**  75:5
85:23 102:12
103:6 130:9,16
147:10,18,24
169:12 179:2
192:17,20 195:1,3
195:20 197:2
**record**  3:4 5:3,10
6:1,14,20,22,23,25
7:2,13 8:8 9:15
11:2,10,18 12:24
16:24 18:9 30:15
32:9,11,15 34:16
46:11,15 48:14,17
48:20 51:14 64:18
69:22 71:7 85:9
89:23 90:3,11,14
91:15 92:2,5,11,13
93:6 94:5,7
109:11,13,15,18
118:13 129:9,17
129:19,22 135:9
144:21,24 161:20
166:13,16,19
192:2 196:18
198:4 199:8 200:2
200:5 204:4,13,16
215:22 216:2,5
217:16 220:6,9
230:3 231:25
232:4,7 233:2,6

**recorded**  3:19
5:11 9:5 100:24
101:3 194:22
**recording**  3:10,11
3:13,20 5:8
161:14,23 162:17
164:5 171:21
173:1,22 181:19
**recordings**  20:13
74:19,24 75:1,3
**records**  28:15
**recovers**  121:24
**recovery**  44:22
52:21 53:9,15
70:1 76:12,15,23
77:9,12 126:12
139:20,24 151:4
151:14 160:8,11
210:24 211:4
212:6 213:5,7
225:17,24
**red**  25:14,15 95:11
96:4,14 97:23
106:3,17 107:17
108:11 174:6,7,12
218:23
**reduced**  235:11
**reef**  99:18 100:1,9
**reentry**  73:6
**refer**  168:3,20
169:21 170:11
**reference**  133:18
138:12 168:1,7,11
168:14 173:14
174:2 181:5
183:18 184:8
202:4 203:2,5
**referenced**  236:6
**referred**  191:14
223:9

referring  67:11
93:11 98:6,7
133:1 134:5
169:16 170:14
175:10 179:12
192:17
refresh  85:23
130:9,16 147:10
147:17,24 155:16
169:12 179:2
228:4
refuse  111:13
112:1
refused  110:21
regard  195:21
216:22
regarding  23:12
35:24
regardless  62:13
registered  2:6
235:4,21
regular  95:22 97:3
105:19 140:13
141:9 145:2,3
208:24 232:19
regularly  108:6
regulation  160:13
160:21
regulations  119:2
rehab  64:25 65:10
66:12,16 124:12
124:16 135:15,21
136:6
reily  1:15
relapse  144:4
151:6 159:4,24
relapsed  16:8
relate  93:17
related  5:22 28:7
123:17 124:9
154:14 213:25

235:14
relates  122:1
relationship  17:14
17:16 19:14
relationships
205:25
relatively  89:14
123:9
release  3:15
relevant  91:8
93:15,24 149:24
162:9
remain  124:1
210:9
remember  16:6
33:5 46:7 69:2
82:9,19 83:22
86:1,6 98:19
100:17 101:4
102:6,7,8,14,17,24
103:24 105:25
107:21 111:15
116:5 125:14
126:15 136:9
166:2 168:9
172:12,15 175:24
184:6,14,15
189:19 194:22
195:2,15,18
196:12 197:6,7,9
197:12,16,19,20
197:21 199:19
204:23 208:20
220:19,20,21
223:1,3,4,9 224:8
227:13 228:1
remembered
227:22
remind  178:22
remote  5:16 6:13
7:2

remotely  2:5 5:24
6:18 7:6 56:14
57:4 235:11
remove  40:13
72:18 104:14,19
105:13 106:8
107:14 113:4
removed  42:10
72:20 104:9
107:21,24 108:1
123:19 130:22
removing  103:3
104:4
rent  53:6
repair  2:14,17,18
26:9 31:15 51:1
51:11 203:20
repeat  18:16 22:10
replacement  14:9
report  19:25
reportable  50:2
reporter  2:7,7
5:19 6:13,15 7:1,3
7:21,25 9:8,12
12:22 26:5 33:25
48:15 51:15 59:20
59:22 83:14,16
121:14 170:19
173:19 183:4
232:14,18,21,24
235:5,5,21,21
reporter's  164:5
235:1
reporting  6:18 7:6
7:11
represent  19:11
164:3
representation
23:13 91:5 93:23
154:11

representative
102:21
representatives
75:4 108:16
represented  15:12
request  49:2 72:16
72:25 73:4 89:2
105:9 113:2,16,19
113:21 117:10
127:17 194:6,8
222:12,13
requested  71:23
71:25 72:18 78:12
79:18 127:16
193:7 223:15
requesting  79:1
104:9 106:2
116:14,18 156:18
197:8
requests  156:20
189:4 190:9
193:13,18,19
218:6
require  150:16
required  42:22
43:22 119:2
180:14 238:13
requirement
80:10 82:4 118:4
requirements
69:10 85:5
requires  39:14
40:11
reserve  54:20,25
58:13 80:3,23,24
80:25 82:1,3 83:1
95:11 96:2,3,13,14
97:8,14,16,17,21
97:23 104:13
105:23,23 106:3
106:10,16,17

107:16 108:11 218:19
**reserve's** 218:23
**reserves** 95:13 96:20
**residential** 137:2 139:22
**resolve** 93:7
**resolving** 94:9
**respect** 99:10 126:8 174:22 199:11 219:2
**respond** 186:25
**responds** 186:20
**response** 116:11
**responses** 9:11
**responsibility** 80:8 136:15,17,23
**rest** 73:17
**restaurants** 26:13
**restless** 185:7
**restrictions** 140:13 141:12,19
**restroom** 12:15
**restructured** 56:15,16
**result** 235:16
**resulted** 35:4
**results** 149:25
**retain** 130:20 169:14
**retired** 113:20
**return** 65:13,14 236:13,17
**returned** 66:11
**review** 12:21 21:19 116:24 162:2 173:8 179:15 236:7
**reviewed** 19:23 91:2 125:8 156:3

**reviewing** 20:12
**rid** 95:3 96:2 97:19 105:10 123:21 214:9 231:1
**ridiculous** 36:16
**riemann** 3:15 139:7
**right** 10:9,10,11 10:17 12:12 14:14 16:2 17:4,22 20:10 21:21 22:9 26:11 27:6,24 28:3 34:11 36:9 37:8,9 38:23 40:23 44:17 46:1 46:18 48:3,10 52:13 55:6,21 59:6 61:7,12,23 67:14,17 68:10,16 70:2 71:9,10,13 73:25 77:7 83:24 84:25 85:8 86:9 87:12 88:1,9,12,15 89:7 92:10 95:21 95:22 97:10 98:2 98:25 103:2 105:3 106:6 110:23 111:21,21 112:22 114:17 115:10,19 115:23 121:5 126:1 132:1 133:14 134:14 135:15,23 136:25 138:20 143:6,22 147:22 150:22 151:21 152:20 153:10 155:8 156:6,25 157:3,5,6 158:14 159:21 162:14,18 164:14

165:23 167:2,9 169:21 170:12 171:7,11 172:11 172:20 176:14 178:8,16 181:24 182:18,19 183:21 185:14 186:14 187:23 188:1 196:8,9 197:25 199:7 203:16,25 205:20 209:17 211:12 212:8 217:4,12,14 219:19 221:24 225:21 226:18,22 228:5,7
**road** 8:11 231:14
**robert** 35:19 46:2
**rocks** 25:14,15
**rolling** 36:10 40:8
**room** 6:17 7:5 10:11,15
**root** 127:20
**ross** 21:21
**roughly** 120:13 221:17 231:4
**roulette** 125:2
**round** 39:23,24
**row** 212:13
**rule** 86:5 106:17 106:21,25 117:15 136:20
**rules** 2:2 44:20 95:22 97:4
**rumor** 133:9
**rumors** 133:16,17
**run** 39:10 40:7 41:23 72:13
**running** 34:23 37:15 52:13

**rush** 108:22,24 111:17,18,24 190:23
**russian** 125:2

**s**

**s** 2:6 5:1 235:4,20 237:3
**sadness** 63:10
**safe** 211:3
**sales** 60:14
**salt** 95:1
**sasser** 98:23 102:5 102:18
**sat** 87:19
**saw** 11:17 75:13 138:5,6 143:24 156:23 167:15 170:4 172:13 174:7 188:7
**saying** 9:19 37:13 37:21 52:24 86:23 87:4 96:7 109:1 128:24 141:8 151:17 170:11 182:19 184:15 191:24 192:7 195:15 197:7,9,21 227:16
**says** 21:16 36:10 50:2 84:12,24 85:12,19 93:9,10 117:10,18 119:8 122:3 134:15,24 135:10,17,25 137:8 140:11 141:12,18 144:1 145:4 146:3 149:1 149:23 150:10 151:9 155:21 157:2 158:17 159:18,23 160:23

164:11 165:5
167:9,17,24 168:3
175:2,9 180:7
183:21 184:23
185:16 187:17
194:15 207:4
208:11,13,17
209:16,24 226:11
226:12,16,23,24
227:6,7,8,9 228:8
228:8 229:14
230:8
**sayser** 98:23
**scale** 151:10,19
**scene** 30:11
**schedule** 41:3
42:10,20 58:12,13
58:25 59:1 62:18
72:10,11,13,14,19
79:17,22,23,25
80:9,24 81:1 86:9
87:10 88:13 95:6
95:15,19,24 96:24
98:4,7,13,21 99:2
99:10,24 102:1,5,9
104:10,15,18
105:14 107:25
109:4 113:5
123:20 140:13
141:9 145:3 156:1
176:19 194:9
195:16 217:1,2,6
217:19 219:2
220:15 221:3
222:17,18
**scholarship** 67:7
67:11,12,18
**school** 25:12 31:6
52:24 62:2,3
148:21 207:8,15
207:25 209:3,8,13

210:17 231:3,8
**schooling** 54:11
**scratch** 95:15 98:9
217:6 220:15
**screen** 9:9 10:16
34:2,12,13 48:11
50:4 51:23 84:19
115:23 136:3
142:18 146:3
152:5 157:10
161:7 168:15
181:25 226:4
**screens** 115:7
**screenshot** 186:6
**scroll** 36:4 45:20
45:21,25 46:9
84:12 85:12
116:11 125:16,18
126:1 134:13
135:7 157:24
158:6 183:9
187:17
**scrolling** 35:10
46:17,25 139:11
157:13,14 159:11
169:7 185:19
**sean** 24:19
**sean's** 61:19
**search** 84:25
164:8 198:10
**searchable** 198:1
**searching** 178:16
**second** 45:15 47:2
48:17 109:8 115:8
125:4 126:9 130:3
140:22 145:21
171:20 178:15
181:3,3 185:4,20
197:23 200:10
219:23 230:25

**secondary** 153:18
**section** 85:5
118:22
**sections** 139:21
**see** 9:9,18,21
10:15,17 34:9,18
35:13,21 36:1
42:18 46:3,12
49:25 50:5,7,16
51:18 60:5 65:20
84:10,14,18,20
85:6,15,21 95:5
101:10 111:23
112:14 113:7
114:21 115:23
116:9,16 117:13
117:20 118:1,24
119:4,23 120:15
120:17,23,24
121:4 122:5
124:25 125:6
126:13,20 127:12
127:23 131:1
134:13,14,22,25
135:12,19 136:2
137:15 138:3,10
138:16 139:17
140:9,15 141:3,16
142:17,21,22
143:3,4,10,13
144:11 145:13,25
146:1,2,13,18
147:5,8,12,14
148:10 149:3
150:3,14,18
151:13,15,25
152:1,3 153:16,17
153:20 154:16,19
155:4,13,19 156:4
157:9,14,15,19
160:14 161:1,6

162:2,14 163:12
164:1,21 165:6,13
165:16 167:5,12
167:20 168:1,5,11
168:18,23 169:1,5
169:10 172:17
173:23 174:18
175:7 176:12,20
178:25 179:6,10
180:2,11 183:2,16
184:3,24 186:11
186:18,23 187:3
188:8,19 192:3
193:22 196:14,23
198:8 201:11,18
201:22 202:2,13
207:10 209:4
222:17 226:5,6,11
228:7
**seeing** 34:11 35:8
50:25 51:10 65:21
102:14 115:13
118:10 120:3,10
120:19,24 121:6
121:18 130:5
148:12 152:7,22
158:20 163:20
164:8 166:2
172:13 176:11
**seeking** 88:10
91:17,19 99:12
202:15 204:21
205:1
**seen** 121:18
143:25 147:2,11
147:15,24 148:6,7
156:13 157:21
177:16
**self** 37:4 38:4
44:21 143:25
160:13,21 218:11

**[self - social]**                                                    Page 35

222:19 224:15
225:1,22
**sell**  53:18 60:11
**semester**  25:13
**send**  21:19 42:8,9
42:18,23 78:6
115:13 128:18
180:8
**sending**  42:15
182:18
**senior**  211:19,20
211:21 212:15,18
218:7,16,24 219:4
219:8,10
**seniority**  58:10
72:5 73:15 75:20
79:22 80:6 101:1
130:10,20,23
131:16,17 132:21
133:13 137:23
142:2 166:4 168:4
168:22 169:8,13
169:19 171:24
172:7,14 177:8,18
178:5,14 188:18
212:3 221:24,25
226:23 227:20
**sense**  82:22 91:7
111:7
**sensitive**  5:4
**sent**  66:1 114:25
116:12 142:13
143:17 180:5
187:19 190:24
236:14
**sentence**  30:19
**september**  24:21
34:17 64:1,2 65:9
65:11 67:5,6,7,20
68:12,24 69:12,15
69:16,23 70:2

71:11,15,17,25
124:13,14,15,17
134:17 136:1
140:8 235:18
236:3
**series**  130:1
**serious**  2:21,24 3:6
13:5 134:20
146:16 157:18
**seriously**  230:8
**serve**  88:24 89:6
**serves**  156:1
**service**  25:17
130:21,23,24
173:19 186:5
**serving**  122:11
**sessions**  151:6
**set**  38:7 52:25
60:11 77:11 93:3
97:7 118:6 218:14
**setbacks**  151:12
**setting**  37:20
127:19 218:10
**settle**  187:12
**settled**  187:10
**seven**  89:23
222:25
**shake**  9:13
**shaking**  9:18
**shaky**  69:4
**share**  34:1 152:5
157:10 168:15
181:25 226:4
**shared**  142:19
**sharing**  38:6 48:10
51:23 115:7 118:8
146:3
**she'd**  170:7
**sheet**  3:14,18
120:3 139:7
236:11

**shelly**  108:25
112:3,5,7
**shift**  63:6 151:13
**shit**  208:18 230:8
**short**  96:18
**shorthand**  235:11
**shorthanded**
96:19
**shortly**  63:20
**show**  30:5 37:13
49:20 50:3,23
51:9 78:4 82:20
84:6 112:11
114:17 117:17
130:1,8,15 134:10
139:5 145:16
166:23 178:18
179:24 181:2
182:14 187:16
200:10 203:8,22
206:18
**showed**  178:19
**showing**  34:4
35:18 50:5 142:15
152:2 161:9 167:2
173:15,21 197:23
200:11
**shown**  41:3
**shows**  30:14 49:24
50:14 51:6,16
**shupernot**  33:4
**shut**  62:10
**sic**  6:25 32:12
98:23 99:18
153:12
**sick**  13:3 31:4,5,7
31:10 36:10,13,14
37:14 39:11,12,13
39:17,19,21 40:6
40:10,10,12 41:1,2
41:3,18,19,24 42:2

44:3,6,20 45:1
62:3 69:3 104:17
180:25
**side**  101:17 153:15
194:24 205:18
**sign**  236:12
**signature**  232:21
235:20
**signed**  35:9 141:2
147:13 236:20
**single**  188:13
212:17
**sitting**  17:9 66:3,7
141:16
**situation**  58:24
59:10 74:14 156:1
218:25 223:5
**situations**  159:4
**six**  61:23 153:10
155:3,13 160:9
212:13
**skills**  61:10 151:13
160:13,21
**slapped**  30:13
**sleep**  14:18
**sleeping**  138:24
225:15,25
**slow**  232:20
**slower**  147:3
**smokes**  127:11
**sober**  53:3 70:16
70:20 71:1 124:1
128:7 214:25
**sobriety**  55:1 67:5
72:7 127:19 159:7
159:25 160:12,24
224:21
**social**  52:17
151:24 152:13,18
154:15 211:15

software  145:19
solutions  236:23
somebody  19:11
  30:11 136:19
  213:5 218:21
  229:10
son  25:3 28:20
soon  77:9 82:16,17
  89:14
sorry  14:7 26:5
  30:3 59:20,25
  61:13,22 69:15
  82:15 83:14 89:11
  114:23 121:14
  124:15 145:19
  152:5 155:6 174:4
  200:21 214:15
sort  16:3 20:12
  28:3 53:12 60:2
  63:2,9 69:25
  123:3 154:2 165:1
  175:22 177:18
  195:25 205:14,19
  206:8 222:14
  223:23
sought  87:5,13
sound  60:8,9
  203:15
sounds  147:18
  232:2
sources  52:1,10
south  1:16 231:15
southwest  2:15
  50:6
speak  15:20 75:7
  98:20 103:2
  154:24 189:7
  190:8 216:19
speaking  18:18,24
  75:3 112:1 183:8
  203:3 206:24

226:14
specialist  65:16
specific  102:12,14
  103:6 107:2 116:5
  133:6 190:1 193:6
  194:2,5,7,8 195:21
  195:22 197:3
specifically  11:18
  46:7 102:17
  131:13 133:1
  184:14 189:17
  195:16 196:10
specifics  107:22
spelled  132:5
spend  210:7
spent  20:11 23:9
split  187:23
spoke  18:25 19:10
  86:15 99:24
  103:24 108:15
  190:10,12,14,16
spoken  19:8 20:21
  22:4,7,11 23:20
  162:21
sponsorship  160:3
spread  28:5
stages  160:8
stamp  34:7 112:13
  119:22 143:8
  146:11 163:24
stand  91:3 167:22
standard  232:16
standing  141:16
stands  152:12
start  43:4 46:25
  54:19 58:9 72:10
  73:19 96:24 98:8
  123:9 155:12
  176:8 189:12
  207:8,15 217:6
  224:24

started  18:24
  31:14 53:8 127:4
  138:22,24 140:23
  154:23 158:20
  212:4,5 230:16
starting  28:12
  72:14 130:2
starts  105:9
state  2:8 5:25 8:7
  21:22 51:13
  141:24 142:7
  235:6
stated  44:21 87:12
  101:2 127:6 139:2
  185:12
statement  6:13 7:2
  23:8 127:25 159:9
  165:3
states  1:1 5:14
  24:5 117:22
  126:10 127:17
  130:16 138:1
  139:14 140:7
  141:11,19 143:12
  148:8 151:3,23
  153:12,14 155:1
  155:17 159:2,12
  160:7 164:16
  176:6
stating  7:12 145:1
  220:14
station  57:1
statistics  75:15
statute  93:20
stay  176:17 210:21
  213:9 227:7,8
staying  53:3
steered  195:13
stefanie  33:6
  42:16 180:20
  184:23 185:15

188:25 190:2,10
  191:10 192:7
  194:13,14,23
  197:13 227:25
  228:5 229:14
step  23:6
stipulating  171:5
stole  30:9,10
stop  26:19 36:17
  38:6 46:19 47:1,2
  48:4,10 51:23
  63:17 108:19
  115:6 151:21
  161:7 185:19
stoplight  56:25
stopped  18:20
  59:8 166:3
stopping  90:5
store  122:15,16,19
stores  60:11
stream  3:2,3,16
street  1:21 25:23
stress  124:4 230:8
  230:13
stressful  159:7
stressors  127:21
  213:23 214:1
  215:11
stretch  31:4
strictly  210:23
strike  36:16 44:1
  65:9 66:10 71:16
  74:18 75:25 81:16
  109:23 131:4
  143:16 153:13
  161:16 162:11
  194:16
stroke  218:2
strong  160:25
strongly  176:7

struggle  159:3
struggles  151:12
struggling  126:11
  178:3
stubs  175:14
stuff  14:10 17:6
  31:6 56:13,14
  65:17 75:15 77:10
  80:10,11 88:22
  97:25 100:7
  103:15,21 110:6
  123:11 145:15
  148:22 160:6
  162:5 166:2
  173:12 175:14
  179:19 180:20
  206:2 209:11,20
  225:25 226:19
stv  1:3
subcontracted
  56:15
subcontractors
  56:17
subject  33:11
  231:10
submit  158:3
submitted  19:24
  148:5 156:11,12
  156:15,16
subscribed  238:14
substantive  171:9
successfully
  165:22
sudden  42:12
  183:10 206:3
suddenly  205:13
sue  228:9,21 229:9
  229:10 230:8,12
  230:22
sued  230:18

suffering  225:12
suggest  172:1
  176:7,22
suggested  73:14
  76:13 78:2 176:3
  191:15
suggestions  110:5
suite  1:16,21
summary  125:5
  125:11 126:9
sunday  208:18
super  10:5 211:20
  211:23 212:15,17
supervisor  32:22
  32:22 33:5 132:4
  133:17 174:25
  185:3,13
supervisors  33:3
supplied  51:15
support  121:24
  151:5,11 159:24
  213:7
supports  160:10
supposed  19:19,21
  66:25 67:1 108:2
  136:20 205:24
  222:24
supposedly  16:4
  103:13
sure  12:19 13:19
  26:2 32:8 35:8,17
  36:12,18 39:24
  40:4 45:16 46:8
  46:16 58:4,17
  78:10,16 82:23
  86:8,10 87:23
  99:20,23 109:9
  122:18 136:24
  143:25 160:12
  174:2 185:5
  186:22 192:5,10

201:25 211:8
  216:10 219:24
  230:5 232:2
swap  80:4 83:7
  85:24 96:25 97:6
  97:6 104:7 105:6
swapping  82:11
  83:19 96:16
swear  7:21
switched  33:21
  55:11 63:9 187:22
switching  188:18
sworn  7:23 235:8
  238:14
sylvia  25:2
symptoms  153:25
  154:3 225:18
system  33:21 78:3
  175:12 213:7

**t**

t  237:3,3
take  5:9 8:19 10:3
  12:14 14:11,17
  16:19 19:20 27:10
  27:18 39:7,25
  48:11 58:11 61:11
  68:6,12 71:1
  72:13 92:25 94:5
  104:11 105:11
  109:6 117:11
  124:17 126:12
  140:2 141:1 163:7
  166:13 180:22
  182:17 199:24
  207:19 208:4
  218:21 225:16
  231:4,24
taken  2:4 5:12 9:8
  13:12,20 14:3
  42:20 76:5 96:22
  103:18 162:13

179:23 180:19
  217:20 235:11
takes  97:20
talk  17:12 21:2
  32:19 62:20 71:22
  93:2 94:5,6 98:2
  98:12 110:21
  111:13 112:5
  122:20 136:7
  149:14 163:2
  190:23 193:6
  209:25 213:22
talked  15:22 18:10
  18:12 42:16 43:5
  48:24 73:11 99:7
  103:5 107:23
  110:14,23 112:6
  143:23 144:6,7
  156:7 170:5 175:4
  180:13 189:9
  190:25 198:21
  210:6 218:9 223:5
talking  18:1 42:7
  70:16 74:15 98:8
  99:7 108:19 112:8
  113:10 132:16
  133:11 172:2
  175:16,20,21
  179:5 181:8
  194:10 195:11
  201:16 204:21
  207:3 208:5,7,10
  208:16
talks  168:4,21
  169:8
tape  75:1
tara  121:11
tax  28:6 52:7
taylor  121:11
teach  123:4

**technical** 12:10
**technically** 27:10
  213:4
**teenager** 62:25
**telehealth** 120:19
**tell** 10:14 16:16
  25:1 30:7 33:25
  45:19,22 49:9
  59:7 62:16 71:24
  80:12 100:22,23
  102:16,19 104:5
  125:18 132:16
  133:2 136:21
  162:22 166:24
  189:17,25 190:1,6
  191:1,12,18,23
  194:19,21 195:7
  195:22 205:5
  214:4 223:6
**telling** 15:21
  169:21 192:20
  226:17 228:20
  229:18 230:9,12
**tells** 168:20 230:17
**temp** 26:4,22,25
  31:11 50:9 54:9
**temporarily** 76:22
  78:23
**temporary** 76:20
  227:18
**temptation** 156:2
**ten** 40:3 68:8 90:7
  204:7
**tend** 94:17 205:14
**tending** 94:18
**tends** 9:17 187:9
**term** 45:9
**terminate** 202:23
**terminated** 26:3
  44:23,25 54:7
  113:23 221:13

224:22
**termination** 17:4
  17:7,22 34:21
  35:5 99:8 103:22
  179:22 182:11
  205:6 208:1
**terms** 21:13,16
  38:25 47:12 70:14
  79:17 87:10 92:14
  93:22,23 122:21
  132:8 136:23
  179:15 195:11
  199:20 213:23
  223:20 224:1
**terrible** 205:21
**terrified** 57:25
  78:9
**tesla** 56:15
**test** 62:12
**testified** 7:24
  101:7,18 170:20
  172:25 182:20
  188:21 197:15,16
  221:16 231:2
**testify** 15:3 18:12
  235:8
**testifying** 100:13
  178:6 189:1
**testimony** 7:9
  101:24 107:11,13
  204:23 217:17
  236:9,18 238:8
**tests** 145:14
**text** 3:22,24 11:1
  11:11 185:2,12,17
  186:8,9 188:6
  198:1 202:9
  227:24 228:12,17
  229:14,16
**texts** 186:1 201:4

**thank** 7:25 8:6
  9:20,24 23:3
  94:12 115:5
  144:23 167:10
  215:21 220:4
  231:21,23 232:9
  232:10,23
**thanks** 18:15 25:6
  115:9 186:25
  232:11,24
**theirs** 38:3
**theis** 1:20 6:8 7:19
  7:19
**theoretically** 91:6
**therapeutic**
  127:19 151:5
**therapist** 65:20,21
  76:13 77:3 142:9
  142:12 144:7
  148:17
**therapy** 155:14
  209:20 214:16,20
  214:22
**thing** 16:13 36:1
  56:16 97:25
  111:17,18 124:1
  178:5 181:5 193:4
  196:1 200:17
**things** 19:24 37:14
  40:14 76:17 123:5
  131:20 144:3
  173:10 213:23
  231:15
**think** 13:5,7,21
  17:21 23:16 26:11
  28:24 30:4,4
  32:24 33:6,9
  37:10,19,23 39:6
  39:23 40:3,15
  52:6 53:16 54:8
  58:14,16 59:6,7

60:3,16,16,25 65:2
  73:2 76:13,14
  87:16 95:14 96:6
  98:1,25 101:6
  107:20,22 111:17
  111:22 114:12,25
  124:11 125:9
  129:7,8 131:8
  133:14 136:8
  146:7 154:21,22
  155:15 158:11
  162:8 165:2
  172:13,20 176:18
  180:13 181:10
  182:15,23 189:20
  194:7 196:3,4,19
  204:1 210:16
  220:2,19 221:21
  223:25 229:4
  230:25 231:12,25
**thinking** 15:7
**third** 117:18
**thomas** 138:2
  141:2,8
**thompson** 33:7
  35:11,16 134:3
  174:21 175:9
  190:14 226:20
**thought** 16:16,18
  77:3 78:6 83:12
  83:15,25 86:2
  128:6 162:8
  177:17 193:18
  215:15 222:3
  229:4
**three** 18:3,4,19
  20:2 26:25 54:8
  61:9 65:25 94:24
  96:1,1 99:6
  105:13 227:18

thyroid   13:15 14:2
  14:8,9,23
tick   230:2
tied   96:13
till   41:20
time   17:22 18:5,22
  19:12 20:18 24:7
  27:20 29:24 30:7
  31:10 32:12,21
  33:2,10,15 34:25
  36:25 38:11,15
  39:10 40:8 42:23
  43:17,21 52:7
  56:2,8 61:17
  63:21,24 65:19
  67:4 68:17 71:2
  72:11,21 74:10
  76:20 78:23 80:1
  82:4,14,15 83:8
  84:22 85:5,19
  88:11,21,24 89:6,9
  89:22 94:5,15
  95:10,16 96:12,13
  96:15,17 97:7,13
  97:14 104:12,15
  105:16 106:8
  113:6 122:17
  123:19 124:20
  126:12 127:25
  128:5 129:10
  132:25 133:3
  137:18 140:17
  145:5 150:25
  151:6,7,9 154:13
  154:20,21 155:2
  155:24 159:9,19
  159:20 160:2,4,19
  162:19,19 165:10
  170:19 175:13
  177:9,15,17 189:3
  199:7 204:11

205:23,24 207:8
  207:12 208:11
  210:7,13,14 211:4
  211:9 213:16
  214:24 215:3,8
  216:12 222:7
  225:22 232:17
  233:5 232:19
timeframe   236:8
timeline   222:14
times   20:15,21
  29:18 31:9 33:14
  33:19,22 36:13
  41:17 59:16 68:8
  68:21 69:1,2
  72:20 74:13 78:19
  96:25 99:4,6
  102:4 104:19
  107:7,20 112:7
  133:15 150:1
  159:19 176:9
  199:12 206:10
  217:25
timing   42:6
tips   50:14 51:6,16
title   165:2
today   8:4,16 9:5
  9:12,21 11:16
  12:5,9 13:1 15:4
  15:11,12 19:17,18
  20:10 100:25
  120:15 121:21
  138:18 156:7
  167:10 189:1
  203:4,9 214:12
told   16:4 17:10
  42:12 66:21 67:8
  74:9 87:20 99:12
  99:14 100:9,25
  102:1 108:4
  113:12 124:23

131:2,13,15
  132:17,19 136:19
  166:4 169:13,19
  169:25 175:23
  179:17,20,21
  183:23 189:10
  191:9 192:8
  195:23,25 196:11
  205:9 221:21
  223:5 227:22
tomorrow   25:3,5
  70:24,25
ton   96:8
top   143:9 158:17
  184:23 186:8
  226:11
topic   90:7 189:18
  225:7
topics   125:14
torn   205:13
torture   123:22
torturing   202:5
total   27:22 28:2
  49:17 51:20 233:5
totally   90:1
town   56:25
track   28:21 45:10
trade   80:4 83:7
  85:24 95:25 96:1
  104:7 105:6
tradeboard   72:12
  80:2 83:7 88:7
  94:23 95:3,18
  96:12 105:16
  113:6
trading   82:12
  83:19
traffic   57:8 221:17
training   175:4
transcribe   161:25
  162:1

transcript   12:21
  161:14 162:2
  164:13 167:14
  170:5 171:20
  173:1 178:23
  181:4 182:24
  194:14 196:14,23
  196:25 197:4
  198:15 206:20
  222:5 227:13
  235:13 236:6,20
  238:5,8
transcription   3:10
  3:11,13,19,20
  161:22 164:4
  173:5,16,21
  182:25 198:6
transcriptionist
  181:14
transcripts   181:7
transfer   75:12,19
  75:21 130:10,17
  130:24 132:18
  163:17 165:19,23
  171:6 177:23
  178:4,7 212:19
transferred   74:3
  188:14
transferring
  132:17 167:25
transfers   163:15
  164:12,12,19
  170:5
transitions   139:14
  139:19
transmission
  21:23
trazodone   14:18
  138:22,23,25
  225:16

treated   14:25 135:25 141:5 171:6 216:21 217:11
treating   148:23
treatment   3:9 24:7 53:1,1 63:23 67:6 67:13,16,19 120:4 120:7 122:18 123:1,4,13 126:19 127:2,16 128:6,8 136:5 137:2 138:23 139:20,22 140:19 143:15 144:2 145:10,11 145:13 150:16,25 152:23 153:3 156:2,6 159:5 205:23 209:11 214:18,20 215:5 222:8,12,13,15,23
tremors   9:17,19
tri   21:22
trick   44:18
tried   36:16 65:14 95:8 96:25 124:25 165:3 190:23
trigger   122:25 123:3,11,19 124:2 124:5 125:1 128:3 128:14
triggered   122:11 122:15
triggers   66:25 122:3,7,22 123:16 124:9,9 127:20 155:22
trinity   207:18
trip   42:10 68:20 76:8 79:2 94:25 96:3 124:21,22

180:15 183:19
trips   41:14 72:7 80:4 82:12 94:16 94:22 95:20 96:20 97:17 108:11 123:15,19 124:2 124:18 155:23 212:18 216:13 217:20 218:17,25
trouble   15:6 225:2
true   34:20 35:15 35:23 45:22 46:5 46:14,21 47:14 48:7 51:3 62:12 83:10 116:2 126:22 137:17 148:4 160:4,19 162:2 180:4,14 188:10 203:12 235:13 238:8
trust   28:20,22 179:20
truth   235:9
truthfully   15:3
try   39:9 40:16 55:3 60:11 78:24 84:25 123:15 134:7 140:20 179:2 181:22 182:13 183:25 196:19 199:2 214:9 226:4
trying   28:4 30:4 39:13 41:21 42:19 53:4,18 67:15 72:23 78:3,4,10,18 78:19 92:11 95:3 114:22 123:21,21 142:24 164:7 172:13 181:4 193:10 200:17

230:22
tubbs   2:6 5:20 235:4,20
tumblers   53:10
turn   5:6 25:2 42:13,15,20 94:23 107:24 180:10,19 183:23,24 210:19 211:24
turned   16:5 25:4,7 30:11 112:19 129:2 187:1 207:23
turns   95:2,18,18 96:3,8,9 97:3,6,20 97:22 104:15,20 105:17 106:13 209:2,7,10,13,17 209:18,21 210:9 210:16 211:18,21 211:21,22 212:7 212:16 213:1,10
two   10:2 18:3,4,19 20:5 21:2 24:15 31:4,8,12 57:8 76:17 105:14 107:20 130:21 139:20 150:25 151:5 154:5 159:19,19 169:9 169:13 193:4 212:12,14 220:1 221:17 227:8 231:24
type   16:10 37:14 43:5 55:8 206:4
types   94:16 123:4
typewritten   235:12
typical   11:19

typically   128:18 212:7

**u**

u   175:17
u.s.   21:24
uh   9:13,13 25:12 105:5 117:21 138:17
ultimate   221:1
ultimately   41:19 55:9 103:8 231:16
ultipro   175:9,12 175:13,16,17,21 175:24,25 176:23 188:7
una   47:16,24
unable   117:23 137:12,18 149:1 158:22
undergo   160:24
understand   8:15 8:18 9:4,7 11:22 12:6 32:17 36:18 37:7,19,20 41:21 41:22 48:22 56:23 58:16,17 71:3 78:10,11 87:22,24 90:16 98:1 109:20 129:24 131:19 166:21 193:15 194:4,6 197:18 200:7 204:18 216:7,10
understanding   15:7 82:23 96:6 152:14,15 177:7,8
understood   123:24
undue   199:2
unemployed   206:11

**unemployment**
26:24 54:6 203:13
**union** 86:15,16,17
86:22,22,24,25
87:5,13,17 89:8
90:19 98:3,13,15
98:20,24 99:15,17
100:6,15,20
102:21,25 103:2,8
103:24 128:18,18
128:24 129:3
184:12 200:24
218:13
**unit** 5:11
**united** 1:1 5:14
**untitled** 4:4
**update** 155:17
159:2
**uproot** 212:23
**upset** 107:24,25
**use** 39:7 78:3
124:23 141:17
173:25 180:8
189:23 191:11
192:11 195:21
222:16,22 228:17
**uses** 127:6
**usual** 117:23
**usually** 10:23
123:5 210:14
**uterus** 214:6,8
**utilizing** 127:18

**v**

**v** 132:5 236:4
237:1 238:1
**varied** 28:3 62:3
**various** 110:14
160:8 189:4
223:10
**varney** 131:15
132:3 133:19

166:8 206:25
207:1
**verbal** 9:11 46:13
**verbally** 7:8
**verify** 47:14 236:9
**veritext** 5:19,20
236:14,23
**veritext.com**
236:15
**versus** 5:13 21:22
**victor** 132:5
**victory** 94:23
**video** 1:11 2:2 5:8
5:11,17
**videoconferenced**
1:11,13 2:3
**videographer** 1:24
5:2,19 6:12,21,24
7:20 32:10,14
48:16,19 90:10,13
109:10,14,17
129:18,21 166:15
166:18 200:1,4
204:12,15 216:1,4
220:5,8 232:3,6,25
**videography**
198:21
**videotaped** 233:1
**view** 58:25 119:13
153:22 202:6
205:14,19
**violate** 87:20
99:13,15 100:21
101:1 184:16
194:12 195:17
197:8
**violated** 80:7
114:14 196:3
**violating** 199:23
**violation** 100:14
101:19 114:10

**vs** 1:7
**vulnerable** 155:25
159:4

**w**

**w** 2:13,15,16,18
49:10,20,24 50:2,6
50:25 51:4,10
203:19
**w2** 50:1
**wages** 49:24,25
50:2,14 51:6,16
**wait** 157:9 197:22
230:2
**waited** 40:9
**waiting** 76:16
201:20,22
**waive** 7:11
**walk** 135:9 174:16
**walking** 141:16
**walter** 138:2 141:2
**want** 9:22 10:1
12:3 15:10 20:2
21:18 25:25 26:24
28:12 36:17 37:13
37:20 38:7 39:24
41:14 43:18 45:14
45:15 47:13 48:11
49:25 52:9 55:14
56:4 58:17 62:20
65:4,23,25 71:22
73:21 75:17,17
78:5,8,22 82:22
87:23 88:23 89:7
89:11 90:3,18,19
94:2,4,21,25 95:1
105:24 109:6,10
115:16,20,20
124:1 125:18,23
128:10 129:12
130:8 132:17
133:5,25 141:21

144:20 171:22
174:1 176:8,17
178:13,18 187:5
188:17,24 192:5
193:5 198:1
199:24 201:24
202:11,20 207:7
209:1,16 213:13
213:22 215:22
216:10 217:15
220:12 221:20
223:23 226:2
227:23 232:12,22
**wanted** 32:11 49:1
60:3 61:13 62:12
63:18 73:17 76:19
78:9 80:11,24
86:14 87:9 96:9
96:24 97:3 98:8
101:19 104:13
117:5,17 130:1,15
135:9 149:15
154:4 174:15
177:25 182:23
185:21 187:13,13
188:16 195:5
204:20 207:19
209:6,13 210:8,11
212:8 215:18
216:12,21,25
217:5,19 218:3
219:11 220:14
221:7
**wanting** 210:7
**wants** 80:2
**warn** 9:16
**warning** 34:21
35:5 46:13 47:18
**warnings** 34:25
47:12

**watched** 8:23
**way** 13:6 36:5
 40:25 41:7 44:16
 53:4 55:24 63:11
 89:13 91:8 97:7
 111:12 115:1,11
 120:17 143:3
 148:20 157:5
 162:10 164:8
 188:15 194:3
 196:9,15 201:25
 205:17 206:11
 208:2 212:13
 214:16 217:4
 218:22 224:25
 228:14
**ways** 134:8
**we've** 42:25 43:5
 89:12 98:7 108:13
 110:18 113:9
 146:7 147:22
 156:13 157:21
 228:16
**weaknesses** 16:21
**weaned** 138:25
**website** 60:4 61:18
 151:22 165:5,8
**wednesday** 186:9
 201:9
**week** 19:19,22
 20:19 28:4 31:4,8
 31:12 54:8 55:21
 61:21,24 62:4,5,7
 150:25,25 151:6
 159:19,19 176:9
 176:10 208:15
 222:23
**weekend** 78:8
**weekends** 208:17
**weekly** 151:5
 176:23

**weeks** 20:19 21:2
 52:3 61:9 65:25
 212:14
**weird** 16:5,7
 145:20 146:5
**went** 25:12 30:4
 31:5 52:3 60:3,9
 60:20 64:3 86:19
 86:21 87:4 120:6
 123:3 124:12,16
 140:22 148:21
 162:9 175:24
 183:25 194:18
 195:18 205:22
 206:14 212:2,4
 214:9 222:7,15
 231:15
**west** 2:13,16,18
 26:8 27:4 31:14
 49:16 50:25 51:10
 51:21,24 54:6
 55:9,10,17,21,23
 56:3,9,12 59:9
 61:14 203:19,23
**whispering** 5:5
**why'd** 177:13
**willing** 78:24
**win** 92:15
**wine** 127:9
**wise** 230:19
**wish** 54:18 55:1
**withdrawal**
 153:13,19,25
 154:3 225:18
**witness** 7:8,21
 29:13 107:11
 157:14 171:10
 217:17 236:8,10
 236:12,19
**woke** 180:7

**won** 230:18
**wood** 53:18
**word** 160:12,17
 162:17 196:12,12
 197:1,1 198:10,13
 198:20
**wording** 174:3
 199:19
**words** 9:7 91:8
 93:15 97:5 100:12
 100:22 101:5
 110:1 162:13,21
 189:19,23 190:1,4
 191:11,19 192:11
 195:21,22 197:17
 197:19 199:8
**work** 26:4 27:2,4
 31:5 45:3 48:25
 59:1 60:22 61:4
 61:19 63:24 64:19
 65:13,15 66:4,13
 66:20 68:9 69:13
 70:11,24 72:2,8,24
 76:8 77:25 78:3,5
 78:8,9,17,18,21,25
 79:3,13,19 80:13
 81:10 96:10
 113:11 127:19
 129:12 131:23
 134:8 140:13
 141:9 142:11
 143:1 145:2,2,15
 153:8 156:1 160:9
 178:11 205:15,17
 208:14,18,19
 212:6 216:13
 226:5
**workday** 155:24
**worked** 25:19,20
 25:21,21,22,22
 27:8 31:16 50:9

 55:5 58:8 110:17
**worker** 151:24
 152:13,18
**working** 16:5,11
 17:6,9 26:8,16,19
 26:21 27:23 36:14
 56:2,4,12 59:8
 62:10,12 68:24
 102:22 160:20,20
 167:18 205:11
 206:9
**works** 34:2 96:13
 129:9,15 143:6
 161:24
**world** 118:8
 122:10 205:19
**worried** 42:14
 86:24
**worries** 167:1
 168:13
**worse** 9:18 72:4
 77:13 226:1
**worth** 183:24
 215:16
**wrap** 216:9
**write** 32:1
**writes** 28:20,21
**written** 2:1 39:1
 140:25 225:6
**wrong** 93:2 101:16
 192:23,25 194:25
 195:13 197:24
 199:1 202:23,25
 229:3
**wrongfully** 54:7
 113:23
**wrote** 162:9

**y**

**yeah** 9:3 14:3,10
 19:6 20:11,20
 23:15 25:7,9

32:10 36:3 37:17
37:18 46:13,14
47:6 48:23 50:10
50:22 52:9 58:4
58:16,19 60:14
63:10 71:6 72:22
81:12 83:18 84:19
85:4 89:21 90:1,4
93:5 96:6 100:11
104:11 109:2,9,12
115:18 116:6
120:14 122:19
125:24,25 129:14
129:14 131:10
133:11,24 136:12
140:6 142:4,23
143:2 146:4 159:8
163:13 166:11
168:14 172:18
181:10,12,20
186:19 187:24
192:16 199:14
203:17 204:5,11
206:16 207:6
208:11,13,15
209:1,5,11 210:2
211:13 219:22
220:3 226:1 227:4
230:25 232:23
**year**   14:4 19:5
27:11 28:10,13
29:22 36:13 58:10
77:5 123:6 151:9
151:18 160:23
214:13
**years**   82:18 83:23
100:25 130:21
169:9,13 192:15
211:6 227:8
**yellow**   36:5 117:18
125:20 137:1

142:24 154:5
174:8 185:18
201:5 228:5
**yep**   47:4 85:7,11
85:16,22 118:16
118:25 122:6
135:13 138:11
140:16 141:4
143:11,14 147:6
150:15,19,23
151:16 153:6,11
155:20 159:14,17
159:22 167:6,13
167:21 173:24
185:20 186:15
190:19 201:12
203:21 207:5
**york**   211:22
**young**   121:13,16

**z**

**zone**   129:10
**zoom**   120:19
143:6 151:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.