**STEFANIE COPPEDGE - July 29, 2020**

```
                                                       1
 1           IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3
 4  Civil Action No. 19-cv-03417-WJM-STV
 5
 6  REBECCA BRIGHAM,          )
                              )
 7           Plaintiff,       )
                              )
 8  vs.                       )
                              )
 9  FRONTIER AIRLINES, INC.,  )
    a Colorado corporation,   )
10                            )
             Defendant.       )
11  _____)
12
13       ZOOM DEPOSITION OF STEFANIE COPPEDGE
14
15
16      The deposition of STEFANIE COPPEDGE was taken by the
17  Plaintiff, pursuant to Notice, pursuant to Federal Rule of
18  Civil Procedure 30, on Wednesday, July 29, 2020, commencing
19  at 9:03 a.m.
20
21
22
23
24
25
```

```
                                                       2
 1                      APPEARANCES
 2
 3  On Behalf of the Plaintiff:  JOHN R. CRONE, Esquire
                                 EVAN S. GRIMES, Esquire
 4                               The Law Office of John R. Crone
                                 4550 E. Cherry Creek Drive South
 5                               Suite 1003
                                 Glendale, Colorado 80246
 6                               john@crone-law.com
 7
 8  On Behalf of the Defendant:  DANIELLE KITSON, Esquire
                                 Littler Mendelson, PC
 9                               1900 16th Street
                                 Suite 800
10                               Denver, Colorado 82020
                                 dkitson@littler.com
11
12  Also Present:                REBECCA BRIGHAM, Plaintiff
13                               JACKIE PETER, Frontier Airlines
14                               WALTER MATHERN, Videographer
15              INDEX OF EXAMINATION
16                                                    Page
17  Direct Examination
       by Mr. Crone...................................  3
18  Cross-Examination
       by Ms. Kitson.................................. 59
19
                INDEX OF EXHIBITS
20
    Exhibit                                      Referenced
21
    Exhibit 1............................................ 43
22  Exhibit 2............................................ 41
    Exhibit 4............................................ 20
23  Exhibit 6............................................ 44
    Exhibit 12........................................... 44
24  Exhibit 13........................................... 35
    Exhibit 19........................................... 47
25  Exhibit 26........................................... 32
    Exhibit 27........................................... 48
```

```
                                                       3
 1                   P R O C E E D I N G S
 2      VIDEOGRAPHER:  We are on the record.  The time now is
 3  9:03 a.m. in the Mountain Time on July 29, 2020.  We are
 4  conducting the virtual deposition of Stefanie Coppedge in the
 5  matter of Rebecca Brigham v. Frontier Airlines, Inc., in the
 6  United States District Court for the District of Colorado,
 7  Case Number 19-cv-03417.  The video technician is Walter
 8  Mathern, the court reporter is Jeannie Gebes.
 9      Will counsel please state their appearances beginning
10  with the Plaintiff's counsel.
11      MR. CRONE:  John Crone for the Plaintiff.
12      MR. GRIMES:  Evan Grimes for the Plaintiff.
13      MS. BRIGHAM:  Rebecca Brigham, Plaintiff.
14      MS. KITSON:  Danielle Kitson for the Defendant and with
15  me is Jackie Peter, in-house counsel.
16      VIDEOGRAPHER:  Please swear in the witness.
17  WHEREUPON,
18                     STEFANIE COPPEDGE
19  having been first duly sworn, was examined and testified on
20  her oath as follows:
21                    DIRECT EXAMINATION
22  BY MR. CRONE:
23  Q.  Good morning, Ms. Coppedge.  Thanks for working through
24  the technical difficulties and joining us this morning.
25  A.  Of course.
```

```
                                                       4
 1  Q.  So I want to give you a quick roadmap of where I think
 2  we're going this morning so you have a sense of how long this
 3  is going to take at least.  I think that based on what I have
 4  planned to ask you that we'll probably be done within a
 5  couple of hours, so not extraordinarily long this morning,
 6  hopefully we're all done by lunch.  That being said, if you
 7  need to take a break feel free to take a break, and I'll
 8  probably want to take a couple of short breaks in the couple
 9  of hours, and if there's a question pending I'll just ask you
10  to answer the question before you take a break.  Does that
11  sound fair?
12  A.  Yes.
13  Q.  Okay.  And so I think I heard Ms. Kitson say that she
14  was there and somebody else was there.  How many people are
15  in the room with you?
16  A.  Myself and two others.
17  Q.  Okay.  And are you aware that when Ms. Brigham noticed
18  this deposition she noticed it so that we could all
19  participate remotely?
20  A.  Yes.
21  Q.  And so to me -- I guess what I mean by that is you're
22  aware that you don't have to be in a room with other people?
23  A.  Yes, I'm aware.
24  Q.  Okay.  And so what I'm getting at is I just want to make
25  sure that you're comfortable sitting in a room with other
```

STEFANIE COPPEDGE - July 29, 2020

### Page 5

1  people for some amount of time.  Is that -- from a health
2  perspective, do you feel safe doing that?
3  **A.  Oh, absolutely.**
4  Q.   And just to be absolutely clear, if you don't Rebecca is
5  not requiring you to be in that room with other people and so
6  if you don't feel safe let me know.
7  **A.   Okay.**
8  Q.   Thank you.  And so do you have any, do you have any
9  applications or programs open on your computer other than the
10 Zoom application?
11 **A.   I may have email open.  I can close it.**
12 Q.   Thank you.
13 **A.   Okay.**
14 Q.   Great.  Okay.  So Ms. Coppedge -- am I saying that
15 right?  Is it Coppedge or Coppedge?
16 **A.   It is Coppedge.**
17 Q.   Coppedge, okay.  So Ms. Coppedge, I want to start with
18 just some background, you know, your current position at
19 Frontier, what you do, how you know Ms. Brigham and that sort
20 of thing, so could you start by telling me what your current
21 position is at Frontier?
22 **A.   Sure.  My current position is the manager of in-flight**
23 **training and professional development so in that position I**
24 **work closely with the F-A-A, adhering to 8900s and C-F-Rs,**
25 **ensuring that flight attendants are trained properly.**

### Page 6

1  Q.   And how long have you had this position?
2  **A.   Since 2016, so roughly four years, three and a half**
3  **years almost, almost four.**
4  Q.   Okay.  And do you, do you supervise any individuals in
5  this position?
6  **A.   I do.**
7  Q.   How many?
8  **A.   I have 11 direct reports.**
9  Q.   Okay.  And those direct reports, what title do they
10 hold?
11 **A.   They -- I have two in-flight training schedule**
12 **coordinators, I have an in-flight training supervisor and I**
13 **have, I guess, eight full-time instructors.**
14 Q.   Okay.  And before you were the manager of in-flight
15 training and professional development, what was your
16 position?
17 **A.   I was a full-time instructor.**
18 Q.   Okay.  And how long did you hold that position?
19 **A.   For about a year I believe.**
20 Q.   So roughly mid 2015 to mid 2016, somewhere in there?
21 **A.   Correct.**
22 Q.   Okay.  And then before that position, what position did
23 you hold?
24 **A.   I was an in-flight supervisor.**
25 Q.   Okay.  And how long did you hold that position?

### Page 7

1  **A.   For about a -- a little over a year.**
2  Q.   So that would be roughly somewhere in 2014 to 2015 or
3  2013 to 2015, something like that?
4  **A.   20 -- the back end of 2014 into probably the -- I'm**
5  **going to say July of 2015 -- or, 2016.**
6  Q.   Okay.  And then before you were an in-flight supervisor
7  -- I'm sorry, what was that?
8  **A.   Go ahead.  Sorry.  I'm thinking about it.**
9  Q.   Oh, you're fine, you're fine.  And before you were an
10 in-flight supervisor, what position did you hold?
11 **A.   I was a flight attendant.**
12 Q.   Okay.  Is that where you started at Frontier?
13 **A.   I did.**
14 Q.   Okay.  And so what year was that that you first became a
15 flight attendant for Frontier?
16 **A.   1995.**
17 Q.   Okay.  Did you work for any other airlines prior to
18 1995?
19 **A.   I did not.**
20 Q.   Between 1995 and present, is Frontier the only airline
21 you've worked for?
22 **A.   It is.**
23 Q.   Okay.  When you were the full-time instructor, what was
24 that position about?  What were your, what were your primary
25 duties in that job?

### Page 8

1  **A.   Instructing current flight attendants on their annual**
2  **training and then instructing new-hire flight attendants on**
3  **the regulations of becoming a flight attendant, company**
4  **policy and procedure.**
5  Q.   Okay.  And when you were the in-flight supervisor, what
6  were your job duties there?
7  **A.   Supporting the flight attendants, running daily**
8  **attendance reports, adhering to F-A-Rs, ensuring flight**
9  **attendants were in compliance with their FAMS, working with**
10 **the D-O-T on compliance measures for flight attendants,**
11 **working with multiple departments in Frontier, streamlining**
12 **processes for flight attendants.**
13 Q.   Okay.  And you had mentioned F-A-Rs.  What does that
14 stand for?
15 **A.   Federal aviation regulations.**
16 Q.   Okay.  And then I think you said AFEN too maybe.  What
17 was that?
18 **A.   Flight attendant manual.**
19 Q.   Got it.  Okay.  FAM.  Is the flight attendant manual
20 something different than an employee handbook, so in other
21 words, do the flight attendants have some written set of
22 policies that are different from the employee handbook?
23 **A.   They're two different manuals.**
24 Q.   So the one that you were referring to is called the FAM,
25 the flight attendant manual?

**STEFANIE COPPEDGE - July 29, 2020**

Page 9

1  A.  Correct.
2  Q.  And so in your current position, you supervise in-flight
3  supervisors and the full-time instructors.  Those are both
4  positions you've held, right?
5  A.  I'm sorry, will you repeat that?
6  Q.  Yeah.  No problem.  So in your current position, you
7  supervise in-flight supervisors and full-time instructors and
8  you've held both of those positions?
9  A.  I -- well, for the in-flight training department.  It's
10 two different buckets, there's the in-flight operations
11 side --
12 Q.  Uh-huh.
13 A.  -- where I worked previously as supervisor and then
14 there's the in-flight training department, and I supervised
15 the supervisor in the in-flight training department as well
16 as the full-time staff.
17 Q.  Got it.  Okay.  And then you also supervise currently
18 the in-flight schedule coordinator?
19 A.  For in-flight training.
20 Q.  Okay.  Got it, got it.  Okay.  So that schedule
21 coordinator, are they coordinating trainings or something
22 else?
23 A.  Trainings and new-hire flight attendant classes.
24 Q.  Okay, okay.  Ms. Coppedge, do you hold any, any sort of
25 specific training credentials or degrees or schooling or

Page 10

1  anything that are related to your current position?
2  A.  I hold training certificates in respect to training
3  flight attendants.  I hold an IOSA certificate, I hold a CAMI
4  certificate, which is a training in Oklahoma for flight
5  attendants, Oklahoma City, for the F-A-A.  So I have
6  certificates specific to training flight attendants, I do not
7  have a college degree, I spent only a few years in college.
8  Q.  Okay.  What were you studying?
9  A.  Finance.
10 Q.  All right.  You took a different turn.  The IOSA, what's
11 that certificate?
12 A.  So that's for -- forgive me, my mind -- that's for code
13 sharing, airlines that code share, so airlines that share
14 with other, other airlines with the auditing process.  So
15 it's a certificate I hold to adequately audit Frontier's
16 in-flight department in line with the needed audit for the
17 IOSA --
18 Q.  Okay.
19 A.  -- in order for Frontier to have a code-share program.
20 Q.  And what's a code share?
21 A.  That means Frontier or any airline has the ability to, I
22 guess, book passengers on each other's aircraft.
23 Q.  Okay.  Any other trainings you can think of related to
24 any of your positions at Frontier?
25 A.  I cannot at this time.

Page 11

1  Q.  Okay.  So you know Rebecca Brigham, correct?
2  A.  I do.
3  Q.  Okay.  And I think I know that at one point you were her
4  in-flight supervisor; is that correct?
5  A.  Correct.
6  Q.  Do you remember when that was, the time period?
7  A.  That would be in -- I believe it to be August 2014 is
8  when I became an in-flight supervisor, so sometime between
9  August 2014 and, I believe, April or March of 2016.
10 Q.  Okay.  And outside of that time when you were Ms.
11 Brigham's in-flight supervisor, did you ever work with her in
12 any other way?
13 A.  I believe I may have flown with Rebecca, but I don't
14 recall how many times.
15 Q.  Okay.
16 A.  As a flight attendant.
17 Q.  Okay.  So sometime prior to August 2014 you might have
18 flown together both as flight attendants?
19 A.  Yes.
20 Q.  Okay.  Did, did you know Ms. Brigham well before
21 becoming her in-flight supervisor, or did you get to know her
22 better as her supervisor?
23 A.  I got to know her better as her supervisor.
24 Q.  Did you have a good working relationship with Ms.
25 Brigham?

Page 12

1  A.  I did.
2  Q.  Any sort of performance or work issues that -- you know,
3  negative things that you can think of related to Ms. Brigham?
4  A.  We had to work through the dependability process.
5  Q.  Okay.  Anything else outside of the dependability
6  process?
7  A.  No, sir.
8  Q.  Okay.  What is the dependability process that you're
9  referring to?
10 A.  That would be when flight attendants obtain so many
11 attendance points --
12 Q.  Uh-huh.
13 A.  -- where you would then have to work with the flight
14 attendant, have a meeting and conversations with the flight
15 attendants regarding their attendance, how can we best
16 support them, how can we help them.
17 Q.  And what was the issue with Ms. Brigham specifically?
18 A.  For Ms. Brigham she, she was hitting my attendance log
19 for gaining too many attendance points which would then
20 warrant a documented verbal warning or a written -- some sort
21 of step of discipline, so I worked directly with Rebecca and
22 sometimes the Union on figuring out the best way to manage
23 her attendance.
24 Q.  Do you recall who you worked with at the Union?
25 A.  I believe it was Angie Reef and Adrienne Prince.

STEFANIE COPPEDGE - July 29, 2020

---

Page 13

1  Q.   And so can you explain, then, what was going on with her
2  attendance and what, what the solution was that you were
3  trying to reach?
4  A.   With Rebecca's attendance, oftentimes if she had called
5  out on a trip it would be marked as a SIC code, S-I-C, in the
6  system.  At the time Rebecca was able to get intermittent
7  F-M-L-A so it would take -- there's a process where she would
8  have to email the L-O-A department, leave of absence
9  department, once that email was cleared the L-O-A department
10 would recode the SIC as an I-F-M, intermittent F-M-L-A day in
11 the attendance tracker and Rebecca was awarded so many I-F-M
12 days per month and if she moved beyond the allowed I-F-M days
13 Rebecca and I would have to come together and have a
14 conversation regarding those days and if she had gone beyond
15 the awarded amount.
16 Q.   Okay.  Do you remember how many per month she was
17 awarded?
18 A.   I do not.
19 Q.   Do you remember why she was awarded those I-F-M days?
20 A.   I was not privy to that information.
21 Q.   Are you, are you aware of any, any facts related to Ms.
22 Brigham's disability of alcoholism?
23      MS. KITSON:  Object to the form.
24 A.   I am aware based off of conversations I had with
25 Rebecca.

Page 14

1  Q.   Uh-huh.  Do you recall when the first conversation was
2  that you and Rebecca discussed her alcoholism?
3  A.   I do not.
4  Q.   Do you remember what you talked about?
5  A.   I know I had conversations with Rebecca, I don't know at
6  what point we -- that she had told me about her alcoholism.
7  Q.   Uh-huh.
8  A.   So I don't know an exact point of when, when she did
9  tell me, but I know at some point throughout that period of
10 time she did tell me.
11 Q.   And by the period of time you mean the time that you
12 were an in-flight supervisor?
13 A.   Yes, sir.
14 Q.   Okay.  And do you remember what she told you about her
15 alcoholism?
16 A.   She had told me that she had self-disclosed that she had
17 alcoholism and she had gone in for treatment and she was
18 working through with her, her, her schedule and the L-O-A
19 department.
20 Q.   Did she ever ask you for help with her schedule?
21 A.   I believe we discussed ways, such as dropping trips and
22 picking up trips, that did work to fulfill her needs.
23 Q.   Yeah.  Do you recall discussing any other potential ways
24 to modify her schedule?
25 A.   To modify her schedule, I don't recall.  I know we

Page 15

1  discussed looking for other options, working on the ground,
2  other -- applying for other departments within Frontier, I do
3  remember discussing that.
4  Q.   Okay.  Did that go anywhere, working with other
5  departments within Frontier?
6  A.   I don't believe so, no.
7  Q.   Do you know any other flight attendants that were, that
8  were assigned to a different department within Frontier for a
9  temporary amount of time for any reason?
10 A.   So contractually with the C-B-A if a flight attendant is
11 on the, on-the-job injury, if, if there is something
12 available within the company they can be assigned light duty
13 and work in said department on light duty during their O-J-I
14 period.
15 Q.   Any other reasons other than the O-J-I?
16 A.   Not that I'm aware of.
17 Q.   Okay.  And what about the -- you had mentioned the
18 dropping trips and picking up trips.  How does a flight
19 attendant create their schedule?
20 A.   So the bidding process is awarded by seniority and
21 bidding opens on the 5th of the previous month --
22 Q.   Okay.
23 A.   -- closes on the 12th, and flight attendants are able to
24 go in and pick the trip that they would like or that are
25 ideal for their own lifestyle.  Bids are then posted on the

Page 16

1  16th of every month, the month prior to what you're bidding.
2  Q.   Uh-huh.
3  A.   On the, on the 18th there is a -- what is called a trade
4  board, on the 18th flight attendants can trade trips amongst
5  each other, and then on the 19th the open-time pot is open
6  for bidding and the open-time pot is trips that were not
7  covered in the original bidding process.
8  Q.   Okay.
9  A.   So you're able to take the trip you have that you don't
10 like and trade it out with what's in the open-time pot or
11 with another flight attendant.
12 Q.   Okay.  And that, that last step, the open time isn't
13 seniority based, it's just whoever gets it?
14 A.   It is first come, first served.
15 Q.   Okay.  So I just want to make sure I understand.  So
16 when the bidding occurs between the 5th and the 12th, that is
17 -- the flight attendants say, "Here are the trips I want, I
18 mean here are the trips that are ideal," and then based on
19 seniority those are assigned?
20 A.   Correct.
21 Q.   Okay.  And then after that on the 18th the trade board
22 is not seniority based, that's just you can trade with
23 whoever is willing to trade with you?
24 A.   Correct.
25 Q.   And then on the 19th the open time is just first come,

**STEFANIE COPPEDGE - July 29, 2020**

```
                                                        17
 1  first served?
 2  A.    Correct.
 3  Q.    Okay.  You had mentioned working with Angie and Adrienne
 4  Prince.  What was Angie's last name?  I'm sorry, I didn't
 5  catch that.
 6  A.    Reef, R-e-e-f.
 7  Q.    Thanks.  And you had mentioned those are Union people.
 8  Do you remember what their, what their positions were with
 9  the Union back then?
10  A.    Angie Reef was the president and Adrienne Prince was the
11  vice president.
12  Q.    Okay.  And what, what were you trying to accomplish with
13  Angie and Adrienne?
14  A.    Well, it's -- they were involved in the fact-finding
15  meetings.  If they could bring anything to light that I would
16  have been unaware of in regards to Rebecca's attendance then
17  we can look at if there was an opportunity to help with her
18  attendance.
19  Q.    Okay.  And the fact-finding meeting, do you remember
20  when that occurred?
21  A.    I do not.  There's, there's several steps to fact-
22  finding meetings from a flight attendant that's on a
23  documented verbal warning is awarded a fact finding, the
24  written warning is a fact finding, the termination warning is
25  a fact finding and then the termination itself is a fact
```

```
                                                        18
 1  finding.
 2  Q.    Okay.  And do you remember when Angie and Adrienne
 3  became involved in the process with respect to Ms. Brigham?
 4  So was it -- were they there from the very first fact-finding
 5  meeting, did they just come in at the end?  Any sort of sense
 6  of that?
 7  A.    I don't, I don't recall at what point.
 8  Q.    And when you communicated with Angie and Adrienne, was
 9  it ever by email, was it just in these meetings, did you send
10  letters, or how did that work?
11  A.    So it's an official email that will go out to the flight
12  attendant and the Union at the same time.
13  Q.    So you didn't, you didn't communicate with them outside
14  of that email or at the meeting itself?
15  A.    I did not.
16  Q.    Okay.  Were Angie and Adrienne also -- I assume they
17  were also Frontier employees.  Is that, is that a good
18  assumption?
19  A.    That is correct.
20  Q.    Do you remember what positions they held at that time?
21  A.    Flight attendant.
22  Q.    Okay.  Have you ever been a member of a Union with
23  Frontier, or is that for non-management people?
24  A.    I have.
25  Q.    Was that when you were a flight attendant?
```

```
                                                        19
 1  A.    It was.
 2  Q.    Okay.  Were you a member of a union at any time after
 3  you were a flight attendant?
 4  A.    No, sir.
 5  Q.    Okay.  So Ms. Coppedge, I've got some documents that I
 6  want to place in front of you, you know, via remotely.
 7  There's a chat box where I can drop them in and you can open
 8  them up and then we can discuss them a little bit.  I'm
 9  realizing as I'm sitting here that I didn't organize them
10  perfectly so if we take -- if you're not opposed to a
11  five-minute break I can sort of shuffle these around a little
12  bit and make it easier for us to discuss this.  Do you mind
13  if we take a quick break?
14  A.    Certainly.
15        MR. CRONE:  Why don't we just make it 10 minutes and
16  then just make it easier for everybody, so we can go off the
17  record.
18        VIDEOGRAPHER:  The time now is 9:32, we're off the
19  record.
20            (There was a recess taken.)
21        VIDEOGRAPHER:  The time now is 9:42, we're back on the
22  record.
23  (Direct Examination by Mr. Crone)
24  Q.    Ms. Coppedge, do you, do you remember -- did you ever
25  advise Ms. Brigham that she should make a reasonable
```

```
                                                        20
 1  accommodation request under the A-D-A?
 2  A.    I don't, I don't recall that.  I don't remember, it's
 3  been five years ago.
 4  Q.    That's fine, that's fine.  So you have no recollection
 5  of whether you ever mentioned the A-D-A to Ms. Brigham?
 6  A.    I don't.
 7  Q.    Do you know Cassandra Micklich?
 8  A.    I do.
 9  Q.    How do you know her?
10  A.    Cassandra worked in the L-O-A department.
11  Q.    Does she still work for the Frontier?
12  A.    She does not.
13  Q.    Do you know where she went after Frontier?
14  A.    I do not.
15  Q.    Do you know when she left?
16  A.    I, I can't give you a definitive date.  I, I don't.
17  Q.    Was it in this year?  Was it in 2020?
18  A.    No, it was 2016 or '15, somewhere in there.
19  Q.    So she's been gone a few years at least then?
20  A.    Yes.
21  Q.    Okay.  Okay.  When Ms. Micklich worked at Frontier, were
22  you and her friends outside of work?
23  A.    No.
24  Q.    Okay.  So I'm going to hand you via the internet an
25  exhibit that has -- is marked Exhibit 4.  So some of these
```

STEFANIE COPPEDGE - July 29, 2020

---

**Page 21**

1 exhibits will seem out of order because they've been numbered
2 in other depositions already and I'm trying to preserve that
3 numbering to some extent so if you can kind of ignore that
4 I'll get this in front of you here.
5         MR. CRONE: And then, Danielle, do you need me to email
6 these to you as well?
7         MS. KITSON: Let me see. I've also got the chat box
8 open and am going to try to download. My connection is not
9 as strong so I'm clicking download now, but I may need, may
10 need you to email.
11        MR. CRONE: Let me know how it works and then we can
12 figure out what to do.
13        MS. KITSON: Go ahead and email it to me while we're
14 doing this because I'm just not sure -- I've got the spinning
15 wheel of death going on here.
16        MR. CRONE: Okay. Sure. Give me one second. This is
17 how we did it last time if I remember right, I put them in a
18 chat and email.
19        MS. KITSON: Yes. Hopefully it's working. I may
20 actually have to be the one to show Ms. Coppedge too because
21 her connection also is not as strong as Arellano's was.
22        THE WITNESS: I have it open.
23        MS. KITSON: You have it open?
24        THE WITNESS: Yeah.
25 Q.  Oh, good. Okay. So now that you have that open, Ms.

---

**Page 22**

1 Coppedge, could you just review it for me?
2 A.  (Witness complies.)
3         MS. KITSON: John, did you email that to me?
4         MR. CRONE: I did -- well, let me make sure I did.
5 Yeah.
6         MS. KITSON: Okay. That means my computer is going
7 extra special slow, but I can see it clearly enough on Ms.
8 Coppedge's screen right now.
9         MR. CRONE: Okay. Yeah, if that works for you maybe we
10 can just try to make that work. None of these are long
11 exhibits so it might be --
12        MS. KITSON: Okay.
13 Q.  Have you reviewed that, Ms. Coppedge?
14 A.  I have.
15 Q.  Have you ever seen this document before today?
16 A.  No.
17 Q.  But you do know Adrienne Price, obviously, because we've
18 talked about her, right?
19 A.  Correct.
20 Q.  So the question I have for you is, is related to
21 paragraph 6 on the second page, do you see where Ms. Price
22 wrote, "however, I explained to Frontier that the Union was
23 not seeking an accommodation that would violate the seniority
24 provision, but rather would work within the seniority
25 provision." Do you see where I'm at there?

---

**Page 23**

1 A.  Yes.
2 Q.  My question for you is do you agree that if Ms. Brigham
3 was granted the accommodation that Ms. Prince is describing
4 here that that would not violate any seniority provision in
5 the Collective Bargaining Agreement?
6         MS. KITSON: Object to the form, mischaracterizes the
7 document.
8 A.  **It still violates the contract. You can't violate the**
9 **contract for one employee when you have 2600 flight**
10 **attendants.**
11 Q.  How would it violate the contract?
12        MS. KITSON: Object to the form. What do you mean "it"?
13 There's no specific accommodation set here.
14 Q.  Ms. Coppedge, do you understand the question I'm asking
15 you, or do you need me to clarify?
16 A.  **Please repeat it.**
17        MR. CRONE: I'm asking Ms. Coppedge.
18 Q.  Do you understand the question, or do you need me to
19 clarify?
20 A.  **I need you to clarify, please.**
21 Q.  Okay. So here do you understand that Ms. Prince is
22 describing a proposed accommodation that Ms. Brigham was
23 seeking?
24        MS. KITSON: Object to the form, lack of foundation,
25 mischaracterizes the document. You can answer.

---

**Page 24**

1 A.  **I, I understand what Ms. Prince is proposing, however,**
2 **it's still a violation of contract.**
3 Q.  Okay. And again that's my question, how is it a
4 violation of the contract?
5 A.  **It's a violation because you're awarding one flight**
6 **attendant an opportunity that you're not awarding 2600 other**
7 **flight attendants, and it's a violation because there's a**
8 **restriction on hours that flight attendants are able to bid**
9 **and drop to.**
10 Q.  Okay. So let's start with one. You said it would be a
11 violation because of the opportunity that would be afforded
12 Ms. Brigham that's not afforded to others. What is that
13 opportunity?
14 A.  **Well, the opportunity is not, not every flight attendant**
15 **is able to avoid layovers, that would be specific to Ms.**
16 **Brigham. There's 2600 flight attendants some of which I**
17 **suspect don't want layovers.**
18 Q.  Okay. And then anything else that you meant by not
19 affording the opportunity to anybody else?
20 A.  **I, I believe in my mind it's an unfair advantage, it's**
21 **not an equal advantage if it's not available to 2600 flight**
22 **attendants.**
23 Q.  And that's avoiding layovers, or what are you referring
24 to? What's the unfair advantage?
25 A.  **Allowing one person to modify their ability to bid**

Page 25

1 versus the other 2600.
2 Q. Got it. Okay. But I thought anybody could bid on open
3 time?
4 A. Anyone can bid on open time.
5 Q. And I thought anybody could trade time?
6 A. They can trade time.
7 Q. So what exactly was Ms. Brigham asking for that anybody
8 else couldn't do?
9 A. Well, I know in conversations I had with Ms. Brigham,
10 which is not what is stated here by Adrienne, is Ms. Brigham
11 was wanting to dump her entire schedule and rebid it or not
12 bid a schedule and simply bid out of open time which both are
13 violation of contract. That's not in Ms. Adrienne Prince's
14 document here, but I do know that was conversations proposed
15 by Adrienne herself and Rebecca.
16 Q. So what, what part of that would violate the contract,
17 what you just described?
18 A. Bidding is -- every flight attendant must bid and
19 bidding is awarded in seniority order.
20 Q. And then after that occurs then there's the trade and
21 the open time, right?
22 A. Correct.
23 Q. So if Ms. Brigham bid for the, for the flights she
24 wanted first and then worked through trade time and open time
25 to, to, to create a schedule that would avoid layovers, that

Page 26

1 wouldn't violate the contract, would it?
2 A. That would not.
3 Q. Okay. Ms. Coppedge, we can set that document aside or
4 close it or whatever is easy for you to sort of have it out
5 of your way.
6 A. Okay.
7 Q. I want to talk a little bit if you can help me
8 understand this, this process of self-disclosure that you had
9 mentioned earlier. How's that work?
10 A. I don't know that I had mentioned a process of self-
11 disclosure. I think I mentioned Rebecca had at some point
12 disclosed to me that she was suffering from alcoholism, other
13 than that that is an H-R process and I'm unaware of any
14 self-disclosures on any platform level.
15 Q. Okay, yeah. And so maybe I, maybe I heard your answer
16 more broadly, so I want to try to make sure I understand. So
17 you had mentioned that Ms. Brigham disclosed to you that she
18 had alcoholism, but you're not aware of sort of any formal
19 program Frontier has where people can self-disclose that type
20 of problem?
21 A. Well, Rebecca had already self-disclosed to the company
22 prior to her conversation with me. So as it would be with
23 any flight attendant, I have no idea why a flight attendant
24 is on an intermittent F-M-L-A and rightfully so for
25 protection purposes. Rebecca in conversations had told me

Page 27

1 that she had suffered from alcoholism and that is why she had
2 the I-F-M.
3 Q. Okay. And when you said she self-disclosed to the
4 company, are you aware of how that process works? Do you
5 know anything about that?
6 A. I have no idea, do not work in H-R.
7 Q. Okay. Do you know who's -- do you know who would know
8 about that?
9 A. I would, I would assume -- I can assume which is not a
10 good thing, right? My guess would be somebody in compliance,
11 in the compliance department, within H-R compliance
12 department.
13 Q. What about Jerry Arellano?
14 A. Jerry Arellano, I believe his position is something,
15 something in H-R. I believe he -- I don't -- I honestly
16 don't know exactly Jerry's title in H-R, I just know he works
17 in H-R.
18 Q. Is he your boss?
19 A. No.
20 Q. Who's your immediate supervisor currently?
21 A. Currently, Stephen Howell.
22 Q. And at the time that you were an in-flight supervisor
23 and you supervised Ms. Brigham, who was your immediate
24 supervisor?
25 A. Kari Thompson, she was a manager.

Page 28

1 Q. In completing your day-to-day duties from 2016 to now,
2 do you ever have occasion to interact with Jerry Arellano?
3 A. I don't recall the exact number of times, I'm sure I
4 have interacted with Jerry Arellano -- from 2016 to 2020, is
5 that the timeframe you gave?
6 Q. From 2014 to 2020.
7 A. I, I'm sure I have interacted with Jerry on matters, I
8 don't recall a number of times.
9 Q. Do you remember why you interacted with him?
10 A. I can think of an incident of a new-hire flight
11 attendant where I had interacted with Mr. Arellano.
12 Q. What about, what about relating to Ms. Brigham?
13 A. Relating to Ms. Brigham, Jerry was the original H-R
14 contact that was handling the case and at one point it
15 switched over to Andrea Warfield.
16 Q. Did it ever, then, switch back to Mr. Arellano, or did
17 Ms. Warfield handle that issue from there on out?
18 A. I believe Mr. Arellano was involved as Mrs. Warfield was
19 new to the role.
20 Q. So did you interact directly with Mr. Arellano relating
21 to Ms. Brigham at all?
22 A. I did.
23 Q. Okay. In what ways?
24 A. Via, via email seeking guidance on what steps were to be
25 taken with Mrs. Brigham's situation.

STEFANIE COPPEDGE - July 29, 2020

## Page 29

1  Q.  And what did Mr. Arellano reply?
2  A.  I believe that they were looking for -- the H-R
3  department was looking for all the proper documentation
4  regarding attendance, I-F-M usage and other policies to
5  ensure that going to the step of termination was the correct
6  thing to do.
7  Q.  Did Ms. Brigham ever ask to be temporarily reassigned to
8  a light-duty position?
9  A.  I don't, I don't recall.  It's so long ago I honestly
10 don't recall.
11 Q.  If, if she had do you think that would have violated the
12 Collective Bargaining Agreement in any way?
13     MS. KITSON:  Object to the form.
14 A.  I do believe it would have violated the C-B-A.  The
15 C-B-A as well as the employee handbook only refers to O-J-I
16 employees in regards to light duty and reassignment.
17 Q.  Have you -- when you were the in-flight supervisor
18 starting in 2014 or any of the positions you've held up till
19 now, are you ever involved when an employee requests a
20 reasonable accommodation?
21 A.  That's hard to say.  When you say am I involved, at what
22 point are you referring to would I be involved?
23 Q.  So at any point.  So maybe, you know, the employee
24 discloses a disability to you or maybe they ask for an
25 accommodation and then I assume it goes through some process,

## Page 30

1  Frontier decides do we grant this, do we not, do we propose
2  something else.  At any point along that chain are you ever
3  involved?
4  A.  That would be a complete H-R function and then I would
5  do as directed based off of H-R's recommendation.
6  Q.  Okay.  And so in Ms. Brigham's case, was H-R ever
7  directing you to do anything with regard to her reasonable
8  accommodation request?
9  A.  No.
10 Q.  Did you ever communicate to H-R a specific request --
11 reasonable accommodation request made by Ms. Brigham?
12 A.  I don't recall.
13 Q.  Do you recall ever communicating to Ms. Brigham that her
14 reasonable accommodations requests were denied or granted?
15 A.  I don't recall.  That would have been an H-R function to
16 deny or grant, I would simply be the vessel.
17 Q.  Okay.  Outside of the world of Ms. Brigham, if somebody
18 is granted a reasonable accommodation, how do you ensure or
19 is it -- I'll start with is it up to you to ensure that the
20 accommodation is actually given?
21 A.  It would not be up to me to ensure it's given.
22 Q.  So when you were an in-flight supervisor, let's kind of
23 narrow it in there, did you ever supervise any flight
24 attendants that were granted reasonable accommodations?
25 A.  I did not.

## Page 31

1  Q.  What about at any time while at Frontier, have you ever
2  supervised any employee that was granted a reasonable
3  accommodation?
4  A.  I can say sure is what I think, but I don't know that
5  it's answering your question.  I recently had an employee
6  that broke her kneecap --
7  Q.  Uh-huh.
8  A.  -- and therefore she needed an accommodation where she
9  couldn't stand and train flight attendants for 12 hours so I
10 had to allow her to sit and elevate her leg so many hours a
11 day based off of the O-J-I department, H-R and her doctor's
12 recommendations.  Is that what you would be speaking to?
13 Q.  Yeah, that's exactly what I'm asking.  So I'm trying to
14 figure out if that occurs, who tells you what to do?  And I
15 think you may have just answered that.  Was that H-R telling
16 you this is the accommodation, this is what you have to give
17 her?
18 A.  Correct, the leave of absence department, correct.
19 Q.  Okay.  Got it.  And then -- but then is it up to you to
20 make sure the accommodation is actually granted, that is in
21 the instance you just cited that this person is actually
22 given the time to elevate her leg?
23 A.  Well, it's up to me as the manager to make sure it's
24 implemented, that we adhere to the L-O-A department and the
25 doctor recommendation.

## Page 32

1  Q.  Got it, yeah.  Okay.  All right.  Do you have any, any
2  sort of involvement with the accommodation process besides
3  making sure accommodations are implemented?
4  A.  Absolutely not.
5  Q.  Do you, do you know a former Frontier employee named
6  David St. Hilaire?
7  A.  I know the name, I don't know who he is.
8  Q.  And do you think you just know the name because you're
9  generally familiar with the names of flight attendants around
10 Frontier, or do you think you ever interacted with him?
11 A.  I think I know the name because the last name is kind of
12 catchy, quite frankly.
13 Q.  Is it kind of a unique last name, isn't it?
14 A.  You know, I know a lot of faces of flight attendants,
15 there's 2600 and I may know their names, but I don't know who
16 they are.
17 Q.  That's, that's fine.  That's fair.  I'm going to put a
18 document in front of you and see if it helps refresh your
19 memory at all about David St. Hilaire.  It is titled -- let
20 me make sure this is right.  It's titled Exhibit 26, and so
21 I'll drop it in the chat box and I will email Danielle a copy
22 too just in case that works.  And the same as last time, when
23 you receive it if you could give it a review.
24 A.  Sure.
25 Q.  Thank you.  Ms. Coppedge, where are you at now?  Are you

STEFANIE COPPEDGE - July 29, 2020

---

Page 33

1 at Frontier's lawyer's offices?
2 **A. I'm at Frontier's headquarters, our headquarter**
3 **building.**
4 Q. Got it. And that's in -- is that downtown, or is that
5 at the airport?
6 **A. Out, out near the airport.**
7 Q. Okay.
8 **A. Okay. I was able to open the document.**
9 Q. Great. If you could give it a review that'd be helpful.
10    MS. KITSON: John, has this been produced?
11    MR. CRONE: Yes, it was produced right after this -- Mr.
12 Arellano's individual deposition, I think the same day -- no,
13 I think it was the day after that, so July 15th.
14    MS. KITSON: I don't know that we received that. I'm
15 going to need to -- Ms. Coppedge, let me review it first and
16 then --
17    THE WITNESS: Okay.
18    MS. KITSON: John, I'm done reviewing it and I'm now
19 handing it back it Ms. Coppedge to review and I'm also going
20 to email it to Ms. Peter to review, so just hang with us for
21 a minute.
22    MR. CRONE: That's fine.
23    MS. KITSON: John, while she's reviewing that, can you
24 just confirm how it is that you produced the document and,
25 you know, on what date, via what means.

---

Page 34

1    MR. CRONE: So just like all the other discovery
2 production it was by email with a pdf that I believe -- I can
3 just pull it up while we're waiting here. It was --
4    MS. KITSON: That would be great.
5    MR. GRIMES: It was July 15th.
6    MR. CRONE: So July 15th by email and it was to you.
7 It's called Plaintiff's Second Supplemental Rule 26(a)(i)
8 Initial Disclosures and so it's a supplement and then the
9 documents Bates number was sent to you, Carolyn, cc to Evan
10 Grimes as well. I can resend it to you right now. So I know
11 your internet is a little slow out there, Danielle, but I
12 just resent you the original production.
13    MS. KITSON: Great. Were there any other documents or
14 just that one?
15    MR. CRONE: It was just that one, yeah, plus, plus like
16 an actual supplement to the 26(a)(i) disclosure.
17    MS. KITSON: Got it.
18    MR. CRONE: But I think that was just noting that this
19 document was being produced.
20    MS. KITSON: Okay.
21    MR. CRONE: Thanks.
22 Q. Ms. Coppedge, have you reviewed Exhibit 26?
23 **A. I have.**
24 Q. Does that help refresh your memory as to whether or not
25 you recall David St. Hilaire's time at Frontier?

---

Page 35

1 **A. It does not.**
2 Q. Well, much ado about nothing then. What about
3 Christopher Benedict, do you know who that is?
4 **A. I do.**
5 Q. Who is Chris Benedict?
6 **A. Chris Benedict was the -- I believe he was a manager,**
7 **possibly a supervisor, I don't know his exact title, but I**
8 **know he was in charge of drug and alcohol compliance.**
9 Q. Is he still with Frontier, do you know?
10 **A. He is not.**
11 Q. Do you know where he went?
12 **A. I do not.**
13 Q. Do you remember when he left?
14 **A. Three or four years ago.**
15 Q. Okay. All right. So I've got another document to put
16 in front of you. Hopefully, hopefully this will go a bit
17 smoother, a little smoother now, we'll find out I guess.
18 This one is titled Exhibit 13, I just dropped that into the
19 chat box. I'll email it to Danielle. So Ms. Coppedge, same
20 drill, once you receive it and have it open if you could give
21 it a quick review for me.
22 **A. Okay.**
23 Q. Thanks.
24 **A. Okay.**
25 Q. Have you ever seen documents like this before?

---

Page 36

1 **A. No.**
2 Q. Do you have any idea what this is?
3 **A. No.**
4 Q. Do you know if Rebecca Kruger is Rebecca Brigham prior
5 to becoming married?
6 **A. No.**
7 Q. Okay. When you were a -- or, in any position that
8 you've held at Frontier, have you ever supervised
9 probationary flight attendants?
10 **A. No.**
11 Q. No? Okay. You were a probationary flight attendant at
12 one time?
13 **A. Yes.**
14 Q. Were you evaluated at the conclusion of your
15 probationary time?
16 **A. I, I don't recall, that's 25 years ago.**
17 Q. So I'm not asking if you recall whether a piece of paper
18 like this was filled out, but whether you were just evaluated
19 at all?
20 **A. I don't, I don't recall.**
21 Q. Is there some reason why a probationary flight attendant
22 wouldn't be made -- I mean what's the name for it, I guess
23 just a regular flight attendant, a non-probationary flight
24 attendant? What's the difference, I'm asking, between a
25 probationary flight attendant and a non-probationary flight

STEFANIE COPPEDGE - July 29, 2020

Page 37

1 attendant?
2 A.   I'm sorry, will you repeat that question?
3 Q.   Yeah.  What makes somebody probationary as a flight
4 attendant?
5 A.   Well, based on their hire date and what's in the
6 employee handbook.  So a new-hire flight attendant would be
7 on probation for nine months in today's world, I don't have
8 any idea what it was -- on this document in 2008 I have no
9 idea what the probationary period was.  In today's world a
10 new-hire flight attendant is on probation for nine months.
11 Q.   How does that -- in today's world, how does that flight
12 attendant get off of the probationary status?  Do they just
13 survive nine months without getting fired, or do they have to
14 do something?
15 A.   Correct, they have to be on the expected, the expected
16 behavior and procedures of the flight attendants throughout
17 that period and once they successfully complete that nine
18 months they are no longer on probation.  They're, they're not
19 covered by the C-B-A while on probation.
20 Q.   And so you've reviewed this Exhibit 13.  Is there
21 anything in this Exhibit 13 that you think would prevent
22 Rebecca Brigham, the employee being evaluated here, from
23 getting off of probationary status?
24 A.   Well, you're asking me what I think.  I don't know what
25 the process was at that time.

Page 38

1 Q.   Yeah, I'm asking for your opinion today.  Would this
2 employee present an issue to you in terms of getting off of
3 probationary status?
4 A.   This would present an issue.  The employee was on final
5 termination warning for missing two trips, that would be a
6 concern.
7 Q.   Would it prevent the employee from getting off of
8 probationary status or what would happen today?
9 A.   I don't handle dependability today so I cannot speak to
10 that.
11 Q.   So then what is -- what's the basis for the concern
12 about the absences?
13 A.   I guess my concern as a general person is how, how is
14 somebody able to hit eight points in attendance in six
15 months.  This is a six-month period on this form, so how did
16 somebody hit eight points in six months.  Eight points would
17 give you 48 sick days, somebody was sick 48 days in six
18 months?  That may not be an ideal employee, that is
19 concerning, but again, I am not involved in the dependability
20 process.
21 Q.   But that's what you think this document says?
22 A.   Correct, it says final termination warning for
23 attendance for two missed trips.
24 Q.   For two missed trips.  So --
25 A.   Correct.

Page 39

1 Q.   And what did you say that means, 48 points or something?
2 What does that mean?
3 A.   Well, an employee that utilizes sick call -- you have
4 eight occurrences to get you to termination level, each
5 occurrence can be for six days.  Now I don't know that this
6 employee used each occurrence for six days, but generally
7 speaking an employee can use six sick days eight times
8 meaning they have the ability to be out from work for 48 days
9 before they get to a term situation in a rolling calendar
10 year.
11 Q.   Is that for an employee covered under the Collective
12 Bargaining Agreement or is that a probationary employee too?
13 A.   The Collective Bargaining Agreement.
14 Q.   So here where it says on the second page under Comments,
15 "Rebecca is currently on a final term warning for two missed
16 trips," it just says she missed two trips, right, not eight
17 occurrences?
18 A.   Correct.
19 Q.   So all you really know from looking at this is that she
20 missed two trips, right?
21 A.   Sure.
22 Q.   And what if she was sick for two days?
23      MS. KITSON:  Object to the form.
24 A.   There's certainly a difference between missing a trip,
25 which is no-show which affects the operation, and there's a

Page 40

1 difference between a sick call.  A missed trip means a flight
2 attendant did not show up to work leaving the operation and
3 passengers stranded, a sick call is when a flight attendant
4 calls in and says, "I will be sick," so it's -- there's a
5 difference between the term missed trip and sick call.
6 Q.   Are you able to tell that by looking at this document?
7 You know that those are no call/no shows versus sick days?
8 A.   I do because I know the terminology, so two missed trips
9 tell me it's defined as a missed trip.
10 Q.   Okay.  And what if those two missed trips were sick days
11 or days taken to -- because a child was sick or something
12 like that, would that change your opinion here?
13 A.   Well, I don't think it -- the whole scenario would have
14 changed.  If it was two sick calls, somebody wouldn't be on
15 termination warning for two sick calls.
16 Q.   Even during a probationary period?
17 A.   Even during probation.
18 Q.   Even during 2008 when you weren't in H-R and you don't
19 really know?
20      MS. KITSON:  Object to the form.
21 A.   Well, I was a flight attendant in 2008 for several years
22 so I knew the process, I knew the sick-call process, so I can
23 speak not on behalf of H-R but on myself as a flight
24 attendant knowing policy and procedure back then.
25 Q.   So you recall the probationary procedure back in 2008

STEFANIE COPPEDGE - July 29, 2020

### Page 41

1  but not in 1995?
2      MS. KITSON:  Object to the form.
3  A.  You asked me if I -- your original question was not --
4  your question originally to me is if I recalled being on
5  probation myself and getting off of probation 25 years ago, I
6  don't remember that.
7  Q.  And that's clear, I recall you testifying to that and I
8  recall that.  What I'm asking is, did you know what the
9  probationary procedure was in 2008?
10 A.  I, I may -- I would have been aware, but it didn't
11 affect me so I didn't digest and think about it.
12 Q.  Okay.  I'm going to hand you what has been marked
13 Exhibit 2.  We'll do the same, the same process -- Ms.
14 Coppedge, I've noticed you've looked off to your right and
15 laughed a couple of times.  Are you communicating with
16 somebody?
17 A.  No, no.  I'm laughing because every time you send me a
18 document it takes forever to download.
19 Q.  Got it, got it.
20 A.  I don't mean that to be disrespectful, it's more of a
21 humorous thing like --
22 Q.  No, you're fine, don't worry.  It's hard to tell what's
23 going on when I'm not in the room.  But it's on its way to
24 you, I'll email it to Danielle.  Sorry about the delay.
25 A.  That was fine, thank you.  Is it Exhibit 2, is that --

### Page 42

1  Q.  Exhibit 2, it should be one page.
2  A.  Okay.  That one was quick.
3  Q.  Okay.  Good.  Have you had a chance to look at it
4  briefly?
5  A.  No, sir, I just opened it.
6  Q.  Oh, okay.  That's fine.
7      MS. KITSON:  John, can we take a break after this
8  document?
9      MR. CRONE:  Yeah, that's fine.
10 A.  Okay, I've read through it.
11 Q.  Have you ever seen this document before?
12 A.  I have not.
13 Q.  Have you ever seen a document like this?
14 A.  I have not.
15 Q.  In your mind, was Jerry Arellano disciplining Ms.
16 Brigham in this document or no?
17     MS. KITSON:  Object to the form.
18 A.  Certainly not, he's informing her.
19 Q.  Is there any sort of term for what this is?  Is it
20 called counseling or something, or is it just -- is it
21 covered --
22 A.  I, I can't speak to what it is, I was not involved in,
23 in creating or implementing the document.  I can speak to how
24 I read the document which is an advisement regarding your
25 sick instances.

### Page 43

1  Q.  And that's something less than discipline?
2  A.  Correct.
3  Q.  Okay.
4  A.  Just like a heads-up.
5      MR. CRONE:  Okay.  Let's, let's go off the record and
6  take that break.  Do you want to do 10 minutes, Danielle?
7      MS. KITSON:  Sure, that sounds good.
8      MR. CRONE:  Okay.
9      VIDEOGRAPHER:  The time now is 10:36, we're off the
10 record.
11     (There was a recess taken.)
12     VIDEOGRAPHER:  The time now is 10:51, we're back on the
13 record.
14 (Direct Examination by Mr. Crone)
15 Q.  Ms. Coppedge, I just sent over what's labeled Exhibit 1
16 and so the same drill, when you get it if you could open it,
17 take a look and let me know.  I'll email it to Danielle too.
18 A.  Okay.  I've read through it.
19 Q.  Thanks.  Have you ever seen a document like this before?
20 A.  I have.
21 Q.  Is this the kind of thing that an in-flight supervisor
22 would issue to a flight attendant?
23 A.  Correct.
24 Q.  Okay.  And so have you, have you issued documents like
25 this before?

### Page 44

1  A.  I have.
2  Q.  Do you know if you issued this one?
3  A.  I don't, I don't recall.
4  Q.  I see that there's no supervisor signature at the
5  bottom.  Is that abnormal?
6  A.  There would have been a supervisor signature at the time
7  that the flight attendant, in this case Rebecca, signed it,
8  they would have signed it at the time.
9  Q.  And so she would have signed at the bottom there at
10 Employee Signature?
11 A.  Correct.
12 Q.  So is there any way for you to know if this was actually
13 issued or if this was a draft?
14 A.  I would have to refer to the P-track, the employee
15 record, which would indicate if this form was issued and if
16 this form was then signed.
17 Q.  Okay.
18 A.  Two separate entries.
19 Q.  Got it.  So there's a way to find out, but you can't
20 tell by looking at this document?
21 A.  Correct.
22 Q.  Got it.  I sent over what's called Exhibit 12, I'm going
23 to send it to Danielle too by email.  Same drill, if when you
24 get it, it should just be one page, if you could open it and
25 take a look.

STEFANIE COPPEDGE - July 29, 2020

---

Page 45

1  A.    Okay.
2  Q.    Have you ever seen this document?
3  A.    I have not.
4  Q.    Do you know what it is?  Have you ever seen a document
5  like this?
6  A.    I have not.
7  Q.    Do you know who wrote it?
8  A.    I do not.
9  Q.    Okay.  I'm going to send over Exhibit 6, and I'll email
10 it to Danielle as well.
11 A.    Okay.
12 Q.    Have you seen this document before?
13 A.    I don't know that I've seen the document recently until
14 today.  Obviously I am one of the authors so I have seen the
15 document, I just don't believe I've seen it in several years.
16 Q.    So it's been a little while.  At the bottom where it
17 says from Stefanie Coppedge to Gerardo Arellano dated October
18 13, 2015, did you write that where it says, "Sir, where are
19 we with this one?"
20 A.    Oh, no, what did I do?  Wait.  Sorry, I just lost your
21 document.
22 Q.    You're fine.
23 A.    Okay.  I'm sorry.  Will you repeat the question?  I kind
24 of freaked out with the document.
25 Q.    No, you're okay.  At the bottom there's an email from

---

Page 46

1  you to Jerry Arellano dated October 13, 2015, it says, "Sir,
2  where are we with this one?"  Did you write that?
3  A.    I did.
4  Q.    Okay.  And then, and then the top of the document is Mr.
5  Arellano's response to you.  Do you agree with that?
6  A.    I do.
7  Q.    Okay.  And do you recall -- looking at it now does it --
8  do you recall Mr. Arellano sending you this email?
9  A.    I don't, I don't recall the email, it's so long ago and
10 there's thousands of emails in our work life.  Obviously they
11 were sent because they are here.  If you're asking me if I
12 remember the content of the email, until I was refreshed by
13 reading it, no, I did not remember any of the content.
14 Q.    Okay.  But now that you've been refreshed by reading it,
15 can you tell me what was going on here?
16 A.    I suspect on October 13th I was following up with Mr.
17 Arellano on Rebecca's status with her attendance and he had
18 sent me the reply back that they had granted her -- or, made
19 an exception for her on her F-M-L-A dates and they're
20 providing her with new F-M-L-A paperwork.
21 Q.    And what was the exception that Mr. Arellano is
22 referring to?
23 A.    I, I believe the email is speaking to her SIC occurrence
24 which placed her in the term situation, I believe they
25 re-coded it as an I-F-M and that they were making an

---

Page 47

1  exception for her.
2  Q.    Do you know why that was an exception?
3  A.    I believe in an effort to work with Rebecca and save her
4  employment.  I can only assume, I don't know.
5  Q.    Can any, can any employee of Frontier apply for F-M-L-A
6  time?
7  A.    That's an H-R function.
8  Q.    You're not aware of whether -- could you apply for
9  F-M-L-A time?
10 A.    I believe it's, I believe it's a government program and
11 every employee that is eligible can apply for F-M-L-A.
12 Q.    Okay.  I'm sorry, I didn't mean to cut you off.  I was
13 trying to get a jump on sending you the next one, it's going
14 to be called Exhibit 19, and when you receive Exhibit 19 if
15 you can, if you can review that.
16 A.    All right.  I have opened it and will read through it
17 now.
18 Q.    Thank you.
19 A.    Okay.
20 Q.    Do you recall this email string?
21 A.    I don't.
22 Q.    Does looking at it now --
23 A.    Even looking at it now I don't.  I believe some of it
24 has been redacted or blacked out so I don't even know --
25 other than the exchange I can see from Jerry and Kari, that's

---

Page 48

1  all I'm able to see.  I don't recall the email.
2  Q.    Yeah.  So the blacked-out portion, there's the dispute
3  between Frontier's attorneys and Ms. Brigham's attorneys as
4  to whether or not that blacked-out portion is privileged or
5  not so I'm not concerned with that.
6  A.    Okay.
7  Q.    I'm actually concerned with the top part where Jerry
8  wrote to Kari, yourself and a variety of other people and he
9  says, "I'm available next week to participate in the
10 meeting."  Does reviewing this refresh your recollection as
11 to what meeting he was referring to?
12 A.    It honestly does not.
13 Q.    That's fine.  I'm going to put in front of you now an
14 exhibit that is labeled 27.  And the same here, once you have
15 that open if you could review that email thread.
16 A.    Yes, it's still downloading.
17 Q.    Okay.
18 A.    Okay, I've read through the email.
19 Q.    Okay.  Have you seen this email thread before?
20 A.    At some point I must have.
21 Q.    Does reviewing it now refresh your recollection?
22 A.    Somewhat.
23 Q.    Okay.  Let's start at the top where Mr. Arellano is
24 writing to you, it says, "Hi, Stefanie.  With regard to her
25 September, I checked the trip she added and it looks like she

## Page 49

1  did work a portion of a trip" and then he attaches this chart
2  of some sort.  Can you decipher that chart?
3  A.   The chart would be her, her trip, the trip she was
4  assigned.
5  Q.   Yep.
6  A.   I would need to click on details within this trip to see
7  what portion she was working and if she did drop the other
8  portion.
9  Q.   Is it --
10 A.   I can't tell from just this.
11 Q.   Is it enough -- can you look at this chart and tell me
12 if Mr. Arellano is correct in that she did work a portion of
13 the trip?  Does this chart show that?
14 A.   Just this chart alone does show that.
15 Q.   Okay.  And then if you scroll down below to the second
16 page, you emailed Mr. Arellano and it says -- under October
17 6, 2015, at 1:52 p.m. it says, "Jerry, were her trips swapped
18 for trips that had turns through Denver so she would be able
19 to do a portion of the trip?  Thank you for keeping me
20 posted."  Do you remember what you were asking about there,
21 why you were asking that?
22 A.   I believe I was asking that -- this email would
23 supersede the email where he sent me her schedule, so I
24 believe I was inquiring if she flew any portion of the trip
25 she was assigned.

## Page 50

1  Q.   Okay.  And why were you asking if it had turns through
2  Denver?  What was that about?
3  A.   At, at that, at that time Rebecca was able to or any
4  flight attendant was able to drop a portion of their trip if
5  that trip came through Denver.
6  Q.   Why was that?
7  A.   It was part of the drop process, an ability to help
8  flight attendants --
9  Q.   Is it because flight attendants --
10 A.   -- flexibility.
11 Q.   Is it because flight attendants live in Denver, or is
12 there some reason or do you know?
13 A.   Well, at this time Denver would have been -- or, Denver
14 is the hub of Frontier Airlines, so it would be because
15 Denver is the hub.
16 Q.   Okay.  And with Denver being the hub, does that just
17 mean that a lot of the flight attendants live here in Denver
18 or around Denver?
19 A.   Yes, correct, a larger portion of the operation flies
20 out of Denver.
21 Q.   Okay.  And then if you scroll down a little bit more
22 there's -- I'm sorry, were you saying something?
23 A.   No.
24 Q.   If you scroll down a little bit more from Jerry Arellano
25 to you, October 6, 2015, at 1:49 p.m. it starts with, "Hi,

## Page 51

1  Stefanie.  Shelly was able to conduct an audit."  Do you see
2  where I am?
3  A.   Yes.
4  Q.   Okay.  So the question I have is in the second
5  paragraph, towards the last sentence of the second paragraph
6  Mr. Arellano wrote "The question that arises is she"
7  referring to Rebecca Brigham "truly doing everything fitting
8  accordingly to help herself?  I'm not so sure anymore."  Do
9  you know what Mr. Arellano was referring to there?
10 A.   I don't know the intent of Jerry, I can't speak to what
11 his intent was on that statement.
12 Q.   You don't recall?  You never discussed it with Mr.
13 Arellano?
14 A.   I don't -- no, I do not believe so.  I believe that's
15 why I asked what her trip was in the email previous.
16 Q.   Was Mr. -- during this time period was Mr. Arellano, to
17 your knowledge, skeptical about whether Ms. Brigham was truly
18 trying to schedule her trips in a way that would accommodate
19 her disability?
20      MS. KITSON:  Object to the form.
21 A.   I can't speak to Mr. Arellano's mindset.
22 Q.   I'm not asking you to, I'm asking if you know.  Do you
23 know whether he was skeptical or not?
24      MS. KITSON:  Object to the form.
25 A.   I do not know.

## Page 52

1  Q.   On the last page do you see -- or, I'm sorry, the third
2  page do you see the portion that's redacted there?
3  A.   Sure.
4  Q.   Okay.  Right below it says, "Next steps.  If the last
5  occurrence is not covered by FMLA then we proceed with the
6  term steps.  On this one let's definitely ensure that she has
7  Union representation available."  Do you know why Mr.
8  Arellano here wanted to ensure that Ms. Brigham had Union
9  representation available?
10      MS. KITSON:  Object to the form.
11 A.   With any termination we ensure that Union representation
12 is there.  I think he's just solidifying let's make sure the
13 Union is present.
14 Q.   So it's required with any termination meeting?
15 A.   It's not required, it's offered.  It's the flight
16 attendant's responsibility to ensure the Union is there.
17 Q.   Okay.  Did Mr. Arellano ever express any concern to you
18 that terminating Ms. Brigham might result in legal action
19 from Ms. Brigham?
20 A.   No, I don't recall that to be the case.
21 Q.   Did you ever tell Ms. Brigham that if she was terminated
22 over these issues that she should, in fact, seek legal action
23 against Frontier?
24 A.   I don't recall that conversation.
25 Q.   Did you ever tell Ms. Brigham you would testify on her

**STEFANIE COPPEDGE - July 29, 2020**

### Page 53

```
 1  behalf in any legal action related to her termination from
 2  Frontier?
 3  A.   I don't, I don't recall that conversation.
 4  Q.   Were you and Ms. Brigham ever friends?
 5  A.   Ms. -- yes, we were friends, we are friends, but I think
 6  there's -- you have work friends, family friends, neighbor
 7  friends.
 8  Q.   Sure.
 9  A.   I mean there's different forms of friends, but yes,
10  Rebecca and I were friends, yes.
11  Q.   And what kinds of friends?  Work friends, neighbor
12  friends?
13  A.   I believe we were, I believe we were work friends.
14  Q.   Do you think that Frontier did everything in its power
15  or its ability to accommodate Ms. Brigham's disability before
16  it terminated her?
17       MS. KITSON:  Object to the form.
18  A.   It doesn't matter what I think, it's the policy.
19  Q.   Well, it matters, it matters to Ms. Brigham what you
20  think, so do you think there was anything else Frontier could
21  have done to help her with her disability prior to
22  terminating her?
23       MS. KITSON:  Object to the form.
24  A.   Again, I believe compliance is beyond my scope so I
25  can't speak to what more Frontier could have done to help
```

### Page 54

```
 1  Rebecca.
 2  Q.   In your opinion as a work friend back in 2015, not as
 3  not an employee/supervisor, but from the perspective of a
 4  work friend of Ms. Brigham, did Frontier do everything they
 5  could do to accommodate Ms. Brigham prior to terminating her?
 6       MS. KITSON:  Object to the form.
 7  A.   You're asking my opinion as a friend?
 8  Q.   Yes.
 9  A.   Correct?
10  Q.   Correct.
11       MS. KITSON:  Same objection.
12  A.   As a friend my heart hurts from Rebecca for what Rebecca
13  went through.  I admire her strength to have gone through,
14  gotten herself through therapy, of having the strength to
15  voluntary self-disclose without getting herself in a
16  situation where she was forced to do so.  In my heart, my
17  heart hurts for Rebecca.  As a friend I -- as a friend I
18  believe everybody needs a second chance and a different
19  outcome based on some of the choices we make.  So as a
20  friend, as a friend, absolutely, I would have liked to have
21  seen a different outcome, as a friend.
22  Q.   Were you at the -- are you aware of Ms. Brigham's loss
23  of a child?
24  A.   I was not aware.
25  Q.   Were you at the final -- I think you would call it fact-
```

### Page 55

```
 1  finding meeting prior to Ms. Brigham's termination, were you
 2  at that meeting?
 3  A.   I recall being at the termination, the fact-finding
 4  termination meeting, yes, I was there.
 5  Q.   At that point was there anything Ms. Brigham could have
 6  said or done to save her job?
 7       MS. KITSON:  Object to the form.
 8  A.   I believe that is an opportunity for Ms. Brigham and the
 9  Union to go through all of her I-F-Ms and attendance and see
10  if they can discover where something may have been miscoded
11  improperly and present that an option allowing, allowing for
12  a re-coding changing the situation.
13  Q.   So if she could have presented some evidence that an
14  absence should have been re-coded, that could have
15  potentially saved her job?
16  A.   Correct.
17  Q.   Was there anything else she could have done?
18       MS. KITSON:  Object to the form.
19  A.   I believe that would be beyond my scope, that, again,
20  would go to an H-R function.  That's an H-R function, my
21  function was strictly the facts of the policy and the
22  procedure.
23       MR. CRONE:  Ms. Coppedge, thank you for coming this
24  morning and putting up with the technical issues and whatnot
25  and so I know that has been a little frustrating, but if we
```

### Page 56

```
 1  could take a quick five-minute break I want to review my
 2  notes, make sure there isn't anything else I wanted to ask
 3  you and then I think we can be done before 11:30 here, that
 4  would be nice.  We can go off the record now.
 5       VIDEOGRAPHER:  The time now is 11:20, we're off the
 6  record.
 7            (There was a recess taken.)
 8       VIDEOGRAPHER:  The time now is 11:32.  We're back on the
 9  record.
10  (Direct Examination by Mr. Crone.)
11  Q.   Ms. Coppedge, just a couple of quick questions and then
12  we'll be done.  So do you recall back when we were discussing
13  the bid process and the open time and the trade time?
14  A.   Yes.
15  Q.   The question I have is after a flight attendant does the
16  bid and then based on seniority they're given a schedule, at
17  the point where they can then trade their time, could they
18  trade away their entire schedule for a new schedule at that
19  point?
20  A.   They're, they're locked to 50 hours.  So this is where I
21  guess it gets complicated so you'll have to follow me if you
22  can.
23  Q.   Sure, yeah.
24  A.   Let's say, for example, I have 100 hours, I've dumped 50
25  of those hours into open time so now I only have 50 hours on
```

STEFANIE COPPEDGE - July 29, 2020

---

Page 57

1 my schedule, I can take one trip, let's say that trip is 10
2 hours, and I can trade that 10 hours with another trip in
3 open time that is equivalent, that is another 10 hours. I
4 have to maintain 50 hours.
5 Q.   Got it.  So as long as you maintain your 50 hours there,
6 you could trade away all those trips for new trips?
7 A.   As long as you maintain 50 hours.
8 Q.   Got it.  Okay.  And is the hours -- when a flight
9 attendant bids, might they always bid 100 hours?  Is there
10 some number they have to bid, or is it like "I'm just going
11 to bid 20 hours this week" and then --
12 A.   It's, it's contractual on how many hours and so the
13 company will put out a threshold in line with the C-B-A so it
14 could be that you can bid anywhere from 50 up to 100, 102,
15 103.
16 Q.   Okay.  And then once you've bid that and you're awarded
17 whatever you're awarded based on seniority, then there's a
18 certain amount you can drop into open time?
19 A.   Down to 50 hours.
20 Q.   Down to 50, okay.  And then once you've done that,
21 you've got to at least keep your 50, but you could trade away
22 all 50 for a different 50 hours?
23 A.   Correct.
24 Q.   Okay.  Got it.  Okay.  Thank you.  That makes sense.
25 It's a little complex, but it makes sense.  The other

Page 58

1 question is did you ever tell Jerry Arellano that Ms.
2 Brigham's brother is a lawyer and if Frontier terminated Ms.
3 Brigham, you know, she'd probably sue because she has a
4 lawyer in the family, her brother?
5 A.   I don't recall that and I don't even -- I don't recall
6 Rebecca having a brother.  I guess --
7 Q.   I'm sorry, go ahead.
8 A.   No, I'm sorry, go ahead.
9 Q.   You don't recall making any comment to Mr. Arellano
10 along those lines?
11 A.   I don't, I don't recall.  I feel like it's a general
12 statement and anytime somebody gets terminated somebody is
13 related to a lawyer, somebody is going to sue you.  I don't
14 recall the conversation, I really don't.
15      MR. CRONE:  Okay.  Ms. Coppedge, that's all we have, and
16 thanks again for appearing this morning and putting up with
17 the technical difficulties.
18      MS. KITSON:  Hey, John, I may have a couple follow-ups.
19 Give me just a couple minutes here.
20      MR. CRONE:  Yeah, that's fine.  Do you want to go off
21 the record, or do you just want to mute it for a minute or
22 two and then come back?
23      MS. KITSON:  We'll just mute it for a minute or two, it
24 should be really quick.
25      MR. CRONE:  Yeah, that's fine.

Page 59

1      MS. KITSON:  Okay.  I have just a few questions if
2 everybody wants to go back on.
3      MR. CRONE:  Sure.  Thanks, Danielle.
4      MS. KITSON:  Do we have our videographer?
5      VIDEOGRAPHER:  Yeah, we're all here.
6      MS. KITSON:  Are we back on the record?
7      MR. CRONE:  We never went off, we just muted.
8      MS. KITSON:  I'm sorry, I forgot that.
9      MR. CRONE:  Oh, no, you're fine, you're fine.
10      MS. KITSON:  Here I'm sitting here.
11 WHEREUPON,
12                CROSS-EXAMINATION
13 BY MS. KITSON:
14 Q.   Ms. Coppedge, do you recall Mr. Crone asking you about a
15 minimum requirement of hours that a flight attendant had to
16 hold after bidding?
17 A.   I did.
18 Q.   And did you testify that that number was 50 hours?
19 A.   I did.
20 Q.   While we were on the break, did you have a chance to
21 consult the Collective Bargaining Agreement that was in place
22 at the time that Ms. Brigham was employed?
23 A.   I did.
24 Q.   And did that refresh your recollection about the number
25 of hours minimally required to be held?

Page 60

1 A.   It did.
2 Q.   And what is that number?
3 A.   45 hours.
4      MS. KITSON:  Okay.  And those are my only questions.
5      THE WITNESS:  Okay.
6      MR. CRONE:  Thank you, Ms. Coppedge.  And Ms. Brigham
7 has no follow-up as a result of that, so thanks again for
8 being here.
9      COURT REPORTER:  Mr. Crone, Ms. Kitson, this is the
10 court reporter.  Would you both like etrans?
11      MR. CRONE:  Yes, please.
12      MS. KITSON:  Please.
13      COURT REPORTER:  And Ms. Kitson, do you want to read and
14 sign?
15      MS. KITSON:  Yes.
16      COURT REPORTER:  Perfect.  Thank you very much.
17      VIDEOGRAPHER:  The time now is 11:40.  We're going off
18 the record.  This concludes today's deposition.
19           (The deposition was concluded at 11:40 a.m.)

STEFANIE COPPEDGE - July 29, 2020

```
                                                    61
 1              CERTIFICATE OF THE REPORTER
 2
   STATE OF WYOMING      )
 3                       ) ss
   COUNTY OF LARAMIE     )
 4
 5         I, JEANNIE GEBES, RPR, freelance court reporter and
 6 Notary Public, hereby certify that I was authorized to and
 7 did record in stenotype the foregoing pages, numbered 1-61,
 8 inclusive.
 9         I further certify that I am not an agent, attorney
10 or counsel for any of the parties hereto, nor am I interested
11 in the outcome thereof.
12         Dated this 9th day of August 2020.
13
14
15              _____
                JEANNIE GEBES, RPR
16              Court Reporter
17              My Commission Expire:
18
19
20
21
22
23
24
25
```