Page 1

1
                    IN THE UNITED STATES DISTRICT COURT
2                       FOR THE DISTRICT OF COLORADO
3        Civil Action No. 19-cv-03417-STV

4        _____

5        REBECCA BRIGHAM,
6                 Plaintiff,
7        vs.
8        FRONTIER AIRLINES, INC.,
9                 Defendant.
10       _____
11                 VIDEO VIDEOCONFERENCED DEPOSITION OF
                         REBECCA LEIGH BRIGHAM
12                          August 31, 2020

13       _____

         VIDEOCONFERENCED APPEARANCES:
14

         ON BEHALF OF THE PLAINTIFF:
15                 JOHN REILY CRONE, ESQ.
                   EVAN GRIMES, ESQ.
16                 John R. Crone, LLC
                   4550 East Cherry Creek Drive South, Suite 1003
17                 Glendale, Colorado  80246
                   Phone:  303-598-3526
18                 Email:  john@crone-law.com
                   Email:  evan@crone-law.com
19

         ON BEHALF OF THE DEFENDANT:
20                 DANIELLE L. KITSON, ESQ.
                   CAROLYN THEIS, ESQ.
21                 Littler Mendelson, P.C.
                   1900 16th Street, Suite 800
22                 Denver, Colorado  80202
                   Phone:  303-629-6200
23                 Email:  dkitson@littler.com
                   Email:  ctheis@littler.com
24

         ALSO PRESENT: Cole Bartelt, Videographer
25                      Jacalyn Peter
         Job No. CS4229140

# EXHIBIT B

```
                                                      Page 40
 1      break?  I hear my kids getting loud.

 2                Q.   Yes.  Let me just look here.  Can we go

 3      about ten more minutes; do you think?

 4                A.   Sure.

 5                Q.   Okay.  So you -- these absences were coded

 6      as sick, correct?

 7                A.   Correct.  When I would run out of my

 8      intermittent FMLA time, which was in a rolling calendar,

 9      and I waited for days to drop off, yes, they would be

10      coded as sick.  I was not sick.  I was adhering to my

11      program, which Frontier requires that I do.  Those should

12      not have been coded as sick.  Frontier had the ability to

13      just remove that.  Frontier had the ability to do

14      multiple things, Danielle, and they decided not to do it.

15                Q.   Okay.  I think I get it now.  So let

16      me -- let me try again.

17                     So you have certain days where you called

18      out, and these were intermittent FMLA, correct?

19                A.   Correct.

20                Q.   And you had certain days where you called

21      out, and you didn't have any intermittent FMLA left,

22      correct?

23                A.   Right.  And I would still call in

24      intermittent FMLA, but then later on, they'd be like, Oh,

25      by the way, you ran out of intermittent FMLA.  This is
```

1     coded as sick.  You're getting a point.  I should have

2     never gotten that sick point.  I should have not -- it

3     should not have even shown up as sick on my schedule, had

4     Frontier reasonably accommodated me.

5            Q.    Okay.  So let me ask you this:  So you had

6     days when you called in intermittent FMLA, and it was

7     coded that way, correct?

8            A.    Yes, when I had intermittent FMLA days.

9            Q.    And you had days where, for whatever

10     reason, you didn't have any intermittent FMLA left,

11     correct?

12            A.    Correct, and I could not do overnights.

13     And I could not do overnights.  It's not that I didn't

14     want to do these trips, Danielle.  I could not do

15     overnights in order to adhere to my program.  Frontier

16     knew this.  We had multiple meetings about this.  I asked

17     multiple times for reasonable accommodations that they

18     denied, denied, denied.  And then give me sick points,

19     and then ultimately fired me for said sick points.  It

20     was not fair, and I will argue that till the day I die.

21            Q.    I -- I understand.  I'm trying to

22     understand your position.  So we had days that were I --

23     IFMLA.  We had days where you had run out, and they were

24     coded sick, correct?

25            You don't agree with it --

1          A.    Correct.

2          Q.    -- but they were coded sick, correct?

3          A.    Correct.

4          Q.    Okay.  And then on at least one occasion,

5     you had neglected to mention that it was an intermittent

6     FMLA day for timing, correct?

7          A.    Correct.  And if you're talking about that

8     final one when I forgot to send an email, the exact

9     reason why I forgot to send that email is because they

10    had removed a trip from my schedule, which they had done

11    in the past, which is part of them driving me crazy on

12    purpose.  They all of a sudden told me I couldn't do a

13    turn at the end.

14              So I was more worried about why can't I do

15    this turn than sending an email in.  So I called my

16    Inflight manager, I talked to Stefanie, and she was like,

17    I don't know, you've always been allowed to do it before.

18    Let me see.  And I forgot to send the email within the

19    24 hours or whatever it was, because I was trying to

20    figure out why that turn was taken off of my schedule.

21         Q.    So you did not follow the call-out

22    procedures that were required, correct?

23         A.    I did not send the email in time, no.

24         Q.    Okay.  So you didn't -- okay.  So getting

25    back to this, so we've got these categories:  You called

1    in for intermittent FMLA, and those were coded under the

2    dependability policy, not assessed points, correct?

3                 A.   Say that again.

4                 Q.   Let me start over again.

5                      We've talked about the different type of

6    call-outs that you did.  One was calling out under

7    intermittent FMLA, correct?

8                 A.   Correct, when I had intermittent FMLA to

9    cover those overnights.

10                Q.   One was when you didn't have any

11   intermittent FMLA left, correct?

12                A.   Well, I would --

13                Q.   There were some days where you called in,

14   and you didn't have any left, correct?

15                A.   Correct.  But I hadn't really known --

16                Q.   I'm not asking for the reason.

17                A.   -- that at this time.  Okay.

18                Q.   I'm not asking for the reason.  I just want

19   to establish that.

20                A.   Okay.

21                Q.   And there was at least one time where you

22   neglected to follow the required call-out procedures,

23   correct?

24                A.   Yes.

25                Q.   Okay.  And all of those were coded

1     because of my sick points.

2          Q.    When you called in -- when you called in,

3     you were calling in because you could not work due to a

4     medical condition, which was alcoholism, correct?

5          A.    Correct.

6          Q.    So the reason you were calling is that you

7     couldn't medically perform your job, correct?

8          A.    Correct.  Well, it's more like -- well, I

9     guess as a general term, yes.

10         Q.    Okay.  We got a little bit off track there.

11    So that -- that helps.  Let's look back then at this

12    Exhibit 16 very quickly here.

13         A.    Okay.

14         Q.    I just want to establish -- and -- and tell

15    me -- hold on one second.  I've got it up.  I just want to

16    make sure that you recognize each of these as an

17    attendance point that you actually did receive.

18         A.    Yes.

19         Q.    So there are several pages here.  Tell me

20    when I can scroll.

21         A.    Scroll.

22         Q.    Tell me if these are all true and accurate

23    copies of attendance points that you received while at

24    Frontier.  Okay?

25         A.    Okay.  You can just scroll.

Page 46

1          Q.    Okay.  All right.  So I am looking at a

2     December 29, 2008, memo from Robert Mitchell to you.

3               Do you see that?

4          A.    Yes.

5          Q.    Is that a true and accurate copy of a memo

6     that you received at Frontier?

7          A.    I mean, I don't specifically remember

8     this, but I'm sure it is.

9          Q.    Okay.  I'm going to scroll down.  I'm now

10    looking at a February 16, 2009 Performance Counseling

11    Record from Inflight to you.

12              Do you see that?

13         A.    Yeah.  The documented verbal warning?

14         Q.    Yeah.  Is this a true and correct copy of a

15    counseling record that you received?

16         A.    I'm sure it is.

17         Q.    I'm going to keep scrolling.

18         A.    All right.

19         Q.    And let me know if you need me to stop at

20    any point.  When I get to the end, I'm going to ask you if

21    these are all true and accurate copies of documents that

22    you received while at Frontier.

23              Okay?

24         A.    Okay.

25         Q.    I'm going to start scrolling.  Let me know

1    if you need me to stop.

2           A.   Okay.  Can you stop for a second,

3    Danielle.

4           Q.   Yep, you bet.

5           A.   Will you go up a little bit.

6           Q.   Yeah.

7           A.   Now, did any of these dates overlap?  Did

8    you look at that?  Like, do I have dates that are on this

9    one that are actually on the other ones too, or are they

10   all just different days?

11          Q.   I -- these are just copies of attendance

12   warnings that you received.  So I don't know in terms of,

13   you know, what infractions are what.  I just want to

14   verify that these are true and correct copies of

15   attendance points that you received.

16          A.   I don't know what UNA is on this one.  And

17   then that's a medical --

18          Q.   Did you receive this attendance warning

19   though?

20          A.   I mean, it looks like every other one that

21   I have received.

22          Q.   Okay.  Do you have any --

23          A.   I just don't know of any code -- I just

24   don't know what the code UNA is.

25          Q.   Do you have any reason to dispute that you

Page 48

1    received this?

2              A.    No, not at all.

3              Q.    Okay.  All right.  Let me keep going.  Let

4    me know if you need to stop at any point.

5              A.    Okay.

6              Q.    Okay.  I'm at the end.

7                    Are these documents all true and correct

8    copies of documents that you received from Frontier?

9              A.    I believe so.

10             Q.    All right.  I'm going to stop sharing my

11   screen.  And then, did you want to take that break?

12             A.    Yes, please.

13                   MS. KITSON:  Okay.  We can go off the

14   record.

15                   THE REPORTER:  Cole?  Cole?

16                   THE VIDEOGRAPHER:  Yes.  Give me one

17   second.  We're going off the record at 9:04 a.m.

18                   (Recess from 9:04 a.m. to 9:16 a.m.)

19                   THE VIDEOGRAPHER:  We are going back on

20   the record at 9:16 a.m.

21             Q.    (By Ms. Kitson)  Ms. Brigham, do you

22   understand that you're still under oath?

23             A.    Yeah.

24             Q.    We talked a little bit before the break

25   about your work for other employers.

Page 54

1          A.    No.

2          Q.    Since leaving Frontier, will you describe

3    for us what efforts you've make to find employment?

4          A.    Basically, the Cakeheads, I found that.

5    And then immediately after that, I got hired by

6    Great West.  I had -- I was collecting unemployment after

7    Frontier wrongfully terminated me.  And I had to

8    apply -- I think it was three jobs a week.  And I did

9    that, and then finally got hired by the temp agency, who

10   hooked me up with Cakeheads.

11               I don't have a bunch of schooling.  I

12   don't -- I mean, I was lucky to get the flight attendant

13   job, and that was like my career.  So for me to get a job

14   that would actually pay anything over what my daycare

15   costs would be would be difficult.

16         Q.    After you left Frontier, did you ever look

17   for any flight attendant position?

18         A.    No, I couldn't.  I wish I could have.  But

19   when you get hired on as a flight attendant, you start at

20   the very bottom.  And you're on what's called reserve,

21   which is where you have to be on call pretty much 24/7.

22               With Frontier, it was you had 11 days off

23   in which they couldn't call you.  They could

24   junior-assign you if you answered the phone.  However, I

25   couldn't go back to being on reserve again and still

```
                                                      Page 55
 1     maintain my sobriety.  I just couldn't do it.  I wish I
 2     could.
 3               Q.    But you didn't even try to look; is that
 4     correct?
 5               A.    Because it wouldn't have worked out.
 6               Q.    All right.  And what other fields did you
 7     look at?
 8               A.    Admin-type of positions, which is what I
 9     ultimately got with Cakeheads and Great West.  I was a
10     house painter at first with Great West, and then they
11     switched me over to admin.
12               Q.    What was your hourly rate at Frontier when
13     you left?
14               A.    I want to say 32-something.
15               Q.    What was your hourly rate at Cakeheads?
16               A.    $12 an hour.
17               Q.    What was your hourly rate at Great West?
18               A.    I believe I was hired at $13 an hour, and
19     then when I left there, I believe I was at 18.75.
20               Q.    After you were fired from Cakeheads, you
21     got the Great West job a week after; is that right?
22               A.    Correct.
23               Q.    And is Great West affiliated with your
24     family in any way?
25               A.    Yes.  It's my dad's business and my
```

Page 64

1           A.    That would have been in September of 2014.

2           Q.    When you disclosed to Frontier in September

3     2014, you went out on a continuous leave of absence; is

4     that correct?

5           A.    Correct.

6           Q.    And Frontier approved that continuous leave

7     of absence, correct?

8           A.    Correct.

9           Q.    That was a leave of absence that was

10    offered under the Collective Bargaining Agreement,

11    correct?

12          A.    I guess.  I wouldn't know.

13          Q.    After that continuous leave of absence that

14    you took, did you ever apply or ask for any other form of

15    continuous leave of absence?

16          A.    No.

17          Q.    As opposed to you -- you know, let me ask

18    it again for the record.

19                As opposed to intermittent FMLA work?

20          A.    No.

21          Q.    So you knew that a continuous leave of

22    absence for medical was available, correct?

23          A.    Correct.

24          Q.    But you did not apply for one after your

25    initial leave for rehab; is that correct?

Page 65

1          A.    That is correct.

2          Q.    And at some point, I think that you and

3    Jerry Arellano discussed the possibility of continuous

4    medical leave, but you decided you did not want to have

5    one, correct?

6          A.    Correct.  I needed money coming in.  And

7    had they accommodated me, I would have had that.

8          Q.    Your alcoholism -- let's say from

9    September 2014 forward -- well, strike that.

10          How long were you in rehab in that

11   September 2014 era?

12          A.    60 days.

13          Q.    After that 60 days, did you return to work?

14          A.    I came back, and I tried to return to

15   work, and I had to meet certain criteria in order to come

16   back.  I had to meet with a DOT specialist, where -- I

17   don't even know why I had to do half the stuff.

18          But I had to meet with DOT.  I had to get

19   paperwork in.  I had to -- I believe during that time,

20   they decided that I needed to see a therapist, which I

21   was seeing a therapist.  There were a bunch of, like,

22   hoops I had to jump through to come back, which I did.

23          And I want to say in -- because I got back

24   November 7th, and all that was done within the first

25   three weeks that I came back, I want to say.  And it was

Page 67

1    supposed to basically, they say, change your playground,

2    which is what I was doing.  And I needed Frontier's help

3    to do it.

4              Q.   When was the last time you had a drink?

5              A.   My sobriety date is September 5th of 2014.

6    I got some treatment September 7th of 2014.  When I got

7    the scholarship, it was on September 4th, and I had been

8    drinking that day and told the guy on the phone that I

9    would dump out what I had, and they put me on a plane on

10   the 7th.

11             Q.   What scholarship are you referring to?

12             A.   I got, like, a scholarship to go to a

13   treatment center.  We wouldn't have been able to afford

14   it.  And I just called the right person -- I called a

15   bunch of people that day, just trying to figure out where

16   I could go get treatment.  And I happened to get on the

17   phone with the right person, and I got a -- what they

18   call a scholarship.  It cost me $100 to do my whole

19   treatment.

20             Q.   So since September 5th, 2014, you have not

21   had a drink, correct?

22             A.   No.  Correct.

23             Q.   Your alcoholism has been under control?

24             A.   Correct.

25             Q.   Before that, did you ever have a drink

Page 68

1    while on the job at Frontier?

2              A.    No.  Luckily, I had never crossed that

3    boundary.  Oh, and I feel like I need to qualify -- or

4    clarify.  So never while on duty.  However, on

5    overnights, after you're done, it's -- it was just kind

6    of a culture where you would take off all your flight

7    attendant gear, put on normal clothes, and go meet at the

8    bar.  Nine times out of ten, that's what you did.

9              Q.    But it never impacted your ability to work

10   the next day, for instance; is that right?

11             A.    What do you mean?

12             Q.    So let's -- let's take pre-September 5th,

13   2014.

14                   You would drink in hotel bars on layovers,

15   correct?

16             A.    Right.

17             Q.    Was there ever a time that you could not

18   fly because you were drunk or because of the aftereffects

19   of that?

20             A.    No, not while I was already on a trip at

21   all.  I mean, there were plenty of times that I flew

22   pretty hung over, but never intoxicated.

23             Q.    So is it fair to say that your alcoholism

24   did not prevent you from working before September 5th,

25   2014?  Is that fair?

Page 69

1          A.    Kind of.   There were plenty of times, like

2    if I had gone on a bender, I remember a few times that I

3    would have to call in sick, because I was too hung over

4    or too shaky to do my job.

5          Q.    But, in general, you were able to keep your

6    job?

7          A.    Correct.

8          Q.    You were able to meet --

9          A.    Yes.

10          Q.    -- the attendance requirements?

11          A.    Yes.

12          Q.    So prior to September 5th, 2014, you were

13    able to work in general, correct?

14          A.    Yes.

15          Q.    Since September -- sorry.

16                Since September 5th, 2014, alcoholism has

17    not impacted your ability to live your life, correct?

18          A.    Since 2014?

19          Q.    Yes.

20          A.    Yes.  Yes.

21          Q.    And let me ask that question again just so

22    the record is clear.

23                Since September 5th, 2014, alcoholism has

24    not impacted your ability to live your life, correct?

25          A.    I mean, you sort of have to clarify that.

Page 70

1   My recovery is part of my life now.

2          Q.   Right.  So since September 5th, 2014,

3   you've been able to live your life, correct?

4          A.   Correct.

5          Q.   You've been able to care for your husband's

6   grandmother, correct?

7          A.   Correct.

8          Q.   You've been able to care for your kids,

9   correct?

10         A.   Correct.

11         Q.   You've been able to work, correct?

12         A.   Correct.

13         Q.   Is there any area of your life that the

14  alcoholism has impacted you in terms of your ability to

15  live a daily life?

16         A.   After I got sober, we're still talking,

17  correct?

18         Q.   Correct.

19         A.   Yes.  It's just different now.  My life is

20  better since getting sober.

21         Q.   So there's no area of your life where it's

22  impacting your ability to function; is that correct?

23         A.   Not currently, but that could change

24  tomorrow, Danielle.  That's why I continue to work my

25  program.  Something could happen, and tomorrow is not

Page 71

1     guaranteed for me to be sober.  I can just take it one

2     day, one minute, at a time.  Anything could change.

3                    Q.   Okay.  I understand that.

4                    So --

5                    A.   So far, it hasn't impacted anything.

6                    Q.   Okay.  Yeah.  So let me just clarify for

7     the record.

8                    So anything could change at any moment,

9     right?

10                   A.   Right.

11                   Q.   But from September 5th, 2014 to the

12    present, alcoholism has not impacted any of your major

13    life activities; is that right?

14                   A.   Correct.

15                   Q.   From September 5th, 2014 to the

16    present -- strike that.

17                   From September 5th, 2014 to the end of your

18    employment at Frontier, you were always able to perform

19    the essential functions of your job while on duty,

20    correct?

21                   A.   Correct.

22                   Q.   Okay.  I want to talk to you now about what

23    accommodations you requested from Frontier.

24                   So tell me about the accommodations that

25    you requested from Frontier from September 5th, 2014 to

Page 72

1    the end of your employment.

2          A.   Okay.  I asked to work at the general

3    office for a little while, since my attendance was so

4    bad, and it kept getting worse the more my -- basically,

5    my seniority would go down, because they opened an

6    Orlando base.  So I was not able to hold the kind of

7    trips that I needed to maintain my sobriety.

8               I had asked to maybe work at the GO, which

9    is what they let people do when they're injured on the

10   job.  I asked to start off with a blank schedule to be

11   able to create my own schedule out of open time and the

12   TradeBoard, which is pretty much what's leftover after

13   they run a schedule.  But that would take Frontier

14   starting me out with a blank schedule.  It was not

15   something that I could have just done without their help.

16          Q.   What other accommodations did you request,

17   if any?

18          A.   I requested they just remove the

19   overnights from my schedule, which they had done a few

20   times prior.  When I needed to, they had just removed

21   them and said, We'll do it this one time, but we can't do

22   it forever.  I mean -- yeah.  I had multiple meetings

23   with them trying to figure out what we could do in order

24   to get this to work.

25          Q.   What other accommodations did you request,

Page 75

1        Q.    Okay.  Did you tape those recordings?

2        A.    I did.

3        Q.    On those recordings, I heard you speaking

4    about open positions with Frontier representatives.

5              Is that your recollection as well?

6        A.    Correct.

7        Q.    Did you speak with them about open

8    positions?

9        A.    Correct.

10       Q.    Who --

11       A.    It was mentioned to me that I could

12   transfer within the company, that that was an option.

13   And at one point, I even looked into it, and I saw a

14   bunch of jobs that really I didn't qualify for.  They

15   were like statistics, ops, stuff like that that I didn't

16   qualify for.  And then I found out from another flight

17   attendant that you don't want to do that if you want to

18   go back to inflight.

19       Q.    So transfer was an option, but it was not

20   attractive to you because of loss of seniority and

21   inability to transfer back.

22             Do I have that correct?

23       A.    Correct.

24       Q.    Let's go back to the general

25   office -- well, strike that.

Page 76

1          So I have that you discussed with the

2     company a potential light-duty assignment in the general

3     office; is that correct?

4          A.    Correct.

5          Q.    And you would have taken that on an

6     intermittent basis.  So whenever you had a layover that

7     involved an overnight, your idea was that you would drop

8     that trip and work at the general office.

9          Do I have that correct?

10         A.    That was one.  The other one was just put

11    me as a GO for a while so that I don't have to do

12    overnights, until I can get further along in my recovery

13    where my therapist suggested, Hey, I think you're okay to

14    do overnights now.  I think you're at a place in your

15    recovery when you would be okay.  That's all we were

16    waiting for.

17         Q.    So then there's two different things there,

18    and I'm breaking that out.

19         So number one, you wanted potentially to be

20    in a temporary position in the general office full-time

21    indefinitely; is that correct?

22         A.    Not indefinitely.  Temporarily, until I

23    got to a point in my recovery when I could pick up the

24    overnights again.

25         Q.    But you didn't have an exact end date for

1    when that would be, correct?

2          A.   No.  It was open-ended, and that was

3    pretty much up to my therapist, when she thought I was

4    ready, and when I felt I was ready.

5          Q.   Which could have been a year, or maybe

6    never.

7               You don't -- you didn't know, right?

8          A.   We were getting a lot further along in my

9    recovery, and it would have been pretty soon after.

10   However, with all the stuff that Frontier put me through

11   and everything that was going on, honestly, that set back

12   my recovery quite a bit.  So it was just making the

13   problem worse.

14         Q.   And the question I have for you,

15   Ms. Brigham, is you did not know exactly when you would be

16   able to fly overnights again, correct?

17         A.   Correct.

18         Q.   It was open-ended, correct?

19         A.   Open-ended, but ended.  It's -- it would

20   never have been indefinitely.

21         Q.   But you didn't know when, correct?

22         A.   Correct.

23         Q.   And the other option that you had discussed

24   with Frontier is this intermittent concept, where whenever

25   you couldn't fly a layover, you would then work in the

1      Q.    So you were requesting the accommodation of

2   when you had an overnight trip, you would call out for

3   that and instead work in the general office, correct?

4           A.    Correct.

5           Q.    And not be assessed any attendance points,

6   correct?

7           A.    Correct.

8           Q.    And be paid, correct?

9           A.    Correct.

10          Q.    Are you aware of anyone else who was given

11   that accommodation?

12          A.    Yes.  Lots of people, after they were

13   injured on the job, would go work at the GO.

14          Q.    Are you aware of anyone who was allowed to

15   do that outside the context of an injury on the job?

16          A.    No.

17          Q.    In terms of the blank schedule, describe

18   for me exactly what you requested.

19                How would that work?

20          A.    So basically -- okay.  When -- every

21   month, a flight attendant has to bid their preferred

22   schedule, and it goes by seniority.  So basically, I was

23   asking to not be awarded a schedule at all.  Leave me

24   with nothing.  Leave me with nothing.  Leave me with a

25   blank schedule, and then at the end of the bidding

Page 80

1    period -- at the end, there's what we call open time and

2    TradeBoard, which are the leftovers that nobody wants

3    that a reserve is going to have to fly or that other

4    people can swap and trade their trips out with.

5                    What I was asking to do was just be left

6    with nothing.  It would not have gone above seniority.

7    It would not have violated anything in the CBA.  Leave me

8    with nothing.  And I -- it will be my responsibility to

9    build my schedule up to 60 hours, which was the

10   requirement, out of stuff that was left over and the

11   stuff that nobody wanted.

12                   Q.   Tell me a little bit more about how the

13   bidding process work.

14                   So every month you bid, correct?

15                   A.   Mm-hmm.

16                   Q.   And every month, if you are an active

17   employee, you have to bid, correct?

18                   A.   Correct.

19                   Q.   And if you don't bid, the CBA provides that

20   you are given a line, correct?

21                   A.   Correct.

22                   Q.   And a line is a --

23                   A.   I mean, so you would bid for reserve if

24   you wanted, which then you'd have a reserve schedule.

25                   Q.   And describe for us, what is a reserve

Page 112

1          Q.   But she didn't refuse the company speaking

2     to you further; she just said, I'm going to need to direct

3     you to Shelly Leyner, correct?

4          A.   Correct.

5          Q.   And did you actually talk to Shelly Leyner?

6          A.   She was copied on that email.  I talked to

7     Shelly multiple times.

8          Q.   So no one prevented you from talking to her

9     or to Mr. Arellano, et cetera?

10         A.   No.

11         Q.   Okay.  I'm going to show you Brigham

12    Exhibit 20.  So Brigham Exhibit 20 is a document bearing a

13    Bates stamp FRONTIERAIRLINES(R.BRIGHAM)- 1766.

14              Do you see that?

15         A.   Yes.

16         Q.   Do you recognize this document?

17         A.   I do.

18         Q.   What is it?

19         A.   I had turned this in at my investigatory

20    meeting.

21         Q.   Your investigatory meeting was on or about

22    November 3rd of 2015; is that right?

23         A.   Correct.

24         Q.   And did you bring this into the meeting?

25         A.   I did.

Page 113

1          Q.    Okay.  And is this the last accommodation

2     request that you made?

3          A.    I believe so.

4          Q.    Okay.  And you say, Ideas, just remove me

5     from the overnights, have me build my own schedule out of

6     open time and TradeBoard.

7               Do you see that?

8          A.    Yes.

9          Q.    Are those the accommodations that we've

10    been talking about?

11         A.    Except not the one where I would go work

12    at the general office.  They had told me that that was

13    impossible because that was just for people that got back

14    from OJI.

15         Q.    Okay.  So other than that, this was the

16    final accommodation request that you made, if you will; is

17    that correct?

18         A.    Correct.

19         Q.    And what happened with this request?

20         A.    I retired.

21         Q.    So Frontier denies this request; is that

22    correct?

23         A.    Yes.  They wrongfully terminated me, I

24    would say.

25         Q.    Are you bringing any claim in this case

Page 118

1          Do you see that?

2          A.   Yes.

3          Q.   And were you aware that that was a

4    requirement under the FMLA?

5          A.   Yes.

6          Q.   Okay.  We can set that aside.

7               I'm going to open what has been marked as

8    Exhibit 23.  It's such a crazy world like sharing and

9    using exhibits.

10              Okay.  Are you seeing a document, Brigham

11   Exhibit 23, which is a Frontier Airlines job description?

12         A.   Yes.

13         Q.   Okay.  And just for the record, this is

14   FRONTIERAIRLINES(R.BRIGHAM)- 93.

15              Are you with me?

16         A.   Yep.

17         Q.   Do you recognize this document?

18         A.   The job description, yes.

19         Q.   And is it familiar to you, the flight

20   attendant for Frontier Airlines?

21         A.   Yes.

22         Q.   And Section 2 is Essential functions.  And

23   then there are a list of bullet points.

24              Do you see that?

25         A.   Yep.

Page 161

1            Do you see that?

2       A.   Yes.

3       Q.   And nowhere on this document does she say

4   that you need any kind of accommodation for avoiding

5   overnights or layovers, correct?

6       A.   Not that I see, nope.

7       Q.   I'll stop the screen.

8            I'm going to pull up Exhibit 42 -- Brigham

9   Exhibit 42.  I'm showing you what has been marked as

10  Brigham Exhibit 42.

11           Do you recognize this document?

12      A.   Yes.

13      Q.   What is it?

14      A.   It's a transcript of some recording that I

15  have.

16      Q.   Is this -- well, strike that.

17           On June 4th, 2015, did you attend a meeting

18  at Frontier's general office?

19      A.   Yes.

20      Q.   Did you record that meeting?

21      A.   I did.

22      Q.   Is this your transcription of the

23  recording?

24      A.   No.  I had a lady that my mom works with

25  transcribe it for me.

Page 167

1          A.   No worries.

2          Q.   All right.  I'm showing you what has been

3    marked as Brigham Exhibit 14, which appears to be an email

4    from Cassandra Micklich to you, dated June 4th, 2015.

5               Do you see that?

6          A.   Yep.

7          Q.   Do you recall receiving this email?

8          A.   I do.

9          Q.   All right.  Ms. Micklich says, Rebecca,

10   thank you for coming in and meeting with us today.  I did

11   get some answers to your questions.

12              Do you see that?

13         A.   Yep.

14         Q.   And is this that same day of the transcript

15   that we saw, June 4th, 2015?

16         A.   I believe so.

17         Q.   Okay.  Ms. Micklich says, Number 1, OJI

18   working at the GO, if that was an option for you.  A, That

19   is not an option.  The GO is only to accommodate OJI.

20              Do you see that?

21         A.   Yep.

22         Q.   And does OJI stand for on-the-job injury?

23         A.   Yes.

24         Q.   Okay.  And then says, Number 2,

25   transferring internally with the company.

Page 168

1                    Do you see that reference?

2              A.   Yes.

3              Q.   And she says, Please refer to page 81 of

4     123.  It talks about the process and seniority.

5                    Do you see that?

6              A.   Yes.

7              Q.   And is that a reference to the Collective

8     Bargaining Agreement?

9              A.   I don't remember.  Is that the one that

10    you put in front of me earlier?

11             Q.   Yes.  Let me see if I can cross-reference

12    it.  Hold on.  Bear with me one moment here.

13             A.   No worries.

14             Q.   Yes.  Okay.  Yeah, let's cross-reference

15    these.  So I'm going to share my screen with you.  Okay.

16    So Brigham Exhibit 14 is the email that we have been

17    looking at.

18                    Do you see that?

19             A.   Yes.

20             Q.   And Ms. Micklich tells you to, Please refer

21    to page 81 of 123.  It talks about the process and

22    seniority.

23                    Do you see that?

24             A.   Yes.

25             Q.   And then if we look at Brigham Exhibit 1,

Page 169

1    which is the Collective Bargaining Agreement, you can see

2    page 81 of 123 --

3              A.    Yes.

4              Q.    -- here at the bottom.

5              Do you see that?

6              A.    I do.

7              Q.    And scrolling up, there's the same

8    language, again, that talks about how you accrue seniority

9    for a period not to exceed two years.

10             Do you see that?

11             A.    I do.

12             Q.    Does that refresh your recollection that

13   the company told you about the two years of seniority that

14   you would retain?

15             A.    No.  I didn't even know what document that

16   she was even referring to.  It didn't say in the

17   Collective Bargaining Agreement or the employee handbook.

18   To be honest, I didn't even look, because I'd already

19   been told that you lose your seniority after 90 days.

20             Q.    Well, Ms. Micklich is directing you and

21   telling you to, Please refer to page 81 of 123, right?

22             A.    Yes.  But it doesn't say what page 81 of

23   123.  I didn't know if it was in the handbook or the CBA.

24   And like I said, I did not look, because I had already

25   been told.

Page 170

1          Q.   Well, this is the exact same day that you

2     met with Ms. Micklich, correct?

3          A.   Correct.

4          Q.   And on that exact same day, we saw in the

5     transcript you talked about internal transfers, correct?

6          A.   Correct.

7          Q.   And she said she'd have to look into it,

8     correct?

9          A.   Correct.

10         Q.   And she's now coming back to you on the

11    exact same day and saying, Please refer to page 1 -- 81 of

12    123; is that right?

13         A.   Yes, but it doesn't say what document

14    she's referring to.  Page 81 of what?

15         Q.   Did you ask her?  Did you --

16         A.   No, I did not.

17         Q.   You say, The reason --

18         A.   I had no reason.

19              THE REPORTER:  One at a time.

20         Q.   (By Ms. Kitson)  You just testified that it

21    could be the handbook, it could be the Collective

22    Bargaining Agreement.

23         A.   I --

24         Q.   Did you look at any one of those?

25         A.   I did not.

Page 172

```
 1                    Wouldn't that suggest to you that it's the
 2        Collective Bargaining Agreement she's talking about?
 3                    A.    Not really, necessarily.  I would
 4        have -- personally, when I looked at that, I figured it
 5        was probably the handbook, not the Collective Bargaining
 6        Agreement.
 7                    Q.    The handbook doesn't address seniority,
 8        correct, that's the CBA?
 9                    A.    I don't know.  I believe the handbook
10        addresses it as well.
11                    Q.    All right.  Looking at Exhibit 43 --
12                    A.    And to be honest, Danielle, I remember
13        seeing somewhere about -- I'm trying to think where I saw
14        it -- about seniority, and I couldn't keep my -- go back
15        to inflight.  And I'm not going to remember.
16                    Q.    I'm just kind of looking through the
17        handbook here to see if there's something there.
18                    A.    Yeah.
19                    Q.    Hold on.  I'm almost through it.  No, I
20        don't think so.  All right.
21                    Well, in any event, let's look back at
22        this --
23                    A.    Okay.
24                    Q.    -- Exhibit 43.
25                    And you had testified that this is a
```

Page 173

1    transcript that was made of a recording that you took at a

2    meeting at Frontier headquarters on October 9th, 2015.

3                 Is that correct?

4         A.   Correct.

5         Q.   And once again, is this a transcription

6    that a friend of yours made?

7         A.   Yes.

8         Q.   Okay.  And did you review it for accuracy?

9         A.   Not in its entirety.

10        Q.   Were there any things that you found to be

11   inaccurate?

12        A.   Yes.  In all of them, there were stuff

13   that was inaccurate.

14        Q.   I'm going to cross-reference -- oops.  Bear

15   with me.  Brigham Exhibit 33 that I'm showing you is

16   another transcription that we had made --

17        A.   Okay.

18        Q.   -- with Hunter + Geist, which is a court

19   reporter service.

20        A.   Okay.

21        Q.   And I'm showing you -- it's, Transcription

22   of Recording, October 9th, 2015.

23                 Do you see that?

24        A.   Yep.

25        Q.   I'm just going to use that to -- for the

Page 175

1   who was at the general office that day.

2           Q.   Okay.  She says, Have you ever looked at

3   other positions within the company, or are you not

4   interested in it?  You answer, No, I talked to training at

5   one point, and that might be good, or I just -- I don't

6   know where to look.  I don't know.

7                Do you see that?

8           A.   Yes.

9           Q.   And then Ms. Thompson says, On UltiPro.

10               Are you aware what she's referring to

11  there?

12          A.   UltiPro, I believe, was a system that we

13  used at the time.  UltiPro would have been like where our

14  paycheck stubs and stuff were.

15          Q.   Mm-hmm.  So you knew where to look on

16  UltiPro, and you knew what she was talking about.  I

17  believe it's UltiPro, with a U, but --

18          A.   I --

19          Q.   -- you knew that -- you knew what she was

20  talking about?

21          A.   I knew that she was talking about UltiPro,

22  but I didn't know like where to sort of look in there.

23  Cassie had told me to go to flyfrontier.com, which I had

24  done.  I don't remember if I went to UltiPro or not.

25          Q.   Okay.  But you knew what UltiPro was in

Page 176

1    her --

2              A.    Correct, yes.

3              Q.    Okay.  And she suggested you go and look

4    there for job listings, correct?

5              A.    Correct.

6              Q.    And she states -- I'm back on Brigham

7    Exhibit 43 -- and, I mean, I would strongly suggest --

8    like start looking at it, and you might want to look at it

9    every week, because a lot of times jobs are only posted

10   for one week.  So I would just get in the habit, in fact,

11   every Monday, getting on there and seeing what's new on

12   there.  Every Monday and every Friday and see what's in

13   there, because there is all these different opportunities

14   that you probably aren't even aware that exist, right?

15   And it might not necessarily be an inflight, but there

16   is -- you know, there is a lot happening.  So, I mean,

17   it's -- since you want to stay with Frontier, and I know

18   it's the flight attendant job, but I don't think it's

19   going to get easier with the schedule.

20              Do you see that language?

21              A.    Yes.

22              Q.    And did she, in fact, suggest that you go

23   into UltiPro at least weekly?

24              A.    Yes.

25              Q.    If not every Monday and every Friday?

1          A.    Yes.

2          Q.    And did you do that?

3          A.    Occasionally, I would go on there, but

4     most of -- it either did not interest me or I didn't

5     qualify, frankly.

6          Q.    Okay.  And at this point, was it your

7     understanding that you would not be able to keep your

8     seniority after 90 days?  Was that your understanding at

9     this time?

10         A.    Yes.

11         Q.    And did you continue to look after that?

12         A.    Occasionally.

13         Q.    Okay.  Why'd you --

14         A.    But it was something that -- it was

15    something that was not -- at the time -- I mean, I know

16    better now, because I've seen it.

17              But at the time, when I thought I was

18    going to lose my seniority after 30 days, it sort of

19    wasn't exactly in my realm of possibilities.  I mean, I

20    still looked.  You never know, there could be some

21    awesome job listed that was like, Oh, hey, I could do

22    this.  But it was not looking with the intent to actually

23    transfer, because I was a flight attendant.  That's what

24    I was good at.  That's what I loved doing.  That's all I

25    wanted to do.  And had Frontier, honestly, reasonably

Page 178

1    accommodated me, it would have been easy to keep that

2    job.

3            Q.   I'm struggling with this, because you said

4    you would not entertain a transfer because of the 90-day

5    seniority thing, but then you're looking, but then you're

6    testifying that you're looking, but not to actually

7    transfer.

8            Do I have that right?

9            A.   You do.  I still looked in there.  You

10   never know.  There may have been an at-home --

11   work-from-home position doing something that I qualified

12   for, in which case, something like that, I would have

13   considered.  However, I did not want to lose my

14   seniority.

15           Q.   Hold on one second here.  I'm just

16   searching for something really quick.  All right.  Bear

17   with me one moment.

18           I want to show -- go back to an exhibit I

19   just showed you --

20           A.   Okay.

21           Q.   -- a moment ago.  This is Brigham

22   Exhibit 32.  And this, just to remind you, is the

23   transcript of the meeting you had with Cassie Micklich on

24   June 4th, 2015.

25           Do you see that?

Page 179

1          A.    Yes.

2          Q.    And to try to refresh your recollection, in

3    that conversation, it looks like you and Mr. Arellano are

4    having a discussion here on page 32 of the PDF.  And

5    you're talking about medical leave.

6                Do you see that?

7          A.    Mm-hmm.

8          Q.    And you say, As per our contract, it counts

9    as a point.

10               Do you see that?

11         A.    Yes.

12         Q.    Is the contract you were referring to the

13   CBA?

14         A.    Yes.

15         Q.    Okay.  So you did review the CBA in terms

16   of --

17         A.    No.  It was all what I had been told.  To

18   be honest with you, Danielle, I don't know if I ever even

19   looked at the contract.  It was stuff that I had been

20   told by other people that I trust.  And it was something

21   that we dealt with previously, where I was told that if I

22   reach termination points, then that medical point will be

23   taken off.  But, obviously, it still counts as a point.

24         Q.    I'll show you another document.  This is

25   Exhibit 15.  Exhibit 15 is an email from yourself to LOA

Page 180

1     Frontier employees, dated Monday October 6 -- 26, 2015.

2                    Do you see that?

3              A.    Yes.

4              Q.    Is this a true and correct copy of an email

5     that you sent to the Leave of Absence Department?

6              A.    Yes.

7              Q.    It says, I woke up this morning in a panic.

8     I forgot to send you an email on Friday.  I had to use my

9     intermittent FMLA on 10-23 for a four-day, but I kept the

10    PDX turn on the end.

11                   Do you see that?

12             A.    Yes.

13             Q.    And I think we talked about this earlier,

14    but is it true that you did not follow the required

15    call-out procedures for that 10-23 trip?

16             A.    Correct.

17             Q.    Okay.

18             A.    And I already explained that there was a

19    turn that was taken off, that I had to call

20    Stefanie Coppedge and do all that stuff, to figure out

21    why they were not allowing me to do what I had been

22    doing, if something had changed, which I'll take that

23    point.  That's fine.  That is my fault.

24                   I'm arguing about all the points before

25    that were coded as sick, when, if Frontier would have

Page 182

1     you here.  Okay.  This is Brigham Exhibit 44.

2               Do you recognize this document?

3          A.   Yes.

4          Q.   Okay.  And what is it?

5          A.   It is the final meeting.

6          Q.   Okay.

7          A.   On -- the investigatory meeting.

8          Q.   Okay.  And what was the purpose of this

9     meeting?

10         A.   It's what -- hold on.  I have -- it's what

11    we call the final termination hearing.  It's basically,

12    they're going to fire you, but this is your one chance to

13    try and argue that they shouldn't, basically.

14         Q.   Okay.  I'm going to show you pages 2 and 3

15    of the PDF.  And this is just going over again.  I think

16    you just said it.  You say here on PDF page 2, And that is

17    honestly -- like I take that.  It is my fault for not

18    sending the email right away.

19               So is that -- what you're saying right

20    there what you just testified to, which is basically that,

21    yes, that point was fairly assessed to you?

22         A.   Yes.

23         Q.   Okay.  I think that's all I wanted to ask

24    you about.  Okay.  On the same transcript -- so Brigham

25    Exhibit 34 is a transcription that we had made for the

Page 183

1    same meeting, November 3rd, 2015.

2                 Do you see that date here?

3         A.   Yes.

4         Q.   And this is, again, our court reporter,

5    Hunter + Geist.  And I'm just going to ask you, again,

6    about the CBA and the contract.

7         A.   Okay.

8         Q.   You're speaking with someone in this

9    meeting -- let me scroll up just a bit.  Someone named

10   Female 2.  And then you say, And then all of a sudden, I

11   was on hold for about five minutes, and then she came

12   back, and she's like, Let me call you back.  So she called

13   me back and said, One of the days on either end has to be

14   all intermittent FMLA, which has never happened to me

15   before.

16                 Do you see that?

17        A.   Yes.

18        Q.   And is this reference, again, to that

19   October 23rd trip and what happened?

20        A.   Yes.

21        Q.   Okay.  Female 2 says, Right.  And you

22   continue on, So I was kind of flustered with that, but

23   anyways, I told her, Okay.  Well, then the Portland turn

24   is worth more, I'll keep the Portland turn.  So after that

25   happened, I went to try to figure -- and figure out --

Page 217

1    entire schedule after bidding and build it up from --

2              A.   Not drop my entire schedule.  Don't award

3    me anything.

4              Q.   All right.  Let me put it a different way.

5                   You wanted to not even have to bid and get

6    to start off with scratch with no schedule?

7              A.   Correct.

8              Q.   Where everybody else had the whole 45,

9    correct?

10             A.   Correct.

11             Q.   But you get to be treated better than

12   everyone else, right?

13             A.    I was asking for a reasonable

14   accomodation, and that is my right under the ADA.

15                  MR. CRONE:  And -- and -- and I want to

16   put an objection on the record that the question's

17   mischaracterizing the witness' prior testimony.

18             Q.   (By Ms. Kitson)  And, Ms. Brigham, you also

19   wanted to, after you bid a full schedule, have your

20   overnight trips just magically taken off, correct?

21             A.   Correct.

22             Q.   Even though no one else got to do that,

23   correct?

24             A.    I don't know what they did for other

25   people, Danielle.  They did it for me a few times,

Page 224

1    familiar with the terms of the Collective Bargaining

2    Agreement as well?

3                    MS. KITSON:  Object to form.

4            A.    Yes.

5            Q.    (By Mr. Crone)  Okay.  Ms. Kitson put in

6    front of you a position description for a flight

7    attendant.

8                    Do you remember that?

9            A.    Yes.

10           Q.    And it listed a bunch of essential job

11   functions.

12                   Do you recall those?

13           A.    Yes.

14           Q.    And when -- when you -- when you -- after

15   you self-disclosed your disability of alcoholism, were you

16   able to complete those essential job functions?

17           A.    With my reasonable accommodation being

18   granted, yes.

19           Q.    Okay.  And what about without it?

20           A.    Without it, no, because if I had to do

21   overnights, I wouldn't have my sobriety.  Therefore, I

22   would be terminated by Frontier.

23           Q.    Okay.  And do you recall -- or actually,

24   let me start over.  Let me formulate the question a

25   different way.

Page 235

1                    REPORTER'S CERTIFICATE

2

3

4              I, Laurel S. Tubbs, a Registered

5    Professional Reporter, Certified Realtime Reporter, and

6    Notary Public within the State of Colorado, do hereby

7    certify that previous to the commencement of the

8    examination, the deponent was duly sworn by me to testify

9    to the truth.

10             I further certify that this deposition was

11   taken in shorthand by me remotely and thereafter reduced

12   to a typewritten form; that the foregoing constitutes a

13   true and correct transcript.

14             I further certify that I am not related

15   to, employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the result

17   of the within action.

18             My commission expires September 1, 2023.

19

20

                 LAUREL S. TUBBS

21               Registered Professional Reporter

                 Certified Realtime Reporter

22               and Notary Public

23

24

25