Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03417-STV
_____

REBECCA BRIGHAM,

       Plaintiff,

vs.

FRONTIER AIRLINES, INC.,

       Defendant.
_____

VIDEO VIDEOCONFERENCED DEPOSITION OF ADRIENNE PRINCE
August 21, 2020
_____

Job No. CS4205084

Page 20

1  Can you remember back to 2015 and tell us,
2  generally, how the bidding process worked under the
3  Collective Bargaining Agreement as a flight attendant?
4      A.   Yeah.  We would bid based on the program
5  FLiCA, and it was in seniority order.  So we would submit
6  our selections, and then it was awarded based on
7  seniority.
8      Q.   Were you required to bid every month?
9      A.   Yes, if you wanted a schedule, correct.
10     Q.   What would happen if you missed a bid?
11     A.   You would be placed on -- well, depending
12 on your seniority, you would get either the trips that
13 were left or, potentially, you could be put back on
14 reserve.
15     Q.   Was anyone given the ability, to your
16 knowledge, to skip bidding and then just build their
17 schedule from scratch?
18     A.   The only time that people were able to
19 build their own schedules and not bid is if they were on
20 a leave and then they came back.  And -- but it
21 was -- they had to pick what was left on open time.
22     Q.   And when you say "leave," you mean a
23 continuous leave of absence, correct, like a medical leave
24 of absence or an FMLA-approved leave of absence?
25     A.   Correct.

```
                                                        Page 21
 1          Q.   And someone on intermittent FMLA still had
 2     to bid; is that correct?
 3          A.   Correct.
 4          Q.   Okay.  Let's take a look at that Collective
 5     Bargaining Agreement together.  And this will be Brigham
 6     Exhibit 1.
 7              MS. KITSON:  If the court reporter could
 8     mark that virtually.  I don't know how that works, but
 9     I'll ask the court reporter to mark either now or
10     subsequent to the deposition Brigham Exhibit 1, which she
11     will have in her possession.  I attempted to send it to
12     her, but we'll send it via FTP.
13              For the record, that is Bates number
14     FRONTIERAIRLINES(R.BRIGHAM)-0000815 through 0000958, for
15     the record.
16              And I will now share my screen with you,
17     Ms. Prince.  And you're going to see some yellow
18     highlighting on this document, and that actually is my
19     yellow highlighting, which will help point you to what
20     I'm looking at.
21          Q.   (By Ms. Kitson)  Are you -- can you now see
22     the document?
23          A.   I am.
24          Q.   And do you recognize this as the Collective
25     Bargaining that -- Agreement that was in place from 2011
```

Page 58

1    able to maintain enough hours to live on.  Ideas, just
2    remove me from the overnights, have be build by own
3    schedule out of open time and TradeBoard.
4             Do you see that?
5         A.   Correct.  Yes, I see that.
6         Q.   Is it your understanding that these were
7    the accommodations that Rebecca Brigham was requesting?
8         A.   Yes.
9         Q.   Okay.  And did you understand that
10   Ms. Brigham wanted to just have her overnight trips
11   removed?
12        A.   Yes.
13        Q.   And did you understand that Ms. Brigham
14   just wanted to build her own schedule from scratch out of
15   open time or the TradeBoard?
16        A.   Yes.
17        Q.   Okay.  And the union would not allow her to
18   build her schedule from scratch on open time, because that
19   would have violated the Collective Bargaining Agreement,
20   correct?
21        A.   Correct.
22        Q.   Okay.  So it was not the union's intention
23   to grant this accommodation, correct?
24        A.   Correct.
25        Q.   Okay.  And the idea of "just remove me from

Page 59

1   the overnights," that would have violated the seniority
2   bidding provisions of the Collective Bargaining Agreement
3   to just do that for her, correct?
4           A.   Correct.
5           Q.   So that's not an accommodation that the
6   union intended to grant to her, correct?
7           A.   Correct.
8           Q.   Okay.  I'll stop sharing that.
9                Since you originally spoke with Mr. Crone
10  and provided this statement, have you spoken with him or
11  anyone else from his firm?
12          A.   No.
13          Q.   Okay.  So you had -- I think you said you
14  had two conversations with him.  Or was it only one?
15          A.   I believe it was two, maybe three.  It was
16  the initial, Hi, this is who I am; and then me responding
17  to him giving him this statement; and then him responding
18  back thanking me for get -- helping.
19          Q.   Was Ms. Brigham on either of those calls?
20          A.   Not to my knowledge.
21          Q.   Okay.  And why did you provide the
22  statement?
23          A.   Because, as a union rep, I advocate -- I
24  was advocating for a flight attendant, and so I was
25  continuing that.

```
                                                           Page 60
 1         Q.   So you felt you were in an advocacy role,
 2    correct?
 3         A.   Yeah.
 4         Q.   But you still would not have approved a --
 5    an exception to the Collective Bargaining Agreement for
 6    her, correct?
 7         A.   Correct.
 8         Q.   I'm going to show you what's been marked as
 9    Brigham Exhibit 44.
10         A.   Okay.
11         Q.   Are you seeing a document with number 3 in
12    the upper left-hand corner?
13         A.   Yes.
14         Q.   Okay.  This is Brigham Exhibit 44, which is
15    Bates stamp BRIGHAM LM 39 through BRIGHAM LM 46.
16         A.   Okay.
17              MS. KITSON:  And, Counsel, do you have
18    this document available to you?
19              MR. CRONE:  I do.
20              MR. SOUK:  Yes, I do.
21         Q.   (By Ms. Kitson)  Okay.  And, Ms. Prince,
22    I'll represent to you that this is a transcription that I
23    believe Ms. Brigham made of an audio-recording that she
24    took of a meeting that you participated in.
25              Were you aware that Ms. Brigham had
```

Page 61

1     audio-recorded a meeting with you?
2          A.   No, I was not aware.
3          Q.   Okay.  Go ahead and read through the
4     document, and let me know when you're finished.
5          A.   Okay.  Hold on just a second.
6          Q.   Oh, my gosh.  I keep forgetting that you're
7     looking at this.  I'm so sorry.
8          A.   No, that's okay.
9          Q.   Okay.
10         A.   No, that's okay.
11         Q.   You tell me when to scroll.  You tell me
12    when to scroll.
13         A.   Okay.  Okay.  I -- you can scroll down.
14         Q.   Okay.
15         A.   Okay.  Okay.  Okay.  Okay.
16         Q.   And this red highlighting that you're
17    seeing on the page here, I believe, is Ms. Brigham's.
18         A.   Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
19    Okay.
20         Q.   And this yellow highlighting is mine.  This
21    is what I'm going to be asking you about.
22         A.   Okay.  Okay.  Okay.  Okay.
23         Q.   This green is, again, Ms. Brigham's
24    highlighting.  Just FYI.
25         A.   Okay.  Okay.  Okay.

Page 62

1       Q.   And the yellow highlighting, this one is
2   mine again.
3       A.   Okay.  Okay.
4       Q.   And I think that's the end.  So I'm going
5   back to the beginning of the document.
6       A.   Okay.
7       Q.   And I'm going back to -- hold on one second
8   here.  I'm looking at Stefanie's statement.
9            Do you see that?
10      A.   Yeah.
11      Q.   And is that Stefanie Coppedge?
12      A.   I would assume so, but I'm not 100 --
13      Q.   And Stefanie --
14      A.   She's the only Stefanie I know that would
15   have been in those meetings, to my knowledge, so I
16   believe that was her, yes.
17      Q.   Okay.  And Stefanie Coppedge was
18   Ms. Brigham's direct supervisor; is that correct?
19      A.   I believe so.
20      Q.   Who is Andrea?
21      A.   If I recall, she was -- I can't
22   remember -- I don't know her exact position, but I
23   believe she had a position in HR.  She worked alongside
24   with Jerry Arellano.
25      Q.   Okay.  And going back up to the top, having

Page 63

1  read through this, does this refresh your recollection of
2  a meeting that you had with Ms. Brigham and the others
3  listed here on November 3rd, 2015?
4       A.   Slightly, yes.
5       Q.   Okay.  But you don't know whether these are
6  the exact words that were said; is that right?
7       A.   No, I don't know.
8       Q.   Is there anything about this that struck
9  you as inconsistent or incorrect based on the meeting that
10 you had on November 3rd?
11      A.   It -- I -- I -- I don't -- I mean, I
12 100 percent don't recall that meeting.  We had several
13 meetings.  So whether or not that was specific to that
14 one, I couldn't be 100 percent certain.
15      Q.   Was -- it says, Final
16 Meeting With the Company, Investigatory.
17           Do you see that?
18      A.   Yes.
19      Q.   Do you remember having a final meeting with
20 the company in the grievance process for Ms. Brigham?
21      A.   Yes.
22      Q.   And what is that, Final Meeting?  What's
23 that a reference to?
24      A.   It's essentially the last step in the
25 grievance process, kind of a last-ditch effort to see if

Page 64

1    there's anything we can do to help the flight attendant.
2         Q.   Okay.  The first person speaking here, it
3    says, Adrian, Union VP.
4              It looks like that's a misspelling of your
5    name, but is that you?
6         A.   I would believe so.  Probably, yes.
7         Q.   And then "Rebecca" is a reference to
8    Ms. Brigham; is that right?
9         A.   I would assume, yes.
10        Q.   Okay.  Just scrolling through here.
11             So we're back at Stefanie Coppedge's
12   statement.  She says, So, of course, this is the
13   fact-finding meeting, uh, because, Rebecca, you have hit,
14   uh -- so I have provided you with your absentee record.
15   That's the first little pile.  I have a letter -- an email
16   from Shelly Liner for the sick call that was, uh, 10/23.
17   Uh, she sent out an email that you probably just got a
18   photocopy of it too that your request was denied for lack
19   of timely notice to the FMLA department.
20             Do you see that?
21        A.   Yes.
22        Q.   Is it your recollection that Ms. Brigham
23   had a sick call on October 23rd, 2015, that put her over
24   the permissible points on the dependability policy such
25   that her employment was to be terminated under policy?

Page 65

1    A.   It looks that way, yes.
2    Q.   And was it true at the time at Frontier
3    that the attendance policy had a termination level of date
4    points?
5    A.   Yes.
6    Q.   Can you explain what that means?
7    A.   For every instance that you called out,
8    whether it be being sick or being late, you acquired
9    points. And each instance had -- like a sick instance
10   had a different point value than being tardy.
11            And then you -- you would accumulate eight
12   points. And so in each step before that -- and I don't
13   remember the exact points, but, like, if you had four
14   points, it was a written warning; if you had 6, it was
15   another step of discipline; and then at the eighth, it
16   was termination.
17   Q.   And it was your understanding that
18   Ms. Brigham had reached that termination level, correct?
19   A.   It looks that way, yes.
20   Q.   And that was the reason you were having
21   this meeting, correct?
22   A.   Correct.
23   Q.   Okay. And Ms. Coppedge says that her
24   request to be excused from that sick call was denied
25   because of lack of timely notice to the FMLA department.

```
                                                      Page 66
 1                 Do you see that?
 2         A.   Yes.
 3         Q.   Okay.  Scrolling down to the next page, we
 4   have Ms. Brigham say -- saying, Which I take that.  It is
 5   my fault.  I did not send it in a timely manner.  I did
 6   email her Monday morning before I did the Portland turn,
 7   and just said, Oh, my gosh, I woke up in a panic.  I
 8   completely forget.  Here is the days, and I understand
 9   that.  Uh, and I will gladly take that point and a half.
10                 Do you see that?
11         A.   Yes.
12         Q.   Was it your understanding that Ms. Brigham
13   agreed that those final points from the October 23rd trip
14   were correctly classified under the dependability policy?
15         A.   It appears that way, yes.
16         Q.   And was that your understanding at the
17   time?
18         A.   Yes.
19         Q.   And was the union taking any issue with the
20   coding of those points for the October 23rd trip?
21         A.   I don't recall specific to that particular
22   date and those particular points.
23         Q.   If Ms. Brigham is saying, though, that she
24   doesn't contest it, would the union agree with that?
25         A.   I would assume that we would have agreed
```

Page 140

REPORTER'S CERTIFICATE

       I, Laurel S. Tubbs, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within the State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify to the truth.

       I further certify that this deposition was taken in shorthand by me remotely and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

       I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

       My commission expires September 1, 2023.

*[Signature]*

LAUREL S. TUBBS
Registered Professional Reporter
Certified Realtime Reporter
and Notary Public