## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 19-cv-03417-WJM-STV

REBECCA BRIGHAM,

        Plaintiff,

v.

FRONTIER AIRLINES, INC.,
a Colorado corporation,

        Defendant.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT FRONTIER AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, by and through the undersigned, hereby submits *Plaintiff's Response to Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment*. Because Defendant is not entitled to summary judgment on: (a) Plaintiff's claim for failure to engage in the interactive process as required under the ADA; (b) Plaintiff's claim of unlawful discrimination under the ADA; (c) Plaintiff's claim of unlawful failure to accommodate under the ADA; or (d) Plaintiff's claim for unlawful retaliation under the ADA, Ms. Brigham respectfully requests the Court deny Defendant's Motion in its entirety.

## I.    RESPONSE TO MOVANT'S STATEMENT OF MATERIAL FACTS

1.    Deny. Defendant's own cited evidence does not state that being scheduled for layovers or overnights is an essential function of the position of flight attendant. *See* Def.'s Ex. A

at ¶ 5; Def.'s Ex. B at 118:10-18. Moreover, Mr. Arellano, when testifying on behalf of Defendant Frontier Airlines, Inc., stated that a flight attendant's primary job duties were those of a "safety professional . . . to make sure the passenger experience is a positive one from every aspect of serving drinks and sharing – safety is obviously the most important." Ex. 2 to Pl.'s Motion for Partial Summary Judgment at 50:1-5. When asked about flight attendants' job duties from the perspective of scheduling such as: "When do they start? Where do they go? How does the day end?", Mr. Arellano responded: "[I]t's hard to answer that question because everybody had a different – a flight attendant had a different way to bid a schedule based on their preference . . . So every day would be different for each flight attendant based on the type of routes they bid for, the type of flying they bid for . . . It just depended on the individual. It's all completely different. It's hard to answer that question." Id. at 55:4-56:21.

Moreover, when questioned by Frontier's attorney as to whether or not the Position Description attached to Frontier's Motion properly listed all essential functions of a flight attendant, Plaintiff responded: "Yes." Ex. 3 to Pl.'s Motion at 118:10-119:14. Notably, the Position Description does not include layovers or overnights. Def.'s Ex. A at ¶5.

2.      Deny. While flight attendants would generally build their schedules through an automated bidding process based on seniority, this was not always the case. Ex. 10 to Pl.'s Motion (the "CBA") at 43 (outlining that in order to bid on a schedule, a flight attendant must be "eligible," which includes all flight attendants unless they were on "company approved leave" such as "LOA, MED, FMLA, OJI, etc."). Thus, for example, a flight attendant coming back from leave for a medical reason may not return to work early enough in any given month to start at the beginning of the bidding process. Id. at 43-44. In this case, the flight attendant would build their schedule

from "Open Time" (trips leftover and unassigned in the seniority-based bidding process and available on a first-come first-served basis). Id. As such, flight attendants were sometimes allowed to build their schedules from the unawarded trips that more senior flight attendants did not take, *i.e.*, they built their schedules outside of the seniority-based bidding process. Id. And if the flight attendant missed part of a trip, or even a complete trip, while out on intermittent leave such as "FMLA, MED, OJI, etc.," then the flight attendant could simply "pick up Open Time to replace the trip" so long as the missed trip was originally scheduled from Open Time. Id. at 105. Again, this schedule would be built without utilizing the seniority bidding process.

Also, flight attendants who called in sick due to illness, but subsequently recovered without being able to rejoin their original trip, were allowed to "pick up Open Time if available to replace his/her original trip." Id. at 94. This scheduling would be accomplished without utilizing the seniority bidding process.

Moreover, so long as a flight attendant was scheduled for a minimum of 60 hours at the end of the bidding process, while not dropping below 45 hours during the scheduling process, a flight attendant could swap out every single one of the flights they were initially awarded after bidding. Id. at 53-59; Ex. 6 to Pl.'s Mot., Deposition of Plaintiff's direct supervisor Stefanie Coppedge, at 57:5-7 ("Q. Got it. So as long as you maintain your [minimum] hours there, you could trade away all those trips for new trips? A. As long as you maintain [minimum] hours.").

Critically, there is no provision in the CBA that purports to restrict Frontier from complying with its obligation under the ADA to grant reasonable accommodations where required. Ex. 10 to Pl.'s Motion at 141 ("Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate is business and work force . . . .").

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Deny. As explained above, flight attendants returning from intermittent leave such as "FMLA, MED, OJI, etc." could simply "pick up Open Time to replace the trip" so long as the missed trip was originally scheduled from Open Time. Ex. 10 to Pl.'s Motion at 105. This schedule would be built without utilizing the seniority bidding process.

8.      Deny. As described above, flight attendants did not always work a schedule "determined by the CBA's seniority-based bidding process." And while flight attendants were required to abide by an attendance policy, Ms. Brigham denies that this policy's requirements demonstrated "dependability" among flight attendants. Ex. 3 to Pl.'s Motion at 36:13-16 ("That's four times being sick in a year, when you're working with the public, who are sick. And I just – I will argue all day that Frontier's attendance policy was ridiculous. We even tried to strike over it.").

9.      Deny. The Dependability policy states that eight (8) occurrences, not "unexcused absences," within a rolling 12-month period will result in termination. Def.'s Ex. A (citing to FRONTIER AIRLINES (R. BRIGHAM) – 0000365-69). The Dependability Policy does not equate each single absence with an occurrence; for example, the Policy states: "Reporting late more than 2 hours for a scheduled duty shift or an entire day's absence for a cold is one occurrence . . . Three consecutive day's absence due to having the flu shall be one occurrence or event." Id.

10.      Deny. The Dependability Policy is not part of the CBA, and therefore, the CBA's

provisions do not "reflect" Defendant's views on the "importance of reliable attendance." *See generally* Ex. 10 to Pl.'s Motion (the "CBA"). The two (2) hour notice provision in the CBA only applies to flight attendants that are calling in due to sickness or off-the-job injury. Id. This provision in the CBA has nothing to do with employees that may be absent for any other reasons, including those that have requested and are seeking reasonable accommodations. Id.

11.     Admit. Defendant offers a variety of leave as required under law, including FMLA leave, military leave and jury duty leave. Def.'s Ex. A at ¶ 14 (citing to FRONTIER AIRLINES (R. BRIGHAM) – 0000307-18).

12.     Admit.

13.     Admit. Frontier has generally correctly stated its policy for use of intermittent FMLA time; however, Defendant's policy also states: "After reporting their absence, employees should send an email . . . [t]his email must be received as soon as practicable, usually the same day of the absence or the next day." Ex. 2 to Def.'s Ex. A at FRONTIER AIRLINES (R. BRIGHAM) – 0000313. Moreover, when an employee is applying for FMLA leave due to substance abuse, then "the application will be considered self-disclosure and the employee made eligible for additional assistance – as outlined in Frontier's Drug and Alcohol-Free Policies and Regulations (Employee Assistance Following Self Disclosure) . . . [t]he employee's return to work will be governed by the policies and processes detailed in that section." Id. at 0000308. After an employee self-discloses an alcohol addiction, the employee may only return to work after completion of an "approved rehabilitation program," testing negative for alcohol use, and being in "full compliance with any additional treatment or aftercare recommended by a Substance Abuse Provider." Id. at 0000355. Non-compliance "with any portion of recommended treatment, aftercare or testing may

result in disciplinary action up to and including suspension or termination." Id.

    14.     Admit.

    15.     Admit.

    16.     Admit.

    17.     Deny. Defendant's citation to various "written warnings" about "attendance issues" does not establish a "pattern of attendance issues." Rather, this citation shows: (1) Ms. Brigham was sick once in 2007 and absent twice; (2) in 2008, Ms. Brigham received an "advisement only" as she was sick four times between 2007 and 2008 (Defendant tracked these sick "occurrences" on a rolling 12-month basis); (3) in 2009, Ms. Brigham utilized another sick day and informed Frontier that she would be "applying for intermittent FMLA to cover absences due to pregnancy;" and (4) in 2010, Ms. Brigham utilized a sick day. Ex. 4 to Def.'s Ex. A at 1-7. Many of Defendant's "written warnings" are duplicative because they are issued on a rolling basis and capture sick days captured in prior warnings that have yet to "drop[] off." Id.

    The record does not pick back up until March 29, 2012, where Ms. Brigham was issued "performance counseling" for taking five sick days in 2011 and one sick day in 2012. Id. at 8. The record then goes blank again until July 13, 2013 where Ms. Brigham was again warned for using an additional three sick days in 2012 and one sick day in 2013. Id. at 9. Notably, one of the sick days in 2013 was coded as "MED" (meaning "medical"). Id. at 10-12. Ms. Brigham then utilized four more sick days in 2013, and one sick day in 2014 prior to self-disclosing her disability of alcoholism to Frontier on or about September 7, 2014. Id. at 13. Thus, between the date of Ms. Brigham's hire and her self-disclosure, a period of approximately **seven (7) years**, Ms. Brigham utilized **25 sick days** – for issues ranging from illness to pregnancy and personal issues. Id.; *see*

*also* Ex. 3 to Pl.'s Motion at 36:13-16 ("That's four times being sick in a year, when you're working with the public, who are sick. And I just – I will argue all day that Frontier's attendance policy was ridiculous. We even tried to strike over it."). Under Frontier's own Dependability Policy a flight attendant could utilize four (4) sick days per year without penalty, or 28 sick days in seven (7) years, *more* than Ms. Brigham actually used. Ex. 2 to Def.'s Ex. A at 0000368; Ex. 4 to Def.'s Ex. A at 3 ("Four Sick Instances Reminder" that stated: "The purpose of this letter is for advisement only.").

After Ms. Brigham's self-disclosure on September 7, 2014 and through the date of her termination on November 11, 2015, Plaintiff's absences from work were due directly to the fact that Frontier required Ms. Brigham to comply with her treatment plan but refused to reasonably accommodate Ms. Brigham to make her compliance possible. Pl's Motion at 8-13 [Dkt. 36].

18.     Admit.

19.     Admit.

20.     Deny. As indicated on the Frontier Airlines Fitness-for-Duty Certification form, filled out by both Ms. Brigham and Dr. Walter Thomas, Ms. Brigham possessed no restrictions related to "standing, walking, sitting, lifting/pushing/pulling, carrying, [or] use of hands." Ex. 6 to Def.'s Ex. A. However, this form mentions nothing of non-physical restrictions, nor does it mention Frontier's own restrictions related to an employee's return to work after self-disclosure of a substance abuse problem. After an employee self-discloses an alcohol addiction, the employee may only return to work after completion of an "approved rehabilitation program," testing negative for alcohol use, and being in "full compliance with any additional treatment or aftercare recommended by a Substance Abuse Provider." Ex. 2 to Def.'s Ex. A at FRONTIER AIRLINES

(R. BRIGHAM) – 0000308. Non-compliance "with any portion of recommended treatment, aftercare or testing may result in disciplinary action up to and including suspension or termination." Id.

21.     Deny. Plaintiff never allowed her *use of alcohol* to impede her ability to perform satisfactorily as a flight attendant *i.e.*, she never drank on the job. Ex. 3 to Pl.'s Mot. at 68:2-9 ("No. Luckily, I had never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on duty. However, on overnights, after you're done, it's – it was just kind of a culture where you would take off all your flight attendant gear, put on normal clothes, and go meet at the bar. Nine times out of ten, that's what you did.").

However, Plaintiff's alcoholism was substantially limiting in a number of ways. Id. at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Ex. 7 to Pl.'s Mot. at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); Ex. 15 to Pl.'s Mot. at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour

and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her."); and Ex. 15 to Pl.'s Mot. at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol dependance.").

22.     Deny. Plaintiff was clear in her deposition to state that while she never let her alcohol *use* interfere with performance of her essential job functions, Ex. 3 to Pl.'s Motion at 68:2-9, she was only able to perform all essential functions of her job *with* a reasonable accommodation. Id. at 224:14-22 ("Q. And when – when you – after you self-disclosed your disability of alcoholism, were you able to complete those essential job functions? A. With my reasonable accommodations being granted, yes . . . Without it, no, because if I had to do overnights, I wouldn't have my sobriety. Therefore, I would be terminated by Frontier.").

23.     Admit that since September 5, 2014, Plaintiff has been sober. Deny that alcoholism has not impacted Plaintiff's daily life activities or inhibited her ability to function. Id. at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. But my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Id. at 215:11-18 ("Q. What other major emotional stressors

have you had in your life, not counting Frontier? A. I honestly – Frontier. I put my daughter [referring to the death of her daughter soon after birth] and Frontier in pretty much the same category. They both destroyed my happiness, what I thought was going to be my life, and just destroyed it. I was worth something when I was a flight attendant. I was proud. It was what I wanted to do when I grew up.").

24.      Deny. Plaintiff was complying with the terms of her treatment plan, as required by Frontier, while Frontier was simultaneously failing to accommodate Ms. Brigham. Pl's Motion at 8-13 [Dkt. 36].

25.      Admit.

26.      Deny. As stated above, Ms. Brigham was complying with the terms of her treatment plan, as required by Frontier, while Frontier was simultaneously failing to accommodate Ms. Brigham. Pl's Motion at 8-13 [Dkt. 36]. Ms. Brigham, in her deposition as cited by Defendant, was referring to a **single** instance in which she neglected to send an email within 24 hours of using intermittent FMLA leave time because she was preoccupied with "trying to figure out why that turn was taken off of [her] schedule," a scheduling problem that even Ms. Brigham's direct supervisor was unable to understand. Ex. 3 to Pl.'s Mot. at 42:4-48:9. And in any event, Frontier's policy with regard to using intermittent FMLA only requires that: "After reporting their absence, employees should send an email . . . [t]his email must be received as soon as practicable, usually the same day of the absence or the next day." Ex. 2 to Def.'s Ex. A at 0000313. And it is undisputed that Ms. Brigham did send an email to Frontier regarding use of this intermittent FMLA leave day the moment she realized she should have. Ex. 3 to Pl.'s Mot. at 179:24-180:12.

27.      Admit.

28.     Admit that Plaintiff requested to avoid layovers and overnights in order to comply with her treatment plan. At this June 4, 2015 meeting, Plaintiff communicated her difficulties in avoiding overnights and layovers, even suggesting that perhaps she could "offer like 20 bucks for somebody to pick it [the overnight trip] up or something, and if that doesn't happen, then I would use my intermittent FMLA." Ex. 8 to Def.'s Ex. A at 0004282. Mr. Arellano responded that Ms. Brigham had already "exhausted" her intermittent FMLA, Id., and that Ms. Brigham could only qualify for a "maximum of 12 weeks" of FMLA leave. Id. at 0004282-83. Mr. Arellano made it clear that Ms. Brigham would not be able to utilize any additional intermittent FMLA time: "[U]nfortunately there's no more for you to use of that piece." Id. at 0004283. And while Mr. Arellano did not discuss accommodating Ms. Brigham under the ADA (apart from a casual reference to possibly transferring to Orlando, which Ms. Brigham could not do given that she had a family with kids in Colorado), he did suggest that she try to swap and drop trips, "maybe put incentives out there for folks who . . . [take those trips]," and "hopefully that will work for you down the road." Id. at 0004289. Apparently, Mr. Arellano's solution was for Ms. Brigham to offer $20 to people to incentivize them to take her layovers an overnights.

At this meeting, Ms. Brigham also asked if she could work at the GO: "And then my other question is, is there an option for – you know, how like OJI, you come to the GO and do whatever. Is that ever an option if they're like – let's say, because I don't want to get in trouble. I don't want to get these sick instances or (indiscernible) instances, points. You know, is there ever an option that if it comes down to it – like this three day that I had you pull me off . . . That way it's not like anybody – nobody thinks that I'm like, oh, she just wants these days off so she's trying to get out of it. Because that's not it at all. I mean, I would have loved to pick up a turn today and tomorrow.

You know what I mean? But is that an option to kind of that way I can still get – it wouldn't be like a point. Like, instead of getting a point, I would come to the GO and work . . . ." Id. at 0004317-18.

29.     Deny. Mr. Arellano never mentioned that Ms. Brigham's requests for reasonable accommodation might violate the CBA in this meeting. *See generally* Ex. 8 to Def.'s Ex. A.

30.     Deny. Ms. Prince never took this position until she was recently deposed by Frontier. **Exhibit 1**, Declaration of Adrienne Prince dated March 13, 2020 at 2, ¶ 6 ("Frontier claimed the requested accommodation would have violated the seniority provision in the collective bargaining agreement, and therefore, never granted the accommodation. However, I explained to Frontier that the Union was not seeking an accommodation that would violate the seniority provision, but rather, would work *within* the seniority provision. In other words, the Union requested that Ms. Brigham be allowed to bid for shifts within her existing seniority to avoid layovers as much as possible, and with regard to the whatever shifts were leftover containing layovers and assigned to Ms. Brigham, the Union proposed a method by which Ms. Brigham could have traded, swapped or dropped these shifts in compliance with the collective bargaining agreement."); Ex. E, Transcript of Meeting dated November 3, 2015, to Def.'s Mot. at BRIGHAM LM 0000043-44 (Ms. Prince: "And if she were picking up that open time or the trade it wouldn't be . . . [b]ecause it wouldn't be like pre-awarded if that was something that came up. Uh as far as the union stance – you know if she could bid what she could hold and then you know was either removed or able to pick up some open time – it wouldn't violate seniority. Because that's all first come first serve anyway."); Ex. E to Def.'s Motion at BRIGHAM LM 0000046 (Ms. Prince: "And I do know just so that you're familiar – a lot of times when people come back mid-month or they're

not released to be able to bid they are given blank schedules and they to – and I mean it's something that inflight already does so it wouldn't be an undue hardship with the company . . . They already allow – pick up in this light so it's not like we are – it's a really unusual request that's never been done before . . . .").

And even in her recent deposition, Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have violated the CBA. **Exhibit 2**, Deposition of Adrienne Prince at 120:14-24; Ex. 2 at 125:9-12 ("Q. Do you still think that that was a reasonable solution, sitting here today looking back on things? A. I do."); Ex. 2 at 126:5-9 (confirming that Ms. Brigham's request for temporary transfer to the GO was also a reasonable request).

Currently, Ms. Prince is no longer affiliated with the Union and does not perform advocacy work on behalf of flight attendants. Ex. 2 at 12:13-22.

31.     Deny. While Mr. Arellano has submitted a Declaration stating as much, he makes this assertion with no logical explanation. Ex. A to Def.'s Motion at 6, ¶ 39. In reality, the seniority-based bidding system contemplates a process where *after* flight schedules are awarded by seniority, flight attendants may drop, add or swap Open Time, which is expressly designated as "first-come first serve" as opposed to seniority based. Ex. 10 to Pl.'s Mot. at 56. Thus, if Ms. Brigham was allowed to build her schedule from Open Time, she would have been choosing from the flights more *and* less senior flight attendants did not want in the initial seniority-based bidding process. This cannot be characterized as "necessarily penalize[ing] other flight attendants."

32.     Deny. These suggestions from Mr. Arellano were not proposed reasonable accommodations, but rather, suggestions that any employee with or without a disability could have pursued. Ex. 2 to Pl.'s Mot. at 96:24-98:13. Frontier never proposed a reasonable accommodation

beyond these suggestions that any other employee could have taken advantage of. Id. Taking intermittent FMLA leave time was not allowing Plaintiff to successfully perform her job hence her requests for reasonable accommodation (not to mention, as cited above, Mr. Arellano told Plaintiff with regard to additional FMLA time: "[U]nfortunately there's no more for you to use of that piece."), and Defendant's suggestion to apply for other jobs was not reasonable because Ms. Brigham did not qualify for any of the available listed positions at the time. Ex. 3 to Pl.'s Mot. at 74:5-17 ("Q. Are you aware that Frontier provides preferential hiring for anyone who needs an accommodation under the Americans with Disabilities Act for positions for which they're minimally qualified? A. They never told me anything about that . . . I asked multiple times what could be done to help me in this situation. I was never aware of whatever you're talking about. They never mentioned anything to me. All they said was that they could not help me."); Ex. 3 to Pl.'s Mot. at 165:22-166:6 ("So you were able to successfully look for potential transfer options; is that right? . . . A. From – honestly, from my memory. I remember seeing a bunch of stuff that I was not quite qualified for. And then at some point, I stopped, because I had been told that, You'll lose your seniority, and you won't be able to go back to inflight after 90 days."); Ex. 3 at 178:9-14 ("A. . . . I still looked in there [referring to Frontier's online job postings]. You never know. There may have been an at-home – work-from-home position doing something that I qualified for, in which case, something like that, I would have considered. However, I did not want to lose my seniority.").

33.     Admit. Plaintiff admits that she needed to continue to earn a living, *i.e.*, she could not afford to take unpaid leave. Ex. 3 to Pl.'s Mot. at 65:6-7 ("Correct. I needed money coming in. And had they accommodated me, I would have had that.").

34.     Admit. Plaintiff preferred to stay a flight attendant, but more importantly, she was not qualified for the available transfers although she would have taken one if she had, and she was told that she would lose her seniority if she transferred out of Inflight. Ex. 3 to Pl.'s Mot. at 165:22-166:6; Ex. 3 at 178:9-14; Ex. 3 at 131:15-17 ("I believe it was Jeff Varney [Inflight Supervisor] told me that after 90 days, you lose your seniority or your ability to go back to Inflight at your seniority."); **Exhibit 3**, Transcript of Meeting between Plaintiff, Jerry Arellano, Jeff Varney, and Meredith [Plaintiff believes that "Meredith" was actually Shelly Leyner, Defendant's HR Manager, and the name "Meredith" may be an error in transcription] dated October 9, 2015 at 63:18-64:10 ("REBECCA BRIGHAM: Right. Do you lose your seniority? MEREDITH: After – JERRY: Ninety days. MEREDITH: Oh, is it ninety days? Oh, if you stay within inflight – JERRY: If you stay within the company – MEREDITH: -- it's two years. If you leave Inflight, it's ninety days. JERRY: Or if you leave the company. REBECCA BRIGHAM: Right. Right. I get that. So I would have to take a position with Inflight more in those darameters – parameters. MEREDITH: Uh-huh. If you wanted to keep your seniority.").

Moreover, in the October 9, 2015 meeting, Ms. Brigham confirms that she was approved for 12 intermittent FMLA days at this point, but because this was not adequate for scheduling purposes, she had requested to increase her allotted days to 15. Ex. 3 at 47:1-11. Mr. Arellano repeated the incorrect assertion that Ms. Brigham's intermittent FMLA time was only approved for "sessions," rather than additional needs related to her alcohol treatment. Id at 48:5-11. Mr. Arellano also made clear that Frontier would not reasonably accommodate Ms. Brigham: "So if we made – if we cherrypicked to try and create you a certain situation – now we've created a whole separate accommodation for you –" Id. at 52:16-21. And to be clear in this denial, Mr. Arellano

stated: "Right. So and I get where you're coming from, but how do we compare only those individuals who have self-disclosure from everybody else who has a serious health condition? And we're not making exceptions –" Id. at 56:17-21. Ms. Brigham stated in response: "We're all individuals and you have to look at us as all individuals." Id. at 56:22-23. Mr. Arellano responded: "Unfortunately, FMLA does not allow us that ability, because now we're only giving special treatment to certain individuals." Id at 56:24-57:1.

35.     Admit. However, in her deposition, Plaintiff further explained: "I didn't even know what document she was even referring to. It didn't say in the Collective Bargaining Agreement or the employee handbook. To be honest, I didn't even look, because I'd already been told that you lose your seniority after 90 days." Ex. 3 to Pl.'s Mot. at 169:15-19. And in any event, the CBA permits a flight attendant to transfer "outside of the Flight Attendant craft or class" and "retain and accrue seniority" only if the transfer is on "account of physical incapacity, illness, or injury." Ex. 10 to Pl.'s Mot. at 102.

36.     Admit; however, as cited above, there were no transfer positions that Plaintiff qualified for. In order to transfer out of Inflight and still retain seniority, Ms. Brigham would have had to transfer on "account of physical incapacity, illness, or injury." Ex. 10 to Pl.'s Mot. at 102.

37.     Admit that Plaintiff requested to temporarily work at the GO as Frontier employees on OJI were regularly allowed to do so. Deny that the CBA only allowed transfers to the GO for "flight attendants injured on the job." Pl.'s Mot. at 9-12. Deny that assignments to the GO were not "open positions" as asserted by Mr. Arellano given that employees were routinely transferred to these positions when they were injured on the job. Id. Admit that transferees to the GO performed administrative or light-duty work.

38.     Deny, again, Plaintiff disputes that the CBA limited Frontier's ability to transfer flight attendants to the GO for temporary administrative or light duty work only to cases of on-the-job injury. Pl.'s Mot. at 9-12. This restrictive interpretation of the CBA contravenes a plain and logical reading of the text. In any event, flight attendants were in fact routinely transferred to the GO when they suffered an OJI, Ex. 2 to Pl.'s Mot. at 66:18-23, and Defendant has proffered no rational reason for denying Plaintiff's request to do the same.

39.     Deny. While the exact duration of Plaintiff's treatment was not stated in terms of a specific date or hour, Plaintiff was clear that: "We were getting further along in my recovery, and it would have been pretty soon after . . . It's – it would never have been indefinitely." Ex. 3 to Pl.'s Mot. at 77:8-20; *see also* Def.'s Ex. 7 to Ex. A at 3 (wherein Ms. Brigham's healthcare provider noted a one (1) year "period of intermittent incapacitation").

40.     Admit.

41.     Deny. Plaintiff disputes the cause of these "occurrences." After Ms. Brigham's self-disclosure on September 7, 2014 and through the date of her termination on November 11, 2015, Plaintiff's absences from work were due directly to the fact that Frontier required Ms. Brigham to comply with her treatment plan but refused to reasonably accommodate Ms. Brigham to make her compliance possible. Pl's Motion at 8-13 [Dkt. 36].

42.     Admit, although as stated above, Plaintiff believes that Shelly Leyner, Defendant's HR Manager, was also at this meeting and is erroneously designated as "Meredith" in the transcript prepared by Defendant.

43.     Admit.

44.     Admit; however, as stated and cited above, Mr. Arellano was mistaken in his

assertions.

45.     Admit.

46.     Deny. Plaintiff's FMLA form dated March 10, 2015 clearly stated that Ms. Brigham would require FMLA leave for both "intermittent capacitation" and "treatment appointments" such as "group sessions." Def.'s Ex. 7 to Ex. A at 3. Thus, Frontier actually approved Plaintiff for 8 FMLA days per month during this period (four (4) days of "intermittent incapacitation" and "1x per week" for "treatment appointments"). Id. Plaintiff's FMLA form dated May 28, 2015 clearly stated that Ms. Brigham would require FMLA leave for both "intermittent incapacitation" and "treatment appointments." Def.'s Ex. 10 to Ex. A at 4-5. Thus, Frontier actually approved Plaintiff for at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"). Id.

47.     Admit; however, as stated and cited above, Plaintiff could not afford unpaid leave nor was she qualified at that time for another internal position within the company.

48.     Admit, but even Shelly Leyner, Defendant's HR Manager also present at the meeting, noted that with regard to this position: "it's not easy to slide into that position" as Plaintiff may not have qualified. **Exhibit 3** at 62:10-63:5.

49.     Admit.

50.     Deny. As stated above, Plaintiff clearly stated she would have taken a position had she been qualified, but she was not. Ex. 3 at 178:9-14 ("A. . . . I still looked in there [referring to Frontier's online job postings]. You never know. There may have been an at-home – work-from-home position doing something that I qualified for, in which case, something like that, I would have considered. However, I did not want to lose my seniority.").  Admit, that Ms. Brigham also

desired to remain a flight attendant and was concerned about losing a critical term of her employment: seniority.

51.     Deny. Ms. Brigham "kept the PDX turn on the end" of this trip, *i.e.*, she did not "fail[] to report for a four (4) day trip." Ex. 3 to Pl.'s Mot. at 180:7-23.

52.     Deny. As stated and cited above, Defendant misstates Frontier policy. Defendant's policy also states: "After reporting their absence, employees should send an email . . . [t]his email must be received as soon as practicable, usually the same day of the absence or the next day." Ex. 2 to Def.'s Ex. A at FRONTIER AIRLINES (R. BRIGHAM) – 0000313.

53.     Admit, although pursuant to Defendant's policy, the parties dispute whether Plaintiff's request was actually untimely.

54.     Admit.

55.     Admit, although Plaintiff notes that meeting was meant to discuss Frontier's allegation that Plaintiff had violated the Dependability Policy. *See* Ex. 17 to Def.'s Ex. A at 1. In fact, as Plaintiff had already been granted at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"), Def.'s Ex. 10 to Ex. A at 4-5, Plaintiff could not have been in violation of the Dependability Policy. And even if she was, this was only due to the fact that Defendant simultaneously required her to comply with her treatment plan while also denying her a reasonable accommodation to make such compliance possible. Pl's Motion at 8-13 [Dkt. 36].

56.     Admit, although as stated and cited above, Plaintiff disputes that Defendant has correctly characterized the policy.

57.     Admit.

58.     Admit.

59.     Admit.

60.     Deny. While flight attendants would generally build their schedules through an automated bidding process based on seniority, this was not always the case. Ex. 10 to Pl.'s Motion (the "CBA") at 43 (outlining that in order to bid on a schedule, a flight attendant must be "eligible," which includes all flight attendants unless they were on "company approved leave" such as "LOA, MED, FMLA, OJI, etc."). Thus, for example, a flight attendant coming back from leave for a medical reason (requiring a doctor's release) may not return to work early enough in any given month to start at the beginning of the bidding process. Id. at 43-44. In this case, the flight attendant would build their schedule from "Open Time" (trips leftover and unassigned in the seniority-based bidding process and available on a first-come first-served basis). Id. As such, flight attendants were sometimes allowed to build their schedules from the unawarded trips that more senior flight attendants did not take, *i.e.*, they built their schedules outside of the seniority-based bidding process. Id. And if the flight attendant missed part of a trip, or even a complete trip, while out on intermittent leave such as "FMLA, MED, OJI, etc.," then the flight attendant could simply "pick up Open Time to replace the trip" so long as the missed trip was originally scheduled from Open Time. Id. at 105. Again, this schedule would be built without utilizing the seniority bidding process.

Also, flight attendants who called in sick due to illness, but subsequently recovered without being able to rejoin their original trip, were allowed to "pick up Open Time if available to replace his/her original trip." Id. at 94. This scheduling would be accomplished without utilizing the seniority bidding process.

Moreover, so long as a flight attendant was scheduled for a minimum of 60 hours at the end of the bidding process, while not dropping below 45 hours during the scheduling process, a flight attendant could swap out every single one of the flights they were initially awarded after bidding. Id. at 53-59; Ex. 6 to Pl.'s Mot., Deposition of Plaintiff's direct supervisor Stefanie Coppedge, at 57:5-7 ("Q. Got it. So as long as you maintain your [minimum] hours there, you could trade away all those trips for new trips? A. As long as you maintain [minimum] hours.").

Critically, there is no provision in the CBA that purports to restrict Frontier from complying with its obligation under the ADA to grant reasonable accommodations where required. Ex. 10 to Pl.'s Motion at 141 ("Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate is business and work force . . . .").

61.     Deny. *See* Para. 60 above. Ms. Prince never took this position until she was recently deposed by Frontier. **Exhibit 1**, Declaration of Adrienne Prince dated March 13, 2020 at 2, ¶ 6 ("Frontier claimed the requested accommodation would have violated the seniority provision in the collective bargaining agreement, and therefore, never granted the accommodation. However, I explained to Frontier that the Union was not seeking an accommodation that would violate the seniority provision, but rather, would work *within* the seniority provision. In other words, the Union requested that Ms. Brigham be allowed to bid for shifts within her existing seniority to avoid layovers as much as possible, and with regard to the whatever shifts were leftover containing layovers and assigned to Ms. Brigham, the Union proposed a method by which Ms. Brigham could have traded, swapped or dropped these shifts in compliance with the collective bargaining agreement."); Ex. E, Transcript of Meeting dated November 3, 2015, to Def.'s Mot. at BRIGHAM LM 0000043-44 (Ms. Prince: "And if she were picking up that open time or the trade it wouldn't

be . . . [b]ecause it wouldn't be like pre-awarded if that was something that came up. Uh as far as the union stance – you know if she could bid what she could hold and then you know was either removed or able to pick up some open time – it wouldn't violate seniority. Because that's all first come first serve anyway."); Ex. E to Def.'s Motion at BRIGHAM LM 0000046 (Ms. Prince: "And I do know just so that you're familiar – a lot of times when people come back mid-month or they're not released to be able to bid they are given blank schedules and they to – and I mean it's something that inflight already does so it wouldn't be an undue hardship with the company . . . They already allow – pick up in this light so it's not like we are – it's a really unusual request that's never been done before . . . .").

And even in her recent deposition, Ms. Prince confirmed that Ms. Brigham's request to build her schedule out of Open Time would not have violated the CBA. **Exhibit 2**, Deposition of Adrienne Prince at 120:14-24; Ex. 2 at 125:9-12 ("Q. Do you still think that that was a reasonable solution, sitting here today looking back on things? A. I do."); Ex. 2 at 126:5-9 (confirming that Ms. Brigham's request for temporary transfer to the GO was also a reasonable request).

Critically, there is no provision in the CBA that purports to restrict Frontier from complying with its obligation under the ADA to grant reasonable accommodations where required. Ex. 10 to Pl.'s Motion at 141 ("Except as restricted by the express terms of this Agreement, the Company will retain all rights to manage and operate is business and work force . . . .").

62.    Deny. *See* Para. 60-61 above.

63.    Admit that both Frontier and Adrienne Prince have stated they believe this to be true. However, the CBA expressly allows for an active flight attendant to build their own schedule from Open Time. Ex. 10 to Pl.'s Motion at 105 (allowing flight attendants to pick up Open Time

when missing a partial or complete trip due to use of intermittent leave). Thus, Plaintiff's request was routine and was permissible as it was within the bounds of the CBA.

64.     Admit.

65.     Admit, but Plaintiff does dispute whether those absences should have counted as "points" under the Dependability Policy given that she only accrued those absences due to Frontier's failure to accommodate her disability. Pl's Motion at 8-13 [Dkt. 36]. In fact, as Plaintiff had already been granted at least 16 FMLA days per month during this period (12 days of "intermittent incapacitation" and "1x per week; group 2x per week" at "2 hours+" per appointment"), Def.'s Ex. 10 to Ex. A at 4-5, Plaintiff could not have been in violation of the Dependability Policy.

66.     Admit. This was part of her inability to secure another flight attendant position. However, Defendant leaves out critical context. Ex. 3 to Pl.'s Mot. at 54:11-55:2 ("I don't have a bunch of schooling. I don't – I mean, I was lucky to get the flight attendant job, and that was like my career. So for me to get a job that would actually pay anything over what my daycare costs would be difficult . . . when you get hired on as a flight attendant, you start at the very bottom. And you're on what's called reserve, which is where you have to be on call pretty much 24/7.") And since being terminated by Frontier, Plaintiff and her family moved to rural Michigan where it is unlikely that an individual can become employed as a flight attendant. Ex. 3 to Pl.'s Mot. at 56:21-59:7 (detailing that Plaintiff's current town is a "one-stoplight town," about 1.5 to 2 hours away from the closest airport (Detroit), and that Plaintiff's family moved to rural Michigan because the cost of living was cheaper and they could be closer to Plaintiff's husband's family).

## II.    LEGAL STANDARD

Ms. Brigham agrees that Defendant has stated the correct legal standard in its Motion. Ms. Brigham also incorporates the summary judgment standard set forth in Plaintiff's Motion for Partial Summary Judgment at 14-15 [Dkt. 36].

### III.     ARGUMENT

Because Defendant is not entitled to summary judgment on: (a) Plaintiff's claim for failure to engage in the interactive process as required under the ADA; (b) Plaintiff's claim of unlawful discrimination under the ADA; (c) Plaintiff's claim of unlawful failure to accommodate under the ADA; or (d) Plaintiff's claim for unlawful retaliation under the ADA, Ms. Brigham respectfully requests the Court deny Defendant's Motion in its entirety.

### A.     Plaintiff's Claim for Failure to Engage in the Interactive Process in Violation of the ADA (Count II) Should Survive Summary Judgment.

Defendant's primary cited case in support of its argument that Ms. Brigham's claim for failure to engage in the interactive process must fail as a matter of law is unpublished and not precedential. *Valdez v. McGill*, 462 Fed. App'x 814, 814 (10th Cir. 2012). And in any event, *Valdez* does not stand for the proposition that Defendant proffers. In *Valdez*, the Tenth Circuit made a practical observation: "[A]n employer is not required to engage an employee in a futile interactive process where, as we have concluded was the case here, no reasonable accommodation was possible." *Id.* at 819. In *Valdez*, the Tenth Circuit quoted *Smith v. Midland Brake*, 180 F.3d 1154, 1172 (10th Cir. 1999) for the proposition: "The obligation to engage in the interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." *Id.* The Court further observed: "the interactive process is only a means to an end . . . **[t]o recover under the ADA, a plaintiff must show a reasonable accommodation was possible**." *Id.* (internal quotation and citation omitted) (emphasis added). In *Smith v. Midland*

*Brake*, the Tenth Circuit provided a thorough analysis of what the interactive process requires and cited *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 634 (7th Cir. 1998) with approval: "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." 180 F.3d at 1173.

Recently, in *Aubrey v. Koppes*, Case No. 19-1153, at *20 (10th Cir. Sep. 18, 2020), the Tenth Circuit held: "[A] reasonable jury could find that the [Defendant] failed to meet its obligation of engaging with [Plaintiff] in good faith in an interactive process to identify her precise limitations and to explore whether there was any accommodation that could enable [Plaintiff] to return to work and perform the essential functions of her job . . . In fact, a reasonable jury could find that the [Defendant] affirmatively acted to avoid having to consider possible accommodations by . . . essentially ignoring any possible accommodation [Plaintiff] suggested during the pre-termination meeting." *Aubrey*, Case No. 19-1153, at *20. Of course, in order to submit these claims to a jury, the plaintiff in *Aubrey* still had to show that there was, in fact, a reasonable accommodation that would have enabled plaintiff to perform the essential functions of her job, "or another job to which the [Defendant] could have re-assigned her." *Id.* at *21-22 (citing *Smith*, 180 F.3d at 1174). Thus, Plaintiff's claim for failure to engage in the interactive process survives with her demonstration that she proffered various possible reasonable accommodations that would have enabled her to perform the essential functions of her job or another job to which Frontier could have reassigned her. Pl.'s Mot. at 9-13.

Here, Defendant does not even argue that it *actually* did participate in a good faith interactive process, let alone that in some way Ms. Brigham failed to engage in the same. Rather, Defendant offers a purely legal, and incorrect, argument that Ms. Brigham's claim fails as a matter

of law. For these reasons, Defendant's request for summary judgment on this claim should be denied.

### B. Plaintiff's Claim for Discrimination in Violation of the ADA (Count IV) Should Survive Summary Judgment.

A prima facie case of discrimination under the ADA requires showing: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is qualified for the job held or desired; and (3) the plaintiff was discriminated against because of her disability. *Aubrey*, Case No. 19-1153, at *31. Establishing a prima facie claim is not onerous. *Id.* If Plaintiff establishes a prima facie case, then the burden shifts to the employer to establish a legitimate non-discriminatory reason for its adverse action; and finally, the plaintiff must then show that defendant's stated reasons are pretext for disability discrimination. *Id.* at 32. In *Aubrey*, the Tenth Circuit explained:

> A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

Case No. 19-1153, at *32 (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018)). Here, the parties agree that this is the correct analytical framework to analyze Plaintiff's ADA discrimination claim; however, the parties disagree on the remainder.

### 1. Plaintiff was disabled within the meaning of the ADA.

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how she is disabled within the meaning of the ADA because: (1) she is substantially limited; (2) she had a record of such impairment; or (3) she was regarded as having such an impairment. Pl.'s Mot. at 18-24. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard

and grant Plaintiff's Motion seeking a finding that she is disabled within the meaning of the ADA.

Moreover, Defendant's cited authorities on this issue are unavailing or inapposite. Even assuming authority from the Fifth Circuit was binding on this Court, which it is not, Defendant conceded in its deposition that Ms. Brigham was disabled within the meaning of the ADA. Pl.'s Mot. at 19. And taken together, Defendant's citations to Fifth Circuit authority in *Kitchen v. BASF* and *Radick v. Union Pac. Corp.* stand only for the proposition that an individualized assessment should be undertaken to determine if Ms. Brigham is disabled within the meaning of the ADA. Def.'s Mot. at 18. Here, despite Defendant's concession that Ms. Brigham is disabled within the meaning of the ADA, Plaintiff has in fact provided the individualized analysis that Frontier demands. Pl.'s Mot. at 18-24.

Where Defendant does cite to Tenth Circuit authority, its arguments fare no better. Defendant cites to *Burris v. Novartis Animal Health U.S., Inc.*, 309 F. App'x 241 (10th Cir. 2009) which is unpublished and non-precedential. *Burris*, 309 F. App'x at 242. Critically problematic is that *Burris* cites to *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 609-10 (10th Cir. 1998) for the proposition that addiction must substantially limit one or more major life activities to be considered a disability under the ADA. *Id.* at 250. *Nielsen* was, of course, decided prior to the ADA's amendment in 2008. *Compare Nielsen*, 162 F.3d at 604 *with* 42 U.S.C § 12101 *et seq.* Thus, *Nielsen's* definition of "substantially limiting," cited and quoted by *Burris*, encompasses a standard deemed too restrictive and superseded by Congress. Rather, the proper standard is set forth at the current version of 29 C.F.R. § 1630.2(j):

> The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard . . . An impairment is a disability within the meaning of this section if it substantially limits the ability of an

individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual form performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section . . . The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment 'substantially limits' a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis . . . [I]n making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is **lower than the standard for 'substantially limits' applied prior to the ADAAA.**

29 C.F.R. § 1630.2(j)(1)(i)-(iv) (emphasis added). As such, Defendant's inapposite and nonbinding authority should be disregarded. Ms. Brigham is disabled within the meaning of the ADA.

### i. Plaintiff did not concede that her alcoholism was not substantially limiting after September 5, 2014.

Defendant argues that "Plaintiff testified unequivocally that her alcoholism has *not* substantially limited her ability to perform a major life activity since September 5, 2014." Def.'s Mot. at 20. This assertion is indisputably incorrect and cannot be "undeniably fatal to her claims."

Plaintiff never allowed her *use of alcohol* to impede her ability to perform satisfactorily as a flight attendant *i.e.*, she never drank on the job. Ex. 3 to Pl.'s Mot. at 68:2-9 ("No. Luckily, I had never crossed that boundary. Oh, and I feel like I need to qualify – or clarify. So never while on duty. However, on overnights, after you're done, it's – it was just kind of a culture where you would take off all your flight attendant gear, put on normal clothes, and go meet at the bar. Nine times out of ten, that's what you did.").

However, Plaintiff's alcoholism was substantially limiting in a number of ways. Id. at 225:1-226:1 ("Q. After you self-disclosed your disability of alcoholism, did you have any trouble with your day-to-day life? A. Yes. Q. Okay. Do you recall being asked a discovery question by

Frontier about that topic? A. Yes. And did you answer that honestly when you answered it? A. Yes. Q. And are you still suffering any of those issues, that is, your ability to complete day-to-day life activity? Do you have any issues with that now? A. The sleeping part, which is why I still take trazodone. By my life is nowhere near what it was early in recovery, when it comes to those post – the post-withdrawal symptoms . . . I was still early in my recovery. I had issues sleeping. And honestly, the Frontier stuff just made it worse."); Ex. 7 to Pl.'s Mot. at 8-9 ("My disability is alcoholism. I was unable to treat my disability on my own and it affected my life in dramatic ways, including my marriage and my relationship with my children. Thus, I had trouble caring for myself, eating, sleeping, concentrating, and working."); Ex. 15 to Pl.'s Mot. at 2 ("Recently, Rebecca notices the [drinking] picked up again and she was consuming approximately a pint within an hour and found herself stumbling and slurring words with the kids around. Her husband recently took the children to Michigan and has returned alone so that he can support her."); and Ex. 15 to Pl.'s Mot. at 3 ("Diagnosis: Dsythmia . . . postpartum depression, utilizing substances as a relief, sadness, feeling overwhelmed, anxious, feeling guilt, and at times hopeless . . . Alcohol dependance.").

### 2.  Plaintiff was a qualified individual within the meaning of the ADA.

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how she is a qualified individual within the meaning of the ADA because she was able to perform the essential functions of her job with an accommodation. Pl.'s Mot. at 16-18. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard and grant Plaintiff's Motion seeking a finding that she is a qualified individual within the meaning of the ADA.

In this context, Defendant again cites the Court to outdated or incomplete authority defining "essential functions." Def.'s Mot. at 20-21. "Essential functions" are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires . . . [t]he term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Further, "a job function may be considered essential for any of several reasons, including but not limited to: (i) [t]he function may be essential because the reason the position exists is to perform that function; (ii) [t]he function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) [t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." Id. at Section 1630.2(n)(2)(i)-(iii).

And finally, "[e]vidence of whether a particular function is essential includes, but is not limited to: (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents in the job; and/or (vii) [t]he current work experience of incumbents in similar jobs." Id at Section 1630.2(n)(3)(i)-(vii).

### i. Layovers were not an essential function of Ms. Brigham's position as a flight attendant.

Despite Defendant's contention otherwise, covering flights with overnight layovers was not an essential function of Plaintiff's position as a flight attendant. Defendant's own cited evidence does not state that being scheduled for layovers or overnights is an essential function of

the position of flight attendant. *See* Def.'s Ex. A at ¶ 5; Def.'s Ex. B at 118:10-18. Moreover, Mr. Arellano, when testifying on behalf of Defendant Frontier Airlines, Inc., stated that a flight attendant's primary job duties were those of a "safety professional . . . to make sure the passenger experience is a positive one from every aspect of serving drinks and sharing – safety is obviously the most important." Ex. 2 to Pl.'s Motion for Partial Summary Judgment at 50:1-5. When asked about flight attendants' job duties from the perspective of scheduling such as: "When do they start? Where do they go? How does the day end?", Mr. Arellano responded: "[I]t's hard to answer that question because everybody had a different – a flight attendant had a different way to bid a schedule based on their preference . . . So every day would be different for each flight attendant based on the type of routes they bid for, the type of flying they bid for . . . It just depended on the individual. It's all completely different. It's hard to answer that question." Id. at 55:4-56:21.

When questioned by Frontier's attorney as to whether or not the Position Description attached to Frontier's Motion properly listed all essential functions of a flight attendant, Plaintiff responded: "Yes." Ex. 3 to Pl.'s Motion at 118:10-119:14. Notably, the Position Description does not include layovers or overnights. Def.'s Ex. A at ¶5. Nor does the applicable CBA require overnight layovers. *See* generally Ex. 10 to Pl.'s Mot. And while Mr. Arellano testified that schedules for flight attendants are "completely different," Ms. Brigham also confirmed that some flight attendants prefer overnights, while others do not: "Q. I mean, doesn't most – don't most flight attendants want to come home at night? A. No, that's actually – most trips that are on the Trade Board are victory laps, which is the turn that is after your whole, let's say, three—or four-day trip. Most people want to be done when they first fly into Denver. They don't want to do Salt Lake City and then back to Denver. There were so many turns on the Trade Board that people were

trying to get rid of, so they wouldn't have to fly." Ex. 3 to Pl.'s Mot. at 94:20-95:4; *see also* Ex. 3 to Pl.'s Mot. at 212:7-18 ("So turns is what people typically – that – that was the premium, right, what people wanted? A. Not necessarily. Everybody was different. Q. But for the most part? A. No. I knew lots of people that would prefer two days, and lots of people that preferred to fly up to six days in a row. That way they could have, like, two weeks off. It just depended on the person . . .").

Defendant's citations to *US Airways* and *Santiago* do nothing to change this fact as even if occasional unforeseen circumstances may require an overnight layover because "marginal functions of the position" are not considered essential functions. 29 C.F.R. § 1630.2(n)(1). Moreover, Defendant does not even attempt to argue that Ms. Brigham could not perform the essential functions of light duty or administrative work at the GO, which of course, she could. Pl.'s Mot. at 9-12.

### ii. Ms. Brigham never conceded that compliance with Frontier's Dependability Policy was an essential function of the position of flight attendant.

The totality of Defendant's cited authority in support of this proposition misses the mark because Frontier fundamentally misunderstands the cause of Ms. Brigham's absences from work after self-disclosing her disability. *See, e.g.,* Def.'s Mot. at 23 ("unsatisfactory conduct caused by alcoholism . . . does not receive protection under the ADA"); Def.'s Mot. at 23-34 (citing *Vandenbrook* where "plaintiff had repeatedly violated the defendant's 'no call/no show' policy despite the fact that this absenteeism was the result of his alcoholism"); and Def.'s Mot. at 24-25 (citing *Stephens* despite the fact the defendant airline in *Stephens* had a drastically different position description that required "16-hour duty days" and a CBA stating that trips may be

scheduled for "six consecutive days" – all conditions not present in Ms. Brigham's case).

Ms. Brigham never testified that after her self-disclosure, she missed work due to alcohol use or her alcoholism; but rather, Ms. Brigham consistently testified that she was absent because: (1) Frontier **required** her to comply with terms of her treatment plan which directed her to avoid overnight layovers, while simultaneously, (2) Frontier failed to reasonably accommodate her so that she could comply the required treatment plan. Pl's Motion at 8-13 [Dkt. 36]. Additionally, it is doubtful that Ms. Brigham ever actually violated Frontier's Dependability Policy such that she should have been terminated. *See supra* p. 18, ¶ 46 (detailing that Plaintiff should have been approved for at least 16 intermittent FMLA days prior to being terminated). And of critical importance, while Defendant's argument is that Ms. Brigham "does not dispute that compliance with Frontier's attendance policy and protocols was an essential function of Frontier's flight attendant position," Def.'s Mot. at 22, Defendant **fails to cite to a single fact in the record in support of this proposition**. The parameters of Defendant's Dependability Policy, its application, and its proper or improper use against Ms. Brigham comprise facts that are very much disputed.

### iii.   Frontier never offered reasonable alternative accommodations.

Defendant is mistaken as to what constitutes a reasonable accommodation. A reasonable accommodation means: "(i) [m]odifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or (ii) [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or (iii) [m]odifications or adjustments that enable a covered entity's employee with a disability to

enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(i)-(iii).

Thus, reasonable accommodations include, but are not limited to: "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . [or] appropriate adjustment or modifications of . . . policies . . . ." Id. at Section 1630.2(o)(2)(ii). And again, Defendant cites pre-ADA amendment law for an outdated proposition in *Kuehl v. Wal-Mart Stores, Inc.* The proper standard for when rejection of a reasonable accommodation may operate to forfeit the ADA's protections is as follows: "And individual is not required to accept an accommodation . . . However, if such individual rejects a reasonable accommodation . . . that is **necessary** to enable the individual to perform the essential functions of the position held or desired, and cannot, **as a result of that rejection**, perform the essential functions of the position, the individual will not be considered qualified." 29 C.F.R. § 1630.9(d).

Here, Defendant's offer of unpaid leave was not an offer for a reasonable accommodation because taking unpaid leave would not have enabled Ms. Brigham to "perform the essential functions of [her] position" or "enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." Ex. 3 to Pl.'s Mot. at 65:6-7 ("Correct. I needed money coming in. And had they accommodated me, I would have had that."). And Defendant's suggestion that Plaintiff apply for positions for which she was unqualified suffers from the same defects notwithstanding that Ms. Brigham also wanted to preserve her seniority. Ex. 3 to Pl.'s Mot. at 74:5-17 ("Q. Are you aware that Frontier provides preferential hiring for anyone who needs an accommodation under the Americans with Disabilities Act for positions for which they're minimally qualified? A. They never told me anything about that . . . I asked multiple

times what could be done to help me in this situation. I was never aware of whatever you're talking about. They never mentioned anything to me. All they said was that they could not help me."); Ex. 3 to Pl.'s Mot. at 165:22-166:6 ("So you were able to successfully look for potential transfer options; is that right? . . . A. From – honestly, from my memory. I remember seeing a bunch of stuff that I was not quite qualified for. And then at some point, I stopped, because I had been told that, You'll lose your seniority, and you won't be able to go back to inflight after 90 days."); Ex. 3 at 178:9-14 ("A. . . . I still looked in there [referring to Frontier's online job postings]. You never know. There may have been an at-home – work-from-home position doing something that I qualified for, in which case, something like that, I would have considered. However, I did not want to lose my seniority.").

And finally, Plaintiff did request additional intermittent FMLA time during the period that Frontier failed to reasonably accommodate her and prior to her termination, but Defendant denied this request and terminated Ms. Brigham. Ex. E to Def.'s Ex. A, Termination Meeting dated November 3, 2015, at 2 ("REBECCA: Oh and then – before we leave I need to find out if LOA got my new intermittent FMLA paperwork for more days. We can deal with that after . . . we had to submit new intermittent FMLSA paperwork."); Ex. A. to Def.'s Mot. at 11, ¶ 67 ("On November 11, 2015, Frontier informed Plaintiff that it was terminating her employment effective immediately for incurring ten (10) occurrences within a twelve (12) month period . . . ."). Therefore, Defendant Frontier never offered any reasonable accommodations for Ms. Brigham to reject, resulting from its failure to actually engage in the interactive process, and moreover, Defendant denied any reasonable accommodations suggested by Plaintiff. Pl.'s Mot. at 10-12.

### 3. Frontier terminated Ms. Brigham because of her disability.

Plaintiff has presented more than adequate evidence to meet her "not onerous" duty to show her termination was due to her disability. **First**, Defendant required Plaintiff to comply with her treatment plan **for alcoholism** then terminated Ms. Brigham when she did so. Pl's Motion at 8-13 [Dkt. 36]. **Second**, Defendant did regularly grant requests for reasonable accommodation in the form modified schedules or light duty, just not for Plaintiff and not for alcoholics. Id. at 11-12. **Third**, Mr. Arellano stated that Ms. Brigham's requested accommodations would have amounted to "making exceptions" and that Frontier would not make a "separate accommodation." Ex. 3 at 52:16-21; 56:17-21. **Fourth**, Ms. Brigham had not actually violated the Dependability Policy as Frontier had previously granted her at least 16 days of intermittent FMLA time per month. Def.'s Ex. 10 to Ex. A at 4-5. **Fifth**, Ms. Brigham was not the only alcoholic at Frontier during the relevant time period to suffer discrimination at the hands of Mr. Arellano and Ms. Leyner. Pl.'s Mot. at 13 (detailing the experiences of David St. Hilaire). And **sixth**, Ms. Brigham was not the only Frontier flight attendant to be denied reasonable accommodations during the relevant time period. Pl.'s Mot. at 13-14 (detailing other flight attendants' failure to be accommodated for pregnancy related issues while being assessed points under the Dependability Policy).

> **i. Ms. Brigham never conceded that she violated Frontier's Dependability Policy.**

Again, Defendant presents as fact that "Plaintiff concedes that she violated Frontier's attendance policy and protocols" without citing a single fact in the record to support this concession. Moreover, as detailed above, these facts are disputed. *See supra* p. 32-33.

> **4. Frontier's stated reasons for Ms. Brigham's termination are pretext for unlawful discrimination in violation of the ADA.**

Ms. Brigham has produced adequate evidence that her termination for violating Frontier's

Dependability Policy was pretext for unlawful termination. To do so Ms. Brigham must show that Frontier's proffered explanation is "factually false, or that discrimination was a primary factor in the employer's decision . . . [t]his is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Aubrey*, Case No. 19-1153, at *32. "[A] showing of pretext *is* evidence which allows a jury to infer discriminatory intent . . . [c]onsequently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to a jury." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995) (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir. 1994) (additional citation omitted)). Here, there can be no reasonable dispute that Ms. Brigham has produced adequate evidence of pretext with her prima facie case. *See supra* p. 36 (discussing evidence in support of assertion that Frontier terminated Plaintiff because of her disability).

### C.     Plaintiff's Claim for Failure to Accommodate in Violation of the ADA (Count I) Should Survive Summary Judgment.

In Plaintiff's Motion for Partial Summary Judgment [Dkt. 36], Ms. Brigham analyzed in detail how Defendant violated the ADA when it failed to accommodate her. Pl.'s Mot. at 24-27. As such, and to avoid duplicative briefing, Ms. Brigham fully incorporates those arguments herein and respectfully requests the Court deny Defendant's Motion in this regard and grant Plaintiff's Motion seeking a finding that Frontier failed to accommodate her in violation of the ADA. Additional specific arguments in response to Defendant's Motion are set forth below.

First, Defendant did not reasonably accommodate Plaintiff nor did Defendant offer any reasonable accommodations, as reasonable accommodations are defined under the ADA—even if

Defendant granted Plaintiff 60 days of FMLA leave for a serious health condition when Plaintiff entered in-patient rehabilitation. *See supra* p. 33-36.

Second, completion of overnight layovers was not an essential function of Plaintiff's job, or at the very least, these facts are disputed for purposes of summary judgment, *see supra* p. 30-32, and therefore, Plaintiff was never requesting that an "essential job function" be removed. Moreover, even assuming *arguendo* that layovers were an essential function, this does not explain Frontier's failure to transfer Ms. Brigham to the GO as it routinely does for flight attendants on OJI.

Third, Defendant cites much law for the proposition that an employer need not accommodate an employee when that accommodation would violate the rights of other employees under a collective bargaining agreement. But Defendant's perceived violations of the CBA in this case are conjectural and inconsistent with a plain reading of the CBA and the Union's Vice President during the relevant time period. *See supra* p. 12-13. Moreover, Defendant's analogy to a case where a flight attendant could not always be guaranteed a pressurized flight cabin as similar to the observation that layovers might occur occasionally on an emergency basis does nothing to illuminate "essential job functions" in *this* case. Also, it has nothing to do with the terms of the CBA.

Similarly, Defendant argues that Plaintiff's contention that liability attached when Frontier failed to reassign Ms. Brigham to the GO is a "red herring." Defendant argues this is because granting this request would have "excused Plaintiff, an active flight attendant, from the mandatory, seniority-based bidding process set forth in the CBA." This hardly makes sense because per the terms of the CBA, Plaintiff could have been granted various types of leave in order to effect a

transfer to the GO, and moreover, the OJI process set forth in the CBA does not prohibit such transfers to the GO for reasons of compliance with the ADA. *See supra* p. 2-4. Moroever, the CBA does not apply to "assignment to non-flying duty (e.g., light duty)." Ex. 10 to Pl.'s Mot. at 101.

Next, Defendant argues that transferring Plaintiff to the GO would have removed an essential function: layovers; but, apart from the fact that the ADA specifically authorizes reassignments to vacant positions as a reasonable accommodation, layovers were not an essential function of Ms. Brigham's job. *See supra* p. 30-34. And Plaintiff was not seeking an indefinite transfer to the GO. *See supra* p. 17, ¶ 39.

Finally, Defendant's argument that Plaintiff's request to be reassigned temporarily to the GO was tantamount to a request that Defendant "create a new position" is without merit. In *Mannan v. Colorado*, plaintiff was seeking assignment to one "post" that any other "Corrections Officer may be assigned to work on a given day." Case No. 18-cv-01844-MSK-SKC, at *10. Here, Plaintiff was seeking reassignment to a different and vacant position at the GO. Pl.'s Mot. at 9-10 (showing Plaintiff's request and Defendant's contention that she could have been reassigned but she was not because she was not "eligible" not because the position did not exist). Further, in *Mannan*, the Court recognized that an employer "may choose to provide <u>temporary</u> light duty assignments to disabled employees," while the employer is not required to "create a new position" nor is it required to "provide a permanent light duty post." *Id.* at 11 (underscore in original). Again, Plaintiff was seeking neither creation of a "new position" nor a "permanent light duty post," *see supra* p. 17, ¶ 39.

Defendant's citation to *Benson* is also inapposite as Plaintiff was not seeking transfer that would have required Defendant to create a job. Similarly, Defendant's citation to *Severson* is

unavailing as in *Severson*, the employer "d[id] not maintain any full- or part-time light-duty positions at its facility, and the plaintiff concedes that [defendant] would have had to create a light-duty position for him . . . ." *Severson v. Heartland Woodcraft, Inc.*, Case No. 14-C-1141, at *15 (E.D. Wis. Nov. 12, 2015). Here, as cited above, Defendant did maintain positions at the GO and could have reassigned Plaintiff to the same.

Importantly, assuming *arguendo* that Defendant's arguments as to creation of a light duty job have merit, this does not excuse the fact that Defendant failed to offer Ms. Brigham *any* type of reasonable accommodation. *See supra* p. 33-35. This fact alone creates liability on the part of Frontier for unlawful failure to accommodate under the ADA. *Exby-Stolley v. Bd. of Cnty. Comm'rs*, Case No. 16-1412, at *19 (10th Cir. Oct. 28, 2020) (". . . the third element of this general test—that the individual was discriminated against because of their disability—is satisfied in a failure-to-accommodate claim *as soon as* the employer, with adequate notice of the disabled employee's request for some accommodation, fails to provide a reasonable accommodation.").

### D. Plaintiff's Claim for Unlawful Retaliation in Violation of the ADA (Count III) Should Survive Summary Judgment.

Frontier's argument in this regard is limited solely to: "Plaintiff has not and cannot show any causal connection between Plaintiff's requests for accommodation and the termination of her employment." Def.'s Mot. at 39. But Defendant's facts cited in support of this argument are incorrect and incomplete, and Plaintiff has produced adequate evidence showing causation. *See supra* p. 35-36 (detailing facts in support of causation and Plaintiff's request for intermittent leave).

### IV. CONCLUSION

For the aforementioned reasons, Ms. Brigham respectfully requests the Court deny Defendant's Motion in its entirety.

Respectfully submitted this 8th day of December, 2020.

THE LAW OFFICE OF JOHN R. CRONE, LLC

/s/ John R. Crone
John R. Crone
CO Bar No. 48284
4550 E Cherry Creek Drive South, #1003
Glendale, Colorado 80246
Telephone: (303) 598-3526
Email: john@crone-law.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, a true and correct copy of the foregoing *Plaintiff's Response to Defendant Frontier Airlines, Inc.'s Motion for Summary Judgment*, including any exhibits, was filed using the CM/ECF system and served electronically upon Defendant through its attorneys of record.

By:   /s/ John R. Crone
        John R. Crone