Page 1

1          IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLORADO

2

     Civil Action No. 19-cv-03417-STV

3    _____

4


     REBECCA BRIGHAM,

5

              Plaintiff,

6

     vs.

7

     FRONTIER AIRLINES, INC.,

8

     _____Defendant._____

9

10     VIDEO VIDEOCONFERENCED DEPOSITION OF ADRIENNE PRINCE
       _____August 21, 2020_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Job No. CS4205084

Veritext Legal Solutions

800-567-8658                                                                                    973-410-4098

Page 2

```
 1   VIDEOCONFERENCED APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFF:
         JOHN REILY CRONE, ESQ.
 3       EVAN S. GRIMES, ESQ.
         John R. Crone, LLC
 4       4550 East Cherry Creek Drive South, Suite 1003
         Glendale, Colorado 80246
 5       Phone: 303-598-3526
         Email: john@crone-law.com
 6       Email: evan@crone-law.com
 7   ON BEHALF OF THE DEFENDANT:
         DANIELLE L. KITSON, ESQ.
 8       CAROLYN B. THEIS, ESQ.
         Littler Mendelson, P.C.
 9       1900 16th Street, Suite 800
         Denver, Colorado 80202
10       Phone: 303-629-6200
         Email: dkitson@littler.com
11       Email: ctheis@littler.com
12   ON BEHALF OF THE DEPONENT:
         JOSHUA CORDER SOUK, ESQ.
13       Association of Flight Attendants-CWA
         501 3rd Street NW, Floor 10
14       Washington, DC 20001
         Phone: 202-434-0579
15       Email: jsouk@afacwa.org
16   ALSO PRESENT: Cole Bartelt, Videographer
         Jacalyn Peter
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1       PURSUANT TO WRITTEN NOTICE and the
 2   appropriate rules of civil procedure, the video
 3   videoconferenced deposition of ADRIENNE PRINCE, called
 4   for examination by the Defendant, was taken remotely,
 5   commencing at 9:19 a.m. on August 21, 2020, before
 6   Laurel S. Tubbs, a Registered Professional Reporter,
 7   Certified Realtime Reporter and Notary Public in and for
 8   the State of Colorado.
 9              INDEX
10   EXAMINATION:                    PAGE
11   By Ms. Kitson           6, 111, 130
     By Mr. Crone           89, 120, 133
12
     EXHIBITS:                       PAGE
13
     Exhibit 1 Collective Bargaining Agreement        21
14
     Exhibit 18 Search for Crew Absentee Records      70
15
     Exhibit 19 Letter Dated October 30, 2015         78
16
     Exhibit 20 Document Entitled "Untitled"          57
17
     Exhibit 21 Letter Dated November 11, 2015        80
18
     Exhibit 22 Letter Dated December 10, 2015        80
19
     Exhibit 31 Letter Dated December 21, 2015        85
20
     Exhibit 40 Declaration of Adrienne Prince        50
21
     Exhibit 44 #C Final Meeting with the             60
22          Company-Investigatory
23   Exhibit 45 Letter Dated November 18, 2016        74
24
25
```

Page 4

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER: Good morning. We're
 3   going on the record at 9:19 a.m. on August 21st, 2020.
 4   Please note that the microphones are sensitive and may
 5   pick up whispering, private conversations, and cellular
 6   interference.  Please turn off all cell phones or place
 7   them away from your computer microphones, as they can
 8   interfere with the deposition audio. Audio and video
 9   recording will continue to take place unless all parties
10   agree to go off the record.
11          This is Media Unit 1 of the video-recorded
12   deposition of Adrienne Prince, taken by counsel for the
13   Defendant, in the matter of Rebecca Brigham versus
14   Frontier Airlines, filed in the United States District
15   Court for the District of Colorado, Case Number
16   19-cv-03417. This deposition is being held via remote
17   video deposition, located in Douglas County, Colorado.
18          My name is Cole Bartelt from the firm
19   Veritext, and I'm the videographer. The court reporter
20   is Laurel Tubbs from the firm Veritext.
21          I'm not authorized to administer an oath
22   to any party in this action, nor am I financially
23   interested in the outcome.
24          Counsel, all -- counsel and everyone
25   appearing remotely will now state their appearances and
```

Page 5

```
 1   affiliations for the record.
 2          MS. KITSON: This is Danielle Kitson on
 3   behalf of the Defendant, Frontier Airlines. And on the
 4   Zoom call today is also Jacalyn Peter, Frontier's vice
 5   president of labor relations.
 6          MR. CRONE: John Crone on behalf of the
 7   Plaintiff, Rebecca Brigham.
 8          MR. GRIMES: Evan Grimes, attorney for
 9   Plaintiff.
10          MR. SOUK: I'm Joshua Souk representing
11   the Association of Flight Attendants, which represents
12   Ms. Prince.
13          THE VIDEOGRAPHER: At this time, will the
14   court reporter please enter the statement for remote
15   proceedings into the record.
16          THE REPORTER: The attorneys participating
17   in this deposition acknowledge that I am not physically
18   present in the deposition room and that I will be
19   reporting this deposition remotely. They further
20   acknowledge that in lieu of an oath administered in
21   person, the witness will verbally declare his/her
22   testimony in this matter is under penalty of perjury.
23   The parties and their counsel consent to this arrangement
24   and waive any objections to this manner of reporting.
25          Please indicate your agreement by stating
```

2 (Pages 2 - 5)

Page 6

1    your name and your agreement on the record, beginning
2    with the taking attorney.
3           MS. KITSON: I agree.
4           MR. CRONE: John Crone and Evans Grimes.
5    I agree.
6           MR. SOUK: Joshua Souk. I agree.
7               ADRIENNE PRINCE,
8    having been first duly sworn or affirmed, was examined and
9    testified as follows:
10               EXAMINATION
11   BY MS. KITSON:
12       Q. Good morning, Ms. Prince.
13           How are you today?
14       A. Good. Thanks.
15       Q. Can you please state your full name for the
16   record.
17       A. Adrienne Prince.
18       Q. What's your current address?
19       A. 16315 Rock Crystal Drive in Parker,
20   Colorado 80134.
21       Q. And have you ever been deposed before in a
22   deposition?
23       A. Yes.
24       Q. Okay. And how many times?
25       A. I don't remember. Just a few.

Page 7

1        Q. A few. How many years has it been?
2        A. Several.
3        Q. I'm assuming, then, that this is your first
4    remote deposition; is that right?
5        A. Yes.
6        Q. Do you understand that you're under oath
7    here today?
8        A. Yes, I do.
9        Q. Do you understand that that oath is the
10   same oath that you would take in a court of law?
11       A. Yes, I do.
12       Q. I'm going to talk to you just a little bit
13   about the new reality of deposition rules in which we're
14   living and kind of the rules for today.
15           Do you understand that you are being
16   recorded via a Zoom call link today?
17       A. I do.
18       Q. And do you understand that your words and
19   the words of everyone on the call are being taken down by
20   our court reporter?
21       A. I do.
22       Q. Okay. It's important, therefore, that you
23   give verbal responses today. It's pretty natural to say,
24   Uh-huh or Huh-uh. I do that and have to be reminded
25   myself.

Page 8

1        But can you endeavor today to give verbal
2    responses, a Yes or a No?
3        A. Yes, I will.
4        Q. Counsel for Ms. Brigham, Mr. Crone and
5    Mr. Grimes, are on the call today. And they may be making
6    objections throughout the questioning. Those objections
7    are for the record for a judge to rule on later in the
8    course of the litigation. So once they make their
9    objections, you can answer the question unless your
10   counsel, Mr. Souk, instructs you not to answer.
11           Do you understand that?
12       A. Yes, I do. Thanks.
13       Q. Okay. Will you agree to give me full and
14   complete answers to my questions today?
15       A. Yes, I will.
16       Q. Will you let me know at any point if
17   there's anything you want to add to a prior answer that
18   you gave?
19       A. Yes, I will.
20       Q. Okay. Will you let me know at any point in
21   the deposition if there's something you don't understand
22   about my question?
23       A. Yes, I will.
24       Q. Okay. And will you know -- sorry.
25           Will you let me know at any point today if

Page 9

1    you encounter any technical difficulties with this Zoom
2    link?
3        A. Yes, I will.
4        Q. Okay. We can take a break whenever you
5    need. I take breaks pretty frequently. But if at any
6    point you need a restroom break or, you know, need to get
7    a drink, or whatever you need, just let me know, and we
8    can take a break. I'd just ask that you answer any
9    question that's pending before we take that break.
10           Is that fair?
11       A. Yes, it is. Thank you.
12       Q. Okay. At the end of this, you'll have an
13   opportunity to review the transcript of what's being taken
14   down today.
15           Will you agree to review it and correct
16   anything that's inaccurate?
17       A. Yes, I will.
18       Q. Okay. How are you feeling today?
19       A. Good. Thank you.
20       Q. Okay. Are you sick at all?
21       A. No.
22       Q. Are you taking any medications that would
23   affect your ability to think clearly?
24       A. No.
25       Q. Any medications that would affect your

3 (Pages 6 - 9)

Page 10

1   ability to recall events?
2       A. No, I'm not.
3       Q. Is there anything at all that would affect
4   your ability to testify truthful -- truthfully and
5   accurately here today?
6       A. No.
7       Q. Okay. Will you let me know at any point if
8   you start to have problems concentrating or answering
9   questions?
10      A. I will. Thank you.
11      Q. Okay. Great.
12          I just want to ask you a little bit about
13  your background, basic stuff.
14          Where are you from originally?
15      A. I'm from Aurora, Colorado.
16      Q. And have you ever lived in any other
17  states?
18      A. I lived in California for a little while.
19      Q. Okay. And tell us about your educational
20  background, if you would.
21      A. I graduated from Colorado State
22  University.
23      Q. Okay. And what year was that?
24      A. '98.
25      Q. Okay. What -- what degree did you receive?

Page 11

1       A. Spanish.
2       Q. That's a B.A., I'm taking it?
3       A. Yeah. Yeah. Yeah. Bachelor of arts.
4       Q. Yeah. And tell us about your employment
5   after college.
6           Where else have you worked other than
7   Frontier?
8       A. I worked at Frontier full-time. I have
9   some side -- I'm a substitute teacher, and I also work
10  for a school for their before- and after-school program.
11      Q. So you started with Frontier right out of
12  college?
13      A. Yep, in 1999.
14      Q. Wow. That's cool.
15      A. Yeah.
16      Q. Well, at a high level, can you tell us,
17  have -- what are your dates of employment at Frontier,
18  then; 1999 to today, correct?
19      A. Correct.
20      Q. Okay. And what positions have you held at
21  Frontier?
22      A. Just flight attendant, and then I did work
23  for the union.
24      Q. Okay. So what's your position on the
25  seniority list?

Page 12

1       A. I think I'm roughly number 50-ish.
2       Q. Wow. Interesting.
3           Tell me about your roles with the union.
4   When did you start having a position with the union?
5       A. I believe I started -- the actual year I
6   don't recall right offhand, but I started as the MEC
7   Grievance chair. I want to say that was roughly 2012,
8   2013. And then after that, I became vice president, and
9   was vice president for about two years.
10      Q. When was that, approximately?
11      A. I'm going to say, roughly, like 2014,
12  2015.
13      Q. Do you currently have any role with the
14  union?
15      A. I do not. Just a member.
16      Q. And was vice president your last role with
17  the union?
18      A. Yes.
19      Q. So since about 2015, you've no longer been
20  associated with the union other than being a member of the
21  union?
22      A. Correct.
23      Q. Okay. When you were MEC of the
24  grievance -- or MEC Grievance chair -- I'm sorry -- what
25  does MEC stand for?

Page 13

1           THE REPORTER: I'm sorry. One more time?
2           THE DEPONENT: I'm sorry. Master
3   Executive Council.
4           Q. (By Ms. Kitson) So starting in about 2012,
5   you were the Master Executive Council Grievance chair; is
6   that correct?
7       A. Correct.
8       Q. And what did you do in that role?
9       A. Advocated for flight attendants.
10      Q. And is that in the grievance process, then?
11      A. Correct.
12      Q. And did you have a boss in that role?
13      A. The -- I would say that the president
14  and -- of the -- of our union.
15      Q. And was that an elected role? Were you
16  elected into it?
17      A. As Grievance chair, no; I was appointed.
18      Q. Okay. And so in that role as Grievance
19  chair, you reported to the president of the union, for
20  lack of a better phrase?
21      A. Correct.
22      Q. Okay. But the president of the union
23  didn't have any ability to fire you, demote you, promote
24  you, anything like that?
25      A. I believe, since I was appointed, that --

4 (Pages 6 - 9)

Page 14

1 that she could have had me removed if she wanted to.
2     Q. But not in your flight attendant role for
3 Frontier?
4     A. Correct -- oh, correct. Correct.
5     Q. Okay. Did anyone within the union report
6 up to you as the Grievance chair?
7     A. The local Grievance representatives.
8     Q. How many of those were there?
9     A. At that time, I don't recall the exact
10 number.
11     Q. Ballpark?
12     A. Maybe two or three.
13     Q. Okay. When you became vice president of
14 the union, were -- how many other vice presidents were
15 there, if any?
16     A. There was one for each base.
17     Q. Okay.
18     A. And -- yeah.
19     Q. So you have the president of the union,
20 correct?
21     A. Correct.
22     Q. And then a vice president for each base; is
23 that correct?
24     A. And each base had their president as well.
25     Q. Okay. And then was there someone above the

Page 15

1 president that they reported to?
2     A. Not -- I don't -- no. I mean, we asked
3 AFA International for advice, but other than that, it
4 wasn't like reporting to as in a job-type role --
5 managerial-type role.
6     Q. And in that 2012-to-2015 period of time,
7 how many bases were there?
8     A. Let me think. I believe, at the time,
9 there was only two. Maybe three. I can't remember if
10 Orlando was part of that at that time.
11     Q. Who was your president in that time frame?
12     A. Angie Piller.
13     Q. And in your role as vice president for your
14 base at the time, which representatives reported up to
15 you?
16     A. Kori Halverson and Dee Emricson.
17     Q. Anyone else?
18     A. I can't remember if there was -- I can't
19 remember if there was anyone else at that time.
20     Q. And what was Kori Halverson's role?
21     A. When I was vice president, she was the MEC
22 Grievance chair.
23     Q. And what was Ms. Emricson's role?
24     A. She was a Grievance rep.
25     Q. And did anyone report up to them at that

Page 16

1 time?
2     A. Not to my recollection.
3     Q. Okay. During the time that you were vice
4 president of the union, can you describe for us your job
5 duties in that role?
6     A. As vice president, I oversaw some
7 committees, and I advocated for flight attendants and
8 helped the -- the president do what -- their -- their
9 duties, if they needed help. And I also participated in
10 grievance hearings.
11     Q. How much time did you spend on union duties
12 versus your regular flight attendant duties, or were you
13 not flying at the time?
14     A. I flew. I would say it was split -- I
15 don't know -- I probably flew -- well, I flew full-time.
16 And then I added probably maybe a few hours a month, a
17 few hours a week, doing union duties.
18     Q. During the time that you were vice
19 president of the union, did you have the authority to make
20 decisions on behalf of the union?
21     A. Not solely, no.
22     Q. What would you have to do in order to make
23 a decision on behalf of the union?
24     A. Typically, I would have to ask for an
25 officer or officers. We did things collectively.

Page 17

1     Q. So, for instance, if someone wanted to
2 change the terms of the Collective Bargaining Agreement,
3 for instance, you would not be able to do that just
4 yourself; is that right?
5     A. Correct.
6     Q. And do you know if your president could
7 have done that herself?
8     THE REPORTER: She's frozen. Can we go
9 off the record?
10     MS. KITSON: Yes.
11     Are you there?
12     THE DEPONENT: Yep. I'm still here.
13     MS. KITSON: You froze up for one second,
14 but --
15     THE DEPONENT: Oh, sorry.
16     MS. KITSON: That's all right.
17     Should we go back on the record?
18     THE REPORTER: Yes.
19     THE VIDEOGRAPHER: I never completely went
20 off, so...
21     MS. KITSON: Oh, that's fine.
22     Q. (By Ms. Kitson) Let me ask that question
23 again.
24     Your president at the time that you were
25 vice president, do you know if she had the sole authority

Veritext Legal Solutions
800-567-8658                                                    973-410-4098

Page 18

1  to make decisions on behalf of the union?
2      A. No, she did not.
3      Q. Okay. And what did she have to do in order
4  to make a decision on behalf of the union?
5      A. Well, it would depend on the type of
6  decision. She would either have to get a vote from our
7  members or consult with the rest of the council -- the
8  Executive Council.
9      Q. And is that true for any change to the
10  Collective Bargaining Agreement?
11      A. Yes.
12      Q.  Is that true for anyone wanting an
13  exception to the Collective Bargaining Agreement?
14      A. To my knowledge, yes.
15      Q. Okay. And just so I'm clear -- I want to
16  make sure I understand it.
17          So if someone came to you during the time
18  that you were vice president of the union and said, I
19  would like to be given an exception, I don't want to have
20  to bid every month for flights, would you be able to
21  approve that yourself?
22      A. No, I would not.
23      Q. Okay. And who would be required to approve
24  that kind of exception?
25      A. Well, typically, that would be either

Page 19

1  something that would come in agreement between the union
2  and the company, in that particular case.
3      Q. And the entire union then would have to
4  negotiate something like that with the company; is that
5  right?
6      A. It would be -- that type of agreement
7  would be between the -- the officers, council, and the --
8  and the company.
9      Q. Okay.
10      A. If I'm understanding.
11      Q. Did you ever seek any kind of exception to
12  the Collective Bargaining Agreement for Rebecca Brigham?
13      A. Not to my recollection, no, I did not.
14      Q. To your knowledge, was she always subject
15  to the terms of the Collective Bargaining Agreement?
16      A. Yes.
17      Q. You would have expected her to follow the
18  terms of the Collective Bargaining Agreement; is that
19  right?
20      A. Yes.
21      Q. To the letter; is that right?
22      A. Yes.
23      Q. If you could tell me, just generally -- and
24  I know that the Collective Bargaining Agreement's changed
25  over the years -- or changed in 2016, I believe.

Page 20

1          Can you remember back to 2015 and tell us,
2  generally, how the bidding process worked under the
3  Collective Bargaining Agreement as a flight attendant?
4      A. Yeah. We would bid based on the program
5  FLiCA, and it was in seniority order. So we would submit
6  our selections, and then it was awarded based on
7  seniority.
8      Q. Were you required to bid every month?
9      A.  Yes, if you wanted a schedule, correct.
10      Q. What would happen if you missed a bid?
11      A. You would be placed on -- well, depending
12  on your seniority, you would get either the trips that
13  were left or, potentially, you could be put back on
14  reserve.
15      Q. Was anyone given the ability, to your
16  knowledge, to skip bidding and then just build their
17  schedule from scratch?
18      A. The only time that people were able to
19  build their own schedules and not bid is if they were on
20  a leave and then they came back. And -- but it
21  was -- they had to pick what was left on open time.
22      Q. And when you say "leave," you mean a
23  continuous leave of absence, correct, like a medical leave
24  of absence or an FMLA-approved leave of absence?
25      A. Correct.

Page 21

1      Q. And someone on intermittent FMLA still had
2  to bid; is that correct?
3      A. Correct.
4      Q.  Okay.  Let's take a look at that Collective
5  Bargaining Agreement together.  And this will be Brigham
6  Exhibit 1.
7          MS. KITSON: If the court reporter could
8  mark that virtually. I don't know how that works, but
9  I'll ask the court reporter to mark either now or
10  subsequent to the deposition Brigham Exhibit 1, which she
11  will have in her possession. I attempted to send it to
12  her, but we'll send it via FTP.
13          For the record, that is Bates number
14  FRONTIERAIRLINES(R.BRIGHAM)-0000815 through 0000958, for
15  the record.
16          And I will now share my screen with you,
17  Ms. Prince. And you're going to see some yellow
18  highlighting on this document, and that actually is my
19  yellow highlighting, which will help point you to what
20  I'm looking at.
21      Q. (By Ms. Kitson) Are you -- can you now see
22  the document?
23      A. I am.
24      Q. And do you recognize this as the Collective
25  Bargaining that -- Agreement that was in place from 2011

6 (Pages 6 - 9)

Page 22

1 to 2016?

2      A. Yes.

3      Q. And in your role as vice president of the

4 union, were you generally familiar with the Collective

5 Bargaining Agreement at that time?

6      A. Yes.

7      Q. Okay. I'm going to direct you to --

8      MS. KITSON: For anyone who's

9 on -- looking at it electronically, I'm going to page 24

10 of the PDF, which is page 838 in terms of a Bates stamp.

11      Q. (By Ms. Kitson) And I'm now looking at

12 Article 2, Definitions.

13      Are you with me?

14      A. Yes, I am.

15      Q. Okay. And there's a reference in number 7

16 to an Automated Bid System. It says, A system that

17 constructs monthly schedules for flight attendants based

18 on his/her preference and seniority.

19      Do you see that?

20      A. I do.

21      Q. Is that the FLiCA system that you were

22 referring to?

23      A. Yes. And sometimes I think it's also

24 called -- I don't remember if it was called the -- back

25 then, pref-bidding system.

Page 23

1      Q. Okay.

2      A. So it might be referred to as both things;

3 FLiCA and pref-bidding.

4      Q. Okay. I'm going to move ahead to page 26

5 in the PDF, which is page 840 on the Bates stamp. And I'm

6 looking at the Definition of Line, which is paragraph 44.

7      Are you with me?

8      A. I am.

9      Q. It says, Line, A bid period award built in

10 accordance with this agreement that consists of assigned

11 trips, days off, and pre-award requests.

12      Do you see that?

13      A. I do.

14      Q. And so every month, were the flight

15 attendants required to bid a line?

16      A. Yes.

17      Q. And the next definition is, Line Holder.

18 It says, A flight attendant who has been awarded a line.

19      Do you see that?

20      A. I do.

21      Q. So once you bid and -- and you get your

22 trips, eventually, you are a line holder; is that right?

23      A. Correct.

24      Q. Do you know what a pre-award is?

25      A. Yeah. It's certain assignments that are

Page 24

1 awarded before lines are -- or even reserves are given.

2 So, like vacation, training, those kind of things.

3      Q. Is that also based on seniority?

4      A. Yes.

5      Q. All right. I'm going to jump ahead to

6 page 39 of the PDF, which is Bates page 853. And I'm

7 looking at paragraph 8.

8      Are you with me?

9      A. I am.

10      Q. Paragraph 8 reads, A line-holding flight

11 attendant who is unable to report for work due to illness

12 or off-duty injury, must notify Crew Scheduling at least

13 two hours prior to trip report time.

14      Do you see that?

15      A. I do.

16      Q. And were all flight attendants subject to

17 that requirement?

18      A. Yes.

19      Q. Was Ms. Brigham, in 2015, subject to that

20 requirement?

21      A. I believe so.

22      Q. Okay. And a flight attendant who was on

23 intermittent FMLA, meaning that on a particular day, they

24 may have to take an FMLA day, or they may have to take

25 FMLA period of time off -- was Ms. Brigham required still

Page 25

1 to notify Crew Scheduling at least two hours prior to trip

2 report time?

3      A. No, she was not.

4      Q. Okay. And explain to me why not.

5      A. It would be based on -- to my knowledge,

6 it's based on your intermittent FMLA approval. And you

7 just would have to let the company know within a

8 reasonable amount of time.

9      Q. And you'd have to let them know that it was

10 a -- an absence for FMLA purposes, correct?

11      A. Correct.

12      Q. All right. Go to page 43 of the PDF, which

13 is Bates page 857. And I'm looking at a table that says,

14 Date, Time, and Event.

15      Do you see that?

16      A. I do.

17      Q. Now, what is this table?

18      A. It's the bidding timelines for our

19 pref-bidding or FLiCA bidding.

20      Q. So, it talks about the 4th day of the

21 month, the 5th day of the month, the 6th day of the month,

22 and so on.

23      Do you see that?

24      A. I do.

25      Q. And is this what happens every month in the

Page 26

1 bidding process in terms of how the process proceeds?
2     A. Yes.
3     Q. Okay. And so it looks like on the 4th day
4 of every month, the pre-award bid period closes; is that
5 right?
6     A. Yes.
7     Q. And then, No later than the 6th of every
8 month, the monthly bids open and are posted, including
9 pre-awards.
10     Do you see that?
11     A. I do see that.
12     Q. So on the 6th of every month, then, are the
13 flight attendants able to bid?
14     A. Correct. Yes.
15     Q. Okay. And then if you go one below that,
16 it talks about Credit Balancing.
17     Do you see that?
18     A. Yes, I do see that.
19     Q. What is Credit Balancing?
20     A. It means that if a flight attendant, for
21 whatever reason, was below 60 credit hours, the company
22 would add a trip to fill those hours to make sure that
23 the flight attendant was above 60.
24     Q. Got it.
25     So you always, at the end of the month, had

Page 27

1 to have 60 hours -- you had to line hold at least
2 60 hours; is that right?
3     A. Yes.
4     Q. And that's regardless of seniority.
5     Every single flight attendant had to do
6 that; is that right?
7     A. Correct.
8     Q. And then on the 12th day of every month,
9 bids close; is that correct?
10     A. Yes.
11     Q. And then the 16th day of the month, bid
12 awards are posted; is that correct?
13     A. Correct.
14     Q. And if you go a little bit further
15 down -- so now, as of the 16th day of every month, every
16 flight attendant has a schedule for the following month,
17 and that schedule is at least 60 hours worth of trips; is
18 that correct?
19     A. Correct.
20     Q. Okay. And then if you go a little bit
21 further down, it says on the 18th of the month that
22 TradeBoard opens.
23     Do you see that?
24     A. I do see that.
25     Q. Tell us what the TradeBoard is.

Page 28

1     A. The TradeBoard is where flight attendants
2 can post trips to either trade with other flight
3 attendants, pick up, or flight attend- -- other flight
4 attendants can just pick up those trips.
5     Q. Now, when you're trading, you can never
6 drop below 45 hours in that process; is that right?
7     A. Correct.
8     Q. Okay. So you've got your schedule, there's
9 things you want to drop, things you want to trade, but no
10 matter what -- you know, if this were a game of cards, for
11 instance, you've got to hold at least 45 while you're
12 doing that trading?
13     A. Yes.
14     Q. Okay. If you go down, then, to the 19th of
15 the month, it says, Daily open time begins, drop/swap/add
16 only, no splits.
17     Do you see that?
18     A. Yes.
19     Q. What is open time?
20     A. Open time is basically trading or swapping
21 with the company. So the company has open trips that you
22 can manipulate your schedule with.
23     Q. And when a flight attendant is dropping,
24 swapping, adding, in open time, once again, that flight
25 attendant always has to hold 45 hours, correct?

Page 29

1     A. Correct.
2     Q. Okay. And then, obviously, at the end of
3 the whole process, you've got to get back up to 60; is
4 that correct?
5     A. Correct.
6     Q. Do you know if there's a maximum amount
7 that you can hold as a line holder?
8     A. I don't believe there is a maximum amount,
9 no.
10     Q. Okay. So this whole time that you're
11 playing kind of this board game of drop/swap/trade, and
12 drop/swap/trade on open time, you're always holding 45,
13 and the ability for you to kind of play with your schedule
14 is between 45 and whatever maximum amount you want to hold
15 as a line holder.
16     Do I have that right?
17     A. Correct. Yes.
18     Q. So then the 26th day of the month, it says,
19 Daily open time split and TradeBoard split for the current
20 bid period close. Daily open time split for the new bid
21 period begins.
22     Can you explain that to us? What is a
23 split?
24     A. So a split is trade -- basically, breaking
25 up your trips. If you have, let's say, a multi-day trip

8 (Pages 6 - 9)

1  that has some, maybe, overnights, and then let's say a
2  turn on either end of the trip, you might not want to do
3  just the turn or you might not want to do just the
4  overnight. So you could break that trip into -- for lack
5  of a better term -- several different trips.
6      Q. Okay. And once again through that split
7  process, a flight attendant still always has to hold the
8  45 hours, correct?
9      A. Correct.
10      Q. If you look a little further down on that
11  page, there is a section C, Eligible to Bid.
12      Are you with me?
13      A. Yes, I am.
14      Q. And then it's much easier for you to be
15  with me with this yellow highlighting.
16      A. Yeah.
17      Q. I usually don't get to show the witness the
18  yellow highlighting.
19      But Eligible to Bid, under number 1, it
20  says, Flight attendants are considered eligible to bid,
21  unless they have been granted company-approved leaves,
22  LOA, MED, FMLA, OJI, et cetera, or removed for company
23  business.
24      Do you see that?
25      A. I do.

1      Q. And once again, that's a continuous leave,
2  correct?
3      A. Correct.
4      Q. Okay. So a flight attendant like
5  Ms. Brigham, who had been granted intermittent FMLA, that
6  flight attendant still is eligible to bid and expected to
7  bid, correct?
8      A. Correct.
9      Q. Let's go down to page 46 of the PDF, which
10  is Bates page 860. And we're on paragraph 5.
11      Are you seeing what I've got on my screen
12  here?
13      A. That's highlighted underneath Misbidding?
14      Q. Yes.
15      A. Yes, I see that.
16      Q. Okay. And it reads, Each flight attendant
17  will be accountable for bidding correctly. In the event,
18  he/she fails to bid, including the default bid, there are
19  trips left, and the flight attendant is senior enough to
20  hold the line, the Automated Bid System will build a
21  line for the flight attendant. If there are not enough
22  trips to fill a line, then the flight attendant will go on
23  reserve for the misbid.
24      Do you see that?
25      A. I do see that.

1      Q. All right. So that's a lot of information.
2  So I'm with this for about, you know, The event that he or
3  she fails to bid and there are trips left.
4      Does that mean trips left just in the
5  company kind of on open time?
6      A. Correct.
7      Q. And the flight attendant is senior enough
8  to hold the line.
9      What does that mean?
10      A. It means it's the -- the flight attendant
11  holds enough seniority to hold enough trips to be
12  full-time, so minimum of 60 hours all the way up to
13  whatever the company threshold was for that month.
14      Q. Got it.
15      So, scenario: You have the most senior
16  flight attendant in the entire company, and for whatever
17  reason he or she is below 60 or failed to bid, misbid,
18  something happened, and there are 60 hours exactly left in
19  open time, that senior-most person is going to get all 60
20  of those hours.
21      Do I have that right?
22      A. Honestly, I'm not sure if they would
23  receive all of those 60 hours. But they would definitely
24  have been given trips to -- I believe at least to
25  75 hours. I don't think it was, they get the

1  whole -- all of the trips left.
2      Q. Gotcha.
3      But in any event, it's a -- it's a system
4  of them trying to pick up above 45 hours, they're trying
5  to pick up enough hours to get to 60, and if they can't,
6  they go on reserve; is that right?
7      A. Yes.
8      Q. And what is reserve?
9      A. Reserve is on call for the company.
10      Q. And that's for if someone calls in sick or
11  can't make a flight for some reason?
12      A. Correct.
13      Q. Okay. We're going to go to page -- pages
14  50 and 51 of the Collective Bargaining Agreement.  And
15  this is Bates pages 864 and 865.  And I just have a quick
16  question about this.  It talks about, Low-Time Flight
17  Attendants.
18      Do you see that?
19      A. I do.
20      Q. What are Low-Time Flight Attendants?
21      A. Low-time is essentially another word for
22  part-time or less than 60 hours.
23      Q. And it says, Inflight will offer low-time
24  flight attendant positions.
25      Do you see that?

Page 34

1    A. I do see that.
2    Q. So it's a specific position; is that right?
3    A. I wouldn't consider it a specific
4  position. It's the same -- it's a flight attendant that
5  just flies less than 60 hours.
6    Q. And that was something that was available
7  to Rebecca Brigham at the time; is that correct?
8    A. She was available to bid for that type of
9  schedule, but it was also based on seniority order.  And
10  I don't believe at the time Rebecca would have been
11  senior enough to hold that position.
12    Q. Gotcha.
13    And this low-time flight attendant, in the
14  board game of bidding, swapping, trading, dropping, this
15  low-time position -- let me just skip to page 53 -- or,
16  actually, sorry. Here it is.
17    We're on Bates page 865, page 51 of the
18  P -- PDF. It reads, 4a, Any flight attendant who is
19  awarded a low-time position must fly between 37 and a half
20  hours and 59 hours and 59 -- sorry. Let me try that
21  again.
22    Any flight attendant who is awarded a
23  low-time position must fly between 37:30 and 59:59 hours
24  per monthly bid -- bid period.
25    Do you see that?

Page 35

1    A. Yes.
2    Q. So a regular flight attendant always has to
3  hold 45 in the game of bid/swap/trade/drop, correct?
4    A. Correct.
5    Q. But a low-time flight attendant can go down
6  as little as 37 and a half hours in that game; is that
7  correct?
8    A. Correct. And can I -- I'm sorry. I need
9  to correct you.
10    I think the full-time flight attendants
11  actually have to be at 60 hours. I should have corrected
12  you before. I don't think 45 is as low as -- because
13  that was for the low-time flight attendant.
14    So I may have misunderstood you in the
15  previous questions, but it should be for full-time --
16  60 hours for a full-time flight attendant.  And then as
17  you see in this low-time flight attendant, the 37 and a
18  half to 59 hours would be for the low-time positions.
19    So I apologize for not correcting that
20  before.
21    Q. No, that's okay. So I -- I may be
22  confused, then.
23    But I thought that, at the end of the month
24  when the whole process is over, you have to, as a regular
25  flight attendant, have 60, right?

Page 36

1    A. Correct. That is correct. Yes.
2    Q. But in the process in between, before the
3  whole thing is over, and when you're doing the
4  drop/swap/trade, can't you drop as low as 45, but no
5  lower, or do I have that incorrect?
6    A.  Honestly, I think -- I don't think you had
7  to -- and I may be wrong.  I would have to relook through
8  the contract.
9    But I think you could -- yes, 45 would be
10  what you could drop down to.  And as long as at the end
11  of the month, you had 60 -- at least 60 hours, you could
12  then be okay.
13    Q. Got it. I think I may be coming up on
14  that.
15    Here we go. There it is.
16    A. I see it, yeah.
17    Q. So this would be your reference to the
18  contract, then.  So --
19    A.  Yes.
20    Q. -- it's at page 55 of the PDF, which is
21  Bates page 869. And I'm looking at L, Open Time, Minimum
22  Credit Requirements.
23    Are you with me?
24    A. Yes. Yes. And that's what I was looking
25  for that I didn't have reference to at the --

Page 37

1    Q. Got it.
2    So it says, number 1, At the completion of
3  each bid period, each flight attendant must accumulate a
4  minimum of 60 credit hours.
5    Do you see that?
6    A. Yes.
7    Q. And so that's what you're talking about
8  with at the end, you have to have 60, right?
9    A. Yes. Correct.
10    Q. And it says, At no time will a flight
11  attendant be allowed to drop below 45 credit hours, except
12  for provided for in this agreement.
13    Do you see that?
14    A.  Yes.  Yes.  Correct.
15    Q. And is that what we're talking about, that
16  when you're, you know, trading and swapping and dropping,
17  you can do all of that before the bid period closes, but
18  you can't drop below 45, right?
19    A. Correct.
20    Q. Okay. And then number 2 here, I believe,
21  is what you were talking about with the credit balancing;
22  that, you know, if -- if at the end of the bid period, you
23  don't have 60, the automated bid system will get you up to
24  60.
25    Is that right?

10 (Pages 6 -

1    A. No. Credit balancing only happens between
2    certain days of the month.  And I think it shows it right
3    below your highlighting.  Between the 7th and the 8th,
4    the credit balancing happens. Other than that, it was
5    the flight attendant's responsibility.
6        Q. Oh, gotcha.
7        But in any event, credit balancing, if it's
8    required at the end, will bring a flight attendant up to
9    60.
10       Do I have that right?
11       A. It would. But it didn't happen except
12   between the 7th and the 8th.
13       Q. Gotcha.
14       A. Does that make -- okay.
15       Q. Yeah, I think so.
16       A. So that the company didn't add trips.
17       THE REPORTER: Whoa, whoa, whoa.
18       THE DEPONENT: Sorry.
19       Q. (By Ms. Kitson) Yeah. Sorry about that.
20   I'll start over.
21       A. No, I'm just saying that -- that -- that
22   the credit balancing only happened on those two days.
23   Other than that, the flight attendant had to be
24   responsible to be up above 60 hours.
25       Q. I think I'm with you. So you bid

1    initially; then there's credit balancing; and then you go
2    into the swap/drop/trade; and you've got the
3    responsibility to end at 60.
4        Do I have that right now?
5        A. Essentially, yeah. The trading, all that
6    stuff, can happen any time. And then if the company saw
7    that you were below 60 hours, between the 7th and the
8    8th, they would add the trips. And then if you still
9    wanted to trade or whatever, you could go -- and you can
10   even drop below 60 hours after the 8th, as long as by the
11   end of the month, you still had -- you made it back up to
12   60 hours.
13       Q. I see.
14       A. So the timeline is only -- for the 7th and
15   8th is only for credit balancing. But the flight
16   attendant had that flexibility the entire month, if that
17   makes sense.
18       Q. That makes sense.
19       And that's where, in terms of the
20   flexibility, you can drop below 60, but never below 45,
21   right?
22       A. Correct.
23       Q. Okay. I think I've got this, so I don't
24   need to ask you about this page that you're seeing right
25   now.

1        A. Okay.
2        Q. I'm headed to page 58 of the PDF, which is
3    Bates page 872. And I'm seeing here on Trip Trades, A
4    flight attendant may trade any trip on his/her current
5    schedule with another flight attendant. Requests must be
6    in compliance with duty and rest limitations as
7    established by this agreement.
8        Do you see that?
9        A. I do.
10       Q. So that's a reference of what we've been
11   talking about in terms of the TradeBoard; is that right?
12       A. Correct.
13       Q. Okay. All right. I'm going to go to
14   page 93 in the PDF, which is Bates page 907. And it says
15   here again, A two-hour notice prior to report time is
16   required when calling in sick as a line holder or as a
17   reserve who has previously been given a trip assignment,
18   and three-hour notice for a reserve flight attendant who
19   has not been previously assigned a trip.
20       Do you see that?
21       A. I do.
22       Q. So even if you're on reserve, you still
23   have a notice period for calling out sick; is that right?
24       A. Yes.
25       Q. Okay. We're almost done with the

1    Collective Bargaining Agreement, I promise.
2        Page 101 of the PDF and 945 of the
3    Bates pages -- actually, no, I'm sorry. I think I jumped
4    down too far.
5        Okay. I'm on page 101 of the PDF, which is
6    page 915 of the Bates stamp. And I'm looking at
7    Seniority Accrual.
8        Are you with me?
9        A. I am.
10       Q. It says, the Frontier Systems Seniority
11   List, Seniority List, is in effect on the date of the
12   signing of this agreement, will be the official seniority
13   list, and, thereafter, the seniority of a newly-hired
14   flight attendant, including transferees from another
15   department within the company, will commence on the first
16   day a flight attendant enters training. And it continues
17   on from there.
18       Do you see that?
19       A. I do.
20       Q. What is the seniority list?
21       A. It's the list of the flight attendants
22   that are -- well, for bidding, it'd be that they were
23   active and able to bid. And it's based on date of hire.
24       Q. Okay. And the more senior you are -- it
25   seems pretty obvious -- the better ability you have to

11 (Pages 6 -

Page 42

1   control your schedule, correct?
2        A. Correct.
3        Q. Okay. And then number 4 of that same page,
4   Except as otherwise provided for in this agreement,
5   seniority will govern all flight attendants for retention
6   in case of reduction-in-force, recall from furlough,
7   preference of vacation periods, filling of vacancies, base
8   assignments, company-offered voluntary leaves of absence,
9   and bidding rights.
10        Do you see that?
11        A. I do.
12        Q. So, basically, seniority governs pretty
13   much everything; is that right?
14        A. Yes.
15        Q. Seniority is king?
16        A. Yes.
17        Q. All right. I'm going to page 105 of the
18   PDF. This is the only question I had. This is page --
19   Bates-stamped page 919 to 920.
20        And it talks about what happens when you're
21   returning from a leave of absence, correct?
22        A. Yes.
23        Q. And that would be, again, a continuous
24   leave of -- of absence, like you're out for a month on
25   medical leave, correct?

Page 43

1        A. Correct.
2        Q. Okay. And it says, number 1, To be
3   eligible to return to work and bid for a line of flying,
4   the flight attendant must complete required training, if
5   applicable. If a flight attendant requires only recurrent
6   training, he/she may bid for the next bid period, if
7   recurrent training is scheduled and a doctor's release has
8   been submitted.
9        Do you see that?
10        A. I do.
11        Q. So when a flight attendant returns from a
12   continuous leave, they have to provide a release from a
13   doctor saying that they're fit to fly; is that right?
14        A. Correct.
15        Q. And if they do that, after the bidding
16   period closes -- so after everyone's submitted their bids
17   through the Automated Bid System -- is that when they can
18   build their schedule from open time, as you were
19   discussing earlier?
20        A. Yes.
21        Q. Okay. All right. I think that's what this
22   is talking about as well. I'll skip through that.
23        And on page 107 of the PDF, which is
24   page 921, Bates stamped -- do you need to get water or
25   anything?

Page 44

1        A. No. I'm okay. Sorry. Thank you.
2        Q. And I'm planning to take a break in just
3   about eight minutes here or so.
4        A. Okay. Perfect.
5        Q. We can take one earlier if you want.
6        A. No. We're good. Thank you.
7        Q. All right. So we are on Bates page 921.
8   And --
9        A. Okay.
10        Q. -- we are looking at the provisions for
11   medical leave.
12        Are you with me?
13        A. I am.
14        Q. Okay. And number 1 says, Flight attendants
15   who do not meet the eligibility requirements for FMLA may
16   be provided a medical leave of absence.
17        Do you see that?
18        A. I do.
19        Q. And is that a benefit that the company
20   provided to flight attendants in the form of additional
21   leave above and beyond what the FMLA provided?
22        A. Yes.
23        Q. Okay. And if you go down to number 4, it
24   says, Medical leave may be granted up to a maximum period
25   of 23 consecutive months.

Page 45

1        Do you see that?
2        A. I do.
3        Q. And so a flight attendant who needed leave
4   for an extended period of time could -- for a medical
5   reason could take up to 23 months of leave; is that right?
6        A. Yes.
7        Q. Okay. And that's job-protected leave,
8   right; meaning at the end of that 23 months, their job is
9   still there for them, right?
10        A. That's my understanding, yes.
11        Q. All right. And then I'm now on page 922 of
12   the document. That's the Bates-stamp number.
13        Paragraph 13, While on medical leave,
14   flight attendants will retain and accrue seniority, and
15   retain and, up to 90 days, accrue longevity.
16        Do you see that?
17        A. I do see that.
18        Q. So the entire time that a flight attendant
19   is out on that 23 months of medical leave, they're
20   accruing seniority the whole time. Is that your
21   understanding?
22        A. That's my understanding of it, yes.
23        Q. Okay. All right. And I'm going to stop
24   sharing my screen, because we're done with this document,
25   except I'm going to have to find out -- somehow I've

12 (Pages 6 -

Page 46

1  adjusted my screen -- all right. I don't know exactly
2  what I did here. Hold on one second while I try to -- oh,
3  I need to stop share. Got it.
4        Q. Okay. Okay. All right. So setting that
5  document aside, I want to just talk to you a little bit
6  more about Rebecca Brigham.  And in fact, before we get
7  into that, why don't we just go ahead and break now, since
8  it's a new topic area.
9        MS. KITSON:  So we can go off the record.
10       THE VIDEOGRAPHER:  We're going off the
11  record at 10:10 am.
12       (Recess from 10:10 a.m. to 10:24 a.m.)
13       THE VIDEOGRAPHER: We're going back on the
14  record at 10:24 am.
15       Q. (By Ms. Kitson) Ms. Prince, do you
16  understand that you're still under oath?
17       A. I do.
18       Q. I wanted to ask a couple follow-up
19  questions from what we talked about earlier this morning.
20       First of all, I had made a reference to the
21  contract changing in 2016. But I looked back at the
22  records, and it -- it looks to me like the contract
23  actually changed in 2019?
24       Is that your understanding as well?
25       A.  I believe so.  I can't -- yes, I believe

Page 47

1  it was last year.
2        Q. Okay.  And I also understand, from the
3  company's HR department, that all flight attendants were
4  required to provide two-hours' notice, even if they were
5  on intermittent FMLA; however, the company would then
6  evaluate if there were any extenuating circumstances.
7        Is that your understanding as well?
8        A. Yes, that is correct.
9        Q. So if you were on intermittent FMLA, you
10  still had to follow the callout procedures, but if you
11  missed them, the company would then evaluate whether there
12  was an extenuating circumstance with respect to you; is
13  that correct?
14       A. Correct.
15       Q. When did you first meet Rebecca Brigham?
16       A. Honestly, I don't recall.
17       Q. Years and years ago, or...
18       A. I would assume so. Yeah, like when she
19  first started flying, I would assume.
20       Q. Okay. So at least since about 2007.
21       Does that sound about right?
22       A. Probably, yes.
23       Q. Okay. And can you describe for us the
24  nature of your relationship? Are you friends? We
25       A. It was pretty much just work-related. We

Page 48

1  didn't meet outside of work.
2        Q. How often would you fly with her, if ever?
3        A. I don't believe I ever flew with her, to
4  my knowledge. Maybe once or twice.
5        Q. When was the last time you spoke with her?
6        A. I do believe she sent me a message asking
7  my contact information through Facebook.
8        Q. How long ago was that?
9        A. I believe it was March this year; maybe a
10  little bit earlier in this year.
11       Q. Did you then talk with her?
12       A. All I did was answer her questions, just
13  gave her my contact information.
14       Q. And before March of this year, when was the
15  last time you spoke with her?
16       A. Directly, probably when she was terminated
17  from Frontier. And I believe that was maybe 2015, 2014.
18       Q. Yeah. And we'll look at some documents.
19       It's roughly November of 2015. October --
20  when you were involved in all of this, it was the
21  October-to-December 2015 time frame. But we'll get that
22  in a minute?
23       Have you had communications with
24  Ms. Brigham's attorney?
25       A. Yes.

Page 49

1        Q. Okay. And how many times have you spoken
2  with Ms. Brigham's attorney?
3        A. I believe maybe two -- twice, three times.
4        Q. And when was the first time?
5        A. It was roughly around that -- March of
6  this year when --
7        THE REPORTER:  She cut out.  She's frozen.
8        MS. KITSON:  Yeah.  You cut out there for
9  a second, but we've got you back.
10       THE DEPONENT: Oh, I'm sorry. I'm still
11  here.
12       MS. KITSON: No, that's okay.
13       Q.  (By Ms. Kitson) So the first time that you
14  spoke with Rebecca Brigham's attorney was approximately
15  March of 2020; is that right?
16       A. Correct. I believe, yes.
17       Q. Did you speak on the phone?
18       A. We had -- I believe he sent me an email,
19  and he did call me, I believe.
20       Q. What did you talk about?
21       A. He asked what I remembered of her case.
22       Q. You provided a written statement in this
23  lawsuit; is that correct?
24       A. Yes.
25       Q. And was that provided in connection with

13 (Pages 6 -

1 your conversation with Mr. Crone, the attorney?
2     A. Yes. Yes.
3     Q. Okay. And is that written statement a good
4 summary of what you told him?
5     A. I believe so, yes.
6     Q. Okay. Is there anything outside of that
7 statement that you told him?
8     I'll pull it up for you now, actually. Let
9 me just get it here.
10     MR. CRONE: Danielle, I'm sorry. This is
11 John Crone.
12     Did you mark that as an exhibit? I was
13 just looking through, and I couldn't find it. I don't
14 know if it is.
15     MS. KITSON: No, I did. And I'm so sorry,
16 I believe that that was -- it is Exhibit 40, which is one
17 that was missing. So I'm going to email that to you
18 right now, John.
19     MR. CRONE: Okay. Thank -- thank you.
20     MS. KITSON: And actually, I'm going to
21 copy our court reporter, Laurel, because I think it was
22 not in the -- bear with me one moment here. Okay. Let
23 me just share my screen.
24     And are you now seeing a document entitled
25 Declaration of Adrienne Prince?

1     THE DEPONENT: I am.
2     Q. (By Ms. Kitson) Okay. If you would like
3 to read through the document, Ms. Prince, and let me know
4 when you're finished.
5     A. Okay.
6     Q. We'll mark this as Brigham Exhibit 40, and
7 that's what I'll be referring to. The Bates stamp is
8 BrighamR_PlaintiffRecords0644 through
9 BrighamR_PlaintiffRecords0645, and I'll wait until you've
10 finished reviewing.
11     A. Okay. Is there a way I can scroll through
12 it myself, or is it only through you?
13     Q. Oh, I forgot you're sharing a screen.
14 Here, let -- let's do it this way: I'll hold it here, and
15 let me know when you're ready for me to scroll to the next
16 piece.
17     A.  Okay.  Okay.  I can scroll now -- or you
18 can scroll now.
19     Q. Let me know when you're ready.
20     A. I'm ready. Okay. Okay. Okay. Okay.
21     Q. Okay. I'm scrolling back up to the first
22 page of the document. Well, first of all, I'm going to
23 scroll down.
24     Is this your signature at the end of the
25 document?

1     A. Yes.
2     Q. And did you provide this statement under
3 penalty of perjury?
4     A. Yes.
5     Q. Okay. I'm scrolling back up.
6     Now having read the declaration, is there
7 anything that you talked about with Mr. Crone that is
8 inconsistent with this statement?
9     A. I don't believe so.
10     Q. Okay. Is this the sum and substance of
11 what you told him?
12     A. Yes.
13     Q. Is there anything else you told him that is
14 not encapsulated within this document?
15     A. I don't believe so.
16     Q. Okay. It says that, From approximately
17 2007 through 2015, I am aware that Plaintiff,
18 Rebecca Brigham, was employed by Frontier Airlines,
19 Incorporated.
20     Do you see that?
21     A. Yes.
22     Q. Okay. And you worked with her in your
23 capacity as a union vice president at the time; is that
24 correct?
25     A. Correct.

1     Q. Okay. You say in paragraph 3, I am also
2 aware that Ms. Brigham suffered from alcoholism,
3 voluntarily disclosed this disability to Frontier, and
4 underwent inpatient treatment.
5     Do you see that?
6     A. I do.
7     Q. How did you become aware of that?
8     A. It was my knowledge, because when we were
9 working on her grievance when she was terminated, that's
10 how it came to fruition.
11     Q. When Ms. Brigham returned to the workplace,
12 the union assisted her in seeking accommodations for her
13 disability.
14     Do you see that?
15     A. Yes.
16     Q. Okay. And -- and did you do that?
17     A. Yes, I did it.
18     Q. Okay. I want to go down to paragraph 5 --
19     A. Okay.
20     Q. -- or actually, I'm sorry. Paragraph 6.
21     A. Okay.
22     Q. Are you with me?
23     A. Yes.
24     Q. And I want to start with the sentence,
25 However, which is three lines down.

14 (Pages 6 -

Page 54

1    A. Yes.

2    Q. However, I explained to Frontier that the

3  union was not seeking an accommodation that would violate

4  the seniority provision, but rather, would work within the

5  seniority provision.

6      Do you see that?

7    A. Yes.

8    Q. Is that seniority provision a reference to

9  the seniority rules that we just saw in the Collective

10  Bargaining Agreement, Brigham Exhibit 1?

11    A. Yes.

12    Q. Okay. And you say here that you proposed

13  that you work within that Collective Bargaining Agreement;

14  is that correct?

15    A. Correct.

16    Q. Did you ever intend that any accommodation

17  for Rebecca Brigham would violate the Collective

18  Bargaining Agreement?

19    A. No.

20    Q. Did you ever intend that Ms. Brigham should

21  be excused from the requirement that she bid like every

22  other flight attendant?

23    A. No, I did not intend.

24    Q. Did you ever intend that she be excused

25  from the requirement that in the bidding process she hold

Page 55

1  45 hours just like everyone else?

2    A. Can you repeat that question?

3    Q. Did you ever intend that she be given an

4  exception to the Collective Bargaining Agreement so that

5  she didn't have to hold those 45 hours in the bidding

6  process like everyone else did?

7    A. No.

8    Q. So it was your intention, on behalf of the

9  union, that she had to comply with those rules, correct?

10    A. Correct.

11    Q. Okay. And it was your intention, on behalf

12  of the union, that she not be allowed to get any benefit

13  that someone more senior to her did not get, correct?

14    A. Correct.

15    Q. You say in paragraph 6, continuing on, In

16  other words, the union requested that Ms. Brigham be

17  allowed to bid for shifts within her existing seniority to

18  avoid layover as much as possible, and with regard to

19  whatever shifts were leftover containing layovers and

20  assigned to Ms. Brigham, the union proposed a method by

21  which Ms. Brigham could have traded, swapped, or dropped

22  these shifts in compliance with the Collective Bargaining

23  Agreement.

24      Do you see that?

25    A. I do.

Page 56

1    Q. Aren't you effectively saying here that,

2  within what the Collective Bargaining Agreement provided,

3  Ms. Brigham could drop/swap/trade just like everyone else?

4    A. Correct.

5    Q. Okay. And you say that, in paragraph 7,

6  Frontier refused to grant this accommodation.

7      Do you see that?

8    A. Yes.

9    Q. Now, to your knowledge, Frontier never said

10  that the Collective Bargaining Agreement wouldn't apply to

11  Ms. Brigham, right?

12    A. Correct.

13    Q. Okay. So anything in the Collective

14  Bargaining Agreement was an accommodation that Frontier

15  fully granted to her, correct?

16    A. Correct.

17    Q. Okay. So what did you mean, "Frontier

18  refused to grant this accommodation"?

19    A. Well, they didn't give her her job back

20  based on -- based on the grievance process.

21    Q. Okay. So by "Frontier refused to grant

22  this accommodation," you meant Frontier refused to

23  reinstate her; is that correct?

24    A. Correct.

25    Q. Did you mean anything else by that?

Page 57

1    A. No.

2    Q. Okay. Okay. I'm going to stop sharing

3  that document. And I'm going to show you what has been

4  marked as Brigham Exhibit 20.

5      Are you seeing a document marked

6  "Untitled"?

7    A. Yes.

8    Q. Okay.  And this is going to be Bates stamp

9  1766.

10      Do you see that?

11    A. I do.

12    MS. KITSON: Okay. And all counsel on the

13  line, do you have this exhibit?

14    MR. CRONE: Yes. Thanks, Danielle.

15    MR. SOUK: Yes.

16    Q. (By Ms. Kitson) Okay. This exhibit reads,

17  Untitled, I am requesting a reasonable accommodation.

18      Do you see that?

19    A. Yes.

20    Q. Have you seen this document before?

21    A. I don't remember that specific document,

22  no.

23    Q. Okay. It reads, I am requesting a

24  reasonable accommodation. It is to not do overnight

25  trips, because it will put my recovery at risk. Also be

15 (Pages 6 -

1 able to maintain enough hours to live on. Ideas, just
2 remove me from the overnights, have be build by own
3 schedule out of open time and TradeBoard.
4      Do you see that?
5      A. Correct. Yes, I see that.
6      Q. Is it your understanding that these were
7 the accommodations that Rebecca Brigham was requesting?
8      A. Yes.
9      Q. Okay. And did you understand that
10 Ms. Brigham wanted to just have her overnight trips
11 removed?
12      A. Yes.
13      Q. And did you understand that Ms. Brigham
14 just wanted to build her own schedule from scratch out of
15 open time or the TradeBoard?
16      A. Yes.
17      Q. Okay. And the union would not allow her to
18 build her schedule from scratch on open time, because that
19 would have violated the Collective Bargaining Agreement,
20 correct?
21      A. Correct.
22      Q. So it was not the union's intention
23 to grant this accommodation, correct?
24      A. Correct.
25      Q. Okay. And the idea of "just remove me from

1 the overnights," that would have violated the seniority
2 bidding provisions of the Collective Bargaining Agreement
3 to just do that for her, correct?
4      A. Correct.
5      Q. So that's not an accommodation that the
6 union intended to grant to her, correct?
7      A. Correct.
8      Q. Okay. I'll stop sharing that.
9      Since you originally spoke with Mr. Crone
10 and provided this statement, have you spoken with him or
11 anyone else from his firm?
12      A. No.
13      Q. Okay. So you had -- I think you said you
14 had two conversations with him. Or was it only one?
15      A. I believe it was two, maybe three. It was
16 the initial, Hi, this is who I am; and then me responding
17 to him giving him this statement; and then him responding
18 back thanking me for get -- helping.
19      Q. Was Ms. Brigham on either of those calls?
20      A. Not to my knowledge.
21      Q. Okay. And why did you provide the
22 statement?
23      A. Because, as a union rep, I advocate -- I
24 was advocating for a flight attendant, and so I was
25 continuing that.

1      Q. So you felt you were in an advocacy role,
2 correct?
3      A. Yeah.
4      Q. But you still would not have approved a --
5 an exception to the Collective Bargaining Agreement for
6 her, correct?
7      A. Correct.
8      Q. I'm going to show you what's been marked as
9 Brigham Exhibit 44.
10      A. Okay.
11      Q. Are you seeing a document with number 3 in
12 the upper left-hand corner?
13      A. Yes.
14      Q. Okay. This is Brigham Exhibit 44, which is
15 Bates stamp BRIGHAM LM 39 through BRIGHAM LM 46.
16      A. Okay.
17      MS. KITSON: And, Counsel, do you have
18 this document available to you?
19      MR. CRONE: I do.
20      MR. SOUK: Yes, I do.
21      Q. (By Ms. Kitson) Okay. And, Ms. Prince,
22 I'll represent to you that this is a transcription that I
23 believe Ms. Brigham made of an audio-recording that she
24 took of a meeting that you participated in.
25      Were you aware that Ms. Brigham had

1 audio-recorded a meeting with you?
2      A. No, I was not aware.
3      Q. Okay. Go ahead and read through the
4 document, and let me know when you're finished.
5      A. Okay. Hold on just a second.
6      Q. Oh, my gosh. I keep forgetting that you're
7 looking at this. I'm so sorry.
8      A. No, that's okay.
9      Q. Okay.
10      A. No, that's okay.
11      Q. You tell me when to scroll. You tell me
12 when to scroll.
13      A. Okay. Okay. I -- you can scroll down.
14      Q. Okay.
15      A. Okay. Okay. Okay. Okay.
16      Q. And this red highlighting that you're
17 seeing on the page here, I believe, is Ms. Brigham's.
18      A. Okay. Okay. Okay. Okay. Okay.
19 Okay.
20      Q. And this yellow highlighting is mine. This
21 is what I'm going to be asking you about.
22      A. Okay. Okay. Okay.
23      Q. This green is, again, Ms. Brigham's
24 highlighting. Just FYI.
25      A. Okay. Okay. Okay.

16 (Pages 6 -

Page 62

1    Q. And the yellow highlighting, this one is
2  mine again.
3    A. Okay. Okay.
4    Q. And I think that's the end. So I'm going
5  back to the beginning of the document.
6    A. Okay.
7    Q. And I'm going back to -- hold on one second
8  here. I'm looking at Stefanie's statement.
9      Do you see that?
10   A. Yeah.
11   Q. And is that Stefanie Coppedge?
12   A. I would assume so, but I'm not 100 --
13   Q. And Stefanie --
14   A. She's the only Stefanie I know that would
15  have been in those meetings, to my knowledge, so I
16  believe that was her, yes.
17   Q. Okay. And Stefanie Coppedge was
18  Ms. Brigham's direct supervisor; is that correct?
19   A. I believe so.
20   Q. Who is Andrea?
21   A. If I recall, she was -- I can't
22  remember -- I don't know her exact position, but I
23  believe she had a position in HR. She worked alongside
24  with Jerry Arellano.
25   Q. Okay. And going back up to the top, having

Page 63

1  read through this, does this refresh your recollection of
2  a meeting that you had with Ms. Brigham and the others
3  listed here on November 3rd, 2015?
4    A. Slightly, yes.
5    Q. Okay. But you don't know whether these are
6  the exact words that were said; is that right?
7    A. No, I don't know.
8    Q. Is there anything about this that struck
9  you as inconsistent or incorrect based on the meeting that
10  you had on November 3rd?
11   A. It -- I -- I -- I don't -- I mean, I
12  100 percent don't recall that meeting. We had several
13  meetings. So whether or not that was specific to that
14  one, I couldn't be 100 percent certain.
15   Q. Was -- it says, Final
16  Meeting With the Company, Investigatory.
17     Do you see that?
18   A. Yes.
19   Q. Do you remember having a final meeting with
20  the company in the grievance process for Ms. Brigham?
21   A. Yes.
22   Q. And what is that, Final Meeting? What's
23  that a reference to?
24   A. It's essentially the last step in the
25  grievance process, kind of a last-ditch effort to see if

Page 64

1  there's anything we can do to help the flight attendant.
2    Q. Okay. The first person speaking here, it
3  says, Adrian, Union VP.
4      It looks like that's a misspelling of your
5  name, but is that you?
6    A. I would believe so. Probably, yes.
7    Q. And then "Rebecca" is a reference to
8  Ms. Brigham; is that right?
9    A. I would assume, yes.
10   Q. Okay. Just scrolling through here.
11     So we're back at Stefanie Coppedge's
12  statement. She says, So, of course, this is the
13  fact-finding meeting, uh, because, Rebecca, you have hit,
14  uh -- so I have provided you with your absentee record.
15  That's the first little pile. I have a letter -- an email
16  from Shelly Liner for the sick call that was, uh, 10/23.
17  Uh, she sent out an email that you probably just got a
18  photocopy of it too that your request was denied for lack
19  of timely notice to the FMLA department.
20     Do you see that?
21   A. Yes.
22   Q. Is it your recollection that Ms. Brigham
23  had a sick call on October 23rd, 2015, that put her over
24  the permissible points on the dependability policy such
25  that her employment was to be terminated under policy?

Page 65

1    A. It looks that way, yes.
2    Q. And was it true at the time at Frontier
3  that the attendance policy had a termination level of date
4  points?
5    A. Yes.
6    Q. Can you explain what that means?
7    A. For every instance that you called out,
8  whether it be being sick or being late, you acquired
9  points. And each instance had -- like a sick instance
10  had a different point value than being tardy.
11     And then you -- you would accumulate eight
12  points. And so in each step before that -- and I don't
13  remember the exact points, but, like, if you had four
14  points, it was a written warning; if you had 6, it was
15  another step of discipline; and then at the eighth, it
16  was termination.
17   Q. And it was your understanding that
18  Ms. Brigham had reached that termination level, correct?
19   A. It looks that way, yes.
20   Q. And that was the reason you were having
21  this meeting, correct?
22   A. Correct.
23   Q. Okay. And Ms. Coppedge says that her
24  request to be excused from that sick call was denied
25  because of lack of timely notice to the FMLA department.

17 (Pages 6 -

1          Do you see that?
2          A. Yes.
3          Q. Okay. Scrolling down to the next page, we
4   have Ms. Brigham say -- saying, Which I take that. It is
5   my fault. I did not send it in a timely manner. I did
6   email her Monday morning before I did the Portland turn,
7   and just said, Oh, my gosh, I woke up in a panic. I
8   completely forget. Here is the days, and I understand
9   that. Uh, and I will gladly take that point and a half.
10          Do you see that?
11          A. Yes.
12          Q. Was it your understanding that Ms. Brigham
13   agreed that those final points from the October 23rd trip
14   were correctly classified under the dependability policy?
15          A. It appears that way, yes.
16          Q.  And was that your understanding at the
17   time?
18          A. Yes.
19          Q. And was the union taking any issue with the
20   coding of those points for the October 23rd trip?
21          A. I don't recall specific to that particular
22   date and those particular points.
23          Q. If Ms. Brigham is saying, though, that she
24   doesn't contest it, would the union agree with that?
25          A. I would assume that we would have agreed

1   with that.
2          Q. Okay. I am now looking at part of the
3   transcript where you're speaking. And you say, And if she
4   were picking up that open time or the trade, it wouldn't
5   be -- it would not -- because it wouldn't be, like,
6   pre-awarded, if that was something that came up. Uh, as
7   far as the union's stance, you know, if she could bid what
8   she could hold, and then, you know, was either removed or
9   able to pick up some open time, it wouldn't violate
10   seniority, because that's all first come, first served
11   anyway.
12          Do you see that?
13          A. Yes.
14          Q.  Was that you kind of piecing together in
15   your mind what the Collective Bargaining Agreement might
16   allow her to do under its terms?
17          A. Yes.
18          Q. Were you in any way suggesting that she
19   should be given an exception from the Collective
20   Bargaining Agreement provisions?
21          A. No.
22          Q. Were you in any way suggesting that she
23   should be allowed to violate the Collective Bargaining
24   Agreement?
25          A. No.

1          Q. I'm going to go, then, to the end here.
2   And again, we've got you speaking. You say, And I do
3   know, just so that you're familiar, a lot of times when
4   people come back mid-month, and they're not released to be
5   able to bid, they are given blank schedules, and they have
6   to -- and I mean, it's something that Inflight already
7   does.  So it wouldn't be an undue hardship with the
8   company, because I know some part of this, too, is that
9   her request cannot make it.
10          Andrea Warfield says, For the company?
11          And then you say, They already allow pickup
12   in this light, so it's not like we are -- it's a really
13   unusual request, that's never been done before, and the
14   placement is responsible for giving that to the -- and if
15   they don't, then there is other disciplines.
16          Do you see that?
17          A. Yeah.
18          Q. And again, it sounds to me like you're kind
19   of piecing together how would this work; is that right?
20          A. Yes.
21          Q. And you're referring it -- to it being an
22   unusual request.
23          Do you see that?
24          A. Yes.
25          Q. And you're talking this through, but it

1   doesn't appear to me that you came to any conclusion. Is
2   that right?
3          A. That's what it looks like, yes. I don't
4   believe there was any conclusion.
5          Q. And the recording -- it looks like it cuts
6   out here right in the middle.
7          Does that appear to be what happened?
8          A. It looks like that, yes.
9          Q. Yeah.
10          So I want to ask you, Ms. Prince -- you're
11   talking about this potential to do something for
12   Ms. Brigham, correct?
13          A.  Yes.
14          Q. But it was never your intention that she
15   should be able to violate the Collective Bargaining
16   Agreement, correct?
17          A. Correct.
18          Q. And it was never your intention that she
19   should be able to skip the bidding process, correct?
20          A. Correct.
21          Q. And it was never your intention that she
22   should be allowed to drop below 45 hours in the bidding
23   process, correct?
24          A. Correct.
25          Q. And it was never your intention, then, that

18 (Pages 6 -

Page 70

1  she be able to come in and build a schedule from scratch
2  from open time, correct?
3      A.  Correct.
4      Q.  Okay. I'm going to stop sharing that
5  document.
6          MS. KITSON: I've got another one, Counsel,
7  that I'm going to pull up. And I'm going to send it to
8  you-all because I don't think it was in the original.
9          I'm sending everyone what has been
10 marked as Brigham Exhibit 18. And, Mr. Crone and
11 Mr. Souk, if you could let me know when you have that in
12 front of you.
13         MR. CRONE: I just got it.
14         THE REPORTER:  Who just said that?  I'm
15 sorry.
16         MS. KITSON:  I did, Danielle -- oh, who
17 just said that? That was John.
18         MR. CRONE: That was -- sorry. I -- this
19 is John.
20         I also have it.
21         MS. KITSON: Brigham Exhibit 18 is a
22 document with a Bates stamp
23 FRONTIERAIRLINES(R.BRIGHAM)-0000101 to 103. And I'm
24 going to share the screen with you now.
25     Q. (By Ms. Kitson) Ms. Prince, are you seeing

Page 71

1  a document entitled "Search for Crew Absentee Records"?
2      A.  Yes.
3      Q.  Okay. Do you recognize this document?
4      A.  I've seen one before, yes.
5      Q.  And what is this document generally?
6      A.  It looks like it's the attendance records
7  for flight attendant -- for -- for Rebecca.
8      Q.  Okay. And is this a document that you
9  typically see in your role as a union rep?
10     A.  Yes.
11     Q.  And is this essentially a flight
12 attendant's attendance record?
13     A.  Yes.
14     Q.  And here in this portion of the page, you
15 see a box that has, Job Performance, Attendance,
16 Recommendation/Commendation, Letters, LOA, Compliance, and
17 Miscellaneous.
18         Do you see that?
19     A.  I do see that.
20     Q.  And it looks like these are a series of
21 warning letters that Ms. Brigham received, including an
22 August 12th, 2015 final order, a July 10th, 2015, final
23 warning, a May 29th, 2015, final warning, a May 14th, 2015
24 written warning, a March 16th, 2015, written warning, and
25 a March 6th, 2015, verbal warning.

Page 72

1          Do I --
2      A.  Yes.
3      Q.  -- have that correct?
4      A.  Yes.
5      Q.  And what are these warnings, in general?
6      A.  They're just documentation from the
7  company to a flight attendant warning -- letting them
8  know where they are in the step-of-discipline process.
9      Q.  Okay. We now have a box that has a series
10 of dates in it.
11         Do you see that?
12     A.  I do.
13     Q.  And are these dates dates on which
14 Ms. Brigham was absent?
15     A.  It looks that way, yes.
16     Q.   Okay.  And then the right-hand column says,
17 OCC Count.
18         Do you see that?
19     A.  Yes.
20     Q.   And for most of these absences, there's a 0
21 number.
22         Do you see that?
23     A.  Yes.
24     Q.  But then two of them have the number 1.
25         Do you see that here?

Page 73

1      A.  Yes.
2      Q.  Does this reflect the dependability points
3  that were assessed against Ms. Brigham, these two number
4  1s?
5      A.  Yes.
6      Q.  Okay. And all of these other 0s were
7  absences for which she did not incur an attendance point;
8  is that correct?
9      A.  Correct.
10     Q.  Okay. If we go to the next page, we
11 continue to see the series of 1s and 0s.
12         Do you see that?
13     A.  Yes.
14     Q.  And over a period of time, starting
15 back -- back at the beginning on September 16th, 2014.
16         Do you see that?
17     A.  Yes.
18     Q.  And continuing on until October 30th, 2015.
19         Do you see that?
20     A.  Yes.
21     Q.  And -- or October -- I'm sorry.
22 October 23rd, 2015 -- wait, strike -- yes.
23         So at the -- at the end of all of this, we
24 come to Total OCC Adjusted For Med is 10 points.
25         Do you see that?

19 (Pages 6 -

Page 74

1    A. Yes.
2    Q. Are those the occurrence points that
3 Ms. Brigham had incurred?
4    A. It looks that way, yes.
5    Q. Okay. And that's above the 8-point
6 termination level, correct?
7    A. Yes.
8    Q. Did the union have any reason to dispute
9 any of these points?
10    A. I don't recall.
11    Q. If the union did dispute them, how would
12 you have communicated that?
13    A. We would have filed a grievance.
14    Q. Okay. But to your recollection sitting
15 here today, none of these points are incorrect or
16 incorrectly assigned?
17    A. Correct. To my knowledge today, I
18 can't -- yeah.
19    Q. Okay.
20    A. I don't believe that there was an, you
21 know, inconsistency.
22    Q. Okay. I'm going to stop sharing that.
23        We're going to look at the exhibit marked
24 45.
25        I'm showing you what has been marked as

Page 75

1 Brigham Exhibit 45. And it carries the Bates stamp
2 FRONTIERAIRLINES(R.BRIGHAM)-0004475.
3        Are you seeing that?
4    A. Yes.
5    Q. And this document is dated November 18th,
6 2016.
7        Do you see that?
8    A. I do see that.
9    Q. And it's a letter from Kori Halverson to
10 Jerry Arellano.
11        Do you see that?
12    A. Yes.
13    Q. And I believe you mentioned that
14 Kori Halverson was the Grievance chair while you were vice
15 president; is that right?
16    A. Yes.
17    Q. Okay. And you are copied on this as the
18 vice president, along with Angie Piller, the president,
19 and others.
20        Do you see that?
21    A. Yes.
22    Q. Okay. And Ms. Halverson says, Dear
23 Mr. Arellano, this is to confirm that the Association of
24 Flight Attendants hereby withdraws this grievance without
25 prejudice.

Page 76

1        Do you see that?
2    A. Yes.
3    Q. Do you remember receiving this letter?
4    A. Specifically, no, I don't.
5    Q. Okay. Do you have any reason to believe
6 you did not receive it?
7    A. No. I'm sure I did receive it.
8    Q. Okay. And what is it this mean, Hereby
9 withdraws this grievance without prejudice?
10    A. It means that we are not pursuing the case
11 with the company.
12    Q. Okay. At some point, Ms. Brigham filed a
13 grievance with respect to her termination of employment
14 with Frontier; is that correct?
15    A. Correct.
16    Q. And she went through the grievance process,
17 correct?
18    A. Correct.
19    Q. And you advocated on her behalf as a
20 representative of the union, correct?
21        Oh, I think we're frozen again. Oh, we
22 lost you there --
23    A. Nope.
24    Q. -- for a second again.
25    A. Yeah. I'm back. I lost you momentarily.

Page 77

1    Q. Got it. Okay. So we were looking at
2 Brigham Exhibit 45, and I was asking you about this.
3        So Ms. Brigham filed a grievance. You went
4 through the grievance process.
5        And you, as a representative of the union,
6 were her advocate; is that correct?
7    A. Correct.
8    Q. Okay. And as an advocate, what is your
9 role?
10        You're trying to get her reinstated; is
11 that right?
12    A. Correct.
13    Q. Okay. And you're supposed to do everything
14 you can in that regard, correct?
15    A. Correct.
16    Q. Okay. And in this situation, I believe the
17 union made a determination that she should be reinstated;
18 is that correct?
19    A. Well, based on the document that I see, we
20 withdrew that grievance. So I don't know if you're
21 referring to the same instance or another -- I -- I don't
22 see if you're referring to something else.
23    Q. Okay. I'll show you those in a moment.
24        So question for you, then, when the union
25 withdraws a grievance in a situation like this with

20 (Pages 6 -

Page 78

1 Ms. Brigham, is it determining that she should be
2 reinstated?
3        A.   Well, we file grievances based on
4 different things.  So it could have -- I don't know if
5 this particular withdrawal was a grievance on one
6 particular instance for her attendance or if it was for
7 the entire termination case.  To me, it's not clear based
8 on this letter.
9        Q.  Okay.
10       A.  So I'm not sure if that's what you're
11 referring to.
12       Q.   But in any event, the union decided not to
13 pursue it further; is that correct?
14       A.  Correct.
15       Q.  Okay.  Let's look at some of that history
16 with respect to her grievance.  First, I'm just going to
17 show you some documents pretty quickly just to refresh
18 your recollection about dates and the like.
19           I'm showing you now what's been marked as
20 Brigham Exhibit 19.
21           Are you seeing a document --
22       A.  Okay.
23       Q.  -- that is a letter to Rebecca Brigham
24 dated October 30th, 2015?
25       A.  Yes.

Page 79

1           MS. KITSON:  Okay.  And, Counsel, do you
2 have that document?
3           MR. CRONE:  Yes.
4           MR. SOUK:  Yes.
5       Q.  (By Ms. Kitson) And this is a letter to
6 Rebecca Brigham that states, In accordance with the
7 Collective Bargaining Agreement, Article 18, Section B.1,
8 an investigatory meeting has been scheduled for you to
9 attend on November 3rd, 2015, at 11:00 a.m., to discuss
10 your attendance, specifically your ten occurrences.  Your
11 sick call on October 23rd, 2015, did not qualify for IFM.
12       Do you see that?
13       A.  Yes.
14       Q.  And IFM is intermittent FMLA; is that
15 correct?
16       A.  Correct.
17       Q.  Okay.  And this is a letter from
18 Stefanie Coppedge.
19       Do you see that?
20       A.  Yes.
21       Q.  And you're copied, along with Angie Reef
22 and Kori Halverson.
23       Do you see that?
24       A.  Yes.
25       Q.  And is this the letter that led up to the

Page 80

1 November 3rd, 2015, meeting that we were discussing in
2 connection with the transcript we were looking at?
3       A.  It appears that way, yes.
4       Q.  Do you remember receiving this letter,
5 specifically?
6       A.  I don't specifically remember it, no.
7       Q.  Okay.  I'm showing you what has been marked
8 as Brigham Exhibit 21.  And this is a letter to
9 Rebecca Brigham dated November 11th, 2015.
10      Do you see that?
11      A.  Yes.
12      Q.  Have you seen this document before?
13      A.  I don't specifically recall seeing it, but
14 I may have.
15          MS. KITSON:  Okay.  And, Counsel, do you
16 have this document?
17          MR. CRONE:  Got it.
18          MR. SOUK:  Yeah.
19      Q.  (By Ms. Kitson) And the letter is from
20 Stefanie Coppedge again.
21      Do you see that?
22      A.  Yes.
23      Q.  And it states, Dear Rebecca, please let
24 this memo serve to confirm your employment with
25 Frontier Airlines has been terminated effective

Page 81

1 November 11th, 2015, for the violation of the
2 dependability policy.
3      Do you see that?
4      A.  Yes.
5      Q.  Does that refresh your recollection that
6 Ms. Brigham's employment was terminated effective
7 November 11th, 2015?
8      A.  Yes.
9      Q.  Okay.  I'm going to show you what's been
10 marked as Brigham Exhibit 22.
11      Are you seeing a letter dated
12 December 10th, 2015?
13      A.  Yes.
14          MS. KITSON:  And, Counsel, do you have the
15 same exhibit?
16          MR. SOUK:  Yes.
17          MR. CRONE:  What number is this one,
18 Danielle?
19          MS. KITSON:  22.
20          MR. CRONE:  Yeah.  I've got it.  Thanks.
21          MS. KITSON:  Uh-huh.
22      Q.  (By Ms. Kitson) This is a letter dated
23 December 10th, 2015, to Angie Reef, the MEC Council 71
24 president, and it's from Frontier, from Jerry Arellano.
25      Do you see that?

21 (Pages 6 -

Page 82

1    A. Yes.
2    Q. And he states, in this highlighted
3  paragraph -- this highlighting is mine, by the way -- A
4  grievance hearing was scheduled for December 2nd, 2015, in
5  accordance with the Collective Bargaining Agreement
6  between Frontier Airlines and the flight attendants of
7  Frontier Airlines, as represented by the Association of
8  Flight Attendants, on the above-referenced grievance.
9  Ms. Brigham was not present at the meeting.
10    Do you see that?
11    A. Yes.
12    Q. And does that refresh your recollection
13  that there was a grievance hearing on December 2nd, 2015,
14  related to Ms. Brigham's termination of employment?
15    A. Briefly, yeah.
16    Q. Okay. Go ahead and read this paragraph,
17  and let me know when you're done -- or this portion of the
18  page.
19    A. Okay. Okay. I'm finished.
20    Q. Okay. Does this refresh your
21  recollection -- well, strike that.
22    It says, number 1, Reinstate flight
23  attendant, Rebecca Brigham, to her position as flight
24  attendant with full backpay.
25    Do you see that line?

Page 83

1    A. Yes.
2    Q. Is that what the union was seeking to do
3  with respect to Rebecca Brigham?
4    A. Yes, it looks that way. Yes.
5    Q. Okay. And in the bullet point, it appears
6  to be the company's position; is that right?
7    A. It looks that way. Yes.
8    Q. Okay. And Mr. Arellano says, An
9  investigation was conducted on behalf of Ms. Brigham. It
10  was determined that her dependability was accurately
11  documented and addressed in a timely manner.
12    It is essential for any organization to
13  have employees in their workstations at their expected
14  times for orderly operation of their business, and
15  Frontier is no exception. We understand employees are
16  absent on occasion or late to work for reasons beyond
17  their control. For that reason, tracking attendance,
18  absences, or tardiness is not intended to reflect
19  negatively on any employee, but to treat everyone fairly
20  and impartially.
21    On October 23rd, 2015, Ms. Brigham incurred
22  an absence, which brought her balance to 10.0, which is
23  above termination level at 8.0, resulting in the
24  termination of her employment.
25    Do you see that?

Page 84

1    A. I do see that.
2    Q. And is that an accurate description of what
3  occurred?
4    A. Yes.
5    Q. Okay. And does that refresh your
6  recollection that this was the grievance that the union
7  withdrew and stopped pursuing?
8    A. To my recollection. I -- I -- I don't
9  recall the exact reasons why we didn't pursue.
10    Q. Okay.
11    THE DEPONENT: I'm going to briefly get up
12  really quick and just get a charger for my iPad. I'll be
13  -- I'll be right back.
14    MS. KITSON: Actually, you know what? I
15  think we've been going another hour. So why don't we
16  take a 10-minute break. And I should have very few
17  questions left at that point; maybe 10 additional
18  minutes. So then -- and Mr. Crone may be asking
19  questions, or your counsel, Mr. Souk. So let's go off
20  the record and reconvene in 10 minutes, if that works for
21  everyone.
22    THE DEPONENT: Okay.
23    MR. SOUK: That works.
24    MR. CRONE: Thanks.
25    THE VIDEOGRAPHER: We're going off the

Page 85

1  record at 11:22 am.
2    (Recess from 11:22 a.m. to 11:33 a.m.)
3    THE VIDEOGRAPHER: We're going back on the
4  record at 11:33 a.m.
5    Q. (By Ms. Kitson) Ms. Prince, do you
6  understand you're still under oath?
7    A. Yes.
8    Q. Okay. I just have one more document to
9  show you. This will be what's been marked Brigham
10  Exhibit 31.
11    And are you seeing a document with the
12  Association of Flight Attendants letterhead at the top?
13    A. Yes.
14    Q. Okay. And this is a document Bates stamped
15  FRONTIERAIRLINES(R.BRIGHAM)-209, and it goes to 212.
16    MS. KITSON: Counsel, do you have the
17  document?
18    MR. CRONE: I've got it.
19    MR. SOUK: Yes, I do. Thank you.
20    MS. KITSON: Okay. Great.
21    Q. (By Ms. Kitson) Ms. Prince, this appears
22  to be a letter from the Association of Flight Attendants
23  to Frontier Airlines Flight Attendants' System Board of
24  Adjustment.
25    Do you see that?

22 (Pages 6 -

Page 86

1      A. Yes.
2      Q. And the letter's dated December 21st of
3 2015.
4      Do you see that?
5      A. Yes.
6      Q. It looks like it's from Sara Nelson, the
7 international president.
8      Do you see that?
9      A. Yes. Yes.
10      Q. And you are not copied on this letter.
11      Did you ever receive this letter?
12      A. I don't recall receiving it.
13      Q. Okay. The only reason I have this in front
14 of you is kind of to lace all of this together. We've
15 been looking at various different pieces of
16 correspondence.
17      And if you look at the attachment here to
18 this letter, it is a grievance form.
19      Do you see that?
20      A. Yes.
21      Q. And it states that the grievant's name and
22 address is Rebecca Brigham, and then the date is
23 November 23rd, 2015.
24      Do you see that?
25      A. Yes.

Page 87

1      Q. Does that refresh your recollection that
2 the union filed a grievance on behalf of Rebecca Brigham
3 on November 23rd, 2015?
4      A. Yes.
5      Q. Okay. And it says, AFA Grievance Number
6 52-71-01-68-15.
7      Do you see that?
8      A. Yes.
9      Q. And is that the grievance number that the
10 union refers to throughout -- throughout the grievance
11 process?
12      A. Yes.
13      Q. Okay. And then if you go down one more
14 page in the attachments, you've got that letter that we
15 saw before dated December 10th, 2015, from Mr. Arellano to
16 Ms. Reef. And that was Brigham Exhibit 22 that we looked
17 at before.
18      Do you recognize that letter as the one we
19 looked at before?
20      A. Yes.
21      Q. Okay. And again, it has the same grievance
22 number, 52-71-01-68-15.
23      Do you see that?
24      A. Yes.
25      Q. And does that indicate that this piece of

Page 88

1 correspondence is related to the original grievance?
2      A. Yes.
3      Q. Okay. And then if you go to the
4 letter -- cover letter, again, it has that AFA case
5 number, 52-71-01-68-15.
6      Do you see that?
7      A. Yes.
8      Q. And does that indicate to you that this
9 relates to that same initial grievance?
10      A. Yes.
11      Q. Okay. And then last one is to look back at
12 that Exhibit 45 again.
13      And are you seeing the AFA letter to
14 Jerry Arellano dated November 18th, 2016?
15      A. Yes.
16      Q. Okay. And this was the withdrawal letter
17 that we looked at earlier, correct?
18      A. Correct.
19      Q. And the case number again is AFA Case
20 Number 52-71-01-68-15.
21      Do you see that?
22      A. Yes.
23      Q. And is that the same grievance that we
24 looked at before?
25      A. Yes.

Page 89

1      Q. So does this refresh your recollection,
2 tying it all up then, that the union filed a grievance on
3 Rebecca Brigham's behalf, that Frontier responded and
4 denied the grievance, that the union then pursued it and
5 continued to advocate on her before, but then withdrew the
6 grievance?
7      A. Yes.
8      Q. Okay. All right.
9      MS. KITSON: Those are my only questions
10 for you today. Thank you so much.
11      THE DEPONENT: Thank you.
12      MS. KITSON: And we should -- Mr. Crone or
13 Mr. Souk may have questions. So let's just hold on a
14 second here.
15      THE DEPONENT: Okay.
16      MR. CRONE: I've got a few, if I may.
17      EXAMINATION
18 BY MR. CRONE:
19      Q. And so, Ms. Prince, I -- really just a few.
20 And I'll kind of start backwards, because Danielle was
21 just asking you about the -- the -- the grievance process
22 and sort of put all those pieces of paper in front of you
23 and asked you if it refreshed your recollection on the
24 process.
25      Is it your understanding that the union

23 (Pages 6 -

Page 90

1  lost the grievance?
2      A. No. It looks like we withdrew the
3  grievance.
4      Q. So -- so did -- did Frontier deny the
5  grievance at some point?
6      A. Honestly, I don't recall how that played
7  out, specifically.
8      Q. When -- when the union ultimately withdrew
9  the grievance, it says -- do you recall looking at a piece
10  of paper that says that it was withdrawn without
11  prejudice?
12      A. Yes.
13      Q. What -- what does that mean?
14      A. It means that we're not pursuing it.
15      Q. Do you know why?
16      A. I --
17          MR. SOUK: I'm going to have to -- yeah,
18  I'll have to voice an objection there.
19          The reasons why a grievance may or may not
20  be pursued at the System Board level generally fall under
21  attorney-client privilege because the staff attorney who
22  is involved gives the Grievance Committee legal advice on
23  whether or not to pursue a grievance to arbitration.
24          MR. CRONE: Thanks. Yeah, I -- I -- I
25  appreciate the explanation. And all -- all I'm asking is

Page 91

1  whether she knows why or not. I'm not asking for the
2  basis, just whether she -- whether Ms. Prince knows why.
3          And so it's a yes-or-no-type question. So
4  if you're fine with that --
5          MR. SOUK: Yeah, if it's -- if it's just a
6  yes or no, if she knows why, that's -- that's okay.
7          MR. CRONE: Yeah.
8      Q. (By Mr. Crone) So let -- let me repeat
9  that, Ms. Prince, sorry. So you probably -- you may have
10  lost track of it.
11          Do you know why the union withdrew the
12  grievance without prejudice?
13      A. I don't recall.
14      Q. Okay. Do you know sort of how far a
15  grievance can go?
16          In other words, what's the end of the road
17  for a grievance? How far can the union push it?
18      A. The grievance -- or the union can push it
19  to arbitration.
20      Q. Got it. Okay.
21          Would they -- would the union ever -- if
22  arbitration failed, would the union ever file a court case
23  on behalf of a flight attendant?
24      A. That, I'm not 100 percent sure. I don't
25  believe so, but I'm not 100 percent sure.

Page 92

1      Q. Does -- does the union ever file an EEOC
2  charge on behalf of a -- of a flight attendant?
3      A. I'm not certain, but I don't believe
4  that's the union's responsibility.
5      Q. Do you know what an EEOC charge is?
6      A. It's -- I don't know the exact initials,
7  but it's like equal opportunity something, along those
8  lines.
9      Q. Okay. Do you recall way back at the
10  beginning when you were talking with Danielle about the
11  flight attendants -- so, a full-time flight attendant in
12  the bidding process has to maintain 45 hours throughout
13  the process?
14      A. Yes.
15      Q. So that's -- after a flight attendant
16  initially bids, and then based on his or her seniority,
17  they -- they obtain a line, correct?
18      A. Correct.
19      Q. And that after they obtain the line, they
20  might need to trade or swap or -- trade or swap. And
21  through that process, they need to maintain 45 hours. Is
22  that how it works?
23      A. Correct. Yes.
24      Q. So there's nothing then stopping a flight
25  attendant from swapping out all of his or her flights,

Page 93

1  correct, as long as they just did it a couple at a time?
2      A. Do you mean they could -- they can't drop
3  down to zero and have zero trips.
4          But can they trade every single trip?
5  Yes.
6      Q. Yeah. And -- and -- and that's what I
7  meant. And that wouldn't violate --
8      A. Okay.
9      Q. Yeah. And that wouldn't violate the
10  Collective Bargaining Agreement in any way, correct?
11      A. Correct.
12      Q. And then do you -- do you recall how many
13  hours per month Ms. Brigham was trying to maintain, like
14  what type of schedule, just in terms of how many hours she
15  wanted per month back at the time you were trying to help
16  her negotiate these issues?
17      A. I don't recall her specific request, no.
18      Q. Okay. Was it -- do you recall if she was
19  trying -- trying to stay full time?
20      A. I would assume she was trying to stay full
21  time.
22      Q. Okay. Ms. Kitson asked you a few questions
23  about coming off of leave and then being able to build a
24  schedule from scratch. She made the distinction about
25  continuous leave or intermittent leave.

24 (Pages 6 -

Page 94

1    Do you recall that conversation?
2    A. I do.
3    Q. Okay. Does the Collective Bargaining
4  Agreement specify that a flight attendant must be coming
5  off of continuous leave in order to have to produce a
6  doctor's note and be approved to bid again?
7    MS. KITSON: Object to the form.
8    THE DEPONENT: Do I still answer?
9    MS. KITSON: Yes.
10   Q. (By Mr. Crone) Oh, yeah. And I can -- I
11  can repeat it for you, and I could --
12   A. Please.
13   Q. -- I could put it -- I could put the
14  Collective Bargaining Agreement up on the screen too, if
15  that's -- I'm just trying to get at whether or not you
16  remember it now. So let me just repeat the question to
17  make it easier.
18   A. Okay.
19   Q. Do you recall if the CBA requires
20  continuous -- so that a flight attendant is coming off of
21  continuous, as opposed to intermittent, leave time in
22  order for that requirement that a doctor's note be
23  submitted before they can bid again?
24   MS. KITSON: Object to the form.
25   A. There's no requirement for intermittent

Page 95

1  FMLA to have doctors' notes to come back to rebid.
2    Q. (By Mr. Crone) Got it.
3    So -- so if someone -- so when Ms. Brigham
4  was -- was she on intermittent -- did she have
5  intermittent FMLA leave approved?
6    A. I believe she was going through the
7  process to get that approved. I don't know if she
8  specifically had that approved at the time of the case.
9    Q. Okay. And -- and if she did, then in order
10  to bid each month, she wouldn't need a doctor's note or
11  anything like that?
12   A. Correct.
13   Q. Okay. And then -- and then the -- the
14  Collective Bargaining Agreement itself --
15   MR. CRONE: I'm -- I'm going to -- I'm
16  going to pull this up just so we can make sure that we're
17  clear about what we're talking about. I -- I wrote down
18  the page number. Give me just a second here.
19   All right. So let me try and share this.
20   Sorry, Adrienne, I have to --
21   THE DEPONENT: That's okay.
22   MR. CRONE: I have to get the -- I have to
23  grant it access in the system preferences. Let's see if
24  I can get this to work.
25   Can you see that, Adrienne, or did I --

Page 96

1  did I succeed?
2    THE DEPONENT: I can -- I can see it, yes.
3    Q. (By Mr. Crone) Okay. Excellent. Okay.
4  Sorry about the delay.
5    Okay. So I'm going to get to the
6  page here. Sorry. I should have wrote down what
7  page number it was on the PDF, instead of the Bates
8  number, and then that would have been easier.
9    And do you see where it says "eligible to
10  bid" there down at the bottom of this page?
11   A. Yes.
12   Q. Okay. And -- and under 1, it says -- I
13  think you've looked at this with Danielle, but I'm just
14  going to read it again to make sure. Flight attendants
15  are considered eligible to bid, unless they have been
16  granted company-approved leaves, LOA, Med, FMLA, OJI,
17  et cetera, or removed for company business.
18   There, it doesn't say that it has to be
19  continuous. How -- how do you know that that's true?
20   A. Well, the types of leaves that are listed
21  are typically continuous for an extended period of time,
22  whether it be just a week, two weeks, or a whole month.
23   Q. Okay. And so -- but -- but given that it
24  doesn't say "continuous" there, was this just something
25  that was understood between the company and the union, or

Page 97

1  was that agreement written down somewhere else, or how did
2  that work?
3    MS. KITSON: Object to the form.
4    A. I don't know if it's listed anywhere else,
5  like in the company handbook or anything, but those
6  are -- I mean, the definitions of those types of leaves
7  of absences that are listed are always continuous.
8    Q. (By Mr. Crone) Except that FMLA could be
9  intermittent, right?
10   A. Right, but it's listed -- it would have
11  been listed specifically with the use of IFMLA or IFML or
12  IFM typically.
13   Q. Okay. So that would be -- so somebody who
14  had intermittent FMLA would say "IFMLA" or something like
15  that?
16   A. Correct.
17   Q. And then that wouldn't be included under
18  this Eligibility to Bid provision?
19   A. Typically, correct.
20   Q. Okay. Are you -- are you aware of whether
21  or not Ms. Brigham requested an accommodation to be
22  reassigned temporarily to light duty at the GO?
23   A. I'm not 100 percent sure if she did
24  request that.
25   Q. Okay. And that -- another question on this

25 (Pages 6 -

Page 98

1  document -- sorry. I've just got to scroll down to the
2  right Bates-numbered page.
3        Okay. And are you with me on that -- this
4  is Bates number page 919.
5        Do you see the capital letter B, Returning
6  From Leave of Absence paragraph?
7        A. I do see it.
8        Q. Okay. And then below that, do you see this
9  paragraph C, Returning From Intermittent Leave Absence?
10       A. Yes.
11       Q. Okay. There, it says, A flight attendant
12  who has missed a portion of a trip or a complete trip due
13  to an intermittent leave, FMLA, Med, OJI, et cetera, and
14  has been completely released, will be returned to his or
15  her original trip if available.
16       What does that mean; do you know?
17       A. Yeah. It means that if a -- a flight
18  attendant, let's say, has called out for the beginning
19  turn of a trip and has an overnight connected to it, that
20  when the flight attendant comes back, then they should be
21  returned to their original trip, unless Crew Scheduling
22  may have assigned it to somebody else for whatever
23  reason.
24       Q. So -- so if -- so Crew Scheduling may have
25  assigned it to somebody else, and then it wouldn't be

Page 99

1  available?
2        A. Correct.
3        Q. Got it. Okay.
4        And then the next sentence says, If the
5  trip was picked up in open time, the flight attendant may
6  pick up open time to replace the trip credit.
7        What does that mean?
8        A. It means they can go into open time, which
9  is essentially the -- the company's TradeBoard, and then
10  they can look and see if there's something that they want
11  to pick.
12       Q. And is open time available to anybody, or
13  is that seniority-based?
14       A. It's open to anybody.
15       Q. Okay. And then it says, If there are no
16  trips that the flight attendant wants to pick up, the
17  flight attendant can opt to be placed on AVA status for
18  the time of the original pairing.
19       What's the AVA status?
20       A. It means available to assign. So it would
21  almost be like a reserve-type position with different
22  parameters.
23       Q. Sort of like being on call again or
24  something?
25       A. Correct.

Page 100

1        Q. Okay. And what -- what's different between
2  that and the regular reserve time?
3        A. AVA has specific requirements. It has to
4  be based on the original trip, certain time frames of
5  that. And they -- you don't get called on an as-needed
6  basis. The company has to call you the day before, I
7  believe -- by 5:00 the day before the specific AVA
8  assignment.
9        Q. So it's like being on call, but a little --
10  a little nicer. So -- so you're not going to be -- it's a
11  little easier to predict when you might be called up; is
12  that fair?
13       A. Yes.
14       Q. Okay. And I -- I've skipped back up in the
15  document to what's page 870.
16       And --
17       A. Okay.
18       Q. -- it's got -- do you see paragraph M,
19  where it says, Daily Open Time. First Come, First Served?
20       A. Yes.
21       Q. Okay. Is -- is this what you've
22  been -- well, let me just -- let me just read the first
23  paragraph.
24       It says, All available open time will be
25  displayed in the Automated Bid System. A flight attendant

Page 101

1  may submit requests in the Automated Bid System to modify
2  his or her schedule using add/drop/swap with open time on
3  a first-come, first-served basis?
4        So does that mean that that's not
5  seniority-based?
6        A. Specifically open time, no, is not
7  seniority-based.
8        Q. Okay. And --
9        A. It's first come, first served.
10       Q. And so if -- so if Rebecca Brigham, for
11  example, had initially bid at the beginning of the month,
12  or -- or even just not bid at all and -- and -- and
13  received -- let's say she didn't bid at all. Would she
14  just receive an automated line based on her seniority?
15       A. I believe so, yes.
16       Q. And then she could use this add/drop/swap
17  with the open time to -- to totally rebuild her schedule
18  without dropping below that 45-hour limit, right?
19       A. In theory, yes.
20       Q. Okay. And -- and -- and then she would fly
21  whatever the schedule is, presumably, right, and then just
22  subject to all the normal, you know, rules that Frontier
23  has in place?
24       A. Correct.
25       Q. Okay. And -- and so when you were

26 (Pages 6 -

Page 102

1  advocating to -- to Frontier that Ms. Brigham be allowed
2  to build her schedule this way, did -- did Frontier ever
3  tell you why they wouldn't allow it?
4       A.  I don't recall if they gave me specifics.
5       Q.  But in that last meeting when you were
6  asking for her -- when the union was asking for her to be
7  reinstated, is it your understanding that if Frontier
8  would have allowed this, they would have reinstated her?
9       A.  That would be an -- my assumption, yes.
10      Q.  I mean, that's what you were asking for,
11  wasn't it?
12      A.  Correct.
13          THE REPORTER: I'm sorry?
14          MS. KITSON: Object to the form.
15      Q.  (By Mr. Crone)  There's another page in
16  this Collective Bargaining Agreement -- and I didn't write
17  down what page number it was, but it was -- it was the
18  page where Danielle drew your attention to --
19  Danielle Kitson, Frontier's attorney, drew your attention
20  and said, This contract would allow somebody 23 months of
21  medical leave, and their job would be protected.
22          Do -- do you remember that provision?
23      A.  I do.
24      Q.  Is that medical leave paid or unpaid?
25      A.  I believe you have to use your sick time

Page 103

1  or your vacation time, and then it goes unpaid. But I --
2  I would have to relook at the specifics on that.
3       Q.  So let's assume you're right, that you've
4  got to use up your accrued sick and vacation time first,
5  and then you go to unpaid.
6          How does an employee -- how does an
7  employee that uses -- let's say the full 23 months of --
8  of -- of medical leave, how does an employee pay their
9  bills during that time?
10      A.  I guess that would be --
11          MR. SOUK: Objection. Speculative.
12  Object. Speculation.
13          You can still answer.
14      A.  Okay.  I guess that would be up to the
15  individual flight attendant how they would pay their own
16  bills.
17      Q.  (By Mr. Crone) But Frontier, through the
18  Collective Bargaining Agreement, didn't commit itself to
19  pay for that -- to pay the employee's salary beyond the
20  sick and the -- and the -- and the other leave time?
21      A.  It doesn't look that way, no.
22      Q.  So Danielle Kitson has pointed you to
23  various provisions of the Collective Bargaining Agreement,
24  and so have I.
25          Did you negotiate this Collective

Page 104

1  Bargaining Agreement? Were -- were you involved in that
2  process at all?
3       A.  No, I was not.
4       Q.  And I think you already answered this, but
5  I just want to make sure.
6          You didn't have at the time -- so back when
7  you were helping Ms. Brigham negotiate with Frontier, you
8  didn't have any ability to amend this Collective
9  Bargaining Agreement on yourself -- by -- by yourself, did
10 you?
11      A.  No, I did not.
12      Q.  Okay. And when the Collective Bargaining
13 Agreement was renegotiated, apparently, in 2019, did you
14 have any part in doing -- in negotiating those amendments?
15      A.  No, I did not.
16      Q.  Okay. Okay. Give me just a minute here.
17          When you were -- when you were negotiating
18 with Frontier on -- on Ms. Brigham's behalf, do you recall
19 if Frontier offered any solutions of its own?
20      A.  I don't recall.
21      Q.  Have you seen anything today -- in -- in
22 all the pieces of paper you've looked at, have you seen
23 anything today that refreshes your memory as to whether or
24 not Frontier offered any of its own solutions?
25      A.  Short of Rebecca asking for an extended

Page 105

1  medical leave, I don't see anything else that Frontier
2  specifically sent to her or the union with other
3  suggestions.
4       Q.  Okay. And you and -- you and Ms. Kitson
5  had a short exchange about the points that Ms. Brigham
6  accrued due to absences.
7          Do -- do you recall that discussion?
8       A.  Yes.
9       Q.  And Ms. Kitson asked you if Ms. Brigham was
10 conceding that these final points were proper.
11          Do -- do you recall that question?
12      A.  I do.
13      Q.  Do you know whether Ms. Brigham thought
14 those final 4 points ought to be assessed against her?
15      A.  The only thing I can recall is seeing what
16 was written in that transcript. And it said that Rebecca
17 had agreed -- or that she had agreed to that.
18      Q.  Yeah. I -- I know that's your
19 interpretation of what it said.
20          I'm asking, do you know what Rebecca
21 actually thought?
22          MS. KITSON: Object to the form.
23      A.  Specifically, no. And I don't recall if
24 she and I specifically had a conversation regarding that.
25      Q.  (By Mr. Crone) In fact, you never did have

27 (Pages 6 -

Page 106

1  a conversation regarding that, did you?
2        MS. KITSON: Object to form.
3        MR. SOUK: Object.
4        A. I don't know.
5        Q. (By Mr. Crone) Did your -- did you -- do
6  you recall telling Ms. Kitson that if an employee -- if a
7  flight attendant is on intermittent FMLA leave, and they
8  don't notify that they're calling out in that two-hour
9  period or whatever it was before a flight, that Frontier
10 would review that -- because they're on intermittent FMLA
11 leave, Frontier would review that after the fact to
12 determine how to code it?
13       Do -- do you recall that?
14       A. I do recall that, yes.
15       Q. (By Mr. Crone) And --
16       THE REPORTER: I'm sorry. Was there an
17 objection?
18       MS. KITSON: Yes. Object to the form.
19       Q. (By Mr. Crone) Okay. And so in -- in that
20 instance with the final points with -- with Ms. Brigham,
21 do you know why Frontier didn't review that after the
22 fact?
23       MS. KITSON: Object to the form. Assumes
24 facts not in evidence.
25       THE DEPONENT: Do --

Page 107

1        MS. KITSON: You can answer.
2        THE DEPONENT: Do I still --
3        MR. SOUK: You can answer.
4        THE DEPONENT: Okay. Okay. Sorry.
5        A. Typically, the -- the flight attendant
6  would have to pursue -- like to request them to review
7  that if there was a discrepancy.
8        Q. (By Mr. Crone) Oh, I got it.
9        So -- so on that final absence, if
10 Ms. Brigham was on IFM -- intermittent FMLA leave, and if
11 she had asked that they look at that, then Frontier would
12 review how to code that. Is -- is that --
13       MS. KITSON: Object to --
14       Q. (By Mr. Crone) Am I understanding that
15 correctly?
16       MS. KITSON: Object to the form.
17       A. Correct.
18       Q. (By Mr. Crone) Okay. And do you know
19 if -- at that time when Frontier assessed those final
20 points, do you know if Rebecca had intermittent FMLA leave
21 approved?
22       A. I don't recall specifically if she had
23 intermittent FMLA at that time.
24       Q. And do you know if she requested that
25 Frontier review how they coded that absence?

Page 108

1        A. If it was specifically that absence? No,
2  I don't recall.
3        Q. And, Ms. Prince, did you prepare for
4  today's deposition in any way?
5        A. Briefly, yes.
6        Q. Who did you prepare with?
7        A. I did have some conversation with
8  Josh Souk, and I just re-looked at what I had sent you
9  previously.
10       Q. Okay. And did you -- did you speak at all
11 with Ms. Kitson prior to today's conversation?
12       A. No, short of just getting the information
13 regarding having this meeting. But, no, I did not
14 prepare with her.
15       Q. Do you know if Mr. Luke (sic) communicated
16 with Ms. Kitson prior to today's deposition?
17       A. I believe he did, just to confirm details.
18       Q. Okay. And how long did you and
19 Mr. Luke (sic) meet to prepare for today?
20       A. Like the duration of our conversations; is
21 that what you're asking -- how long our conversations
22 were?
23       Q. Yeah. Exactly.
24       A. Oh, maybe an hour, half hour.
25       MR. SOUK: Just to jump in, if you're

Page 109

1  referencing me, my last name is Souk.
2        MR. CRONE: Oh, Souk. I'm sorry.
3        MR. SOUK: Yeah. That's okay. No one
4  ever gets it right.
5        Q. (By Mr. Crone) Yeah. Did you -- did you
6  understand that I was referencing Mr. Souk, not Luke?
7        I'm sorry, Adrienne.
8        A. I did assume that, yes.
9        Q. Okay.
10       A. Thank you.
11       Q. And did you and Mr. Souk review any
12 documents as part of your preparation?
13       A. Together? No, we did not. Well, that's
14 not true. I think I did ask him about the deposition
15 that I had sent you.
16       Q. Okay. Do you understand that I represent
17 Ms. Brigham in a lawsuit against Frontier that alleges
18 Frontier violated the AVA in various ways?
19       A. Yes.
20       Q. And you -- back when Ms. Brigham filed her
21 grievance, you represented her in that -- in that
22 proceeding, right?
23       A. Yes.
24       Q. Okay. And today, do you feel like you're
25 giving testimony for or against any one side?

28 (Pages 6 -

Page 110

1      A. No, I don't believe it's for either side
2  or the other.
3      Q. Does the union take a side -- when it files
4  a grievance for, say, the flight attendant -- say,
5  Rebecca Brigham -- was the union on a side during that
6  grievance?
7      A. Yes, the union is advocating for the
8  flight attendants.
9      Q. Got it. And so -- so the union was
10  advocating for Ms. Brigham at the time of the grievance,
11  right?
12      A. Correct.
13      Q. And you understand I'm advocating for
14  Ms. Brigham in a lawsuit on her behalf, correct?
15      A. Correct.
16      Q. Do you think it's odd that -- that -- that
17  Mr. Souk objected to some of my questions to you today,
18  given the fact that I also represent Ms. Brigham?
19          MS. KITSON: Object to the form.
20      A. I don't understand why lawyers object.
21  I'm just following along.
22          MR. CRONE: I don't have any further
23  questions, Ms. Prince. Thank you.
24          THE DEPONENT: Thank you.
25          MS. KITSON: I have a little follow-up, if

Page 111

1  that's okay.
2              EXAMINATION
3  BY MS. KITSON:
4      Q. Ms. Prince, I really appreciate your
5  patience today. I -- I need to ask you a little bit more
6  about this 45 hours, because I believe the record is
7  unclear.
8          So you testified earlier that during the
9  bidding process, a flight attendant is not permitted to
10  drop below 45 hours at any point in that process, correct?
11      A. Correct.
12      Q. Okay. So I want to walk through a
13  hypothetical with you. Let's say that Ms. Brigham did not
14  bid.
15          Are you with me?
16      A. Yes.
17      Q. And the automated system spits out a
18  line for her of 60 hours.
19          Are you with me?
20      A. Yes.
21      Q. And is that what would happen?
22      A. Honestly, I don't know the specifics if
23  Ms. Brigham had misbid, not bid, how many hours she would
24  have been given. It varies -- that varies month to
25  month. But she would have been awarded some sort of

Page 112

1  line based on whatever company -- the threshold was at
2  that time.
3      Q. Okay. And that line would have been above
4  45 hours for sure, right?
5      A. Oh, for sure, yes.
6      Q. Okay. Now, she now has this line, correct?
7      A. Yes.
8      Q. All right. Let's assume that she has
9  60 hours.
10      A. Yes.
11      Q. Are you with me?
12      A. Yes.
13      Q. Okay. And she wants to get rid of all of
14  her trips.
15      A. Correct.
16      Q. Are you with me?
17      A. Yes.
18      Q. She has to drop all of them all at once in
19  the system.
20          Are you with me?
21      A. Yes.
22      Q. She cannot do that, right?
23      A. Correct.
24      Q. Okay. Now, she's holding -- she -- she
25  decides she wants to give up one trip that's worth five

Page 113

1  hours.
2          Are you with me?
3      A. Yes.
4      Q. She drops that trip.
5          Are you with me?
6      A. Yes. Yes.
7      Q. She's now at 55 hours, correct?
8      A. Correct.
9      Q. And that's okay, right?
10      A. Yes.
11      Q. Now she wants to drop a block of 20 hours.
12          Are you with me?
13      A. Yes.
14      Q. She can't do that, because it would take
15  her down under 45, correct?
16      A. Correct.
17      Q. Okay. So when she's sitting at 55, the
18  most she can drop in one shot is 15, correct -- oh, I'm
19  sorry. I'm terrible at math. Let me say that again.
20          Ms. Brigham has 50 -- 55 hours, and she
21  wants to drop 20, she cannot do that, correct?
22      A. Correct.
23      Q. But she could drop 10 because that will
24  bring her to the 45-hour threshold, correct?
25      A. Yes.

29 (Pages 6 -

Page 114

1    Q. Okay. Now she's at 45.
2        Are you with me?
3    A. Yes.
4    Q. Okay. And she can't drop any more trips,
5 then, until she picks up trips to take her above 45,
6 correct?
7    A. Correct.
8    Q. Okay. So at no point -- you can't trade
9 out a trip that's going to bring her below 45 at any point
10 in the process, right?
11    A. Okay. Now you're talking two different
12 things, because trading is different than dropping. So
13 she wouldn't have been able to drop, but she could
14 have -- if she had a trip that was 20 hours that she
15 wanted to get rid of, and she saw a trip that was -- I'm
16 really bad at math -- 35 hours, she could have traded
17 those to keep her above whatever math we are at.
18        So she could trade to get back up. She
19 wouldn't have been able to drop first and then pick up,
20 in theory.
21        Does that make sense?
22    Q. That does make sense. So she can't -- she
23 can't drop unless she's replacing, if she's at that 45
24 mark, right?
25    A. Correct. Correct.

Page 115

1    Q. So she's -- let me follow it through. So
2 she's at 45.
3        Are you with me?
4    A. Yes.
5    Q. She wants to trade with another flight
6 attendant. She wants to give that flight attendant 20 and
7 get 20 back.
8        Are you with me?
9    A. Yes. Yes.
10    Q. She can do that, right?
11    A. Correct. Correct.
12    Q. But let's say she's at 45, and she wants to
13 give a flight attendant 20, but only get back 10.
14    A. Yes.
15    Q. Let me try that again.
16    A. Okay.
17    Q. Ms. Brigham is at 45 hours.
18        Are you with me?
19    A. Yes.
20    Q. She wants to drop 20 of her hours.
21    A. Okay.
22    Q. Are you with me?
23    A. Yes.
24    Q. She can't drop it, right?
25    A. Right.

Page 116

1    Q. She sees another flight attendant has a
2 20-hour trip that she would be willing to take.
3        So she's able to swap that, right, give 20
4 and get 20 right back?
5    A. As long as that other flight attendant
6 wants to do the same, then, yes.
7    Q.  Okay.  But she can't -- let's say that she
8 wants to drop 20 and she sees another flight attendant
9 with only 10.
10        She can't give away 20 and only get back 10
11 so that she's at 35 hours, can she?
12    A. Correct. No, she cannot.
13    Q. Okay. So she always has to balance at 20;
14 is that right? I'm sorry. Let me --
15    A. Whatever it is to be at 45, yes.
16    Q. Got it. So she always has to balance to
17 45, whatever move she's making?
18    A. Correct.
19    Q. Now, is that also true in terms of trading
20 off of open time?
21        So let's say that Ms. Brigham is sitting at
22 45.
23        Are you with me?
24    A. Yes.
25    Q. Okay. And she wants to drop 20, right?

Page 117

1    A. Yes.
2    Q.  And she sees there's 20 available on open
3 time.
4        Are you with me?
5    A. Yes.
6    Q. Can she swap those?
7    A. The difference with open time is that the
8 company has minimum requirements on each day. So if she
9 had a trip that was on the 5th and the 6th, for example,
10 and she wanted to get rid of that and pick up something
11 on the 7th and 8th, the 5th and the 6th would have to
12 have enough reserve coverage to allow her to drop that
13 trip to pick up the other trip on the 7th and 8th, unless
14 it was day-for-day.
15        Does that make sense?
16    Q. Yes.
17    A. Okay.
18    Q. And nothing ever stopped her from following
19 these rules, right?
20        These rules applied to everybody, correct?
21    A. Correct.
22    Q. And so it's not like Frontier was saying
23 she couldn't do that, right?
24    A. Correct.
25    Q. She could. She could play by the same

30 (Pages 6 -

Page 118

1 rules as everyone else, right?
2    A. Correct.
3    Q. So when you said -- I was a little bit
4 confused about what you said before, when you said that if
5 Frontier had granted what she wanted, she would be
6 reinstated.
7    Was that your testimony?
8    A. Yes. I mean, granted that she was able
9 to -- she wanted her job back and trade and drop trips to
10 not have overnights.
11    Q. Okay. And so what the union was saying is
12 that she should be able to do whatever she could within
13 the existing Collective Bargaining Agreement to try to
14 achieve that, correct?
15    A. Correct.
16    Q. Okay. And you're not saying that she
17 should be able to drop below the 45 and start over again
18 from scratch, correct?
19    A. Correct.
20    Q. Okay. And so when you say she would have
21 been reinstated, you don't know that for sure, right?
22    A. I don't think so. I -- what I -- I think
23 what I'm trying to clarify is that if her attendance had
24 been not at -- you know, when you -- you file a grievance
25 and you fight against the attendance, whatever, and if

Page 119

1 she'd have been able to drop and trade and everything,
2 she would have been able to have her job back. But the
3 attendance was the issue.
4    Q. Yeah. But the union did not approve her
5 ability to do what she wanted, which was drop everything
6 and start from scratch?
7    A. I don't recall that that's what she -- she
8 didn't want to drop everything; she just wanted to drop
9 overnights.
10    Q. Okay. And if she --
11    A. To my -- to my understanding.
12    Q. Okay. So let me ask you this: If she
13 tried everything she could under the Collective Bargaining
14 Agreement and she still had overnights, and the company
15 took those overnights from her, that would be a violation
16 of the seniority bidding rules of the Collective
17 Bargaining Agreement, right?
18    A. Correct.
19    Q. Okay.
20    A. Correct.
21    Q. So she can't just have the overnights taken
22 away magically, right?
23    A. Correct.
24    Q. She's got to follow the same rules?
25    A. Correct.

Page 120

1    Q. Okay.
2    MS. KITSON: Those are my only questions.
3 Thank you.
4    THE DEPONENT:  Okay.
5      EXAMINATION
6 BY MR. CRONE:
7    Q. And I'll -- I just have a few follow-up
8 based on that, of course.
9    So Ms. -- I think we should sort of nail
10 down and be clear about what Ms. Brigham was asking.
11    She wasn't asking to magically eliminate
12 overnights, was she?
13    A. Not to magically eliminate, no.
14    Q. I mean, really what she was proposing was
15 that -- was that if she could build her schedule out of
16 the -- the -- the open time -- you know, the trade time
17 and the open time, what she was proposing was to take that
18 burden on herself to make sure she didn't have the
19 overnights.
20    Isn't that correct?
21    A. Correct.
22    Q. And -- and so that wouldn't violate the
23 Collective Bargaining Agreement, right?
24    A. Correct.
25    Q. But -- but, still, despite that fact, when

Page 121

1 you went into the grievance meeting with Ms. Brigham, she
2 had absences that put her over the limit and -- and -- and
3 set her up for termination, right?
4    A. Correct.
5    Q. So wasn't -- and so -- so, was she asking
6 to be allowed to build a schedule in such a way that she
7 wouldn't have these absences that would put her over the
8 line for termination?
9    A. It was -- from my understanding, what
10 the -- the accommodation, it was moving forward to be
11 able to manipulate her schedule.
12    Q. Because prior to that, it wasn't working,
13 which is why she had racked up these termination points;
14 isn't that correct?
15    A. Correct. Correct.
16    Q. And isn't -- so -- so Ms. Brigham, what she
17 was proposing is -- is actually different -- slightly
18 different than what everybody else is entitled to, because
19 she's trying to eliminate overnights; is that correct?
20    MS. KITSON: Object to the form.
21    A. I -- I don't think it's different than
22 what everybody -- everybody is able to manipulate their
23 schedules, whether they don't want overnights or certain
24 trips.
25    Q. (By Mr. Crone) Sure. And -- but -- but

31 (Pages 6 -

Page 122

1  in -- in her case, it wasn't working.
2          I mean, she was at the termination level
3  based on attendance, right?
4          A. Correct.
5          Q. Okay. And -- and so what she was
6  proposing, which was to take -- you know, whether she bid
7  originally or just didn't bid and received a line, and
8  then traded and swapped with other people or with open
9  time after that, isn't -- that process that she was
10  proposing, isn't that nicer to the more senior flight
11  attendants in a way, because then she didn't originally
12  bid on trips she really wasn't going to keep?
13          MS. KITSON: Object to the form.
14          A. I would disagree with that. I mean --
15          Q. (By Mr. Crone) Why?
16          A. Well, if she had bid and followed with the
17  procedure, she would have probably gotten better trips
18  than she would have been awarded anyway, and it would
19  have been easier for her to trade based on what flight
20  attendants like to fly, the availability.
21          Q. Got it. So she could -- she could try to
22  bid for those non-overnight flights in the first place?
23          A. Correct.
24          Q. And then -- yeah. And then she's going to
25  keep more than she's going to need to trade or swap later

Page 123

1  in the month?
2          A. Correct.
3          Q. Okay. So I guess it's the same question,
4  though.
5          Is -- isn't that friendly to the other
6  flight attendants in terms of the seniority provision?
7  She's just not just picking up trips that
8  she really wants to dump; she's trying to pick up trips
9  that she can keep?
10          MS. KITSON: Object to form.
11          A. I don't really -- I don't really think
12  that that's exactly how it works. And being friendly
13  or -- I mean, that's not how the system works. It's all
14  on seniority.
15          Q. (By Mr. Crone) Oh, I know it's all on
16  seniority. But what -- what I'm saying is that -- that a
17  flight attendant could -- could -- he or she could bid on
18  trips that they don't really want, with the idea that
19  they're going to swap them out later, which means they're
20  not available for some other flight attendant who wants it
21  when they first bid at the beginning of the month.
22          Does that make sense?
23          A. Yeah. But in theory, you always bid for
24  the best. So it's either whether you want to fly it --
25  you have the best that you want to fly or you have the

Page 124

1  best that you can trade.
2          Q. Got it. Okay. Okay. So -- so then -- so
3  then, again -- and maybe I already asked you this.
4  In -- and I don't think I asked it in quite the same way.
5          In -- in the meetings leading up to that
6  final meeting -- so either that final meeting or the
7  meetings leading up to that final meeting, did Frontier
8  ever discuss why what Ms. Brigham was proposing wasn't
9  acceptable?
10          A. I don't recall the specifics on each
11  meeting.
12          Q. I mean, you thought it was acceptable at
13  the time, though, didn't you?
14          MS. KITSON: Object to the form.
15          A. We suggested what was based on the
16  contract.
17          Q. (By Mr. Crone) Because that would help
18  Ms. Brigham, right?
19          MS. KITSON: Object to the form.
20          A. Correct.
21          Q. (By Mr. Crone) Okay. I mean, you
22  were -- you -- you were representing an interest of your
23  member at that time, right?
24          A.  Of course.
25          Q. Okay. And so you thought this was a

Page 125

1  reasonable solution, or you wouldn't have proposed it,
2  would you?
3          MS. KITSON: Object to form.
4          A. Correct.
5          Q. (By Mr. Crone) Okay.
6          THE REPORTER: I'm sorry. Your answer was
7  "Correct"?
8          THE DEPONENT: Yes.
9          Q. (By Mr. Crone) Okay. Do you still think
10  that that was a reasonable solution, sitting here today
11  looking back on things?
12          A. I do.
13          Q. Okay. And what about -- you -- I can't
14  remember. Were you aware that Ms. Brigham also requested
15  temporary light-duty reassignment?
16  A. I -- I'd --
17          THE REPORTER: She cut out.
18          MR. CRONE: Yeah.
19          MR. SOUK: It's frozen.
20          MR. CRONE: I think if history serves as a
21  guide, it will come back in a second here.
22          THE DEPONENT: Sorry, I'm back.
23          It's true.
24          Q. (By Mr. Crone) No. You're fine. You're
25  fine.

1    I was asking -- I couldn't remember --
2 if -- if you were aware of whether or not Ms. Brigham also
3 requested a temporary light-duty reassignment to the GO.
4    A. I'm not 100 percent sure, but I think so.
5    Q. Okay. And sitting here today, looking back
6 on that, would -- would that have been a reasonable
7 solution to her problem?
8    MS. KITSON: Object to the form.
9    A. Yes.
10    Q. (By Mr. Crone) Do you know -- do you know
11 why Frontier didn't allow her to do that?
12    A. There was a certain time that --
13    MS. KITSON:  Object to form.
14    THE DEPONENT:  Oh, sorry.
15    A. There was a certain time that there were
16 no light-duty or availability to flight attendants to
17 work not flying.
18    Q. (By Mr. Crone) And was it --
19    A. But I don't know exactly when those were.
20    Q. And do you know if flight attendants ever
21 were reassigned to light duty at any time you've been at
22 Frontier?
23    A. At some point, yes, they have been.
24    Q. Okay. Do you know if that's -- if that
25 goes on now, today?

1    A. I'm not sure if it goes on now.
2    Q.  Do you know if it happened in 1999, when
3 you started?
4    A. I believe so, yes.
5    Q. So -- so -- and you just -- but there was
6 some point where it wasn't allowed; you just can't
7 remember when that was?
8    A.  Correct.  And it -- it wasn't offered
9 like -- they -- you had to do a different program.  It
10 was like working at the Goodwill or some -- some sort of
11 charity. It wasn't working at Frontier.
12    Q. Okay. Okay. Do you know -- are you aware
13 of a flight attendant ever being injured on the job?
14    A. Yes.
15    Q. Do you know if that injured flight
16 attendant is reassigned to light duty ever?
17    A. It depends. And like I said, sometimes
18 they were not offered light -- light assignments.
19 There -- there wasn't the ability to have that.
20    Q. Okay. But do you recall if it ever
21 happened?
22    A. I believe it has happened, yes.
23    Q. Okay. And can you think of anyone in
24 particular -- an actual specific name -- can you remember
25 a flight attendant that was injured and reassigned?

1    A. Yes.
2    Q. Who is that?
3    A. Marilyn Actor.
4    Q. Marilyn -- I'm sorry, what was the last
5 name?
6    A. Actor, A-c-t-o-r.
7    Q. Do you recall when this happened?
8    A. No. Specifically, no.
9    Q. Do you recall what the injury was?
10    A. She broke her wrist.
11    Q. And you can't remember when, but you
12 remember that she got temporarily reassigned to light
13 duty?
14    A. At the Goodwill, yes. It was not at
15 Frontier.
16    Q.  Okay.  Was she still paid by Frontier; do
17 you know?
18    A. I don't know how that worked.
19    Q. Okay. And did she return to regular flight
20 attendant duties?
21    A. I believe so, yes.
22    Q. Can you recall anybody else that this
23 occurred with?
24    A. Specifically, no.
25    Q. When -- when a flight attendant has their

1 60 hours, they have their line, and now they want to trade
2 and swap, they can't drop below 45.
3    But they could, for example, trade
4 ten hours six times, right?
5    A. Yes. In theory, yes.
6    Q. Okay. And -- and that could be pulled out
7 of open time, too, so long as each trip that they're
8 swapping out of the open time is a one-for-one trade.
9    So it's like if they have a five-hour trip
10 and they swap it with a five-hour trip in open time,
11 that's okay?
12    A. Yes, as long as there's coverage on the
13 days that they're -- like if it's not
14 same-day-for-same-day, the day that they want to trade
15 has to have separate coverage for what they want to pick
16 up on the other day.
17    Q. Got it. So -- so if it's on the same day,
18 they can just trade it out five hours for five hours. But
19 if they want to trade something on a Monday, that -- for
20 something on a Wednesday, how do they know there's
21 coverage?
22    A. We have a chart that's listed on FLiCA,
23 and it shows how many open periods there are, how many
24 reserves are available.
25    Q. Okay. So it's pretty easy for a flight

33 (Pages 6 -

Page 130

1  attendant at that point to figure out where they
2  can -- where they can --
3      A.  Correct.
4      Q. -- where they can trade?
5      A. Correct.
6          MR. CRONE: That's all, Ms. Prince. Thank
7  you again.
8          MS. KITSON: I'm so sorry. I have a few
9  follow-up. All right.
10             EXAMINATION
11  BY MS. KITSON:
12      Q. So, really fast, temporary light-duty
13  assignments, those were only for people injured on the
14  job, correct?
15      A. That's my understanding, but I'm not
16  100 percent sure.
17      Q. And the program was the OJI program, right?
18      A. Correct.
19      Q. Okay. You talked about the reasonable
20  solution that the union was proposing.
21          Do you remember that testimony?
22      A. Yes.
23      Q.  And wasn't the reasonable solution for
24  Ms. Brigham to work within the confines of the Collective
25  Bargaining Agreement?

Page 131

1      A. Yes.
2      Q. Okay. And we talked about how, you know,
3  letting Ms. Brigham do whatever it was she was asking,
4  that wouldn't hurt anybody.
5          Do you remember that -- him asking you
6  those questions?
7      A. Yes.
8      Q. My question to --
9      A. Correct.
10      Q. -- you is, if Ms. Brigham were permitted to
11  drop below the 45 hours, she would have an advantage over
12  those more senior to her who had to hold that 45; isn't
13  that correct?
14      A. Correct.
15      Q. And she would be treated preferentially in
16  that regard, correct?
17      A. Yes.
18          MS. KITSON: All right. Those are my only
19  questions -- oh, wait. No, sorry. I have a few more.
20  Sorry. Sorry. Sorry.
21      Q. (By Ms. Kitson)  Ms. Prince, did the
22  company ever prohibit Ms. Brigham from doing something
23  with her schedule that was allowed by the contract?
24      A. I don't believe so.
25      Q. Yeah. In other words, she was allowed to

Page 132

1  do all the things under the contract that anybody else
2  could, right?
3      A. I believe so, yes.
4      Q. And if the company had prohibited her from
5  doing what the contract allowed -- for instance, dropping,
6  swapping -- that would have been a violation of the
7  contract's (sic), correct?
8      A.  Correct.
9      Q. Let me ask you that again. All right.
10  I'll ask that again.
11          If the company had allowed her -- strike
12  that.
13          If the company had prohibited Ms. Brigham
14  from doing something that was allowed by the contract,
15  like dropping or swapping or trade, that in itself would
16  have been a violation of the contract's work rules, right?
17      A. Correct.
18      Q. Okay. Quickly here. Does the union
19  routinely file grievances related to alleged company
20  violation of work rules?
21      A. Yes.
22      Q. Okay. Did the company ever violate the
23  open time rules with respect to Ms. Brigham, to your
24  knowledge?
25      A. To my knowledge, I don't think so.

Page 133

1      Q. Did the company ever violate the CBA at all
2  with respect to Ms. Brigham, to your knowledge?
3      A. Not to my knowledge.
4      Q. Okay. And if Frontier had prohibited --
5  strike that.
6          If Frontier had prohibited Ms. Brigham from
7  doing anything that the contract allowed, the union would
8  have filed a grievance based on that, correct?
9      A. Correct.
10          MS. KITSON: Okay. I think those are my
11  only questions. Let me just double-check here. Bear
12  with me.
13          Okay. I think I'm done. Thank you very
14  much.
15          MR. CRONE: Just -- just --
16          THE DEPONENT: Thank you.
17          MR. CRONE: -- just one. Just one,
18  Ms. Prince, and then I -- and then --
19          MS. KITSON: He has to get the last word.
20          MR. CRONE: -- you can be released from --
21  you can release -- no, I just don't understand.
22             EXAMINATION
23  BY MR. CRONE:
24      Q. If -- if -- if the -- if the company didn't
25  deny Ms. Brigham what she needed, then why were you and

34 (Pages 6 -

Page 134

1　her in a grievance meeting in the first place?
2　　　　　In other words, why was she up for
3　termination, if Frontier was giving her what she needed?
4　　　　　MS. KITSON: Object to form.
5　　　　　A. We were in a grievance hearing because she
6　had exceeded her attendance points.
7　　　　　Q. (By Mr. Crone) And why did she exceed her
8　attendance points?
9　　　　　MS. KITSON: Object to the form.
10　　　　A. Because she called in sick to work too
11　many times.
12　　　　Q. (By Mr. Crone) And why did she call in
13　sick too many times?
14　　　　MS. KITSON: Object to the form.
15　　　　A. Well, each time, I don't know why she
16　called in sick. She wasn't able to be at her trips, for
17　whatever reason.
18　　　　Q. (By Mr. Crone) For whatever reason.
19　　　　Do you know what those reasons were?
20　　　　MS. KITSON:  Object to the form.
21　　　　A.  Well, I do know that some of the reasons
22　were due to alcoholism, but I don't know if every single
23　instance was.
24　　　　Q. (By Mr. Crone) Okay. So were you really
25　in a good position to be advocating for her back then?

Page 135

1　　　　　MS. KITSON: Object to the form.
2　　　　　A. At the time, I believe I advocated to the
3　best of my ability.
4　　　　　Q. (By Mr. Crone) Okay. And -- but sitting
5　here today, you're not sure why she accrued the absences
6　she accrued, but that -- well, let's just start there.
7　　　　　Sitting here today, you can't -- you can't
8　recall why she accrued all of the absences she accrued; is
9　that correct?
10　　　　A. Correct. That was several years ago.
11　　　　Q. Okay. And -- but that's what the fight was
12　over in the grievance hearing, right?
13　　　　A. Correct.
14　　　　Q. Okay. Do you think, looking back, that
15　there was perhaps somebody else that may have been better
16　equipped to advocate on her behalf?
17　　　　MR. SOUK: Objection. Calls for
18　speculation.
19　　　　You can answer.
20　　　　THE DEPONENT: I can answer?
21　　　　MR. SOUK: Yes.
22　　　　A. I don't know. Maybe if -- I mean, she
23　went through the process. We provided the resources that
24　we had for her.
25　　　　MR. CRONE: Okay. And thank you,

Page 136

1　Ms. Prince. That's all.
2　　　　　THE DEPONENT: Okay.
3　　　　　MS. KITSON: He gets the last word this
4　time.
5　　　　　Thank you very much.
6　　　　　THE DEPONENT: Thank you.
7　　　　　THE REPORTER: Just a moment.
8　　　　　Starting with Ms. Kitson, your order,
9　please?
10　　　　MS. KITSON: I think we have a standard
11　order with you through our paralegal, but I don't know.
12　What -- I don't know what the options are.
13　　　　THE REPORTER: Etran, PDF.
14　　　　MS. KITSON: I'm going to have to consult
15　with my paralegal and get back to you. I'm sorry.
16　　　　THE REPORTER: Mr. Crone, your order?
17　　　　MR. CRONE: So we're going to want
18　whatever the regular is. It doesn't need to be
19　expedited.  Whatever that order is that's -- that's just
20　sort of the slowest, cheapest version it, that's what we
21　want.
22　　　　THE REPORTER: Okay. And signature?
23　　　　(Discussion held off the record.)
24　　　　THE REPORTER: Do you want to handle
25　signature, and do you want exhibits, Mr. Crone?

Page 137

1　　　　　MR. CRONE: I think I -- we do want
2　exhibits, yes.
3　　　　　THE VIDEOGRAPHER: And then did anyone
4　want the video at all?
5　　　　　MS. KITSON: We would want it, for sure.
6　　　　　THE VIDEOGRAPHER: Go ahead.
7　　　　　MR. CRONE: And we'll also want the video.
8　　　　　THE VIDEOGRAPHER: Do you know if you just
9　want MP4 or synch or --
10　　　　MR. CRONE: MP4 is great for the
11　Plaintiff.
12　　　　THE VIDEOGRAPHER:  And Ms. Kitson?
13　　　　MS. KITSON:  You can always sync it later,
14　right?
15　　　　THE VIDEOGRAPHER: Yes.
16　　　　MS. KITSON: We'll do MP4 for now.
17　　　　THE REPORTER: Who wants to take care of
18　signature, or do you want us to do it?
19　　　　MS. KITSON: Mr. Souk, would you mind
20　doing that?  Would you mind having her review and sign?
21　　　　MR. SOUK:  That's fine.  I can do that.
22　　　　THE REPORTER: He's not ordering a copy,
23　so I can't send it to him.
24　　　　MR. SOUK: I -- actually, I will -- I'll
25　order, like Mr. Crone said, the slowest and cheapest.

35 (Pages 6 -

Page 138

1  But E-copy, PDF, if I could.
2          THE REPORTER: Okay. Thank you.
3          I'm off the record.
4          THE VIDEOGRAPHER: This concludes the
5  videotaped deposition of Adrienne Prince. We're going
6  off the record at 12:36 p.m.
7  * * * * * * *
8          WHEREUPON, the foregoing deposition was
9  concluded at the hour of 12:36 p.m. Total time on the
10  record was 2 hours and 51 minutes.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 141

1  Joshua Souk, Esq.
2  jsouk@afacwa.org
3          September 9, 2020
4  RE:  Brigham, Rebecca v. Frontier Airlines, Inc.
5      8/21/2020, Adrienne Prince (#4205084)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 140

1          REPORTER'S CERTIFICATE
2
3
4          I, Laurel S. Tubbs, a Registered
5  Professional Reporter, Certified Realtime Reporter, and
6  Notary Public within the State of Colorado, do hereby
7  certify that previous to the commencement of the
8  examination, the deponent was duly sworn by me to testify
9  to the truth.
10          I further certify that this deposition was
11  taken in shorthand by me remotely and thereafter reduced
12  to a typewritten form; that the foregoing constitutes a
13  true and correct transcript.
14          I further certify that I am not related
15  to, employed by, nor of counsel for any of the parties or
16  attorneys herein, nor otherwise interested in the result
17  of the within action.
18          My commission expires September 1, 2023.
19
20
   LAUREL S. TUBBS
21      Registered Professional Reporter
        Certified Realtime Reporter
22      and Notary Public
23
24
25

Page 142

1  Brigham, Rebecca v. Frontier Airlines, Inc.
2  Adrienne Prince (#4205084)
3      E R R A T A   S H E E T
4  PAGE_____LINE_____CHANGE_____
5      _____
6  REASON_____
7  PAGE_____LINE_____CHANGE_____
8      _____
9  REASON_____
10  PAGE_____LINE_____CHANGE_____
11      _____
12  REASON_____
13  PAGE_____LINE_____CHANGE_____
14      _____
15  REASON_____
16  PAGE_____LINE_____CHANGE_____
17      _____
18  REASON_____
19  PAGE_____LINE_____CHANGE_____
20      _____
21  REASON_____
22
23  _____  _____
24  Adrienne Prince              Date
25

36 (Pages 138, 140, 141, 142)

Page 143

1   Brigham, Rebecca v. Frontier Airlines, Inc.

2   Adrienne Prince (#4205084)

3           ACKNOWLEDGEMENT OF DEPONENT

4     I, Adrienne Prince, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Adrienne Prince                Date

13   *If notary is required

14           SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____DAY OF___, 20 .

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

37 (Page 143)

**[0 - 50]**

| 0 |
|---|
| **0**  72:20 |
| **0000101**  70:23 |
| **0000815**  21:14 |
| **0000958**  21:14 |
| **0004475**  75:2 |
| **03417**  1:2 4:16 |
| **0s**  73:6,11 |

| 1 |
|---|
| **1**  3:13 4:11 21:6 21:10 30:19 37:2 43:2 44:14 54:10 72:24 82:22 96:12 140:18 |
| **10**  2:13 3:18 73:24 84:16,17,20 113:23 115:13 116:9,10 |
| **10.0**  83:22 |
| **10/23**  64:16 |
| **100**  62:12 63:12,14 91:24,25 97:23 126:4 130:16 |
| **1003**  2:4 |
| **101**  41:2,5 |
| **103**  70:23 |
| **105**  42:17 |
| **107**  43:23 |
| **10:10**  46:11,12 |
| **10:24**  46:12,14 |
| **10th**  71:22 81:12 81:23 87:15 |
| **11**  3:17 |
| **111**  3:11 |
| **11:00**  79:9 |
| **11:22**  85:1,2 |

| **12:36**  138:6,9 |
|---|
| **12th**  27:8 71:22 |
| **13**  45:13 |
| **130**  3:11 |
| **133**  3:11 |
| **14th**  71:23 |
| **15**  113:18 |
| **16315**  6:19 |
| **16th**  2:9 27:11,15 71:24 73:15 |
| **1766**  57:9 |
| **18**  3:14,23 70:10 70:21 79:7 |
| **18th**  27:21 75:5 88:14 |
| **19**  1:2 3:15 4:16 78:20 |
| **1900**  2:9 |
| **1999**  11:13,18 127:2 |
| **19th**  28:14 |
| **1s**  73:4,11 |

| 2 |
|---|
| **2**  22:12 37:20 138:10 |
| **20**  3:16 57:4 113:11,21 114:14 115:6,7,13,20 116:2,3,4,8,10,13 116:25 117:2 143:15 |
| **20001**  2:14 |
| **2007**  47:20 52:17 |
| **2011**  21:25 |
| **2012**  12:7 13:4 15:6 |
| **2013**  12:8 |

| **20:1** 24:19 48:17 48:19,21 52:17 63:3 64:23 71:22 71:22,23,23,24,25 73:18,22 78:24 79:9,11 80:1,9 81:1,7,12,23 82:4 82:13 83:21 86:3 86:23 87:3,15 |
|---|
| **2016**  3:23 19:25 22:1 46:21 75:6 88:14 |
| **2019**  46:23 104:13 |
| **202-434-0579**  2:14 |
| **2020**  1:10 3:5 4:3 49:15 141:3 |
| **2023**  140:18 |
| **209**  85:15 |
| **21**  1:10 3:5,13,17 3:19 80:8 |
| **212**  85:15 |
| **21st**  4:3 86:2 |
| **22**  3:18 81:10,19 87:16 |
| **22402**  140:20 |
| **23**  44:25 45:5,8,19 102:20 103:7 |
| **23rd**  64:23 66:13 66:20 73:22 79:11 83:21 86:23 87:3 |
| **24**  22:9 |
| **26**  23:4 |
| **26th**  29:18 |
| **29th**  71:23 |
| **2nd**  82:4,13 |

| 3 |
|---|

| 30th |
|---|
| **30th**  73:18 78:24 |
| **31**  3:19 85:10 |
| **35**  114:16 116:11 |
| **37**  34:19 35:6,17 |
| **37:30**  34:23 |
| **39**  24:6 60:15 |
| **3rd**  2:13 63:3,10 79:9 80:1 |

| 4 |
|---|
| **4**  42:3 44:23 105:14 |
| **40**  3:20 50:16 51:6 |
| **4205084**  141:5 142:2 143:2 |
| **43**  25:12 |
| **44**  3:21 23:6 60:9 60:14 |
| **45**  3:23 28:6,11,25 29:12,14 30:8 33:4 35:3,12 36:4 36:9 37:11,18 39:20 55:1,5 69:22 74:24 75:1 77:2 88:12 92:12 92:21 101:18 111:6,10 112:4 113:15,24 114:1,5 114:9,23 115:2,12 115:17 116:15,17 116:22 118:17 129:2 131:11,12 |
| **4550**  2:4 |
| **46**  31:9 60:15 |
| **4a**  34:18 |
| **4th**  25:20 26:3 |

| 5 |
|---|

| | | | |
|---|---|---|---|
| **11:33**  85:2,4 | **2014**  12:11 48:17 | **30**  3:15 141:17 | **5**  31:10 53:18 |
| **11th**  80:9 81:1,7 | 73:15 | **303-598-3526**  2:5 | **50**  3:20 12:1 33:14 |
| **120**  3:11 | **2015**  3:15,17,18,19 | **303-629-6200**  2:10 | 113:20 |
| | 12:12,19 15:6 | | |

**501**  2:13
**51**  33:14 34:17
   138:10
**52-71-01-68-15**
   87:6,22 88:5,20
**53**  34:15
**55**  36:20 113:7,17
   113:20
**57**  3:16
**58**  40:2
**59**  34:20,20 35:18
**59:59**  34:23
**5:00**  100:7
**5th**  25:21 117:9,11

**6**

**6**  3:11 53:20 55:15
   65:14
**60**  3:21 26:21,23
   27:1,2,17 29:3
   32:12,17,18,19,23
   33:5,22 34:5
   35:11,16,25 36:11
   36:11 37:4,8,23,24
   38:9,24 39:3,7,10
   39:12,20 111:18
   112:9 129:1
**6th**  25:21 26:7,12
   71:25 117:9,11

**7**

**7**  22:15 56:5
**70**  3:14
**71**  81:23
**74**  3:23
**75**  32:25
**78**  3:15
**7th**  38:3,12 39:7
   39:14 117:11,13

**8**

**8**  24:7,10 74:5
**8.0**  83:23
**8/21/2020**  141:5
**80**  3:17,18
**800**  2:9
**80134**  6:20
**80202**  2:9
**80246**  2:4
**838**  22:10
**840**  23:5
**85**  3:19
**853**  24:6
**857**  25:13
**860**  31:10
**864**  33:15
**865**  33:15 34:17
**869**  36:21
**870**  100:15
**872**  40:3
**89**  3:11
**8th**  38:3,12 39:8
   39:10,15 117:11
   117:13

**9**

**9**  141:3
**90**  45:15
**907**  40:14
**915**  41:6
**919**  42:19 98:4
**920**  42:19
**921**  43:24 44:7
**922**  45:11
**93**  40:14
**945**  41:2
**98**  10:24
**9:19**  3:5 4:3

**a**

**a.m.**  3:5 4:3 46:12
   46:12 79:9 85:2,2
   85:4
**ability**  9:23 10:1,4
   13:23 20:15 29:13
   41:25 104:8 119:5
   127:19 135:3
**able**  17:3 18:20
   20:18 26:13 41:23
   58:1 67:9 68:5
   69:15,19 70:1
   93:23 114:13,19
   116:3 118:8,12,17
   119:1,2 121:11,22
   134:16
**absence**  20:23,24
   20:24 25:10 42:8
   42:21,24 44:16
   83:22 98:6,9
   107:9,25 108:1
**absences**  72:20
   73:7 83:18 97:7
   105:6 121:2,7
   135:5,8
**absent**  72:14
   83:16
**absentee**  3:14
   64:14 71:1
**acceptable**  124:9
   124:12
**access**  95:23
**accommodation**
   54:3,16 56:6,14,18
   56:22 57:17,24
   58:23 59:5 97:21
   121:10
**accommodations**
   53:12 58:7
**accountable**  31:17

**accrual**  41:7
**accrue**  45:14,15
**accrued**  103:4
   105:6 135:5,6,8,8
**accruing**  45:20
**accumulate** 37:3
   65:11
**accuracy**  141:9
**accurate**  84:2
**accurately**  10:5
   83:10
**achieve**  118:14
**acknowledge**  5:17
   5:20
**acknowledgement**
   143:3
**acknowledgment**
   141:12
**acquired**  65:8
**action**  1:2 4:22
   140:17
**active**  41:23
**actor**  128:3,6
**actual**  12:5 127:24
**add**  8:17 26:22
   28:15 38:16 39:8
   101:2,16
**added**  16:16
**adding**  28:24
**additional**  44:20
   84:17
**additions**  143:6
**address**  6:18
   86:22
**addressed**  83:11
**adjusted**  46:1
   73:24
**adjustment** 85:24
**administer** 4:21
**administered** 5:20

| | | | |
|---|---|---|---|
| **adrian** 64:3 | 67:15,20,24 69:16 | **answer** 8:9,10,17 | **area** 46:8 |
| **adrienne** 1:10 3:3 | 79:7 82:5 93:10 | 9:8 48:12 94:8 | **arellano** 62:24 |
| 3:20 4:12 6:7,17 | 94:4,14 95:14 | 103:13 107:1,3 | 75:10,23 81:24 |
| 50:25 95:20,25 | 97:1 102:16 | 125:6 135:19,20 | 83:8 87:15 88:14 |
| 109:7 138:5 141:5 | 103:18,23 104:1,9 | **answered** 104:4 | **arrangement** 5:23 |
| 142:2,24 143:2,4 | 104:13 118:13 | **answering** 10:8 | **article** 22:12 79:7 |
| 143:12 | 119:14,17 120:23 | **answers** 8:14 | **arts** 11:3 |
| **advantage** 131:11 | 130:25 | **anybody** 99:12,14 | **aside** 46:5 |
| **advice** 15:3 90:22 | **agreement's** 19:24 | 128:22 131:4 | **asked** 15:2 49:21 |
| **advocacy** 60:1 | **ahead** 23:4 24:5 | 132:1 | 89:23 93:22 105:9 |
| **advocate** 59:23 | 46:7 61:3 82:16 | **anyway** 67:11 | 107:11 124:3,4 |
| 77:6,8 89:5 | 137:6 | 122:18 | **asking** 48:6 61:21 |
| 135:16 | **airlines** 1:7 4:14 | **apologize** 35:19 | 77:2 84:18 89:21 |
| **advocated** 13:9 | 5:3 52:18 80:25 | **apparently** 104:13 | 90:25 91:1 102:6 |
| 16:7 76:19 135:2 | 82:6,7 85:23 | **appear** 69:1,7 | 102:6,10 104:25 |
| **advocating** 59:24 | 141:4 142:1 143:1 | **appearances** 2:1 | 105:20 108:21 |
| 102:1 110:7,10,13 | **alcoholism** 53:2 | 4:25 | 120:10,11 121:5 |
| 134:25 | 134:22 | **appearing** 4:25 | 126:1 131:3,5 |
| **afa** 15:3 87:5 88:4 | **alleged** 132:19 | **appears** 66:15 | **assessed** 73:3 |
| 88:13,19 | **alleges** 109:17 | 80:3 83:5 85:21 | 105:14 107:19 |
| **afacwa.org** 2:15 | **allotted** 141:20 | **appended** 143:7 | **assign** 99:20 |
| 141:2 | **allow** 58:17 67:16 | **applicable** 43:5 | **assigned** 23:10 |
| **affect** 9:23,25 10:3 | 68:11 102:3,20 | 141:8 | 40:19 55:20 74:16 |
| **affiliations** 5:1 | 117:12 126:11 | **applied** 117:20 | 98:22,25 |
| **affirmed** 6:8 | **allowed** 37:11 | **apply** 56:10 | **assignment** 40:17 |
| **ago** 47:17 48:8 | 55:12,17 67:23 | **appointed** 13:17 | 100:8 |
| 135:10 | 69:22 102:1,8 | 13:25 | **assignments** 23:25 |
| **agree** 4:10 6:3,5,6 | 121:6 127:6 | **appreciate** 90:25 | 42:8 127:18 |
| 8:13 9:15 66:24 | 131:23,25 132:5 | 111:4 | 130:13 |
| **agreed** 66:13,25 | 132:11,14 133:7 | **appropriate** 3:2 | **assisted** 53:12 |
| 105:17,17 | **alongside** 62:23 | **approval** 25:6 | **associated** 12:20 |
| **agreement** 3:13 | **amend** 104:8 | **approve** 18:21,23 | **association** 2:13 |
| 5:25 6:1 17:2 | **amendments** | 119:4 | 5:11 75:23 82:7 |
| 18:10,13 19:1,6,12 | 104:14 | **approved** 20:24 | 85:12,22 |
| 19:15,18 20:3 | **amount** 25:8 29:6 | 30:21 60:4 94:6 | **assume** 47:18,19 |
| 21:5,25 22:5 | 29:8,14 | 95:5,7,8 96:16 | 62:12 64:9 66:25 |
| 23:10 33:14 37:12 | **andrea** 62:20 | 107:21 | 93:20 103:3 109:8 |
| 40:7 41:1,12 42:4 | 68:10 | **approximately** | 112:8 |
| 54:10,13,18 55:4 | **angie** 15:12 75:18 | 12:10 49:14 52:16 | **assumes** 106:23 |
| 55:23 56:2,10,14 | 79:21 81:23 | **arbitration** 90:23 | **assuming** 7:3 |
| 58:19 59:2 60:5 | | 91:19,22 | |

**assumption** 102:9
**attached** 141:11
**attachment** 86:17
**attachments** 87:14
**attempted** 21:11
**attend** 28:3 79:9
**attendance** 65:3
  71:6,12,15 73:7
  78:6 79:10 83:17
  118:23,25 119:3
  122:3 134:6,8

**attendant** 11:22
  14:2 16:12 20:3
  23:18 24:11,22
  26:20,23 27:5,16
  28:23,25 30:7
  31:4,6,16,19,21,22
  32:7,10,16 33:24
  34:4,13,18,22 35:2
  35:5,13,16,17,25
  37:3,11 38:8,23
  39:16 40:4,5,18
  41:14,16 43:4,5,11
  45:3,18 54:22
  59:24 64:1 71:7
  72:7 82:23,24
  91:23 92:2,11,15
  92:25 94:4,20
  98:11,18,20 99:5
  99:16,17 100:25
  103:15 106:7
  107:5 110:4 111:9
  115:6,6,13 116:1,5
  116:8 123:17,20
  127:13,16,25
  128:20,25 130:1
**attendant's** 38:5
  71:12
**attendants** 2:13
  5:11 13:9 16:7

26:13 28:1,3,4
30:20 33:17,20
35:10 41:21 42:5
44:14,20 45:14
47:3 75:24 82:6,8
85:12,22,23 92:11
96:14 110:8
122:11,20 123:6
126:16,20
**attention** 102:18
  102:19
**attorney** 5:8 6:2
  48:24 49:2,14
  50:1 90:21,21
  102:19 141:13
**attorneys** 5:16
  140:16
**audio** 4:8,8 60:23
  61:1
**august** 1:10 3:5
  4:3 71:22
**aurora** 10:15
**authority** 16:19
  17:25
**authorized** 4:21
**automated** 22:16
  31:20 37:23 43:17
  100:25 101:1,14
  111:17
**ava** 99:17,19 100:3
  100:7 109:18
**availability**
  122:20 126:16
**available** 34:6,8
  60:18 98:15 99:1
  99:12,20 100:24
  117:2 123:20
  129:24 141:6
**avoid** 55:18
**award** 23:9,11,24

**awarded** 20:6
  23:18 24:1 34:19
  34:22 67:6 111:25
  122:18
**awards** 26:9 27:12
**aware** 52:17 53:2
  53:7 60:25 61:2
  97:20 125:14
  126:2 127:12

**b**

**b** 2:8 98:5
**b.1** 79:7
**b.a.** 11:2
**bachelor** 11:3
**back** 17:17 20:1
  20:13,20 22:24
  29:3 39:11 46:13
  46:21 49:9 51:21
  52:5 56:19 59:18
  62:5,7,25 64:11
  68:4 73:15,15
  76:25 84:13 85:3
  88:11 92:9 93:15
  95:1 98:20 100:14
  104:6 109:20
  114:18 115:7,13
  116:4,10 118:9
  119:2 125:11,21
  125:22 126:5
  134:25 135:14
  136:15
**background** 10:13
  10:20
**backpay** 82:24
**backwards** 89:20
**bad** 114:16
**balance** 83:22
  116:13,16
**balancing** 26:16

**ballpark** 14:11
**bargaining** 3:13
  17:2 18:10,13
  19:12,15,18,24
  20:3 21:5,25 22:5
  33:14 41:1 54:10
  54:13,18 55:4,22
  56:2,10,14 58:19
  59:2 60:5 67:15
  67:20,23 69:15
  79:7 82:5 93:10

  94:3,14 95:14
  102:16 103:18,23
  104:1,9,12 118:13
  119:13,17 120:23
  130:25
**bartelt** 2:16 4:18
**base** 14:16,22,24
  15:14 42:7
**based** 20:4,6 22:17
  24:3 25:5,6 34:9
  41:23 56:20,20
  63:9 77:19 78:3,7
  92:16 99:13 100:4
  101:5,7,14 112:1
  120:8 122:3,19
  124:15 133:8
**bases** 15:7
**basic** 10:13
**basically** 28:20
  29:24 42:12
**basis** 91:2 100:6
  101:3
**bates** 21:13 22:10
  23:5 24:6 25:13
  31:10 33:15 34:17
  36:21 40:3,14
  41:3,6 42:19
  43:24 44:7 45:12
  51:7 57:8 60:15

| 22:17 23:15 24:16 | 26:4 | 26:19 37:21 38:1 38:4,7,22 39:1,15 | 70:22 75:1 85:14 |

96:7 98:2,4
**bear** 50:22 133:11
**beginning** 6:1 62:5
  73:15 92:10 98:18
  101:11 123:21
**begins** 28:15 29:21
**behalf** 2:2,7,12 5:3
  5:6 16:20,23 18:1
  18:4 55:8,11
  76:19 83:9 87:2
  89:3 91:23 92:2
  104:18 110:14
  135:16
**believe** 12:5 13:25
  15:8 19:25 24:21
  29:8 32:24 34:10
  37:20 46:25,25
  48:3,6,9,17 49:3
  49:16,18,19 50:5
  50:16 52:9,15
  59:15 60:23 61:17
  62:16,19,23 64:6
  69:4 74:20 75:13
  76:5 77:16 91:25
  92:3 95:6 100:7
  101:15 102:25
  108:17 110:1
  111:6 127:4,22
  128:21 131:24
  132:3 135:2
**benefit** 44:19
  55:12
**best** 123:24,25
  124:1 135:3
**better** 13:20 30:5
  41:25 122:17
  135:15
**beyond** 44:21
  83:16 103:19
**bid** 18:20 20:4,8

22:16 23:9,15,21
  26:4,13 27:11
  29:20,20 30:11,19
  30:20 31:6,7,18,18
  31:20 32:3,17
  34:8,24,24 35:3
  37:3,17,22,23
  38:25 41:23 43:3
  43:6,6,17 54:21
  55:17 67:7 68:5
  94:6,23 95:10
  96:10,15 97:18
  100:25 101:1,11
  101:12,13 111:14
  111:23 122:6,7,12
  122:16,22 123:17
  123:21,23
**bidding** 20:2,16
  22:25 23:3 25:18
  25:19,19 26:1
  31:17 34:14 41:22
  42:9 43:15 54:25
  55:5 59:2 69:19
  69:22 92:12 111:9
  119:16
**bids** 26:8 27:9
  43:16 92:16
**bills** 103:9,16
**bit** 7:12 10:12
  27:14,20 46:5
  48:10 111:5 118:3
**blank** 68:5
**block** 113:11
**board** 29:11 34:14
  85:23 90:20
**boss** 13:12
**bottom** 96:10
**box** 71:15 72:9
**break** 9:4,6,8,9
  30:4 44:2 46:7

**breaking** 29:24
**breaks** 9:5
**briefly** 82:15
  84:11 108:5
**brigham** 1:4 4:13
  5:7 8:4 19:12 21:5
  21:10 24:19,25
  31:5 34:7 46:6
  47:15 51:6 52:18
  53:2,11 54:10,17
  54:20 55:16,20,21
  56:3,11 57:4 58:7
  58:10,13 59:19
  60:9,14,15,15,23
  60:25 63:2,20
  64:8,22 65:18
  66:4,12,23 69:12
  70:10,21 71:21
  72:14 73:3 74:3
  75:1 76:12 77:2,3
  78:1,20,23 79:6
  80:8,9 81:10 82:9
  82:23 83:3,9,21
  85:9 86:22 87:2
  87:16 93:13 95:3
  97:21 101:10
  102:1 104:7 105:5
  105:9,13 106:20
  107:10 109:17,20
  110:5,10,14,18
  111:13,23 113:20
  115:17 116:21
  120:10 121:1,16
  124:8,18 125:14
  126:2 130:24
  131:3,10,22
  132:13,23 133:2,6
  133:25 141:4
  142:1 143:1
**brigham's** 48:24

62:18 81:6 82:14
  89:3 104:18
**brighamr** 51:8,9
**bring** 38:8 113:24
  114:9
**broke** 128:10
**brought** 83:22
**build** 20:16,19
  31:20 43:18 58:2
  58:14,18 70:1
  93:23 102:2
  120:15 121:6
**built** 23:9
**bullet** 83:5
**burden** 120:18
**business** 30:23
  83:14 96:17

**c**

**c** 3:21 4:1 30:11
  98:9 128:6
**california** 10:18
**call** 5:4 7:16,19
  8:5 33:9 49:19
  64:16,23 65:24
  79:11 99:23 100:6
  100:9 134:12
**called** 3:3 22:24,24
  65:7 98:18 100:5
  100:11 134:10,16
**calling** 40:16,23
  106:8
**callout** 47:10
**calls** 33:10 59:19
  135:17
**capacity** 52:23
**capital** 98:5
**cards** 28:10
**care** 137:17
**carolyn** 2:8

| 20:10,19 21:2 | 84:16 | 49:2,14 61:17,23 | **carries**   75:1 |

**[case - continuous]**                                                                 Page 6

**case** 4:15 19:2
42:6 49:21 76:10
78:7 88:4,19,19
91:22 95:8 122:1
**cba** 94:19 133:1
**cell** 4:6
**cellular** 4:5
**certain** 23:25 38:2
63:14 92:3 100:4
121:23 126:12,15
**certificate** 140:1
**certified** 3:7 140:5
140:21
**certify** 140:7,10
140:14
**cetera** 30:22 96:17
98:13
**chair** 12:7,24 13:5
13:17,19 14:6
15:22 75:14
**change** 17:2 18:9
142:4,7,10,13,16
142:19
**changed** 19:24,25
46:23
**changes** 141:10
143:6
**changing** 46:21
**charge** 92:2,5
**charger** 84:12
**charity** 127:11
**chart** 129:22
**cheapest** 136:20
137:25
**check** 133:11
**cherry** 2:4
**circumstance**
47:12
**circumstances**
47:6

**civil** 1:2 3:2
**clarify** 118:23
**classified** 66:14
**clear** 18:15 78:7
95:17 120:10
**clearly** 9:23
**client** 90:21
**close** 27:9 29:20
**closes** 26:4 37:17
43:16
**code** 106:12
107:12
**coded** 107:25
**coding** 66:20
**cole** 2:16 4:18
**collective** 3:13
17:2 18:10,13
19:12,15,18,24
20:3 21:4,24 22:4
33:14 41:1 54:9
54:13,17 55:4,22
56:2,10,13 58:19
59:2 60:5 67:15
67:19,23 69:15
79:7 82:5 93:10
94:3,14 95:14
102:16 103:18,23
103:25 104:8,12
118:13 119:13,16
120:23 130:24
**collectively** 16:25
**college** 11:5,12
**colorado** 1:1 2:4,9
3:8 4:15,17 6:20
10:15,21 140:6
**column** 72:16
**come** 19:1 67:10
68:4 70:1 73:24
95:1 100:19 101:3
101:9 125:21

**comes** 98:20
**coming** 36:13
93:23 94:4,20
**commence** 41:15
**commencement**
140:7
**commencing** 3:5
**commendation**
71:16
**commission**
140:18
**commit** 103:18
**committee** 90:22
**committees** 16:7
**communicated**
74:12 108:15
**communications**
48:23
**company** 3:22
19:2,4,8 25:7
26:21 28:21,21
30:21,22 32:5,13
32:16 33:9 38:16
39:6 41:15 42:8
44:19 47:5,11
63:16,20 68:8,10
72:7 76:11 96:16
96:17,25 97:5
100:6 112:1 117:8
119:14 131:22
132:4,11,13,19,22
133:1,24
**company's** 47:3
83:6 99:9
**complete** 8:14
43:4 98:12 143:8
**completed** 141:17
**completely** 17:19
66:8 98:14
**completion** 37:2

**compliance** 40:6
55:22 71:16
**comply** 55:9
**computer** 4:7
**conceding** 105:10
**concentrating**
10:8
**concluded** 138:9
**concludes** 138:4
**conclusion** 69:1,4
**conducted** 83:9
**confines** 130:24
**confirm** 75:23
80:24 108:17
**confused** 35:22
118:4
**connected** 98:19
**connection** 49:25
80:2
**consecutive** 44:25
**consent** 5:23
**consider** 34:3
**considered** 30:20
96:15
**consists** 23:10
**constitutes** 140:12
**constructs** 22:17
**consult** 18:7
136:14
**contact** 48:7,13
**containing** 55:19
**contest** 66:24
**continue** 4:9 73:11
**continued** 89:5
**continues** 41:16
**continuing** 55:15
59:25 73:18
**continuous** 20:23
31:1 42:23 43:12
93:25 94:5,20,21
96:19,21,24 97:7

**contract**  36:8,18
46:21,22 102:20
124:16 131:23
132:1,5,14 133:7
**contract's**  132:7
132:16
**control**  42:1 83:17
**conversation**  50:1
94:1 105:24 106:1
108:7,11
**conversations**  4:5
59:14 108:20,21
**cool**  11:14
**copied**  75:17
79:21 86:10
**copies**  141:14
**coppedge**  62:11,17
65:23 79:18 80:20
**coppedge's**  64:11
**copy**  50:21 137:22
138:1
**corder**  2:12
**corner**  60:12
**correct**  9:15 11:18
11:19 12:22 13:6

13:7,11,21 14:4,4
14:4,20,21,23 17:5
20:9,23,25 21:2,3
23:23 25:10,11
26:14 27:7,9,12,13
27:18,19 28:7,25
29:1,4,5,17 30:8,9
31:2,3,7,8 32:6
33:12 34:7 35:3,4
35:7,8,9 36:1,1
37:9,14,19 39:22
40:12 42:1,2,21,25
43:1,14 47:8,13,14
49:16,23 52:24,25
54:14,15 55:9,10

56:15,16,23,24
58:5,20,21,23,24
59:3,4,6,7 60:2,6,7
62:18 65:18,21,22
69:12,16,17,19,20
69:23,24 70:2,3
72:3 73:8,9 74:6
74:17 76:14,15,17
76:18,20 77:6,7,12
77:14,15,18 78:13
78:14 79:15,16
88:17,18 92:17,18
92:23 93:1,10,11
95:12 97:16,19
99:2,25 101:24
102:12 107:17
110:12,14,15
111:10,11 112:6
112:15,23 113:7,8
113:15,16,18,21
113:22,24 114:6,7
114:25,25 115:11
115:11 116:12,18
117:20,21,24
118:2,14,15,18,19

119:18,20,23,25
120:20,21,24
121:4,14,15,15,19
122:4,23 123:2
124:20 125:4,7
127:8 130:3,5,14
130:18 131:9,13
131:14,16 132:7,8
132:17 133:8,9
135:9,10,13
140:13 143:8
**corrected**  35:11
**correcting**  35:19
**corrections**  143:6
**correctly**  31:17

**correspondence**
86:16 88:1
**council**  13:3,5
18:7,8 19:7 81:23
**counsel**  4:12,24,24
5:23 8:4,10 57:12
60:17 70:6 79:1
80:15 81:14 84:19
85:16 140:15
141:14
**count**  72:17
**county**  4:17
**couple**  46:18 93:1
**course**  8:8 64:12
120:8 124:24
**court**  1:1 4:15,19
5:14 7:10,20 21:7
21:9 50:21 91:22
**cover**  88:4
**coverage**  117:12
129:12,15,21
**credit**  26:16,19,21
36:22 37:4,11,21
38:1,4,7,22 39:1
39:15 99:6

**creek**  2:4
**crew**  3:14 24:12
25:1 71:1 98:21
98:24
**crone**  2:2,3,5,6
3:11 5:6,6 6:4,4
8:4 50:1,10,11,19
52:7 57:14 59:9
60:19 70:10,13,18
79:3 80:17 81:17
81:20 84:18,24
85:18 89:12,16,18
90:24 91:7,8
94:10 95:2,15,22
96:3 97:8 102:15

106:5,15,19 107:8
107:14,18 109:2,5
110:22 120:6
121:25 122:15
123:15 124:17,21
125:5,9,18,20,24
126:10,18 130:6
133:15,17,20,23
134:7,12,18,24
135:4,25 136:16
136:17,25 137:1,7
137:10,25
**crystal**  6:19
**cs**  141:15
**cs4205084**  1:25
**ctheis**  2:11
**current**  6:18 29:19
40:4
**currently**  12:13
**cut**  49:7,8 125:17
**cuts**  69:5
**cv**  1:2 4:16
**cwa**  2:13

| d |
| --- |

**d**  4:1
**daily**  28:15 29:19
29:20 100:19
**danielle**  2:7 5:2
50:10 57:14 70:16
81:18 89:20 92:10
96:13 102:18,19
103:22
**date**  25:14 41:11
41:23 65:3 66:22
86:22 142:24
143:12
**dated**  3:15,17,18
3:19,23 75:5
78:24 80:9 81:11

| 55:13,14 56:4,12 | 66:14 107:15 | 103:17 105:25 | 81:22 86:2 87:15 88:14 |

**dates** 11:17 72:10 72:13,13 78:18
**day** 24:23,24 25:20,21,21 26:3 27:8,11,15 29:18 29:25 41:16 100:6 100:7 117:8,14,14 129:14,14,14,16 129:17 143:15
**days** 23:11 38:2,22 45:15 66:8 129:13 141:17
**dc** 2:14
**dear** 75:22 80:23
**december** 3:18,19 48:21 81:12,23 82:4,13 86:2 87:15
**decided** 78:12
**decides** 112:25
**decision** 16:23 18:4,6
**decisions** 16:20 18:1
**declaration** 3:20 50:25 52:6
**declare** 5:21 143:4
**dee** 15:16
**deemed** 143:6
**default** 31:18
**defendant** 1:8 2:7 3:4 4:13 5:3
**definitely** 32:23
**definition** 23:6,17
**definitions** 22:12 97:6
**degree** 10:25
**delay** 96:4
**demote** 13:23
**denied** 64:18 65:24 89:4

**denver** 2:9
**deny** 90:4 133:25
**department** 41:15 47:3 64:19 65:25
**depend** 18:5
**dependability** 64:24 66:14 73:2 81:2 83:10
**depending** 20:11
**depends** 127:17
**deponent** 2:12 13:2 17:12,15 38:18 49:10 51:1 84:11,22 89:11,15 94:8 95:21 96:2 106:25 107:2,4 110:24 120:4 125:8,22 126:14 133:16 135:20 136:2,6 140:8 141:13 143:3
**deposed** 6:21
**deposing** 141:13
**deposition** 1:10 3:3 4:8,12,16,17 5:17,18,19 6:22 7:4,13 8:21 21:10 108:4,16 109:14 138:5,8 140:10
**describe** 16:4 47:23
**description** 84:2
**despite** 120:25
**details** 108:17
**determination** 77:17
**determine** 106:12
**determined** 83:10
**determining** 78:1
**difference** 117:7

**different** 30:5 65:10 78:4 86:15 99:21 100:1 114:11,12 121:17 121:18,21 127:9
**difficulties** 9:1
**direct** 22:7 62:18
**directly** 48:16
**disability** 53:3,13
**disagree** 122:14
**discipline** 65:15 72:8
**disciplines** 68:15
**disclosed** 53:3
**discrepancy** 107:7
**discuss** 79:9 124:8
**discussing** 43:19 80:1
**discussion** 105:7 136:23
**displayed** 100:25
**dispute** 74:8,11
**distinction** 93:24
**district** 1:1,1 4:14 4:15
**ditch** 63:25
**dkitson** 2:10
**doctor** 43:13
**doctor's** 43:7 94:6 94:22 95:10
**doctors** 95:1
**document** 3:16 21:18,22 45:12,24 46:5 50:24 51:3 51:22,25 52:14 57:3,5,20,21 60:11 60:18 61:4 62:5 70:5,22 71:1,3,5,8 75:5 77:19 78:21 79:2 80:12,16 85:8,11,14,17 98:1

100:15
**documentation** 72:6
**documented** 83:11
**documents** 48:18 78:17 109:12
**doing** 16:17 28:12 36:3 104:14 131:22 132:5,14 133:7 137:20
**double** 133:11
**douglas** 4:17
**drew** 102:18,19
**drink** 9:7
**drive** 2:4 6:19
**drop** 28:6,9,15 29:11,12 35:3 36:4,4,10 37:11,18 39:2,10,20 56:3 69:22 93:2 101:2 101:16 111:10 112:18 113:11,18 113:21,23 114:4 114:13,19,23 115:20,24 116:8 116:25 117:12 118:9,17 119:1,5,8 119:8 129:2 131:11
**dropped** 55:21
**dropping** 28:23 34:14 37:16 101:18 114:12 132:5,15
**drops** 113:4
**due** 24:11 98:12 105:6 134:22
**duly** 6:8 140:8
**dump** 123:8
**duration** 108:20

**duties** 16:5,9,11 16:12,17 128:20
**duty** 24:12 40:6 97:22 125:15 126:3,16,21 127:16 128:13 130:12

**e**

**e** 4:1,1 138:1 142:3 142:3,3
**earlier** 43:19 44:5 46:19 48:10 88:17 111:8
**easier** 30:14 94:17 96:8 100:11 122:19
**east** 2:4
**easy** 129:25
**educational** 10:19
**eeoc** 92:1,5
**effect** 41:11
**effective** 80:25 81:6
**effectively** 56:1
**effort** 63:25
**eight** 44:3 65:11
**eighth** 65:15
**either** 18:6,25 20:12 21:9 28:2 30:2 59:19 67:8 110:1 123:24 124:6
**elected** 13:15,16
**electronically** 22:9
**eligibility** 44:15 97:18
**eligible** 30:11,19 30:20 31:6 43:3 96:9,15
**eliminate** 120:11 120:13 121:19

**email** 2:5,6,10,11 2:15 49:18 50:17 64:15,17 66:6
**employed** 52:18 140:15
**employee** 83:19 103:6,7,8 106:6
**employee's** 103:19
**employees** 83:13 83:15
**employment** 11:4 11:17 64:25 76:13 80:24 81:6 82:14 83:24
**emricson** 15:16
**emricson's** 15:23
**encapsulated** 52:14
**encounter** 9:1
**endeavor** 8:1
**enter** 5:14
**enters** 41:16
**entire** 19:3 32:16 39:16 45:18 78:7
**entitled** 3:16 50:24 71:1 121:18
**equal** 92:7
**equipped** 135:16
**errata** 141:11,13 141:17
**erratas** 141:15
**esq** 2:2,3,7,8,12 141:1
**essential** 83:12
**essentially** 33:21 39:5 63:24 71:11 99:9
**established** 40:7
**et** 30:22 96:17 98:13

**etran** 136:13
**evaluate** 47:6,11
**evan** 2:3,6 5:8
**evans** 6:4
**event** 25:14 31:17 32:2 33:3 38:7 85:12
**events** 10:1
**eventually** 23:22
**everybody** 117:20 121:18,22,22
**everyone's** 43:16
**evidence** 106:24
**exact** 14:9 62:22 63:6 65:13 84:9 92:6
**exactly** 32:18 46:1 108:23 123:12 126:19
**examination** 3:4 3:10 6:10 89:17 111:2 120:5 130:10 133:22 140:8
**examined** 6:8
**example** 101:11 117:9 129:3
**exceed** 134:7
**exceeded** 134:6
**excellent** 96:3
**exception** 18:13 18:19,24 19:11 55:4 60:5 67:19 83:15
**exchange** 105:5
**excused** 54:21,24 65:24
**executive** 13:3,5 18:8
**exhibit** 3:13,14,15 3:16,17,18,19,20

3:21,23 21:6,10 50:12,16 51:6 54:10 57:4,13,16 60:9,14 70:10,21 74:23 75:1 77:2 78:20 80:8 81:10 81:15 85:10 87:16 88:12
**exhibits** 3:12 136:25 137:2
**existing** 55:17 118:13
**expected** 19:17 31:6 83:13
**expedited** 136:19
**expires** 140:18
**explain** 25:4 29:22 65:6
**explained** 54:2
**explanation** 90:25
**extended** 45:4 96:21 104:25
**extenuating** 47:6 47:12

**f**

**facebook** 48:7
**fact** 46:6 64:13 105:25 106:11,22 110:18 120:25
**facts** 106:24
**failed** 32:17 91:22
**fails** 31:18 32:3 141:19
**fair** 9:10 100:12
**fairly** 83:19
**fall** 90:20
**familiar** 22:4 68:3
**far** 41:4 67:7 91:14,17
**fast** 130:12

**[fault - fruition]**                                                                 Page 10

**fault**  66:5
**feel**  109:24
**feeling**  9:18
**felt**  60:1
**fight**  118:25
 135:11
**figure**  130:1
**file**  78:3 91:22
 92:1 118:24
 132:19
**filed**  4:14 74:13
 76:12 77:3 87:2
 89:2 109:20 133:8
**files**  110:3
**fill**  26:22 31:22
**filling**  42:7
**final**  3:21 63:15,19
 63:22 66:13 71:22
 71:22,23 105:10
 105:14 106:20
 107:9,19 124:6,6,7
**financially**  4:22
**find**  45:25 50:13
**finding**  64:13
**fine**  17:21 91:4
 125:24,25 137:21
**finished**  51:4,10
 61:4 82:19
**fire**  13:23
**firm**  4:18,20 59:11
**first**  6:8 7:3 41:15
 46:20 47:15,19
 49:4,13 51:21,22
 64:2,15 67:10,10
 78:16 100:19,19
 100:22 101:3,3,9,9
 103:4 114:19
 122:22 123:21
 134:1
**fit**  43:13

**five**  112:25 129:9
 129:10,18,18
**flew**  16:14,15,15
 48:3
**flexibility**  39:16
 39:20
**flica**  20:5 22:21
 23:3 25:19 129:22
**flies**  34:5
**flight**  2:13 5:11
 11:22 13:9 14:2
 16:7,12 20:3
 22:17 23:14,18
 24:10,16,22 26:13
 26:20,23 27:5,16
 28:1,2,3,3,23,24
 30:7,20 31:4,6,16
 31:19,21,22 32:7
 32:10,16 33:11,16
 33:20,24 34:4,13
 34:18,22 35:2,5,10
 35:13,16,17,25
 37:3,10 38:5,8,23
 39:15 40:4,5,18
 41:14,16,21 42:5
 43:4,5,11 44:14,20
 45:3,14,18 47:3
 54:22 59:24 64:1
 71:7,11 72:7
 75:24 82:6,8,22,23
 85:12,22,23 91:23
 92:2,11,11,15,24
 94:4,20 96:14
 98:11,17,20 99:5
 99:16,17 100:25
 103:15 106:7,9
 107:5 110:4,8
 111:9 115:5,6,13
 116:1,5,8 122:10
 122:19 123:6,17
 123:20 126:16,20

 127:13,15,25
 128:19,25 129:25
**flights**  18:20 92:25
 122:22
**floor**  2:13
**fly**  34:19,23 43:13
 48:2 101:20
 122:20 123:24,25
**flying**  16:13 43:3
 47:19 126:17
**fmla**  20:24 21:1
 24:23,24,25 25:6
 25:10 30:22 31:5
 44:15,21 47:5,9
 64:19 65:25 79:14
 95:1,5 96:16 97:8
 97:14 98:13 106:7
 106:10 107:10,20
 107:23
**follow**  19:17 46:18
 47:10 110:25
 115:1 119:24
 120:7 130:9
**followed**  122:16
**following**  27:16
 110:21 117:18
**follows**  6:9
**force**  42:6
**foregoing**  138:8
 140:12 143:5
**forget**  66:8
**forgetting**  61:6
**forgot**  51:13
**form**  44:20 86:18
 94:7,24 97:3
 102:14 105:22
 106:2,18,23
 107:16 110:19
 121:20 122:13
 123:10 124:14,19
 125:3 126:8,13

 134:4,9,14,20
 135:1 140:12
**forward**  121:10
**four**  65:13
**frame**  15:11 48:21
**frames**  100:4
**frequently**  9:5
**friendly**  123:5,12
**friends**  47:24
**front**  70:12 86:13
 89:22
**frontier**  1:7 4:14
 5:3 11:7,8,11,17
 11:21 14:3 41:10
 48:17 52:18 53:3
 54:2 56:6,9,14,17
 56:21,22 65:2
 76:14 80:25 81:24
 82:6,7 83:15
 85:23 89:3 90:4
 101:22 102:1,2,7
 103:17 104:7,18
 104:19,24 105:1
 106:9,11,21
 107:11,19,25
 109:17,18 117:22
 118:5 124:7
 126:11,22 127:11
 128:15,16 133:4,6
 134:3 141:4 142:1
 143:1
**frontier's**  5:4
 102:19
**frontierairlines**
 21:14 70:23 75:2
 85:15
**froze**  17:13
**frozen**  17:8 49:7
 76:21 125:19
**fruition**  53:10

**ftp** 21:12
**full** 6:15 8:13 11:8 16:15 32:12 35:10 35:15,16 82:24 92:11 93:19,20 103:7
**fully** 56:15
**furlough** 42:6
**further** 5:19 27:14 27:21 30:10 78:13 110:22 140:10,14
**fyi** 61:24

**g**

**g** 4:1
**game** 28:10 29:11 34:14 35:3,6
**general** 72:5
**generally** 19:23 20:2 22:4 71:5 90:20
**getting** 108:12
**give** 7:23 8:1,13 56:19 95:18 104:16 112:25 115:6,13 116:3,10
**given** 18:19 20:15 24:1 32:24 40:17 55:3 67:19 68:5 96:23 110:18 111:24 143:9
**gives** 90:22
**giving** 59:17 68:14 109:25 134:3
**gladly** 66:9
**glendale** 2:4
**go** 4:10 17:8,17 25:12 26:15 27:14 27:20 28:14 31:9 31:22 33:6,13 35:5 36:15 39:1,9 40:13 44:23 46:7

46:9 53:18 61:3 68:1 73:10 82:16 84:19 87:13 88:3 91:15 97:22 99:8 103:5 126:3 137:6
**goes** 85:15 103:1 126:25 127:1
**going** 4:3 7:12 12:11 21:17 22:7 22:9 23:4 24:5 32:19 33:13 40:13 42:17 45:23,25 46:10,13 50:17,20 51:22 57:2,3,8 60:8 61:21 62:4,7 62:25 68:1 70:4,7 70:7,24 74:22,23 78:16 81:9 84:11 84:15,25 85:3 90:17 95:6,15,16 96:5,14 100:10 114:9 122:12,24 122:25 123:19 136:14,17 138:5
**good** 4:2 6:12,14 9:19 44:6 50:3 134:25
**goodwill** 127:10 128:14
**gosh** 61:6 66:7
**gotcha** 33:2 34:12 38:6,13
**gotten** 122:17
**govern** 42:5
**governs** 42:12
**graduated** 10:21
**grant** 56:6,18,21 58:23 59:6 95:23
**granted** 30:21 31:5 44:24 56:15 96:16 118:5,8

**great** 10:11 85:20 137:10
**green** 61:23
**grievance** 12:7,24 12:24 13:5,10,17 13:18 14:6,7 15:22,24 16:10 53:9 56:20 63:20 63:25 74:13 75:14 75:24 76:9,13,16 77:3,4,20,25 78:5 78:16 82:4,8,13 84:6 86:18 87:2,5 87:9,10,21 88:1,9 88:23 89:2,4,6,21 90:1,3,5,9,19,22 90:23 91:12,15,17 91:18 109:21 110:4,6,10 118:24 121:1 133:8 134:1 134:5 135:12
**grievances** 78:3 132:19
**grievant's** 86:21
**grimes** 2:3 5:8,8 6:4 8:5
**guess** 103:10,14 123:3
**guide** 125:21

**h**

**h** 142:3
**half** 34:19 35:6,18 66:9 108:24
**halverson** 15:16 75:9,14,22 79:22
**halverson's** 15:20
**hand** 60:12 72:16
**handbook** 97:5
**handle** 136:24
**happen** 20:10 38:11 39:6 111:21

**happened** 32:18 38:22 69:7 127:2 127:21,22 128:7
**happens** 25:25 38:1,4 42:20
**hardship** 68:7
**headed** 40:2
**hearing** 82:4,13 134:5 135:12
**hearings** 16:10
**held** 4:16 11:20 136:23
**help** 16:9 21:19 64:1 93:15 124:17
**helped** 16:8
**helping** 59:18 104:7
**hereto** 143:7
**hi** 59:16
**high** 11:16
**highlighted** 31:13 82:2
**highlighting** 21:18 21:19 30:15,18 38:3 61:16,20,24 62:1 82:3
**hire** 41:23
**hired** 41:13
**history** 78:15 125:20
**hit** 64:13
**hold** 27:1 28:11,25 29:7,14 30:7 31:20 32:8,11 34:11 35:3 46:2 51:14 54:25 55:5 61:5 62:7 67:8 89:13 131:12
**holder** 23:17,22 29:7,15 40:16

**holding** 24:10
29:12 112:24
**holds** 32:11
**honestly** 32:22
36:6 47:16 90:6
111:22
**hour** 40:15,18
84:15 101:18
106:8 108:24,24
113:24 116:2
129:9,10 138:9
**hours** 16:16,17
24:13 25:1 26:21
26:22 27:1,2,17
28:6,25 30:8
32:12,18,20,23,25
33:4,5,22 34:5,20
34:20,23 35:6,11
35:16,18 36:11
37:4,11 38:24
39:7,10,12 47:4
55:1,5 58:1 69:22
92:12,21 93:13,14
111:6,10,18,23
112:4,9 113:1,7,11
113:20 114:14,16
115:17,20 116:11
129:1,4,18,18
131:11 138:10
**hr** 47:3 62:23
**huh** 7:24,24 81:21
**hurt** 131:4
**hypothetical**
111:13

**i**

**idea** 58:25 123:18
**ideas** 58:1
**ifm** 79:11,14 97:12
107:10
**ifml** 97:11

**ifmla** 97:11,14
**illness** 24:11
**impartially** 83:20
**important** 7:22
**inaccurate** 9:16
**included** 97:17
**including** 26:8
31:18 41:14 71:21
**inconsistency**
74:21
**inconsistent** 52:8
63:9
**incorporated**
52:19
**incorrect** 36:5
63:9 74:15
**incorrectly** 74:16
**incur** 73:7
**incurred** 74:3
83:21
**index** 3:9
**indicate** 5:25
87:25 88:8
**individual** 103:15
**inflight** 33:23 68:6
**information** 32:1
48:7,13 108:12
**initial** 59:16 88:9
**initially** 39:1
92:16 101:11
**initials** 92:6
**injured** 127:13,15
127:25 130:13
**injury** 24:12 128:9
**inpatient** 53:4
**instance** 17:1,3
28:11 65:7,9,9
77:21 78:6 106:20
132:5 134:23
**instructs** 8:10

**intend** 54:16,20,23
54:24 55:3
**intended** 59:6
83:18
**intention** 55:8,11
58:22 69:14,18,21
69:25
**interest** 124:22
**interested** 4:23
140:16
**interesting** 12:2
**interfere** 4:8
**interference** 4:6
**intermittent** 21:1
24:23 25:6 31:5
47:5,9 79:14
93:25 94:21,25
95:4,5 97:9,14
98:9,13 106:7,10
107:10,20,23
**international** 15:3
86:7
**interpretation**
105:19
**investigation** 83:9
**investigatory** 3:22
63:16 79:8
**involved** 48:20
90:22 104:1
**ipad** 84:12
**ish** 12:1
**issue** 66:19 119:3
**issues** 93:16
**it'd** 41:22

**j**

**jacalyn** 2:16 5:4
**jerry** 62:24 75:10
81:24 88:14
**job** 1:25 15:4 16:4
45:7,8 56:19
71:15 102:21

118:9 119:2
127:13 130:14
**john** 2:2,3,5 5:6
6:4 50:11,18
70:17,19
**josh** 108:8
**joshua** 2:12 5:10
6:6 141:1
**jsouk** 2:15 141:2
**judge** 8:7
**july** 71:22
**jump** 24:5 108:25
**jumped** 41:3

**k**

**keep** 61:6 114:17
122:12,25 123:9
**kind** 7:14 18:24
19:11 24:2 29:11
29:13 32:5 63:25
67:14 68:18 86:14
89:20
**king** 42:15
**kitson** 2:7 3:11 5:2
5:2 6:3,11 13:4
17:10,13,16,21,22
21:7,21 22:8,11
38:19 46:9,15
49:8,12,13 50:15
50:20 51:2 57:12
57:16 60:17,21
70:6,16,21,25 79:1
79:5 80:15,19
81:14,19,21,22
84:14 85:5,16,20
85:21 89:9,12
93:22 94:7,9,24
97:3 102:14,19
103:22 105:4,9,22
106:2,6,18,23
107:1,13,16
108:11,16 110:19

110:25 111:3
120:2 121:20
122:13 123:10
124:14,19 125:3
126:8,13 130:8,11
131:18,21 133:10
133:19 134:4,9,14

134:20 135:1
136:3,8,10,14
137:5,12,13,16,19
**know** 8:16,20,24
8:25 9:6,7 10:7
16:15 17:6,25
19:24 21:8 23:24
25:7,9 28:10 29:6
32:2 37:16,22
46:1 50:14 51:3
51:15,19 61:4
62:14,22 63:5,7
67:7,8 68:3,8
70:11 72:8 74:21
77:20 78:4 82:17
84:14 90:15 91:11
91:14 92:5,6 95:7
96:19 97:4 98:16
101:22 105:13,18
105:20 106:4,21
107:18,20,24
108:15 111:22
118:21,24 120:16
122:6 123:15
126:10,10,19,20
126:24 127:2,12
127:15 128:17,18
129:20 131:2
134:15,19,21,22
135:22 136:11,12
137:8
**knowledge** 18:14
19:14 20:16 25:5

59:20 62:15 74:17
132:24,25 133:2,3
**knows** 91:1,2,6
**kori** 15:16,20 75:9
75:14 79:22

**l**

**l** 2:7 36:21
**labor** 5:5
**lace** 86:14
**lack** 13:20 30:4
64:18 65:25
**late** 65:8 83:16
**laurel** 3:6 4:20
50:21 140:4,20
**law** 7:10
**law.com** 2:5,6
**lawsuit** 49:23
109:17 110:14
**lawyers** 110:20
**layover** 55:18
**layovers** 55:19
**leading** 124:5,7
**leave** 20:20,22,23
20:23,24 31:1
42:21,24,25 43:12
44:11,16,21,24
45:3,5,7,13,19
93:23,25,25 94:5
94:21 95:5 98:6,9
98:13 102:21,24
103:8,20 105:1
106:7,11 107:10
107:20
**leaves** 30:21 42:8
96:16,20 97:6
**led** 79:25
**left** 20:13,21 31:19
32:3,4,18 33:1
60:12 84:17

**legal** 90:22 141:23
**letter** 3:15,17,18
3:19,23 19:21
64:15 75:9 76:3
78:8,23 79:5,17,25
80:4,8,19 81:11,22
85:22 86:10,11,18

87:14,18 88:4,4,13
88:16 98:5
**letter's** 86:2
**letterhead** 85:12
**letters** 71:16,21
**letting** 72:7 131:3
**level** 11:16 65:3,18
74:6 83:23 90:20
122:2
**lieu** 5:20
**light** 68:12 97:22
125:15 126:3,16
126:21 127:16,18
127:18 128:12
130:12
**limit** 101:18 121:2
**limitations** 40:6
**line** 23:6,9,15,17
23:18,22 24:10
27:1 29:7,15
31:20,21,22 32:8
40:16 43:3 57:13
82:25 92:17,19
101:14 111:18
112:1,3,6 121:8
122:7 129:1 142:4
142:7,10,13,16,19
**liner** 64:16
**lines** 24:1 53:25
92:8
**link** 7:16 9:2
**list** 11:25 41:11,11
41:13,20,21

**listed** 63:3 96:20
97:4,7,10,11
129:22
**litigation** 8:8
**little** 7:12 10:12,18
27:14,20 30:10
35:6 46:5 48:10

64:15 100:9,10,11
110:25 111:5
118:3
**littler** 2:8
**littler.com** 2:10,11
**live** 58:1
**lived** 10:16,18
**living** 7:14
**llc** 2:3
**lm** 60:15,15
**loa** 30:22 71:16
96:16
**local** 14:7
**located** 4:17
**long** 36:10 39:10
48:8 93:1 108:18
108:21 116:5
129:7,12
**longer** 12:19
**longevity** 45:15
**look** 21:4 30:10
48:18 74:23 78:15
86:17 88:11 99:10
103:21 107:11
**looked** 46:21
87:16,19 88:17,24
96:13 104:22
108:8
**looking** 21:20 22:9
22:11 23:6 24:7
25:13 36:21,24
41:6 44:10 50:13
61:7 62:8 67:2

| 48:4 53:8 56:9 | **leftover** 55:19 | | 77:1 80:2 86:15 |

**90**:9 125:11 126:5
135:14
**looks**   26:3 46:22
64:4 65:1,19 69:3
69:5,8 71:6,20
72:15 74:4 83:4,7
86:6 90:2
**lost**   76:22,25 90:1
91:10
**lot**   32:1 68:3
**low**   33:16,20,21,23
34:13,15,19,23
35:5,12,13,17,18
36:4
**lower**   36:5
**luke**   108:15,19
109:6

**m**

**m**   100:18
**magically**   119:22
120:11,13
**maintain**   58:1
92:12,21 93:13
**making**   8:5 116:17
**managerial**   15:5
**manipulate**   28:22
121:11,22
**manner**   5:24 66:5
83:11
**march**   48:9,14
49:5,15 71:24,25
**marilyn**   128:3,4
**mark**   21:8,9 50:12
51:6 114:24
**marked**   57:4,5
60:8 70:10 74:23
74:25 78:19 80:7
81:10 85:9
**master**   13:2,5
**math**   113:19
114:16,17

**matter**   4:13 5:22
28:10
**maximum**   29:6,8
29:14 44:24
**mean**   15:2 20:22
32:4,9 56:17,25
63:11 68:6 76:8
90:13 93:2 97:6
98:16 99:7 101:4
102:10 118:8
120:14 122:2,14
123:13 124:12,21
135:22
**meaning**   24:23
45:8
**means**   26:20 32:10
65:6 76:10 90:14
98:17 99:8,20
123:19
**meant**   56:22 93:7
**mec**   12:6,23,24,25
15:21 81:23
**med**   30:22 73:24
96:16 98:13
**media**   4:11
**medical**   20:23
42:25 44:11,16,24
45:4,13,19 102:21
102:24 103:8
105:1
**medications**   9:22
9:25
**meet**   44:15 47:15
48:1 108:19
**meeting**   3:21
60:24 61:1 63:2,9
63:12,16,19,22
64:13 65:21 79:8
80:1 82:9 102:5
108:13 121:1
124:6,6,7,11 134:1

**meetings**   62:15
63:13 124:5,7
**member**   12:15,20
124:23
**members**   18:7
**memo**   80:24
**memory**   104:23
**mendelson**   2:8
**mentioned**   75:13
**message**   48:6
**method**   55:20
**microphones**   4:4,7
**mid**   68:4
**middle**   69:6
**mind**   67:15 137:19
137:20
**mine**   61:20 62:2
82:3
**minimum**   32:12
36:21 37:4 117:8
**minute**   48:22
84:16 104:16
**minutes**   44:3
84:18,20 138:10
**misbid**   31:23
32:17 111:23
**misbidding**   31:13
**miscellaneous**
71:17
**missed**   20:10
47:11 98:12
**missing**   50:17
**misspelling**   64:4
**misunderstood**
35:14
**modify**   101:1
**moment**   50:22
77:23 136:7
**momentarily**
76:25

**monday**   66:6
129:19
**month**   16:16
18:20 20:8 23:14
25:21,21,21,25
26:4,8,12,25 27:8
27:11,15,16,21
28:15 29:18 32:13
35:23 36:11 38:2
39:11,16 42:24
68:4 93:13,15
95:10 96:22
101:11 111:24,25
123:1,21
**monthly**   22:17
26:8 34:24
**months**   44:25 45:5
45:8,19 102:20
103:7
**morning**   4:2 6:12
46:19 66:6
**move**   23:4 116:17
**moving**   121:10
**mp4**   137:9,10,16
**multi**   29:25

**n**

**n**   4:1
**nail**   120:9
**name**   4:18 6:1,15
64:5 86:21 109:1
127:24 128:5
**natural**   7:23
**nature**   47:24
**necessary**   143:6
**need**   9:5,6,6,7 35:8
39:24 43:24 46:3
92:20,21 95:10
111:5 122:25
136:18
**needed**   16:9 45:3
100:5 133:25

134:3
**negatively** 83:19
**negotiate** 19:4
93:16 103:25
104:7
**negotiating** 104:14
104:17
**nelson** 86:6
**never** 17:19 28:5

39:20 56:9 68:13
69:14,18,21,25
105:25
**new** 7:13 29:20
46:8
**newly** 41:13
**nicer** 100:10
122:10
**non** 122:22
**nope** 76:23
**normal** 101:22
**notary** 3:7 140:6
140:22 143:13,19
**note** 4:4 94:6,22
95:10 141:10
**noted** 143:7
**notes** 95:1
**notice** 3:1 40:15
40:18,23 47:4
64:19 65:25
**notify** 24:12 25:1
106:8
**november** 3:17,23
48:19 63:3,10
75:5 79:9 80:1,9
81:1,7 86:23 87:3
88:14
**number** 4:15 12:1
14:10 21:13 22:15
30:19 37:2,20
42:3 43:2 44:14

72:21,24 73:3
81:17 82:22 87:5
87:9,22 88:5,19,20
95:18 96:7,8 98:4
102:17
**numbered** 98:2
**nw** 2:13

**o**

**o** 4:1 128:6
**oath** 4:21 5:20 7:6
7:9,10 46:16 85:6
**object** 94:7,24
97:3 102:14
103:12 105:22
106:2,3,18,23
107:13,16 110:19
110:20 121:20
122:13 123:10
124:14,19 125:3
126:8,13 134:4,9
134:14,20 135:1
**objected** 110:17
**objection** 90:18
103:11 106:17
135:17
**objections** 5:24
8:6,6,9
**obtain** 92:17,19
**obvious** 41:25
**obviously** 29:2
**occ** 72:17 73:24
**occasion** 83:16
**occurred** 84:3
128:23
**occurrence** 74:2
**occurrences** 79:10
**october** 3:15 48:19
48:21 64:23 66:13
66:20 73:18,21,22

**odd** 110:16
**offer** 33:23
**offered** 42:8
104:19,24 127:8
127:18
**offhand** 12:6
**officer** 16:25
**officers** 16:25 19:7
**official** 41:12

**oh** 14:4 17:15,21
38:6 46:2 49:10
51:13 61:6 66:7
70:16 76:21,21
94:10 107:8
108:24 109:2
112:5 113:18
123:15 126:14
131:19
**oji** 30:22 96:16
98:13 130:17
**okay** 6:24 7:22
8:13,20,24 9:4,12
9:18,20 10:7,11,19
10:23,25 11:20,24
12:23 13:18,22
14:5,13,17,25 16:3
18:3,15,23 19:9
21:4 22:7,15 23:1
23:4 24:22 25:4
26:3,15 27:20
28:8,14 29:2,10
30:6 31:4,16
33:13 35:21 36:12
37:20 38:14 39:23
40:1,13,25 41:5,24
42:3 43:2,21 44:1
44:4,9,14,23 45:7
45:23 46:4,4 47:2
47:20,23 49:1,12
50:3,6,19,22 51:2

51:20,20,20,21
52:5,10,16,22 53:1
53:16,18,19,21
54:12 55:11 56:5
56:13,17,21 57:2,2
57:8,12,16,23 58:9
58:17,22,25 59:8
59:13,21 60:10,14
60:16,21 61:3,5,8

61:9,10,13,13,14
61:15,15,15,15,18
61:18,18,18,18,18
61:19,22,22,22,22
61:25,25,25 62:3,3
62:6,17,25 63:5
64:2,10 65:23
66:3 67:2 70:4
71:3,8 72:9,16
73:6,10 74:5,14,19
74:22 75:17,22
76:5,8,12 77:1,8
77:13,16,23 78:9
78:15,22 79:1,17
80:7,15 81:9
82:16,19,19,20
83:5,8 84:5,10,22
85:8,14,20 86:13
87:5,13,21 88:3,11
88:16 89:8,15
91:6,14,20 92:9
93:8,18,22 94:3,18
95:9,13,21 96:3,3
96:5,12,23 97:13
97:20,25 98:3,8,11
99:3,15 100:1,14
100:17,21 101:8
101:20,25 103:14
104:12,16,16
105:4 106:19
107:4,4,18 108:10

| 44:23 45:12 60:11 | 78:24 79:11 83:21 | 51:5,11,17,17,20 | 108:18 109:3,9,16 |

109:24 111:1,12 112:3,6,13,24 113:9,17 114:1,4,8 114:11 115:16,21 116:7,13,25 117:17 118:11,16 118:20 119:10,12 119:19 120:1,4 122:5 123:3 124:2 124:2,21,25 125:5 125:9,13 126:5,24 127:12,12,20,23 128:16,19 129:6 129:11,25 130:19 131:2 132:18,22 133:4,10,13 134:24 135:4,11 135:14,25 136:2 136:22 138:2

**once** 8:8 23:21 28:24 30:6 31:1 48:4 112:18

**open** 20:21 26:8 28:15,19,20,21,24 29:12,19,20 32:5 32:19 36:21 43:18 58:3,15,18 67:4,9 70:2 99:5,6,8,12 99:14 100:19,24

101:2,6,17 116:20 117:2,7 120:16,17 122:8 129:7,8,10 129:23 132:23

**opens** 27:22
**operation** 83:14
**opportunity** 9:13 92:7
**opposed** 94:21
**opt** 99:17
**options** 136:12

**order** 16:22 18:3 20:5 34:9 71:22 94:5,22 95:9 136:8,11,16,19 137:25
**ordering** 137:22
**orderly** 83:14
**organization** 83:12
**original** 70:8 88:1 98:15,21 99:18 100:4
**originally** 10:14 59:9 122:7,11
**orlando** 15:10
**ought** 105:14
**outcome** 4:23
**outside** 48:1 50:6
**overnight** 30:4 57:24 58:10 98:19 122:22
**overnights** 30:1 58:2 59:1 118:10 119:9,14,15,21 120:12,19 121:19 121:23
**oversaw** 16:6

## p

**p** 4:1 34:18
**p.c.** 2:8
**p.m.** 138:6,9
**page** 3:10,12 22:9 22:10 23:4,5 24:6 24:6 25:12,13 30:11 31:9,10 33:13 34:15,17,17 36:20,21 39:24 40:2,3,14,14 41:2 41:5,6 42:3,17,18

61:17 66:3 71:14 73:10 82:18 87:14 95:18 96:6,7,10 98:2,4 100:15 102:15,17,18 142:4,7,10,13,16 142:19
**pages** 33:13,15 41:3
**paid** 102:24 128:16
**pairing** 99:18
**panic** 66:7
**paper** 89:22 90:10 104:22
**paragraph** 23:6 24:7,10 31:10 45:13 53:1,18,20 55:15 56:5 82:3 82:16 98:6,9 100:18,23
**paralegal** 136:11 136:15
**parameters** 99:22
**parker** 6:19
**part** 15:10 33:22 67:2 68:8 104:14 109:12
**participated** 16:9

60:24
**participating** 5:16
**particular** 19:2 24:23 66:21,22 78:5,6 127:24
**parties** 4:9 5:23 140:15
**party** 4:22
**patience** 111:5
**pay** 103:8,15,19 103:19

**pdf** 22:10 23:5 24:6 25:12 31:9 34:18 36:20 40:2 40:14 41:2,5 42:18 43:23 96:7 136:13 138:1
**penalty** 5:22 52:3
**pending** 9:9
**people** 20:18 68:4 122:8 130:13
**percent** 63:12,14 91:24,25 97:23 126:4 130:16
**perfect** 44:4
**performance** 71:15
**period** 15:6 23:9 24:25 26:4 29:20 29:21 34:24 37:3 37:17,22 40:23 43:6,16 44:24 45:4 73:14 96:21 106:9
**periods** 42:7 129:23
**perjury** 5:22 52:3
**permissible** 64:24
**permitted** 111:9 131:10

**person** 5:21 32:19 64:2
**peter** 2:16 5:4
**phone** 2:5,10,14 49:17
**phones** 4:6
**photocopy** 64:18
**phrase** 13:20
**physically** 5:17
**pick** 4:5 20:21 28:3,4 33:4,5 67:9

| | 42:19 43:23,24 44:7 45:11 51:22 | | 99:6,11,16 114:19 |
| --- | --- | --- | --- |

117:10,13 123:8
129:15
**picked** 99:5
**picking** 67:4 123:7
**picks** 114:5
**pickup** 68:11
**piece** 51:16 87:25
90:9
**pieces** 86:15 89:22
104:22
**piecing** 67:14
68:19
**pile** 64:15
**piller** 15:12 75:18
**place** 4:6,9 21:25
101:23 122:22
134:1
**placed** 20:11
99:17
**placement** 68:14
**plaintiff** 1:5 2:2
5:7,9 52:17
137:11
**plaintiffrecords0...**
51:8
**plaintiffrecords0...**
51:9
**planning** 44:2
**play** 29:13 117:25
**played** 90:6
**playing** 29:11
**please** 4:4,6 5:14
5:25 6:15 80:23
94:12 136:9
**point** 8:16,20,25
9:6 10:7 21:19
65:10 66:9 73:7
74:5 76:12 83:5
84:17 90:5 111:10
114:8,9 126:23
127:6 130:1

**pointed** 103:22
**points** 64:24 65:4
65:9,12,13,14
66:13,20,22 73:2
73:24 74:2,9,15
105:5,10,14
106:20 107:20
121:13 134:6,8
**policy** 64:24,25
65:3 66:14 81:2
**portion** 71:14
82:17 98:12
**portland** 66:6
**position** 11:24
12:4 34:2,4,11,15
34:19,23 62:22,23
82:23 83:6 99:21
134:25
**positions** 11:20
33:24 35:18
**possession** 21:11
**possible** 55:18
**post** 28:2
**posted** 26:8 27:12
**potential** 69:11
**potentially** 20:13
**pre** 23:11,24 26:4
26:9 67:6
**predict** 100:11
**pref** 22:25 23:3
25:19
**preference** 22:18
42:7
**preferences** 95:23
**preferentially**
131:15
**prejudice** 75:25
76:9 90:11 91:12
**preparation**
109:12

**prepare** 108:3,6
108:14,19
**present** 2:16 5:18
82:9
**president** 5:5 12:8
12:9,16 13:13,19
13:22 14:13,19,22
14:24 15:1,11,13
15:21 16:4,6,8,19
17:6,24,25 18:18
22:3 52:23 75:15
75:18,18 81:24
86:7
**presidents** 14:14
**presumably**
101:21
**pretty** 7:23 9:5
41:25 42:12 47:25
78:17 129:25
**previous** 35:15
140:7
**previously** 40:17
40:19 108:9
**prince** 1:10 3:3,20
4:12 5:12 6:7,12
6:17 21:17 46:15
50:25 51:3 60:21
69:10 70:25 85:5
85:21 89:19 91:2
91:9 108:3 110:23
111:4 130:6
131:21 133:18
136:1 138:5 141:5
142:2,24 143:2,4
143:12
**prior** 8:17 24:13
25:1 40:15 108:11
108:16 121:12
**private** 4:5
**privilege** 90:21

**probably** 16:15,16
47:22 48:16 64:6
64:17 91:9 122:17
**problem** 126:7
**problems** 10:8
**procedure** 3:2
122:17
**procedures** 47:10
**proceeding** 109:22
**proceedings** 5:15
**proceeds** 26:1
**process** 13:10 20:2
26:1,1 28:6 29:3
30:7 35:24 36:2
54:25 55:6 56:20
63:20,25 69:19,23
72:8 76:16 77:4
87:11 89:21,24
92:12,13,21 95:7
104:2 111:9,10
114:10 122:9
135:23
**produce** 94:5
**professional** 3:6
140:5,21
**program** 11:10
20:4 127:9 130:17
130:17
**prohibit** 131:22
**prohibited** 132:4
132:13 133:4,6
**promise** 41:1
**promote** 13:23
**proper** 105:10
**proposed** 54:12
55:20 125:1
**proposing** 120:14
120:17 121:17
122:6,10 124:8
130:20

protected   45:7
102:21
provide   43:12
47:4 52:2 59:21
provided   37:12
42:4 44:16,20,21
49:22,25 56:2
59:10 64:14
135:23
provision   54:4,5,8
97:18 102:22
123:6
provisions   44:10
59:2 67:20 103:23
public   3:7 140:6
140:22 143:19
pull   50:8 70:7
95:16
pulled   129:6
purposes   25:10
pursuant   3:1
pursue   78:13 84:9
90:23 107:6
pursued   89:4
90:20
pursuing   76:10
84:7 90:14
push   91:17,18
put   20:13 57:25
64:23 89:22 94:13
94:13 121:2,7

**q**

qualify   79:11
question   8:9,22
9:9 17:22 33:16
42:18 55:2 77:24
91:3 94:16 97:25
105:11 123:3
131:8
questioning   8:6

questions   8:14
10:9 35:15 46:19
48:12 84:17,19
89:9,13 93:22
110:17,23 120:2
131:6,19 133:11
quick   33:15 84:12
quickly   78:17
132:18
quite   124:4

**r**

r   2:3 4:1 128:6
142:3,3
r.brigham   21:14
70:23 75:2 85:15
racked   121:13
reached   65:18
read   51:3 52:6
61:3 63:1 82:16
96:14 100:22
141:9 143:5
reads   24:10 31:16
34:18 57:16,23
ready   51:15,19,20
reality   7:13
really   68:12 84:12
89:19 111:4
114:16 120:14
122:12 123:8,11
123:11,18 130:12
134:24
realtime   3:7 140:5
140:21
reason   26:21
32:17 33:11 45:5
65:20 74:8 76:5
83:17 86:13 98:23
134:17,18 141:11
142:6,9,12,15,18
142:21

reasonable   25:8
57:17,24 125:1,10
126:6 130:19,23
reasons   83:16 84:9
90:19 134:19,21
reassigned   97:22
126:21 127:16,25
128:12
reassignment
125:15 126:3
rebecca   1:4 4:13
5:7 19:12 34:7,10
46:6 47:15 49:14
52:18 54:17 58:7
64:7,13 71:7
78:23 79:6 80:9
80:23 82:23 83:3
86:22 87:2 89:3
101:10 104:25
105:16,20 107:20
110:5 141:4 142:1
143:1
rebid   95:1
rebuild   101:17
recall   10:1 12:6
14:9 42:6 47:16
62:21 63:12 66:21
74:10 80:13 84:9
86:12 90:6,9
91:13 92:9 93:12
93:17,18 94:1,19
102:4 104:18,20
105:7,11,15,23
106:6,13,14
107:22 108:2
119:7 124:10
127:20 128:7,9,22
135:8
receipt   141:18
receive   10:25
32:23 76:6,7

86:11 101:14
received   71:21
101:13 122:7
receiving   76:3
80:4 86:12
recess   46:12 85:2
recognize   21:24
71:3 87:18
recollection   16:2
19:13 63:1 64:22
74:14 78:18 81:5
82:12,21 84:6,8
87:1 89:1,23
recommendation
71:16
reconvene   84:20
record   4:3,10 5:1
5:15 6:1,16 8:7
17:9,17 21:13,15
46:9,11,14 64:14
71:12 84:20 85:1
85:4 111:6 136:23
138:3,6,10
recorded   4:11
7:16 61:1
recording   4:9
60:23 69:5
records   3:14 46:22
71:1,6
recovery   57:25
recurrent   43:5,7
red   61:16
reduced   140:11
reduction   42:6
reef   79:21 81:23
87:16
reference   22:15
36:17,25 40:10
46:20 54:8 63:23
64:7

**referenced**  82:8
  141:6
**referencing**  109:1
  109:6
**referred**  23:2
**referring**  22:22
  51:7 68:21 77:21
  77:22 78:11
**refers**  87:10
**reflect**  73:2 83:18
**refresh**  63:1 78:17
  81:5 82:12,20
  84:5 87:1 89:1
**refreshed**  89:23
**refreshes**  104:23
**refused**  56:6,18,21
  56:22
**regard**  55:18
  77:14 131:16
**regarding**  105:24
  106:1 108:13
**regardless**  27:4
**registered**  3:6
  140:4,21
**regular**  16:12 35:2
  35:24 100:2
  128:19 136:18
**reily**  2:2
**reinstate**  56:23
  82:22
**reinstated**  77:10
  77:17 78:2 102:7
  102:8 118:6,21
**related**  47:25
  82:14 88:1 132:19
  140:14
**relates**  88:9
**relations**  5:5
**relationship**  47:24
**release**  43:7,12
  133:21

**released**  68:4
  98:14 133:20
**relook**  36:7 103:2
**remember**  6:25
  15:9,18,19 20:1
  22:24 57:21 62:22
  63:19 65:13 76:3
  80:4,6 94:16
  102:22 125:14
  126:1 127:7,24
  128:11,12 130:21
  131:5
**remembered**
  49:21
**reminded**  7:24
**remote**  4:16 5:14
  7:4
**remotely**  3:4 4:25
  5:19 140:11
**remove**  58:2,25
**removed**  14:1
  30:22 58:11 67:8
  96:17
**renegotiated**
  104:13
**rep**  15:24 59:23
  71:9
**repeat**  55:2 91:8
  94:11,16
**replace**  99:6
**replacing**  114:23
**report**  14:5 15:25
  24:11,13 25:2
  40:15
**reported**  13:19
  15:1,14
**reporter**  3:6,7
  4:19 5:14,16 7:20
  13:1 17:8,18 21:7
  21:9 38:17 49:7
  50:21 70:14

102:13 106:16
  125:6,17 136:7,13
  136:16,22,24
  137:17,22 138:2
  140:5,5,21,21
**reporter's**  140:1
**reporting**  5:19,24
  15:4
**represent**  60:22
  109:16 110:18
**representative**
  76:20 77:5
**representatives**
  14:7 15:14
**represented**  82:7
  109:21
**representing**  5:10
  124:22
**represents**  5:11
**request**  64:18
  65:24 68:9,13,22
  93:17 97:24 107:6
**requested**  55:16
  97:21 107:24
  125:14 126:3
**requesting**  57:17
  57:23 58:7
**requests**  23:11
  40:5 101:1
**required**  18:23
  20:8 23:15 24:25
  38:8 40:16 43:4
  47:4 143:13
**requirement**
  24:17,20 54:21,25
  94:22,25
**requirements**
  36:22 44:15 100:3
  117:8
**requires**  43:5
  94:19

**reserve**  20:14
  31:23 33:6,8,9
  40:17,18,22 99:21
  100:2 117:12
**reserves**  24:1
  129:24
**resources**  135:23
**respect**  47:12
  76:13 78:16 83:3
  132:23 133:2
**responded**  89:3
**responding**  59:16
  59:17
**responses**  7:23 8:2
**responsibility**
  38:5 39:3 92:4
**responsible**  38:24
  68:14
**rest**  18:7 40:6
**restroom**  9:6
**result**  140:16
**resulting**  83:23
**retain**  45:14,15
**retention**  42:5
**return**  43:3
  128:19 141:13,17
**returned**  53:11
  98:14,21
**returning**  42:21
  98:5,9
**returns**  43:11
**review**  9:13,15
  106:10,11,21
  107:6,12,25
  109:11 137:20
  141:7
**reviewing**  51:10
**rid**  112:13 114:15
  117:10
**right**  7:4 11:11
  12:6 17:4,16 19:5

19:19,21 23:22
24:5 25:12 26:5
27:2,6 28:6 29:16
32:1,21 33:6 34:2
35:25 37:8,18,25
38:2,10 39:4,21,24
40:11,13,23 42:13
42:17 43:13,21
44:7 45:5,8,9,11
45:23 46:1,4
47:21 49:15 50:18

56:11 63:6 64:8
68:19 69:2,6
72:16 75:15 77:11
83:6 84:13 89:8
95:19 97:9,10
98:2 101:18,21
103:3 109:4,22
110:11 112:4,8,22
113:9 114:10,24
115:10,24,25
116:3,4,14,25
117:19,23 118:1
118:21 119:17,22
120:23 121:3
122:3 124:18,23
129:4 130:9,17
131:18 132:2,9,16
135:12 137:14
**rights**  42:9
**risk**  57:25
**road**  91:16
**rock**  6:19
**role**  12:13,16 13:8
13:12,15,18 14:2
15:4,5,13,20,23
16:5 22:3 60:1
71:9 77:9
**roles**  12:3
**room**  5:18

**roughly**  12:1,7,11
48:19 49:5
**routinely**  132:19
**rule**  8:7
**rules**  3:2 7:13,14
54:9 55:9 101:22
117:19,20 118:1
119:16,24 132:16
132:20,23

**s**

**s**  2:3 3:6 4:1 140:4
140:20 142:3
**salary**  103:19
**sara**  86:6
**saw**  39:6 54:9
87:15 114:15
**saying**  38:21 43:13
56:1 66:4,23
117:22 118:11,16
123:16
**says**  22:16 23:9,18
25:13 27:21 28:15
29:18 30:20 33:23
37:2,10 40:14
41:10 43:2 44:14
44:24 52:16 63:15
64:3,12 65:23
68:10 72:16 75:22
82:22 83:8 87:5
90:9,10 96:9,12
98:11 99:4,15
100:19,24
**scenario**  32:15
**schedule**  20:9,17
27:16,17 28:8,22
29:13 34:9 40:5
42:1 43:18 58:3
58:14,18 70:1
93:14,24 101:2,17

131:23
**scheduled**  43:7
79:8 82:4
**schedules**  20:19
22:17 68:5 121:23
**scheduling**  24:12
25:1 98:21,24
**school**  11:10,10
**scratch**  20:17
58:14,18 70:1
93:24 118:18

119:6
**screen**  21:16 31:11
45:24 46:1 50:23
51:13 70:24 94:14
**scroll**  51:11,15,17
51:18,23 61:11,12
61:13 98:1
**scrolling**  51:21
52:5 64:10 66:3
**search**  3:14 71:1
**second**  17:13 46:2
49:9 61:5 62:7
76:24 89:14 95:18
125:21
**section**  30:11 79:7
**see**  21:17,21 22:19
23:12,19 24:14
25:15,23 26:10,11
26:17,18 27:23,24
28:17 30:24 31:15
31:24,25 33:18,25
34:1,25 35:17
36:16 37:5,13
39:13 40:8,20
41:18 42:10 43:9
44:17 45:1,16,17
52:20 53:5,14
54:6 55:24 56:7
57:10,18 58:4,5

64:20 66:1,10
67:12 68:16,23
71:9,15,18,19
72:11,18,22,25
73:11,12,16,19,25
75:7,8,11,20 76:1
77:19,22 79:12,19
79:23 80:10,21
81:3,25 82:10,25
83:25 84:1 85:25
86:4,8,19,24 87:7

87:23 88:6,21
95:23,25 96:2,9
98:5,7,8 99:10
100:18 105:1
**seeing**  31:11 39:24
40:3 50:24 57:5
60:11 61:17 70:25
75:3 78:21 80:13
81:11 85:11 88:13
105:15
**seek**  19:11
**seeking**  53:12 54:3
83:2
**seen**  57:20 71:4
80:12 104:21,22
**sees**  116:1,8 117:2
**selections**  20:6
**send**  21:11,12 66:5
70:7 137:23
**sending**  70:9
**senior**  31:19 32:7
32:15,19 34:11
41:24 55:13
122:10 131:12
**seniority**  11:25
20:5,7,12 22:18
24:3 27:4 32:11
34:9 41:7,10,11,12
41:13,20 42:5,12

| | 101:21 102:2 120:15 121:6,11 | 62:9 63:17,25 | 42:15 45:14,20 |
| --- | --- | --- | --- |

54:4,5,8,9 55:17
59:1 67:10 92:16
99:13 101:5,7,14
119:16 123:6,14
123:16
**sense**  39:17,18
114:21,22 117:15
123:22
**sensitive**  4:4
**sent**  48:6 49:18
64:17 105:2 108:8
109:15 141:14
**sentence**  53:24
99:4
**separate**  129:15
**september** 73:15
140:18 141:3
**series**  71:20 72:9
73:11
**serve**  80:24
**served**  67:10
100:19 101:3,9
**serves**  125:20
**set**  121:3
**setting**  46:4
**share**  21:16 46:3
50:23 70:24 95:19
**sharing**  45:24
51:13 57:2 59:8
70:4 74:22
**she'd**  119:1
**sheet**  141:11
**shelly**  64:16
**shifts**  55:17,19,22
**short**  104:25 105:5
108:12
**shorthand**  140:11
**shot**  113:18
**show**  30:17 57:3
60:8 77:23 78:17
81:9 85:9

**showing**  74:25
78:19 80:7
**shows**  38:2 129:23
**sic**  108:15,19
132:7
**sick**  9:20 33:10
40:16,23 64:16,23
65:8,9,24 79:11
102:25 103:4,20
134:10,13,16
**side**  11:9 109:25
110:1,3,5
**sign**  137:20 141:12
**signature**  51:24
136:22,25 137:18
140:20
**signed**  141:20
**signing**  41:12
**single**  27:5 93:4
134:22
**sitting**  74:14
113:17 116:21
125:10 126:5
135:4,7
**situation**  77:16,25
**six**  129:4
**skip**  20:16 34:15
43:22 69:19
**skipped**  100:14
**slightly**  63:4
121:17
**slowest**  136:20
137:25
**sole**  17:25
**solely**  16:21
**solution**  125:1,10
126:7 130:20,23
**solutions**  104:19
104:24 141:23
**somebody**  97:13
98:22,25 102:20

135:15
**sorry**  8:24 12:24
13:1,2 17:15
34:16,20 35:8
38:18,19 41:3
44:1 49:10 50:10
50:15 53:20 61:7
70:15,18 73:21
91:9 95:20 96:4,6
98:1 102:13
106:16 107:4
109:2,7 113:19
116:14 125:6,22
126:14 128:4
130:8 131:19,20
131:20,20 136:15
**sort**  89:22 91:14
99:23 111:25
120:9 127:10
136:20
**souk**  2:12 5:10,10
6:6,6 8:10 57:15
60:20 70:11 79:4
80:18 81:16 84:19
84:23 85:19 89:13
90:17 91:5 103:11
106:3 107:3 108:8
108:25 109:1,2,3,6
109:11 110:17
125:19 135:17,21
137:19,21,24
141:1
**sound**  47:21
**sounds**  68:18
**south**  2:4
**spanish**  11:1
**speak**  49:17
108:10
**speaking**  64:2
67:3 68:2

**specific**  34:2,3
57:21 63:13 66:21
93:17 100:3,7
127:24
**specifically**  76:4
79:10 80:5,6,13
90:7 95:8 97:11
101:6 105:2,23,24
107:22 108:1
128:8,24
**specifics**  102:4
103:2 111:22
124:10
**specify**  94:4
**speculation**
103:12 135:18
**speculative**  103:11
**spend**  16:11
**spits**  111:17
**split**  16:14 29:19
29:19,20,23,24
30:6
**splits**  28:16
**spoke**  48:5,15
49:14 59:9
**spoken**  49:1 59:10
**staff**  90:21
**stamp**  22:10 23:5
41:6 45:12 51:7
57:8 60:15 70:22
75:1
**stamped** 42:19
43:24 85:14
**stance**  67:7
**stand**  12:25
**standard**  136:10
**start**  10:8 12:4
38:20 53:24 89:20
118:17 119:6
135:6

**started** 11:11 12:5
12:6 47:19 127:3
**starting** 13:4
73:14 136:8
**state** 3:8 4:25 6:15
10:21 140:6
**statement** 5:14
49:22 50:3,7 52:2
52:8 59:10,17,22
62:8 64:12

**states** 1:1 4:14
10:17 79:6 80:23
82:2 86:21
**stating** 5:25
**status** 99:17,19
**stay** 93:19,20
**stefanie** 62:11,13
62:14,17 64:11
79:18 80:20
**stefanie's** 62:8
**step** 63:24 65:12
65:15 72:8
**stop** 45:23 46:3
57:2 59:8 70:4
74:22
**stopped** 84:7
117:18
**stopping** 92:24
**street** 2:9,13
**strike** 73:22 82:21
132:11 133:5
**struck** 63:8
**stuff** 10:13 39:6
**stv** 1:2
**subject** 19:14
24:16,19 101:22
**submit** 20:5 101:1
**submitted** 43:8,16
94:23

**subsequent** 21:10
**substance** 52:10
**substitute** 11:9
**succeed** 96:1
**suffered** 53:2
**suggested** 124:15
**suggesting** 67:18
67:22
**suggestions** 105:3
**suite** 2:4,9

**sum** 52:10
**summary** 50:4
**supervisor** 62:18
**supposed** 77:13
**sure** 18:16 26:22
32:22 76:7 78:10
91:24,25 95:16
96:14 97:23 104:5
112:4,5 118:21
120:18 121:25
126:4 127:1
130:16 135:5
137:5
**swap** 28:15 29:11
29:12 35:3 36:4
39:2 56:3 92:20
92:20 101:2,16
116:3 117:6
122:25 123:19
129:2,10
**swapped** 55:21
122:8
**swapping** 28:20
28:24 34:14 37:16
92:25 129:8 132:6
132:15
**sworn** 6:8 140:8
143:14
**sync** 137:13

**system** 22:16,16
22:21,25 31:20
33:3 37:23 43:17
85:23 90:20 95:23
100:25 101:1
111:17 112:19
123:13
**systems** 41:10

**t**

**t** 128:6 142:3,3
**table** 25:13,17
**take** 4:9 7:10 9:4,5
9:8,9 21:4 24:24
24:24 44:2,5 45:5
66:4,9 84:16
110:3 113:14
114:5 116:2
120:17 122:6
137:17
**taken** 3:4 4:12
7:19 9:13 119:21
140:11
**talk** 7:12 46:5
48:11 49:20
**talked** 46:19 52:7
130:19 131:2
**talking** 37:7,15,21
40:11 43:22 68:25
69:11 92:10 95:17
114:11
**talks** 25:20 26:16
33:16 42:20
**tardiness** 83:18
**tardy** 65:10
**teacher** 11:9
**technical** 9:1
**tell** 10:19 11:4,16
12:3 19:23 20:1

**telling** 106:6
**temporarily** 97:22
128:12
**temporary** 125:15
126:3 130:12
**ten** 79:10 129:4
**term** 30:5
**terminated** 48:16
53:9 64:25 80:25
81:6

**termination** 65:3
65:16,18 74:6
76:13 78:7 82:14
83:23,24 121:3,8
121:13 122:2
134:3
**terms** 17:2 19:15
19:18 22:10 26:1
39:19 40:11 67:16
93:14 116:19
123:6
**terrible** 113:19
**testified** 6:9 111:8
**testify** 10:4 140:8
**testimony** 5:22
109:25 118:7
130:21 141:9,18
143:8
**thank** 9:11,19
10:10 44:1,6
50:19,19 85:19
89:10,11 109:10
110:23,24 120:3
130:6 133:13,16
135:25 136:5,6
138:2
**thanking** 59:18
**thanks** 6:14 8:12
57:14 81:20 84:24

| | | | |
|---|---|---|---|
| **subscribed** 143:14 | **synch** 137:9 | 27:25 61:11,11 102:3 | 90:24 |

**theis**  2:8
**theory**  101:19
  114:20 123:23
  129:5
**thing**  36:3 105:15
**things**  16:25 23:2
  24:2 28:9,9 78:4
  114:12 125:11
  132:1
**think**  9:23 12:1
  15:8 22:23 32:25
  35:10,12 36:6,6,9
  36:13 38:2,15,25
  39:23 41:3 43:21
  50:21 59:13 62:4
  70:8 76:21 84:15
  96:13 104:4
  109:14 110:16
  118:22,22 120:9
  121:21 123:11
  124:4 125:9,20
  126:4 127:23
  132:25 133:10,13
  135:14 136:10
  137:1
**thought**  35:23
  105:13,21 124:12
  124:25
**three**  14:12 15:9
  40:18 49:3 53:25
  59:15
**threshold**  32:13
  112:1 113:24
**time**  5:13 11:8
  13:1 14:9 15:6,8
  15:10,11,14,19
  16:1,3,11,13,15,18
  17:24 18:17 20:18
  20:21 22:5 24:13
  24:25 25:2,8,14
  28:15,19,20,24

29:10,12,19,20
  32:5,12,19 33:16
  33:20,21,22,23
  34:7,10,13,15,19
  34:23 35:5,10,13
  35:15,16,17,18
  36:21 37:10 39:6
  40:15 43:18 45:4
  45:18,20 48:5,15
  48:21 49:4,13
  52:23 58:3,15,18
  65:2 66:17 67:4,9
  70:2 73:14 92:11
  93:1,15,19,21
  94:21 95:8 96:21
  99:5,6,8,12,18
  100:2,4,19,24
  101:2,6,17 102:25
  103:1,4,9,20 104:6
  107:19,23 110:10
  112:2 116:20
  117:3,7 120:16,16
  120:17 122:9
  124:13,23 126:12
  126:15,21 129:7,8
  129:10 132:23
  134:15 135:2
  136:4 138:9
  141:19
**timeframe**  141:8
**timeline**  39:14
**timelines**  25:18
**timely**  64:19 65:25
  66:5 83:11
**times**  6:24 49:1,3
  68:3 83:14 129:4
  134:11,13
**today**  5:4 6:13 7:7
  7:14,16,23 8:1,5
  8:14,25 9:14,18
  10:5 11:18 74:15

74:17 89:10
  104:21,23 108:19
  109:24 110:17
  111:5 125:10
  126:5,25 135:5,7
**today's**  108:4,11
  108:16
**told**  50:4,7 52:11
  52:13
**top**  62:25 85:12
**topic**  46:8
**total**  73:24 138:9
**totally**  101:17
**track**  91:10
**tracking**  83:17
**trade**  28:2,9 29:11
  29:12,24 35:3
  36:4 39:2,9 40:4
  56:3 67:4 92:20
  92:20 93:4 114:8
  114:18 115:5
  118:9 119:1
  120:16 122:19,25
  124:1 129:1,3,8,14
  129:18,19 130:4
  132:15
**tradeboard**  27:22
  27:25 28:1 29:19
  40:11 58:3,15
  99:9
**traded**  55:21
  114:16 122:8
**trades**  40:3
**trading**  28:5,12,20
  34:14 37:16 39:5
  114:12 116:19
**training**  24:2
  41:16 43:4,6,7
**transcript**  9:13
  67:3 80:2 105:16
  140:13 141:6,20

143:5,8
**transcription**
  60:22
**transferees**  41:14
**treat**  83:19
**treated**  131:15
**treatment**  53:4
**tried**  119:13
**trip**  24:13 25:1
  26:22 29:25 30:2
  30:4 40:3,4,17,19
  66:13,20 93:4
  98:12,12,15,19,21
  99:5,6 100:4
  112:25 113:4
  114:9,14,15 116:2
  117:9,13,13 129:7
  129:9,10
**trips**  20:12 23:11
  23:22 27:17 28:2
  28:4,21 29:25
  30:5 31:19,22
  32:3,4,11,24 33:1
  38:16 39:8 57:25
  58:10 93:3 99:16
  112:14 114:4,5
  118:9 121:24
  122:12,17 123:7,8
  123:18 134:16
**true**  18:9,12 65:2
  96:19 109:14
  116:19 125:23
  140:13 143:8
**truth**  140:9
**truthful**  10:4
**truthfully**  10:4
**try**  34:20 46:2
  95:19 115:15
  118:13 122:21
**trying**  33:4,4
  77:10 93:13,15,19

93:19,20 94:15
118:23 121:19
123:8
**tubbs**  3:6 4:20
140:4,20
**turn**  4:6 30:2,3
66:6 98:19
**twice**  48:4 49:3
**two**  12:9 14:12
15:9 24:13 25:1
38:22 40:15 47:4
49:3 59:14,15
72:24 73:3 96:22
106:8 114:11
**tying**  89:2
**type**  15:4,5 18:5
19:6 34:8 91:3
93:14 99:21
**types**  96:20 97:6
**typewritten**
140:12
**typically**  16:24
18:25 71:9 96:21
97:12,19 107:5

**u**

**uh**  7:24,24 64:13
64:14,16,17 66:9
67:6 81:21
**ultimately**  90:8
**unable**  24:11
**unclear**  111:7
**underneath**  31:13
**understand**  7:6,9
7:15,18 8:11,21
18:16 46:16 47:2
58:9,13 66:8
83:15 85:6 109:6
109:16 110:13,20
133:21
**understanding**
19:10 45:10,21,22

46:24 47:7 58:6
65:17 66:12,16
89:25 102:7
107:14 119:11
121:9 130:15
**understood**  96:25
**underwent**  53:4
**undue**  68:7
**union**  11:23 12:3,4
12:14,17,20,21
13:14,19,22 14:5
14:14,19 16:4,11
16:17,19,20,23
18:1,4,18 19:1,3
22:4 52:23 53:12
54:3 55:9,12,16,20
58:17 59:6,23
64:3 66:19,24
71:9 74:8,11
76:20 77:5,17,24
78:12 83:2 84:6
87:2,10 89:2,4,25
90:8 91:11,17,18
91:21,22 92:1
96:25 102:6 105:2
110:3,5,7,9 118:11
119:4 130:20
132:18 133:7
**union's**  58:22 67:7
92:4
**unit**  4:11
**united**  1:1 4:14
**university**  10:22
**unpaid**  102:24
103:1,5
**untitled**  3:16 57:6
57:17
**unusual**  68:13,22
**upper**  60:12
**use**  97:11 101:16
102:25 103:4

**uses**  103:7
**usually**  30:17

**v**

**v**  141:4 142:1
143:1
**vacancies**  42:7
**vacation**  24:2 42:7
103:1,4
**value**  65:10
**varies**  111:24,24
**various**  86:15
103:23 109:18
**verbal**  7:23 8:1
71:25
**verbally**  5:21
**verify**  141:9
**veritext**  4:19,20
141:14,23
**veritext.com**
141:15
**version**  136:20
**versus**  4:13 16:12
**vice**  5:4 12:8,9,16
14:13,14,22 15:13
15:21 16:3,6,18
17:25 18:18 22:3
52:23 75:14,18
**video**  1:10 3:2 4:8
4:11,17 137:4,7
**videoconferenced**
1:10 2:1 3:3
**videographer**  2:16
4:2,19 5:13 17:19
46:10,13 84:25
85:3 137:3,6,8,12
137:15 138:4
**videotaped**  138:5
**violate**  54:3,17
67:9,23 69:15
93:7,9 120:22
132:22 133:1

**violated**  58:19
59:1 109:18
**violation**  81:1
119:15 132:6,16
132:20
**virtually**  21:8
**voice**  90:18
**voluntarily**  53:3
**voluntary**  42:8
**vote**  18:6
**vp**  64:3
**vs**  1:6

**w**

**wait**  51:9 73:22
131:19
**waive**  5:24
**walk**  111:12
**want**  8:17 10:12
12:7 18:15,19
28:9,9 29:14 30:2
30:3 44:5 46:5
53:18,24 69:10
99:10 104:5
111:12 119:8
121:23 123:18,24
123:25 129:1,14
129:15,19 136:17
136:21,24,25
137:1,4,5,7,9,18
**wanted**  14:1 17:1
20:9 39:9 46:18
58:10,14 93:15
114:15 117:10
118:5,9 119:5,8
**wanting**  18:12
**wants**  99:16
112:13,25 113:11
113:21 115:5,6,12
115:20 116:6,8,25
123:8,20 137:17

**[warfield - zoom]**

**warfield**  68:10
**warning**  65:14
71:21,23,23,24,24
71:25 72:7
**warnings**  72:5
**washington**  2:14
**water**  43:24
**way**  32:12 51:11
51:14 65:1,19
66:15 67:18,22
72:15 74:4 80:3
82:3 83:4,7 92:9
93:10 102:2
103:21 108:4
121:6 122:11
124:4
**ways**  109:18
**we've**  40:10 49:9
68:2 84:15 86:14
**wednesday**  129:20

**week**  16:17 96:22
**weeks**  96:22
**went**  17:19 76:16
77:3 121:1 135:23
**whispering**  4:5
**whoa**  38:17,17,17
**willing**  116:2
**withdrawal**  78:5
88:16
**withdrawn**  90:10
**withdraws**  75:24
76:9 77:25
**withdrew**  77:20
84:7 89:5 90:2,8

91:11
**witness**  5:21 30:17
141:8,10,12,19
**woke**  66:7
**word**  33:21 133:19

**words**  7:18,19
55:16 63:6 91:16
131:25 134:2
**work**  11:9,22
24:11 43:3 47:25
48:1 54:4,13
68:19 83:16 95:24
97:2 126:17
130:24 132:16,20
134:10
**worked**  11:6,8
20:2 52:22 62:23
128:18
**working**  53:9
121:12 122:1
127:10,11
**workplace**  53:11
**works**  21:8 84:20
84:23 92:22
123:12,13

**workstations**
83:13
**worth**  27:17
112:25
**wow**  11:14 12:2
**wrist**  128:10
**write**  102:16
**written**  3:1 49:22
50:3 65:14 71:24
71:24 97:1 105:16
**wrong**  36:7
**wrote**  95:17 96:6

**y**

**yeah**  11:3,3,3,4,15
14:18 20:4 23:25
30:16 36:16 38:15
38:19 39:5 47:18
48:18 49:8 60:3

90:24 91:5,7 93:6
93:9 94:10 98:17
105:18 108:23
109:3,5 119:4
122:24 123:23
125:18 131:25
**year**  10:23 12:5
47:1 48:9,10,14
49:6
**years**  7:1 12:9
19:25 47:17,17
135:10
**yellow**  21:17,19
30:15,18 61:20
62:1
**yep**  11:13 17:12

**z**

**zero**  93:3,3
**zoom**  5:4 7:16 9:1

| 136:3 | 62:10 68:17 69:9 74:18 76:25 80:18 81:20 82:15 90:17 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness;  Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that  the transcript or recording is available in  which:

(A)  to review the transcript or recording;  and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making  them.

(2)  Changes Indicated in the Officer's  Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day  period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES  ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE  INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.